**<u>EXHIBIT E</u>**
**Superior Court of Santa Clara County Case No. 18CH008067 Hearing Transcripts**

1      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SANTA CLARA

3       BEFORE THE HONORABLE CAROL OVERTON, JUDGE

4

5                ---o0o---

6

7  AARON GREENSPAN,          )
                        )
8       Petitioner,    )
                        )
9        v.        )
                        )  Case No. 18-CH008067
10  DIEGO MASMARQUES,        )
                        )
11      Respondent.    )
  _____)
12

13

14                ---o0o---

15

16

17       Reporter's Transcript of Proceedings

18          JUNE 19, 2018

19

20

21

22  A P P E A R A N C E S:

23

24  For the Petitioner:        AARON GREENSPAN
                             IN PRO PER
25
  For the Respondent:        NO APPEARANCE
26

27  REPORTED BY:              DEANNE M. HELGESEN, CSR
                             CERTIFICATE NO. 8445
28

| | |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                            JUNE 19, 2018 |
| 2 | PROCEEDINGS |
| 3 | THE COURT: Line No. 3 is the matter of Aaron |
| 4 | Greenspan and MasMarques. |
| 5 | And your name? |
| 6 | MR. GREENSPAN: Aaron Greenspan. |
| 7 | THE COURT: Good morning. |
| 8 | Give me just a second to access your case here. |
| 9 | Sir, we don't have a proof of service.  Were you |
| 10 | unable to serve the Respondent or did you have a proof of |
| 11 | service today? |
| 12 | MR. GREENSPAN: I have a proof of service. |
| 13 | THE COURT:  Sure.  Let's take a look at it. |
| 14 | The sheriff did not fill out the required |
| 15 | information and so we're going to check our computer systems |
| 16 | to see if we have that. They're supposed to say what date |
| 17 | they served, what time and what location.  And that |
| 18 | information is not filled in. |
| 19 | MR. GREENSPAN: The date and time are actually in the |
| 20 | paragraph below. Massachusetts -- I think it's a little bit |
| 21 | different.  It says on May 19th at 12:49 p.m. |
| 22 | THE COURT:  It does look like the essential |
| 23 | information is in there, as you indicated.  You can see it's |
| 24 | in a different format, but the content is there. |
| 25 | So we'll go ahead and file the proof of service. |
| 26 | And why don't you go ahead, if you would, and raise |
| 27 | your right hand for the oath. |
| 28 | (Mr. Aaron Greenspan is sworn in.) |

1    THE COURT:  I wanted to go over just a couple of

2    preliminary things with you just to make sure.  It's my

3    understanding that you're asking for protection for yourself,

4    as well as your mother, father and brother; is that correct?

5        MR. GREENSPAN: That is correct.

6        THE COURT:  And, specifically, you're asking for a

7    300-yard stay away from you and your family members, your

8    home, your job, your vehicle, and have no contact, direct or

9    indirect, from the Respondent. And you would also -- you're

10   trying to restrain internet speech, which may be overly broad

11   for purposes of these proceedings, because people do have

12   First Amendment privileges.

13       Let me see what we did on the temporary restraining

14   order. You're trying to basically impose what we call a prior

15   restraining on speech.

16       Let me see what we did in issuing the restraining

17   order.

18       I had omitted that section because it was overly

19   broad and inadmissible for purposes of these proceedings.

20   Obviously, if there's any speech that is threatening or

21   otherwise harassing in nature that occurs in the future, you

22   would have a remedy for that.  But at this point, the Court

23   cannot restrain potential future speech in a broad way as

24   requested. I don't see any problem with any of the other

25   provisions.

26       And keep in mind, that there are personal conduct

27   orders which may get at the issues you've been having as

28   well, because if I issue the restraining order, the

1    Respondent would not be able to use social media or the

2    internet as an indirect means of harassing you.

3         Now I need to ask you a couple of other questions.

4    Did you fill out the paperwork in support of your request for

5    restraining order?

6         MR. GREENSPAN: Yes, I did.

7         THE COURT:  Is all of that information true and

8    correct based on your personal knowledge?

9         MR. GREENSPAN: Yes, it is.

10        THE COURT:  In addition to that information, which

11   was fairly detailed in nature, is there anything else that

12   you think is important to add?

13        MR. GREENSPAN: Your Honor, I have evidence here of

14   the kind of speech this individual has been making.  I don't

15   know if you want to see that evidence.

16        THE COURT: You described it in your request, but if

17   you have the actual messages or postings, let's go ahead and

18   hand those to our deputy. Collectively, those will be marked

19   as Exhibit 1.

20        (Whereupon, Petitioner's Exhibit No. 1 was marked

21   for identification.)

22        THE COURT: And I'll admit them and take a look at

23   them. You can just have one compilation. Did you want that to

24   be in two parts?

25        MR. GREENSPAN: No.

26        THE COURT:  Just all one?

27        MR. GREENSPAN: I would also point out that this

28   individual is now harassing others, including government

1  officials, so it's gotten fairly serious.  I've reported it
2  to the FBI, just so you know that.
3       THE COURT:  Thank you for that. And let me just
4  check one thing.
5       One of the things that's prohibited when a person
6  has a restraining order against them is to own or possess any
7  guns or other firearms, but we get limited information from
8  law enforcement because sometimes we find people have
9  firearms that are not captured by the law enforcement
10  database, but the database that we have that's provided, does
11  not show any firearms.
12       Mr. GREENSPAN: Okay.
13       THE COURT:  I don't know if that's a comfort to you
14  or not, but I just wanted to make sure you knew that.  It
15  doesn't mean people don't have firearms, but it can be an
16  indicated when people have firearms that police have located
17  or that have been registered in some fashion.
18       MR. GREENSPAN: It's quite a bit of evidence but --
19       THE COURT:  Well, I'm going to look it over and it
20  seems like the Respondent has had some other court
21  proceedings against him.
22       MR. GREENSPAN:  To my knowledge, he is a convicted
23  murderer and rapist.
24       THE COURT: So it's your understanding that he was
25  convicted; is that right?
26       MR. GREENSPAN:  Yes, he was.  He was convicted in
27  Spain and extradited to the United States to serve the time
28  in a federal prison.

1          THE COURT:  Again, our law enforcement database is

2     not picking up that conviction probably because it happened

3     elsewhere.

4          Do you know anything more about the sentence that he

5     received?

6          MR. GREENSPAN: I believe he was sentenced to

7     something, like, ten years.  I don't know if he served a full

8     ten years, but, again, this was a federal proceeding so I

9     don't know if the California database would cover that.

10          THE COURT:  Yeah. We don't typically get that.  At

11     one point it says he was sentenced to 21 years.

12          MR. GREENSPAN: There were a variety of court --

13          THE COURT:  Where he may be serving a sentence, if

14     he has access to electronics and is, you know, harassing

15     people on the internet, then it's sort of a question as to

16     how, if he's incarcerated, he has access to be able to do

17     that. It's a little bit --

18          MR. GREENSPAN: He's no longer incarcerated. He was

19     let go on maybe parole because one of the people he's out

20     harassing, in addition to myself, is his former probation

21     officer.

22          THE COURT:  Is he on probation or parole or both?

23          MR. GREENSPAN: He's no longer on either --

24          THE COURT: Okay. I was going to say, you know,

25     reporting it to the parole officer or probation officer,

26     obviously, would be --

27          MR. GREENSPAN: I did that and I think he's no longer

28     under their jurisdiction.

1          THE COURT:  I'm looking over the materials.

2          So, obviously, if there's any violation of the

3   restraining order, you're going to be reporting them to law

4   enforcement?

5          MR. GREENSPAN: Correct.

6          He's already violated the TRO repeatedly, and I've

7   reported that repeatedly.

8          THE COURT: How did this person even get connected to

9   you in any manner?

10          MR. GREENSPAN: So my company and non-profit run the

11   website where -- many websites where his case appears on

12   the internet. He is upset that that is the case.

13          THE COURT:  Obviously this is very, very intrusive

14   and scary conduct.

15          MR. GREENSPAN: I would agree.

16          THE COURT: And, you know, unfortunately, too, when

17   people are operating in this fashion at arm's length, it can

18   be difficult for law enforcement to track them down and take

19   action against them, but I imagine you're going to be

20   vigilant in making sure that these matters are documented

21   with law enforcement.

22          MR. GREENSPAN: Yes.

23          THE COURT: Unfortunately, we see too much of this

24   kind of thing here.

25          MR. GREENSPAN: I'm sure you do.

26          It's not always quite so easy to identify the

27   perpetrator in these cases --

28          THE COURT:  In this case you've done so --

1        MR. GREENSPAN: It's pretty straight forward.

2        THE COURT:  The Court is going to issue a five-year

3    restraining order.

4        MR. GREENSPAN: Thank you, Your Honor.

5        THE COURT: Thank you for bringing in these

6    materials.  They're certainly instructive. So we can mark

7    these as Exhibit 1 for the record.

8        (Whereupon, Petitioner's Exhibit No. 1 were marked

9    for identification.)

10       THE COURT: Take a look at the restraining order that

11   I issued.  Make sure you don't have any questions about the

12   duration or the terms.  If you do, let our deputy know, and

13   we can revisit the matter.

14       But this restraining order will not expire until

15   June 19, 2023.

16       MR. GREENSPAN: My only question would be that if

17   this kind of internet speech that's been perpetrated

18   continues, is that going to qualify as a violation of the

19   order because --

20       THE COURT: It certainly could.  And I think that

21   saying that people can't post anything in the future is

22   problematic, but I think that it definitely -- based on what

23   I've seen of the speech that you've showed me in Exhibit 1,

24   it definitely is threatening, intimidating in nature.  And,

25   so, that type of conduct through speech would be something

26   that would run afoul of the personal conduct orders.

27       MR. GREENSPAN: Okay.

28       THE COURT:  Which are fairly broadly crafted.

1          And, of course, you'll take this downstairs to be

2   filed.

3          MR. GREENSPAN: Thank you.

4          THE COURT: The exhibits are released.

5          (Whereupon, the proceeding was concluded.)

```
1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SANTA CLARA    )

3

4              I, DEANNE M. HELGESEN, HEREBY CERTIFY THAT:

5              The foregoing is a full, true, and correct

6    transcript of the testimony given and proceedings had in the

7    above-entitled action taken on the above-entitled date; that

8    it is a full, true, and correct transcript of the evidence

9    offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and acting stenographic

13   reporter of said Court, and thereafter had the same

14   transcribed into typewriting as herein appears.

15             I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted, if applicable.

18             Dated: DECEMBER 2, 2018

19

20

21                                 _____

22                                 Deanne M. Helgesen, C.S.R.
                                   Certificate No. 8445
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                 IN AND FOR THE COUNTY OF SANTA CLARA

3            THE HONORABLE CAROL OVERTON, JUDGE PRESIDING

4                            ---oOo---

5

6    AARON GREENSPAN, et al,              )   No. 18CH008067
                                          )
7                         Plaintiff,      )
                                          )
8               Versus                    )
                                          )
9    DIEGO MASMARQUES,                    )
                                          )
10                        Defendant.      )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

16                   SAN JOSE, CALIFORNIA

17                     AUGUST 14, 2018

18

19

20

21

22

23

24   APPEARANCES:

25   For the Plaintiff:          Katrina Saleen,
                                  Attorney at Law
26
     For the Defendant:          In Pro Per,
27
     Official Court Reporter:    Kathryn A. Keay, CSR
28                               CSR No. 7915

```
 1 │ SAN JOSE, CALIFORNIA                   AUGUST 14, 2018
 2 │                   P R O C E E D I N G S
 3 │         MS. SALEEN:  Your Honor, line item 9.  I am
 4 │ specially appearing for Aaron Greenspan.
 5 │         THE COURT:  Greenspan versus MasMarques.
 6 │         MS. SALEEN:  Yes, Your Honor.
 7 │         THE COURT:  You have not been able to serve;
 8 │ is that right?
 9 │         MS. SALEEN:  No.  This is -- so, you
10 │ granted --
11 │         THE COURT:  Hang on a second.  We need your
12 │ name one more time.
13 │         MS. SALEEN:  Katrina Saleen, specially
14 │ appearing for Mr. Greenspan.
15 │         THE COURT:  Would you please spell your
16 │ first and last name since you are not counsel of
17 │ record.
18 │         MS. SALEEN:  Sure.  Katrina is
19 │ K-a-t-r-i-n-a.  My last name is Saleen, S-a-l-e-e-n.
20 │         THE COURT:  Thank you for that.
21 │         You don't have proof of service in the case;
22 │ is that correct?
23 │         Just tell me, yes or no.  Has the respondent
24 │ been served because we don't show --
25 │         MS. SALEEN:  The respondent was served and
26 │ an order was issued against him.  He filed a
27 │ cross-petition for restraining order.
28 │         THE COURT:  I am a little behind the times
```

1  here.

2       So this is a request and motion to terminate

3  the TRO on cross-request and we have no proof of

4  service.

5       MS. SALEEN:  Yes, Your Honor.

6       THE COURT:  This is your motion to strike.

7       MS. SALEEN:  Yes, Your Honor.

8       THE COURT:  We don't have a proof of

9  service.

10       MS. SALEEN:  There is a proof of service.

11       THE COURT:  If you can furnish that to us,

12  when is the case set for hearing?

13       MS. SALEEN:  I believe September 4th.  It

14  was set for July 24th, and I believe it was continued.

15  And I believe there's a --

16       THE COURT:  Is the cross-request set for

17  hearing on the same day?

18       MS. SALEEN:  Your Honor, the hearing on

19  plaintiff Greenspan's request was heard and granted on

20  July 4th.

21       THE COURT:  You have a three-year

22  restraining order?

23       MS. SALEEN:  Five-year.

24       THE COURT:  Thanks for getting me caught up.

25  Let me make a note of that so I don't go through this

26  next time on petitioner's request.

27       There's a couple of issues here.  Let me

28  tell you what they are.

1          MS. SALEEN:  I gave you the wrong date, Your

2    Honor.  April 4th it was heard and granted,

3    plaintiff's.

4          THE COURT:  That's fine.  This is a

5    five-year restraining order.

6          Did you furnish your proof of service to us?

7          I want to tell you what my inclination is

8    today.  You can see we have an impacted calendar.  We

9    really shouldn't have law and motion matters on this

10   calendar.

11         My concern is, number one, I was not the

12   judge who issued the TRO.  In essence, this is almost

13   like a reconsideration request.

14         Moreover, the hearing on the matter is

15   coming up shortly and it would seem, before any judge

16   can make a determination, the judge would have to hear

17   the evidence in the case.

18         So I am inclined to just have it remain as

19   set for hearing --

20         MS. SALEEN:  Your Honor --

21         THE COURT:  -- because I am going to have to

22   make a determination of the credibility of the

23   witnesses, and I understand it's your position that

24   the request is baseless.

25         MS. SALEEN:  Yes, Your Honor.

26         THE COURT:  But I think that the Court would

27   need to hear the evidence first.

28         When does the TRO expire on the

1    cross-request?

2            THE CLERK:  September 4th.

3            THE COURT:  Did you furnish your proof of

4    service?  We need to see that.

5            What I will do is --

6            MS. SALEEN:  The plaintiff was in pro per up

7    until my special appearance.

8            THE COURT:  Where's your proof of service?

9    I just asked for proof of service.

10           MS. SALEEN:  I flipped to what he submitted

11   as his -- he called it a certain --

12           THE COURT:  You know, generally it is a

13   proof of service that's filed on a standard form.

14           We don't have a proof of service, so matter

15   is going to go off calendar.  And you can tell counsel

16   you are appearing for that he did not have proof of

17   service.

18           MS. SALEEN:  It's pro per.

19           THE COURT:  So if he wants to try and

20   re-calendar the matter, he can, but the statutory

21   notice period is going to probably bring him beyond

22   the date that the hearing is going to take place

23   anyway.

24           MS. SALEEN:  All right, Your Honor.

25           THE COURT:  Are you going to be making a

26   general appearance in this case?

27           MS. SALEEN:  I personally am not.

28           THE COURT:  It's unclear whether counsel is

1   going to be retained?

2           MS. SALEEN:  Yes.

3           THE COURT:  We will say counsel for

4   petitioner, general -- I am sorry -- special

5   appearance only today; is that right?

6           MS. SALEEN:  Yes, that's correct.

7           THE COURT:  So you can tell your client --

8   or your could-be client -- that we didn't have a

9   proper proof of service.

10           MS. SALEEN:  He knows of the hearing because

11   he's been paying careful attention to the court

12   docket, but he has not been served with anything as

13   far as that hearing.

14           THE COURT:  He is not served, then he

15   doesn't have an obligation to show up.  If he is not

16   served, the case will get continued for service.  Or

17   if respondent doesn't show up, it's off calendar and

18   the TRO will expire.

19           MS. SALEEN:  Thank you, Your Honor.

20           (Whereupon, the hearing was concluded.)

21

22

23

24

25

26

27

28

```
 1              State of California    )

 2              County of Santa Clara  )

 3

 4              I, Kathryn A. Keay, hereby certify:

 5   That I was the duly appointed, qualified and acting

 6   official shorthand reporter of said court in the

 7   above-entitled action taken on the above-entitled

 8   date; that I reported the same in machine shorthand

 9   and thereafter had the same transcribed through

10   computer-aided transcription as herein appears, and

11   that the foregoing typewritten pages contain a true

12   and correct transcript of the proceedings had in said

13   matter at said time and place to the best of my

14   ability.

15              I further certify that I have

16   complied with CCP 237(A)(2) in that all personal juror

17   identifying information has been redacted, if

18   applicable.

19

20        Dated:  April 22, 2019

21

22

23        _____

24        Kathryn A. Keay, CSR 7915

25

26

27

28
```

```
 1         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              IN AND FOR THE COUNTY OF SANTA CLARA

 3          THE HONORABLE DEBORAH A. RYAN, JUDGE PRESIDING

 4                         ---oOo---

 5

 6   AARON GREENSPAN, et al,            )   No.18CH8067
                                        )
 7                      Plaintiff,      )
                                        )
 8              Versus                  )
                                        )
 9   DIEGO MASMARQUES,                  )
                                        )
10                      Defendant.      )
     _____)
11

12

13

14

15        REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

16                   SAN JOSE, CALIFORNIA

17                    OCTOBER 9, 2018

18

19

20

21

22

23

24

25   APPEARANCES:

26   For the Plaintiff:          In Pro Per

27   For the Defendant:          In Pro Per

28   Official Court Reporter:    Kathryn A. Keay, CSR
                                 CSR No. 7915
```

1    SAN JOSE, CALIFORNIA                    OCTOBER 9, 2018
2                     P R O C E E D I N G S
3              THE COURT:  Numbers 1 and 2 on the
4    9:00 o'clock calendar, Aaron Greenspan and Diego
5    MasMarques.
6              MR. MASMARQUES:  Mr. MasMarques, present,
7    Your Honor.
8              THE COURT:  And apparently you have been
9    authorized to appear by phone by Judge Overton for
10   this proceeding.  My understanding was --
11             MR. MASMARQUES:  Yes, Your Honor.
12             THE COURT:  -- that was due to the fact that
13   you were going to be requesting a continuance for
14   proof of service on Mr. Greenspan; is that correct?
15             MR. MASMARQUES:  That's correct, Your Honor.
16             THE COURT:  Mr. Greenspan is present.
17             Good morning, sir.
18             MR. GREENSPAN:  Good morning.
19             THE COURT:  Have you been served with notice
20   of these actions?
21             MR. GREENSPAN:  I have not.
22             THE COURT:  Are you prepared to proceed,
23   notwithstanding that?
24             MR. GREENSPAN:  I am, for the purpose of
25   refuting the allegations being made.
26             THE COURT:  So there's a cross-request.
27   There's a request to terminate the restraining order
28   that you obtained and there's a cross-request that's

```
 1    been granted.
 2              Mr. MasMarques is attempting to secure a
 3    temporary restraining order against you.  Do you
 4    understand that?
 5              MR. GREENSPAN:  I do.
 6              THE COURT:  So you are, in essence,
 7    accepting service of those matters?  Have you received
 8    the paperwork?  Are you aware of what --
 9              MR. GREENSPAN:  I never actually received
10    the paperwork.  I attempted to obtain it myself
11    because I was never properly served, so I am prepared
12    to proceed.  But again, I completely refute everything
13    in that paperwork.
14              THE COURT:  Mr. MasMarques, how long would
15    you anticipate these two matters taking?
16              MR. MASMARQUES:  I apologize, Your Honor.
17    You mean for a continuance?
18              THE COURT:  Mr. Greenspan, in essence, has
19    accepted service of the documents and is prepared to
20    proceed is what he is indicating.
21              We are not going to be able to do that today
22    with you on the telephone, so we need to discuss the
23    next step.
24              MR. MASMARQUES:  Okay.
25              THE COURT:  Do you have copies of the
26    restraining order?
27              MR. GREENSPAN:  Not in front of me.  I do
28    have exhibits that would prove that everything in
```

 1   those documents is essentially false.

 2            THE COURT:  So since you are accepting

 3   service, I think we will just provide you with those

 4   documents so that you have them the next time.

 5            Sir, are you planning to be in the state

 6   sometime soon?

 7            MR. MASMARQUES:  Me, Your Honor?

 8            THE COURT:  Yes, you.

 9            MR. MASMARQUES:  Yes, I can fly out there.

10   I can fly out there.  I actually had a ticket today,

11   but I was told since I didn't have the papers served

12   on Mr. Greenspan that, you know, it wouldn't make

13   sense to go out there.  But I wasn't sure if he was

14   going to be there or not.

15            But he is fully aware of everything.  He has

16   a website where he collects people's legal documents.

17   And he has everything on there, so he's been fully

18   aware of this since day one.

19            THE COURT:  He's indicated that he is

20   prepared to go forward and he is accepting proof of

21   service.  So we are just going to provide him with the

22   actual documents so there's no issue when the matter

23   is set.

24            What I need to know is what is your

25   anticipation as to the amount of time this matter will

26   take?

27            MR. MASMARQUES:  You mean to fly out to

28   California?

```
 1              THE COURT:  No, for the hearing itself.
 2              MR. MASMARQUES:  Four to six weeks, Your
 3   Honor.
 4              THE COURT:  Tell me how long the actual
 5   hearing you would anticipate would take.  How many
 6   witnesses do you have?
 7              MR. MASMARQUES:  I have my wife.  She is the
 8   main witness.  She is not with me right now, but she
 9   is ten minutes away.
10              THE COURT:  We are not doing it today.  I am
11   talking about a date in the future when you will
12   actually be out here.
13              MR. MASMARQUES:  Yes, Your Honor.
14              THE COURT:  You give me an idea, is it going
15   to take half an hour?  Is it going to take an hour?
16   Three hours?  What?
17              MR. MASMARQUES:  I apologize, Your Honor.  I
18   would say about an hour, perhaps.
19              THE COURT:  An hour for your time.
20              Mr. Greenspan?
21              MR. GREENSPAN:  I think it's hard to
22   estimate, but I would say an hour is reasonable.  But
23   I'd also like to point out that Mr. MasMarques says
24   his wife is a witness.
25              THE COURT:  We are not talking about the
26   facts of the case right now.
27              MR. GREENSPAN:  Okay.
28              THE COURT:  I am going to put down two-hour
```

```
 1   estimate.
 2               MR. GREENSPAN:  That's fine.
 3               THE COURT:  It's always better to over
 4   estimate than to underestimate.
 5               And you say, sir, that you could come out in
 6   about four to six weeks.  That would work best for
 7   you?
 8               MR. MASMARQUES:  Yes, Your Honor.
 9               THE COURT:  Give us a date.
10               We can do the 13th of November or
11   December 12th.
12               Mr. MasMarques?
13               MR. MASMARQUES:  Yes.  December 12th.
14               THE COURT:  That's going to be at 1:30 in
15   the afternoon.  Does that work for you, Mr. Greenspan?
16               MR. GREENSPAN:  Yes.
17               THE COURT:  All right.  We will set this
18   down for December 12th.  That's a Tuesday at -- it's a
19   Wednesday at 1:30 with a two-hour estimate.
20               MR. MASMARQUES:  So Your Honor, this will
21   then be reissued until that date, November 12th?
22               THE COURT:  Yes.
23               MR. MASMARQUES:  Also, can I make a
24   statement, Your Honor?
25               THE COURT:  As long as it's not about the
26   facts of the case.  If it's some procedural question,
27   you can.
28               MR. MASMARQUES:  Yes.  I did call the
```

1    mediation department.  I talked to Carlos and said
2    there was no response from Mr. Greenspan.
3              THE COURT:  It doesn't sound like that's
4    going to work unless that's something you wish to
5    engage in, Mr. Greenspan.
6              MR. GREENSPAN:  Frankly, I am not sure what
7    he is referring to, but I have never heard from
8    mediation and I don't think that's appropriate here.
9              THE COURT:  We will see you back then on
10   December 12th at 1:30 for hearing.
11             And sir, you will be here with any witnesses
12   that you have.
13             MR. MASMARQUES:  Yes.
14             THE COURT:  Judge Overton or someone that is
15   here on her behalf will be hearing the matter that
16   day.  Thank you.
17             MR. MASMARQUES:  Yes, Your Honor.  Thank you
18   very much, Your Honor.
19             MR. GREENSPAN:  Thank you.
20             (Whereupon, the hearing was concluded.)
21
22
23
24
25
26
27
28

1          State of California    )

2          County of Santa Clara  )

3

4          I, Kathryn A. Keay, hereby certify:

5 That I was the duly appointed, qualified and acting

6 official shorthand reporter of said court in the

7 above-entitled action taken on the above-entitled

8 date; that I reported the same in machine shorthand

9 and thereafter had the same transcribed through

10 computer-aided transcription as herein appears, and

11 that the foregoing typewritten pages contain a true

12 and correct transcript of the proceedings had in said

13 matter at said time and place to the best of my

14 ability.

15          I further certify that I have

16 complied with CCP 237(A)(2) in that all personal juror

17 identifying information has been redacted, if

18 applicable.

19

20      Dated:  April 22, 2019

21

22

23      _____

24      Kathryn A. Keay, CSR 7915

25

26

27

28

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               IN AND FOR THE COUNTY OF SANTA CLARA

3           THE HONORABLE CAROL OVERTON, JUDGE PRESIDING

4                          ---oOo---

5

6   AARON GREENSPAN, et al,          )  No.  18CH008067
                                     )
7                      Plaintiff,    )
                                     )
8              Versus                )
                                     )
9   DIEGO MASMARQUES,                )
                                     )
10                     Defendant.    )
    _____)
11

12

13

14

15          REPORTER'S TRANSCRIPT OF THE PROCEEDINGS

16                  SAN JOSE, CALIFORNIA

17                  DECEMBER 12, 2018

18

19

20

21

22

23

24   APPEARANCES:

25   For the Plaintiff:          Timothy Broderick,
                                 Attorney at Law
26
     For the Defendant:          Pro Se
27

28   Official Court Reporter:    Kathryn A. Keay, CSR
                                 CSR No. 7915

```
1                       INDEX OF WITNESSES

2
                            DIRECT   CROSS   REDIRECT   RECROSS
3

4    FOR THE PETITIONER:

5    Aaron Greenspan          17

6                             43

7    Request for Restraining Order:

8    Aaron Greenspan          51      83

9

10

11

12

13

14

15

16

17

     FOR THE RESPONDENT:
18
     Diego MasMarques          8      11       13         14
19
         Further                                          21
20

21

22

23

24

25

26

27

28
```

```
 1                      INDEX OF EXHIBITS

 2

 3                                    MARKED      RECEIVED

 4

 5    FOR THE PETITIONER:

 6    On the Issue of Service:

 7    1      A Legal Document            34

 8    Request for Restraining Order:

 9    1-15   Documents                   51

10

11

12

13

14

15

16

17

18

19    FOR THE RESPONDENT:

20    On the Issue of Service:

21    A      An Affidavit                16

22    Request for Restraining Order:

23    B      A Document                  136

24

25

26

27

28
```

```
 1   SAN JOSE, CALIFORNIA                    DECEMBER 12, 2018
 2                    P R O C E E D I N G S
 3         THE COURT:  Aaron Greenspan versus Diego
 4   MasMarques.  Let's get everybody's name on the record
 5   one more time.
 6         MR. GREENSPAN:  This is Aaron Greenspan.
 7         MR. BRODERICK:  Timothy Broderick for Aaron
 8   Greenspan.
 9         MR. MASMARQUES:  Diego MasMarques.
10         THE COURT:  Just as a preliminary matter,
11   let me make sure that I understand the procedural
12   posture of the case.
13         There is currently a restraining order
14   against Mr. MasMarques.  And sir, you are trying to
15   get that terminated, claiming that you were never
16   notified.  Is that right?
17         MR. MASMARQUES:  Yes, Your Honor.
18         THE COURT:  Also, you have a Request for
19   Restraining Order against Mr. Greenspan.
20         MR. MASMARQUES:  Yes, Your Honor.
21         THE COURT:  Is that your understanding,
22   counsel, of the procedural status of the case as well?
23         MR. BRODERICK:  Yes.
24         THE COURT:  I was just informed that there
25   may be a pending criminal case against Mr. MasMarques,
26   is that correct, that's related to all of this?
27         MR. MASMARQUES:  It is, Your Honor.
28         THE COURT:  What's going on with that?
```

```
1                    MR. MASMARQUES:  What happened was --

2                    THE COURT:  Don't tell me the particulars.

3     I just want to know procedurally, do you have a court

4     case coming up in criminal court, yes or no?

5                    MR. MASMARQUES:  I do.

6                    THE COURT:  When is that?

7                    MR. MASMARQUES:  December 21st.

8                    THE COURT:  December 21st?  Where is that?

9                    MR. MASMARQUES:  Marlborough, Massachusetts.

10                    THE COURT:  What is the charge?

11                    MR. MASMARQUES:  Criminal harassment and

12     violation of restraining order.

13                    THE COURT:  Violation of restraining order.

14                    Counsel, what do you know about the

15     particulars of that?

16                    I am not asking for your testimony, but just

17     your understanding of the factual underpinnings of

18     that case.

19                    MR. BRODERICK:  So I don't misspeak, may I

20     defer to my client?

21                    THE COURT:  Okay, briefly.

22                    MR. GREENSPAN:  Can you specify what you are

23     looking for?

24                    THE COURT:  Sure.  He had said that it was a

25     violation of the restraining order which I assume is a

26     violation of the restraining order that exists in this

27     case.  And then you had said that there was some

28     harassment charge separate from that.  Is that your
```

1  understanding as well?

2      MR. GREENSPAN:  That's correct.

3      THE COURT:  Do you know anything about the

4  factual allegations that led to those charges, just

5  sort of in a summary fashion?

6      MR. GREENSPAN:  In summary, the facts around

7  the violation of the restraining order here in

8  California are the same facts that led to the criminal

9  harassment charges under Massachusetts State Law.  But

10  because they violate both the statute there and the

11  civil harassment restraining order --

12      THE COURT:  What about the allegation that

13  he violated the restraining order?  In what manner is

14  it alleged that he violated it?

15      MR. GREENSPAN:  He violated it by posting

16  several thousand pornographic and/or harassing, in

17  general, posts on various websites concerning myself,

18  my family members, including members who are listed on

19  the restraining order, and one of my colleagues as

20  well.

21      THE COURT:  Are you both coming from out of

22  state today?

23      MR. GREENSPAN:  No.  I live in California.

24      MR. MASMARQUES:  I am.

25      THE COURT:  You know you have the privilege

26  against self-incrimination.  Anything you do say can

27  be used against you either in this proceeding or in

28  other proceedings.  You understand that?

1          MR. MASMARQUES:  Yes, Your Honor.

2          THE COURT:  Since there's currently some

3 overlap between this case and your pending criminal

4 case, if you do testify here, your testimony can be

5 used against you.  Do you understand that?

6          MR. MASMARQUES:  Yes, Your Honor.

7          THE COURT:  With a that in mind, is it still

8 your desire to testify in this matter?

9          MR. MASMARQUES:  Yes, Your Honor.

10          THE COURT:  Okay.  So you understand and

11 essentially waive your privilege against

12 self-incrimination so you can proceed with this case?

13          MR. MASMARQUES:  I understand.  Yes, Your

14 Honor.

15          If I don't testify, I can't proceed?

16          THE COURT:  If you don't testify -- well,

17 first of all, what we have here today is you are

18 making a claim that you were never served and

19 therefore the restraining order against you should be

20 dissolved.

21          If you don't testify, I am not going to have

22 any factual basis to grant your motion.

23          MR. MARQUES:  I see.

24          THE COURT:  And then you are asking for a

25 restraining order against Mr. Greenspan.  And if you

26 don't testify, I am not going to know any factual

27 basis for that request.

28          If you want to withdraw the request, you

1   don't have to testify.

2           MR. MASMARQUES:  Yes, I will testify, Your

3   Honor.

4           THE COURT:  Pardon me?

5           MR. MASMARQUES:  I want to testify, please.

6           THE COURT:  Somebody has a witness here; is

7   that correct?  Is that your witness, sir?

8           MR. BRODERICK:  No.

9           THE COURT:  Your witness?

10          MR. MASMARQUES:  No.  He's just with me,

11  Your Honor.

12          THE COURT:  He is not a witness though?

13          MR. MASMARQUES:  No.

14          THE COURT:  Gentlemen, would you both kindly

15  stand up and raise your right hands for the oath.

16          (Whereupon, the parties were duly sworn to

17  tell the truth.)

18          THE COURT:  Feel free to have a seat.

19                    DIEGO MASMARQUES,

20  called as a witness on behalf of the Defendant, having

21  been previously duly sworn to tell the truth,

22  testified as follows:

23                    DIRECT EXAMINATION

24  BY THE COURT:

25  Q.      Sir, you are asking that the restraining

26  order against you be terminated.  And I think your

27  allegation is that you were never properly served; is

28  that correct?

```
 1    A.          Yes, Your Honor.

 2    Q.          What do you want to tell me about that?

 3    A.          A sheriff had come --

 4    Q.          Let's get that mic a little closer to you so

 5    we can hear you.

 6    A.          A sheriff came to my father's house, I

 7    believe, on May 21, 2018.

 8    Q.          Give me that date one more time?

 9    A.          May 21st, I believe it was.

10    Q.          Let me go ahead and get into the documents

11    because I want to see what the proof of service says

12    so I can follow along.

13                Just will take a minute.  Thanks for your

14    patience.

15                We have proof of service on May 21st.  Hang

16    on.  I can find that.

17                Proof of personal service.  This goes all

18    the way back to May, you say?

19    A.          I believe it was May, Your Honor.

20    Q.          That was the original request for

21    restraining order.  Hang on a second.

22                MR. BRODERICK:  We can supply you with a

23    copy, Your Honor.

24                THE COURT:  If you have a copy handy, that

25    would be just great.  And maybe you want to have that

26    marked as your Exhibit 1 for purposes of these

27    proceedings.

28                MR. BRODERICK:  These exhibits are our
```

1    exhibits that include that summary.

2           THE COURT:  If we are just dealing with the

3    motion to set aside the original, I think --

4           MR. BRODERICK:  We can take it apart.

5           THE COURT:  If you want to take it apart for

6    the moment, I will look at it and give it back to you.

7    I don't want your papers to get out of order.  We

8    don't have to mark it at this time because it's part

9    of the court record.

10          Do you know what the filing date was?  If

11   you do, I can look at it on my screen.

12          MR. GREENSPAN:  Your Honor, I believe you

13   saw it on June 19th at the hearing on that date.

14          THE COURT:  Yeah, I do see June 19th as the

15   date here.  Thanks.

16          So I do have it in front of me, so you don't

17   have to take apart everything.  I see it and it is

18   proof of personal service.

19          I am trying to see who served it.  Was it

20   registered process server?

21          MR. GREENSPAN:  It was the Middlesex

22   Sheriff's Office.

23          THE COURT:  I see that now.  Middlesex,

24   M-i-d-d-l-e-s-e-x, Sheriff's Office, Cambridge,

25   Massachusetts.

26          Thank you for that reminder.  I do have it

27   on the screen in front of me.

28   Q.        (By The Court)  Go ahead, sir.

```
 1   A.          So what happened -- I have an exhibit here.

 2   Q.          Let me hear your testimony first.

 3   A.          Yes.  Your Honor, so what happened was they

 4   came to my father's house.  He lives alone, One

 5   Walking Court, Apartment F, Medford, Massachusetts

 6   02195.  My father's the same name as me, same exact

 7   name, Diego MasMarques.

 8               Somebody came and said, basically, I think

 9   said something -- they asked him his name.  He said,

10   "Yeah, Diego MasMarques.  It's on the mailbox."

11               And my father, you know, he has a tendency

12   to let anybody in.  So the person came upstairs, said,

13   "Diego MasMarques?"  My father said, "Yes."

14               The person said, "Here you go," and just

15   left (indicating).

16   Q.          You made a gesture giving papers to

17   somebody?

18   A.          Yes.  Gave him a manilla envelope or

19   something.

20   Q.          So you are saying your dad was served and

21   not you.

22   A.          Exactly, Your Honor.

23   Q.          What is your dad's name?

24   A.          Diego MasMarques.

25               THE COURT:  Cross-examination.

26                         CROSS EXAMINATION

27   BY MR. BRODERICK:

28   Q.          When did you find out your father received
```

1    these documents?

2    A.        When my father sent them back, he sent them

3    back to the Sheriff's Department because it had the

4    year of birth was 1965.

5              THE COURT:  See if you can just answer the

6    question that's posed.

7              Could you ask it again, counsel?  See if you

8    can answer it directly.

9    Q.        (By Mr. Broderick)  When did you learn that

10   your father had been served?

11   A.        About a few days later, about a week later.

12   Q.        What prejudice do you have from not having

13   received the papers personally?

14   A.        I have no prejudice.  They didn't serve me,

15   they served my father.

16             THE COURT:  He's just claiming improper

17   service.  And of course, we all know that personal

18   service is required in these cases.

19             Did you have any other cross-examination?

20             MR. BRODERICK:  No.

21             THE COURT:  Anything else you wanted to add?

22             MR. MASMARQUES:  Yes.  My father is very

23   taken aback by this situation.  And I believe that the

24   other party had contacted the Middlesex Sheriff's

25   Department and instructed them to go to my father's

26   address.  Highly likely that he knew that my father

27   lives there.

28   ****

```
 1                    REDIRECT EXAMINATION
 2    BY THE COURT:
 3    Q.        Who knew?
 4    A.        Mr. Greenspan.
 5    Q.        How do you know that he knows that?
 6    A.        Because he does all kinds of data
 7    downloading and he gets information.
 8    Q.        Were you living with your father?
 9    A.        No, I was not.  So it's not for sure, but he
10    sent them -- he sent them to my father's address.
11    Q.        When you say "he," I am not sure who you are
12    talking about?
13    A.        Mr. Greenspan.
14              And the picture -- he sent pictures of me to
15    the Sheriff's Department that don't match at all my
16    father.
17    Q.        How do you know he sent those pictures to
18    the Sheriff?  How do you know that?
19    A.        Because that came up in a hearing most
20    recently.  And the clerk's hearing in Marlborough,
21    Massachusetts, when the police showed all these
22    pictures that Mr. Greenspan had sent to the Sheriff's
23    Department of me.  And he had sent them to the
24    Middlesex Sheriff's Department.  And I don't know how
25    he accessed those pictures because they were only in
26    email.
27    Q.        What kind of hearing was this?
28    A.        It was a clerk magistrate's hearing.
```

1    Q.        In the criminal case?

2    A.        Yeah.

3    Q.        Well, I don't know how you know that.  You

4    said it came up in another hearing, but --

5    A.        The sergeant took out the documents and he

6    showed the pictures of me that Mr. Greenspan had given

7    to the Middlesex Sheriff's Department.

8    Q.        So then presumably they knew who they were

9    serving, right?

10             If they had photos of you, then they knew

11   that you were the person they were serving, correct?

12   A.        Yes, but it wasn't me.  It wasn't me.

13   Q.        Is your father pictured in those photos?

14   A.        Yes, Your Honor.

15   Q.        So you are in the photos?

16   A.        No.  In the photos, no.  It was only me in

17   the pictures.

18             THE COURT:  Okay.  Cross-examination?

19                      RECROSS EXAMINATION

20   BY MR. BRODERICK:

21   Q.        Do you know who supplied the pictures to the

22   Sheriff?

23   A.        According to what I was told, Mr. Greenspan.

24             THE COURT:  He is saying they were actually

25   pictures of him as opposed to his dad or furnished to

26   the sheriffs.  That's my understanding.

27             THE WITNESS:  Yes.

28             THE COURT:  Any other questions on

1    cross-examination?

2              MR. BRODERICK:  No.

3              THE COURT:  So basically, obviously,

4    personal service is required.  And Mr. MasMarques is

5    saying he was never personally served.

6              So what would you like to present?

7              MR. BRODERICK:  One is admitted.  There's no

8    prejudice.  Two, the implication --

9              THE COURT:  Well, prejudice is not the

10   issue.  The issue is he is saying he was never served.

11             MR. BRODERICK:  I understand.  But on the

12   issue of not being served, it stands to reason that

13   the sheriff would not have served an elderly person

14   who is not in the photo.

15             THE COURT:  The problem is that that person

16   isn't here to testify.  We don't know if that person

17   is going to be able to rebut these statements because

18   that person is not here.

19             MR. GREENSPAN:  Your Honor, can I clarify

20   something?

21             THE COURT:  You are going to communicate

22   through your counsel.

23             MR. MASMARQUES:  I have an affidavit from my

24   father.

25             THE COURT:  Okay.  If you want to present

26   that, you need to show it to counsel first.

27             And he is saying he has an affidavit from

28   his dad, so he is going to show that to you before he

1   gets it marked by the Court.

2          We will have this marked as Exhibit A for

3   purposes of these proceedings.

4          (Whereupon, Exhibit A was marked for

5          identification.)

6          THE COURT:  Sir, you said you found out

7   about this a couple days or so after he was served.

8   So you were aware that the case was pending against

9   you, correct?

10         MR. MASMARQUES:  Well, my father said

11  someone came from the Sheriff's Department from

12  California.

13         THE COURT:  Then he gave you the papers,

14  correct?

15         MR. MASMARQUES:  My father, no.  He sent

16  them back to the Sheriff's Department because it had

17  the date of birth.

18         THE COURT:  You are saying your dad sent

19  them back to the Sheriff's Office without showing you?

20  Is that your testimony?

21         MR. MASMARQUES:  Yes.

22         THE COURT:  The affidavit, just for the

23  record, is under the laws of State of Massachusetts.

24  Okay.

25         Anything further, sir --

26         MR. MASMARQUES:  No.

27         THE COURT:  -- on this issue?

28         MR. MASMARQUES:  No, Your Honor.

1          THE COURT:  And any further questions?

2          MR. BRODERICK:  No, some rebuttal if I may,

3    Your Honor.

4          THE COURT:  Sure.  Both parties are under

5    oath.  So did you want to call Mr. Greenspan as your

6    witness?

7          MR. BRODERICK:  I do.

8          THE COURT:  Fair enough.

9                    AARON GREENSPAN,

10   called as a witness on behalf of the Plaintiff, having

11   been previously duly sworn to tell the truth,

12   testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. BRODERICK:

15   Q.        Very briefly, Mr. Greenspan, my

16   understanding --

17          THE COURT:  Because of this interference

18   here, everybody, if you could try to bring the mic

19   close.

20   Q.        (By Mr. Broderick)  Mr. Greenspan, it's my

21   understanding, if I heard the testimony correctly,

22   that Mr. MasMarques did not receive the papers.

23          Did he, nevertheless, file documents in this

24   case, knowing the case number?

25   A.        Yes.  According to what I have seen, he's

26   filed a number of documents in this case, some of them

27   hundreds of pages, and somehow he knew the case

28   number.

```
1              THE COURT:  During what time frame are you
2   referring to, if you can recall?  Because it looks
3   like May 22nd was the service date.
4              I guess what I am trying to find out --
5              THE WITNESS:  May 19th was the service date.
6              THE COURT:  Okay.  I have to make this
7   larger.
8              THE WITNESS:  It's a little confusing
9   because it said May 22nd is when they printed out the
10  sticker, I think, but they actually served --
11             THE COURT:  Thank you for pointing that out.
12  I am still not seeing the service date.
13             THE WITNESS:  It's in the last sentence of
14  the paragraph.
15             THE COURT:  It says, "I personally gave
16  copies of the documents," but it doesn't have the date
17  on my copy.
18             THE WITNESS:  It says, "I hereby certify and
19  return that on 5-19" --
20             THE COURT:  Thank you for pointing that out.
21             So 5-19, and the hearing was set for --
22  let's see when the hearing was set for.  If anybody
23  wants to help me out on this, feel free.
24             THE WITNESS:  I believe it's June 19th was
25  the hearing where the TRO was made permanent.
26             THE COURT:  Okay.  But --
27             THE WITNESS:  Are you talking about the
28  prior hearing?
```

1          THE COURT:  Yeah.  Let's get this squared

2     away on the record just so we have it clear.

3          The Temporary Restraining Order in this

4     case, it looks like, issued -- I am going to take a

5     look at this.

6          THE WITNESS:  April 4th.

7          THE COURT:  April 4, 2018.  Thank you for

8     that.  And the hearing -- bear with me for just a

9     second.

10         The hearing was set for April -- again, it's

11    hard to read the writing.  Looks like it was set for

12    April 24th, if I am reading that correctly.

13         If anybody wants to correct me, you can.

14    It's a little bit hard to read.

15         THE WITNESS:  I think it might have been

16    continued because I think the actual permanent

17    restraining order issued in June.

18         THE COURT:  So this was just the hearing

19    that was initially set, and it looks like it's

20    April 24th.  And then let's see what happened on

21    April 24th.  What happened thereafter, I should say.

22         We have the Temporary Restraining Order.

23    And then, yes, we have re-issuance and a new hearing

24    date, as indicated by Mr. Greenspan, was 6-19.

25         So initially it was set for April 24th, then

26    it was continued to June 19th.  There was a

27    re-issuance.

28         I want to see, Mr. MasMarques, when you

1    filed papers.  That's going to tell me when you were

2    aware of the case.

3              I am going to take a brief recess.

4              (Whereupon, a recess was taken.)

5              THE COURT:  Back on the record.

6              April 4, 2018, TRO was issued.  Hearing was

7    set for April 24th, and then it got continued to

8    June 19th.

9              We have the proof of service dated May 19th,

10   which presumably would be for the 6-19 hearing.

11             And now I just need to see papers that were

12   filed in the case.

13             MR. GREENSPAN:  I believe he filed a number

14   of papers on July 3rd.

15             THE COURT:  Let me take a look.  That would

16   have been after the hearing.  Let's see what happened.

17             Gentlemen, I just need to get into a

18   different application that's going to give me a little

19   better access to the documents.  I appreciate your

20   patience.

21             I am going to look at the minute order from

22   June 19th to see what it says.

23             The plaintiff was duly sworn, there was

24   direct examination.  Communications from

25   Mr. MasMarques were marked, identified, admitted.

26             Court determined that petitioner had met the

27   burden of proof and the restraining order issued on

28   that date in Mr. MasMarques' absence.  So let's see

1      what happened thereafter.

2                It looks like shortly thereafter, there was

3      a request to terminate the restraining order.  And

4      that was on July 3rd.

5                So at least by July 3rd there was some

6      action that was taken by you, Mr. MasMarques.

7                So counsel, if you want to inquire further,

8      having that time line in mind, feel free to go ahead.

9                      FURTHER RECROSS EXAMINATION

10     BY MR. BRODERICK:

11     Q.        Did you receive papers that were also given

12     to your wife in connection with this action?

13     A.        No, I did not.  And there's an affidavit in

14     there because apparently --

15                THE COURT:  You are going to have to keep

16     your voice up.  I am sorry to keep saying that.  Pull

17     the mic close.  I want to make sure our court reporter

18     doesn't have to strain to hear you.

19                THE WITNESS:  So apparently, I don't

20     remember, but Mr. Greenspan had made allegations that

21     my wife was either given papers or papers were dropped

22     off or something.

23                But there's an affidavit from my wife in

24     this exhibit, Your Honor, as well that --

25                THE COURT:  I am not sure what exhibit you

26     are referring to and it would be a lot more helpful

27     for me if you could directly answer the question and

28     then wait for a follow up question.  Then if you want

1  to go back and explain some of these things further,

2  that would be fine.  But I am sort of getting lost in

3  the detail.  Please try and answer the question.

4          Counsel, if you want to just reiterate the

5  question, please.

6  Q.       (By Mr. Broderick)  Did you receive the

7  documents also by email?

8          THE COURT:  When you say "documents," I am

9  not sure what documents you mean.  Counsel, we have to

10  clarify.

11          MR. BRODERICK:  The restraining order.

12          THE COURT:  Which restraining order?  It

13  could have been the restraining after hearing, it

14  could have been the Temporary Restraining Order.  We

15  need to know.  It's key for the purposes of this

16  motion, so let's clarify that.

17  Q.       (By Mr. Broderick)  Did you receive the

18  Notice of Court Hearing, Temporary Restraining Order,

19  Request for Civil Harassment by email from my client?

20          THE COURT:  Keep your voices up.  I am

21  sounding like I am nagging everybody.

22          THE WITNESS:  No, I did not.

23          THE COURT:  Counsel, if you are looking at

24  an email that was sent, you can inquire further.

25          MR. BRODERICK:  Thank you.

26  Q.       On April 19, 2018, did you receive an email

27  from my client containing the Temporary Restraining

28  Order?

```
1    A.          No, I did not.

2    Q.          Is your email address rickymas@msn.com?

3    A.          Yes, that's my email that was hacked and I

4    haven't been in there.

5                THE COURT:  We are not asking about hacking.

6                Keep in mind -- I just have to say this.

7    When folks are evasive in answering questions, it

8    makes me doubt your credibility.

9                THE WITNESS:  Yes.

10               THE COURT:  So I know that this is a

11   situation that's contentious.  I understand that.  But

12   try and answer the question.

13               All he is asking is whether that's your

14   email address or not.  Yes or no.

15               THE WITNESS:  Yes.  I haven't used it in a

16   year and a half.

17               THE COURT:  Is it one that you had access to

18   at that time?

19               THE WITNESS:  Yes, but nothing was coming in

20   because it's all closed.  It's closed out.  I kept it

21   open in case --

22               THE COURT:  You said it was closed out and

23   you kept it open.  Was it accessible at that time in

24   April of 2018, yes or no?

25               THE WITNESS:  Yes.  But closeout meaning the

26   emails were being redirected to a new email address

27   and I didn't get anything.

28               THE COURT:  But was it -- were the emails
```

1   that were being sent to you on or about or around the

2   time period of mid-April 2018 to that address being

3   received by you, yes or no?

4           THE WITNESS:  I did not receive anything on

5   that.  I did not receive that.  I did not receive any

6   restraining order.

7           THE COURT:  I am not asking that.  I am

8   asking if you were receiving emails at that address.

9   Yes or no?

10          THE WITNESS:  No.  No, Your Honor.

11          THE COURT:  So your answer is now no.

12          THE WITNESS:  The account -- what happened

13  was because --

14          THE COURT:  But you are giving me an

15  explanation before you are giving me the answer.

16          For example, if somebody asks me if I was

17  receiving emails at a certain account, if it was a

18  closed account, I would say no.  If it was an open

19  account I would say yes.

20          Either you were receiving emails and capable

21  of receiving emails at that address at that time or

22  you weren't.

23          I am still having a hard time understanding

24  whether you were receiving emails generally at that

25  email address at or near that time.

26          THE WITNESS:  It's hard for me to explain,

27  if I may, because the account -- what happened was, I

28  stopped getting emails going into that account

 1   because --

 2            THE COURT:  When?

 3            THE WITNESS:  About maybe last fall.  Last

 4   fall.  And the reason is is because --

 5            THE COURT:  So you are talking about around

 6   about October, November of 2017?

 7            THE WITNESS:  Yes, Your Honor.

 8            THE COURT:  What happened in October or

 9   November of 2017 with respect to that account?

10            THE WITNESS:  Yes, Your Honor.  The MSN

11   email account, I could not access it.

12            THE COURT:  Because?

13            THE WITNESS:  Because it was hacked.  The

14   account was hacked.  So I could not access the

15   account.

16            When I finally somehow got back in after

17   four or five weeks, because I had to do -- you have to

18   write Microsoft and things, password or whatever to

19   get back in.  I immediately started taking all the

20   most pertinent important documents that were in the

21   emails.

22            THE COURT:  We are still back in the fall of

23   2017.  So again, I am trying to find out what was

24   going on with that account at or near the month of

25   April 2018.  Can you help me out with that?

26            THE WITNESS:  Yes.  So I have not

27   received -- no emails are really coming into the MSN

28   account since that last fall.

```
 1              THE COURT:  Okay.  You said you got back in
 2       four to five weeks later though.
 3              THE WITNESS:  Yeah.  I got back in, then I
 4       transferred all the most important -- because I had
 5       important documents in there and pictures and now on
 6       the web.  And I had all those things and I transferred
 7       them and I opened Proton mail.  It's a Swiss based,
 8       highly secure, encrypted.
 9              THE COURT:  You transferred it to an
10       encrypted email.
11              THE WITNESS:  Yes.
12              THE COURT:  What happened to email messages
13       that you got on the -- what you are calling the hacked
14       account in about April of this year?
15              What was happening to emails that were being
16       sent to that account?
17              THE WITNESS:  It's not even being -- it's
18       still there.  It's still accessible.
19              THE COURT:  But you told me it wasn't
20       accessible.
21              THE WITNESS:  I don't use it anymore.
22              THE COURT:  So you are saying it would have
23       been accessible, but you didn't use it because it was
24       hacked.
25              THE WITNESS:  That's right.  Yes, Your
26       Honor.
27              THE COURT:  That's all I needed to know.
28              THE WITNESS:  I don't use it anymore because
```

```
1    I deleted everything out of there.  I transferred all
2    the important files over to the --
3              THE COURT:  You are telling me a lot of what
4    you did and I understand that explanation, but I
5    wanted to know whether you were accessing that account
6    back in April of this year.  You said no.
7              THE WITNESS:  No, Your Honor, I did not.
8              THE COURT:  We will continue with
9    cross-examination.  Just wanted to make sure I
10   understood.
11   Q.        (By Mr. Broderick)  On that topic, Your
12   Honor, I just asked, do you have any evidence that the
13   email bounced back to Mr. Greenspan?
14   A.        I have no idea because I didn't look at it.
15   I don't know.
16   Q.        Did you ever use it in the vicinity of
17   December 2017?
18             That is, by "it," I meant this email address
19   of rickymas@msn.com.
20   A.        I don't remember at this time.  I don't
21   remember because I have had the Proton mail account
22   for quite some time now because of the issue with MSN
23   account.
24   Q.        I am sorry I have to get into this, but it
25   goes to your credibility.
26             Are you a convicted felon?
27   A.        Okay.  That's a good question.  This is the
28   problem.
```

1              Your Honor, may I explain something?

2              THE COURT:  Can you answer the question?

3              THE WITNESS:  Okay.  I am not --

4              THE COURT:  If it's a crime of moral

5     turpitude, I want you to answer the question.

6              Were you convicted of a felony?  Just yes or

7     no.

8              THE WITNESS:  In the United States, no, I

9     was not.  I am not a convicted felon.

10             I have what's called -- this is what

11    Mr. Greenspan doesn't understand.

12             My case is from Spain.  I have what is

13    called an International Prison Treaty Transfer.  I

14    even had a job in 2015 that required a lengthy

15    background check.  I was working for a company -- I

16    worked in sales.  And they did a lengthy background

17    check, and I have no -- my cory (phonetic) was sealed.

18    My cory (phonetic) in Massachusetts is completely

19    sealed.

20             What happens is -- may I present --

21             THE COURT:  You know, the thing is, I am

22    having a real difficult time here.  Let me explain why

23    because I want to make sure everybody gets a fair

24    chance to be heard.

25             I haven't been living with this for months

26    and years the way you both have been.  So you have to

27    help me.  The way you can help me is by answering the

28    questions directly.

1          THE WITNESS:  So a foreign conviction is not
2     a felony in the United States.  So a foreign
3     conviction -- because if a U.S. citizen is tried and
4     accused in a foreign country, it comes back as a
5     Prison Treaty Transfer, as I did.  And that does not
6     count as a U.S. base criminal act as per the record
7     because foreign convictions in America --
8          THE COURT:  So you are saying you don't have
9     any felony convictions stemming from the United
10    States.
11         THE WITNESS:  I do not.  I do not.
12         THE COURT:  And you are further saying that
13    whatever records you had in Europe were sealed.  Is
14    that what you are saying?
15         THE WITNESS:  Well, here, what happened was,
16    it was only supposed to be in NCIC.  When I was first
17    released in New York City in 2008, I got back with my
18    son's mother.
19         And when I transferred to Boston, the lady
20    who was the supervisor of the release, supervised
21    release when I come back, International Prison
22    Transfer, the books are on public risk, she put it in
23    my cory (phonetic), my Massachusetts cory (phonetic).
24    And I had -- it didn't belong in the Massachusetts
25    cory (phonetic).
26         I called the Massachusetts Probation
27    Department, Mr. Walsh, the Assistant Director, and he
28    told me, "Diego, that's the reason since 2015 we no

1  longer allow the Feds, the First Circuit, to put any

2  information into our computer system because your

3  crime was in Spain."

4          So what happened was --

5          THE COURT:  So you were convicted in Spain.

6          THE WITNESS:  In Spain.

7          THE COURT:  The conviction was not properly

8  included in your state record.  Is that essentially

9  what you are telling me?

10          THE WITNESS:  Not properly included?  No,

11  they put it in the Mass cory (phonetic).  But it

12  doesn't belong in the Mass cory (phonetic).

13          THE COURT:  That's what I meant.

14          THE WITNESS:  Yes.  I have all the documents

15  from the State Department.

16          THE COURT:  So you suffered the conviction

17  in Europe.

18          THE WITNESS:  And now I am suffering it all

19  over again constantly by having my stuff all over the

20  web.  It's like continuous punishment.  I can't get a

21  job.

22          THE COURT:  I know you are frustrated, but

23  we do have to handle these proceedings in an orderly

24  fashion.

25          I think the answer is he is saying he was

26  convicted in Spain.  I don't know what the offense

27  was.  And he is saying apparently it was something

28  that was not to be included in his records here in the

1  United States.  But that is what I was gleaning from

2  what he is saying.

3  Q.         (By Mr. Broderick)  Do you admit that the

4  crime for which you served time in United States

5  prisons was based on a crime of moral turpitude?

6  A.         I don't understand that question.

7         THE COURT:  I am not sure he understands the

8  legal definition.  If you want to say what the offense

9  was, then --

10  Q.         (By Mr. Broderick)  Can you tell us what was

11  the underlying facts of your conviction?

12  A.         Sure.  I don't want to go into a long story

13  over here.  This is why Mr. Greenspan has been

14  punishing me so much because --

15         THE COURT:  Let's stop.  We are going to

16  need to take another time out.

17         I am not sure that the Court needs to hear

18  the underlying facts.  The issue, I think, that you

19  are bringing out is that there was a conviction.  So

20  why don't we just find out what the conviction was

21  for.

22         What offense was the conviction for?

23         THE WITNESS:  It was -- was a manslaughter

24  charge, but it wasn't a manslaughter charge.

25         What happened was in Spain --

26         THE COURT:  What were you convicted of?

27  Just tell me what you were convicted of.

28         THE WITNESS:  It was called manslaughter

1    (speaking in Spanish).  The acronym was -- I was found

2    not guilty in the jury trial in Spain.  Nine jurors,

3    not guilty by majority vote.  And in Spain, they

4    require only six people to vote.

5              THE COURT:  Now you are getting again into

6    particulars that I don't need because I think that if

7    we get into this level of detail, we will be here for

8    days.

9              Here's the thing.

10             THE WITNESS:  I am being punished

11   constantly.

12             THE COURT:  Try not to interrupt because I

13   understand you are upset.  I understand this is a

14   contentious matter, but our court reporter is making a

15   record here for the protection of the parties so if

16   anybody needed a transcript, you would be able to do

17   that.  If we are talking at the same time, then she

18   can't do her job.  And I sort of have the privilege of

19   being able to interject because I want to keep things

20   on point here.

21             If you were found not guilty, that means you

22   were not convicted.  Let's get back -- please don't

23   interrupt.

24             Let's get back to the original question.

25             Were you convicted?  If you were found not

26   guilty, that's not a conviction.  You need to inform

27   the Court.  Were you convicted of a crime, yes or no?

28             THE WITNESS:  If I may, I have to go into a

1    little detail.

2              THE COURT:  Answer the question, yes or no

3    before you go into detail.

4              THE WITNESS:  Yes, I was.

5              THE COURT:  What was the offense for which

6    you were convicted?

7              THE WITNESS:  It was something between

8    involuntary and manslaughter because I was found not

9    guilty first, and then what happened was --

10             THE COURT:  You are saying it was basically

11   a lesser charge.

12             THE WITNESS:  It was a lesser charge.  It's

13   called (speaking in Spanish.)

14             THE COURT:  I don't know how to spell that.

15   I imagine it's not in this language, but are you

16   saying it roughly translates into involuntary

17   manslaughter?  Is that your understanding?  I don't

18   want to put words in your mouth.

19             THE WITNESS:  No intention, yes, Your Honor.

20             THE COURT:  Unintentional.

21             THE WITNESS:  Unintentional.

22             THE COURT:  Any follow-up questions,

23   counsel?

24   Q.       (By Mr. Broderick)  I'd like to show you a

25   decision of the United States District Court of

26   Massachusetts in the United States versus Diego

27   MasMarques, and ask if you have ever seen this

28   document?

```
 1              THE COURT:  Let's get it pre-marked.  Let's
 2    follow protocol.
 3              What exhibit would that be, counsel?  You
 4    want to have that marked as exhibit -- that would be
 5    the first.
 6              MR. BRODERICK:  "1" would be fine.  Right
 7    now they're labeled "A," "B," "C".
 8              THE COURT:  Don't worry about it.  We will
 9    get them labeled for you.  That will be Exhibit 1.
10              One at a time.  Hang on.  There's no
11    question pending yet.
12              (Whereupon, Exhibit No. 1 was marked
13              for identification.)
14              THE COURT:  Exhibit 1 is the Indictment.  Is
15    that correct, counsel?
16              MR. BRODERICK:  Yes, it is a decision of the
17    United States District Court that recites the fact of
18    this conviction.
19              THE COURT:  What date is that?
20              MR. BRODERICK:  I am sorry.  I just gave it
21    to the bailiff.
22              September 22, 2015.  It's at the top of the
23    document.
24              THE COURT:  Thank you so much.
25              MR. BRODERICK:  Your Honor, we do have
26    copies of documents for you.
27              THE COURT:  United States District Court,
28    District of Massachusetts.  And it is dated --
```

```
1              MR. BRODERICK:  At the top, Your Honor.
2              THE COURT:  September 22, 2015.  And I think
3    counsel is going to show you this document.  And I
4    think this is all going to credibility.
5              That's why you are presenting it; is that
6    correct?
7              MR. BRODERICK:  Correct.
8    Q.        I am showing you Exhibit 1.
9              Have you ever seen that document before?
10   A.        Yes.  Mr. Greenspan -- it's all over the
11   web, yes.
12   Q.        Would you read the second paragraph, please,
13   to the Court?
14   A.        The second paragraph?
15   Q.        Yes, please.
16   A.        July 17, 2000.
17             THE COURT:  Slow down and bring the mic
18   closer to you.
19             THE WITNESS:  "On July 17, 2000, Mr. Marques
20   was an American citizen."
21             THE COURT:  Slow down.
22             THE WITNESS:  "Mr. Marques, who is an
23   American citizen, was convicted of two counts of
24   burglary, one count of willful homicide in Spain.
25             "The Spanish court sentenced him to one year
26   in prison on the first burglary count, two years in
27   prison on the second burglary count, and 12 years in
28   prison on the homicide count.
```

1      "In 2005, pursuant to a treaty transfer, he

2  was transferred to the United States to serve the

3  remainder of his sentence."

4  Q.      (By Mr. Broderick)  Going to the last page,

5  do you see that that was entered by Mark L. Wolf,

6  United States District Judge?

7  A.      Yes.

8  Q.      Do you refute the paragraph two that you

9  read to the Court?

10  A.      I do.  Yes, I do.  It's been updated by the

11  Probation Department.  Right now, Massachusetts --

12  it's been updated on the NCIC record as manslaughter.

13      That was the first -- what happens is when a

14  U.S. citizen -- this is one of the problems when

15  somebody has access to all these legal documents --

16  especially from foreign countries -- that they don't

17  understand and they just automatically think -- I have

18  been called murderer now.

19      THE COURT:  Here's the thing.  I don't know

20  about the underlying facts at all.  And we are not

21  going to have a trial about the underlying facts.  But

22  what counsel has indicated he is doing is he is trying

23  to establish, based on a prior conviction, that your

24  truthfulness is at issue here.  And individuals can be

25  impeached with crimes of moral turpitude.

26      The couple burglary counts here, and I guess

27  we can call it manslaughter, I don't know if it's

28  voluntary or involuntary.  But he is seeking to

1    impeach your credibility with that information.

2              I am not going to have a trial on the

3    underlying facts.  I think that would be prejudicial.

4    And counsel hasn't asked to do that.  He is just

5    trying to show that there's information from the past

6    that calls your credibility into question.  Whether

7    that's highly relevant or not is something for the

8    trier of fact to determine.

9              Did you want to explore further, counsel?

10             MR. BRODERICK:  Simply this.

11   Q.        At the time that this was issued in

12   September of 2015, was Judge Wolf correct in his

13   recitation of the facts that you read to the Court?

14   A.        It's not willful homicide.  It's

15   manslaughter.  I don't know what to do here.

16             THE COURT:  Basically, you are answering the

17   question no, it's not accurate.

18             THE WITNESS:  No.

19             Can I explain why?  Can I explain?

20             So when you are an American citizen and you

21   have an International Prison Treaty Transfer and you

22   come back to the United States, the U.S. Parole

23   Commission, they do a first impression of the client.

24   So they wrote in there, "willful homicide."

25             But last year in 2017, when I found out this

26   was in a Mass cory (phonetic) as willful homicide, the

27   Chief Probation Officer, Christopher Maloney, Federal

28   District Court, he updated --

```
 1              THE COURT:  Spell the last name, please.
 2              THE WITNESS:  Maloney, M-a-l-o-n-e-y,
 3    Christopher.
 4              THE COURT:  You are saying he updated those
 5    records?
 6              THE WITNESS:  He updated those records to
 7    show it's not willful homicide, that it's
 8    manslaughter.
 9              THE COURT:  Manslaughter and two counts of
10    burglary.
11              THE WITNESS:  That's right, Your Honor.
12              MR. BRODERICK:  Nothing further.
13              THE COURT:  All right.  Any other questions
14    about the service, where he was living at the time or
15    anything like that?
16              If there's anything that either party wants
17    to explore that would help illuminate for the Court, I
18    welcome it from either side.
19              We are still talking about whether service
20    was proper in this case or not.
21              Any other questions?
22              MR. BRODERICK:  We rest on that issue.
23              THE COURT:  Anything else you wanted to say
24    about that issue?
25              MR. MASMARQUES:  No, just that I was not
26    served, Your Honor.
27              THE COURT:  How did you find out about the
28    case?  How and when?
```

1          THE WITNESS:  Mr. Greenspan posted it
2      online.
3          THE COURT:  What was posted online?
4          THE WITNESS:  Greenspan versus MasMarques.
5          THE COURT:  In other words, the permanent
6      restraining order, the five-year restraining order,
7      you are saying he posted that online?
8          THE WITNESS:  Yes, Your Honor.
9          THE COURT:  How did you happen to see it on
10     online?
11         THE WITNESS:  I opened up the URL.
12         THE COURT:  Okay.  Does your client have
13     anything to say in rebuttal on these allegations or
14     assertions?
15         MR. BRODERICK:  No, Your Honor.
16         THE COURT:  The Court is left in a little
17     bit of a quandary here.
18         We know that by statute, service of papers
19     must be by personal service.  We have a proof of
20     service and a witness who says that his name and his
21     father's name are the same name and that his father
22     was served and he wasn't served.
23         There are, I guess, some more information,
24     questions or answers that could have been given that
25     would have been illuminating to the Court, but I think
26     both parties have rested on that issue.
27         So would you like to argue?
28         MR. BRODERICK:  Your Honor, I think --

1    please consider that Mr. MasMarques has made a general

2    rather than a special appearance.  He is not just

3    contesting the order, but he is asking for affirmative

4    relief which would subject him to the jurisdiction of

5    this Court as well as to having waived a special

6    appearance for the purposes of just quashing service.

7          THE COURT:  But this is all after the fact.

8    I mean, he is coming in after the permanent

9    restraining order issued and he is saying I never had

10    an opportunity to attend the hearing because I was

11    never personally served.  And obviously, you

12    understand the Court has to be concerned about

13    procedural due process.

14          The statute doesn't allow any form of

15    substitute service.  No posting, no mailing, no

16    emailing, no substitute service.  And what I am

17    hearing, at least from Mr. MasMarques, is his dad was

18    served and he wasn't.

19          You know, the challenge here is that you

20    have got somebody from out of state who completed the

21    service and obviously they're not here.

22          There's circumstantial evidence.  Apparently

23    law enforcement was furnished with a photo of the

24    respondent.  And I don't know what to make of that

25    because it's certainly possible that when they

26    completed the service, they assured that they were

27    serving the right person.  That calls for the Court to

28    speculate.  I don't know that.

1        I don't think that proof of service has any

2   description of the person served which would have been

3   enlightening also.  So the Court is sort of left in a

4   quandary here without a real clear showing that this

5   response was served.

6        I mean, we are going to have a hearing on

7   the cross request, and I suppose that we could just

8   have a hearing on everything because the facts are

9   pretty much coextensive.  So that's something we can

10  do and I think that's probably the prudent course of

11  action in this case.

12        MR. BRODERICK:  Thank you.

13        THE COURT:  So unless you want to request

14  some additional time to supplement your evidence on

15  the issue of service.

16        MR. BRODERICK:  I rest.  Thank you.

17        THE COURT:  So the Court finds that the

18  respondent has essentially met his burden of showing

19  that service was not completed properly in this case.

20        The Court is a little bit flat-footed

21  because it certainly would have been good to hear from

22  the person who completed service.  But absent that,

23  that's the Court's determination, which means that's

24  going to open us up to having a new hearing.  And I am

25  wondering if the parties are ready to proceed on that

26  today.

27        MR. BRODERICK:  We are ready, Your Honor.

28        MR. MASMARQUES:  A new hearing for the

1    termination?  Yes, Your Honor.

2           THE COURT:  Okay.

3           MR. BRODERICK:  Not just for termination.

4    If I heard him correctly, he said for termination.

5           THE COURT:  Termination of the existing

6    restraining order and a new hearing to determine

7    whether your client will meet the burden of

8    establishing that he is entitled to a restraining

9    order.  And he is ready to proceed on that.  You are

10    ready to proceed on that.

11           So essentially, we are dealing with a

12    request and a cross-request for restraining order

13    here.

14           Would you like your client to testify first

15    so he can establish the basis for his request for

16    restraining order?

17           MR. BRODERICK:  Of course, Your Honor.

18           THE COURT:  Mr. Greenspan, you are still

19    under oath and I guess your attorney is going to

20    question you.

21           Once he testifies, sir, you are going to be

22    able to cross-examine him.  Then after

23    cross-examination, I will certainly hear from you

24    further.  But the existing restraining order against

25    you is terminated by the Court's decision.

26           MR. BRODERICK:  Ready to go?

27           MR. GREENSPAN:  I am ready.

28    ****

```
 1                    AARON GREENSPAN,
 2   called as a witness on behalf of the Plaintiff, having
 3   been previously duly sworn to tell the truth,
 4   testified as follows:
 5                    DIRECT EXAMINATION
 6   BY MR. BRODERICK:
 7   Q.       You have assembled a number of exhibits and
 8   it may be easiest for you to identify them and tell
 9   the Court --
10            THE COURT:  If you have exhibits, let's get
11   them pre-marked and get them out of the way.  You
12   don't have to stop each time.
13            I know you have to start to dismantle them.
14   We can start with Exhibit 1 or 2.
15            We have had a separate proceeding, now you
16   want to start a new Exhibit 1 in your request for
17   restraining order.
18            MR. BRODERICK:  Thank you, Your Honor.  That
19   would be fine.
20            THE COURT:  What is Exhibit 1?
21            MR. BRODERICK:  These are a packet of
22   exhibits that were introduced and they are currently
23   labeled "A" through "O".
24            THE COURT:  Do you want to give them to me
25   and we can remark them and identify them on the record
26   and get that out of the way?
27            MR. BRODERICK:  Yes.
28            THE COURT:  You don't mind if I write over
```

1    the letters with numbers, do you?

2              MR. BRODERICK:  Of course not.

3              THE COURT:  Do you have an exhibit list?

4              MR. BRODERICK:  I do not.

5              THE COURT:  We have what you had marked

6    previously "A" through "O."  Is that right?

7              MR. BRODERICK:  That's correct, Your Honor.

8              THE COURT:  Now they're being marked 1

9    through 15.

10             MR. BRODERICK:  I am handing copies to

11   Mr. MasMarques.

12             THE COURT:  The different Exhibit 1 is

13   Memorandum and Order from United States District

14   Court, District of Massachusetts, dated September 22,

15   2015.  It's essentially the same as your Exhibit 1 in

16   the other related proceedings.

17             Exhibit 2 is -- I don't know what to call

18   this.  It looks like --

19             MR. BRODERICK:  It's Mr. Marques' request.

20             THE COURT:  This says "free speech" at the

21   top.  Tell me in a few words what this is so we can

22   identify it for the record.

23             MR. GREENSPAN:  I believe the exhibit that

24   has "free speech" at the top, this is a compendium of

25   two articles.

26             THE COURT:  Compendium of articles.  Is that

27   going to work for you?

28             MR. GREENSPAN:  That's fine.

1          THE COURT:  Exhibit 3 is going to be a

2     series of what looked to be explicit photographs.  And

3     I assume these were posted online as well as also some

4     messages with text.  These are internet postings.

5          MR. GREENSPAN:  That's correct.

6          THE COURT:  We will say photographic and

7     language postings or text posting.  Photographic and

8     text postings.

9          Then Exhibit 4 is entitled Judi, J-u-d-i,

10    Greenspan.  Tell me in a few words what this document

11    is.

12          MR. GREENSPAN:  This is a set of similar

13    internet postings, but on a different website.

14          THE COURT:  Got it.  And then Exhibit 5 is

15    entitled Aaron Greenspan, A-a-r-o-n, 956 Carolina

16    Street, San Francisco, zip code.  What would that be,

17    that set of documents?

18          MR. GREENSPAN:  This is another set of

19    internet postings, different website.

20          THE COURT:  And then number 6 appears to be

21    email transmissions.  Yes or no?

22          MR. GREENSPAN:  In part.  These are messages

23    received from Mr. MasMarques and the explanation of a

24    pseudonym he used as well.

25          THE COURT:  Okay.  Exhibit 7 is called

26    "Black List Report."

27          MR. GREENSPAN:  Correct.  This post concerns

28    Mr. MasMarques' probation officer.

1          THE COURT:  All right.  Then Exhibit 8 is
2     going to be a series of posted photographs and texts.
3          MR. GREENSPAN:  Correct, additional internet
4     postings.
5          THE COURT:  Then Exhibit 9 looks to be an
6     email message.
7          MR. GREENSPAN:  Correct.  This is an email
8     from the Senior Assistant Attorney General of Arkansas
9     concerning Mr. MasMarques.
10         THE COURT:  Okay.  And then 10 is going to
11    be what appears to be a letter.
12         MR. GREENSPAN:  Correct.  This is a letter
13    from my father.  His name is Dr. Neil Greenspan,
14    N-e-i-l, Greenspan.
15         And this is a letter to law enforcement and
16    his employer.
17         THE COURT:  It's dated October 26, 2018.
18         We have Exhibit 11 which, again, has your
19    dad's name on it.
20         MR. GREENSPAN:  Correct.  This is one page
21    from my father's personal website as well as a log
22    file corresponding to that particular page.
23         THE COURT:  Exhibit 12, a letter from
24    Comcast.
25         MR. GREENSPAN:  This is a subpoena response
26    from Comcast.
27         THE COURT:  Dated July 27, 2018.
28         MR. GREENSPAN:  Correct.

```
 1              THE COURT:  Exhibit 13?

 2              MR. GREENSPAN:  One more thing.

 3              THE COURT:  With number 12?

 4              MR. GREENSPAN:  Yes.  There's another page

 5    in that exhibit which is the criminal Complaint in the

 6    Marlborough District Court concerning Mr. MasMarques.

 7              THE COURT:  Number 13?

 8              MR. GREENSPAN:  Number 13 is correspondence

 9    between myself and the Santa Clara County D.A.'s

10    office.

11              THE COURT:  And then Exhibit 14?

12              MR. GREENSPAN:  Exhibit 14 are documents

13    concerning the service issues, essentially.

14              THE COURT:  And Exhibit 15.

15              MR. GREENSPAN:  I think that that's the last

16    exhibit I have.

17              THE COURT:  So we will get these marked.

18    Our clerk is going to take a few minutes to do that.

19              And then the only thing I ask is if the

20    witnesses are going to be shown the documents, let's

21    show them the marked exhibits and identify them by

22    number for the record.

23              And sir, Mr. MasMarques, if you have any

24    documents you are going to want me to consider, we

25    will be able to get those marked as well.

26              MR. MASMARQUES:  I do, Your Honor.

27              THE COURT:  Remind me if this case has been

28    mediated before.  I am just curious.  I don't think
```

1      the parties were before the Court previously, right?

2                    MR. BRODERICK:  I agree.

3                    THE COURT:  We are going to have

4      Mr. Greenspan go first with his request for

5      restraining order.  And he will also have an

6      opportunity to respond to the allegations you made

7      against him.  And of course, you are going to have

8      your opportunity to testify about the reasons you are

9      asking for restraining order against him, defending

10     against his request.

11                   And as soon as you need to use any documents

12     in that process, just let me know and we will get

13     those marked in due course as well.

14                   MR. MASMARQUES:  Thank you, Your Honor.

15                   THE COURT:  Counsel, as soon as you get

16     these back, they are going to be numbered instead of

17     lettered.  So they will be easier for you to work

18     with.

19                   I don't know what the time estimate on this

20     case was, but I am a little bit concerned that we are

21     going to be able to finish.  Mindful of the fact that

22     it's an inconvenience for the parties to have to come

23     back, so we will see how we fare.

24                   Counsel, if you did want to offer a

25     stipulation -- for example, if you wanted to offer

26     those documents into evidence by stipulation -- we can

27     always explore whether the respondent would be willing

28     to have them admitted without any controversy.

1        MR. BRODERICK:  May I approach?

2        THE COURT:  We will wait to get the marked

3   exhibits, then you can show those to him.  See if you

4   want to try and grab the stipulation.

5        Exhibit 1 is Memorandum and Order; Exhibit 2

6   is the document entitled "Free Speech;" Exhibit 3 are

7   the explicit internet postings; and Exhibit 4 is the

8   Judi Greenspan documents.

9        Exhibit 5, Aaron Greenspan documents.  We're

10  saying this in shorthand.

11        Exhibit 6 is -- looks like an email and some

12  additional data.

13        Exhibit 7 is the Black List Report.

14        Exhibit 8 is more internet postings, photos

15  and texts.

16        Exhibit 9 is email.

17        Exhibit 10 is the October 6, 2018, letter to

18  Sgt. Attaway, A-t-t-a-w-a-y.

19        Exhibit 11 is what's entitled Dr. Neil S.

20  Greenspan.

21        Exhibit 12 is Comcast information.

22        Exhibit 13 is an email from the Family

23  Violence Unit to Mr. Greenspan.

24        Exhibit 14 looks like this email dated May

25  22, 2018.  And it looks like 14 is the file.

26        So I think you can operate off the tags.  I

27  will hand this back to our deputy.

28        MR. BRODERICK:  The first document --

1        THE COURT:  Wait a second.  I want you to

2   use the tagged documents.

3        MR. BRODERICK:  Very good.

4        THE COURT:  Use the official record and I

5   think we will be fine.

6        MR. BRODERICK:  Thank you very much.  That's

7   fine.

8        I have numbered these and I will give them

9   to Mr. MasMarques.

10        THE COURT:  Well, it just depends on whether

11   you are going to ask your client questions.  If you

12   have an extra duplicate set for Mr. MasMarques so he

13   can follow along, that's fine.

14        MR. BRODERICK:  I do.

15        THE COURT:  Any time you ask a witness about

16   a document, I want to make sure it's a marked

17   document.

18        MR. BRODERICK:  The only one that is not

19   marked that we will use is Mr. Martinez's Request for

20   Restraining Order, his top document.

21        THE COURT:  We have marked 14, so let's work

22   with those.  If you want other documents to be marked,

23   we will be glad to mark it.

24        MR. BRODERICK:  Mark this number 15.

25        THE COURT:  Number 15 is going to be the

26   Request for a Temporary Restraining Order filed by --

27        MR. GREENSPAN:  It's a Request to Terminate.

28        THE COURT:  You know you are communicating

1    through counsel and we want to make sure we keep you

2    not in an advocates role, but in a witness role which

3    is a proper role.

4              Any time you need to confer with your

5    attorney, just let me know and I will give you an

6    opportunity to do that.

7              15.  I think we are squared away on

8    documents now.

9              (Whereupon, Exhibit Nos. 1-15 were

10             marked for identification.)

11             THE COURT:  Counsel, Mr. Greenspan is going

12   to communicate through you.  If he needs time to

13   confer with you, I told him that would be just fine,

14   just let us know.  And I know he is under oath and I

15   think you are ready to ask him some questions.

16             MR. BRODERICK:  I am.

17                     DIRECT EXAMINATION

18   BY MR. BRODERICK:

19   Q.        Before you is a set of exhibits.

20             Number 15, have you ever seen that document

21   before?

22             It purports to be a request to terminate

23   civil harassment restraining order by Mr. MasMarques.

24   Have you seen this before?

25   A.        Yes, I have.

26   Q.        Can you explain why you use this document in

27   support of your request for restraining order?

28   A.        Well, on page 2 of the document,

1  Mr. MasMarques makes a number of statements simply
2  that he's filed claims against me, he says, with many
3  law enforcement agencies, including the IRS, FBI, FCC,
4  FTC, California Attorney General's Office, California
5  eCrimes Unit, U.S. Attorney in San Francisco.
6           THE COURT:  I get the gist.
7  Q.        (By Mr. Broderick)  These are all in
8  paragraph or section 5, right?
9  A.        In section 5, yes.
10 Q.        Going deeper into the document, on about
11 page 4, without going through every item, will you
12 give the Court an idea of why you have attached this
13 in particular?
14 A.        Well, specifically, Mr. MasMarques states
15 that he uploaded online, he says, around eight of the
16 60 pages of a corporate filing from one of my
17 companies.
18           And it just goes to show that he admits to
19 having uploaded information on the internet concerning
20 me and my company.  And I believe this is
21 representative and a small sample of what he actually
22 uploaded on the internet.
23           THE COURT:  When you are talking about these
24 agencies, are you indicating that he has made these
25 reports or has not made these reports?
26           Are you indicating he has made them and they
27 are, sort of, evidence of his harassment?
28           THE WITNESS:  Yes.  I am indicating not only

1   that he claims to have made them, which he does in

2   this document, but he also actually attached a number

3   of the reports in the court records.  So you can see

4   them.  I am not sure how many there are in total.

5           THE COURT:  You feel that's part of the

6   harassment?

7           THE WITNESS:  It is definitely part of the

8   harassment.  And if we are able to skip around,

9   there's an exhibit --

10          THE COURT:  Wait a second.  Let your

11  attorney ask the question.  You are just on Exhibit 15

12  now.

13          Counsel, let's go ahead and continue with

14  your questions.

15  Q.        (By Mr. Broderick)  May we now look at the

16  document that's been marked number 7.

17          THE COURT:  What is the question?

18  Q.        (By Mr. Broderick)  What is the significance

19  of that document?

20  A.        Just in relation to the various agencies

21  where Mr. MasMarques filed complaints.

22          This email from Shawn, S-h-a-w-n, J.

23  Johnson, Senior Assistant Attorney General of the

24  State of Arkansas, reflects that Mr. MasMarques had

25  even been harassing his office so frequently that the

26  Senior Assistant Attorney General emailed me to find

27  out why this was all even going on.

28          MR. BRODERICK:  I want to make a correction.

1    That was Exhibit 9, not 7.

2            THE COURT:  Thank you.  Is that what you

3    were looking at?

4            THE WITNESS:  That's the same document, yes.

5    Q.        (By Mr. Broderick)  Going back in order, we

6    previously reviewed Exhibit 1.  Is that a true and

7    correct copy of the reporter's transcript of

8    proceedings of June 19, 2018, in the -- in this court?

9    A.        Yes.

10   Q.        Why do you attach that?

11   A.        I attached that because at the end of the

12   transcript, the Court found that the exhibits

13   presented on that day were, quote, "Threatening,

14   intimidating in nature."

15   Q.        What document do you have to show that

16   something was intimidating or threatening?

17   A.        If you look at Exhibit -- I believe it's

18   Exhibit marked 3.

19           THE COURT:  Keep in mind, the Court doesn't

20   have these.  So I don't know what you mean by

21   threatening toward whom.

22           Counsel, if you want to give the Court a

23   working copy, that's fine.

24           MR. BRODERICK:  I do.

25           THE COURT:  Are you okay with that?

26           MR. BRODERICK:  Yes.

27           THE COURT:  It looks like everybody has a

28   copy because when you are talking about threatening in

1    Exhibit 1, I am not sure threatening toward whom.  You

2    need to clarify that.

3              These are already marked so that's a copy

4    for me.

5              So with reference to Exhibit 1, threatening

6    toward whom?

7              THE WITNESS:  Are you asking me directly?

8              THE COURT:  Sure.

9              THE WITNESS:  The threats were made toward

10   myself.  And based on my perception of what was being

11   posted, toward my family as well.

12             THE COURT:  We are still talking about

13   Exhibit 1?

14             THE WITNESS:  Sorry.  I sort of lost track

15   here.  I was reading from the transcript of the

16   June 19th, so that's Exhibit 1, yes.

17             THE COURT:  Thank you.  Got it.

18   Q.        (By Mr. Broderick)  Can you give us an

19   example of a threatening --

20             THE COURT:  If you can do it without

21   reference to the document, that would be great.  If

22   you need to refer to the document, that's fine.  But

23   if you can do it from independent recall, feel free to

24   do that.

25             THE WITNESS:  Okay.

26             I recall I received a number of threats

27   either from somebody calling themselves Diego

28   MasMarques or somebody using a pseudonym which is

1    easily traced back to Mr. MasMarques.

2              THE COURT:  In what format did you get that?

3    What kind of communication?  Was it social media?  Was

4    it --

5              THE WITNESS:  So my company and my

6    non-profit jointly run a website called Plainsite

7    which hosts a number -- several tens of millions of

8    court documents and dockets.  And there's a "contact

9    us" form on that site which, when completed, will

10   generate an email that I receive.

11             THE COURT:  That was one mode of

12   communication.

13             What was the nature of the threat that was

14   communicated?

15             THE WITNESS:  One particular message, there

16   was a lot of profanity and a question like, "Where do

17   you live," as in I am gonna hunt you down.

18             In another message, I believe one of the

19   exhibits, Mr. MasMarques used the pseudonym of Liborio

20   Bellomo.

21             THE COURT:  You better spell that.

22             THE WITNESS:  I believe it's Liborio

23   L-i-b-o-r-i-o.  Last name, Bellomo, B-e-l-l-o-m-o.

24             And my understanding is that Mr. Bellomo is

25   a convicted mob boss who has murdered a number of

26   people.

27             THE COURT:  How did you determine that was a

28   pseudonym that was being used by Mr. MasMarques?

1          MR. BRODERICK:  You can use the documents
2     for this question because I think it would be helpful.
3          THE COURT:  Let him explain in regular
4     terms.
5          THE WITNESS:  So each time one of these
6     forms is completed, because there have been problems
7     like this, my server will record the IP address of the
8     server.  The IP address is one method.
9          Another method is that Mr. MasMarques has a
10    fairly distinctive writing style.  And --
11         THE COURT:  So on those bases, you were able
12    to link it up with him?
13         THE WITNESS:  Yes.
14         THE COURT:  Next question.
15    Q.        (By Mr. Broderick)  Can you give us an
16    example of how you traced the IP address to
17    Mr. MasMarques?
18    A.        Yes.  For this, I think an exhibit would be
19    helpful.
20         THE COURT:  Tell me what exhibit it was, and
21    just explain in your own words what the process was of
22    sort of verifying that.  I think we can move on after
23    that.
24         THE WITNESS:  So a frequent target of the
25    harassment has, unfortunately, been my immediate
26    family.  And my father has a personal website that my
27    company hosts, so I have access to the logs for that
28    site.  Exhibit 11 is a printout of one page from that

1   site where his photograph appears.

2            Exhibit 11 on the next page contains a log

3   file of every time somebody accessed that page from

4   approximately January 2018 to -- looks like about

5   July 2018.

6            And in red or highlighted, one particular IP

7   address, which is 24.60.59.25.

8            THE COURT:  Is this just showing that

9   Mr. MasMarques accessed that information or is it

10  showing something different?

11           THE WITNESS:  Well, it's showing something

12  specific which is that he didn't just access the web

13  page, but he actually accessed the specific photograph

14  from the web page directly on a number of occasions.

15           THE COURT:  What's the significance of that

16  for you, the fact that he accessed the photograph?

17           THE WITNESS:  The fact that he accessed the

18  photograph directly without even viewing the page

19  suggests that he was particularly interested in that

20  photograph for some reason.

21           THE COURT:  Why was that of concern to you?

22           THE WITNESS:  That was of concern to me

23  because that exact same photograph, which is not

24  available on the internet anywhere else, appears in a

25  number of the composite, pornographic and offensive

26  images that are shown in Exhibit -- I believe it is at

27  least 3 and maybe others as well.

28           THE COURT:  So he co-opted that photo which

1    was unique to that site.  And he used them for these

2    pornographic images.

3              THE WITNESS:  Among others, yes.

4              THE COURT:  Got it.

5              Counsel, go on from there.

6              If you want to just go through the Exhibits

7    1 through 14 and explain briefly why they're important

8    to your case, counsel, I don't know if you think that

9    might be a more efficient thing to do.  It's

10   completely up to you.

11             MR. BRODERICK:  In the interests of saving

12   time.

13             THE COURT:  So we have already talked about

14   Exhibit 15.  We have talked about Exhibit 1.

15             Do we want to take Exhibit 2 for starters?

16             MR. BRODERICK:  Yes, Your Honor.

17             THE WITNESS:  Exhibit 2 comprises two

18   separate articles that were published on the

19   publication called Tech Dirt, T-e-c-h, D-i-r-t.  And

20   these articles concern a set of events that happened

21   in about September 2018 where the Plainsite Twitter

22   account was, for some reason, taken off line by

23   Twitter at the request of somebody, which was

24   surprising because Plainsite is a media outlet, albeit

25   a small media outlet, but it's the kind of thing you

26   do not expect to happen.

27             THE COURT:  Right.  Let me understand.  Draw

28   the connection between Tech Dirt and Plainsite.

1          MR. GREENSPAN:  There's actually -- Tech

2    Dirt was simply reporting on the situation concerning

3    the Twitter account being removed because it involved

4    the GDPR which is the European law recently passed and

5    how the GDPR is having effects on United States

6    businesses which are perhaps unexpected.

7          THE COURT:  So Tech Dirt was reporting on

8    Plainsite's removal from Twitter.  And that's

9    significant because?

10          THE WITNESS:  It's significant because, on

11    December 4th, Mr. MasMarques filed --

12          THE COURT:  Of what year?

13          THE WITNESS:  Of this year.  This is only

14    about a week ago.

15          Mr. MasMarques filed in this court, in this

16    case, a number of documents which indicate that he

17    worked with another individual to remove the Plainsite

18    account from Twitter using the GDPR as a false

19    pretense.

20          And I think this goes to show not only that

21    Mr. MasMarques has had a detrimental and threatening

22    presence in my life the past year and a half or so,

23    but also that he has now moved into the domain of

24    affecting my business and that is of great concern to

25    me.

26          THE COURT:  So you are saying that he was

27    tampering with Plainsite's Twitter account.

28          THE WITNESS:  Not directly, but in this

1    particular case, through a false request to Twitter.

2              THE COURT:  Got it.  And the false request

3    would have been to remove it.

4              THE WITNESS:  On the basis that I had

5    somehow violated the GDPR or that Plainsite account.

6              THE COURT:  Violate in what manner?

7              THE WITNESS:  Well, this is a matter of

8    considerable controversy, but the GDPR -- and I am not

9    an expert on this -- but it broadly states that

10   European citizens have the right to be forgotten and

11   that they can have information removed within

12   24 hours.  And if such information is not removed,

13   then the hosting party or the hosting company for that

14   content must actually completely remove the entire

15   site.

16             THE COURT:  What was improper about the

17   request?  If he is saying -- help me understand.

18             If he is saying that there was information

19   posted, for example, on this criminal history and that

20   he has a right under European law to make sure that

21   that information is not broadcast or publicized and he

22   made the request on that basis, help me understand

23   what was improper about that request.

24             THE WITNESS:  To be clear, I have not seen

25   the actual request.  So I don't know what was in the

26   request.

27             THE COURT:  But if it is one of the bases

28   for your request for a restraining order, help me

1    understand why you believe that that was part of a

2    course of harassing conduct as opposed to him sort of

3    just protecting his reputation and his interests.

4              THE WITNESS:  My understanding is that

5    Mr. MasMarques is especially sensitive about his home

6    address appearing online.

7              THE COURT:  But are we talking about the

8    home address or the criminal history?

9              THE WITNESS:  We are talking about the home

10   address at this point.

11             THE COURT:  Got it.  But isn't the basis for

12   which he was asking for removal on the Twitter account

13   information about criminal history?

14             THE WITNESS:  I don't believe so.  And this

15   is where this all gets complicated.

16             THE COURT:  Let me see if I can understand.

17             You are saying it was almost pre-textural

18   and you feel he was less concerned about the criminal

19   history and more concerned about the personal

20   residential data.

21             THE WITNESS:  That's my belief.  But again,

22   I haven't seen the actual request.  So I don't know

23   who made the request.  I don't know what the request

24   states.

25             THE COURT:  You don't know he made the

26   request?

27             THE WITNESS:  What I do have is emails that

28   he has provided to the Court suggesting that he and

1   another individual explicitly and in writing conspired

2   to remove the Plainsite Twitter account.

3            THE COURT:  So he's made an admission doing

4   this?

5            THE WITNESS:  Yes.

6            THE COURT:  The Court is still a little bit

7   murky.  You are going to have a chance to be heard for

8   sure, but I think the thing that's a little bit murky,

9   just so everybody knows, to me is if somebody is

10  trying to protect something, obviously one thing they

11  might be trying to protect is information that they

12  believe is being unlawfully or improperly publicized

13  about the criminal history.  And it's my

14  understanding, Mr. Greenspan, that that could have

15  included some personal data that Mr. MasMarques may

16  have been sensitive to as well.

17            Is that fair or is my statement wrong?

18            THE WITNESS:  He may have been concerned

19  about any number of things.  I don't know which of

20  those things were part of the request that was made,

21  if it was even made by them.

22            But what I do know is that based on the

23  admissions he made in writing, there is no justifiable

24  circumstance where his concerns should override the

25  ability of the media outlet to publish under the First

26  Amendment.

27            THE COURT:  Then why do you suppose they

28  removed it?

```
 1              THE WITNESS:  Twitter has a policy of
 2    automatically handling GDPR requests very quickly
 3    because there is a 24-hour penalty to Twitter.
 4              THE COURT:  Did you do anything to, in your
 5    view, rectify the situation?
 6              THE WITNESS:  I contacted Twitter's general
 7    counsel and I also contacted one of her deputy general
 8    counsels and eventually was able to get the site
 9    restored.
10              THE COURT:  On what basis?
11              THE WITNESS:  Honestly, I don't remember
12    exactly what their basis was.
13              THE COURT:  But I mean, how did you convince
14    them to restore it?
15              THE WITNESS:  I explained that we have a
16    First Amendment right to publish.
17              THE COURT:  So it was based on the First
18    Amendment right overriding any other privacy
19    considerations.
20              THE WITNESS:  Yes, and also the request they
21    received which, again, I wasn't able to actually see.
22    But I believe any request they received claiming that
23    we had somehow violated a law by publishing
24    information was incorrect.
25              THE COURT:  Okay.  Got it.  Did you want to
26    continue with the documents?
27              MR. BRODERICK:  Thank you.
28    Q.        Can you tell us, have you ever seen the
```

1    document marked Exhibit 4?

2    A.        Yes.

3    Q.        Can you describe that document, please?

4    A.        Yes.  This is a printout of a website

5    calling itself Cyber Extortioner.  And to the best of

6    my knowledge, this website was set up by somebody

7    named Scott, S-c-o-t-t, Breitenstein,

8    B-r-e-i-t-e-n-s-t-e-i-n.

9            Mr. Breitenstein hosts a number of what are

10   called gripe sites where people who have some

11   dissatisfaction they would like to express can write

12   whatever they like.

13           And Mr. MasMarques has used a number of

14   Mr. Breitenstein's gripe sites to express his

15   dissatisfaction with me and with my family.

16   Q.        Can you give us some examples of that?

17           THE COURT:  Before you go on, let me make

18   this comment.

19           Obviously, I don't know everything right now

20   and I am keeping a open mind.  But it strikes me that

21   in some sense, if we are going to be just sort of

22   generalizing about this, you both have the same kind

23   of complaint against one another that there is just

24   information out there that's troubling and problematic

25   and what both parties consider to be harassing.

26           And I am just going to throw this out here.

27   You don't need to respond to it.  But it seems to me

28   that if both parties agree not to post about one

1    another, then -- you know, this case is definitely

2    going to pose First Amendment questions.  And it may

3    be that the parties are going to need to do some

4    briefing on this issue and it may be that you are not

5    represented by counsel now.

6            But the Court's going to have to make a

7    distinction in this case if the Court is of a mind to

8    grant relief as to what is protected conduct and what

9    is not.  And that's going to be a little bit of a

10   prickly issue here.  So I just want both of you to

11   keep that in mind.

12           Obviously, if you wanted to, I guess you

13   could call a truce, but I am not going to even get

14   myself involved in that other than to say if it's

15   something you wanted to explore, there are resources

16   that would enable you to do that.

17           We do have mediators that are available and

18   not associated with the court, but they are very very

19   talented and experienced mediators and they volunteer

20   their considerable services free of cost to folks who

21   are on these calendars.

22           I will let that rest out there and think

23   about.

24           Feel free to go ahead.

25   Q.        (By Mr. Broderick)  Give us an example,

26   please.

27           You were testifying about how this platform

28   is used to make gripes and you indicated that

1   Mr. MasMarques had used it.  Can you give us an

2   example of his use?

3   A.          Right.

4            THE COURT:  Give us an example that you

5   think is sort of egregious that you think sort of

6   crosses the line from First Amendment privilege into

7   territory that's harassing.

8            THE WITNESS:  Right.  So I think that you

9   draw the line because the content that we have

10  published about Mr. MasMarques, again, among

11  millions --

12           THE COURT:  Let's not have an argument about

13  what you did.  I want to get a sense from you as to

14  what he did that you feel sort of crosses that line,

15  as you put it.

16           THE WITNESS:  The statements that are made,

17  I believe by Mr. MasMarques, about me and my family

18  are false.  They are lies.

19           THE COURT:  So presumably they would be

20  actionable through some sort of defamation suit.

21           THE WITNESS:  They would.

22           THE COURT:  So you think they're defamatory.

23  That's the basic thing.  They don't contain threats or

24  anything else that's causing you to be fearful for

25  your safety?

26           THE WITNESS:  Some of them do contain

27  threats.

28           THE COURT:  That's what I need to hear from

1    you.

2         THE WITNESS:  As I stated previously, the

3    messages I have received asking where I live, messages

4    I have received with pseudonyms of convicted

5    murderers.

6         THE COURT:  We are talking about Cyber

7    Extortioner.  That's where our focus is now on Exhibit

8    Number 4.

9         Is there anything in Exhibit 4 you think is

10   unprotected speech or something that crosses the line

11   from protected speech to something you feel is in the

12   nature of harassing conduct?

13        THE WITNESS:  Sure.  I am quoting here, "The

14   entire truth about all the Aaron Greenspan illegal

15   hacking will soon come to light.  He will be going to

16   prison."

17        That casts me in a false light.  I have not

18   hacked into Mr. MasMarques' email account as he has

19   alleged.

20        THE COURT:  It always becomes problematic

21   for the Court when there's an allegation of some

22   defamatory content.

23        These hearings are not about defamations.

24   These hearings are about harassment.  And it's hard

25   for the Court to ferret out what is false and what

26   isn't false in the context of these cases.  And of

27   course, that doesn't mean that these allegations

28   aren't actionable elsewhere.

1          But I guess what's going to be really
2     helpful to me is to find out if there's other
3     instances of conduct on respondent's part that you
4     consider to basically be harassing in nature as
5     opposed to posting information that you consider to be
6     false.
7     Q.        (By Mr. Roderick)  To help the Court, would
8     you reference Exhibit 3, for example?
9     A.        Exhibit 3 contains numerous pornographic
10    composite images where my face, my parent's faces, in
11    some cases my brother's face has been pasted onto
12    pornography or vice versa.
13          THE COURT:  It's hard to see how that would
14    be anything other than harassment in nature if, in
15    fact, respondent was responsible for that.  I
16    understand that.
17          THE WITNESS:  In addition to that, this
18    isn't an exhibit, but my phone number and my family's
19    home phone number in Ohio is embedded in many of these
20    images and many of the text posts that accompany them.
21          THE COURT:  So you are sensitive to the same
22    thing that you indicate that Mr. MasMarques is
23    sensitive to.  You have that commonality, it sounds
24    like.
25          THE WITNESS:  I am not talking about a
26    sensitivity.  I don't care if my phone number is
27    posted online.  I do care if it's posted in a
28    composite fake pornographic photo image.  And I also

1    care if, for example, somebody were to call 25 times

2    to my parents' house.

3             THE COURT:  I don't think we have gotten to

4    that yet.  You are getting ahead of us here.

5             THE WITNESS:  You asked for examples.

6             THE COURT:  No, no, for sure.  But

7    pornography is obviously concerning to the Court.

8    It's very graphic.  It doesn't seem to have any useful

9    purpose.  And I think you are probably going to get to

10   the other things as soon as your counsel walks you

11   through it.

12   Q.        (By Mr. Broderick)  How do you know who

13   posted those things?

14   A.        In some cases, I don't know for certain.

15   Other cases, I do.

16   Q.        Give us one that you do know.

17   A.        As I said, the IP address that seems to have

18   requested my father's photograph with unusual

19   frequency -- according to those subpoena response from

20   Comcast -- belongs to Mr. MasMarques' wife at the same

21   mailing address where Mr. MasMarques resides.

22            THE COURT:  Got it.  And I am looking at the

23   time.  I know the Court's been sort of frequently

24   interjecting, but maybe you want to get through the

25   balance of the documents.

26            MR. BRODERICK:  Thank you.

27   Q.        We just testified on Exhibit 4.  Is that

28   your address on Exhibit 5?

```
1    A.         Yes, that's my home address.

2    Q.         Did you post it?

3    A.         I did not.

4    Q.         Who did?

5    A.         I cannot say for certain, but it is

6    consistent with other posts made by Mr. MasMarques.

7    Q.         Tell us about the consistency that you

8    contend is there.

9    A.         Specifically, it says that Plainsite is an

10   extortion machine and it will not remove any names

11   until you pay $4,500.  That's a specific number that,

12   first of all, is completely false.

13             Second of all, has been, I believe, used by

14   Mr. MasMarques in the past in his various false

15   allegations.

16   Q.         Number 6, exhibit marked number 6.

17   A.         These are emails from Mr. MasMarques where

18   he uses profanity and characterizes the completely

19   legal and protected posting of federal court records

20   as --

21             THE COURT:  What is the profanity that's

22   used?

23             THE WITNESS:  "Aaron, you dirty low life

24   mother fucker.  You need to fucking stop terrorizing,

25   harassing, stalking and threatening my life and family

26   online.  You are" -- misspelled -- "a fucking scum

27   POS.  You are" -- misspelled -- "not worth a fucking

28   penny.  You are" -- again, misspelled -- "just a piece
```

1     of trash blowing in the wind.  Stop the fucking

2     harassment you dirt bag and go fuck yourself."

3              The IP address is 24.60.59.25.  He's

4     provided a false phone number and a false email

5     address.

6              THE COURT:  For himself or for you?

7              THE WITNESS:  For himself.

8              The next message --

9     Q.        (By Mr. Broderick)  Go ahead.

10    A.        Next message from a different IP address,

11    also geo-located to Marlborough, Massachusetts, where

12    he lives, from Liborio Bellomo with a false phone

13    number and a very similar false email address.

14             The message reads, "You dirty mother fucker.

15    Where are you in the" -- misspelled -- "Bay Area.  You

16    asshole.  You cock sucker.  Shut this site down.  It

17    is not needed by the public.  It is harmful to the

18    public.  Get a real job in a Burger King or something

19    instead of trying to freeload off of people's

20    information."

21             This also brings to mind another concern

22    which is that I and my family are Jewish.  A number of

23    these images, some of them pornographic, some not,

24    contain swastikas and Nazi materials.

25             THE COURT:  Which exhibits?

26             MR. GREENSPAN:  Exhibit 3 contains a number

27    of images with swastikas.  For example, painted on my

28    face, a fake image of some pornographic actor with my

1    mother's face pasted on wearing Nazi arm bands.

2            I take that kind of imagery extremely

3    seriously.  A number of people have been killed by

4    individuals exhibiting similar behavior on social

5    media, and I view that as clearly threatening.

6            THE COURT:  Let's go through the balance of

7    documents.  I think you were just talking about

8    Exhibit 6.

9            MR. BRODERICK:  Number 7.

10           THE COURT:  Let's ask a question and Mr.

11   Greenspan can respond.

12   Q.      (By Mr. Broderick)  Can you identify the

13   exhibit that's been marked number 7?

14   A.      Yes.  Exhibit 7 is on a site called Black

15   List Report.  This is one of the aforementioned Scott

16   Breitenstein gripe sites.

17           This particular page is of interest because

18   it is about somebody named Lisa Dube.

19           THE COURT:  Last name?

20           THE WITNESS:  D-u-b-e.  And Ms. Dube is the

21   federal probation officer who is assigned to

22   Mr. MasMarques' case.

23           So although I am not here to represent her

24   interests or anything like that, it's notable for

25   several reasons.

26           One, there were nearly a thousand posts on

27   this same website about myself and my family.

28           Number two, the image of Ms. Dube on this --

1    I assume it's of Ms. Dube, I don't know for certain --
2    but the image on this page contains a speech bubble
3    with pretty thick border and some text that's been
4    added on.  And that exact same style can be found in
5    many of the images that are pertaining to myself.
6             Presumably this was posted by Mr. MasMarques
7    because I don't know who else would care about his
8    probation officer and mention his probation officer
9    status.
10            THE COURT:  In what context was she
11   mentioned there?
12            THE WITNESS:  It says, "Lisa Dube AKA Lisa
13   Dube Carpenter is a holier than thou hypocrite whose
14   moral compass is totally out of whack.  This
15   individual works as a Federal U.S. Probation Officer
16   who is completely unprofessional, underhanded, biased
17   and simply completely unprofessional."
18            And it goes on.
19            THE COURT:  Let's get through the balance of
20   documents, then we are going to take our afternoon
21   recess.
22            THE WITNESS:  Exhibit 8 contains, as I was
23   mentioning, similar speech bubble imagery where my
24   parents are made to look as though they are saying
25   things that they have obviously not said.
26            Images where similar text pasted on about me
27   on the same site, Black List Report.
28            Notably, I am referred to in many of these

1   posts with my middle name which is Jacob.  So I am

2   called Aaron Jacob Greenspan.

3           I never refer to myself with my middle name.

4   But if you look at Mr. MasMarques' court filings, he

5   almost exclusively refers to me as Aaron Jacob

6   Greenspan.

7           Further evidence that these were posted by

8   him.  Next exhibit?

9   Q.          (By Mr. Broderick)  Please.

10  A.          Exhibit 9 we covered, email from Arkansas

11  Assistant Attorney General.

12          Exhibit 10 is a letter from my father to the

13  Marlborough Police Department, the FBI and one of the

14  General Counsel employees at Case Western Reserve

15  University where he works.  Because, as a result of

16  the post made by Mr. MasMarques again, many of which

17  contain completely false information as well as this

18  pornography, he has had to deal with problems at work.

19          A, he's received harassing phone calls at

20  work where he is a physician and dealing with life and

21  death situations.

22          B, many of his colleagues have sometimes

23  also received emails either from Mr. MasMarques or

24  from other individuals who have seen Mr. MasMarques'

25  posts.  And because of the phone numbers and email

26  addresses and explicit encouragement to harass my

27  father, have done so.

28          THE COURT:  What explicit encouragement are

1    you talking about?

2              THE WITNESS:  I am not sure if the exact

3    text is in these exhibits, but at one point there was

4    a post on a site called Complaints Board that said

5    that individuals should contact Neil at Case and

6    basically bother him until I remove content.

7    Q.        (By Mr. Broderick)  Next?

8    A.        We have gone over Exhibit 11.

9              Exhibit 12 is the subpoena response from

10   Comcast confirming Mr. MasMarques' home address is

11   tied to the IP address.

12   Q.        Could you elaborate a little more about the

13   IP address?  Was that a link in regard to earlier

14   exhibits?

15   A.        Yes.

16   Q.        Can you describe that link?

17   A.        So, for example, on Complaints Board, one of

18   the many sites involved here, there are some posts

19   where whoever posted them -- assuming we don't know

20   for a second -- used specific URLs in those posts.

21   Those URLs point to websites that are hosted by my

22   company on a server I control.  Therefore, I have the

23   log files for those sites.

24             If you cross-reference the date and time of

25   those posts with the date and times from the log

26   files, what you will find for those specific URLs at

27   those times is Mr. MasMarques' IP address.

28   Q.        A URL is what?

A.          It's a Uniform Resource Locator.  It refers
to the address of a web page, generally.

THE COURT:  Did you want to go onto 13?

THE WITNESS:  Just to reiterate that the
other page in this exhibit is the criminal harassment
complaint from Massachusetts.

THE COURT:  Criminal harassment complaint.

THE WITNESS:  Yeah.  The Marlborough
District Court filed its own complaint about
Mr. MasMarques both regarding the harassment
prevention order of the previous one, which I suppose
is now terminated, and the general violation of
Massachusetts General Laws Section 43A.

THE COURT:  And that deals with pending
criminal charges; is that correct?

THE WITNESS:  Correct.

THE COURT:  Got it.  Were you ready to go
onto 13?

THE WITNESS:  Yes.

Exhibit 13 is correspondence between the
Santa Clara County District Attorney's Office and
myself.

I had contacted them about this matter to
find out whether something could be done, and this
explains how I knew, in part, that Mr. MasMarques is
responsible, at least for a good part of it.  I don't
know if every single post was authored by him, but
certainly many --

1          THE COURT:  Is that exhibit your
2  communication with the D.A. or their communication
3  back to you?
4          THE WITNESS:  I'm sorry.  I didn't catch the
5  question.
6          THE COURT:  Was Exhibit 13 your
7  communication to them or theirs to you?
8          THE WITNESS:  Actually, both.  The most
9  recent email here is them communicating back to me.
10          THE COURT:  Is there anything about their
11  response to you that is significant for purposes of
12  these proceedings?
13          THE WITNESS:  Well, it outlines what I was
14  describing before about cross referencing the IP
15  address with these times, so I think just having that
16  in writing.
17  Q.       (By Mr. Broderick)  14, is that servers?
18  A.       14, yes.  A number of documents concerning
19  what we discussed before which is the service issues.
20          And also, because I sent those photographs
21  to the Middlesex County Sheriff's Office just to make
22  sure they got the right person because they said they
23  weren't certain, but they could look at some photos.
24  Those photos come from publicly available newspaper
25  articles in recent court filings.
26          Mr. MasMarques has alleged that I somehow
27  hacked into Spanish newspapers.  That's false.
28          THE COURT:  So you are categorically denying

1    these claims that you hacked into his accounts?

2              THE WITNESS:  A hundred percent denying all

3    of them.

4              THE COURT:  Anything further, counsel?

5              MR. BRODERICK:  Yes.

6    Q.        Out of all these exhibits, do you find

7    Exhibit 3 and Exhibit 6 to be not only upsetting, but

8    actually threatening to you?

9    A.        Yes.

10   Q.        Exhibit 3 is the pictures including

11   swastikas on your family members, correct?

12   A.        And myself, yes.

13   Q.        And Exhibit 6 uses the "F" word frequently

14   in referring to you, correct?

15   A.        Yes.

16   Q.        Just by a little way of background, do you

17   know what it is Mr. MasMarques wants you to take down?

18   A.        My understanding from his prior request is

19   that he does not want there to be any evidence of his

20   criminal conviction available anywhere.

21   Q.        Now, did you write anything about his

22   conviction?

23   A.        Not until the Twitter account for Plainsite

24   was removed, at which point I made it clear to people

25   interested that there was a connection between this

26   restraining order case and this case.

27             THE COURT:  Let him finish.

28             Connection between the restraining order

1    and?

2                THE WITNESS:  And the removal of the account

3    because people were wondering why it disappeared.

4                Prior to that point, no, I had not written

5    any kind of editorial content.  I didn't know --

6                THE COURT:  I think also your attorney may

7    have been asking you if you wrote anything or

8    published anything about the underlying facts or just

9    what you put in there about the conviction.

10               THE WITNESS:  Right.  The answer is no.

11               The content that was published on Plainsite

12   was simply a reproduction of the Federal Court docket

13   and the Federal Court documents in an unaltered form.

14   So there is no expression of my opinion, there is no

15   expression of any of my employees' opinions.  There

16   was really nothing other than the facts, which is what

17   we seek to publish.

18   Q.        (By Mr. Broderick)  About how many cases do

19   you have published right now in your computer?

20   A.        Between 11 and 12 million.

21   Q.        And this is one of 11 or 12 million?

22   A.        It's one and the only case where this has

23   been a problem of this magnitude.

24               MR. BRODERICK:  One moment.

25               Thank you, Your Honor.

26               THE COURT:  So Mr. MasMarques, you are going

27   to have a chance to cross-examine Mr. Greenspan.

28               We are going to take our afternoon recess

```
1    which will be until 3:42.  And that will give you
2    maybe a little additional time to prepare any
3    questions.
4            You might not have any questions for him,
5    and of course I am going to hear your statements, but
6    if you have any questions for him, you will be able to
7    ask those when we come back.
8            I don't know whether the parties wanted to
9    explore mediation, but if it's something you are
10   interested in, you can have that discussion.  I don't
11   need to know about it unless it's something you decide
12   to do.
13           I am thinking we can get through this by the
14   end of the day.
15           MR. BRODERICK:  I think so.
16           THE COURT:  I think we are going to clear
17   the courtroom, but your documents will be secure
18   inside the courtroom.  If you want to have a chat, I
19   think counsel's available to talk.
20           MR. BRODERICK:  I am.
21           THE COURT:  If you want to chat with him.
22           (Whereupon, a recess was taken.)
23           THE COURT:  Back on the record in the matter
24   of Aaron Greenspan versus Diego MasMarques.
25           Let's have everybody's name for the record
26   again.
27           MR. BRODERICK:  Tim Broderick,
28   B-r-o-d-e-r-i-c-k, for Mr. Greenspan.
```

```
1              MR. GREENSPAN:  Aaron Greenspan.
2              MR. MASMARQUES:  Diego MasMarques.
3              THE COURT:  All right.  So Mr. Greenspan,
4     you are still under oath and Mr. MasMarques is going
5     to have a chance to cross-examine you now.
6              Any questions you'd like to ask?
7              MR. MASMARQUES:  Yes.
8              THE COURT:  And keep in mind, I know you
9     want to be heard also, but at this juncture, you are
10    going to be asking questions.
11             MR. MASMARQUES:  May I ask, Your Honor, why
12    his attorney took a picture of me?
13             THE COURT:  I am sorry?
14             MR. MASMARQUES:  His attorney just took a
15    picture of me in the hall.
16             THE COURT:  I don't know.
17             MR. BRODERICK:  I erased it because the
18    deputy told me to.  But I took his picture so that if
19    I have to serve him again, we would like to know what
20    he looks like.
21             THE COURT:  Okay.  So it looks like he
22    erased the photo.  He's given you the information as
23    to why he did that.
24             You can go ahead and cross-examine.
25             MR. MASMARQUES:  It was a rule in court.
26             THE COURT:  I think that's why our deputy
27    asked that counsel go ahead and erase it.  It looks
28    like he went ahead and did that.
```

```
 1              MR. MASMARQUES:  I know Mr. Greenspan.  I
 2   thought he might try to take a picture of me to keep
 3   himself.
 4              Anyways, I do have questions.  This
 5   harassment --
 6              THE COURT:  So here's the thing.  I think
 7   that in these situations, it's very tempting to want
 8   to give me your statement now.  And if you don't have
 9   any questions for Mr. Greenspan, that's fine.  But if
10   you do have questions, now would be your opportunity
11   to ask.
12              MR. MASMARQUES:  I do, Your Honor.
13              THE COURT:  Go ahead.
14              MR. MASMARQUES:  So do I direct them to the
15   counsel?
16              THE COURT:  You are asking Mr. Greenspan
17   questions, so just ask.
18              MR. MASMARQUES:  Okay.
19                     AARON GREENSPAN,
20   called as a witness on behalf of the Defense, after
21   having been previously duly sworn to tell the truth,
22   testified as follows:
23                     CROSS EXAMINATION
24   BY MR. MASMARQUES:
25   Q.        Mr. Greenspan, are you the owner of this
26   website called leagle.com, spelled l-e-a-g-l-e, .com?
27   A.        No.
28   Q.        No?
```

1              You said that the district attorney -- I am

2      sorry -- the Assistant Attorney General of Arkansas

3      communicated with you about some type of harassment.

4      And I wonder why would that mean to you if -- because

5      the only thing I complained about was leagle.com.

6              THE COURT:  You are starting to get into

7      additional facts.

8              See if you can form just a cogent question

9      and don't make it compound.  In other words, you can

10     ask follow-up questions after that.

11             MR. MASMARQUES:  Sorry, Your Honor.

12             THE COURT:  I think your question there was

13     why, in Mr. Greenspan's judgment or his opinion, would

14     some official from Arkansas be contacting him about

15     alleged harassment.  Is that your question?

16             MR. MASMARQUES:  Yes, Your Honor.

17             THE COURT:  Can you answer the question,

18     sir?

19             Let me just say this.  If both of you can

20     answer questions without reference to documents,

21     that's my preference because we want your independent

22     recall.

23             If you do need to refer to documents, let us

24     know.

25             Are you able to answer that question?

26             THE WITNESS:  To the best of my ability.

27             THE COURT:  Sure.  Go ahead.

28             THE WITNESS:  I don't know exactly what that

1    Arkansas official had in mind, but I believe that in

2    whatever complaint you filed with Arkansas or in

3    whatever phone conversations you had with their

4    office, you mentioned my name.  And so they contacted

5    me because they didn't understand the connection

6    between, I believe, leagle.com, which you are

7    complaining about, and me because there is no

8    connection.

9    Q.        (By Mr. MasMarques)  Okay.  You say that I

10   am responsible for posting pornographic images and

11   images with swastikas on them.

12             First of all, I want to say I have not done

13   any of that.

14             THE COURT:  This is not your opportunity to

15   make those statements.  And now is your opportunity to

16   cross-examine.

17             If you don't want to cross-examine and you'd

18   rather go right into your testimony, that's fine with

19   me too.  But to the extent that you are going to be

20   asking questions, don't include your testimony in

21   those questions.  We call that facts that have not yet

22   been established.

23             MR. MASMARQUES:  I apologize, Your Honor.  I

24   don't have legal training.

25             THE COURT:  It's fine.  Just go ahead and

26   ask the questions you would like to.  You are doing

27   okay.

28   Q.        (By Mr. MasMarques)  Do you know who owns

1   the website leagle.com?

2   A.          Not for certain.

3              THE COURT:  Do you have an idea or a sense

4   of who owns it?

5              THE WITNESS:  I basically heard a rumor, but

6   I have not independently confirmed that.

7   Q.          (By Mr. MasMarques)  Is it possible to hear

8   who the possible person is?

9              THE COURT:  What is your understanding about

10  who the owner may be?

11             THE WITNESS:  My understanding is that it's

12  owned by the former president of ICANN, which is

13  I-C-A-N-N, all capitals.  But I don't know for sure.

14  Q.          (By Mr. MasMarques)  Mr. Greenspan, you said

15  you have between 10 and 12 million court documents on

16  plainsite.org; is that correct?

17  A.          No, that's court dockets.

18  Q.          Court dockets.  Mr. Greenspan, have you ever

19  wrote on readit.com or anyplace online or Twitter that

20  you received threats almost daily and that you have

21  complaints against you on a regular basis?

22             THE COURT:  Stop right there because it's

23  going to become compound.

24             Have you acknowledged the fact that you have

25  received a lot of complaints and threats as a result

26  of what you do?

27             THE WITNESS:  We receive occasional

28  complaints and threats.

1          THE COURT:  But that's not the question.
2    The question was whether or not you have basically
3    indicated in communications or postings that you have
4    received threats.
5          THE WITNESS:  Well, just to be clear, his
6    question used the word "daily," so I want to be
7    specific.
8          But yes, we receive threats.  That's a fact.
9    We do not receive threats every day and if you have a
10   specific document --
11         THE COURT:  That's okay.  I think that
12   suffices.  Go ahead.
13   Q.        (By Mr. MasMarques)  Have you mentioned on
14   Twitter that you received -- that you receive threats
15   every day from people, but it's only annoying when
16   they send it to you by certified mail, something like
17   that?
18         THE COURT:  Does that sound familiar as to
19   anything you have ever posted?
20         THE WITNESS:  No.
21         THE COURT:  Next question.
22   Q.        (By Mr. MasMarques)  Do you receive removal
23   requests from a lot of people, you say?
24         MR. BRODERICK:  Objection.  Vague.
25         THE COURT:  Overruled.  Overruled.
26         Go ahead, answer.
27         THE WITNESS:  We receive removal requests on
28   a regular basis.

1    Q.          (By Mr. MasMarques)  Do you remove those

2    requests at all when people need, like, to find a job

3    or reputation, to keep their reputation?  Like

4    employment?

5               THE COURT:  You take into account these

6    requests in terms of the personal impact that these

7    postings are having on their lives?

8               THE WITNESS:  Sure.  So we have a written

9    privacy policy which is posted on the site which

10   explains how we take a number of factors into account.

11              One of those factors is often whether the

12   person making the request is looking for employment.

13              Another factor is whether the person making

14   the request has ever been convicted of a serious

15   crime.

16              THE COURT:  So you post the factors that you

17   take into account in determining whether or not data

18   should be removed.

19              THE WITNESS:  Not only do we post them, but

20   we also, in individually tailored responses, will send

21   back to the requestor an explanation as to why we made

22   the decision that we did.

23              THE COURT:  Whether it's to remove or not

24   remove?

25              THE WITNESS:  Correct.

26              THE COURT:  Got it.  Next question.

27              Did that happen in this instance?

28              THE WITNESS:  It happened multiple times.

1   And I believe in Mr. MasMarques' instance, there were

2   several important factors.

3           One was that he had been accused and

4   convicted of a serious crime.  The other that comes to

5   mind is that he had filed motions to seal in District

6   Court and in the First Circuit, I believe, so on

7   appeal.  And in both instances, a federal judge came

8   back and said that his documents should not be sealed

9   and that his request was denied.

10          MR. MASMARQUES:  I object.  This is not part

11  of the question.

12          THE COURT:  All right.  You are saying it's

13  nonresponsive.  I am not going to go ahead and

14  consider it.  It's something that may come up again.

15  So you can continue.

16  Q.          (By Mr. MasMarques)  Is plainsite.org, is it

17  a for profit or is it a 501C3, not for profit

18  website?

19          MR. BRODERICK:  Objection.  Relevance.

20          THE COURT:  What is the relevance of that

21  information?

22          Let me just say this.  I want to give you

23  some latitude on cross-examination, but right now it's

24  about 3:54.  And fundamentally, what the Court is

25  looking at is whether or not there's a basis for

26  granting a restraining order against you based on the

27  course of harassing conduct.  And having more

28  information about this website, I am not sure how

1    helpful it's going to be for the Court.

2             If you want to tell me how you think it's

3    going to be relevant and helpful, I will be glad to

4    hear your explanation.

5             MR. MASMARQUES:  Because Mr. Greenspan,

6    that's how he makes his living by posting people's

7    data online.

8             THE COURT:  Right.  And there's a dispute in

9    the facts here because you say he gets that

10   information through hacking.  And he is saying he

11   doesn't, and that's something that's sort of

12   unresolved.  And I don't know if it needs to be

13   resolved for purposes of these proceedings, but I

14   think it may be significant for you.

15            But I guess I don't want to have this

16   hearing turn into sort of a conduit for the parties

17   just trying to extract more information, background

18   information, about one another.

19            I really want to focus it on the allegations

20   at hand.  And of course, you have your own allegations

21   against him, so you may be questioning him about those

22   things as well.

23            MR. MASMARQUES:  Yes, Your Honor.

24            THE COURT:  I am not sure what's relevant

25   about more information about Plainsite.  If you want

26   to explore it, go ahead, do that, but it's going to

27   have to be very brief.  Go ahead.

28   Q.       (By Mr. MasMarques)  Mr. Greenspan, have you

1   called me a murderer and a rapist online?

2   A.        Yes.

3   Q.        Why did you do that?

4   A.        Because in your criminal history, there are

5   charges of murder and rape.

6           THE COURT:  Now, let me just ask this

7   question for clarification.

8           You had said in your earlier testimony,

9   Mr. Greenspan, that you did not include editorial

10  remarks, that you were basically taking that approach

11  of just the facts and letting the facts speak for

12  themselves.

13          And then you said there was an instance

14  where you didn't do that because you needed to explain

15  why information had been taken off Twitter.

16          But now you seem to be indicating something

17  different where you are characterizing his conduct in

18  a certain way.  So do you want to explain that?

19          THE WITNESS:  Sure.  So I believe what I

20  said before was accurate and is actually consistent.

21          So the particular editorial content he is

22  referring to right now relates back to that incident

23  involving Twitter where I was trying to explain to

24  others who were concerned why the Twitter account

25  disappeared.  And I clarified that Mr. MasMarques who,

26  according to the facts, has a history of murder and

27  rape, is the one most likely responsible.

28          THE COURT:  Did you say history of murder

1    and rape or did you say he is a rapist and a murderer,

2    if you recall the distinction.

3          THE WITNESS:  I believe I said he is a

4    rapist and a murderer, based on those facts.

5          THE COURT:  Let me ask you this.  Did you do

6    that out of anger because of the fact that he had had

7    this data removed from Twitter?  Because it seems to

8    be a departure from how you described how you convey

9    information, generally speaking.

10         THE WITNESS:  Well, I am not going to deny

11   that I was upset.

12         THE COURT:  But is that characteristic of

13   what you do or do you generally do what you said

14   before, which is just to sort of post the facts based

15   on information that's available publicly?

16         THE WITNESS:  To be clear, we are talking

17   about two different mediums.  Plainsite, the website,

18   contains factual information.

19         THE COURT:  Got it.

20         THE WITNESS:  Twitter, as you are probably

21   aware, does not always contain 100 percent factual

22   information.  But in this case, everything that I said

23   was based upon a fact.  And I think it was important

24   to clarify it to those concerned that there was a

25   particular individual responsible for this sequence of

26   events who had a serious criminal history.

27         THE COURT:  So this is where my follow up on

28   that based on what you said.  Thanks for clarifying.

1              Your medium for communicating information is

2    generally Plainsite.  What role does Twitter have in

3    your getting information out to the public at large?

4              THE WITNESS:  So as an example -- you don't

5    have to read it, but just to show you, one of the

6    things that Plainsite has produced is this report

7    (indicating).

8              THE COURT:  If you say, "this report," it's

9    going to have to be marked or identified.  Tell me in

10   your own words.

11             THE WITNESS:  It's a report on a publicly

12   traded company of interest to the general public.  I

13   and some of my colleagues spent almost a year

14   preparing this piece of work.  And then the challenge

15   was to make the public aware of it.

16             So that would be an instance where Twitter

17   is useful to make the public aware that there is this

18   new research that people may be interested in.

19             THE COURT:  But you don't depart from your

20   custom of just presenting the facts from whatever

21   source you get them from when you are communicating on

22   Twitter as opposed to making editorial comments or

23   calling somebody a rapist or a murderer.

24             Is there a distinction between how you use

25   Plainsite and Twitter that I need to know?

26             THE WITNESS:  Yes.  Twitter does have more

27   editorial -- more editorial kind of bent.  I think

28   that's fair to say.

```
 1            THE COURT:  And are you -- customarily, on
 2   Twitter, will you call people rapists or murderers,
 3   pedophiles or whatever it might be?  Or is that
 4   something that is not your general practice?
 5            MR. GREENSPAN:  It's not a general practice,
 6   no.
 7            THE COURT:  So is it fair to say that when
 8   you did this in Mr. MasMarques' case, it might have
 9   been a little bit of a departure from what's customary
10   for you on Twitter?
11            THE WITNESS:  I suppose that's fair to say
12   with the underlying basis being that having some of my
13   company's intellectual property affected by a
14   particular individual is also fairly uncustomary.
15            THE COURT:  So it became a little more
16   personal to you?
17            THE WITNESS:  Well, as you can understand, I
18   am sure, all of this has been very personal.  Those
19   are my parents and my brother.
20            THE COURT:  I am asking you in this
21   particular context.
22            THE WITNESS:  It's hard for me to separate
23   the various acts that Mr. MasMarques has --
24            THE COURT:  So your reaction may have been a
25   little different in this instance as a result of his
26   conduct.
27            THE WITNESS:  Yes, but I think it was wholly
28   merited and entirely factual.
```

1        THE COURT:  I am not asking about that.  I
2    am sort of sticking to the facts now, too, but I
3    appreciate that.
4        You want to continue?
5        MR. MASMARQUES:  Yes.
6    Q.        Mr. Greenspan, have I been convicted of
7    rape?
8    A.        According to one of the Pacer documents, you
9    were at least charged with rape.
10   Q.        Have I been --
11       THE COURT:  So now, you know that's not
12   responsive to his question.
13       Do you know of any conviction that he has
14   suffered for the offense of rape?
15       THE WITNESS:  I do not, off the top of my
16   head, either way.
17       MR. MASMARQUES:  He knows --
18       THE COURT:  No, no, no.  Question.
19   Q.        (By Mr. MasMarques)  Mr. Greenspan, when was
20   the first time that you say that you called me a
21   murderer and rapist online?
22       MR. BRODERICK:  Objection.  I find it
23   compound.  Please break up the question.
24       THE COURT:  It's overruled.
25       When?
26       MR. BRODERICK:  I'm objecting that he is
27   combining murder and rapist.
28       THE COURT:  We will just use rape.

1              When was that?  Just give an approximate.

2              THE WITNESS:  I honestly don't know the

3     exact date.

4              THE COURT:  Can you give us a sense of when

5     that was?

6              THE WITNESS:  I believe this whole

7     circumstance with the Plainsite Twitter account took

8     place in roughly September 2018.  So after that.

9              THE COURT:  Why did you call him a rapist if

10    you didn't have any information to suggest that he was

11    convicted of rape?

12             THE WITNESS:  So a lot of these questions

13    are asking me to recall specific facts that are in his

14    legal file.

15             THE COURT:  Wait a second.  Let me just ask

16    you this.  Let's just -- let's just see if we can hone

17    in on this.

18             You had already indicated that you did call

19    him a rapist in the Twitter situation.  And did you

20    ever have any information that you can recall that

21    would lead you to the conclusion that he had suffered

22    a rape conviction?

23             MR. GREENSPAN:  I do not remember exactly

24    what I wrote, first of all.  I do not remember --

25             THE COURT:  But you are backtracking a

26    little bit on your testimony now.  All I am asking you

27    is if you recall any information that you have had

28    within your possession or that you have had access to

1    that would lead you to the conclusion that he was a

2    rapist based on a conviction.  And I don't want you to

3    be evasive.

4            MR. GREENSPAN:  I am not trying to be

5    evasive.  I am trying to answer carefully because I

6    feel as though words are being put in my mouth here.

7            THE COURT:  We can have a read back.  I will

8    ask our court reporter.

9            I am wondering if you can read back what he

10   said.  I thought he said that he had indicated that

11   Mr. MasMarques was a rapist and a murderer.  I don't

12   know if that's something you can find on the record.

13           Mr. Greenspan is right.  We should have the

14   actual statement that he made on the record as a point

15   of departure.

16           The question is, did you have any

17   information in the past to suggest that Mr. MasMarques

18   had suffered a conviction for rape?

19           THE WITNESS:  The answer is, I read in his

20   Pacer filing that he had been charged with rape, but I

21   don't recall --

22           THE COURT:  You are savvy enough to know the

23   distinction between an allegation or accusation and a

24   conviction.

25           Let me reiterate.  Did you have any

26   information to suggest that he had been convicted of

27   rape?

28           THE WITNESS:  I can't answer that with a yes

```
 1    or no because I don't remember.  I probably --
 2              THE COURT:  We can move on.
 3              THE WITNESS:  I probably wrote what I
 4    thought I had read.
 5              THE COURT:  If you don't remember, that's
 6    fine.  That's your response.  We can move on from
 7    there.  Go ahead.
 8    Q.        (By Mr. MasMarques)  What is the reason why
 9    I am being called a murderer by you online with the
10    specification of murder in terms that you know that
11    from the filing that it's not murder?
12              MR. BRODERICK:  Objection.
13              THE COURT:  I think it's a little
14    incomprehensible.  I am going to sustain it on that
15    basis.  It's not real clear.
16              If you could, ask a cogent question for
17    Mr. Greenspan.
18    Q.        (By Mr. MasMarques)  Have you -- what was
19    the first time you called the Marlborough,
20    Massachusetts police?
21    A.        I don't remember.
22    Q.        When was the first time that you called the
23    Marlborough, Massachusetts court?
24    A.        Again, I don't remember.
25              THE COURT:  Do you have an estimate?
26              You don't have to guess or speculate, but if
27    you have an estimate, a rough estimate, that would be
28    fine.
```

1          THE WITNESS:  As to the police, I would
2    assume sometime around April 2018 when the TRO was
3    effective.
4          And as to the court, September or -- I am
5    not sure, September or October, 2018.  Those are
6    guesses.
7          THE COURT:  Those are your sort of best
8    estimates?
9          THE WITNESS:  Correct.
10   Q.        (By Mr. MasMarques)  And when you called the
11   Marlborough District Court, did you call them only one
12   time?  Did you call them several times during the day
13   to have them push a charge against me?
14         MR. BRODERICK:  Objection.  Relevance.
15         THE WITNESS:  No.  I don't believe the court
16   makes its own criminal charges.
17         THE COURT:  Okay.  Well, I guess the
18   objection is moot.  The question has been answered.
19   Q.        (By Mr. MasMarques)  Did you continuously
20   call the court around the third week in October for
21   several weeks and you kept calling the clerk's office?
22         Did you ever make any threats or harassment
23   that you were going to sue the Marlborough District
24   Court at the Massachusetts Superior Court level if
25   they didn't take action against me immediately with a
26   criminal charge?
27   A.        No.
28         THE COURT:  You hesitated a little bit

```
 1   there.
 2             THE WITNESS:  Well, I was trying to
 3   understand his question because it was sort of long.
 4             THE COURT:  Do you want it maybe broken
 5   down?
 6             MR. MASMARQUES:  My attorney told me -- I
 7   had to hire an attorney out there.
 8             MR. BRODERICK:  Objection.  Hearsay.  Move
 9   to strike.
10             THE COURT:  You know, it's interesting
11   because in these proceedings, all relevant evidence is
12   admissible.  But it's more helpful now that you are
13   asking the question as opposed to testifying.  Just
14   ask the question.
15             MR. MASMARQUES:  Sure.
16   Q.        When was the first time that you wanted the
17   Marlborough police, and I think the Marlborough
18   District Court as well, when was the first time that
19   you wanted them to file charge against me, criminal
20   charge?
21   A.        As soon as I continuously saw your IP
22   address showing up in server logs.
23   Q.        Could you give me a date, specific date?
24   There's one located there.
25             THE COURT:  You can ask him a leading
26   question.  If you think it was on a certain date, ask
27   him if it was on that date.
28   Q.        (By Mr. MasMarques)  Was it on June 25,
```

1    2018?

2    A.        I am sorry.  Was what on that date?

3    Q.        The date that you requested -- you contacted

4    the Marlborough police, District Court and Marlborough

5    Police, and you wanted them to file a charge against

6    me for restraining order violation?

7            MR. BRODERICK:  I must object, Your Honor.

8    Relevance.

9            And the particular ground is California

10   Civil Code section 47 which has the privileges,

11   including the judicial privilege.  So this is

12   inadmissible for defamation purposes.

13           THE COURT:  Apart from the privilege, I

14   think that if Mr. Greenspan contacted the court or law

15   enforcement agency requesting that charges be filed

16   based on violation of a restraining order, I assume

17   that would be appropriate for him to do that.  I am

18   not sure.

19           Do you want to tell me what you are trying

20   to get at or why you think this is relevant?

21           MR. MASMARQUES:  It's relevant because on

22   June 25, 2018, Mr. Greenspan contacted Sgt. Attaway at

23   the Marlborough Police Station and he wanted Sgt.

24   Attaway to file charges against me.

25           They did an investigation and they said no

26   crime was committed.

27           THE COURT:  Well, then ask about that.

28           Were you ever told by an investigator with a

1    law enforcement agency that Mr. MasMarques had not

2    committed any crime?

3                    THE WITNESS:  No.

4                    THE COURT:  Go ahead.  You can keep asking

5    questions.

6    Q.        (By Mr. MasMarques)  Have you posted any

7    tweets in effect shaming the Marlborough Police

8    Station saying that they are not taking action against

9    me because you wanted them to take action against me?

10                   THE COURT:  Have you ever complained on

11   Twitter that they have not taken appropriate action?

12                   MR. BRODERICK:  Continuous objection, given

13   this line.

14                   THE COURT:  Overruled.

15                   THE WITNESS:  I can't recall if I

16   specifically wrote that law enforcement was not taking

17   action.

18                   THE COURT:  Let's not sort of parse words

19   here.  I think I want to get something from you that's

20   responsive to the extent that you are able.

21                   If the questions mischaracterize it, you can

22   clarify.

23                   Did you post anything on Twitter essentially

24   making a complaint that criminal charges were not

25   being pursued?

26                   THE WITNESS:  I think I complained that law

27   enforcement was not taking my concern seriously.

28                   THE COURT:  Okay.  Next question.

```
 1              MR. MASMARQUES:  I do need an answer.
 2              THE COURT:  Ask another question.  Go ahead.
 3    Q.       (By Mr. MasMarques)  Did you in any way keep
 4    harassing the Marlborough Court clerk personnel into
 5    making demands on them that if they didn't take action
 6    that you would file a lawsuit against the Marlborough
 7    District Court at the Massachusetts Superior Court,
 8    and you demanded from them --
 9              THE COURT:  Now it's getting to be compound.
10    Don't make it compound.
11              I think that the first part was fine.  Go
12    ahead and ask that and then save the rest for a follow
13    up question.
14              MR. MASMARQUES:  I didn't get a direct
15    answer.
16              THE COURT:  Because the question hasn't been
17    formulated appropriately.  So go ahead and try again.
18    Q.       (By Mr. MasMarques)  Did you call the
19    Marlborough District Court and make demands about
20    charges against me?
21              MR. BRODERICK:  Objection.  Asked and
22    answered.
23              THE COURT:  Overruled.
24              THE WITNESS:  No, because it's not my
25    understanding that the court files criminal charges on
26    its own.
27              THE COURT:  Did you contact them in some
28    regard with respect to Mr. MasMarques' conduct, yes or
```

1    no?

2              THE WITNESS:  I believe I followed up on

3    what the police were doing at some point.

4              I did call the court, yes.

5              THE COURT:  To find out if the police had

6    taken any action?  Or to find out --

7              THE WITNESS:  There was a lot of confusion.

8              THE COURT:  Why were you contacting the

9    court?

10             THE WITNESS:  There was a lot of confusion

11   between who was doing what with the police and the

12   court.  And so I contacted the court to find out

13   whatever I could from them versus what the police were

14   telling me.

15             THE COURT:  But you just said that it was

16   your understanding that the court did not initiate

17   criminal charges, so why were you contacting the

18   court?

19             THE WITNESS:  In Massachusetts, my

20   understanding is that it's a little bit different than

21   most states in that a complaint, a criminal complaint,

22   by the police is not public until there has been

23   what's called a probable cause hearing.  And I don't

24   think we have those here.

25             THE COURT:  That's fine.  Were you

26   contacting the court to see if there had been a

27   probable cause hearing?  Is that what you were doing?

28             THE WITNESS:  No, I wasn't initially aware

1   of this situation.

2           THE COURT:  So it goes back to the question

3   of why were you contacting the court.  Simple

4   question.  I would like to have a straight forward

5   answer.

6           THE WITNESS:  Right, but it's a complex

7   answer because of this situation with the laws in

8   Massachusetts.

9           THE COURT:  Why were you contacting the

10  court?  Very simple.

11          Something caused you to contact the court.

12  What was it?

13          THE WITNESS:  In November 2018, I wanted to

14  see if I could get a copy of the criminal complaint

15  and I was given a lot of different answers.

16          THE COURT:  That's all.  You answered the

17  question.

18          Let me just say this to both of you.

19  Narrative responses are generally disfavored.  That's

20  not always the case, particularly in these types of

21  scenarios.

22          When we get a narrative response to a

23  question that can be answered either yes or no or a

24  with a brief answer, it's a lot more helpful to the

25  Court if you have a brief answer.

26          And the Court has to be concerned about

27  undue consumption of time.  The more lengthy answers

28  that we have that aren't necessary, the more likely it

1    is that you are going to have to come back on another

2    day, which is fine with me.  Don't get me wrong.  But

3    let's see if we can answer the questions briefly and

4    directly.

5              So it's my understanding, Mr. Greenspan,

6    that initially you called to see if a criminal

7    complaint had been filed.  Is that correct, yes or no?

8              THE WITNESS:  To see if I could get a copy

9    of anything that had been filed.

10             THE COURT:  Got it.  You were looking for

11   court documents.

12             THE WITNESS:  Yes.

13             THE COURT:  Next question.

14   Q.        (By Mr. MasMarques)  I would like a simple

15   yes or no.

16             Did you call the Marlborough District Court

17   and make demands that they file charges against me?

18             THE COURT:  At any point in time.

19             MR. BRODERICK:  Objection.  Relevancy, Your

20   Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  No.  I don't believe so.

23             THE COURT:  Next question.

24             MR. MASMARQUES:  Okay.

25   Q.        Have you been calling the mayor of

26   Marlborough, Massachusetts, and making all kinds of

27   complaints about me in relation to Sgt. Attaway and

28   the police and the court?

1          And you called the mayor's office at

2    Marlborough, Massachusetts, to make specific,

3    basically shaming where I live.

4          THE COURT:  You are getting into a

5    convoluted territory.

6          See if you can ask a straight forward --

7    there's nothing magical about asking a question in

8    court.  I know it can be a little bit intimidating.

9    But ask the question as if you were in any other

10   setting.  And understand that if you want a meaningful

11   answer from Mr. Greenspan, you have to make the

12   question clear to him.

13         MR. MASMARQUES:  All right.

14   Q.        Mr. Greenspan, have you contacted the mayor

15   of Marlborough, Massachusetts, and made complaints

16   about me?

17   A.        I contacted the mayor to find out why the

18   police was not doing its job.

19         THE COURT:  Next question.

20   Q.        (By Mr. MasMarques)  Did you contact them

21   and divulge information about my past to the mayor, to

22   the assistant?

23         THE COURT:  In making that phone contact,

24   did you disclose information about Mr. MasMarques'

25   past, yes or no?

26         THE WITNESS:  Yes.

27         THE COURT:  Next question.

28   Q.        (By Mr. MasMarques)  Why would you do that?

1    A.          Because I wanted to make it clear that I

2    viewed your harassment as threatening and deeply

3    concerning.  And that your criminal history impacted

4    my thinking.

5    Q.          But you realize I don't have a criminal

6    history?

7               THE COURT:  Let's not go down that road

8    right now.  I know there's a dispute about that, and

9    it's a little bit murky to me and I imagine it might

10   become clear when you testify.  But I know there's a

11   difference of opinion here as to what's fair game to

12   publicize about the history of the prosecution.

13   Q.          (By Mr. MasMarques)  Mr. Greenspan, have you

14   been contacting for over a lengthy period of time the

15   D.A.'s office and Marlborough District Court also

16   asking them to put charges on me?

17              MR. BRODERICK:  Objection.  Relevance.

18              THE COURT:  Overruled.

19              THE WITNESS:  I have contacted the D.A.'s

20   office in, I believe, Middlesex County.

21              THE COURT:  And they ultimately made a

22   determination to file charges, right?

23              THE WITNESS:  They did.

24              THE COURT:  Let's get on there.  He made the

25   contact, he made the complaint, if that's how you want

26   to characterize that.

27              Criminal charges ensued.  They are in the

28   process.  You have not been convicted.  It's something

1    that's pending.  Let's go on and go on to other

2    matters.

3              MR. MASMARQUES:  Thank you, Your Honor.

4    Q.        Mr. Greenspan, did you provide the IP

5    address to Sgt. Attaway at Marlborough District Court?

6              THE COURT:  What IP address?

7              MR. MASMARQUES:  My IP address.

8              THE COURT:  Did you do that?

9              THE WITNESS:  Based on what we know now,

10   yes.

11   Q.        (By Mr. MasMarques)  Were you the one that

12   told the Marlborough police that they should look at

13   some picture, that it came from my IP address?  You

14   gave them my IP address saying that's my IP address?

15             THE COURT:  It's getting a little convoluted

16   again.

17             He said that he gave them an address which

18   he now understands is your IP address.  Now ask your

19   follow up question.

20   Q.        (By Mr. MasMarques)  Did you tell the police

21   that -- that a picture was posted from my IP address?

22             THE COURT:  Did you tell the police that

23   Mr. MasMarques had posted a photo -- I don't know what

24   photo he's talking about -- but a photo or photos from

25   that address?

26             THE WITNESS:  What I explained to the police

27   is that I believe that there was a correlation.

28             THE COURT:  Next question.

```
 1    Q.          (By Mr. MasMarques)  A correlation, but not
 2    a fact.
 3                MR. BRODERICK:  Objection.  Argumentative.
 4                THE COURT:  Yes.  It's sustained.
 5                Next question.
 6                I think he is talking about circumstantial
 7    information that he has described in his direct
 8    testimony.  That's the Court's understanding.  Go on
 9    from there.
10    Q.          (By Mr. MasMarques)  Mr. Greenspan, have you
11    contacted anybody else in Massachusetts regarding me?
12    Any public, any state agency, where I live in my
13    neighborhood, the leasing office, anything?
14    A.          I believe I, at one point, called the
15    leasing office at your apartment complex before I knew
16    that you lived there because I was trying to serve you
17    and you were evading service.
18                THE COURT:  Next question.
19    Q.          (By Mr. Masmarques)  Mr. Greenspan, did you
20    communicate to my leasing office what the situation
21    was?  Did you explain anything about me, any
22    personal --
23                THE COURT:  Did you say anything to the
24    leasing office about his criminal history?
25                THE WITNESS:  I don't think so.
26                THE COURT:  Next question.
27                I am assuming that's what you were getting
28    at.
```

```
 1              MR. MASMARQUES:  Yeah, it is, Your Honor.
 2   Q.         Is there anybody else that -- anybody else
 3   in Massachusetts that you contacted about me?
 4   A.         Yes.
 5   Q.         Can you tell me who they were?
 6   A.         My family members that you wrote content
 7   about.
 8   Q.         I didn't write anything.
 9              THE COURT:  We are not going to use this as
10   a forum for there to be a direct back-and-forth
11   between the pair of you.  That's not going to happen.
12              He said his family.  Anybody else, people or
13   entities?
14              THE WITNESS:  Not off the top of my head.
15              THE COURT:  Next question.
16   Q.         (By Mr. MasMarques)  Can I ask what you said
17   to the mayor's office, just the detail?  Was it
18   just --
19   A.         I believe I called the mayor and asked if
20   there had been any action taken with the police.  And
21   that's pretty much it.
22              THE COURT:  That was based on the alleged
23   violation of restraining order?
24              THE WITNESS:  Correct.
25   Q.         (By Mr. MasMarques)  But did you inform them
26   of any charges that I had or my past criminal history?
27              Did you say that, you know -- did you put me
28   in a bad light in front of the mayor?
```

1          MR. BRODERICK:  Objection.  Relevance.

2          THE COURT:  I think the question -- it's

3     overruled, but I think the question is sort of the

4     same that you have been asking before.

5          Did you tell them about what you understood

6     about his criminal history?

7          THE WITNESS:  If so, then only incredibly

8     briefly to make clear as to the reason for my call.

9     But I don't recall ever stating anything more than --

10         THE COURT:  He stated that his concern was

11    heightened in light of the criminal history, and he

12    may have some prior information about that.  Let's go

13    on from there.

14    Q.        (By Mr. MasMarques)  Did you consider the --

15    (unintelligible).

16    A.        No.

17         MR. BRODERICK:  Objection.  Legal opinion.

18         THE COURT:  He said no.  Ultimately, his

19    conclusion may not be that significant for the trier

20    of fact.

21         But do you want to have the answer stand?

22    He said he did not consider it to be harassing.

23         MR. BRODERICK:  That's fine.

24         THE COURT:  So it will stand.

25    Q.        (By Mr. MasMarques)  Mr. Greenspan, were you

26    served with a restraining order on October 9, 2018, at

27    the Santa Clara Superior Court?

28         THE COURT:  On or about that date?

```
1              THE WITNESS:  No, I waived service.
2              THE COURT:  Did you do that with counsel or
3    otherwise?
4              THE WITNESS:  No.  I did it because I
5    thought it would be in everyone's best interests to
6    just move this process along.
7              THE COURT:  Got it.
8              So he conceded or waived service, formal
9    service of process.
10   Q.        (By Mr. MasMarques)  On that evening,
11   October 9th, did you go on Twitter and upload my home
12   address on Twitter?
13   A.        I believe what I posted was a copy of a
14   motion I filed with the court.
15             THE COURT:  Did any of that data include his
16   home address?
17             THE WITNESS:  The motion included your
18   address because it calls for your address.
19             THE COURT:  The caption, are you talking
20   about his address on a legal document or otherwise?
21             THE WITNESS:  On a legal document.
22             THE COURT:  Next question.
23   Q.        (By Mr. MasMarques)  Have you posted my home
24   address on any website?
25   A.        No.
26   Q.        Do you know anybody that's close to you
27   that's done that?
28   A.        No.
```

```
 1    Q.         Did you upload pictures of me on your
 2    Twitter account on October 9th?
 3    A.         Only insofar as they were already public
 4    pictures that were part of a newspaper article.
 5               THE COURT:  He didn't ask you about the
 6    source.  He just asked --
 7               THE WITNESS:  Then yes.
 8               THE COURT:  So you did post photos.
 9    Q.         (By Mr. MasMarques)  Do you consider that
10    harassment?
11               MR. BRODERICK:  Objection.
12               THE WITNESS:  No, I don't.
13               THE COURT:  Are you withdrawing your
14    objection?
15               MR. BRODERICK:  I will withdraw.
16    Q.         (By Mr. MasMarques)  Did Twitter suspend
17    your account at first?
18    A.         Yes, at some point Twitter did suspend the
19    Plainsite account.
20    Q.         Did they ask you to remove those accounts
21    and the pictures, the personal information when you
22    posted?
23               THE COURT:  Is this different than the
24    removal we talked about earlier?
25               THE WITNESS:  This is all connected.
26               THE COURT:  But are these different
27    instances, is what I am trying to find out.
28               THE WITNESS:  There were actually, I think,
```

1    two.

2           THE COURT:  So you had described one and

3    then you had contacted them and they had sort of

4    basically re-posted the data.  Is that accurate, more

5    or less?

6           THE WITNESS:  Yeah.

7           THE COURT:  Is this a separate incident?

8           THE WITNESS:  I think we are talking about

9    the same incident here.

10          THE COURT:  But you are saying there was

11   more than one.

12          THE WITNESS:  There was a first incident

13   where an individual in Europe totally unconnected to

14   this used the GDPR to get his court case removed from

15   our site which caused some --

16          THE COURT:  Somebody other than --

17          THE WITNESS:  Completely separate, yes.

18          THE COURT:  So we are just -- what I am

19   asking is just about relative to the respondent.

20          THE WITNESS:  There is only one incident.

21   Q.       (By Mr. MasMarques)  But your account was

22   suspended because you uploaded personal information on

23   me.

24   A.       I don't know that for a fact.

25          THE COURT:  What was your understanding

26   about why your account got suspended?

27          THE WITNESS:  Eventually, we received

28   something from Twitter saying that there was some kind

1    of personal information, but we didn't know exactly

2    what it was.

3             THE COURT:  What was your understanding of

4    what it was?

5             THE WITNESS:  I honestly don't know.  This

6    is an ongoing source of confusion for me.

7             THE COURT:  But in your communications with

8    them, did you get any clarification from them as to

9    what type of information should not be posted?

10            THE WITNESS:  No.  That's the problem is

11   that it's very vague.

12            THE COURT:  Ultimately, what conclusion did

13   you draw?

14            Did you think that it was relative to a past

15   criminal conduct or did you think it was relative to

16   sort of personal information of residential

17   information or any other personal information?  What

18   did you bring out of that?

19            This is sort of your -- this is all part of

20   your wheel house, so I assume you would have an

21   interest in finding out.

22            THE WITNESS:  I do, absolutely.  I still

23   have an interest in finding out exactly how --

24            THE COURT:  What is your current

25   understanding?

26            THE WITNESS:  My current understanding is

27   that no matter what anyone complains about, as long as

28   they say the magic wording, GDPR, Twitter will

1    automatically enforce that requestor's wishes.

2                 THE COURT:  And you are on that list, is

3    your understanding.

4                 THE WITNESS:  Beyond that understanding is

5    Mr. MasMarques is especially sensitive to his name

6    appearing anywhere.

7                 THE COURT:  We are not talking about his

8    sensitivity.  We are talking about Twitter.

9                 What is your understanding about their

10   policy concerning the posting of certain personal

11   information?

12                THE WITNESS:  Well, I guess I am not clear

13   on how to answer because they are taking a very broad

14   approach.

15                So Mr. MasMarques may have -- I don't know

16   this, but he may have made a request because his

17   address appeared in the legal document.  And they may

18   have approved that request.  That could have happened.

19   I don't know.

20                But I suspect that even if there had been no

21   address, just his name and he had made the same

22   request, they would have done the same thing, most

23   likely, because that's how sensitive they are.

24                THE COURT:  Basically, approach it, at least

25   initially, in this broad manner, as you indicated.

26                But subsequent to the Twitter account being

27   removed, it was reinstated.  And at that point in time

28   or thereafter, did you gain any additional clarity as

1    to what might be sort of offending information or --

2    and/or did you get the impression that maybe they were

3    responsive to the sensitivity of specific individuals

4    and that sort of varied their approach, varied from

5    case to case?

6           THE WITNESS:  I really didn't get any useful

7    insight.  And I think this is something that is

8    internally a discussion taking place at a variety of

9    tech companies right now about how to handle these

10   GDPR requests.

11          THE COURT:  So you don't think there's a

12   real clear cut policy.  That's your understanding?

13          THE WITNESS:  Correct.

14          THE COURT:  You can follow up from there.

15   Q.        (By Mr. MasMarques)  Does Twitter have terms

16   and conditions?  Do they have a policy of terms and

17   conditions?

18   A.        I believe so.

19   Q.        Was that stated to you when you first got

20   your Twitter account suspended the first time at

21   Plainsite?

22          Twitter emailed -- Twitter, I guess, deleted

23   you?

24          Did they not explain to you that you

25   violated the terms and conditions set forth in the

26   Twitter account policy, uploading people's personal

27   information, like my address, photos and --

28          THE COURT:  So in this first incident that

```
1    was unrelated to the respondent here, did you gain

2    some clarity as to what information was unacceptable

3    for posting?

4              THE WITNESS:  I think in the first incident,

5    I had -- I had believed that Twitter was worried about

6    the individual's name appearing.  But what I later

7    learned was that they were actually concerned because

8    individual's email address appeared buried in some

9    content.  So I hadn't even been aware of that.

10             So what that told me was that I have to be

11   careful about putting an email address on Twitter even

12   though that's something that happens routinely.

13             THE COURT:  Is the concern underlying all of

14   this that the data that's posted could lead to sort of

15   third party individuals sort of bullying or harassing

16   people, contacting them in a negative way as a result

17   of personal information that's posted, whether it be

18   the person's name or their address, things like that?

19             THE WITNESS:  I suppose that could be a

20   concern.  But I think you would have to ask the

21   European parliament as to their motivations for

22   passing this legislation.

23             THE COURT:  All right.  Anything further?

24             MR. MASMARQUES:  Yes.

25   Q.        Once Twitter suspended your account, did you

26   see --

27             THE COURT:  The first time or the second

28   time?
```

1          MR. MASMARQUES:  The first time because

2     they -- first time, they didn't do a suspension.

3          THE COURT:  Ask the question.

4     Q.        (By Mr. MasMarques)  After the first time

5     that they suspended your Twitter account, and you were

6     explaining that you were violating the terms and

7     conditions of what you are doing with the Twitter

8     account uploading personal information, did you cease

9     and desist doing that or did you continue after that?

10         MR. BRODERICK:  I have to object.  Lacks

11    foundation in several parts of the question.

12         THE COURT:  Overruled.  It's cross

13    examination.  And petitioner has admitted that his

14    account was suspended first, unrelated to the

15    respondent here.  In fact, he volunteered that

16    information.

17         If you have the question in mind, you can

18    try to answer it.

19         THE WITNESS:  I am sorry.  Can you repeat

20    the question?

21         MR. MASMARQUES:  Yeah.

22    Q.        After you had your Twitter account

23    suspended --

24         THE COURT:  The first time.

25    Q.        (By Mr. MasMarques)   -- the first time, and

26    they explained to you that you violated the terms and

27    conditions by uploading people's private information

28    on Twitter, did you cease and desist from doing that

1    or did you continue?

2                MR. BRODERICK:   In regard to?

3                THE COURT:   In regard to that particular

4    scenario.

5                MR. MASMARQUES:   Uploading personal

6    information.

7                THE WITNESS:   So the answer to your question

8    hinges on how do you define "personal information."

9                THE COURT:   What, if anything, did you cease

10   and desist doing as a common practice after this first

11   instance?

12               THE WITNESS:   So after that first instance,

13   I stopped.   If I noticed an email address embedded in

14   something, I would determine whether or not that

15   needed to be redacted.

16               THE COURT:   So would it be fair to say that

17   you took a closer look at redacted information that

18   could be considered as being personal data?

19               For example, a person's residential address

20   or they're email address, things of that nature.

21               THE WITNESS:   Specifically, email addresses.

22               THE COURT:   That's helpful.   Anything else?

23   Q.        (By Mr. MasMarques)   Did you have your

24   account blocked after that, which is the way Twitter

25   does after the suspension, the second -- did Twitter

26   block your account because you continued posting my

27   personal information?

28               THE COURT:   Now the Court's getting confused

1   because he talked about this first instance of a

2   suspension unrelated to you and then you talked about

3   the second suspension related to you.  And so far we

4   don't have any information on the record about

5   anything being blocked.  So you need to establish that

6   foundation first.

7               And let me know whether you are talking

8   about this first instance or the situation involving

9   you, in particular.

10              MR. MASMARQUES:  Sure.

11              THE COURT:  You can ask the question.

12  Q.          (By Mr. MasMarques)  Did you have a Twitter

13  account blocked?

14              THE COURT:  At any time, I guess he is

15  asking.

16              THE WITNESS:  I don't know what the

17  definition of "blocked" is, but there was a second

18  suspension, as I recall.

19              THE COURT:  In which situation?

20              THE WITNESS:  I believe the second

21  suspension related to Mr. MasMarques, as we now know

22  from his filings.

23              THE COURT:  That's a second suspension.  But

24  if you are talking about something beyond that, you

25  need to clarify what that is because petitioner is

26  saying he doesn't understand what you mean when you

27  use the terminology "blocked."

28  Q.          (By Mr. MasMarques)  So Twitter suspended

1    your account because of somebody making a GDPR

2    complaint before --

3              THE COURT:  That's already been established.

4    Q.        (By Mr. MasMarques)  So then -- so then,

5    there was a third -- Twitter then took a third action

6    against you, Mr. Greenspan, where they blocked your

7    account which is a higher level than suspension.

8    A.        Is that a question?

9    Q.        It is.  Are you aware of that?

10   A.        I am aware that I was unable to use the

11   Twitter account for a second time.

12   Q.        Did you tweet that my account was blocked?

13   A.        I may have said that, yes.

14   Q.        So you were aware that my account was

15   blocked.

16             Did you cease and desist from uploading my

17   personal information after that block?

18   A.        Can you define what you mean by your

19   "personal information"?

20   Q.        Did you remove it?

21   A.        From where?

22   Q.        From your Twitter account.

23   A.        To the extent that Twitter required us to

24   remove a particular piece of content to comply with

25   GDPR, we went ahead and did that.

26             THE COURT:  And then did you thereafter post

27   other information that could be construed as personal

28   in nature?

1      THE WITNESS:  I don't believe so, but I am

2  fuzzy here on the definition of what is "personal in

3  nature" because we have --

4      THE COURT:  Did they ever take the position

5  that you hadn't complied with their initial directive?

6      THE WITNESS:  No.  We complied with what we

7  were asked to comply with.

8      THE COURT:  So are we splitting hairs here

9  or are you just saying it was your understanding it

10  was emails, so you stopped doing that.  But then you

11  posted other personal data and they told you,

12  basically, no, you are not complying.

13      THE WITNESS:  I don't want to be evasive.

14      THE COURT:  We can sort of dance around this

15  issue for quite some time.

16      THE WITNESS:  Sure.

17      THE COURT:  And without knowing more

18  information, it's hard for the Court to try and

19  formulate the question.

20      But you, I think, had taken maybe a narrow

21  sort of perspective on this that you felt that the

22  first time that their concern was email address, and

23  so you, after that, would go ahead and redact that

24  information.

25      But after that, did you come to understand

26  that maybe it was something beyond just email

27  information that was concerning to Twitter?

28      THE WITNESS:  As I think I said before, the

1    email portion became clear after the first suspension.

2              THE COURT:  Right.

3              THE WITNESS:  After the second suspension, I

4    was left with very little clarity as to what had

5    actually been the instigating factor.

6              So no, I did not understand exactly what we

7    were supposed to be --

8              THE COURT:  Was it your understanding that

9    maybe Twitter took maybe a more restrictive position

10   because of the fact that there had been this prior

11   suspension?

12             THE WITNESS:  No.  I didn't view the two

13   suspensions as being related, really.

14             THE COURT:  I am not sure if that's what you

15   were getting at, but you can follow up.

16             I am not clear on a distinction between a

17   suspension and a situation where you are sort of

18   locked out of your account, whether they are the same

19   thing, whether there's something different, whether

20   there's some escalating action taken by Twitter.

21             I just want to let you both know, very murky

22   on that.  It's not clear at all.

23             THE WITNESS:  As am I.

24   Q.        (By Mr. Masmarques)  Did you write a tweet

25   saying that Twitter escalated this to a block on your

26   account because of a murderer and a rapist?

27             THE COURT:  Did you ever make a statement of

28   that nature?

1          THE WITNESS:  I may have written something
2     like that.  It would be helpful if I could see
3     documents.
4          THE COURT:  Would it have been posted on
5     Twitter?
6          THE WITNESS:  Probably.
7          THE COURT:  After your account was sort of
8     reinstated?
9          THE WITNESS:  Or from my personal account.
10         THE COURT:  Okay.  Got it.  Because we are
11    talking -- all this time, we are talking about your
12    Plainsite.
13         THE WITNESS:  This is the Plainsite account.
14    Q.       (By Mr. MasMarques)  Did you usually mix
15    harassing comments with --
16         THE COURT:  If you are going to start your
17    question with harassing comments, you already know the
18    petitioner has taken the position that he wasn't
19    harassing you.  So there's going to be an
20    argumentative objection.
21    Q.       (By Mr. MasMarques)  Did you write a tweet
22    saying that Santa Clara Superior Court illegally
23    served you with a restraining order?
24    A.       I don't think I would have phrased it quite
25    that way.
26         THE COURT:  How would you phrase it?
27         THE WITNESS:  Again, I can see that he is
28    reading off some documents, but I don't have the

1    privilege of reading them.

2                THE COURT:  Let's try and get to some

3    factual information that would be helpful to the

4    Court.  I would ask you both, let's do that.

5                I know there's animosity between the two of

6    you.  You are both, obviously, very careful about

7    details.  But sometimes in this sort of dancing around

8    the details and splitting hairs a little bit, the

9    Court's not getting the information that I need.

10               THE WITNESS:  Can I hear the question again,

11   please?

12   Q.          (By Mr. MasMarques)  Did you post a tweet

13   stating that the service, the restraining order

14   service, was illegal by Santa Clara Superior Court?

15   A.          Again, I don't think I did.  I don't think I

16   said that, exactly.

17   Q.          You are not saying it was illegal?  You used

18   that word?

19   A.          I waived service, so I don't quite

20   understand.

21   Q.          You said it was illegal served by Santa

22   Clara Superior Court.

23   A.          I don't think so.

24   Q.          Did you -- did you translate Spanish media

25   documents, copyright documents, did you translate them

26   into English and post them on Twitter?

27   A.          Yes.

28   Q.          That's copyright --

```
1              THE COURT:  Let's not make a statement
2    because now is the time to ask questions.
3    Q.         (By Mr. MasMarques)  Why would you translate
4    Spanish copyright media documents into English and
5    post them on Twitter account about me?
6    A.         I thought it was important for public to
7    understand the context in which this dispute was
8    playing out, and most people who read the Plainsite
9    Twitter account speak English.
10   Q.         Are these translations 100 percent accurate?
11   A.         I think that would depend on who you ask.  I
12   don't know if there's a hundred percent accurate
13   translation of any language to any other language.
14   Q.         And again, the purpose of this?
15              THE COURT:  Were you making the best effort
16   you could to translate them in a way that was
17   accurate?
18              THE WITNESS:  Yes, they are generally
19   accurate.
20              THE COURT:  Are you fluent in the Spanish
21   language?
22              THE WITNESS:  I am not fluent, but I have
23   some capacity.
24              THE COURT:  Go ahead.
25   Q.         (By Mr. MasMarques)  Did you -- do you
26   selectively only leave the most negative documents
27   open online in people's cases in a selective manner?
28   A.         No.
```

1    Q.        Do you seek out the most negative documents

2    you can on a person and leave only those open and the

3    rest closed?

4              MR. BRODERICK:  Objection.  Relevance.  Goes

5    to persons in general as opposed to anything specific.

6              THE COURT:  Sustained.  Getting a little far

7    afield here.

8    Q.        (By Mr. MasMarques)  Did you upload a

9    probation office document on Twitter?

10   A.        It's possible.  I don't recall exactly what

11   I wrote on Twitter when.

12   Q.        Did you upload my wife's place of employment

13   in Boston also?

14   A.        If it was part of a Pacer filing, then it's

15   possible.

16   Q.        Did you upload my handwritten signature

17   online?

18   A.        If it was part of a Pacer filing, it's

19   possible.

20   Q.        Did you upload my birthday online?

21   A.        If it was part of a Pacer filing, it's

22   possible.

23   Q.        Would you think that could harm a person's

24   employment, career?

25             MR. BRODERICK:  Objection.  Argumentative.

26             THE COURT:  Overruled.

27             THE WITNESS:  I don't know why the fact that

28   your wife works at a hospital could hurt your

1    employment.

2            I don't know why the fact that you had a

3    probation officer -- I mean, perhaps that could hurt

4    your employment, but your employment is really not my

5    concern at this stage.

6    Q.         (By Mr. MasMarques)  Yeah, I see that.

7            Did you write a tweet on July 20, 2018?

8            MR. MASMARQUES:  Can I read it out loud to

9    the Court real fast?

10           THE COURT:  If you are asking the question

11   and there's no objection, go ahead.

12           MR. MASMARQUES:  Aaron Greenspan on his

13   personal account.

14           "Pursuant to California Code of Civil

15   Procedure 128.5, this is a notice to Diego MasMarques

16   that I plan to file a motion for sanctions seeking

17   monetary damages in the Superior Court of California,

18   County of Santa Clara, in case number 18CH008067

19   unless his July 3rd filings are retracted in 21 days."

20   Q.         Did you write that?

21   A.         Yes.

22   Q.         Do you see that as harassment, threat?

23   A.         No.  I see that as what I am required to do

24   under the Civil Code to notify you that I plan to file

25   a motion for sanctions against you.

26   Q.         Did I have a restraining order against you

27   at that time?

28   A.         What was the date?

1    Q.          July 20th.

2    A.          You had a restraining order based entirely

3    on false pretenses and I am required to do that under

4    California law regardless of whether there's a

5    restraining order.  And it's a public notice, so it

6    was not addressed to you, it was addressed to the

7    public.

8    Q.          But it says, "Notice to Diego MasMarques."

9    A.          It's a public notice and we are publishing

10   in a newspaper a public notice.

11   Q.          Did you make comments on Twitter that --

12   that I filed a restraining order based on false

13   information?

14   A.          Yes.

15   Q.          Did you state on Twitter, "Then breaks into

16   your house and then kills you.  He sends emails from

17   Mafioso names.  In August he sent a PI to where I had

18   just lived.  Get it?"

19   A.          What's the question?

20   Q.          Did you write that?

21   A.          Yes.

22   Q.          What was the purpose of that?

23   A.          Letting my friends and family know that I am

24   afraid of you.

25              THE COURT:  Could you read that again into

26   the record?  I didn't hear it.  Would you just read a

27   little louder.

28              MR. MASMARQUES:  "Then breaks into your

```
 1    house" --
 2                THE COURT:  No, I mean through the
 3    microphone.
 4                MR. MASMARQUES:  "Then breaks into your
 5    house and then" --
 6                THE COURT:  Who breaks into your house?
 7                MR. MASMARQUES:  He is referring to me, Your
 8    Honor.
 9                THE COURT:  Could you read it verbatim?
10                MR. MASMARQUES:  Okay.  Here's page 2 of the
11    July 22, 2000, article.  Translated from Ultimora
12    (phonetic), Spain.
13                "He harasses you, then breaks into your
14    house and then kills you.  He sends me emails from
15    Mafioso names.  In August he sent a PI where I just
16    lived.  Get it?"
17    Q.        You wrote that?
18    A.        Yes.
19    Q.        Did you write this?
20              Did you have other Twitter followers call
21    me -- call me names?
22    A.        No.
23    Q.        Did you write the following?
24              Did you write the following, "At the moment,
25    this is the kind of person" -- and you wrote this to a
26    couple other twitter followers -- "is a reliable
27    arbiter of the First Amendment rights, someone who
28    serially harasses, rapes and murders women.  It's a
```

1  strange position to take in the midst of Me-Too

2  movement.  Plainsite.org."  There's a case file after

3  that.

4        THE COURT:  Did you write that?

5        THE WITNESS:  Can you read the entire thing?

6        MR. MASMARQUES:  I am sorry.  I will.

7        MR. BRODERICK:  Your Honor, I think we

8  should ask where he is reading from.

9        MR. MASMARQUES:  It's a tweet by Aaron

10  Greenspan.

11        THE COURT:  It is cross-examination and he

12  is asking if this was a tweet that was authored by

13  your client.

14        MR. BRODERICK:  At the moment, he is reading

15  from a document.  We should have an exhibit to put it

16  into context.

17        THE COURT:  It's cross-examination and I am

18  going to allow the question.  It's cross-examination

19  and he is asking your client if he tweeted out certain

20  information and he is going to read it into the

21  record.

22        If you want to look at the document he is

23  reading from, that's fine.  He hasn't asked to

24  introduce it.

25        Show it to counsel first, please.

26        We are going to have to conclude here in the

27  next couple minutes because the deputy needs to close

28  the courtroom and we need to discuss further

1   proceedings here because this is obviously taking

2   longer than it was initially contemplated.

3           Go ahead and ask your question.

4           MR. MASMARQUES:  Okay.

5           THE COURT:  If you are going to use any

6   other printed document that has not been identified,

7   make sure counsel sees it first.

8   Q.        (By Mr. MasMarques)  The question is,

9   Mr. Greenspan, did you write, "At the moment, this is

10  the kind of person," and then you wrote Jack, Vijaya

11  (phonetic) and (inaudible) "is a reliable arbiter of

12  First Amendment rights, someone who serially harasses,

13  rapes and murders women.  It's a strange position to

14  take in the midst of the Me-Too movement.

15  Plainsite.org.  Documents to follow."

16  A.        Yes.  I believe there was an image embedded.

17  That is what that part at the end refers to.  The

18  image was of one of the case documents from your case.

19          THE COURT:  Are you going to be able to wrap

20  up your cross-examination in the next couple minutes?

21          MR. MASMARQUES:  Yes.

22          THE COURT:  Let's wrap it up.  That way, at

23  least we will have that segment of the proceedings

24  over.

25  Q.        (By Mr. MasMarques)  Did you write -- when

26  Twitter suspended your account, did you write, "We

27  don't think journalists should be subject to

28  restraining orders in an effort to shut them up.  We

```
1    also think Santa Clara County litigants are entitled
2    to electronic access to documents, all non-sealed
3    court cases, especially their own," exclamation point.
4              Did you write that?
5    A.        Yes.
6              THE COURT:  See if you can wrap it up.
7              MR. MASMARQUES:  Okay.
8    Q.        Do you realize that your tweets have made
9    their way onto the search engines?
10             THE COURT:  Search engines.
11             THE WITNESS:  No, I was not aware.
12   Q.        (By Mr. MasMarques)  Well, they are there.
13   All of them.
14             MR. BRODERICK:  Objection.
15             THE COURT:  You can't get into that kind of
16   back and forth with Mr. Greenspan.  You just need to
17   ask him questions.
18   Q.        (By Mr. MasMarques)  In the restraining
19   order that you received on October 9th, did it clearly
20   say to not access any of my personal information and
21   not to upload my information onto search engines?
22   A.        I don't have that in front of me.
23   Q.        I can show it to you.
24             THE COURT:  Show it to him.  Show him the
25   document.
26             We will get it marked for identification.
27   Let's do it quickly because I don't want to cut you
28   off before you complete cross-examination.  You said
```

1    you can complete it promptly.

2              MR. BRODERICK:  Your Honor, while we have a

3    second, may we move into evidence the documents that

4    we have identified?  They are Exhibit 1 --

5              THE COURT:  1 through 14.  Let's do one

6    thing at a time here.  I think that Mr. MasMarques is

7    focused on something else now.

8              If you are able to complete the examination

9    without the document, go ahead and do that.

10             Hand the document to our deputy, please.

11   That would be Respondent's B.  We are talking about

12   something entitled Exemplification of Record and Civil

13   Harassment Restraining Order documents in docket

14   18CH008067.  Will be marked as Exhibit B, it will be

15   shown to Mr. Greenspan, and then you can ask your

16   question and we will conclude.

17             (Whereupon, Respondent's Exhibit B

18             was marked for identification.)

19             THE COURT:  Our deputy is placing the

20   document in front of Mr. Greenspan.

21             What is your question, sir?

22   Q.        (By Mr. MasMarques)  Part of the restraining

23   order that was allowed to me --

24             THE COURT:  You are talking about part of

25   the document that's been placed in front of

26   Mr. Greenspan that's identified as Exhibit B, correct?

27             MR. MASMARQUES:  Yes.

28             THE COURT:  What about that document did you

1    want to ask?

2    Q.          (By Mr. MasMarques)  Does it not state in

3    there that, Mr. Greenspan, that you were not to access

4    my personal information and to upload my information

5    on search engines?

6              THE COURT:  Is it part of the prohibition,

7    yes or no?

8              THE WITNESS:  It is part -- I will say yes.

9              THE COURT:  Okay.  Does that conclude your

10   examination?

11             MR. MASMARQUES:  It does.

12             THE COURT:  So direct and cross-examination

13   of Mr. Greenspan has been concluded.  We are going to

14   need to hear from you.

15             I need you to talk to counsel at this very

16   moment and I want you both to get a realistic time

17   estimate of how much time you need to conclude these

18   proceedings, knowing that Mr. Greenspan may very well

19   need to testify again on rebuttal.

20             But have that discussion in the next

21   60 seconds.  I want a realistic time estimate because

22   I need to know when to calendar this so you don't all

23   have to be inconvenienced by coming back multiple

24   times.

25             But talk to each other.  You don't need

26   to -- counsel, why don't you get up and talk to him.

27   That will be helpful.  Time is limited.

28             (Whereupon, a discussion was held off the

1  record.)

2          THE COURT:  How much time do you need to

3  reserve for your testimony?

4          MR. MASMARQUES:  An hour.

5          THE COURT:  How much do you want to the

6  reserve for cross-examination?

7          MR. BRODERICK:  45 minutes.

8          THE COURT:  We are talking about two hours

9  with a recess.

10          This case would have gone to a trial

11  department if we had had a realistic time estimate.

12  It's going to be hard for the Court to give you a

13  block of three hours.  But if that's what it's going

14  to take to conclude the case, then we will give you an

15  afternoon session.

16          Problem we have is we are very impacted.  We

17  don't have the assurance of a court reporter on

18  Thursdays, but if you want to get this basically taken

19  care of sooner than later, we are going to have to put

20  you on a Thursday calendar.

21          And we can accommodate you, for example, on

22  February 7th.  No -- February 28th is the date that's

23  available in the afternoon.

24          MR. BRODERICK:  Your Honor, I think we can

25  do it in an hour and 45 minutes, the whole case.

26          THE COURT:  Either way, we are going to have

27  to -- we are very impacted.  That's why I say, if it

28  looked initially as if it was a half day case, I would

1   have put you on a trial department calendar.  Now we

2   are going to have to try and fit you in.  And it looks

3   like we would be able to do that on February 28th in

4   the afternoon.

5           I don't want to set this on a date that's

6   going to be bad for the parties, but if I don't hear

7   an alternative date that works for you, that's when I

8   am going to have to set it because our deputy is going

9   to need to clear the courtroom.

10          MR. BRODERICK:  We could go sooner?

11          THE COURT:  Well, it's subject to getting a

12  court reporter.

13          MR. BRODERICK:  As a matter of housekeeping,

14  I'd like to move my documents --

15          THE COURT:  Any objection to those documents

16  being admitted?

17          MR. MASMARQUES:  Yes, Your Honor.

18          THE COURT:  We will address that next time.

19  We are going to have to keep those documents and

20  safeguard them while the case is pending.

21          We will have you come back at 1:30.  I will

22  reissue existing orders to maintain status quo.

23          Why don't you come back and mediate in the

24  interim.  I am not going to interfere in the process.

25  But even if you cannot globally resolve this case,

26  there might be pieces of it to resolve.  And you don't

27  have to disclose anything about the process to the

28  Court unless you resolve the case in its entirety.

1          MR. BRODERICK:  I will talk to him about it.

2          MR. MASMARQUES:  I am willing.

3          THE COURT:  Any Tuesday -- any Tuesday

4    morning -- or I shouldn't say any Tuesday, but you can

5    come back on a Tuesday morning and work directly with

6    mediators.  Are you going to be local?

7          MR. MASMARQUES:  No, I am in Massachusetts.

8    I live in Boston.  I live in Marlborough,

9    Massachusetts.

10         THE COURT:  Are you going to be available

11   telephonically?

12         MR. MASMARQUES: Yes, I will.  Yes.  Yes, I

13   will.

14         THE COURT:  Do you want to select a Tuesday

15   that looks good and we will set it for an interim date

16   for mediation?

17         MR. BRODERICK:  Your Honor, I'd like to

18   discuss the parameters before we commit to mediation.

19         THE COURT:  We are not going to be able to

20   do that in the next two minutes.

21         In terms of the parameters, I am telling you

22   these mediators are very skillful.  They will be able

23   to navigate that for you.

24         What Mr. MasMarques has indicated is that

25   this proceeding is also Mr. Greenspan's -- hearing on

26   Mr. Greenspan's initial request for restraining order.

27         So I am going to -- I am going to issue a

28   TRO.  We are taking the case back to the same status

1    it had previously, which means that Mr. Greenspan is

2    going to have TRO against Mr. MasMarques pending

3    further hearing in this case.

4             The only other thing we need to do is figure

5    out what Tuesday is available for mediation.

6             MR. GREENSPAN:  Your Honor --

7             THE COURT:  I just can't.  I just can't.

8             If you have a question, you can ask it, but

9    it's like less than a minute before 5:00 and I am not

10   going to incur overtime for court personnel.

11            MR. MASMARQUES:  I contacted mediation,

12   Carlos, and he contacted --

13            THE COURT:  If you want to work it out

14   offline, that's fine.  But I don't think it's going to

15   happen unless you both appear in court.

16            MR. MASMARQUES:  All right.

17            THE COURT:  Mediation on January 15, 2019,

18   at 9:00 a.m.  We are going to say for mediation,

19   respondent may appear telephonically.

20            What that means is you have to be readily

21   accessible and available on that date and give counsel

22   the phone number where you can be reached.

23            MR. MASMARQUES:  Yes, Your Honor.

24            THE COURT:  January 15th at 9:00 o'clock.

25            MR. BRODERICK:  9:00 o'clock.

26            THE COURT:  I am sorry to be short, but we

27   can't go further than 5:00 o'clock.

28            Get your paperwork and you will be free to

1    go.

2              Any tagged exhibits are going to have to

3    remain with the court, and we are in recess.

4              MR. MASMARQUES:  Thank you very much, Your

5    Honor.

6              (Whereupon, the evening recess was taken.)

```
 1              State of California    )

 2              County of Santa Clara  )

 3

 4              I, Kathryn A. Keay, hereby certify:

 5    That I was the duly appointed, qualified and acting

 6    official shorthand reporter of said court in the

 7    above-entitled action taken on the above-entitled

 8    date; that I reported the same in machine shorthand

 9    and thereafter had the same transcribed through

10    computer-aided transcription as herein appears, and

11    that the foregoing typewritten pages contain a true

12    and correct transcript of the proceedings had in said

13    matter at said time and place to the best of my

14    ability.

15              I further certify that I have

16    complied with CCP 237(A)(2) in that all personal juror

17    identifying information has been redacted, if

18    applicable.

19

20         Dated:  February 25, 2019

21

22

23         _____

24         Kathryn A. Keay, CSR 7915

25

26

27

28
```

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               IN AND FOR THE COUNTY OF SANTA CLARA

3                         DEPARTMENT 11

4               BEFORE HONORABLE CAROL OVERTON, JUDGE

5

6   AARON GREENSPAN,                    )
                                        )
7           Petitioner,                 )
                                        )
8      vs.                              )
                                        )        Case No. 18CH008067
    DIEGO MASMARQUES,                   )
9                                       )
            Respondent,                 )
10                                      )
    And related cross-request.          )
11  _____    )

12

13

14   San Jose, California              February 28, 2019

15

16            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17

18

19

20   A P P E A R A N C E S:

21   For the Plaintiff:      Timothy B. Broderick,
                             Attorney at Law

22   For the Defendant:      Diego MasMarques,
                             In Propria Persona

23

24

25

26

27                     **Reported by:**

28              **LISA L. BROWN, CSR**
            **License Number CSR 13148**

1

**INDEX OF EXAMINATIONS**

2

**Witness**                                                    **Page**

3

Diego MasMarques

4        Cross-Examination by Mr. Broderick              53

5

Aaron Greenspan (Rebuttal)

6        Direct Examination by Mr. Broderick             85
         Cross-Examination by Mr. MasMarques             93

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDEX OF EXHIBITS**

**On behalf of Petitioner**

| No. | DESCRIPTION | ID | EV | WD |
|-----|-------------|-----|-----|-----|
| 16 | Document Relating to the Department of Justice Against MasMarques | 54 | | |
| 17 | Series of Tweets | 60 | | |
| 18 | Copy of CH600 | 65 | | |
| 19 | E-mail Message Dated 11/29/18 from J. Steinport to Marlborough Police Department | 74 | | |

**On behalf of Defendant**

| No. | DESCRIPTION | ID | EV | WD |
|-----|-------------|-----|-----|-----|
| C | Group of Documents Comprised of an Application for a Subpoena Dated 03/15/17; String of E-mails; Correspondence Dated 07/23/18; and Other Related Court Documents | 16 | | |
| D | Group of Photographs | 39 | | |
| E | Google Page Concerning Mr. Mas Marques' Wife | 51 | | |

1    San Jose, California                    February 28, 2019

2

3                        PROCEEDINGS

4

5              (At 2:26 p.m., court convened in the matter,

6          and the following proceedings were had:)

7

8              THE COURT:  We're here in the matter of the

9    request and cross-request for civil restraining order in

10   the matter of Aaron Greenspan versus Diego MasMarques.

11      Let's get names for the record.

12             MR. BRODERICK:  Timothy Broderick, attorney for

13   Aaron Greenspan --

14             MR. MASMARQUES:  Diego MasMarques.

15             MR. BRODERICK:  -- specially appearing.

16             THE COURT:  Okay.  We have a court reporter now,

17   and we have an official record.  But before we were able to

18   go on the record we had some informal discussions about

19   procedural matters with the consent of the parties.

20      And my understanding is that everybody is in agreement

21   that we're going to have written closing argument briefs

22   with the first initial closing argument brief not to exceed

23   20 pages in length and then a reply closing argument brief

24   not to exceed 10 pages in length.

25      We can agree on dates as soon as we conclude the matter

26   here today, assuming we're able to do that given our late

27   start.

28      I also put in here the parties shall reference portions

1   of the hearing transcripts in support of their factual

2   arguments.

3       The parties shall address any defenses that are based

4   on free speech rights with citations to applicable

5   supporting legal authority.  In the latter regard the

6   parties shall set forth any arguments as to whether their

7   conduct as alleged by the opposing party constitutes

8   protected free speech and/or whether any remedies sought by

9   the opposing party encroach upon protected free speech

10  rights.

11      Service of closing argument briefs on the opposing

12  party shall be by e-mail, assuming that's okay with

13  everybody.

14              MR. BRODERICK:  It did not work out, Your Honor.

15              THE COURT:  How do you want to serve the briefs?

16  And I'll just put it in here.

17              MR. BRODERICK:  We'll do it by regular --

18              THE COURT:  U.S. mail.

19              MR. BRODERICK:  Yes.

20              THE COURT:  Okay.  And I also indicated courtesy

21  copies of the briefs should be provided to this department.

22      Unless there is any proposed change to that then I'll

23  go ahead and finalize it.

24              MR. BRODERICK:  We agree.

25      Thank you, Your Honor.

26              THE COURT:  We'll fill in the dates as soon as we

27  conclude the matter.

28              MR. MASMARQUES:  Your Honor, is it possible to

1  get 15 days on the reply?

2       THE COURT:  Well, I didn't fill in the dates so

3  I'm sort of leaving it blank to see what happens here

4  today.

5     Would you both like to stand up and raise your right

6  hands.

7                    **AARON GREENSPAN,**

8  called as a witness, being first duly sworn, was examined

9  and testified as follows:

10                   **DIEGO MASMARQUES,**

11 called as a witness, being first duly sworn, was examined

12 and testified as follows:

13       MR. GREENSPAN:  I do.

14       MR. MASMARQUES:  I do.

15       THE CLERK:  Thank you.

16       THE COURT:  All right.  Subject to the admission

17 of documents that were submitted by petitioner, the

18 petitioner rests and wants to reserve for potential

19 rebuttal.

20       MR. BRODERICK:  Correct, Your Honor.  And he

21 would also like to take up moving our exhibits into

22 evidence.

23       THE COURT:  Okay.  So we'll take that up at the

24 end.

25       MR. BRODERICK:  All right.

26       THE COURT:  So it's my understanding that,

27 Mr. MasMarques, you're going to go ahead and testify, and

28 I'll be glad to hear from you.

1    Let me just make a brief comment at the outset about
2    documents.
3    Just show it to him, and I'll be happy to take a look
4    at it.  We can finalize it later so you can just keep it
5    there for now.
6    Let's go ahead and reserve that just because of the
7    time.  We need to be mindful of time here.  We're getting
8    an hour late start.
9        MR. BRODERICK:  The only matter in that proposed
10   order that we see it is -- Mr. MasMarques has signed it as
11   "Inc.," and I don't think that's a applicable.
12       THE COURT:  Where are you at?
13   Oh, yeah.
14       MR. MASMARQUES:  In the caption.
15       THE COURT:  That's what happens when you use a
16   template.  Okay.  So thanks for pointing that out.
17   Any other errors that you see?
18       MR. MASMARQUES:  Case number.
19       THE COURT:  Oh, the case number is wrong?
20       MR. BRODERICK:  I think it is 18 instead of 19,
21   Your Honor.
22       THE COURT:  Thank you kindly.  That's some good
23   proofing there.
24   So those have been fixed now.
25       MR. BRODERICK:  Mr. MasMarques has an objection
26   that he has given to me.
27   I'll ask you to address the Court.
28       MR. MASMARQUES:  I apologize, Your Honor.  I

1    thought we were --

2         THE COURT:  We're not finalizing this now because

3    we have to put in the dates, but I just wanted to give you

4    sort of a template for what we're going to do.  And I've

5    corrected the case number and also taken out the "Inc."

6      What I was going to say about the documents is I find

7    that sometimes parties can become sort of preoccupied with

8    the documents.  It's most helpful to me if you can just

9    sort of recount the facts based on your independent

10   recollection and then if you need to reference documents,

11   have them marked, and seek to admit them.  We can do them

12   as needed.

13        MR. MASMARQUES:  Sure.

14        THE COURT:  Sometimes the parties will advance

15   facts that are really not in dispute, and you might not

16   need that sort of corroborating evidence or circumstantial

17   evidence, okay?

18      Whenever you're ready.

19        MR. MASMARQUES:  I'll try to be as brief as

20   possible.

21        THE COURT:  And, well, you may want to start off

22   just by saying maybe just a summary of the relief you're

23   requesting; in other words, what injunctive provisions

24   you're requesting and just a summary of the reasons why you

25   feel that there has been unlawful harassment.

26        MR. MASMARQUES:  Yes, Your Honor.

27      Thank you.

28        THE COURT:  And I may be taking notes

1    electronically.

2          MR. MASMARQUES:  So I would be requesting a life

3    time restraining order from Mr. Greenspan because of all

4    this harassment that's gone on for a couple of years.  It's

5    been very horrendous or at a minimum a five-year

6    restraining order against him because he's been ignoring

7    the restraining order on a continuous basis.

8       And I would like to respectfully ask this Court that

9    Mr. Greenspan not be able to receive a restraining order as

10   he's the one doing the harassing towards me.

11         THE COURT:  I'm sorry.  If you could move that

12   mic a little bit closer to you so our court reporter can

13   hear what you're saying.

14      There you go.

15         MR. MASMARQUES:  Mr. Greenspan is the one who is

16   doing the harassing and the stalking towards myself and my

17   immediate family.  And so, therefore, I'd be asking this

18   Court respectfully for a permanent restraining order that

19   has no time limit or at a minimum a five-year restraining

20   order.

21      And I don't believe Mr. Greenspan should receive a

22   restraining order.  He is the one that -- he is the

23   perpetrator in this case.  And he's been doing it

24   especially since he's been served on October 9th.  He's

25   been doing it, like -- it's just so -- he's been doing so

26   much.  It is just unbelievable, and this is after he was

27   served.  So he has little to no respect for the court.  Or

28   I think for law enforcement.  He just thinks he's above the

1    law, and, therefore, I don't think Mr. Greenspan should

2    receive anything because he doesn't respect the court

3    system.  And I would like to respectfully ask for a

4    permanent restraining order.

5                THE COURT:  Let me focus you on a couple of

6    things that came up last time that were sort of center

7    pieces of this case.

8        One of the issues was the publication of information

9    about a criminal history and that whole scenario was sort

10   of complicated by the fact that this was something that

11   arose out of this jurisdiction, in fact, out of this

12   country.  And you had made the assertion that was

13   confidential information by law, which is one of the things

14   that's going to have to be addressed in the closing

15   arguments among others.

16       And so the Court is not -- does not have the ability,

17   as I sit here now, to determine whether that information

18   that was published by Mr. Greenspan is, in fact,

19   confidential and that it would be unlawful for him to

20   publish that information.  That's going to be a legal

21   argument that's going to need to be addressed by the

22   parties.

23       The other thing is that I recall that there were images

24   that were discussed and shown to the Court, lewd images,

25   that had members of Mr. Greenspan's family sort of

26   interposed.  And if that was information that was generated

27   by you, the Court would consider that to be harassing.  It

28   doesn't have any legitimate First Amendment, you know,

1    privilege associated with it in the Court's estimation.  So

2    that's something you are going to have to address as well.

3            MR. MASMARQUES:  Yes, Your Honor.

4        I can say that none of those images that he showed -- I

5    was sitting there last time, and I'm not a lawyer so I

6    didn't really know I was supposed to object at the time.

7    But I did not upload any of those images, not one of them.

8    And I was really shocked by what I'm being accused of.

9        And I have evidence today that I want to show this

10   Court that he has been having issues with other hosting

11   companies in the past before I even knew who Mr. Greenspan

12   was where he was trying to find out who was uploading

13   images about him, I guess, and his family.  And it was

14   right -- one of the subpoenas that he filed was right here

15   in the United States Federal Court, Northern District of

16   California.  And it's in my --

17           MR. BRODERICK:  Your Honor, I'm going to object

18   to it.  Objection.

19           THE COURT:  It is sort of in the realm of an

20   argument.

21           MR. BRODERICK:  This is attempted character

22   evidence.

23           THE COURT:  Well, okay.  I'm going to overrule

24   that objection.

25       I think, you know, one of the problems when you have

26   two sophisticated people here dealing with somebody who is

27   not real savvy about these machinations of computers and

28   the like is that you're going to have to make it clear to

1  the Court how -- and I'm now saying this globally to both

2  parties -- how you can establish that the opposing party

3  was the originator of the objectionable material.  And

4  that's something that is going to have to be presented in a

5  way that the Court is going to understand.

6      Now, Mr. Greenspan went through that in his testimony

7  last time.  I'm going to have to review the record a little

8  more closely to sort of refresh my memory on that.  But now

9  you're in here, and you're disputing it, and you're saying

10  among other things that there's evidence out there showing

11  that Mr. Greenspan was not certain about who was doing

12  these types of things.

13          MR. MASMARQUES:  No.  No.  And he actually filed

14  another subpoena, July 24th, 2018, in the Northern District

15  of Ohio in the Federal Court.  That's what 22 is,

16  Exhibit 22.  It is very large, but it's basically the last

17  few pages are what's important because it shows that

18  Mr. Greenspan is trying to find out who has been uploading

19  these vile images about him and his family.

20      So the motivation for Mr. Greenspan to say that I'm

21  doing it is because I believe I can -- is because I have

22  filed many IRS complaints against him for tax fraud and tax

23  evasion, FBI complaints with the Internet Criminal

24  Division.  And so I have even met with IRS agents who have

25  called me about a month ago down in Boston about

26  Mr. Greenspan so I can think that it may be hurting him.

27  He may not like, you know -- there may be an investigation

28  going on with the IRS or something like this, and so he may

1   feel his business is in danger or something or, you know,

2   his finances.

3       So he's attacking me and saying that I'm responsible

4   for uploading all these vile images.  I have not uploaded

5   any of these vile images.  And I was sitting here last time

6   on December 12th, and I didn't even know what Mr. Greenspan

7   was talking about.  He said that I accessed a picture of

8   his father on a computer; that I accessed a picture of his

9   partner.

10      Your Honor, I have no idea what Mr. Greenspan is even

11  talking about.  I have not --

12              THE COURT:  So you're categorically denying any

13  of that conduct?

14              MR. MASMARQUES:  I am.  Yes, Your Honor.

15              THE COURT:  You can continue with anything else

16  you wanted to.

17              MR. MASMARQUES:  Yes.

18      So I am categorically denying that I have uploaded any

19  of these vile, disgusting images that Mr. Greenspan has

20  presented to this Court and blaming me for.  And I have the

21  proof in these documents that will show that Mr. Greenspan

22  has had an ongoing and long term issue with having problems

23  with people uploading these images on him, and it makes him

24  quite upset.

25              THE COURT:  Okay.  And what are those documents?

26  Are they lawsuits or something else?

27              MR. MASMARQUES:  He filed a subpoena, a DMCA

28  subpoena in the United States federal court here.

1          THE COURT:  Okay.  How voluminous is that exhibit

2  that you have?  It is hard for me to see.

3          MR. MASMARQUES:  Which one?

4          THE COURT:  The one that you're referring to now

5  that shows Mr. Greenspan had a certainty about who was

6  perpetrating this conduct.

7          MR. MASMARQUES:  That's actually -- the first one

8  is actually quite -- not very long.

9          THE COURT:  Well, if you've grouped it together,

10  just why don't you take it out of your binder, and we can

11  have it marked as next in order, which I think is

12  Exhibit C.

13          MR. MASMARQUES:  Correct.

14          THE COURT:  Show it to Counsel first.

15    I don't see -- yes, it would be Exhibit C.

16    Just pull out the whole copy set and hand it to our

17  deputy.  We'll get it marked as Exhibit C and give it back

18  to you.

19          MR. MASMARQUES:  This was the first few.

20          THE COURT:  If you're going to group the

21  documents together that show that Mr. Greenspan didn't know

22  who was perpetrating this conduct, group those type of

23  documents together as one.

24          MR. MASMARQUES:  Oh, yes, Your Honor.  I'm sorry.

25    This is a very lengthy one.  It's got a lot of filler

26  in it, I think, within a short amount of months.

27          THE COURT:  Okay.  So you've got one that is

28  fairly voluminous, and one that is just a few pages?

1        MR. MASMARQUES:  Yes.  There are two subpoena

2  right there.

3        THE COURT:  And those are the documents that you

4  indicate are in support of this argument that you're making

5  that Mr. Greenspan is -- excuse me.

6        MR. MASMARQUES:  I'm sorry.

7        THE COURT:  That these are documents that you are

8  submitting in support of your position that Mr. Greenspan

9  was uncertain as to who perpetrated this conduct?

10        MR. MASMARQUES:  Yes, Your Honor.

11        MR. BRODERICK:  May I pose an objection?

12        THE COURT:  We're just going to have them marked

13  for identification -- that's all we're doing --

14  collectively as Exhibit C.

15    Let me see if I can identify it further.

16    Exhibit C is comprised of an application for a subpoena

17  dated March 15th, 2017.  And it looks like it also has

18  associated with it a string of e-mails, and the string of

19  e-mails being from Mr. Greenspan.  I'm not reading the

20  content.

21    It also includes voluminous documents that is a

22  correspondence dated July 23rd, 2018, to the Clerk's Office

23  of the United States District Court for the Northern

24  District of Ohio, with, I believe, related court documents

25  attached.

26        MR. MASMARQUES:  Yes, Your Honor.

27        THE COURT:  So that's what's identified as one

28  exhibit as Exhibit C.  We'll get it marked and returned to

1    you.

2                (Defendant's Exhibit No. C, Group of

3                Documents Comprised of an Application for a

4                Subpoena Dated 03/15/17; String of E-mails;

5                Correspondence Dated 07/23/18; and Other Related

6                Court Documents, was marked for identification.)

7                THE COURT:  While you're waiting for the

8    documents to get back to you, is there anything else you

9    wanted to say to summarize your claims?

10               MR. MASMARQUES:  Yeah.  I just want to, like,

11   basically sum up the fact that -- and I have to insist on

12   this -- that I have not uploaded anything of these vile,

13   disgusting, naked images that Mr. Greenspan has been

14   showing to this Court.  He's been showing them to my local

15   police.  He's been showing them to my local court.  And I'm

16   getting really tired.  And this is the harassment that I've

17   been going through.  I have not done any of this.  And he

18   will not stop.  Mr. Greenspan he's continuously pushing

19   this issue.  And these two documents --

20               THE COURT:  He will not stop what?

21               MR. MASMARQUES:  He will not stop showing, like,

22   the mayor of Marlborough, where I live.  He's been sending

23   documents to them about my past; what happened to me in

24   Europe.

25               THE COURT:  Okay.  Now we're on to a different

26   subject.

27       You're saying that you deny categorically that you have

28   uploaded any of these lewd images, and, therefore, to the

1    extent that Mr. Greenspan is basing his request for

2    injunctive relief against you on that --

3              MR. MASMARQUES:  Yes.

4              THE COURT:  -- it hasn't happened.  You haven't

5    done it.

6        But now I think you're going on to a different topic --

7              MR. MASMARQUES:  Sorry.

8              THE COURT:  -- which is what he has done to

9    harass you allegedly.

10             MR. MASMARQUES:  Sorry, Your Honor.

11             THE COURT:  And did that have to do with him

12   showing some documents reflecting prior criminal

13   proceedings, or is it something beyond that?

14             MR. MASMARQUES:  It's prior criminal proceedings,

15   but it is also the lewd images.  He's saying I uploaded

16   lewd images.  He is sending them to the local court where I

17   live, to the local police station where I live.  So I

18   don't -- I'm not sure what else --

19             THE COURT:  In other words, he's showing those --

20   you're claiming that he is showing those to the police and

21   identifying you as the culprit?

22             MR. MASMARQUES:  Yeah.  He's saying I'm the

23   culprit of all this when I'm not.

24             THE COURT:  But if he has a suspicion that you

25   may be the culprit, and he's relaying that to law

26   enforcement, how would that constitute harassment?

27             MR. MASMARQUES:  Because he's saying that it is

28   me.  He's saying it's definitely me.

1    Now, I talked to a cyber forensics company, and they

2    explained to me how -- that when a person clicks on a

3    site --

4                MR. BRODERICK:  Objection.  Hearsay.

5                MR. MASMARQUES:  -- it registers their IP

6    address.

7                THE COURT:  Okay.  There is an objection that is

8    pending, and I think the objection is hearsay?

9                MR. BRODERICK:  Hearsay, Your Honor.

10               THE COURT:  Okay.  So basically what counsel is

11   saying is if you're giving this information secondhand, the

12   Court can't accept it for the truth of the matter asserted.

13   In these proceedings evidence is a little bit different.

14   The Court can consider all relevant evidence.  I'm not sure

15   whether it's relevant or not.  I'll take it subject to a

16   motion to strike.

17               MR. BRODERICK:  Thank you, Your Honor.

18               MR. MASMARQUES:  It all -- well, what I'm saying

19   is also in that voluminous document, Your Honor.  It

20   clearly shows the attorney for the hosting company stating

21   to Mr. Greenspan that when a person clicks -- it's right

22   there.  It's in black and white.  When a person clicks on a

23   site, their IP address is automatically registered.

24       I don't know how Mr. Greenspan got ahold of my Comcast

25   IP address, but he already knew my IP address from a long

26   time ago when I made a request to him to remove my legal

27   documents that he had uploaded in a selective --

28               THE COURT:  So you're essentially saying he's

LISA L. BROWN, CSR
License Number CSR 13148

1   framing you --

2           MR. MASMARQUES:  Yes.

3           THE COURT:  -- by identifying your --

4           MR. MASMARQUES:  Yes, I am.  I am.  100 percent,

5   Your Honor.

6           THE COURT:  What else, if anything, did you want

7   to say in your testimony?

8           MR. MASMARQUES:  I don't know what his motivation

9   is, but I can just think, you know, I mean in these

10  documents I have I filed a lot of tax evasion IRS referral

11  Form 13909 forms against him going all the way back to

12  August 17th --

13          THE COURT:  Because?

14          MR. MASMARQUES:  Because I looked up how he's

15  getting the documents from another company, and the other

16  person who runs that company said that Mr. Greenspan -- The

17  Free Law Project, it's called.  He said that

18  Mr. Greenspan's company is not a non-profit; that it's for

19  profit.

20          MR. BRODERICK:  Move to strike.  Hearsay.

21          THE COURT:  Okay.

22          MR. MASMARQUES:  It's a for-profit company.

23          THE COURT:  It's granted.

24      I think that -- okay.  There's a lot of suspicion on

25  both sides, but I just want to give a gentle reminder that

26  there is a high burden of proof in this type of case, a

27  higher than usual civil burden, which is a preponderance of

28  the evidence, often described as a tipping of the scales.

1   Here we have clear and convincing evidence.  So it has to

2   be established that there is a strong probability or

3   likelihood, and it's difficult for the Court to conclude

4   that absent some additional information.

5           MR. MASMARQUES:  Yes, Your Honor.

6           THE COURT:  So you can proceed.  Go ahead.

7           MR. MASMARQUES:  So, Your Honor, would you like

8   me to go through the documents?

9           THE COURT:  Well, I think that before you do

10  that, why don't you sort of summarize.  I think that your

11  primary issue was at least initially was publication of

12  information about criminal history that essentially was

13  confidential in nature and had been sealed and that

14  Mr. Greenspan was violating the law or certain court

15  directives that that information not be published or

16  disseminated; right?

17          MR. MASMARQUES:  Yes.  For example, there was one

18  case, a Social Security case, I applied for when I came

19  back to the United States, but I dismissed it after, like,

20  two years.  I dismissed it.  And I requested from the

21  judge, I requested that it be sealed or --

22          THE COURT:  That what be sealed?

23          MR. MASMARQUES:  That case be sealed.  And it was

24  approved, and I was told by the clerk that only the parties

25  involved directly in that case will be able to access the

26  Social Security case.  And lo and behold I found my case on

27  Mr. Greenspan's website, PlainSite.org.  And although the

28  files weren't opened, on the bottom of each file or each

1  date there was a -- Mr. Greenspan left on the bottom a
2  little -- this word "requests."  In other words, you can
3  request the documents from Mr. Greenspan, and he will be
4  able to acquire them for you, if you wanted to see them.
5          THE COURT:  What was the basis for sealing of the
6  court file in that matter?
7          MR. BRODERICK:  Your Honor, we do move to strike
8  the testimony that there was a sealing.  There has been no
9  evidence of that.
10          MR. MASMARQUES:  No, not a sealing.
11          THE COURT:  Well, if the records were sealed --
12          MR. BRODERICK:  In fact, they were never sealed.
13  There was nothing that --
14          THE COURT:  Well, you can cross-examine him.  You
15  can rebut it.  The Court is not going to strike it.  But
16  obviously if there's a court order, that would be the most
17  useful evidence to the Court.
18      The objection, however, is overruled.
19      So what was it about that Social Security case that you
20  feel was confidential that would warrant a sealing order?
21  Just help me understand in plain terms.
22          MR. MASMARQUES:  Yeah.  Essentially it's
23  personal -- you know, just personal.  You know, it is a
24  personal case.
25          THE COURT:  Are you saying that the case should
26  have been redacted to eliminate identifying information
27  like your Social Security number, or are you saying there
28  was some basis to seal the entire record because of the

1  subject matter?  What was it about that file that you are

2  saying is confidential and not subject to publication?  I

3  need to know that.

4  　　　　　MR. MASMARQUES:  Yeah, basically it had personal

5  medical documents in there.

6  　　　　　THE COURT:  So you are saying medical documents

7  that are protected.

8  　　　　　MR. MASMARQUES:  Yes.

9  　　　　　THE COURT:  What else besides medical documents?

10  　　　　　MR. MASMARQUES:  Also I had, like, identifying

11  information.

12  　　　　　THE COURT:  Like Social Security number or some

13  other type of number?

14  　　　　　MR. MASMARQUES:  I don't recall at this point,

15  Your Honor.

16  　　　　　THE COURT:  Social Security number, or you're not

17  sure?

18  　　　　　MR. MASMARQUES:  I'm not sure if it was in there

19  or not.

20  　　　　　THE COURT:  Okay.  So you're saying some

21  identifying --

22  　　　　　MR. MASMARQUES:  Like, information, like, date of

23  birth, for example.

24  　　　　　THE COURT:  Information e.g., date of birth, but

25  you're not sure what else.

26  　　　　　MR. MASMARQUES:  Yeah.  And the judge --

27  　　　　　THE COURT:  But how did you know that

28  Mr. Greenspan was going to make that information available

1    in an unredacted version as opposed to making it available

2    in some redacted version?

3       I'm trying to find out if the case in its entirety was

4    protected by some confidentiality or whether it was just

5    certain information, like, you know, date of birth --

6    that's what you mentioned -- or Social Security number or

7    something else that was confidential in nature.

8            MR. BRODERICK:  We also have a relevance

9    objection because there has been no showing that any Social

10   Security case was ever published.

11           THE COURT:  Well, it's just his testimony.

12           MR. MASMARQUES:  Mr. Greenspan has been

13   acquiring -- if I may just side track real quick.

14      Mr. Greenspan got a hold of the police report from the

15   Marlborough District Court.

16           THE COURT:  Well, now you're on to a different

17   topic so hold that aside for just a minute.

18      You're telling me about him publishing information from

19   a case that was sealed.  You described it as a Social

20   Security case.  You indicated that there were some medical

21   documents that would be confidential by law.

22           MR. MASMARQUES:  Yes.

23           THE COURT:  As well as possibly some identifying

24   information, but you're not sure exactly what that was.

25      What else, if anything, about what you called the

26   Social Security case in your estimation was confidential

27   and should not have been published?

28           MR. MASMARQUES:  It's -- the main things are the

```
 1    medical documents.
 2              THE COURT:  Medical documents.
 3              MR. MASMARQUES:  Yeah.  That's the main thing.
 4    Mr. Greenspan should not be accessing any of that.
 5              THE COURT:  And are you saying that he published
 6    information about your medical history?
 7              MR. MASMARQUES:  No, he has not.
 8              THE COURT:  He did not.
 9              MR. MASMARQUES:  No, he did not, Your Honor.
10              THE COURT:  So what did he do that you believe
11    was improper and harassing?
12              MR. MASMARQUES:  He posted the Social Security
13    case online.
14              THE COURT:  Okay.  And then that takes me back to
15    my original question:  In what aspect was that Social
16    Security case -- you're calling the Social Security case
17    protected in terms of confidentiality.  Was it the medical
18    documents, or was it something else as well?
19              MR. MASMARQUES:  It's been a while since I looked
20    at it but the medical document, I guess.
21              THE COURT:  Medical documents.
22        Now you can move on to the other matter, which is the
23    criminal history, because you had started to mention that
24    as well.
25              MR. MASMARQUES:  So --
26              THE COURT:  And again my understanding was that
27    you had said that the information was sealed, but I'm not
28    sure why it would need to be confidential.
```

1          MR. MASMARQUES:  Well --

2          THE COURT:  You had said there was a finding of

3     factual innocence or something like that?

4          MR. MASMARQUES:  Oh, the one from Spain?

5          THE COURT:  Sure.  That was the center piece of

6     the case so. . . .

7          MR. MASMARQUES:  Yes.  What happened was in this

8     case, it is very complicated.  This is one of the reasons

9     why in my opinion an individual who is not an expert in law

10    should not be exposing these kind of legal cases and

11    messing around with them and showing them online to the

12    public because especially this case is a foreign case.

13    This is not from the United States.

14        I was found not guilty by a majority vote of 9 to 0.

15    The verdict was then given back to the jurors because the

16    prosecutor didn't accept it at that time.  They didn't

17    care.  There was no evidence.  There was no cause of death,

18    but they didn't care.  So it was given back to them.  They

19    changed the wording from, like -- it's a Spanish word

20    *dolamedwel* [phonetic].  Something to do with manslaughter.

21         THE COURT:  If you're going to say something like

22    that then you're going to have to spell it for the record.

23        But did you say it was changed to manslaughter?

24         MR. MASMARQUES:  No.  They changed the wording so

25    that the jurors -- because the original charge was

26    manslaughter so in order for them to think that -- the

27    prosecution changed the wording.  It's a Spanish charge

28    under the Spanish Article 138.  It doesn't exist in the

```
1    Spanish Penal Code.  And then -- so then the jury verdict
2    was 8 to 1.  But there was no cause -- it was --
3            THE COURT:  You're not explaining it adequately
4    to let me understand what happened.
5        You said there was a not guilty verdict --
6            MR. MASMARQUES:  Yes.
7            THE COURT:  -- on what you considered to be the
8    equivalent of manslaughter.
9            MR. MASMARQUES:  Correct.
10           THE COURT:  And then the jury had to reconsider
11   based on some new consideration?
12           MR. MASMARQUES:  No.  The prosecutor -- he
13   gave -- he gave the verdict back to the nine jurors and
14   then he let the two reserve jurors -- in Spain they have
15   nine jurors, and they -- you only need two-thirds majority
16   vote to find the person guilty.  So they needed six people
17   to find me guilty minimum.
18           THE COURT:  Were you found guilty?  Yes or no.
19           MR. MASMARQUES:  I was found -- yeah, but not of
20   that -- not of that.
21           THE COURT:  What were you found guilty of?
22           MR. MASMARQUES:  It was a manslaughter charge.
23           THE COURT:  You said the original wording was
24   manslaughter, and you were not guilty on that.
25           MR. MASMARQUES:  Yeah, but they changed the
26   wording.  So I can't explain it.
27           THE COURT:  Okay.  In what aspect was the wording
28   changed?  So you were basically found guilty on a revised
```

1    charge?

2         MR. MASMARQUES:  On a revised charge, yeah,

3    revised charge.

4         THE COURT:  Which was also manslaughter but with

5    different charging language?

6         MR. MASMARQUES:  They said there was no

7    intention, but the final outcome was the same.

8         THE COURT:  So it would have been sort of the

9    equivalent of involuntary manslaughter?  Is that what

10   you're saying?

11        MR. MASMARQUES:  It is somewhere in between the

12   involuntary and the manslaughter.

13        THE COURT:  Okay.

14        MR. MASMARQUES:  It's not -- like, there was no

15   intention, like, there was, you know.

16        THE COURT:  Okay.  So without intent.

17        MR. MASMARQUES:  There was no intention, and

18   there was no cause of death, and there was no violence, no

19   weapon, no nothing, zero.  And they did, you know, the

20   autopsy reports, and there was no evidence.  There was --

21   the two medical forensics stated in their declaration that

22   they could not describe the cause of death based upon the

23   signs --

24        THE COURT:  So you were found guilty even though

25   no cause of death was determined?

26        MR. MASMARQUES:  Yes, Your Honor, because the

27   prosecutor was very -- it's different in Spain.  It is

28   completely different, you know.

1        This is what -- this is what in my opinion that

2    Mr. Greenspan does not understand, you know.  It's not --

3    if this happened to me in the United States, I would -- it

4    would, you know, be different.  They do it --

5            THE COURT:  Even though the system is different

6    there, I think you need to make it clear what you were

7    convicted of and what was published that was either

8    impermissibly published or was inaccurate because you have

9    to help the Court understand.

10           MR. MASMARQUES:  Yeah.  So I got charged with in

11   Spain *homicidio* is manslaughter, Article 138.  I got

12   charged with that.

13           THE COURT:  Homicide.

14           MR. MASMARQUES:  It's -- well, they deem it

15   manslaughter because in Spain they don't have a word for

16   manslaughter.  So it is Article 138.  It's just --

17           THE COURT:  Okay.  So you can continue from

18   there.

19           MR. MASMARQUES:  So what happened was the -- all

20   the jurors, nine of them, found me not guilty.  They called

21   me from the prison to the courthouse, and they kept me in

22   the holding cell for five hours.  And the attorney told me

23   that the prosecutor didn't want to accept the fact that I

24   was found not guilty.  So he gave the jurors the verdict

25   back, and he also asked the two reserve jurors to step in

26   and discuss the matter.  I don't know why.  And out came

27   the final verdict, which was 8 to 1.  So when I was

28   transferred to the United States --

1          THE COURT:  8 to 1 on what charge?  Was it
2    manslaughter without intent or causation?
3          MR. MASMARQUES:  Well --
4          THE COURT:  They didn't determine that you were
5    the person who was the cause of death?
6          MR. MASMARQUES:  Well, yeah.  It is showing up as
7    manslaughter; right?  It sounds complicated because it
8    is -- it is complicated in Spain.
9       So what happens is when a person is transferred back to
10   the U.S. as a U.S. citizen, the United States Parole
11   Commission is in charge of that.  And my attorney in New
12   York City told me they do what's called a first impression.
13   So the first impression was willful homicide.
14      Now, that has been changed now in the NCIC records.  It
15   is not willful homicide.  It's manslaughter.  And that will
16   also be removed very soon because this is being expunged in
17   Spain.  Spain expunges criminal records, not just seal
18   them.  They expunge it from the police records.
19         THE COURT:  But that hasn't happened yet.
20         MR. MASMARQUES:  It's in the process.  And the --
21         MR. BRODERICK:  Your Honor, we did move to strike
22   the testimony about what went on in Spain because there is
23   no evidence and will be no evidence that anything from
24   Spain was ever published.
25         THE COURT:  Well, here's the thing.  I'm not
26   going to strike it because the rules of evidence here are
27   expansive in these types of cases.  But that's one of the
28   reasons I reminded the parties of the burden of proof.  If

1   I don't have adequate proof of the confidential nature of
2   the documents and information then I'm not going to be able
3   to find that publishing them was harassment.  And I'm
4   trying to gain some clarifications, but certainly it's
5   still a little bit murky for the Court.
6       You can continue.
7           MR. MASMARQUES:  Yes.  So basically when I
8   transferred back to the United States, they put their first
9   impression of the charges, you know.  They usually do it
10  higher.  It said willful homicide on there and one even
11  said murder and that was just the initial --
12          THE COURT:  Then you got that corrected and
13  revised in some fashion.
14          MR. MASMARQUES:  Yeah.  It took quite a long time
15  to get that corrected actually, Your Honor.
16          THE COURT:  And then the result of the correction
17  was that it was sealed?
18          MR. MASMARQUES:  No.  In the United States, no,
19  it's manslaughter.  It's manslaughter.  But I was told by
20  the probation department in Boston that once all of this is
21  expunged when I get the documents back from Spain because
22  after a certain period of time, they expunge the record.
23  The probation department here in the United States will
24  expunge it from the NCIC.
25          THE COURT:  But that hasn't happened yet.
26          MR. MASMARQUES:  No, it hasn't happened yet.
27          THE COURT:  Okay.  Anything else in this regard?
28          MR. MASMARQUES:  Yes.  So there is a -- there is

1    a seven-page legal decision that Mr. Greenspan keeps

2    referring to that shows willful homicide.  And it does

3    because that's Judge Wolf when I had filed to seal the

4    records in January 2013.  And then a couple of years went

5    by.  I thought the whole thing had been forgotten about.

6    And then the next thing I know I saw it on Google when I --

7    because, you know -- so somebody was telling me your name

8    is on Google --

9          THE COURT:  But that information has not been

10   expunged; that information has not been sealed or expunged

11   or deemed to be confidential; is that correct?  It's just

12   basically an inadequate record because it doesn't show what

13   happened subsequently.

14         MR. MASMARQUES:  Yes.  That's right.

15         THE COURT:  You're saying -- you're not saying

16   it's confidential per se or that there was any order that

17   was forbidding its publication.  You're just saying that it

18   provided an incomplete picture of what actually happened.

19         MR. MASMARQUES:  Yes, Your Honor.  Yeah.  The

20   charge wasn't willful homicide, but it is showing like that

21   online like when Mr. Greenspan uploads it.  But it has been

22   corrected.  And my --

23         THE COURT:  So it's creating a false impression

24   is what you're saying.

25         MR. MASMARQUES:  Yes, it's creating a very false

26   impression of me.  It's creating a very bad image of me,

27   Your Honor, as a person who has killed somebody.  And the

28   problem is Mr. Greenspan in my opinion he enjoys

1   Judge Wolf's seven-page legal decision out there because it
2   has a very important message in that legal decision about
3   not sealing a record.  And Judge Wolf said, you know, that
4   he didn't need to seal a record because, you know, it's
5   public information and so on.  But every judge is
6   different.  And the thing is this case is different.
7       This case is not -- this case I did not go through a
8   United States trial with due process under the United
9   States Constitution -- constitutional guarantees.  I was
10  tried in a foreign country, Your Honor, where there was no
11  due process at all; where they returned the verdict where
12  the cause of death was unknown; and the two medical
13  forensics even stated that.
14          THE COURT:  So, again, you're basically saying it
15  creates a false and misleading impression.
16          MR. MASMARQUES:  Yes.  It does, and it creates a
17  very bad image for me.  It's hurting my employment.  It's
18  hurting my career.  It's hurting my reputation.  It's
19  hurting my wife's reputation.
20      And the reason why Mr. Greenspan -- this document is
21  important to him because it does say in there about not
22  having to seal the record.  But that's not what this is all
23  about.  This is about my future, my reputation, my
24  employment.
25          THE COURT:  Understood.  So far what we have
26  though is information which you believe as incomplete and
27  inaccurate and/or misleading concerning this criminal
28  proceeding in Spain as well as medical documents that were

1    disclosed or offered to be disclosed as part of what you

2    described as the Social Security case.

3        What else, if anything, are you also alleging to have

4    been harassment by Mr. Greenspan?

5            MR. MASMARQUES:  Yes.  Mr. Greenspan requested

6    the police report from the Marlborough District Court, and

7    he received that on December 4th, 2018, from --

8            THE COURT:  When you're saying the police report,

9    you're saying for which case?

10           MR. MASMARQUES:  The case out there.

11           THE COURT:  Which case?

12           MR. MASMARQUES:  The Marlborough case.

13           THE COURT:  Which case?  Which case are you

14   referring to?

15           MR. MASMARQUES:  The criminal case.

16           THE COURT:  The criminal case.

17           MR. MASMARQUES:  Yeah.

18           THE COURT:  Okay.  So he was able to get his

19   hands on the police report from the criminal case that was

20   tried in Spain?

21           MR. MASMARQUES:  No.

22           THE COURT:  Make it clear what you're saying.

23           MR. MASMARQUES:  Yeah.

24           THE COURT:  Police report from what case?

25           MR. MASMARQUES:  Mr. Greenspan has accused me of

26   uploading vile images and comments and --

27           THE COURT:  Oh, okay.  So you're talking about

28   the police report from the --

1       MR. MASMARQUES:  He's accused me of all these

2   nasty things, and he kept harassing the Marlborough Police.

3   He kept harassing the DAs.  He kept harassing -- and

4   finally my lawyer told me -- I have a new lawyer now.  My

5   lawyer told me they had had enough of Mr. Greenspan.  They

6   can't take his harassment any more.  They're going to just

7   put charges on you and let the court and the judge --

8       THE COURT:  Charges for what?

9       MR. MASMARQUES:  Criminal harassment and

10  restraining order violation under Massachusetts law.  And

11  my lawyer told me --

12      THE COURT:  Violation of what restraining order?

13      MR. MASMARQUES:  His restraining order.

14      THE COURT:  You're saying Mr. Greenspan has

15  violated the restraining order.

16      MR. MASMARQUES:  No.  He says I violated the

17  restraining order.  But Mr. Greenspan has also violated the

18  restraining order, Your Honor.

19      THE COURT:  So violated the restraining order by

20  publishing lewd images.

21      MR. MASMARQUES:  Oh, he said -- yeah.

22      THE COURT:  He's saying that you have violated

23  the restraining order by publishing lewd images.

24      MR. MASMARQUES:  Yes, Your Honor.

25      THE COURT:  Okay.

26      MR. MASMARQUES:  And I have not published these

27  lewd images.

28      THE COURT:  But that's your understanding of the

1    basis for his request for criminal investigation against

2    you.

3            MR. MASMARQUES:  Yes.

4            THE COURT:  Got it.

5        Anything else?

6            MR. MASMARQUES:  Yes.  So Mr. Greenspan got ahold

7    of a document from the Marlborough Police, a report, and it

8    had my Social Security number on there.  It had my date of

9    birth, and it had my driver's license number on there.  My

10   home address.

11           THE COURT:  Well, so you're saying that he must

12   have gotten that impermissibly because if he had received

13   that from the police, it would have been in redacted form.

14   It would have omitted that information.

15           MR. MASMARQUES:  No, they didn't omit it, which I

16   don't understand.

17           THE COURT:  No.  But where are you saying that he

18   obtained that information?

19           MR. MASMARQUES:  He received it from a clerk at

20   the Marlborough --

21           THE COURT:  Okay.  So basically the clerk should

22   have redacted information, and the clerk didn't redact it.

23   That's what you're saying.

24           MR. MASMARQUES:  Yes, Your Honor.

25           THE COURT:  Okay.

26           MR. MASMARQUES:  But then Mr. Greenspan uploaded

27   it onto the Santa Clara Superior Court docket.

28           THE COURT:  Got it.  So it's part of the docket

1  in this case.

2          MR. MASMARQUES:  Yes.

3          THE COURT:  Got it.

4          MR. MASMARQUES:  I do have a motion to seal that.

5          THE COURT:  Okay.  And then what else did you

6  want to mention?

7          MR. MASMARQUES:  So Mr. Greenspan has been, you

8  know, continuously harassing me with tweets on Twitter.

9          THE COURT:  Okay.  What are the harassing tweets

10  about?  Just tell me in your own words first.

11          MR. MASMARQUES:  It's just nonstop, Your Honor.

12          THE COURT:  When you say nonstop, how frequent is

13  it?

14          MR. MASMARQUES:  Well, it's kind of -- he's kind

15  of stopped lately, but he started up again.

16          THE COURT:  When did he start up again?

17          MR. MASMARQUES:  He started up again on

18  November 6, 2018.

19          THE COURT:  Well, tell me just in your own words

20  what is the nature of the harassment on Twitter?

21          MR. MASMARQUES:  He tweeted, Meet convicted

22  murderer Diego MasMarques.  He writes this crazy stuff ten

23  times a day.  It's not true.  And we have a restraining

24  order.  PlainSite.org.

25      And this goes on and on, Your Honor.  It just doesn't

26  stop.  And there's another one from February 20th, 2019.

27      Diego MasMarques has filed a motion to seal the case

28  involving a restraining order against him for harassing and

LISA L. BROWN, CSR
License Number CSR 13148

1    threatening Aaron Greenspan and his family.  It appears

2    that's why his previous motions --

3          THE COURT:  Speak into the microphone.

4          MR. MASMARQUES:  Oh, I'm sorry.

5      His previous motions to seal his cases have all been

6    denied.

7      But this has nothing to do with sealing the entire

8    case.  This has to do with sealing what Mr. Greenspan

9    uploaded on December 4th.

10          THE COURT:  So, again, what you're saying is it

11    is inaccurate information?

12          MR. MASMARQUES:  Yes.  And these are also against

13    Twitter's policies here.

14          THE COURT:  Well, it came out previously that

15    he's had his account suspended previously.

16          MR. MASMARQUES:  Yes.  Suspended it and then

17    locked.  I have all the proof right here.

18          THE COURT:  Okay.

19          MR. MASMARQUES:  They locked it.

20          THE COURT:  Anything further?  Let's see if you

21    can wrap up.

22          MR. MASMARQUES:  Yeah.  Oh, very important.

23    Mr. Greenspan is taking my name, Diego MasMarques, and he's

24    altering it to no end.  He's changing my first name to

25    Rick.  Rick MasMarques.  Ricky MasMarques.  And with that,

26    Your Honor, he's then exposing the legal documents from

27    Spain under more and more variations of these names that he

28    invents --

1          THE COURT:  So, in other words, it is going to be
2    more accessible and more prominently displayed.
3          MR. MASMARQUES:  Yes, Your Honor.
4          THE COURT:  Okay.
5          MR. MASMARQUES:  And before it was never under my
6    wife's name a couple of years ago.  And now this has
7    started to come up under my wife's name.  So when you
8    Google my wife's name, these legal documents from Spain and
9    from here that all have to do with Spain, Mr. Greenspan has
10   made sure that they are coming up under my wife's name.
11   And, you know, my wife works in the medical field,
12   Your Honor.  Yes.
13         THE COURT:  So you're indicating that he's being
14   vindicative.
15         MR. MASMARQUES:  Yes, he is.
16         THE COURT:  Okay.  Anything additional?  Let's
17   see if you can wrap up.
18         MR. MASMARQUES:  There's pictures that's been
19   posted of me.
20         THE COURT:  If there are some pictures that have
21   been posted by Mr. Greenspan, let's get those marked
22   collectively as next in order as Exhibit D.
23      Show them to counsel first.
24         MR. BRODERICK:  Objection, Your Honor.  Lacks
25   foundation as to --
26         THE COURT:  He's not seeking to admit them.  He's
27   just going to have them marked for identification.  He
28   hasn't discussed them yet.

1          MR. BRODERICK:  Do you have any copies?

2          THE COURT:  We can go ahead and get them marked,

3    and we'll return them and then you can look at them.  I'm

4    not going to look at them.

5                (Defendant's Exhibit No. D. Group of

6                Photographs, was marked for identification.)

7          THE COURT:  Okay.  So Exhibit D has not been

8    offered.  It hasn't been admitted, and you wanted to talk

9    about certain images you said -- so go ahead and talk about

10   that.

11         MR. MASMARQUES:  The images that Mr. Greenspan --

12         THE COURT:  Well, you had brought up -- this is

13   your case.

14         MR. MASMARQUES:  Oh, I apologize.  Yes.

15      Mr. Greenspan on September 22nd of 2018, which is an

16   important date because it's the date of Judge Wolf's legal

17   decision, which was September 22nd, 2015, on this date

18   September 22nd, 2018, Mr. Greenspan started uploading a lot

19   of nasty pictures with comments.  My home address is right

20   under the picture here.  And all this was --

21         THE COURT:  When you say nasty photos, describe

22   it, what you're talking about.  Just tell me in your own

23   words.

24         MR. MASMARQUES:  He's calling me names.  Calling

25   me gay.  Closet gay.

26         THE COURT:  And what is offensive about the

27   images themselves, if anything?  I haven't seen them.

28         MR. MASMARQUES:  Oh, sorry.  Sorry.

1          THE COURT:  Just tell me.  Or if you're seeking

2     to admit any photos then unless there is an objection

3     that's sustained, I'll look at them.

4       Are there photos of you or somebody else?  You need to

5     convey this to me with your words.

6          MR. MASMARQUES:  Yes.  I apologize, Your Honor.

7       No, they are not pictures of me.  They are somebody

8     else.  But somebody else -- so when you Google Diego

9     MasMarques, this man comes up.  There is a picture of him.

10    And it's been like that for probably years.

11         THE COURT:  In other words, you Google your name,

12    and this image that is part of Exhibit D shows up?

13         MR. MASMARQUES:  Yes.

14         THE COURT:  Okay.

15         MR. MASMARQUES:  But that's not, but that picture

16    has always been there under my name.  I don't know who that

17    is.

18      These are things that Mr. Greenspan has been doing.

19    And what is really concerning me is that after he was

20    served the restraining order on October 9th, I thought that

21    the harassment would kind of stop, but it's actually

22    increased.

23         THE COURT:  Increased in what aspect?

24         MR. MASMARQUES:  More uploading of negative

25    comments about me, the pictures.  The legal documents from

26    Spain have been uploaded under variations of my name more

27    and more and more to the extent where now my wife, who

28    works in the medical field -- she works with doctors, you

LISA L. BROWN, CSR

License Number CSR 13148

1  know.  And if somebody Googles her name, they are, like,
2  who is this?  Is that your husband?
3      And everything under there, under my wife's name, is
4  from Mr. Greenspan.  Nobody else.  Only Mr. Greenspan.
5          MR. BRODERICK:  Move to strike.  Lack of
6  foundation.
7          THE COURT:  Overruled.
8      You know, counsel is going to cross-examine you on
9  these issues.  So to the extent that you can convey to the
10  Court how you know that has been published by Mr. Greenspan
11  as opposed to somebody else that is something you would
12  need to convey to the Court.  I keep reminding everybody of
13  the burden of proof in this case.
14          MR. MASMARQUES:  Well, there is nobody else that
15  does this, Your Honor.
16          THE COURT:  So you're saying it fits with his
17  pattern of conduct?
18          MR. MASMARQUES:  It does fit with his pattern.
19  Yes, Your Honor.  There's a pattern of conduct here that
20  he's had since -- from the get-go, from the beginning.
21      This is -- and, Your Honor, it's not -- I'm not the
22  only victim of Mr. Greenspan.  There are hundreds if not
23  thousands of victims that are being victimized today still
24  by Mr. Greenspan today.  There are comments in here I have
25  from people -- Mr. Greenspan does not leave people alone,
26  Your Honor.  People -- I was reading a case of a woman who
27  said she was --
28          MR. BRODERICK:  Objection, Your Honor.

1          THE COURT:  Overruled.

2          MR. MASMARQUES:  She had to get out of her place

3     because she was abused by husband.  She went to court, and

4     she had the documents sealed.  Mr. Greenspan got a hold of

5     the documents, Your Honor, and he uploaded them all over

6     the place.  And the woman had to move from her house.

7          And this is what is happening.  He -- Mr. Greenspan

8     doesn't leave people alone, Your Honor.  When you ask him

9     to please stop uploading this or, you know, stop doing this

10    because you're hurting my employment, you're hurting my

11    job, he does it even more.  This is -- it's not normal

12    behavior.  It's just not normal behavior.

13          THE COURT:  Is there anything else you wanted to

14    mention?

15          Help me understand what is the significance of

16    Exhibit D?  You said that it was photos that will appear

17    associated with your name, but it's not a photo of you.

18          MR. MASMARQUES:  Well, there's not many people

19    that know my home address.  So when you go to Google and

20    you Google my name, this is the picture that comes right

21    up.  And so this was taken, copied, and pasted onto this

22    comment.

23          THE COURT:  And the comment is your identifying

24    information?

25          MR. MASMARQUES:  Exactly.  It has my home address

26    and that never was up online, Your Honor, you know.  And my

27    wife and I fear for our safety, you know.  I hired -- I

28    hired protective -- a person from a protective company who

1  came with me last time as well.

2      And when we left the courthouse, Mr. Greenspan had left

3  earlier.  He was stalking us outside to the right-hand side

4  of the courthouse telling his attorney to take pictures of

5  me.  Then when we went down to the parking lot down here --

6          THE COURT:  Counsel who is present in court?

7          MR. MASMARQUES:  Counsel was present outside.

8  Yeah.

9      The Santa Clara Sheriff came out and told him to stop

10  it actually.  The Santa Clara Sheriff came outside and told

11  Attorney Broderick to stop it because he was over there

12  lingering, and Mr. Greenspan -- I didn't know Mr. Greenspan

13  was on the right side of the courthouse.  And now he had

14  already left minutes -- this is why we waited.  We took our

15  time leaving.  We expected Mr. Greenspan to be by his car

16  already, but no.  He was stalking us downstairs.  This is

17  what Mr. Greenspan does, Your Honor.  He stalks people

18  nonstop.

19      I don't know what his issue is, you know.  I don't

20  think -- I think it's a mental health issue myself, but I

21  don't know.

22          THE COURT:  Where was your photograph taken?

23  Where were you when your photo was taken?

24          MR. MASMARQUES:  It was right in front of the

25  courthouse.  Attorney Broderick was -- the person I

26  hired --

27          THE COURT:  And how long ago did that happen?

28          MR. MASMARQUES:  That was on the court date

 1   December 12th.  And actually when we came back up from
 2   break, I could hear Mr. Greenspan saying, Take his picture.
 3   Take his picture.  Take his picture.
 4       And I don't think Attorney Broderick wants to take my
 5   picture, but his client kept insisting to take my picture.
 6   So Attorney Broderick took his camera out and started
 7   taking my picture.  And then the sheriff had him delete his
 8   pictures.  But this is the obsessiveness that Mr. Greenspan
 9   has.  He doesn't stop, Your Honor.  He just continuous and
10   continues.
11       And so when the person who was escorting me from this
12   protective service, when we went down this way, he said,
13   Stop.  Stop.  Greenspan was at the corner down there on the
14   other block just lingering.  And I'm so glad that I have
15   someone coming with me to this court from protective
16   services because I don't know what Mr. Greenspan is capable
17   of because when I see these things that he does online,
18   they're just not normal.  A normal person doesn't do these
19   things, Your Honor.  And now he's trying to blame me for
20   all these vile images and all this.
21       This is all a bunch of nonsense, Your Honor.  This is
22   all garbage.  I didn't do any of the stuff he's accusing me
23   of.  Nothing.  And there is no evidence that I've done any
24   of that, and he knows it.
25       But you know what he does?  He keeps obsessively
26   calling people, obsessively stalking people.  I'll file a
27   complaint against you if you don't do A, B, and C.  And
28   this is what he does.

1      And in that -- in the large document that I gave you

2    with the subpoena, he threatened the law firm of a hosting

3    company in LA that he threatened them and said, If you

4    don't do as I say, I'm going to file complaints against you

5    with the Bar Association --

6             THE COURT:  How do you know this?

7             MR. MASMARQUES:  It's right there.  It's in the

8    file I gave you.  It's right there.

9      I'm going to file complaints against you with the Bar

10   Association.  I'm going to --

11            THE COURT:  It is part of which exhibit?

12            MR. MASMARQUES:  22.

13            MR. BRODERICK:  Objection.  Move to strike.

14            THE COURT:  Well, wait.  You're saying it is part

15   of an exhibit that was presented by you or by

16   Mr. Greenspan?

17            MR. MASMARQUES:  No.  It's a subpoena.  It's --

18            THE COURT:  So you're saying it is a subpoenaed

19   document?

20            MR. MASMARQUES:  Yes.  Sorry.

21            THE COURT:  Got it.

22            MR. MASMARQUES:  Subpoenaed document.

23      And, you know, I never really read it through until,

24   like, a few days ago, and I was, like -- I just can't --

25   like, a normal person doesn't behave like this.  He

26   threatened the attorney saying, If you don't do as I say,

27   you're going to get sanctioned of $10,000 per day.  You're

28   going to get incarceration.  I'm going to file a Bar

1   Association complaint against all of you.  And he gave them

2   step by step instructions on how to hack into their own

3   servers.  And it is all there in that subpoena.  And they

4   said, you know, they said to the judge in Ohio, federal

5   judge, what Mr. Greenspan wants us to do literally is to

6   criminally hack into our own servers.  And they repeatedly

7   said that.

8           THE COURT:  For what purpose?

9           MR. MASMARQUES:  He wanted them to change the

10  password on the servers because he's trying to find out

11  who's doing these vile images, you see.

12          THE COURT:  I'm understanding now.

13          MR. MASMARQUES:  He's trying to -- so he doesn't

14  know who's doing these vile images.  So he's in this court

15  over here lying to you, Your Honor, like he's been lying to

16  you since the first day he came here on April 4th saying

17  that I've done this, and I've done that, and I've called

18  his parents.

19      I have not done any of this.  I have not uploaded these

20  pictures.  He is lying.  That's all I can say, Your Honor.

21  He continuously lies and lies and lies.  That's what he

22  does, and he's been doing this for -- this is what he does.

23  And when I read comments about him online, I'm not the only

24  person that's saying this.  He's got a lot of issues with

25  people.

26      And there is always the same pattern.  He gets obsessed

27  with somebody, and he just can't leave them alone.  And I

28  don't know what his issue is.  I really don't know what his

1  issue is.

2        THE COURT:  All right.  I think this is getting

3  somewhat repetitive so if there is anything new you wanted

4  to add, go ahead.

5        MR. MASMARQUES:  Yeah.  Then I'd say -- I'd say

6  last week, you know, my MSN e-mail account was hacked, and

7  I'm pretty sure it was done by Mr. Greenspan.  And pictures

8  of me from Spain were only on that e-mail account that I

9  had from the newspaper articles.  They were not -- none of

10  them were online.  None of them.  I had no pictures of me

11  online.  There was never a picture of me online at all.

12  There was nothing of me online.  And then all of a sudden

13  around, I think, the fall of 2017, my MSN e-mail account

14  got hacked.  I couldn't get into it for 30 days.  A couple

15  of months later it got hacked again.  And then right after

16  that point in time I started seeing my pictures all over

17  the Web.

18     Mr. Greenspan can sit here and say, I'm not a hacker.

19  But I presented proof, Your Honor, to you that he's a

20  hacker.  And that's in that subpoena where he literally

21  gives instructions and this is -- I also have another

22  exhibit where he was at a deposition where he sued a

23  company called ConnectU, and there was something going on

24  with the computer, and they gave him a keyboard and in

25  three minutes, in three minutes, he hacked into the legal

26  database of this law firm, which they thought was highly

27  protected.

28        MR. BRODERICK:  Objection, Your Honor.  There is

1    no basis in fact for foundation, nor is it non-hearsay.

2    It's hearsay.

3         THE COURT:  The objection is sustained.

4       You're saying these things, but I'm not sure what

5    foundation you have for making these conclusions.

6         MR. MASMARQUES:  It's an article, Your Honor.

7    It's an article that was posted online.  It's called "Above

8    the Law."  It's an article about him.  He went to a

9    session.  He --

10        THE COURT:  So, first of all, do I have a copy of

11   that article?

12        MR. MASMARQUES:  You have it in the folder.

13        THE COURT:  Well, you say the folder, but there

14   has only been several documents that have been filed that

15   have been identified.  I'm not sure if that's one of the

16   documents that has been identified with an exhibit tag on

17   it.  And, moreover, it would be hard for the Court to

18   really give such a document any weight given the fact that

19   it's just fraught with hearsay.

20        MR. MASMARQUES:  I have here, Your Honor, the

21   tweet.  This was sent to me by an anonymous e-mailer.  I've

22   since closed my account.  Somehow they got ahold of my

23   e-mail account that I was using for the court.  The

24   individual over here -- I don't know who he is -- he says

25   he has a lot of issues with Aaron Greenspan.  He sent me a

26   tweet that Aaron Greenspan did from May 11th, 2015.

27      It says, We get these threats practically daily.  It's

28   only when someone stupidly bothers with certified mail that

1    it gets annoying.

2        It's right there in black and white.

3            THE COURT:  But what does that have to do with

4    anything?  Tell me what the significance of that is.

5            MR. MASMARQUES:  Yes.  Because he's saying I'm

6    doing all these things to him, which I'm not doing, you

7    know.  He's been having issues with people way before I

8    even knew who --

9            THE COURT:  So you're just trying to show that he

10   has similar issues with other people.

11           MR. MASMARQUES:  Yes.  He's got a pattern over

12   here, Your Honor.  It's a pattern.  It's a long standing

13   pattern.  It goes back many years before I even knew who he

14   was.  And I don't know --

15           THE COURT:  So a lot of people are objecting to

16   his conduct is basically what you're saying?

17           MR. MASMARQUES:  Yes, Your Honor.

18           THE COURT:  Got it.

19       All right.  So let's have you wrap up.

20       So what we'll do is take our afternoon recess.  We'll

21   be back in session at 3:40.

22       That's going to give you some time to determine whether

23   there is anything else you need to add to your testimony.

24   When you come back, I'll give you an additional ten minutes

25   to wrap up.  The recess will give you an opportunity to

26   sort of recalibrate and look through your documents and see

27   if there isn't anything that you haven't mentioned before

28   that you'd like to add and then we will commence

1    cross-examination at 3:50.

2            MR. MASMARQUES:  Yes, Your Honor.

3            MR. BRODERICK:  Thank you, Your Honor.

4            THE COURT:  Thank you all.

5

6            (At 3:27 p.m., a recess is taken in the

7            matter.)

8

9            (At 3:44 p.m., court reconvened in the

10           matter, and the following proceedings were held:)

11

12           THE COURT:  All right.  We're back in session in

13   the matter of Greenspan versus MasMarques.

14       Both parties are present.  Counsel is present on behalf

15   of Mr. Greenspan, and we had just taken a recess.

16       And, Mr. MasMarques, I wanted to give you an

17   opportunity to sort of collect your thoughts and see if

18   there is anything else you wanted to mention that you

19   haven't had a chance to mention in your prior testimony.

20           MR. MASMARQUES:  Yes, Your Honor.

21           THE COURT:  I was going to give you an additional

22   ten minutes to complete.

23           MR. MASMARQUES:  So basically I just want to wrap

24   it up and conclude it by stating that Mr. Greenspan's

25   actions online with his computer skills that he -- and his

26   website have been extremely detrimental to not only my

27   career, my reputation but also to my wife.  And, you know,

28   it's very disturbing for people to look up either one of us

1    and then have to explain these things.  This is when my

2    wife --

3              THE COURT:  If you're referring to a document, we

4    need to make sure that it has been marked as an exhibit.

5    Did you need to mark a new exhibit?

6              MR. MASMARQUES:  Yes, Your Honor.

7              THE COURT:  Would that be E?

8       Exhibit E.  What is Exhibit E?

9              MR. MASMARQUES:  Exhibit E is my wife.  That's

10   her name.  So when you Google my wife's name --

11             THE COURT:  Is it a Google page concerning your

12   wife?

13             MR. MASMARQUES:  Yes.

14                  (Defendant's Exhibit No. E. Google Page

15                  Concerning Mr. MasMarques' Wife, was marked for

16                  identification.)

17             THE COURT:  Counsel, have you had a chance to see

18   it?

19             MR. BRODERICK:  No.

20             THE COURT:  We need to show counsel first.

21             MR. MASMARQUES:  They have it in the booklet.

22             THE COURT:  So you're basically saying one of the

23   reasons that it's been so detrimental is the fact that the

24   information pops up basically when you Google your wife's

25   name as well.

26             MR. MASMARQUES:  Yes, Your Honor.  And

27   Mr. Greenspan is making sure that it's being repetitive.

28   Like, in other words, instead, like, just one of the

1    documents showing up, the same documents will show up two

2    or three times.

3            THE COURT:  Now, are you real savvy about these

4    types of things?  In other words, how are you -- for

5    example, how did you determine that the information that

6    was attributed to you, the lewd information, was actually

7    something that was perpetrated by Mr. Greenspan?  How did

8    you determine that?

9            MR. MASMARQUES:  Because this is all from his

10   website, PlainSite.org and from his Twitter feed.

11           THE COURT:  But I was talking about the lewd

12   images that he was attributing to you.  How are you able to

13   conclude that he, in fact, is the one who has been creating

14   those document?

15           MR. MASMARQUES:  I cannot say 100 percent for

16   sure unlike he said I did something that I didn't do.

17           THE COURT:  So you think that it was published by

18   somebody else other than yourself and other than

19   Mr. Greenspan?  The lewd images.

20           MR. MASMARQUES:  Oh, yes, they were.  They were.

21           THE COURT:  By somebody else.

22           MR. MASMARQUES:  Yes, they were.  I apologize.

23   Yes.

24           THE COURT:  Got it.

25           MR. MASMARQUES:  They were uploaded by somebody

26   else, and they were whatever they did copy and paste, and

27   somebody else did this.  And as I stated earlier,

28   Mr. Greenspan has hundreds if not thousands of people very

1    angry at him because --

2            THE COURT:  So it could be almost anybody.

3            MR. MASMARQUES:  It could be almost -- because

4    he's doing this to so many people, and I'm one of, like,

5    many out there.  I just happened to be, like, the only

6    person that got involved with a restraining order from

7    Mr. Greenspan.  But when one does a Google search, they see

8    so many complaints against him.  And it's always the same

9    pattern.

10            THE COURT:  Okay.  So does that conclude your

11   testimony?

12            MR. MASMARQUES:  Yes, Your Honor.

13            THE COURT:  All right.  Cross-examination.

14            MR. BRODERICK:  Thank you.

15                          **CROSS-EXAMINATION**

16   **BY MR. BRODERICK:**

17       Q.   Have you ever seen this document before?

18            THE COURT:  Wait a second.  What document are we

19   referring to?  We have to have a marked document.  We need

20   to create a record.

21            MR. BRODERICK:  Oh, we need to mark it.  Let me

22   mark it.

23            THE COURT:  All right.  You'd like this to be

24   marked as Petitioner's next in order, which is going to be

25   Exhibit --

26            MR. BRODERICK:  I believe it's 15.

27            THE COURT:  This will be Exhibit 16.

28       What is Exhibit 16?  What is Exhibit 16?

1        MR. BRODERICK:  It is a document relating to the
2    Department of Justice against MasMarques.
3        THE COURT:  Okay.  So that's going to be
4    Exhibit 16.  And once it's marked, counsel is going to show
5    it to you and ask you some questions.
6               (Plaintiff's Exhibit No. 16, Document
7               Relating to the Department of Justice Against
8               MasMarques, was marked for identification.)
9        MR. MASMARQUES:  I object to that document.
10        THE COURT:  It's just being marked.
11        THE BAILIFF:  Is this for him or for the Court,
12    the extra copy?
13        MR. BRODERICK:  The extra copy may be for him,
14    yes.
15        MR. MASMARQUES:  I have it.
16        THE COURT:  Mr. MasMarques, since you're not
17    represented by counsel, let me just say this:  You both
18    have seen a transcript of the proceedings that have
19    occurred before today's date; right?  And you obtained a
20    copy of the transcript.  When you look at a transcript, you
21    need to be able to identify what document the witness is
22    talking about.  So if one of the parties just says, Hey,
23    look at this document.  And you look back over the
24    transcript later on, nobody is going to know with certainty
25    what that document is.  So the only way to create a clear
26    record is by having the documents marked.  So just the fact
27    that it is being marked doesn't mean it's being admitted
28    into evidence.  It's just really a way that we can create a

1   record, okay?

2           MR. MASMARQUES:  Yes, Your Honor.

3           THE COURT:  So I'm showing the witness what's

4   been marked as Exhibit 16.

5       Counsel, what is your question?

6       Q.   BY MR. BRODERICK:  Have you ever seen this

7   document before?

8       A.   Oh, yes.  This is Mr. Greenspan's most favorite

9   document of all, this one right here.  Mr. Greenspan --

10          THE COURT:  So the answer is yes.

11      Next question.

12      Q.   BY MR. BRODERICK:  Referring to --

13      A.   He posted this all over online.

14          THE COURT:  So just wait for the next question

15   please, sir.

16      Q.   BY MR. BRODERICK:  The second page under

17   "Offense," what does it say there where it says the

18   commission finds?  What does that say?

19      A.   You can read it, sir.

20          THE COURT:  Why don't you read it for the record,

21   Counsel, just for time-saving purposes.

22          MR. BRODERICK:  The Commission finds that

23   transferee's offense is most similar to, one, burglary,

24   and, two, voluntary manslaughter.

25      Q.   BY MR. BRODERICK:  Is that correct?

26      A.   You know, are we getting into --

27          THE COURT:  Well, the question is, is that what

28   the document says.

```
 1              THE WITNESS:  Yeah, the document says that.
 2              THE COURT:  Okay.  Next question.
 3              THE WITNESS:  But this is a document that
 4    Mr. Greenspan has been e-mailing --
 5              THE COURT:  Now, sir, you have to wait for the
 6    next question.  We're going to do this in an orderly
 7    fashion.
 8         Q.   BY MR. BRODERICK:  On page 5 of 6 it says,
 9    "Conditions of Supervised Release."  Do you see that?
10         A.   Oh, are you referring to page 2?
11         Q.   It's page 5 of 6.
12         A.   Oh, at the top.
13         Q.   At the bottom it's 2.
14         A.   Okay.  What about it?
15              THE COURT:  What is the question?
16         Q.   BY MR. BRODERICK:  You don't have the right page.
17              THE COURT:  Could you help -- listen.  Let's use
18    the marked -- no.  No.  We're going to use the marked
19    exhibit.  That's the only exhibit -- excuse me, sir,
20    Mr. MasMarques.
21              THE WITNESS:  Yes.
22              THE COURT:  We're only going to use the marked
23    exhibit.  Let's not use copies.
24         Counsel, why don't you point out the passage that you
25    were referring to.  Tell us the page number and where it is
26    located.
27         Q.   BY MR. BRODERICK:  It's on page 5 of 6.  I'll
28    hand you that.
```

1           THE COURT:  All right.  And what is the question?

2      Q.    BY MR. BRODERICK:  Did the Commission impose

3  conditions upon you?

4      A.    Yes.  You can read that there.

5      Q.    Would you read the condition there?  It says, In

6  addition.

7      A.    You can read them if you want, Counsel.

8      Q.    The condition you shall be subject to the special

9  mental health after care condition.

10     A.    Yes.  Because I was falsely accused in Spain.  I

11  can see a doctor for --

12           THE COURT:  Now, listen.  Don't give a narrative

13  response.  Just answer the question.  And then once

14  cross-examination is concluded, if there is anything you

15  wanted to augment from your previous testimony, you'll be

16  able to do that.

17           THE WITNESS:  But, Your Honor, this is the issue

18  at hand that it all has to do with Mr. Greenspan smearing

19  my name, defaming me --

20           THE COURT:  Answer the questions that are posed.

21           THE WITNESS:  That's what he does.

22           THE COURT:  Mr. Greenspan has the opportunity to

23  for cross-examination.  That's what's happening now.

24           THE WITNESS:  Go ahead, Counsel.

25     Q.    BY MR. BRODERICK:  What is your understanding of

26  why the court sent you to mental health care?

27     A.    Because of what happened to me in Spain.

28     Q.    Did you go to mental health care?

LISA L. BROWN, CSR

License Number CSR 13148

1     A.    I was there, yes.

2     Q.    Are still under the care?

3     A.    No, I'm not.

4     Q.    Did you receive a diagnosis?

5     A.    No.

6     Q.    Have you ever heard of the psychological concept

7 of projecting?

8           THE WITNESS:  Your Honor, I object to this.  I

9 really do.

10         THE COURT:  Do you want to make an offer of

11 proof, Counsel?

12         THE WITNESS:  This is just abusive.

13     Q.    BY MR. BRODERICK:  Earlier on you testified on a

14 number of things that Mr. Greenspan did.

15     A.    He did.

16     Q.    And is there any doubt in your mind that was the

17 description of what has been happening through you in that

18 you were projecting onto him the actions you've actually

19 been taking?

20     A.    No, Counselor.  That's a sad way of thinking.

21 That probably best describes Mr. Greenspan.  I'm not

22 projecting anything.  I am stating facts, and I've been

23 showing facts to this Court of all the harassment and abuse

24 I've been enduring.

25         THE COURT:  Next question.

26     Q.    BY MR. BRODERICK:  Do you have any single

27 document that shows with some Internet protocol number or

28 identification that any of the things you said that

1    Mr. Greenspan posted about you other than the legal

2    documents that he does through his PlainSite came from him?

3        A.    Yes, I do.

4        Q.    Can you show me one?

5              THE COURT:  If it is something that has already

6    been marked then we need to refer to the marked document.

7    If it is a new document, we're going to need to get it

8    identified, and it is going to be identified as

9    Petitioner's exhibit.

10             THE WITNESS:  Are you saying anything online that

11   he's posted?

12       Q.    BY MR. BRODERICK:  No.  Anything derogatory about

13   you that you attribute to him.

14       A.    Oh.

15       Q.    Other than the things that are legal documents?

16             THE COURT:  Derogatory about whom?  Derogatory

17   about Mr. MasMarques?

18             THE WITNESS:  He's called me a murderer and

19   rapist here in tweets.

20             THE COURT:  So he's referring to the tweets.

21             THE WITNESS:  Right here.

22       Q.    BY MR. BRODERICK:  Anything else?

23             THE COURT:  And wait a second.  I think those are

24   part of the packet that's already been identified.

25             THE WITNESS:  Yes.

26             THE COURT:  So go ahead and take a look at the

27   marked exhibit and tell us which one it is that has the

28   tweets in it.  And that's Mr. MasMarques' response to the

1    question posed.

2              MR. BRODERICK:  I don't see those tweets in here.

3              THE COURT:  Listen, gentlemen, if you're looking

4    at a marked document, you need to identify what document it

5    is by letter or number.

6         So what document are you referring to, Mr. MasMarques?

7              THE WITNESS:  Oh, I'm referring to --

8              THE COURT:  Don't look at the documents in your

9    binder.  Look at the marked document and see if it is

10   amongst the marked documents.

11             THE WITNESS:  No, it's not, Your Honor.

12             THE COURT:  Okay.  So these are additional

13   documents with tweets that are disparaging comments;

14   correct?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  All right.  Let's get that marked as

17   petitioner's next in order.  Exhibit 17.

18        So respondent is identifying these tweets.  They need

19   to be marked.

20        Counsel, let's get them marked please so you can have a

21   record.

22        All right.  So the record will reflect that Exhibit 17

23   is a series of tweets.

24        Is that correct, Mr. MasMarques?

25             THE WITNESS:  Yes, Your Honor.

26                  (Plaintiff's Exhibit No. 17, Series of

27                  Tweets, was marked for identification.)

28             THE COURT:  And that is your response to

1    counsel's question about whether there is any

2    documentation.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  Okay.

5            THE WITNESS:  There is more, but I don't want to

6    over burden.

7            THE COURT:  That's fine.

8        Counsel, next question.

9        Q.    BY MR. BRODERICK:  Can you identify the tweets

10   you're referring to?

11       A.    Sure.

12           THE COURT:  Let's see if we can give you some

13   Post-Its and maybe you can post the -- there you go.  Post

14   the pages that have the tweets that you're referring to.

15           THE WITNESS:  He posts my home address right

16   there.

17       Counselor --

18           THE COURT:  Just go ahead and tab them first and

19   then you can go over and tell counsel what statements were

20   made in the tweets that you considered to be disparaging

21   and improper.

22           THE WITNESS:  There's just no end to this with

23   Mr. Greenspan.

24           THE COURT:  Let's do this in an orderly fashion.

25   Just keep tabbing the pages that you're referring to.  Take

26   the time you need to do that.

27           THE WITNESS:  I just want to point out,

28   Your Honor, I did try to hire an attorney.  I talked to

1    over a dozen attorneys.  And when they found out who the
2    other party was, they did not want to take the case.
3             THE COURT:  Okay.  Go ahead and finish what
4    you're doing, which is tabbing those pages.  Once you've
5    had a chance to do that, let us know that you've finished.
6        You want to tab them so you can see the tab on the
7    outside.
8             THE WITNESS:  Okay.
9             MR. BRODERICK:  I would suggest that you put the
10   sticky part of it in those.
11            THE WITNESS:  I did that already but. . . .
12            MR. BRODERICK:  Okay.
13            THE WITNESS:  The Judge wants me to do it so you
14   can what pages it is on.
15       Q.    BY MR. BRODERICK:  Have you had the opportunity
16   to identify with Post-Its the areas in which you say there
17   are derogatory posts about you by Mr. Greenspan on Twitter?
18       A.    Yes.
19       Q.    Okay.  You are known as Diego MasMarques, Junior;
20   correct?
21       A.    Correct.
22       Q.    You've also gone by Diego Mas Howard in the past;
23   correct?
24       A.    Yeah.  In Spain.
25       Q.    In Spain.  Okay.  Have you communicated in the
26   past with Mr. Greenspan as Rick or Ricky with an old e-mail
27   address of Rickymas@MSN.com?
28       A.    Yes.  That's what I used in 2017 to request my

1    information to be removed.

2            THE COURT:  Keep your voice up so our court

3    reporter can hear you.  And if you're saying any names,

4    they should be spelled for the record.

5            THE WITNESS:  Should I repeat it?

6            THE COURT:  Counsel needs to clarify.

7            MR. BRODERICK:  Rick is R-i-c-k.  And Ricky is

8    R-i-c-k-y.

9            THE WITNESS:  Yes.

10            THE COURT:  But there was a different last name.

11            MR. BRODERICK:  Oh, he was known as Diego Mas

12    Howard.

13            THE COURT:  M-a-s-H-o-w-a-r-d?

14            MR. BRODERICK:  Yes, with a space between "Mas"

15    and "Howard."

16            THE COURT:  Thank you.

17       Q.   BY MR. BRODERICK:  Do you recall on page 4 of

18    your July -- strike that.

19       Do you have any other names or aliases that you use or

20    have used in the last three years?

21       A.   No.

22       Q.   On page 4 of your July 3rd, 2018, request to

23    terminate the initial restraining order against you --

24    maybe we should mark this as Exhibit 18.

25            THE COURT:  What is it?

26            MR. BRODERICK:  It is his request to terminate

27    the civil restraining order.

28            THE COURT:  In this matter or a different matter?

1    THE WITNESS:  Your Honor, I really have to object
2  to all of this --
3    THE COURT:  Now, wait a second.  You have to
4  understand.  We're not admitting it into evidence.
5    THE WITNESS:  Yes, Your Honor, I do.
6    THE COURT:  We're just identifying it for the
7  record.  If there is any particular question that counsel
8  asks you that you find objectionable, you can make the
9  objection before you respond to the question.  But the
10  document is not being admitted.
11    THE WITNESS:  Well, what is concerning to me is
12  that this is all about shaming me, and this all about
13  making me look bad in front of the Court.
14    THE COURT:  Let's hear a question and then once
15  the question is posed, if you have an objection to it, I'll
16  be glad to entertain your objection.
17    THE WITNESS:  Mr. Greenspan is doing exactly what
18  he does online.  He is doing this here in the court.
19    THE COURT:  But you have to understand.  We
20  proceed in an orderly fashion.
21    Let's say I admit some evidence that you feel that I
22  committed an error and you want to appeal my decision.  We
23  have to have a clear record.  In order to have a clear
24  record, we have to have documents identified and tagged.
25  That's all that's happening here.  It's really for the
26  protection of the record of this case.
27    THE WITNESS:  Yes, Your Honor.
28    Q.    BY MR. BRODERICK:  I'll refer you to page 4 of

1    Exhibit 18 that has been marked as Exhibit 18.

2            THE COURT:  And have we had it identified for the

3    record already?  What is it?

4            MR. BRODERICK:  This is a copy of a CH600 request

5    to terminate civil restraining order.

6                (Plaintiff's Exhibit No. 18, Copy of CH600,

7                was marked for identification.)

8            THE COURT:  Got it.  Thank you kindly.  We can go

9    on from there.

10       Q.    BY MR. BRODERICK:  Mr. MasMarques, on page 4, you

11   wrote, did you not, that I uploaded around eight pages of

12   the 60 pages of this supposed 501(c)(3) called Think

13   Computer Corporation and Think Computer Foundation?

14       A.    Yes, I did.

15       Q.    Is that correct?

16       A.    That's correct.  That's public domain

17   information.

18            THE COURT:  Pardon me?

19            THE WITNESS:  It's public domain.  It's public

20   domain.  Apparently Mr. Greenspan didn't like that.

21       Q.    BY MR. BRODERICK:  On which Websites did you

22   upload those pages?

23       A.    I don't recall.

24       Q.    Could it have been BlackListReport.com or

25   ComplaintsBoard.com?

26       A.    It might have been ComplaintsBoard.

27       Q.    Did you upload anything else connected with

28   Mr. Greenspan?

1    A.    No.  I have not uploaded any pictures, any vile,

2    nothing, none of this.

3          THE COURT:  What was it you were uploading and

4    why?

5          THE WITNESS:  Yeah.  On April 3rd, one day before

6    Aaron Greenspan came to this court to request a restraining

7    order, I had uploaded eight of the sixty pages of his

8    public -- of his 501(c)(3) non-profit company called Think

9    Computer Corporation.  And I talked to the clerk in Ohio,

10   and she even stated it me that he has Websites that are

11   for-profit, but he has them under nonprofit.  And she

12   explained to me that these documents are public domain so

13   they can be posted online.  So essentially what

14   Mr. Greenspan has been doing to me, gaining --

15         THE COURT:  So what did you do?

16         THE WITNESS:  So I uploaded -- so I went through

17   the documents and one of them said that one of the

18   501(c)(3) documents said that his foundation is there to

19   assist to help the children with technology.  And I thought

20   that was very -- that was not very nice at all; that kind

21   of mission statement because none of this what

22   Mr. Greenspan is doing helps the children in my opinion.

23         THE COURT:  Okay.  Next question.

24         THE WITNESS:  So I uploaded that.

25   Q.    BY MR. BRODERICK:  Did you write comments on the

26   uploaded matter that you believe you posted on

27   ComplaintsBoard.com?

28   A.    I don't -- I don't recall.  I mean I don't think

1   I did.  You mean with those eight pictures or whatever,

2   those eight documents that I uploaded?

3       Q.   Yes.  The documents that have been just referred

4   to in Exhibit 18?

5           THE COURT:  Did you make any comments associated

6   with those documents that you in uploaded?  That's the

7   question.

8           THE WITNESS:  Yeah.  I may have, but nothing

9   derogatory.  I just said, you know, I just said what my

10  opinion was, but there was nothing derogatory about him.

11      Q.   BY MR. BRODERICK:  What was your opinion stated?

12      A.   I don't recall because is was so long ago.  It

13  wasn't -- I did that on April 3rd, 2018.

14          THE COURT:  Is that document the same as

15  Exhibit 8, or is it a different document?

16          THE WITNESS:  So I did that April 3rd, and then

17  Mr. Greenspan came to this court to file a restraining

18  order against me the next day once he saw that online.

19  That's his penitents for getting the restraining order,

20  Your Honor.  It has nothing to do with any of these

21  pictures that he's accusing me of.

22          THE COURT:  Got it.

23          MR. BRODERICK:  Apparently different, Your Honor.

24      Q.   BY MR. BRODERICK:  So you don't recall whether or

25  not you made derogatory comments about the 501(c)3 when

26  you uploaded it to ComplaintsBoard.com; correct?

27      A.   I don't.  I don't recall.  It's been so long.  I

28  haven't even looked at it.

1    Q.    So you don't know one way or another?

2    A.    I just -- I say it to answer your question.  I

3    didn't upload -- I didn't say anything or make any

4    derogatory comments.

5         THE COURT:  No.  You said you didn't remember.

6         THE WITNESS:  Oh, I didn't remember, I mean,

7    yeah.

8    Q.    BY MR. BRODERICK:  Which is it?

9    A.    You're putting words in my mouth now.

10   Q.    Which is it?

11   A.    I don't remember.

12   Q.    What user name did you use on the site where you

13   uploaded those pages?

14   A.    I don't remember.

15   Q.    Did you upload them as one user or as several

16   users?

17   A.    One user only.

18   Q.    Do you have a user name or handle that you

19   typically use online?

20   A.    I only did it one time.  That's it.

21   Q.    Do you have a user name or handle that you use

22   online?

23   A.    No.  I have no social media at all.  No social

24   media.  Mr. Greenspan is one of the reasons why I would

25   never have any social media.

26   Q.    What user name did you use for

27   ComplaintsBoard.com?

28   A.    I don't remember.

1      Q.    You used one; correct?

2      A.    I don't remember.  I uploaded eight pictures, but

3  I don't remember what it was.  But it was attached to my

4  e-mail address.  Mr. Greenspan knows what it is.  I

5  admitted that I uploaded eight pictures.

6          THE COURT:  But you're responding to questions

7  now.  Mr. Greenspan is not.

8          THE WITNESS:  Yup.

9          THE COURT:  He's entitled to ask questions on

10  cross-examination.  You must answer those questions unless

11  you have an evidentiary objection.

12          THE WITNESS:  I don't -- I don't understand -- I

13  don't remember.  I mean I don't remember.

14          THE COURT:  All right.  Next question.

15          THE WITNESS:  I really don't, Counselor.  I

16  don't.

17          THE COURT:  Next question.

18          THE WITNESS:  I don't sit there and make comments

19  every day.

20          THE COURT:  All right.  That's sufficient.

21      Q.    BY MR. BRODERICK:  Have you posted any content of

22  any kind on ComplaintsBoard.com after the 501(c)(3)

23  materials?

24      A.    I don't, Counselor.

25      Q.    When was the last time you wrote or posted

26  anything about Mr. Greenspan?

27      A.    I don't remember.  It's quite some time ago.  I

28  don't remember.

1          THE COURT:  Give your best estimate of when it

2    was.  You shouldn't speculate, but give us some frame of

3    reference in terms of months or years, however you're able

4    to.

5          THE WITNESS:  It was around the time when I

6    uploaded those eight pictures.  I mean that's it.  I mean

7    I'm not uploading --

8          THE COURT:  How long ago was that approximately?

9          THE WITNESS:  Ten months ago.

10   Q.    BY MR. BRODERICK:  And what was that you posted

11   approximately ten month ago?

12   A.    It was eight pages of the 60 pages of

13   Mr. Greenspan's --

14   Q.    Well, the question is did you post anything other

15   than those 501(c)(3) items?

16   A.    No, I have not.

17   Q.    Are you familiar with the Proton mail encrypted

18   e-mail service?

19   A.    Yes.

20   Q.    Do you have a user name for it?

21   A.    Yes.

22   Q.    What user name do you use?

23   A.    You mean do I have an e-mail?  Is that what you

24   mean?

25          THE COURT:  User name.

26          THE WITNESS:  Oh, yeah.  8586.  I post on that

27   all the time.

28          THE COURT:  Did our court reporter catch that?

1   It was awful fast.

2           THE WITNESS:  Oh, sorry.  You know, well, I'm

3   worried here because I don't want Mr. Greenspan to have my

4   e-mail address, you know.

5       8586@protonmail.com, I believe -- or I believe it was

6   that.

7       Q.   BY MR. BRODERICK:  Are you familiar with the

8   e-mail address that you placed on the request for civil

9   restraining orders as 56546 --

10      A.   Yes.

11      Q.   -- @protonmail.com?

12      A.   Yes, I am.  I use that exclusively for the court.

13  I have had to shut that down because I've had people now

14  contact me that I don't even know who they are.

15      Q.   Do you have access to the e-mail account called

16  classactionlawsuit@protonmail.com?

17      A.   No, I do not.

18      Q.   Have you ever accessed it?

19      A.   No, I did not.

20      Q.   Do you know who Jeff Steinport is?

21          THE COURT:  Spell the last name.

22          MR. BRODERICK:  S-t-e-i-n-p-o-r-t.

23          THE WITNESS:  Yes, I do.

24      Q.   BY MR. BRODERICK:  Who is he?

25      A.   He is also an individual that does pretty much

26  the same thing as Mr. Greenspan.  He had a site called

27  United States Courts Archive, and he was uploading my

28  documents.  And I filed complaints on him, and his website

1    he shut it down.  Mr. Greenspan said in one of his comments

2    that he thinks that I had something to do with it.  I don't

3    think I was the only one because he was doing the same

4    thing as Mr. Greenspan was doing, uploading your personal

5    documents.  People losing their jobs, losing their

6    relationships, losing their reputations.  And I did file

7    complaints against this individual, and he eventually

8    closed his site down.

9        After that Mr. Greenspan started on the attack.

10          MR. BRODERICK:  Move to strike the last comment.

11          THE COURT:  Overruled.

12       Q.   BY MR. BRODERICK:  Did Mr. Steinport call the

13    police and the FBI regarding your harassing actions?

14       A.   No.  No police and no FBI.  I don't have --

15          THE COURT:  Let the witness answer the question

16    please.

17       Q.   BY MR. BRODERICK:  Did you ever post online about

18    Mr. Steinport?

19       A.   I don't recall.  It's been so long.  It's been a

20    long time.  I don't --

21       Q.   To the best of your recollection how did you

22    complain?

23       A.   I complained to him to the Attorney General's

24    Office and other complaints.  I do know that Mr. Greenspan

25    and --

26          THE COURT:  Answer the question that's posed.

27          THE WITNESS:  Mr. Steinport they know each other

28    quite well.

```
 1              THE COURT:  But answer the question that's posed.

 2       If you need to repeat the question, go ahead, Counsel.

 3       You need to focus on the question and answer that

 4  question.

 5              THE WITNESS:  Okay.

 6       Q.   BY MR. BRODERICK:  Mr. Steinport's site you said

 7  was called U.S.courtsarchive?

 8       A.   I think, yeah, it's UnitedStatescourtsarchive.com

 9  something like that, yeah.

10       Q.   And what did he post that you objected to?

11       A.   He posted the same things that Mr. Greenspan did.

12       Q.   A legal document?

13       A.   Not just a legal document, selectively posting

14  legal documents.  In other words, this is what

15  Mr. Greenspan is doing so --

16       Q.   Move to strike.  I'm asking you what

17  Mr. Steinport did.

18              THE COURT:  Denied.  He can explain his answer.

19              THE WITNESS:  Yeah, because he's not just -- he's

20  just not innocently -- Mr. Greenspan is not just innocently

21  posting legal documents under the First Amendment, under

22  the guise of the First Amendment.  He's doing much more

23  than that.  He's viciously leaving documents open that are

24  harming people.

25       For example, if you have a whole case of documents,

26  Mr. Greenspan goes through them.  Like this is a good

27  example right here.

28              THE COURT:  You can't just refer to a document
```

1 | without -- if it's not marked.

2 | THE WITNESS:  I apologize.

3 | THE COURT:  Just try and answer the question

4 | though.

5 | THE WITNESS:  Yeah.  Mr. Greenspan leaves open

6 | the most negative and damaging documents on an individual

7 | open on the search engines.  It's not harmless what

8 | Mr. Greenspan is doing, not at all.

9 | Q.    BY MR. BRODERICK:  Did Mr. Steinport post

10 | anything other than court case materials about you?

11 | A.    Not that I know of.

12 | I retract.  I think he did make a comment about me, I

13 | think.  But I'm not sure if it was him on a blog, a Google

14 | blog, but I'm not sure.

15 | MR. BRODERICK:  May I have this marked as No. 19?

16 | THE COURT:  Yes.  And what is it?

17 | Counsel, so you know if you're going to have a document

18 | marked, you need to generally describe what it is, okay?

19 | Let's do that.

20 | MR. BRODERICK:  This is a November 29, 2018,

21 | e-mail message from Jeff Steinport to Marlborough, MA,

22 | police department about Diego MasMarques.

23 | THE COURT:  Thank you.

24 | (Plaintiff's Exhibit No. 19, E-mail Message

25 | Dated 11/29/18 from J. Steinport to Marlborough

26 | Police Department, was marked for

27 | identification.)

28 | Q.    BY MR. BRODERICK:  Have you ever seen this

1    document before, No. 19?

2        A.    This is very interesting that --

3              THE COURT:  Answer the question please.

4              THE WITNESS:  No, I have not, Your Honor.

5        This is interesting that he would send that

6    November 28, 2018.

7        Q.    BY MR. BRODERICK:  What user names have you used

8    on these Websites such as --

9        A.    Counsel, can I read the rest of it?

10       Q.    No.

11             THE WITNESS:  Your Honor, can I read the whole

12   e-mail?

13             THE COURT:  You can take a look at the document.

14   Sure.  It should have been shown to you before it's used.

15             MR. BRODERICK:  It was, Your Honor.

16             THE COURT:  He needs to review it further.

17   Really?  Let him do it.

18             MR. BRODERICK:  He said he never saw it before.

19             THE WITNESS:  I never saw it before that's why I

20   want to read it.

21             THE COURT:  Well, let him review it further.

22   He's entitled to take a look at the document.

23             MR. MASMARQUES:  I believe Mr. Steinport is an

24   attorney.  He's also an attorney.

25             THE COURT:  You know what?  I think what we

26   really need to do is dial things back a little bit.  This

27   is cross-examination.  You're going to have an opportunity

28   to be heard from again.  But now we're in question and

1 | answer mode.  So wait for the next question.
2 |     Q.    BY MR. BRODERICK:  Have you ever -- do you use a
3 | PC or Mac computer?
4 |     A.    I use a Mac.
5 |     Q.    Do you have a user name called Tech on any of
6 | your computers?
7 |         THE COURT:  Spell it.
8 |         MR. BRODERICK:  T-e-c-h.
9 |         THE WITNESS:  Tech is from -- it's not -- well,
10 | the computer was actually given to me from the Apple store.
11 | The guy who fixes computers, that was his name, and so it's
12 | on the computer now.  It's not my computer.
13 |     Q.    Have you ever made references in your posts to
14 | Mr. Greenspan about his being Jewish?
15 |     A.    Never ever.  And, you now, I'm really disgusted
16 | with that, Your Honor, because even in my family in Spain,
17 | you know, you know, I don't -- you know, I'm not going to
18 | get into it, but I don't go around asking -- you know, I
19 | find that very offensive when --
20 |         MR. BRODERICK:  Your Honor, I move to strike.
21 | The objection is irrelevant.
22 |         THE COURT:  Motion to strike is granted.
23 |     Listen.  It's a question.  Just answer the question.
24 |         MR. MASMARQUES:  He's always mentioning the
25 | Jewish thing.
26 |         THE COURT:  Let me just say this:  You know,
27 | often I try and give people leeway in explaining their
28 | answers.  But narrative responses are disfavored, and we

1  can be here forever if there is going to be a narrative

2  response to each question.

3          MR. MASMARQUES:  Yes, Your Honor.

4          THE COURT:  But I keep assuring you that I will

5  return to you and hear if there is anything additional you

6  have to add once cross-examination is concluded.

7      And it's noted for the record that you very vehemently

8  denied that you ever engaged in that conduct.

9      Next question.

10     Q.    BY MR. MASMARQUES:  Have you ever called

11 Mr. Greenspan?

12     A.    Yes, I have.

13     Q.    Have you ever called anyone in his family other

14 than him?

15     A.    No, I have not.

16     Q.    Have you ever impersonated Mr. Greenspan or his

17 family members by communicating with individuals they know?

18     A.    No, I have not.

19     Q.    Did you ever search for images of Mr. Greenspan's

20 father, Dr. Neil Greenspan?

21     A.    No, I did not.

22     Q.    Did you ever access an image of Dr. Greenspan?

23     A.    No, I did not.

24     Q.    On what basis have you accused Mr. Greenspan of

25 owning leagle.com?

26     A.     In the manner in which Mr. Greenspan answered

27 the -- I actually have the e-mail.  I don't know if I have

28 it with me.

1          THE COURT:  Try to be linear in your responses to
2     the questions posed.
3          THE WITNESS:  In the way -- Mr. Greenspan in the
4     way he answered the investigator at the Arkansas Attorney
5     General's Office, Mr. Greenspan uses "we" a lot.  He talks
6     in third person a lot.  And he also writes that way a lot.
7     Like, he'll say --
8          MR. BRODERICK:  Objection.  Move to strike.
9     Nonresponsive.
10          THE COURT:  I'm not sure if it is responsive or
11     not.  I'm not going to strike it at this point, but you do
12     need to get to your point.
13          THE WITNESS:  Yes.  Basically the answer was very
14     similar to the answer that I received from Aaron Greenspan
15     in 2017 when I asked him to remove things from
16     PlainSite.org, the writing.
17          THE COURT:  In what aspect was it similar?
18          THE WITNESS:  He starts off with "we" as if he
19     has a multi-national company, you know, as if he's got,
20     like, tons of people working for him.  He always -- that's
21     how he writes.  Like, Oh, we have been in contact with
22     Mr. MasMarques and so on.  And then he'll repeat that "we,"
23     you know.  He talks in the third person when he's writing.
24          THE COURT:  Do you want to ask the question again
25     because I want to make sure we've got a responsive reply.
26     Q.    BY MR. BRODERICK:  On what basis have you accused
27     Mr. Greenspan of owning leagle.com, l-e-a-g-l-e?
28     A.    Yeah.  It's because of the response that the

1    Attorney General's Office from Arkansas received.  They

2    don't have an address.  They don't have a name that's

3    associated with leagle.com, but the answer was --

4              THE COURT:  What answer?

5              THE WITNESS:  The e-mail that they received.

6              THE COURT:  From Mr. Greenspan.

7              THE WITNESS:  Well, I don't know if it is

8    Mr. Greenspan.

9              THE COURT:  So the e-mail that was received on

10   behalf of this company was similar in nature to

11   communications from Mr. Greenspan --

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  -- on previous occasions.

14             THE WITNESS:  Yes.

15             THE COURT:  Okay.

16       Q.    BY MR. BRODERICK:  The major similarity you found

17   was that they used the word "we"; correct?

18       A.    Yeah.  And also, like, in the sentence there is a

19   lot of similarities.  I just can't -- I don't have it with

20   me to show you.

21             THE COURT:  Do you remember, you know, again that

22   reliance on documents, which can be fine, but as you sit

23   here today if you don't have documents in what aspects do

24   you remember it being similar besides the use of the

25   terminology "we"?

26             THE WITNESS:  He'll --

27             THE COURT:  Just don't say what he does.  Just

28   say what are the similarities.

1          THE WITNESS:  We have been in contact before with
2   Mr. MasMarques.
3          THE COURT:  So there were certain phrases that
4   were similar?
5          THE WITNESS:  Yes, Your Honor.  Definitely.
6          THE COURT:  And what were those phrases?
7          THE WITNESS:  The phrases were --
8          THE COURT:  To the best of your recollection.
9      If you don't know or if you don't remember, just say
10  so.
11         THE WITNESS:  I don't have the document in front
12  of me right now.
13         THE COURT:  So you don't remember.
14         THE WITNESS:  I don't remember.  But last night I
15  was just looking at it.
16         THE COURT:  Well, take a minute to reflect and
17  see if you can think of any other basis for concluding that
18  there are similarities.  That's what counsel is asking you.
19         THE WITNESS:  The structure of the paragraph was
20  very similar.  He started off when he answered me from
21  PlainSite.org.  You know, We don't remove.  Or, We don't do
22  this.
23      And then the answer that they got received from
24  leagle.com, and nobody knows who owns this.  And the
25  similarities, the sentence structure was very similar.  The
26  way he placed my name.  The way he writes, very
27  authoritative.  And it's just a lot of similarities.  And I
28  do apologize I don't have --

1          THE COURT:  Okay.  That's a response to the
2   question.
3       Next question.
4       Q.   BY MR. BRODERICK:  Did you accuse Mr. Greenspan
5   of evading taxes?
6       A.   I did.
7       Q.   To whom?
8       A.   To the IRS.
9       Q.   Why?
10      A.   Because Mr. Greenspan is requesting subscription
11  fees from the public to look at legal documents.  In other
12  words, we have a federal database called PACER, where a
13  person can go there and see these public -- my documents,
14  if they want.  But they don't go all over the Web.
15  Mr. Greenspan charges between $9.99 to 99.99, and I don't
16  know how he chooses to charge people.
17      But he also gets private advertising from, I guess,
18  Google AdSense.
19          THE COURT:  So you're saying you reported him
20  because you felt he was not operating in a non-profit
21  manner?
22          THE WITNESS:  Yes, Your Honor.  That's exactly
23  right.  He's not.
24          THE COURT:  That's what he's saying.
25          MR. BRODERICK:  Your Honor, I would appreciate it
26  that you would stop helping the witness.
27          THE COURT:  I'm not helping the witness.  I'm
28  clarifying what he's saying.  He's obviously struggling,

1    and I'm just describing what he's already described.  He's

2    talked about charges and fees.  And I'll be glad to step

3    out of this, but we need to move on.

4           MR. BRODERICK:  I'm trying, Your Honor.

5           THE COURT:  All right.

6       Q.    BY MR. BRODERICK:  Do you have any evidence that

7    Mr. Greenspan posted anything about your Social Security

8    case?

9       A.    Yes, I do.

10      Q.    What is that?  And does that document purport to

11   be a docket?

12      A.    I'm not exactly sure what this is.

13          THE COURT:  Listen, Counsel, if you don't want

14   the Court to step in, you're going to have to take

15   ownership here.  If we're referring to a document, I need

16   to know whether it's been marked or whether it needs to be

17   marked or whether -- wait a second -- or whether you're

18   asking the question just based on the witness's personal

19   recall because we have a record to protect here.

20       And it's 4:30, and we need to conclude

21   cross-examination.

22       So please go ahead and make sure we have a clear record

23   here.

24          THE WITNESS:  Your Honor, with all due respect,

25   you've already seen this, and you know this exists.

26          THE COURT:  You're ignoring the Court's

27   admonition here.

28          THE WITNESS:  Oh, sorry.

1          THE COURT:  We can't wave papers around that have

2     not been identified for the record.  And let me keep

3     reminding you, gentlemen, you've already ordered a

4     transcript from the previous proceedings.  You're likely

5     going to order a transcript of these proceedings.  We need

6     to have a clear record.  If you're looking back on a record

7     and the record says, This paper here, it's anybody's guess

8     what paper that is.  We need to create a clear record for

9     the benefit of the parties, okay?

10         Counsel knows how to do that so let's proceed in

11    accordance with that.

12         Do you want to re-ask your question.

13         Counsel, do you want to re-ask the question?

14             MR. BRODERICK:  No.

15     Q.    BY MR. BRODERICK:  Okay.  Have you ever called

16    Mr. Greenspan a parasite?

17     A.    No, I have not.

18     Q.    Have you called him a sociopath?

19     A.    No, I have not.

20     Q.    I refer you to Exhibit 7.  And do you know who

21    this woman is in the picture?

22     A.    Yes.  She was briefly my probation officer.

23             THE COURT:  Excuse me, Counsel.

24             THE WITNESS:  What does this have to do with

25    this?

26             THE COURT:  Are you ignoring the Court's

27    advisement?

28             MR. BRODERICK:  It's been marked as Exhibit 7.

LISA L. BROWN, CSR

License Number CSR 13148

1          THE COURT:  Well, you need to make that clear and
2     also tell us what page it is.
3          MR. BRODERICK:  I did.  The first page.
4          THE COURT:  Okay.  So counsel has shown the
5     witness the first page of Exhibit?
6          MR. BRODERICK:  7.
7          THE COURT:  All right.  And what is the question
8     relative to that page?
9          MR. BRODERICK:  It's already been asked and
10    answered.
11         THE COURT:  But let's make it clear for the
12    record which document you are referring to.
13    Q.    BY MR. BRODERICK:  Who is the woman?
14    A.    Yeah.  I already answered you.  I said that was
15    my probation officer when I came back from Spain.
16         THE COURT:  All right.  Next question.  Probation
17    officer.
18    Q.    BY MR. BRODERICK:  At the bottom of this page --
19         THE COURT:  Are we on the same page?
20    Q.    BY MR. BRODERICK:  -- which is Exhibit 7, the
21    first page, can you identify the site that it came from?
22         THE COURT:  Is it apparent from looking at that
23    document which site it was delivered from?
24         THE WITNESS:  Yes.  It's right there.  He sees
25    it.
26         MR. BRODERICK:  It says www.BlackListReport.  It
27    is a single word, BlackListReport.com.
28         THE WITNESS:  Yes.

1          THE COURT:  And what is the question?

2     Q.    BY MR. BRODERICK:  Are you the author of this

3     document that is in Exhibit 7?

4     A.    No, I'm not.

5          MR. BRODERICK:  Your Honor, I'd like to call my

6     client for rebuttal.

7          THE COURT:  Well, now wait a second.  Are you

8     done with cross-examination?

9          MR. BRODERICK:  I am.

10         THE COURT:  Okay.  Is there any redirect?  As a

11    result of these questions that have been asked you is there

12    anything that you wanted to add briefly?

13         THE WITNESS:  Just I want to add that they're

14    bringing up things that have nothing to do with, like, just

15    things to, like, shame me over here continuously.  But

16    that's it.  I have nothing else to say.

17         THE COURT:  Okay.  So now Mr. Greenspan is being

18    recalled for rebuttal testimony.

19      Go ahead.

20                    **AARON GREENSPAN,**

21    recalled as a witness on behalf of the petitioner, having

22    been previously duly sworn, was examined and testified

23    further as follows:

24                    **DIRECT EXAMINATION**

25    **BY MR. BRODERICK:**

26     Q.    All right.  Mr. Greenspan, I'd like you to take a

27    look at what was marked with Post-Its and --

28         THE COURT:  On Exhibit?

1          MR. BRODERICK:  This is Exhibit 17.

2          THE COURT:  Thank you.

3      Q.    BY MR. BRODERICK:  And earlier Mr. MasMarques

4  identified things that were derogatory that you posted on

5  Twitter.  Can you go through and identify those items as to

6  what you said?

7      A.    The first Post-It note is adjacent to a tweet

8  that says -- and this is coming from the Plain, P-l-a-i-n,

9  S-i-t-e, PlainSite Twitter account, quote, We don't think

10  journalists should be subject to restraining orders in an

11  effort to shut them up.  We also think Santa Clara county

12  litigants are entitled to electronic access to documents in

13  all non-sealed court cases, especially their own.

14      Apparently he found that derogatory.

15          THE COURT:  Well, now wait a second.  Just answer

16  the question because he's asking you to go through those

17  factually each of the Post-Its.

18          THE WITNESS:  Just list them.

19          THE COURT:  Yes.  It's like making a list.

20          THE WITNESS:  Yeah.

21      I'm not exactly sure if this is the tweet above or

22  below the Post-It, but I think what he's referring to is

23  what is listed from October 9th, 2018, from the PlainSite

24  account as, quote, Translated Article 7 from July 19th,

25  2000.

26      And there is an image of a Spanish newspaper article

27  about Mr. MasMarques translated into English.

28      Next Post-It is from my personal Twitter account, which

1   is in my name, Aaron Greenspan.  And again he's, I guess,

2   marked a newspaper article from Spain.  The exact tweet

3   says, quote, Here's page 2 of the July 22nd, 2000, article

4   translated from Ultima, U-l-t-i-m-a, Hora, H-o-r-a, in

5   Spain.  He harasses you, then breaks into your house and

6   then kills you.  He sends e-mails from mafioso names.  In

7   August he sent a PI to where I had just lived.  Get it?

8       The next Post-It is also from my personal Twitter

9   account.  Can't tell the date based on what he printed.

10  Quote, At the moment this is the kind of person, @jack,

11  @Vijaya -- that's V-i-j-a-y-a.  And at sign damokieran.

12  That's @D-a-m-o-k-i-e-r-a-n -- think is a reliable arbiter

13  of First Amendment rights.  Someone who serially harasses,

14  rapes, and murders women.  It is a strange position to take

15  in the midst of the Me Too movement.

16      And then there's a picture from the newspaper of

17  Mr. MasMarques 20 years ago.

18      Next Post-It is from the PlainSite Twitter account.  It

19  says, quote, More likely he lied.  We have lost track of

20  the number of lies he's told but here are a few.

21      And there is an image.

22           MR. MASMARQUES:  There's other tweets on there.

23           MR. BRODERICK:  Objection.

24           MR. MASMARQUES:  That's not the one I'm referring

25  to.

26           THE COURT:  Okay.  There is an objection based on

27  the fact that the witness is saying that was not the

28  specific tweet or not the only tweet that was identified by

1    the Post-It.

2                MR. MASMARQUES:  I mean --

3                THE WITNESS:  I mean --

4                THE COURT:  So if there is anything else there.

5                THE WITNESS:  I'm unclear on what else the

6    respondent is referring to here so I'm just going to

7    proceed with what I see.

8                THE COURT:  So you can go back and explain that

9    afterward.

10        Go ahead.

11                THE WITNESS:  There's an image of a motion to

12   strike filed in this case from the July of 2018 below that

13   tweet.

14        I think this Post-It is referring to a tweet from

15   October 17, 2018, where from my personal account I wrote,

16   Could this be any more Orwellian?  I mean at least he

17   hasn't killed me yet.  He is a convicted murderer after all

18   and not like any journalists haven't been killed recently.

19        And there's an image from an e-mail that I received

20   from Twitter that says that PlainSite had violated the

21   Twitter rules.

22        In the interest of time, Your Honor, I wonder if I can

23   just summarize the remainder because I think these have

24   actually been admitted before.

25                THE COURT:  Why don't you just answer your

26   attorney's question however you think is the most efficient

27   way or the way that you would like to answer it.  Directly

28   would be fine.

```
 1              THE WITNESS:  Okay.  I think the point that
 2    Mr. MasMarques is trying to make is that he finds it
 3    harassing whenever his name is mentioned in virtually any
 4    context.  And so he's put --
 5              MR. MASMARQUES:  I object.
 6              THE WITNESS:  -- Post-Its next to practically --
 7              THE COURT:  That's non-responsive to the
 8    question, Counsel.  You've asked him to list the actual
 9    content, which I think you were doing, Mr. Greenspan.  Why
10    don't you just finish that up.
11              THE WITNESS:  Okay.  That could take some time.
12              THE COURT:  How much time do you think it is
13    going to take?
14              THE WITNESS:  I think it could take 10 or
15    15 minutes so that's why I'm a little bit concerned.  I
16    don't want to --
17              THE COURT:  Give it your best effort, and we'll
18    see how it goes.
19       Q.   BY MR. BRODERICK:  You don't have to read them
20    all.  Just give us give us a list.
21       A.   Okay.  He has noted tweets concerning the locking
22    of PlainSite's Twitter account.
23       He's noted a tweet where we have posted a screen shot
24    of a threat he sent us under the name Liborio Bellomo.
25    That's L-i-b-o-r-i-o, last name B-e-l-l-o-m-o.
26              MR. MASMARQUES:  That's not the only tweet that's
27    on there.  And I did not.
28              THE COURT:  But you're going to go back on this.
```

1          THE WITNESS:  This is the same one as before.

2      A lot of these are duplicate.

3      There is something on top of this one so I can't

4  actually read it.

5      These are more newspaper articles from Spain, which are

6  already in the public domain and, therefore, not my words.

7          THE COURT:  Well, let's not editorialize at this

8  point because you're going to have ample opportunity to

9  expand your arguments.  Why don't you see if you can

10  factually respond.

11          THE WITNESS:  This tweet says from PlainSite on

12  November 6th, 2018, that Mr. MasMarques has marked with a

13  Post-It, Meet convicted murderer Diego MasMarques.  He

14  writes this crazy stuff ten times a day.  It's not true.

15  And we have a restraining order.

16      And finally -- this is the same one actually, and

17  that's the last Post-It.

18          THE COURT:  Okay.

19          MR. MASMARQUES:  There are other things in there

20  that he didn't read, Your Honor.

21          THE COURT:  That's fine.  But we're conducting --

22  you know, we can let this become a free for all.  Let's not

23  do that.  This is examination of Mr. Greenspan.  Now he has

24  the same opportunity you had.  Let's see if counsel has any

25  more questions for him then I will return to you.

26      Q.    BY MR. BRODERICK:  Did you post any Social

27  Security cases about Mr. MasMarques?

28      A.    So not selectively or intentionally as he has

1    alleged.  There are roughly 11 million dockets on

2    PlainSite.  And one of them does appear to be a case that

3    he filed against the Social Security Administration.

4        I think he may be conflating the difference between a

5    docket and a document.  And it would appear that based

6    on -- I don't know if it is marked yet -- but based on one

7    of the papers in his binder, there was it appears an

8    electronic order issued by the court in that Social

9    Security case that said that as a general rule in federal

10   court, documents in Social Security cases are protected and

11   are under seal.

12       PlainSite never actually posted any documents.  Social

13   Security dockets are publicly available.  And so that's why

14   that docket appears on PlainSite.  It is not --

15            THE COURT:  So you're saying it is a docket

16   without documents that are deemed confidential?

17            THE WITNESS:  Correct.

18            THE COURT:  Got it.

19       If we don't wrap up in the next five minutes, we are

20   going to have to schedule another session.

21            MR. MASMARQUES:  That's what I think they are

22   trying to do, Your Honor.

23            THE COURT:  Well, let's not go there, okay?

24   Everybody has an entitlement to be heard including you,

25   Mr. MasMarques.

26       Q.   BY MR. BRODERICK:  We heard Mr. MasMarques say

27   that you --

28            THE COURT:  How do you pronounce your last name?

1          THE WITNESS:  MasMarques.

2          MR. BRODERICK:  MasMarques.

3          THE COURT:  Let's be respectful of that.

4     Q.    BY MR. BRODERICK:  We heard him say that you

5     posted things about his wife; is that correct?

6     A.    No, that's not correct.  What may have happened,

7     which I'm not sure the average computer user necessarily

8     understands, is that Google or other search engines will

9     find content on the Internet, which has been posted.

10    Whether it was posted for one reason or another, search

11    engines don't particularly care.  But --

12          THE COURT:  So you're saying that wasn't an

13    affirmative and specific effort on your part.  It was just

14    happenstance.

15          THE WITNESS:  That's correct.  And the Internet

16    changes on a second by second basis, and search engines

17    results also change frequently.

18          THE COURT:  But you're denying specifically

19    targeting his wife?

20          THE WITNESS:  I'm denying not only specifically

21    targeting his wife, but I think I am also denying -- I

22    don't think.  I am also denying that I have ever taken any

23    concerted action to harm or embarrass Mr. MasMarques that

24    was not taken in self-defense because of something he had

25    already done or posted based on his IP address being

26    clearly visible in server logs connected to some of this

27    content.

28          THE COURT:  Well, we're just talking about his

1    wife now; right?

2         THE WITNESS:  I understand, but I want to make

3    that clear.

4         THE COURT:  Well, it can be -- if you're sort of

5    expanding it, it becomes a little murkier for the Court.

6       Are you indicating that you did not intentionally post

7    anything on any site that related specifically to his wife?

8         THE WITNESS:  That's correct.

9         THE COURT:  And you're saying to the extent that

10   her information pops up with information about her husband,

11   it's just the way things work.  It is not something

12   precipitated by anything you did?

13        THE WITNESS:  That is correct.

14        THE COURT:  Counsel.

15        MR. BRODERICK:  We rest, Your Honor.

16        THE COURT:  Okay.  So as a result of this

17   additional testimony by Mr. Greenspan, do you have any

18   question for him?

19        MR. MASMARQUES:  Yes.

20                    **CROSS-EXAMINATION**

21   **BY MR. MASMARQUES:**

22      Q.    So, Mr. Greenspan, do you selectively leave

23   documents open on a site regarding a person's legal past in

24   a selective manner?

25        THE COURT:  And I think -- Counsel, when I jump

26   in like this, I'm not trying to help anybody.  I'm

27   trying -- I did the same thing with your client.  I'm only

28   trying to speed things up and understand what people are

1    saying.

2        And I think that as I'm understanding the gist of

3    Mr. MasMarques's argument is that Mr. Greenspan is not

4    telling the whole picture.  He's leaving a false impression

5    about what has happened by not sort of correcting or

6    updating the record or providing a complete record.  And so

7    I think that's what the question goes to, Mr. MasMarques.

8    You can correct me if I'm wrong --

9            MR. MASMARQUES:  No.

10            THE COURT: -- that we have had this reference to

11    murderer.  We've had reference to certain language and

12    apparently, according to Mr. MasMarques' testimony, that

13    has been altered and are lies and was the equivalent of

14    manslaughter.  So I think the question is whether or not

15    you feel any of the documents that you have been posting

16    have been misleading or incomplete to suggest sort of an

17    overview that's just not accurate.

18            MR. GREENSPAN:  I can appreciate the concern, and

19    often there are updates to court cases.  And it's important

20    to stay current; however, today I double checked

21    Mr. MasMarques's case in the District of Massachusetts on

22    the federal level.  And Count 3 is listed as of today as

23    willful homicide.  So his testimony that it is some other

24    kind of homicide or something else, I don't know how he

25    reaches those conclusions.  I don't know if he's believable

26    but what --

27            THE COURT:  So you're basically saying to the

28    extent that the information that was posted there was

1    incomplete or misleading, or there was some sort of
2    subsequent occurrence which would need to be updated, it
3    would be your intention to do that, update it.
4         THE WITNESS:  Not only would it be my intention,
5    but as I can see it is up-to-date as willful homicide, and
6    Mr. MasMarques is lying.
7         THE COURT:  But this is a different question.
8    The question is whether or not you would augment the record
9    to make sure that you're not giving a false impression?
10        THE WITNESS:  Of course.  And we do that all the
11   time.
12        THE COURT:  Next question.
13   Q.   BY MR. MASMARQUES:  The charge is not willful
14   homicide and that has to be, you know -- and this is the
15   reason why --
16        THE COURT:  Don't argue with Mr. Greenspan.
17   We're not here to argue.  Ask him a question.
18   Q.   BY MR. MASMARQUES:  So you do not selectively
19   leave documents open that are harmful to somebody and --
20        THE COURT:  You don't want to ask that.  It is a
21   very generalized question.  And maybe you should ask a more
22   specific question so Mr. Greenspan can understand and
23   respond in a meaningful way.
24        MR. MASMARQUES:  Well, to attract more attention
25   and more traffic to his website, people like to read
26   negative things, bad things.  So Mr. Greenspan --
27        MR. BRODERICK:  Move to strike.
28        MR. MASMARQUES:  -- only uploads --

1          THE COURT:  That sounds like testimony.  Do you

2     have any questions for him?

3          Q.    BY MR. MASMARQUES:  Well, do you admit that you

4     only leave open the most negative documents --

5          A.    No.

6          Q.    -- that will attract the most attention and

7     traffic --

8          A.    No.

9          Q.    -- and the end game money to your website?

10          A.    No.

11          Q.    Is money your greatest return?

12          A.    No.  And, in fact, there is a non-profit

13     component to PlainSite as well as a for-profit component,

14     which are separate and which you frequently conflate.

15          Q.    Do you make a good living off of this, off of

16     PlainSite.org?

17          A.    Not particularly.

18          Q.    If you don't mind me asking how do you make a

19     living?

20          A.    From PlainSite.

21          Q.    So you make a living off PlainSite.

22          THE COURT:  We're going to schedule another

23     session.  I think any further session can be limited to

24     30 minutes.  And then we have to decide on a briefing

25     schedule.

26          Counsel, I don't think you were involved at the time

27     when the case was mediated, but I'll just make the

28     following observations.

1     It seems like a big part of your case, Mr. MasMarques,
2   has to do with the information that Mr. Greenspan has
3   posted about this Spain conviction.
4           MR. MASMARQUES:  Yes, Your Honor.
5           THE COURT:  To the extent that you think that the
6   information that he has posted is misleading, incomplete,
7   or hasn't been updated, it seems to me you can provide the
8   supplemental information to his counsel.  He's already
9   indicated on the record that he has a willingness generally
10  to update information and to make sure that there's an
11  accurate depiction of what happened in the court system.
12  So that would be something that you could approach in a
13  mediation mode or in a settlement mode because now in the
14  course of the hearing I think probably that shouldn't be an
15  issue in dispute.  And even if the whole case can't be
16  resolved, you can still resolve certain aspects of the
17  case.  Sometimes when that happens, it can pave the way to
18  a more global resolution of the case.
19     But, you know, it seems to me that the overtones here
20  may not be civil harassment per se.  They may be an
21  allegation that you're making, which you stated yourself,
22  was more of a casting something in a false light or being
23  incomplete or inaccurate.  And the Court here may not be
24  able to give you the remedy that you're seeking.  But it
25  may be that Mr. Greenspan is willing to correct or update
26  any information that he has.  He stated that willingness
27  right here in court on the record under oath and that would
28  certainly be something that you can discuss with his

1     counsel.

2         The thing that does concern me -- I'll just sort of

3     forecast for both of you what my concerns are.  I told you

4     what my concerns are about your case.

5         One of the more concerning aspects, Mr. Greenspan, from

6     your standpoint are these comments on the Twitter account.

7     The fact that the Twitter had been restricted a couple of

8     times, and there was a comment about rapist, and there is

9     no evidentiary support to indicate that Mr. MasMarques has

10    been involved in that type of activity; also characterizing

11    him as a murderer.  Those are the things that probably

12    would be helpful to be further addressed.

13        And, again, if there is going to be an agreement not to

14    post certain types of information on Twitter when people

15    are maybe in a heightened state of conflict, you may be

16    able to actually resolve this case.  I'm not going to get

17    involved in that.  I encourage people strongly to revisit

18    settlement discussions in every stage of the proceedings

19    because then you can have some control over the outcome of

20    the case, and you can have certainty about what is going to

21    happen.  So now that counsel is involved, it is something

22    that you may want to try and revisit.  But these are the

23    things that sort of stand out for me at this point.

24            MR. BRODERICK:  We move for the exhibits to be

25    entered.

26            THE COURT:  I think because there may be some

27    objections, we may need to address that on a subsequent

28    date.

1     Is there any objection to the Court considering the

2     exhibits that have been presented by the petitioner?  Any

3     objection to the Court considering those documents?

4          MR. MASMARQUES:  Yes, Your Honor.  Yes.

5          THE COURT:  So next time be prepared to complete

6     your testimony and also be prepared to advance any

7     objections you have to any of the individual documents.  We

8     can go through those one by one, and the Court can make a

9     determination as to whether or not they're going to be

10    admitted, okay?

11         MR. MASMARQUES:  May I say something?

12         THE COURT:  We're at the point where we need to

13    select a new court date.  What was the question?

14         MR. MASMARQUES:  Mr. Greenspan doesn't want to

15    work anything out.  He didn't what to do --

16         THE COURT:  I don't want to hear what was

17    discussed during the course of the settlement discussions.

18    It's not relevant.

19      But can I just say this to everybody if you'll indulge

20    me for just moment longer?

21      Sometimes when there is a hearing, it can change the

22    landscape of the case.  Now that I've heard more testimony

23    and I have a better understanding of the issues, it seems

24    to me that there may be some aspects of the case that are

25    not generally in dispute.

26      If you feel that Mr. Greenspan has not been giving

27    updated, accurate information and there is other

28    information that would cast this in a more accurate light,

1   he's indicated a willingness to do that.  Talk to his

2   attorney about that.  You might be able to accomplish

3   something --

4           MR. MASMARQUES:  He won't.

5           THE COURT:  I don't want to hear what you

6   discussed.  It's not appropriate for me to hear that.

7           MR. MASMARQUES:  No.  No --

8           THE COURT:  I'm just suggesting that you broach

9   this issue again with his attorney.

10      And, Counsel, you're willing to talk to Mr. MasMarques

11  in that regard, aren't you?

12          MR. BRODERICK:  Although I'm specially appearing,

13  I'd be most happy to talk to him.

14          THE COURT:  All right.  If he's authorized to do

15  that by Mr. Greenspan, he said he's willing to do that.  I

16  know you're not going to talk to Mr. Greenspan directly

17  because you, gentleman, don't want to do that and you're

18  excluded from doing that.

19          MR. MASMARQUES:  I personally don't mind, but

20  Mister -- I don't know.  But I'll talk to counsel.

21          THE COURT:  Talk to counsel.  That would be a

22  good conduit for the information that you want to convey.

23      This does not have to be an ongoing source of

24  litigation and contention.  There are some ways that you

25  can both alleviate these ongoing conflicts, and I would

26  encourage you to try and do so.

27      Let's pick a new date.

28          MR. MASMARQUES:  It's a lot of taxpayer money.

1    It's been wasted.

2           THE COURT:  How much more time are you going to

3    need to reserve for your further testimony, sir?  Fifteen

4    minutes?

5           MR. MASMARQUES:  I don't know.  45 minutes,

6    Your Honor.

7           THE COURT:  45 minutes, I don't think you need.

8    You've already testified expansively.

9           MR. MASMARQUES:  Half an hour.  20 minutes.

10          THE COURT:  Okay.  Cumulatively I'll give the

11   parties another 45 minutes, which would be maybe 20 minutes

12   a piece and then a few minutes for rebuttal.  And then we

13   should conclude within 45 more minutes.  I'm going to allow

14   an hour because we have to go through documents, and we

15   have to get a briefing schedule.

16      Let's see what dates we can offer you.

17      We can have you come back on the 17th of April.  We

18   haven't set anything for that afternoon, have we?

19          THE CLERK:  I can't recall.  Let me check.

20          MR. MASMARQUES:  I have a court hearing on the

21   18th of April with Mr. Greenspan.

22          THE COURT:  So the 17th wouldn't be bad?

23          MR. MASMARQUES:  No, it will interfere because

24   I'm flying from Boston -- coming out from Boston here.

25          THE COURT:  So you're unavailable on the 17th or

26   the 18th?

27          MR. MASMARQUES:  Yeah.  Because it will make it

28   difficult -- I can come on the 17th, but I don't think I'll

1    be able to make it back home.  I won't make it back home in

2    time.

3           THE COURT:  What time do you need to be back

4    home?

5           MR. MARQUES:  9:00 a.m. on the 18th.  It's a

6    seven-hour flight.

7           THE COURT:  So could you come in here at 1:30 to

8    2:30 on the 17th.

9           MR. MASMARQUES:  It will be cutting it too close.

10          MR. BRODERICK:  Your Honor, there is a motion to

11   seal on this case.  Perhaps we have it in conjunction.

12          THE COURT:  When is that being heard?

13          MR. GREENSPAN:  That's in the morning.  It will

14   be too crowded.

15          MR. MASMARQUES:  March 9th.

16          THE COURT:  Well, March 9th is a Saturday.

17          THE CLERK:  19th.

18          THE COURT:  March 19th, a Tuesday.  We don't hear

19   motions on Tuesday mornings.  Our calendars are too

20   impacted.

21          MR. MASMARQUES:  I was going to ask you if it is

22   possible to get a Court Call, Your Honor, for that motion

23   to seal.

24          THE COURT:  All right.  Two things need to happen

25   in the next of couple minutes or else the Court is going to

26   select dates that the parties may not like.  I don't want

27   to that.  I don't want to be heavy-handed here.

28       Can you come in for an hour on the 17th of April?  Yes

1    or no.  At 1:30.

2              MR. MASMARQUES:  No, Your Honor.

3              THE COURT:  Okay.  So we can a have motion to

4    seal on Wednesday, Thursday, or Friday morning.  Currently

5    you said the motion is set for what date?

6       Somebody please tell me.

7              MR. GREENSPAN:  I believe March 19th.

8              THE COURT:  It is set for March 19th.  Let's take

9    a look at March 21st or 22nd.  We need to do this quickly

10   because our deputy is going to have to secure the building

11   here.

12             THE CLERK:  You said March?

13             THE COURT:  So if we're looking at March 21st or

14   22nd, do one of those days that is relatively lightly set

15   looking at both the 9:00 and 9:15 calendar, the trial

16   calendar and the law and motion.

17             THE CLERK:  Monday, on the 21st there's nothing

18   on the law and motion calendar.

19             THE COURT:  How many are on the regular calendar?

20   We can have you come in on the 21st of March at 9:00

21   o'clock for the motion.

22             MR. BRODERICK:  Oh, for the motion.

23             THE COURT:  Right.  And if the parties want to

24   appear telephonically through Court Call, that's fine on

25   the motion.  You'll have to set that up through Court Call.

26             MR. MASMARQUES:  Thank you, Your Honor.

27             THE COURT:  And that applies to both parties.

28   So is there an agreement that the date of the 19th is going

1    to be continued to the 21st at 9:15 in this department?

2    Yes or no.

3            MR. MASMARQUES:  For Court Call?

4            MR. BRODERICK:  Yes, that's fine.

5            MR. MASMARQUES:  Yes, Your Honor.

6            THE COURT:  Okay.  And do you waive formal

7    written notice of the new date?

8            MR. MASMARQUES:  Yes, Your Honor.

9            MR. BRODERICK:  Yes.

10           THE COURT:  Okay.  So that's taken care of.

11       So now we just need to find a date when you can come

12   back and conclude your testimony, and we can go over the

13   evidentiary exhibits and set a briefing schedule.

14           MR. BRODERICK:  Does it make sense to do it

15   before the motion to seal?

16           THE COURT:  Well, I mean we're still heavily

17   impacted in the afternoon, but if you can't come in on the

18   17th or the 18th then the next hearing date I'm going to be

19   able to offer you is going to be May 2nd.

20           MR. MASMARQUES:  I'd be open.

21           THE COURT:  You know, the thing is that if I had

22   known what a realistic time estimate was in this case, it

23   would have gone to a trial department.  You know, we have

24   to sort of deal with the situation we have right now, but

25   we are very impacted on hearings, and we only get a court

26   reporter certain days of the week.  So that's the issue

27   too.  But we have calendars in the mornings Tuesdays

28   through Fridays each week, and we do short cause trials on

1    Monday mornings.  I can offer you the 2nd of May.

2             MR. MASMARQUES:  Yes, Your Honor.  I can do it.

3             THE COURT:  1:30.  Does that work for you?

4             MR. GREENSPAN:  Okay.

5             THE COURT:  Are you sure?  Do you want to suggest

6    a different date?

7             MR. GREENSPAN:  No, that's okay.

8             THE COURT:  You're anxious to get this concluded?

9             MR. GREENSPAN:  Yeah.  I honestly don't think

10   you're hearing the whole story, and it worries me.

11            THE COURT:  Well, let me just say this:  If

12   you're going to testify further because you don't think I'm

13   hearing the whole story then I think it is better now for

14   me to get a realistic sense of how much more time we need

15   to set aside for this case.

16            MR. GREENSPAN:  Right.

17            THE COURT:  Because you've testified on a number

18   of occasions, but it sounds to me like you're going to go

19   back and talk to your attorney and try and augment your

20   testimony, which is fine.  But for planning purposes I just

21   need to have a realistic sense of how long it's going to

22   take.  Tell your attorney -- have an off-the-record

23   discussion and see how long you really think you're going

24   to need to reserve.

25            MR. BRODERICK:  My client estimates about

26   45 minutes.

27            THE COURT:  Okay.  Reluctantly 45 minutes a piece

28   and that's an hour and a half.  It will be two hours less

1    half-hour to go through documents and to get a briefing

2    schedule.  So we're going to reserve two hours, again,

3    somewhat reluctantly, but that's going to be May 2nd,

4    two hours.

5        And the only thing I'll ask everybody is make sure

6    between now and then you get yourself organized so that we

7    don't have repetitive information because don't forget I'm

8    going to be going back and reviewing records.  And I'm sure

9    that there is plenty of information on the record that is

10   not readily coming to mind, but once I read the closing

11   argument briefs and get a chance to look over the records

12   that will refresh my memory.  And I'll have sort of a

13   better sense of the whole case.  That's frankly one of the

14   disadvantages of having multiple sessions, but we have to

15   deal with that.

16       And one of the positives here is that the parties have

17   requested the transcript, which is going to be very useful

18   to the Court.

19       All right.  So we're going to keep the status quo by

20   renewing the restraining orders that are currently in place

21   on a temporary basis.  They'll be filed upstairs.

22       Is that okay?  No.

23       So we'll make these available to you.

24       Will you accept service on behalf of your client?

25       We're going to be mailing it out.  Do you want it to go

26   directly to the party?

27               MR. BRODERICK:  Yes, to the party.

28               THE COURT:  Okay.  That's fine.

1    MR. BRODERICK:  And is that the 1:30 calendar on
2    May 2nd?
3    THE COURT:  1:30.  And your case will be the only
4    case set that afternoon so it is my intention that we're
5    going to hear the balance of the testimony.
6    And you may want to get information from the court
7    reporter because I don't know if we're going to have the
8    same court reporter next time so you may want to make
9    contact with her because you're going to want to request a
10   transcript.
11   Unless you want to have the motion to seal heard on the
12   same date, we've got that set now for the 21st of March.
13   MR. GREENSPAN:  Honestly I'd prefer to have it
14   all on the same date.  This is becoming kind of a burden.
15   THE COURT:  Fine with me.  That's fine with me.
16   Is that agreeable?
17   MR. GREENSPAN:  I don't think that should require
18   much time.
19   THE COURT:  Is that agreeable?
20   MR. MASMARQUES:  Yes, Your Honor.
21   THE COURT:  Okay.  So we're going to vacate the
22   currently set date.  We're not going to put it over to the
23   21st.  We're going to hear it in conjunction with the other
24   matter.
25   MR. BRODERICK:  Thank you, Your Honor.
26   THE COURT:  All right.  We're in recess.  Thank
27   you all.
28   MR. MASMARQUES:  Thank you, Your Honor.

1          THE COURT:  And just a general reminder to leave

2     the documents that have been marked here.  We need to

3     retain those for the record so please don't remove any

4     marked documents from the courtroom.

5          MR. MASMARQUES:  May I ask?  Can you give us a

6     couple of minutes so we can leave.  Like can we leave

7     before Mr. Greenspan?

8          THE COURT:  I think that our deputy is going to

9     encourage that that happen.

10        We're in recess.

11

12             (At 5:03 p.m., court was recessed in this

13             matter until May 2, 2019, at 1:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1   STATE OF CALIFORNIA      )
                             )   ss.
2   COUNTY OF SANTA CLARA    )

3

4           I HEREBY CERTIFY:  That I was the duly appointed,

5   qualified, and acting official shorthand reporter of said

6   court in the above-entitled action taken on the

7   above-entitled date; that I reported the same in machine

8   shorthand and thereafter had the same transcribed into

9   typewriting as herein appears; and that the foregoing

10  typewritten pages contain a true and correct transcript of

11  the proceedings had in said matter at said time and place,

12  to the best of my ability.

13      I further certify that I have complied with CCP

14  237(a)(2), in that all personal juror identifying

15  information has been redacted, if applicable.

16  Dated:  April 5, 2019

17

18

19                  _____

20                       LISA L. BROWN, CSR #13148

21

22  Government Code Section 69954(d) state:

23

24      "Any court, party, or person who has purchased a
    transcript may, without paying a further fee to the
    reporter, reproduce a copy or portion thereof as an exhibit
25  pursuant to court order or rule, or for internal use, but
    shall not otherwise provide or sell a copy or copies to any
26  other party or person."

27

28
```

```
 1              SUPERIOR COURT OF CALIFORNIA

 2                 SANTA CLARA COUNTY

 3            HONORABLE CAROL OVERTON, JUDGE

 4                   DEPARTMENT 11

 5                    ---oOo---

 6  AARON GREENSPAN,              )
                                  )
 7          Petitioner,           )
                                  )
 8     vs.                        )     Case No. 18CH008067
                                  )
 9  DIEGO MASMARQUES,             )
                                  )
10          Respondent.           )
    _____ )
11

12                    ---oOo---

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  MAY 2, 2019

16

17

18  A P P E A R A N C E S:

19  FOR THE PETITIONER:      AARON GREENSPAN
                             IN PROPRIA PERSONA
20
    FOR THE RESPONDENT:      DIEGO MASMARQUES
21                           IN PROPRIA PERSONA

22  ALSO PRESENT:            TIM GOMES
                             ATTORNEY AT LAW
23

24  COURT REPORTER:          AMY GOODING, CSR
                             CERTIFICATE No. CSR 13386
25

26                    ---oOo---

27

28
```

1                    **INDEX OF WITNESSES**

2
     **RESPONDENT'S**
3
     CATHERINE GOMES
4    DIRECT EXAMINATION BY MR. GOMES ......................8

5    DIEGO MASMARQUES
     DIRECT EXAMINATION BY MR. GOMES .....................12
6
     AARON GREENSPAN
7    DIRECT EXAMINATION BY MR. MASMARQUES .................17
     CROSS-EXAMINATION BY MR. GREENSPAN ...................54
8    REDIRECT EXAMINATION BY MR. MASMARQUES ..............90

9    _____

10

11                   **INDEX OF EXHIBITS**

12
     **RESPONDENT'S**
13
     **No.   DESCRIPTION                       MARK      ADMIT**
14
     F     A 4-page document titled USA .........17      106
15          vs. Massachusetts District
            Court
16   G     A Notice of Magistrate's .............36      106
            Hearing on Complaint
17          Application
     H     A document titled The ................39      106
18          Commonwealth of Massachusetts
            Executive Office of Public
19          Safety and Security
     I     A document titled The ................40      106
20          Commonwealth of Massachusetts
            Department of Criminal Justice
21          Information Services
     J     A printout showing the ...............40      106
22          disposition of a criminal
            matter
23   K     An affidavit from Mr. ................49      106
            MasMarques's wife
24   L     A document not described ............92       106

25   **PETITIONER'S**

26   **No.   DESCRIPTION                       MARK      ADMIT**

27   20    A copy of an e-mail and a ............89      106
            response e-mail
28   21    A complaint to the Ohio .............105      106
            Attorney General

```
 1   SAN JOSE, CALIFORNIA                        MAY 2, 2019
 2                        PROCEEDINGS
 3
 4           THE COURT:  The matter of Aaron Greenspan.  Let's
 5   get the parties' names.
 6           MR. GREENSPAN:  Aaron Greenspan.
 7           THE COURT:  Good afternoon.
 8           MR. GOMES:  Your Honor, my client --
 9           THE COURT:  You have not stated your name for the
10   record.
11           MR. GOMES:  Tim Gomes, G-O-M-E-S.
12           THE COURT:  First name?
13           MR. GOMES:  Tim.  This room has always been this
14   way.
15           THE COURT:  Sir?
16           MR. MASMARQUES:  Diego MasMarques.
17           THE COURT:  Are you making a special appearance?
18           MR. GOMES:  Special appearance, yes.
19           THE COURT:  Are you their expert?
20           MR. MASMARQUES:  The gentleman accompanying me is
21   from Executive Protection Services.
22           THE COURT:  Let's take inventory for a moment
23   here.  We have six matters on calendar.  The only matters
24   scheduled for this afternoon, based on our proceedings last
25   time, were the final hearing on the request for restraining
26   order and the cross-request for a restraining order.  This
27   is a case, just to sort of recap, that was going to be one
28   session.  What is this, the third session?  It keeps growing
```

1    and growing.  It's really not appropriate at this stage of

2    the process for the Court to be hearing motions that should

3    be heard separately or before the hearing.

4         I'll go through them, but to the extent we spend

5    time on them, Mr. MasMarques, this may be time better spent

6    on completing the evidence in the case.  And the Court

7    certainly hasn't been notified there would be additional

8    witnesses.

9         MR. GOMES:  Could we pass on this for a minute?

10        THE COURT:  We can't.  We'll be concluding by 3:30

11   this afternoon.  I'm not going to allow this to become

12   enlarged and delayed, and delayed some more.  It's already

13   gone way over the initial time estimate.  Had the Court

14   known that the time estimate was going to be so broad in the

15   case, this would have gone to a trial department.  But this

16   is not a case that we'll be continually hearing.  It's going

17   to draw to a conclusion.  The statute requires we have these

18   cases heard expeditiously.

19        What is your request?

20        MR. GOMES:  I'm trying to maybe shorten this.

21        THE COURT:  How?

22        MR. GOMES:  You say 3:30, right?

23        THE COURT:  It should be done way before that.

24   I'm trying to give deference to the parties so they can say

25   what they have to say.

26        Just to recap further, one of the things I think I

27   pointed out on the record last time was that if Mr.

28   Greenspan can prove to the applicable standard that your

1    client put his and his father's images onto the other

2    people's bodies in a pornographic display, he's going to get

3    the restraining order he's requesting.  A lot of it came

4    down to can Mr. Greenspan present by clear and convincing

5    evidence proof that you are responsible for that.  And we

6    have conflicted information on that.

7             (Simultaneous colloquy.)

8             THE COURT:  And I do have to have Mr. MasMarques

9    establish to the Court that Mr. Greenspan has done something

10   that goes beyond his free speech rights.  I think I had also

11   pointed out the fact that you both are computer savvy, and

12   anytime we have witnesses -- you're not qualified as

13   experts, but you may be like expert witnesses in the

14   knowledge that you have -- that knowledge has to be imparted

15   in a way that is clear and convincing to the Court.  So, I

16   wanted to give the parties an opportunity to present any

17   final testimony that they may have in the case so the Court

18   could have a better grasp and understanding of these issues.

19   But we're not going to turn this into a lengthier proceeding

20   than what was originally contemplated.  It's already gone

21   way, way beyond the initial time estimate.  I don't know why

22   you need time to confer.

23            MR. GOMES:  We have a witness here.

24            THE COURT:  But the Court wasn't notified that

25   there would be an additional witness today.  If you want to

26   present the witness today, everything has to be completed by

27   3:30.

28            Now, who is going to want to testify first between

1  the two of you?  I think we're coming back just for any

2  final testimony.  And then if you can fit this additional

3  witness in within the timeframe allotted to you, you can do

4  that.

5          MR. GOMES:  Okay, good.  Let's get started, then.

6          THE COURT:  Mr. Greenspan, it looks like you're

7  going to present this witness {*sic*}.  Now, it is 1:37, say

8  1:40.  All right.  I'm keeping track of the time.  I'm

9  keeping track of the time, because I want to make sure it's

10  even on both sides.

11          MR. GREENSPAN:  Your Honor, I would like to point

12  out also I was not notified there would be a witness.

13          THE COURT:  Mr. Gomes, why don't you make an offer

14  of proof?  Mr. Greenspan is saying he was not notified there

15  would be an additional witness in this case.

16          MR. GOMES:  Well, there is an additional witness.

17          THE COURT:  Wait a second.  How many additional

18  witnesses do we have here?

19          Gentlemen, please answer the question.  If you

20  want to have sufficient time to finish your case, you're

21  coming here for hearing.  I'm asking a simple question.  How

22  many additional witnesses do you have here?

23          MR. MASMARQUES:  Just one, your Honor.

24          MR. GOMES:  Just one.

25          THE COURT:  And, Counsel, why was Mr. Greenspan

26  and the Court not notified that there would be an additional

27  witness today?

28          MR. GOMES:  I just got on this case today, okay?

1          THE COURT:  Sir, you want to usurp your time with

2    this witness.  I want Counsel to make an offer of proof so,

3    at the very least, Mr. Greenspan knows what he's here for.

4    He should be allowed to know who is going to testify and be

5    prepared and cross-examine them.

6          MR. GOMES:  Well, we do have a witness.  The offer

7    of proof is that it's going to prove that he posts malicious

8    documents --

9          THE COURT:  Who is "he"?

10          MR. GOMES:  The defendant in this case, I believe.

11    Mr. Greenspan posts malicious documents.

12          THE COURT:  I'll allow the testimony subject to

13    any objections made.

14          Step up and state your first and last name for us,

15    spelling both.

16          THE WITNESS:  My name is Catherine Gomes,

17    G-O-M-E-S.

18          THE COURT:  How do you spell your first name?

19          THE WITNESS:  My name is spelled with a C.

20    C-A-T-H-E-R-I-N-E.

21          THE COURT:  Could you raise your right hand for

22    the oath?

23

24                    CATHERINE GOMES

25    was called as a witness on behalf of the Respondent, was

26    sworn, examined, and testified as follows:

27          THE WITNESS:  Yes, I do.

28          THE COURT:  You can come up all the way to the

```
 1   witness stand here.  Have a seat and move the mic close to
 2   you so our court reporter can hear you.
 3              It's now 1:40, Counsel.
 4                      DIRECT EXAMINATION
 5   BY MR. GOMES:
 6        Q    What do you do for a living, Ms. Gomes?
 7        A    My profession.  I'm a legal assistant/informally a
 8   law clerk.
 9        Q    And has Mr. Greenspan made any postings about you
10   with regard to any incidents that have occurred?
11              THE COURT:  That's a broad question.
12        Q    (By Mr. Gomes) Strike that.  Do you know Mr.
13   Greenspan in any way?
14        A    I do not.
15        Q    Have you seen any postings regarding you or your
16   business?
17        A    I have seen a proof of service document related to
18   the law office, yes.
19        Q    And what about the document itself?
20        A    I have seen a document, yes, posted by Mr.
21   Greenspan's company, PlainSite.
22        Q    And what does this company PlainSite do?
23        A    I believe they post law documents for purchase or
24   something like that.
25        Q    And does that entail actual court documents?
26        A    I believe it does.
27        Q    And have any actual court documents been posted
28   about the business that you work for?
```

```
 1        A    Yes, they have.

 2        Q    And what are those documents?

 3        A    There are proof of service and some kind of a

 4   document related to a lawsuit.

 5        Q    What kind of lawsuit did that involve?

 6        A    A collections lawsuit.

 7        Q    And it was a collections document posted to the

 8   public?

 9        A    Yes, I believe it has been posted to the public.

10        Q    Did it have any public purpose, or did it assist

11   the public in making a determination about this business?

12             THE COURT:  You know, Counsel, you're asking a

13   question that really goes to a legal standard.

14             MR. GOMES:  Okay, I'll withdraw it.

15             MR. GREENSPAN:  Your Honor, I object to the

16   relevance of all of this.

17             THE COURT:  Well, it hasn't become apparent to the

18   Court.  I'm not going to rule on your objection yet.  I'm

19   going to see if it becomes relevant.  If it doesn't, I'm

20   going to grant your motion to strike the testimony.

21        Q    (By Mr. Gomes) What was the purpose of the

22   publication of that document?

23        A    I saw no purpose for the publication of that

24   document to the search engines -- public search engines.

25             THE COURT:  It was a proof of service?

26             THE WITNESS:  It was actually a proof of service,

27   along with other documents from the lawsuit.  So, when you

28   run my husband's name --
```

1           THE COURT:  Let's not get further.  It was a

2      lawsuit -- documents from a lawsuit that was --

3           THE WITNESS:  It's a collection lawsuit.

4           THE COURT:  Okay.  And it was publicly filed.  It

5      wasn't filed under seal, right?

6           THE WITNESS:  Right.

7           THE COURT:  Got it.  Go ahead, Counsel.

8      Q    (By Mr. Gomes) It was a collections document,

9      wasn't it?

10     A    Yes.

11     Q    And it was done in such a manner as to cause

12     disparity towards a law firm, was it not?

13     A    It certainly was, yes.

14          THE COURT:  Counsel, this is a little far afield.

15     Let me just say this.  We have an objection on the relevance

16     grounds.  I'm inclined to sustain that objection.  You may

17     not like what Mr. Greenspan does, the witness may not like

18     what he does, and your client may not like what he does, but

19     we're not here to decide whether he's got a popular website

20     or not.  We're here to determine whether he harassed your

21     client.  I don't see the relevance of this other than this

22     witness is upset by some documentation that was filed

23     publicly from public documents.

24          MR. GOMES:  Okay.  I just want to say one thing.

25     What does whether somebody pays their bills have to do with

26     how good a lawyer they are?

27          (Simultaneous colloquy.)

28          THE COURT:  That's not why we're here.

1          MR. GOMES:  I know it's not, but it's an harassing

2     document that was done.

3          THE COURT:  The objection is sustained.  The

4     testimony is stricken.  You can keep the witness on the

5     stand if you have anything relevant to ask her about.

6          I think you made your point.  You don't like what

7     Mr. Greenspan does; I understand that.  We can't bring

8     everybody in here who has a beef with Mr. Greenspan.  The

9     scope of this hearing is narrow.  If you have any relevant

10    questions to ask her, go ahead.

11    Q    (By Mr. Gomes) Well, do you think that that

12    posting was a harassment of you?

13    A    I couldn't tell you if Mr. Greenspan means to

14    harass me or anyone.

15         MR. GREENSPAN:  Objection, your Honor.  This is

16    not relevant to Mr. MasMarques.

17         THE COURT:  The relevance objection is sustained.

18    Q    (By Mr. Gomes) Well, did you feel like you were

19    harassed?

20         MR. GREENSPAN:  Objection, same reason.

21         THE COURT:  The relevance objection is sustained.

22         MR. GOMES:  Okay.  No further questions.  We have

23    no other witnesses.

24         THE COURT:  Essentially, there's no testimony

25    that's been provided that the Court is going to consider.

26    Thank you for being here.

27         THE WITNESS:  I'll walk to my husband, thank you.

28         MR. GOMES:  We're going to ask my client to

1   testify as to the harassment he suffered.

2          THE COURT:  He has the time to complete his

3   testimony, certainly.

4          Gentlemen, stand up and raise your right hands,

5   please.

6          (The Petitioner and the Respondent were duly

7   sworn.)

8          THE COURT:  Have a seat.  As long as you don't

9   confer with your attorney in terms of your testimony, you

10  can remain seated where you're at.  Of course, if there's

11  any objections that come along by your attorney, I'll rule

12  on them as they come up.  Direct examination.

13

14                      DIEGO MASMARQUES

15                    DIRECT EXAMINATION

16  BY MR. GOMES:

17     Q    Could you describe to the Court the circumstances

18  that involved harassment by Mr. Greenspan?

19     A    Yes.  Mr. Greenspan essentially opens up the legal

20  documents --

21          THE COURT:  Now, bring the mic a little closer to

22  you.  I want to make sure our court reporter can hear.

23  That's better.

24          MR. GREENSPAN:  Your Honor, I would like to

25  object.  If this is going to be the exact same testimony

26  that's already been given twice, I don't think we need to

27  hear it a third time.

28          MR. GOMES:  There's no grounds for that objection,

1  by the way.  He needed to say.

2          THE COURT:  Mr. MasMarques, wait.  The Court has

3  an obligation to manage these proceedings.  We have an

4  attorney who has come in sort of in the middle or toward the

5  tail end of this hearing.  The Court is not going to allow a

6  duplication of previous testimony.

7          If you want to ask your client very pointed

8  questions about why he's asking for a restraining order

9  here, as long as you can do that efficiently in a wrap-up

10  fashion, I'll allow it to happen.  We're not going to

11  have --

12          MR. GOMES:  Sure.

13          THE COURT:  -- proceedings that are duplicative

14  and long-winded.  I really had asked both parties to give me

15  your high points and to focus on those things that really

16  are essential to your case.

17          To that extent, the objection is overruled, but if

18  we hear any questions that are redundant, I think we can

19  expect objections.

20          MR. MASMARQUES:  Your Honor, I can --

21          THE COURT:  Speak through your counsel.  You're

22  represented.

23          This is direct examination.  Mr. MasMarques, I

24  know this is stressful for everybody.  Question, pause,

25  answer.  Our court reporter --

26          I always say the court reporters have the toughest

27  job of anybody in the courthouse, and nobody has ever

28  contradicted me on that.  We often speak outside of the

1   courtroom in the kind of manner where we're talking over one
2   another in a conversational interaction.  We can't do that
3   here.
4          One of the things that's helpful is to wait until
5   your attorney completes your question, even if you think you
6   know what the question is going to be.  Pause and provide
7   your answer.  A gentle reminder, because I think you both
8   have been requesting transcripts in this case, if we're
9   interrupting one another, you're not going to have a solid
10  transcript.
11         I sort of have the prerogative of being able to
12  jump in.  Your attorney is going to question you now.
13         If you need to consult, don't consult with the
14  Court.  Consult with your attorney.  You're represented
15  today.
16         MR. GOMES:  Your Honor, I'm going to step out of
17  this.  He's going to make his testimony to you directly.
18         MR. MASMARQUES:  Because I wasn't expecting an
19  attorney today.
20         THE COURT:  What's the scope of your
21  representation today?
22         MR. GOMES:  It's for a special appearance today.
23  He asked me to do it.
24         THE COURT:  That's fine.  What is the scope of
25  your representation today if you're not going to be
26  questioning your client?
27         MR. GOMES:  That's what it was.  If he doesn't
28  want me to ask questions, that's fine.

1        MR. MASMARQUES:  No, because I know the case

2    inside and out.

3        THE COURT:  Are you releasing your attorney?  He

4    may be able to ask you questions in a more cogent manner and

5    organize them.  If you want to see if he can try, and that

6    doesn't work, you can go on your own.

7        Is that what you would like to do?

8        MR. MASMARQUES:  No.  I would like to release my

9    attorney.

10       THE COURT:  I guess you're free to go.  Thank you,

11   Counsel.

12       It's about 1:49.  Go ahead, and you can complete

13   your testimony, sir.

14       MR. MASMARQUES:  Do you want me to go first, your

15   Honor?

16       THE COURT:  You're about to testify, so go ahead.

17       MR. MASMARQUES:  Okay.  When I was here the last

18   time, Mr. Greenspan's attorney did allow -- he didn't want

19   this being turned in.  This exhibit here is one of the best

20   examples of what --

21       THE COURT:  If that's an exhibit that's been

22   marked, tell us the tag number.  If it hasn't been marked,

23   we'll need to mark it and identify it.

24       MR. MASMARQUES:  No, it hasn't been marked.

25       THE COURT:  What is Respondent's next in order?

26       THE CLERK:  It would be F.

27       THE COURT:  Exhibit F.  And what is that, sir?

28   Tell us briefly what it is so we can identify it and tag it,

 1  and then you can talk further about it.

 2          MR. MASMARQUES:  Yes, your Honor.  This is a

 3  docket from Mr. Greenspan's website PlainSite.org.

 4          THE COURT:  Why don't you give it to the deputy,

 5  and we'll return it to you as soon as it gets tagged.

 6          MR. GREENSPAN:  Is there a copy, by chance?

 7          THE COURT:  Do you have a copy for Mr. Greenspan?

 8          MR. MASMARQUES:  I Have a Copy for Mr. Greenspan.

 9          THE COURT:  It looks like it may be an internet

10  printout.  It says USA versus MasMarques, Massachusetts

11  District Court.  It's how many pages?  Let me see.  It looks

12  like it is four pages, followed by another document of a

13  similar nature of four pages.

14          From what I can see, they're different documents.

15  Okay.  Collectively, Exhibit F.

16          MR. MASMARQUES:  Unless it's two copies of the

17  same.  It should be -- it's this case from Spain, that

18  docket in Federal Court.

19          THE COURT:  Take a look at the marked exhibit and

20  see if that's what you intended to present.

21          Remove the portion that is not part of it.  I'll

22  reidentify it for the record.

23          Did you want both documents, or just one?

24          MR. MASMARQUES:  Just the one with the tag on it.

25          THE COURT:  Okay.

26          MR. MASMARQUES:  The one in the back was another

27  copy.

28          THE COURT:  When I get it from the deputy, I'll

```
1    reidentify it for the record, since it's been modified.

2              It's a four-page document.  It's marked 104, 204,

3    etc.  It's the same description.

4              (Respondent's Exhibit F was marked for

5    identification.)

6              Go ahead.

7

8                         AARON GREENSPAN

9                         DIRECT EXAMINATION

10   BY MR. MASMARQUES:

11        Q    Mr. Greenspan, have you seen that?

12        A    Yes.

13             MR. MASMARQUES:  What Mr. Greenspan does is --

14   deliberately, I may add -- he leaves open the documents --

15             MR. GREENSPAN:  Objection, your Honor.

16             THE COURT:  Hang on.  I don't know what he's

17   saying yet.  I think the objection may be premature.  Go

18   ahead.

19             MR. MASMARQUES:  Yes.

20             THE COURT:  It's overruled.

21             MR. MASMARQUES:  What Mr. Greenspan does in a

22   highly calculated and intentional manner, in order to

23   attract the most traffic to his website and attention to his

24   website, because people want to read negative things.  They

25   don't want to read positive things.

26             THE COURT:  Let's get to the point, okay?

27             MR. MASMARQUES:  He leaves open on the web the

28   most negative and the most vicious legal documents in the
```

1   whole entire docket.  This is an example here of what he's

2   been doing.

3          THE COURT:  I don't know that.  It hasn't been

4   admitted.  I haven't read it.  Tell me, in your own words,

5   what you're talking about.

6          MR. MASMARQUES:  Yes.  Mr. Greenspan, like, he'll

7   leave open, like --

8          THE COURT:  When you say "leave open," I'm not

9   even sure what you mean by that.

10          MR. MASMARQUES:  Oh, on the web, the case docket

11   will be -- when you click on it, you will be able to see it.

12          THE COURT:  Okay.  You're saying on his website he

13   has a case docket.  You click on it, and what can you see?

14          MR. MASMARQUES:  Well, documents that are not very

15   interesting.  You cannot click on them and open them.

16          THE COURT:  You're saying he's selective about the

17   documents you can open?

18          MR. MASMARQUES:  Highly selective.

19          THE COURT:  And you're saying the ones you can

20   open are the negative ones, and the other ones are not

21   readily accessible?

22          MR. MASMARQUES:  Yes.

23          THE COURT:  But remember we're getting back to

24   what he has done that is unlawful harassment.  I understand

25   you don't like what he does.  I want to understand why you

26   think it should be subject to restraint of speech because it

27   constitutes harassment.

28          MR. MASMARQUES:  I cannot find employment, proper

1    employment.  I need to make a living, your Honor.

2         THE COURT:  You didn't really tell me about that

3    particular document.  Other than what you've said and the

4    fact that it's negative information that is accessible and

5    it sort of goes to whatever most negative information is

6    available, what else about that document do you think is

7    important for me to know?

8         MR. MASMARQUES:  Yes, your Honor.  When Mr.

9    Greenspan came here on April 4th and he applied for a

10   restraining order, this is exactly what he did.  He showed

11   the Court the most negative documents that he could find in

12   the entire case to put me in a bad light.  That was from the

13   probation officer and then, like, the charges that were

14   dismissed against me.

15        THE COURT:  So, you're saying he was selective

16   about the information he provided to the Court?

17        MR. MASMARQUES:  One hundred percent.  That's what

18   he does.

19        THE COURT:  So, he presents negative information.

20        MR. MASMARQUES:  That's what he does.  He's not

21   impartial of what he wants.  When he presents something to

22   the courts or law enforcement, he'll do it so it presents a

23   one-sided view of me, which is the most negative that he can

24   find.

25        THE COURT:  So, it's your position if he's only

26   presenting one side, that that constitutes harassment?

27        MR. MASMARQUES:  Yeah.  That is harassment,

28   because he's doing it.  He's going into my documents that

```
 1    are on me, and he's searching and, he's reading through
 2    them, and he's intentionally seeking out the most negative
 3    and damning documents that he can find in order to destroy
 4    my reputation on the search engines.  Because when a person
 5    goes in and looks at a docket sheet, this is all closed --
 6            THE COURT:  You say this is all closed, and you're
 7    referring to Exhibit F.  What is it on there on Exhibit F
 8    that is accessible to somebody who goes onto the website
 9    that you feel is harassing in nature.  Help me to understand
10    that.
11            MR. MASMARQUES:  Yes, your Honor.  So, on the page
12    before last --
13            THE COURT:  It should have a page number.
14            MR. MASMARQUES:  Page 3, your Honor.
15            THE COURT:  Okay.  What is on page 3?
16            MR. MASMARQUES:  Four attachments that he has left
17    open.
18            THE COURT:  And what are they?
19            MR. MASMARQUES:  I don't recall, but it talks
20    about, like, I was charged with a rape charge that was
21    dismissed.  It was dismissed.
22            THE COURT:  So, he's talking about a charge that
23    was subsequently dismissed?
24            MR. MASMARQUES:  It was dismissed, but he leaves
25    that open.  He talks about the Probation Department that,
26    you know, I don't remember all the details.
27            THE COURT:  So, it's the most negative aspects of
28    that particular criminal case, and you feel that it is
```

```
 1   published in a way that's sort of skewed toward the
 2   negative?
 3           MR. MASMARQUES:  One hundred percent.  It is, your
 4   Honor.
 5           THE COURT:  Okay.
 6           MR. MASMARQUES:  In that fashion, Mr. Greenspan
 7   attracts the most attention.  Now, these charges were
 8   immediately dismissed against me, and they (unintelligible
 9   words).
10           (Whereupon the court reporter attempted to have
11   the witness clarify what he said in order to ascertain a
12   complete record.)
13           MR. MASMARQUES:  On my first court date when I
14   first went there, they're in here.  For some reason, the
15   Probation Department put it in one of the documents.
16           THE COURT:  This is sort of repetitive of what was
17   said last time from the time before, that you said there was
18   a disposition of the case and that the favorable disposition
19   was not published by Mr. Greenspan.
20           MR. MASMARQUES:  He doesn't favor.  He doesn't
21   publish anything that's positive.
22           THE COURT:  What else did you want to tell me in
23   the time allotted here?
24           MR. MASMARQUES:  Yes.  So, when I was here last
25   time on February 28th, I showed the exhibits to Attorney
26   Broderick (phonetic) about things that have been going up on
27   me, calling me a murderer and a rapist, and continuously a
28   murderer or a rapist.  If you look on the search engine
```

```
1    Bing, you have three pages of negative --
2            MR. GREENSPAN:  Objection, your Honor.  It's all
3    repetitive of last time.
4            MR. MASMARQUES:  It's not repetitive; it's what
5    he's doing.
6            THE COURT:  It is.  I'm going to allow him to
7    recap, and I'm going to allow you to do the same.  That's
8    what's inefficient about these proceedings getting
9    disjointed.  If you want to recap the main points that are
10   important to you, you probably want to be mindful of the
11   time allowed.  We also have motions, and you may want to
12   reserve time for that as well.  You can continue.
13           The objection is overruled.
14           MR. MASMARQUES:  So, when I was sitting here and I
15   showed these exhibits to Attorney Broderick --
16           THE COURT:  Which exhibits?  Why don't you tell me
17   the number.  We have them tagged.  So you have a good
18   record, why don't you identify them by their number or
19   letter?
20           MR. MASMARQUES:  D and F.
21           THE COURT:  Do you have D and F there?
22           MR. MASMARQUES:  Yes.  Attorney Broderick turned
23   to Mr. Greenspan and stated, "What is this all about?"
24           THE COURT:  How was it that you were able to show
25   him tagged documents?  Those are supposed to be retained by
26   the Court.
27           MR. MASMARQUES:  No, no, no, no.  They weren't
28   tagged when I showed him.
```

1          Your Honor, these were in my documents when I left

2     the courthouse.

3          THE COURT:  In other words, you took documents

4     that were supposed to remain here, and now you're returning

5     them.

6          MR. MASMARQUES:  I didn't take them intentionally.

7     I got all the way back to Watson, and I found this one first

8     in my paperwork.  I found this like a week later.

9          THE COURT:  Well, they're back in court now.  Just

10    a gentle reminder the documents do need to remain in court

11    when they've been marked.

12          You showed the attorney D and F?

13          MR. MASMARQUES:  Before the tags were on it.  They

14    wound up in my papers when I left.  But he showed them to

15    Mr. Greenspan.  And Mr. Greenspan said, "What's this all

16    about?"  He said, "Oh, yeah, people that I know are doing

17    that.  I've asked them to stop, but they don't want to

18    stop."

19          I clearly heard that from Mr. Greenspan.  I wasn't

20    sure if I should even say that when I was here last time.

21          THE COURT:  What did you hear from Mr. Greenspan?

22          MR. MASMARQUES:  Mr. Greenspan knows who is doing

23    these --

24          MR. GREENSPAN:  Objection, your Honor.  There's

25    just no basis for any of this.

26          THE COURT:  Well, now, wait a second.  The

27    objection is going to be overruled at this juncture.

28          I think that maybe I'm confusing what you're

1   saying.  First, you started talking about your attorney's

2   reaction to Exhibits D and F.  Had you finished with that,

3   and are you moving on to something else?

4          MR. MASMARQUES:  No.  It's basically all part of

5   the same thing.

6          THE COURT:  So, your attorney looked at them?

7          MR. MASMARQUES:  No, no, his attorney.

8          THE COURT:  Oh, his attorney looked at them --

9          MR. MASMARQUES:  Attorney Broderick.  His attorney

10  said -- Mr. Greenspan said, "Oh, yeah.  That's people I know

11  that are doing that.  I asked them to stop, but they don't

12  want to stop."

13         THE COURT:  People that he knows doing what?

14         MR. MASMARQUES:  Putting all these wild comments

15  on me online.  It's gotten so out of hand that he's lied

16  here in court.  He sat here in front of you, your Honor, and

17  I asked him a question on December 12th, "Have you posted

18  any of these comments?"

19         (The court reporter asked the speaker to slow

20  down.)

21         MR. MASMARQUES:  "Do you know any friends or

22  associates of yours that have posted these comments?"  He

23  sat there and lied and said, "No, I do not."

24         THE COURT:  So, you're basically saying that you

25  overheard him saying that he knows the people that are

26  posting these comments?

27         MR. MASMARQUES:  Yes.

28         THE COURT:  Okay.  And that he perjured himself by

```
 1    saying otherwise.
 2              MR. MASMARQUES:  He did.  I also believe he's
 3    doing some of these comments himself.  There's no doubt
 4    about that at all.
 5              THE COURT:  All right.  What else did you want to
 6    tell me?  I think I'm following what you're telling me so
 7    far.
 8              MR. MASMARQUES:  So, your Honor, since he got the
 9    restraining order on April 4th, what's been happening online
10    is all these vile pornographic images have been going up and
11    everything.  And he's very astute.  So, he started calling
12    the local police in Marlborough, the D.A.'s office, the
13    mayor's office, and paving the way to frame me, basically,
14    right?  So, he's saying --
15              He kept calling the Marlborough police and saying,
16    Diego MasMarques has done this, and Diego MasMarques has
17    done that.  So, once he got the restraining order for five
18    years --
19              THE COURT:  What five-year restraining order?
20              MR. MASMARQUES:  Oh, back in June when he
21    originally got his restraining order.
22              THE COURT:  He got a five-year restraining order
23    against whom?
24              MR. MASMARQUES:  Against me.
25              THE COURT:  Not in this case.
26              MR. MASMARQUES:  Yes.  It was terminated.
27              THE CLERK:  I think it was an issue of service.
28    It was terminated in December.
```

1          MR. MASMARQUES:  So, that was terminated.  Once he

2     got that in June, he wasted no time in contacting the local

3     police and the Court and the DA and everybody under the sun,

4     and making these false claims that I have done these things

5     to him with these pictures.  It didn't go anywhere.  They

6     said, "No crime committed."

7          But he didn't stop at that.  Pictures started

8     going up on the web.  I even said to my wife, "Look at these

9     pictures.  You think this guy is going to try to set me up?"

10          And she goes, "With this guy, who knows?"  That

11     was my wife's answer.

12          THE COURT:  Let me jump in for a minute.  I want

13     to make sure I'm following you.  My recollection is last

14     time you said that you thought Mr. Greenspan was trying to

15     figure out who posted these -- and we'll call them

16     pornographic images -- and that there could have been any

17     number of people who did it because he was unpopular with a

18     lot of people.

19          Now, you seem to be saying something different,

20     which is that he's the one who posted them.

21          MR. MASMARQUES:  No.  I can't prove that he posted

22     them.  Just for the record, your Honor, I can't prove that

23     he did it, but it sure is coincidental how he gets a

24     restraining order, and these pictures start going up all

25     over the web.

26          THE COURT:  So, you think the timing of everything

27     is suspicious, although you can't prove it.

28          MR. MASMARQUES:  Yes, your Honor.  I can tell this

1    Court with one hundred percent truthfulness that I have zero

2    to do with any pornographic or vile images posted online.

3    Nothing.  I didn't do any of that.

4              THE COURT:  Did you follow Mr. Greenspan's

5    testimony when he was describing how it was that he

6    determined, in his estimation, that it was you who had

7    posted these issues?  Did you sort of follow his testimony

8    in that regard?

9              MR. MASMARQUES:  He talked about Comcast and IP

10   addresses.  Here's the thing.  I talked to a computer expert

11   in Boston --

12             MR. GREENSPAN:  Objection, hearsay.

13             MR. MASMARQUES:  He tried to stop me last time.

14             THE COURT:  Wait a second.  The objection is

15   overruled.  The Court can consider all relevant evidence in

16   this type of matter.  I'm not constrained by the type of

17   evidentiary rulings that would apply in all civil cases.

18   That being said, if there's really nothing in there that's

19   relevant to the Court, I'm not going to consider it.

20             And you consulted with an expert, but just tell me

21   in your words what you make out of Mr. Greenspan's sort of

22   description of how he felt he determined that this was you

23   who was posting this.  You may have consulted with other

24   people, but as you sit here today, what is your

25   understanding about, sort of, the litany of explanation he

26   went through to suggest it was you, as opposed to somebody

27   else.

28             MR. MASMARQUES:  Mr. Greenspan has not determined

1    that it was me.  He wants it to be me.

2           What I want to say, your Honor, is when an

3    individual clicks on a site, a picture or a URL online,

4    their IP address is automatically saved.  So, like, if a

5    person uses an internet service and they go and look at this

6    or they look at that, what happens is your internet service

7    then will save your IP address and connect it to that

8    picture or to that comment, and so on.

9           THE COURT:  So, the presence of your IP address,

10   you say, proves nothing?

11          MR. MASMARQUES:  Proves nothing.  I have not

12   uploaded any pictures.  I have not messed with anything.  I

13   have not done anything to his parents.  I have not called

14   his parents.

15          THE COURT:  What was the last thing you said about

16   his parents?

17          MR. MASMARQUES:  Called.

18          THE COURT:  You have not?

19          MR. MASMARQUES:  I have not.  He stated that I

20   did.  He came in here and he lied, your Honor, to get a

21   restraining order against me.  And it was purely based on

22   vindictive reasons, because he did not like the fact that I

23   got ahold of his public domain documents on his 501C3, which

24   was 50 pages.  And I uploaded eight pages on April 3rd, and

25   it put him in a bad light in regards to showing that the

26   501C3 was supposed to "help the children."

27          THE COURT:  Basically, you're telling me that you

28   were doing something to Mr. Greenspan that you feel he does

1    to others, and that as a result of that, he took vindictive

2    action against you?

3            MR. MASMARQUES:  Well, yes, because Mr. Greenspan,

4    he feels like he can do whatever he wants to anybody.  What

5    I uploaded was eight pages of public domain documents.

6    That's all it was, your Honor.  It was nothing more and

7    nothing less, eight pages.

8            When I called the State Department in Ohio,

9    somebody left a link on the Complaints Board how to find

10   the -- who to contact.

11           (The court reporter asked the witness to slow

12   down.)

13           MR. MASMARQUES:  Somebody left a link on how to

14   find the -- who to contact.

15           MR. GREENSPAN:  Objection.  That's not what he

16   said the first time.  He said "on the Complaints Board."

17           THE COURT:  The objection on that basis is

18   overruled.  Go ahead.

19           MR. MASMARQUES:  There was a comment before.

20   Like, I didn't know how to do this on my own.  I didn't know

21   how to find --

22           Somebody left a comment on the Complaints Board.

23           THE COURT:  Now, the court reporter has asked you

24   a couple of times to slow down.  You need to slow down.

25           MR. MASMARQUES:  Somebody left a -- what do you

26   call that -- like a site, like how to find documents on

27   Greenspan on his 501C3.  So, I clicked on there, and then it

28   opened up.  It showed the State Department in Cleveland,

1  Ohio, and I called them.  I think it was April 2nd or April

2  3rd.  I downloaded the documents.  I uploaded eight pages.

3          April 4th, Mr. Greenspan walked in here and got a

4  restraining order against me.  There's no need for Mr.

5  Greenspan to have a restraining order against me.  I have

6  not threatened him; I have not harassed him.  I have not

7  done anything to his family.

8          MR. GREENSPAN:  The opposite is true, your Honor.

9          MR. MASMARQUES:  The thing is Mr. Greenspan wants

10  to do it to whoever he pleases.  He wants to do this with

11  legal documents, upload and show the most negative

12  documents.

13          MR. GREENSPAN:  Objection.  This is repetitive

14  testimony.

15          THE COURT:  The objection is sustained.  Let's

16  move on.

17          MR. MASMARQUES:  So anyway, he got me charged in

18  Massachusetts with these vile pictures that we're talking

19  about.

20          THE COURT:  Did you get charged?

21          MR. MASMARQUES:  Yeah.  That charge has been

22  dismissed.  It's been dismissed.  So, I want the Court to

23  know that.

24          THE COURT:  Is this a changed circumstance since

25  last time?

26          MR. MASMARQUES:  Yes, your Honor.

27          THE COURT:  So, you're saying since you were all

28  here last time, the charges out of state against you have

1  been dismissed?

2          MR. MASMARQUES:  Yeah, one of the two has been

3  dismissed.

4          THE COURT:  What about the other one?

5          MR. MASMARQUES:  The other one is in Tweets and

6  weren't directed against him.

7          THE COURT:  No.  I'm just asking about the status

8  of the charges.

9          MR. MASMARQUES:  I apologize, your Honor.

10         So, that one with the vile pictures that he's

11  always talking about --

12         (The court reporter attempted to have the witness

13  slow down and clarify what he said in order to ascertain a

14  complete record.)

15         THE COURT:  Is there another criminal charge or

16  charges?

17         MR. MASMARQUES:  There's another one that's going

18  to be dismissed next month in June.

19         THE COURT:  Is it the same case?

20         MR. MASMARQUES:  The same case.

21         THE COURT:  What's the allegation in that other

22  charge?

23         MR. MASMARQUES:  It's Tweets.

24         THE COURT:  What kind of Tweets?

25         MR. MASMARQUES:  On Twitter.

26         THE COURT:  What kind of Tweets?

27         MR. MASMARQUES:  Saying that he harasses people.

28         THE COURT:  In what manner?  What are the

```
 1    allegations with respect to the Tweets?
 2              MR. MASMARQUES:  To be honest with you, your
 3    Honor, my lawyer isn't even fully aware, because the date of
 4    the allegation is June 26th.  When we were looking at the
 5    Tweets, there's no Tweets on June 26th.  I'm sorry, October
 6    26th.  I apologize.
 7              THE COURT:  Why wasn't that charge dismissed last
 8    time?
 9              MR. MASMARQUES:  Because my lawyer was going to
10    file a motion to dismiss them when I was in court last time,
11    and he didn't get around to it.  He talked to the D.A.'s
12    office and is going to be going in there on June 10th.
13              THE COURT:  What was the reason for dismissal of
14    the other charge?
15              MR. MASMARQUES:  The lawyer said there's no
16    connection.  I haven't done any of these, you know.
17              MR. GREENSPAN:  Objection.  There's been no
18    evidence of any dismissal.
19              THE COURT:  Well, he says he has knowledge of
20    that.  That's fine.
21              MR. GREENSPAN:  There's no evidence.
22              THE COURT:  Overruled.
23              MR. MASMARQUES:  I'm not the one being charged,
24    your Honor.
25              THE COURT:  Do you have any documentation showing
26    the disposition of that case?  In other words, showing the
27    charge has been dismissed.
28              Did you bring any of those documents with you?
```

```
 1              MR. MASMARQUES:  No, I have not, your Honor.  My
 2    lawyer is very busy.
 3              THE COURT:  So, you're basing this on what your
 4    attorney told you.  Is that right?
 5              MR. MASMARQUES:  I appeared in court, and he said
 6    the charge of the pictures has been dismissed.  I'm not
 7    being charged with anything.
 8              THE COURT:  That happened in court?
 9              MR. MASMARQUES:  Yes.  I was in court April 18th.
10              THE COURT:  Is it your understanding that Mr.
11    Greenspan was a complaining witness in that case?
12              MR. MASMARQUES:  He was.  There was something very
13    important I would like to say to the Court --
14              THE COURT:  Go ahead.
15              MR. MASMARQUES:  -- how this came about.  This
16    came about because Mr. Greenspan continuously called, like,
17    over five times a day sometimes, calling the mayor's office,
18    calling the Marlborough police, calling the victim
19    advocate's office, calling the D.A.  He threatened to sue
20    them in the Massachusetts Superior Court where charges were
21    put against me.  My lawyer that they had --
22              MR. GREENSPAN:  Objection.  There's no evidence of
23    this.
24              MR. MASMARQUES:  My lawyer said they had had it
25    with him.  The police said --
26              THE COURT:  Okay.  There's an objection pending.
27    Basically, the objection is that this is outside the scope
28    of your knowledge.  Basically, you're talking about other
```

1  people's motivations for doing something.

2          MR. MASMARQUES:  I didn't do this.

3          THE COURT:  I'm going to accept the statement that

4  you deny doing this.  The rest of the answer is stricken as

5  not relevant.

6          I wish you had some documentation showing what

7  happened in the case, but since you say you were in court

8  and you know about the disposition, I will accept your

9  testimony on this basis.

10          MR. MASMARQUES:  On April 18th, that charge with

11  the pictures was --

12          THE COURT:  Yeah, I understand it's your opinion

13  that Mr. Greenspan coerced the prosecution or law

14  enforcement to file the charges.  That's your opinion.

15          MR. MASMARQUES:  Your Honor, that's one hundred

16  percent, and I can tell you the reason.  The reason is

17  because on October 9th, he was served the restraining order,

18  and he took to Twitter and started harassing me on Twitter,

19  putting my home address online.

20          MR. GREENSPAN:  Objection.  This is repetitive.

21          MR. MASMARQUES:  It's not repetitive.  My

22  restraining order specifically states he's not to access any

23  of my personal information, not to upload it to search

24  engines.

25          THE COURT REPORTER:  I really need him to slow

26  down.

27          THE COURT:  You need to slow down for the court

28  reporter.

1      And, you know, I'm going to overrule that

2  objection.  You have very little time left.  I don't think

3  you want to spend that time with repetitive information.

4  But I understand what you have told me so far.

5      Let me recap, because I want to know if there's

6  anything else important.  First of all, you said that Mr.

7  Greenspan presents an unfair sort of picture of events that

8  happened by accessing negative documents online, and the

9  other documents which would provide a fuller context, a more

10  reasonable context, are not available online.  He's just

11  publishing, sort of, the worst of the worst and making that

12  accessible.  And you're saying he's doing that, presenting

13  that one-sided story, for purposes of harassment.

14      You also said that he had repeatedly, I think,

15  called you a rapist and a murderer.  I think you're

16  referring in that regard to his Instagram?

17      MR. MASMARQUES:  Twitter.

18      THE COURT:  Twitter.  Also, you said that this

19  whole issue of the pornographic images was something that

20  you now believe was done by Mr. Greenspan himself to try and

21  frame you, that you've never engaged in that activity

22  involving him or his family, and that he pressured the

23  prosecutors into filing charges against you that were

24  baseless charges.  One of those charges has been dismissed.

25  You expect the other one to be dismissed.

26      You also said that the fact that your IP address

27  showed up with reference to these pornographic images does

28  not in any way, shape, fashion or form establish that you're

```
1  responsible for them?
2            MR. MASMARQUES:  That's correct, your Honor.
3            THE COURT:  Is there anything else you want to say
4  in conclusion?
5            MR. MASMARQUES:  Mr. Greenspan is facing charges
6  himself now in Marlborough Federal Court.
7            MR. GREENSPAN:  Objection.  There's no evidence of
8  that.
9            MR. MASMARQUES:  He has to show up in court on May
10 9th.
11           THE COURT:  Stop talking for just a moment.
12           Have you looked at it?
13           MR. GREENSPAN:  Yes, your Honor.  I would just
14 like to note this is actually not what he has just
15 described.
16           THE COURT:  That's fine.  We're just going to mark
17 it for the record.  Hand it to the deputy, please.  We'll
18 have it marked as Exhibit G.  We'll return it to you.
19           (Respondent's Exhibit G was marked for
20 identification.)
21           THE COURT:  Mr. MasMarques, to the extent you're
22 delaying these things, you're cutting off the time you're
23 going to have.
24           MR. GREENSPAN:  This is actually not the same.
25 They're different because he whited out part of the
26 document.
27           MR. MASMARQUES:  I whited out my address.
28           MR. GREENSPAN:  Well, that means they're not the
```

```
 1   same.
 2              THE COURT:  What is it you're presenting to the
 3   Court?
 4              MR. MASMARQUES:  Criminal charges against Mr.
 5   Greenspan in Massachusetts, your Honor.  It doesn't have my
 6   address on there.  He doesn't need to know my address.  He
 7   knows too much of my business already.
 8              The other thing is --
 9              THE COURT:  Hold off.  It's a Notice of
10   Magistrate's Hearing on Complaint Application is the title
11   of the document, Exhibit G.
12              What is the significance of that document?
13              MR. MASMARQUES:  Criminal charges have been filed
14   against Mr. Greenspan for harassment.
15              MR. GREENSPAN:  Objection.  There's no evidence of
16   that.
17              MR. MASMARQUES:  Multiple restraining orders.
18              THE COURT:  Are you saying that this document,
19   Exhibit G, reflects the fact that criminal charges have been
20   filed against him?
21              MR. MASMARQUES:  Yes, your Honor.
22              THE COURT:  The document is going to speak for
23   itself.
24              In any event, let's finish up.  You're sort of
25   running low on time here.
26              MR. MASMARQUES:  Mr. Greenspan keeps saying, you
27   know, that willful homicide was the charge.  He's made some
28   kind of motion online and sent it to the courts.
```

```
1              THE COURT:  What was the charge?
2              MR. MASMARQUES:  The charge was manslaughter.  I
3  can prove it right here.
4              THE COURT:  If you have a document that
5  establishes that, we'll have it marked as Exhibit H.
6              MR. MASMARQUES:  I do.
7              THE COURT:  Slow down.  Show it to Mr. Greenspan.
8              MR. MASMARQUES:  I just don't want --
9              THE COURT:  Listen.  We marked documents long ago.
10 To the extent there are any documents, let's produce them so
11 we can move on.  I really don't like to spend a lot of time
12 on documents.  It's going to cut into your testimonial time.
13             Are there any other documents?  Yes or no.
14             MR. MASMARQUES:  Yes.
15             THE COURT:  You can talk about the documents.  You
16 don't necessarily have to admit them or seek to admit them.
17 We can't have these documents trickling in.
18             You'll remember at the beginning of this case, I
19 asked the parties to identify documents.  Now, if you have
20 documents that you didn't produce before, let's get them all
21 identified now, and then you'll be able to go forward with
22 your testimony without stopping.
23             MR. MASMARQUES:  I don't know if this is
24 important, but I don't have any criminal record at all.  And
25 he said --
26             MR. GREENSPAN:  Objection, your Honor.
27             THE COURT:  Gentlemen, I know you're not
28 attorneys, but we have to have some semblance of order here.
```

1    Let's see if you have any other documents.  If you do, hand

2    them to our deputy at once.  We'll get them marked and

3    identified, give them back to you, and you can discuss them

4    as you see fit.

5              Is there anything else?

6              MR. MASMARQUES:  Basically, my court records --

7              THE COURT:  I asked you a question.  I expect you

8    to answer.  Are there any other documents?

9              MR. MASMARQUES:  No.

10             THE COURT:  The ones you produced, I'll go ahead

11   and identify for the record.  We'll get them tagged.  Then

12   you can talk about them.

13             Next in order will be?

14             THE CLERK:  H.

15             THE COURT:  It was the Magistrate's --

16             THE CLERK:  That's G.

17             THE COURT:  So, H.  Is this one document that goes

18   together or separate documents?

19             MR. MASMARQUES:  It's separate.

20             THE COURT:  Exhibit H is going to be a document

21   with a header of The Commonwealth of Massachusetts Executive

22   Office of Public Safety and Security.  You can explain what

23   that is.  It says the request date is March 21st, 2017.

24   When you get it back, you can explain that.

25             (Respondent's Exhibit H was marked for

26   identification.)

27             Then Exhibit I is going to be a document again

28   from The Commonwealth of Massachusetts Department of

1   Criminal Justice Information Services.  And you can explain

2   that document when you get it back.

3           (Respondent's Exhibit I was marked for

4   identification.)

5           And then Exhibit J looks like a printout showing

6   the disposition of a criminal matter.  It has charges of

7   burglary and manslaughter.

8           (Respondent's Exhibit J was marked for

9   identification.)

10          MR. MASMARQUES:  If I may, your Honor --

11          THE COURT:  Let me have you do this.  I think by

12  skipping around, it's not that helpful to me.  You wanted

13  the Court to consider these documents.  Wait until you get

14  them back.  Starting with the one you haven't described yet,

15  tell me what each one of them is and the importance to your

16  case, and then you can wrap up.

17          And I think Exhibit G was the --

18          THE CLERK:  Notice of Magistrate Hearing in

19  Massachusetts.

20          THE COURT:  If you want to say anything about

21  Exhibit G to Exhibit I think it's I now, you can go over

22  those each and tell me what the significance of them is.

23  Okay?  G through J.  And I think you can do that in short

24  order, and then any closing thoughts that you have.

25          MR. MASMARQUES:  So, G --

26          THE COURT:  Well, wait until you get them back and

27  put them in that order.  G is this, H is this, I is this, so

28  I understand their importance to the case.

1              I see our deputy is returning the documents to

2    you, if you want to go over them in order, starting with G.

3    G might be already on the table there, possibly.

4              MR. MASMARQUES:  Yes, your Honor.  So, G is a

5    criminal complaint against Mr. Greenspan for abusing -- for

6    basically a violation of a restraining order.

7              THE COURT:  Which restraining order would that be?

8              MR. MASMARQUES:  The one that I have against him.

9              THE COURT:  Here?

10             MR. MASMARQUES:  Yes.

11             THE COURT:  In what jurisdiction is that?

12             MR. MASMARQUES:  Massachusetts.

13             THE COURT:  So, you're saying they're charging him

14   there with violating a California restraining order?

15             MR. MASMARQUES:  Yes.

16             MR. GREENSPAN:  Objection.  That's simply not what

17   the document says.

18             THE COURT:  You can cross-examine him.  You can

19   inquire about that.

20             Exhibit H?

21             MR. MASMARQUES:  Exhibit H is a -- in 2017 -- I

22   usually do it once a year.  It's a CORI -- It's a copy of no

23   criminal record.

24             THE COURT:  So, it's a printout showing no

25   criminal record?

26             MR. MASMARQUES:  Yeah.  No criminal record in

27   Massachusetts.

28             THE COURT:  In Massachusetts.

```
 1              MR. MASMARQUES:  Yes.  And I have no criminal
 2    record anywhere in the United States, as Mr. Greenspan
 3    falsely said to the Court last December 12th.
 4              THE COURT:  Previously, we heard testimony that
 5    you were convicted in Europe.  You came back, and you were
 6    under a period of probation.  You had a conviction on your
 7    record, and you were being supervised here.
 8              Are you still on probation?
 9              MR. MASMARQUES:  No.  I've been long off of that,
10    your Honor.
11              THE COURT:  Did you get your record cleared or
12    expunged?
13              MR. MASMARQUES:  Yes.  Well, what happened --
14              Spain is in the process of expunging it now.
15              THE COURT:  But it hasn't happened yet?
16              MR. MASMARQUES:  No.  I was told by Federal
17    Probation that once I get that document, probably like
18    sometime this year, probably in the fall, I'm going to show
19    it to them, and they're going to help me expunge all these
20    things from the Federal system.
21              THE COURT:  So, I'm given to understand that
22    there's currently a criminal record, but you're anticipating
23    it's going to get cleared sometime in the future?
24              MR. MASMARQUES:  Yes.
25              THE COURT:  But your position is that Mr.
26    Greenspan has erroneously claimed that you have a conviction
27    that you suffered here.  I need to find out what it is he
28    said relative to that criminal matter that you believe is
```

```
 1   harassing, as opposed to an exercise of his free speech
 2   rights?
 3            MR. MASMARQUES:  Sure.  He states, for example,
 4   not that I'm an alleged rapist or I was accused of rape.  He
 5   says I'm a rapist.
 6            THE COURT:  Well, you're talking about his Tweets
 7   now, right?
 8            MR. MASMARQUES:  Yes, and comments online.
 9   They're all over the search engines.  I'm not a rapist.  I
10   haven't been convicted of a rape.  He's putting that all
11   over the place.
12            He's putting charges that I'm a murderer.  I'm not
13   a murderer.  He doesn't know what happened in Spain.
14            THE COURT:  Again, we're getting into the
15   situation that I understand there was an escalated conflict,
16   and then you indicated that Mr. Greenspan took to his
17   Tweets, and that's when he started making these statements,
18   not on his PlainSite website, but his own personal Tweets,
19   calling you a murderer and a rapist?
20            MR. MASMARQUES:  Yes.  He was doing it, actually,
21   before that.  He was doing it through March of 2018 as well.
22            THE COURT:  Tweets?
23            MR. MASMARQUES:  No.  He was uploading on the
24   Complaints Board, and I read it.
25            MR. GREENSPAN:  Objection, your Honor.  There's no
26   evidence.
27            MR. MASMARQUES:  March 28, 2019.  That's why I
28   called him and said, "If you don't stop, I'm going to file a
```

1   restraining order against you."  That's what happened.

2   There's no need for Mr. Greenspan --

3           THE COURT:  You're going to have a chance to

4   cross-examine him on these issues.  Let's go to I.

5           MR. MASMARQUES:  So, I, I have a computer account

6   with --

7           (The witness was asked to clarify what he said.)

8           MR. MASMARQUES:  With C-O-R-I.

9           THE COURT:  And what's the significance of that

10  document?

11          MR. MASMARQUES:  No criminal record.  That's from

12  today.

13          THE COURT:  Okay.  This is the thing I'm having

14  sort of a hard time wrapping my head around.  You're saying

15  you have these printouts saying no criminal record, yet

16  you're conceding that you have suffered a conviction in

17  Europe, in Spain I believe, and when you came back here you

18  were under a period of supervision, and the records haven't

19  been cleared yet.

20          So, how do you explain the fact that you were

21  convicted, and yet you have the printouts saying no

22  convictions?  How do you explain that, given the fact that

23  you say your record hasn't been cleared yet?

24          MR. MASMARQUES:  I did enter an exhibit last time

25  I was here in court from the State Department.  Under U.S.

26  law, you cannot be convicted twice for the same crime.

27          THE COURT:  But we're talking about the conviction

28  that you suffered in Spain, right?

```
 1              MR. MASMARQUES:  Yes.
 2              THE COURT:  Was that for burglary and
 3   manslaughter?
 4              MR. MASMARQUES:  Oh, that's another thing.
 5              THE COURT:  Answer my question.
 6              MR. MASMARQUES:  Yes, but it wasn't burglary.
 7   What happened was --
 8              THE COURT:  Sir, we're not going to re-litigate
 9   the criminal case.  And I don't think you want to.  Just
10   tell me what charges you were convicted of in Spain.  What's
11   the equivalent?  One is manslaughter, right?
12              MR. MASMARQUES:  It was a little lesser, but they
13   put it as manslaughter.  And, two, breaking and entering.
14   But under the Federal system, under the Federal legal
15   system, the law, they don't have breaking and entering, I
16   was told by Probation.  So, they put it as burglary.
17              THE COURT:  Got it.
18              MR. MASMARQUES:  And this is the problem.
19              THE COURT:  So, we'll call it manslaughter and
20   breaking and entering.  But the fact is you suffered those
21   convictions, and your record has not yet been cleared.  True
22   or false?
23              MR. MASMARQUES:  It's true, but I don't have a
24   U.S. conviction.
25              THE COURT:  No.  I understand.  That's why I asked
26   the question before.  You've suffered a conviction; your
27   record hasn't been cleared.  Are you alleging that what Mr.
28   Greenspan published is harassing because he's suggested that
```

```
 1   it was a conviction that you suffered in this country?
 2           MR. MASMARQUES:  He's -- he doesn't know what he's
 3   doing with the legal document.
 4           THE COURT:  But when you won't answer my
 5   question --
 6           MR. MASMARQUES:  Yes.
 7           THE COURT:  -- directly or help me understand,
 8   it's going to be murky and unhelpful.  I think that I
 9   mentioned this multiple times before.  I'm sorry for
10   sounding like a broken record, but there's got to be a
11   distinction between harassment and an exercise of free
12   speech.
13           What I'm asking you is, what is it that he
14   published, other than these Tweets and message boards saying
15   rapist and murderer, what is it that he published on his
16   PlainSite website, if that's what we call it, about this
17   conviction that you suffered in Spain that you believe
18   constitutes harassment?  That's what I need to know from you
19   in a very cogent manner.
20           MR. MASMARQUES:  Yes, your Honor.  What you're
21   saying is correct.  He's making it look like the charge is
22   from the United States.
23           THE COURT:  And what did he do or say that makes
24   it appear that the conviction was suffered here?
25           MR. MASMARQUES:  He's just leaving certain
26   documents open.
27           THE COURT:  So, you think he's giving sort of an
28   unfair impression of what's going on because he's publishing
```

```
 1    some documents without the others?

 2               MR. MASMARQUES:  Yes.

 3               THE COURT:  But you were under a period of

 4    probation in this country stemming from these convictions,

 5    correct?

 6               MR. MASMARQUES:  But it's a foreign conviction.

 7    There's a difference.

 8               THE COURT:  I'm just asking.

 9               MR. MASMARQUES:  Yes.

10               THE COURT:  The Court's understanding is that your

11    main complaints are that he's presenting sort of a skewed

12    view of what's happening because he's presenting only part

13    of the picture, and the most negative part of the picture,

14    number one.  And, number two, he's suggesting or indicating

15    or expressing that the convictions were suffered in the

16    United States, as opposed to a foreign country, and possibly

17    mischaracterizing the nature of the charges you were

18    convicted of.

19               Does that sort of sum it up?

20               MR. MASMARQUES:  It does, your Honor.

21               THE COURT:  In the time that's left, why don't you

22    finish up.

23               MR. MASMARQUES:  I also wanted to state that when

24    Mr. Greenspan came here December 12th, he went through the

25    14 exhibits, and before he even handed them to me, he was

26    narrating No. 4.

27               THE COURT:  Narrating No. 4 what?

28               MR. MASMARQUES:  Like, he was introducing the
```

1   fourth exhibit before his attorney even gave me his file of

2   exhibits.

3          THE COURT:  Let's not spend the last time that you

4   have about something petty like that.  Let's talk about

5   today's exhibits.

6          MR. MASMARQUES:  Last time I was here, I entered

7   my 22 exhibits, but I was not allowed to go through them.

8          THE COURT:  Allowed to go through what?

9          MR. MASMARQUES:  So, I gave you 22 exhibits.  When

10  I was, like, going through the case, I had to pull the

11  exhibits.  I had to pull the original exhibits out of my

12  folder.  I gave you a folder, your Honor, and I gave the

13  other party a folder.

14         THE COURT:  Well, I mean, if you don't mention

15  documents in your testimony, the Court is not going to

16  consider them.  This is like our third session here.  I had

17  told you both I was somewhat reluctant even to schedule a

18  third session, but I wanted to give you every opportunity to

19  wrap up and say the things that maybe you hadn't had the

20  chance to say before and highlight some things that were

21  important to you.  So, let's have you do that and wrap up.

22         MR. MASMARQUES:  I was mentioning that, because in

23  those documents there was a lot of important information

24  about what Mr. Greenspan has been doing.

25         THE COURT:  You can tell me in your own words

26  also.

27         MR. GREENSPAN:  Your Honor, just as a procedural

28  matter, I think last time you allocated 45 minutes for each

1   side.  We've reached that point.

2           THE COURT:  I did.  I told you what your stopping

3   points are, and we're going to conclude at 3:30.

4           I need to speak with Mr. Greenspan unless you have

5   something you want to say in conclusion.

6           MR. MASMARQUES:  Just an affidavit from my wife,

7   your Honor.

8           THE COURT:  That's going to be next in order,

9   which I believe at this juncture is Exhibit K.  I'll take a

10  look at that.

11          (Respondent's Exhibit K was marked for

12  identification.)

13          MR. MASMARQUES:  Basically, what Mr. Greenspan has

14  been doing to my wife and I has been putting a lot of

15  economic hardship on us.  This is the main reason why I'm

16  here today, because he has not allowed me to find adequate

17  employment.

18          I have a degree in marketing.  I read, write, and

19  speak three languages, and I cannot find good employment

20  like I used to because of what Mr. Greenspan has been doing,

21  you know?  It's not right, you know?  Just because somebody

22  can do certain things, doesn't mean it's right.  This is

23  over the top when it comes to personal (inaudible phrase.)

24          Before I forget, your Honor, I would like to have

25  what he uploaded, my social security and my driver's license

26  number and my date of birth -- he uploaded that.  I was

27  trying to see if I could get that sealed.

28          THE COURT:  You're saying he uploaded that?

1          MR. MASMARQUES:  He uploaded it here on the court

2     docket.  It was a motion that I had filed.

3          THE COURT:  You just want that to be redacted from

4     the filings?

5          MR. MASMARQUES:  I would like to have it sealed.

6          THE COURT:  Or excised.

7          MR. MASMARQUES:  Yes, ma'am.  I'm sorry.  Yes,

8     your Honor.

9          THE COURT:  That would be your home address as

10    well as your social security number?

11         MR. MASMARQUES:  Yes.  Driver's license and

12    date --

13         THE COURT:  Mr. Greenspan, did you publish his

14    social security and driver's license number as part of your

15    filings in this matter?

16         MR. GREENSPAN:  No, your Honor.

17         THE COURT:  In what documents did Mr. Greenspan

18    disclose that information?

19         MR. MASMARQUES:  On the police report.

20         THE COURT:  A police report that was admitted as

21    an exhibit?

22         MR. MASMARQUES:  Yes, he did.

23         THE COURT:  He disclosed that information, and you

24    want it to be redacted?

25         MR. MASMARQUES:  Yes, your Honor.

26         THE COURT:  How did you obtain an unredacted copy

27    of the police report?

28         MR. GREENSPAN:  Your Honor, I actually don't know

1   what he's talking about.

2          THE COURT:  Was it one of the documents that was

3   presented previously?

4          MR. MASMARQUES:  Yes.  I'm trying to think.

5          THE COURT:  Was it a police report?

6          MR. MASMARQUES:  Yes.

7          THE COURT:  We can locate it, then.

8          MR. MASMARQUES:  He got the clerk of the

9   Marlborough District Court to send it to him.

10          THE COURT:  Is that who you got it from, Mr.

11   Greenspan?

12          MR. GREENSPAN:  I still don't know what document

13   he's referring to.

14          MR. MASMARQUES:  He got it from the clerk.

15          THE COURT:  What clerk?

16          MR. MASMARQUES:  He got the police report.  He

17   knows exactly what I'm talking about, your Honor.  It is

18   the -- it is the charges -- it is the charges they put on

19   me.

20          THE COURT:  I don't want to look through this

21   whole thing.  I have the whole list of exhibits.

22          MR. GREENSPAN:  Your Honor, if it helps, I think

23   what he's talking about is the Declaration I filed on

24   December 6th, 2018.  And as part of that Declaration,

25   there's an attachment which is the fax I received from the

26   Marlborough District Court.  The version of that that is

27   online has his social security number and driver's license

28   number redacted already.

1      MR. MASMARQUES:  Date of birth.  There's no reason

2 for that docket to even be on the docket, your Honor

3 (verbatim).

4      THE COURT:  But you're saying that information is

5 already redacted?

6      MR. GREENSPAN:  Anything that wasn't already

7 public domain has been redacted, yes.  Especially the social

8 security number and the driver's license number, are

9 redacted.

10      THE COURT:  If you can further identify the

11 document where you think your social security number

12 appears, then we can do that.  I think that's getting into

13 the motions.  You need to wrap up your testimony.

14 Otherwise, we're going to have to cut you off, and I really

15 don't want to do that.

16      MR. MASMARQUES:  It's from December 6th, 2018.

17      THE COURT:  He uploaded what?

18      MR. MASMARQUES:  He uploaded the complaint against

19 me that had my social security and driver's license number.

20      THE COURT:  So, you're saying it was a public

21 domain document?

22      MR. MASMARQUES:  No, it wasn't public domain.  He

23 took it.  He got the clerk to fax it to him.  I don't know

24 how he did this.

25      THE COURT:  Did you get a copy of an unredacted

26 complaint bearing his social security number which then you

27 filed with the Court?

28      MR. GREENSPAN:  Yes.  And I filed the public

1    record document with the courts so you would be aware of the

2    criminal charges.

3              THE COURT:  Did you get it directly from the

4    clerk?

5              MR. GREENSPAN:  Yes, I did.

6              THE COURT:  Okay.  And how did you get them to

7    send you an unredacted copy of that documentation?

8              MR. GREENSPAN:  I simply asked for a copy of the

9    complaint.

10             THE COURT:  All right.  And you don't have any

11   objection of that information being redacted for purposes of

12   this court filing?

13             MR. GREENSPAN:  I don't have any objection to a

14   redaction.  I do object to a document being sealed in its

15   entirety.

16             THE COURT:  So, as far as your request to seal, it

17   needs to be narrowly tailored.  And there's no objection to

18   me redacting the information that you want to have redacted.

19             Is that satisfactory to you?

20             MR. MASMARQUES:  No, your Honor, because the

21   charge has been dismissed.

22             THE COURT:  See, I think we're talking in circles

23   here.  My understanding, based on your testimony, was that

24   you objected to having your social security number and your

25   driver's license disclosed.  I'm indicating we'll have that

26   redacted.

27             What, if anything else, is confidential that you

28   feel needs to be eliminated from the court record?

1          MR. MASMARQUES:  The entire report.

2          THE COURT:  Why?

3          MR. MASMARQUES:  He does it to shame me.  It's

4   what he does.

5          MR. GREENSPAN:  Objection.

6          THE COURT:  You're talking about a court filing.

7          MR. MASMARQUES:  No.

8          THE COURT:  Okay.  If you're asking that court

9   documents be sealed, the Court can make --

10          MR. MASMARQUES:  That report doesn't belong in

11   there.

12          THE COURT:  If it was something submitted to the

13   Court, either as evidence or filings with the Court, I can

14   address it.  But if you're asking me to make an order as

15   part of what I'm doing here today to tell some other entity

16   to seal their documents, documents that are not being kept

17   or retained by the Court, if that's your request, it's

18   denied.  And if you cannot articulate your request in a

19   clear manner, I'm not going to be able to provide any relief

20   to you.

21          And you've run out of time.  We're going to put

22   that aside.  As soon as we finish with the balance of the

23   hearing in this case, we can readdress it.

24          Cross-examination.

25          MR. GREENSPAN:  Thank you, your Honor.

26                    CROSS-EXAMINATION

27   BY MR. GREENSPAN:

28      Q    Mr. MasMarques, when you have filled out the

```
 1    PlainSite Contact Us form, as you have on a number of
 2    occasions.  You provided the number of --
 3              THE COURT:  No, no.  Ask a simple question.
 4              MR. GREENSPAN:  Well, I'm getting to that.
 5         Q    (By Mr. Greenspan) You provided a number of
 6    different e-mail addresses.
 7         In total, how many different e-mail addresses do you
 8    have?
 9              MR. MASMARQUES:  I only have, I think, two e-mail
10    addresses.
11         Q    Can you tell me what those are?
12              MR. MASMARQUES:  85086 -- I don't want Mr.
13    Greenspan getting any more of my information, your Honor.
14              THE COURT:  We've got to have some semblance of
15    order.  This is our third session in this case.  Let's look
16    at it this way.  You're looking at a computer screen, Mr.
17    Greenspan.  Tell him what the e-mail addresses are that you
18    have.  He says there are two, and you can recite them first.
19    Then he'll tell you whether that's one of his or not.
20         Q    (By Mr. Greenspan) Okay.  Have you ever used the
21    e-mail address 986842A@gmail.com?
22         A    No.
23         Q    Would you agree that many of your e-mail addresses
24    contain both letters and numbers?
25         A    Letters and numbers?  Only numbers.
26         Q    Only numbers?
27         A    Yes.  That's because --
28              THE COURT:  You don't have to say "because," or
```

1    we're going to be here all day and another day if we don't

2    give succinct answers.  I don't want narrative answers when

3    they're not required.

4         Q    (By Mr. Greenspan) Have you ever e-mailed the

5    Think Computer Foundation e-mail address

6    Info@ThinkComputer.org?

7         A    No.  I don't remember the exact specifics, but I

8    know in August of 2017, I e-mailed on the site.  There was a

9    place where you could e-mail them, requesting my documents

10   to be removed.  No answer.

11        Q    Can you specify which site?

12        A    PlainSite.

13        Q    So, that's different from the Think Computer

14   Foundation site?

15             THE COURT REPORTER:  I need you guys to slow down

16   with these websites, and please use the microphone.

17             THE COURT:  And keep your voices from going down.

18             THE COURT REPORTER:  So, could you please ask the

19   last question?

20             MR. GREENSPAN:  Sure.

21        Q    (By Mr. Greenspan) Did you visit the Think

22   Computer Foundation site specifically?

23        A    No, I did not.  Just PlainSite.

24             THE COURT:  So, you made a request that PlainSite

25   remove this information about your criminal history?

26             THE WITNESS:  Yes.  I didn't know who Mr.

27   Greenspan was at the time, yes.

28        Q    (By Mr. Greenspan) How many accounts do you have

1   on ComplaintsBoard?

2      A    One.  One.  I think one account.

3      Q    Okay.  What is the name of that account?

4      A    I don't recall.  It's when I uploaded eight pages.

5      Q    Okay.  Would you call Twitter a social media site?

6   Would you just agree with that statement that it's a social

7   media site?

8      A    A social media site?  Yes, I would.

9      Q    Do you control the Twitter account

10  @badbadwebsites, which was established on or around March

11  30th, 2018?

12     A    No.

13     Q    Do you control or have you ever controlled the

14  Twitter account @R62607249?

15     A    I don't recall.  I don't remember.

16     THE COURT:  Mr. Greenspan, this is really not an

17  opportunity for you to find out who has been posting

18  negative information about you.  Just ask about information

19  that you believe is associated with him.  This is not a

20  discovery expedition here.

21     You started out by asking him about his e-mail

22  accounts.  Why don't you finish with that, if that is what

23  you're interested in.  And let's move on to other matters.

24     Q    (By Mr. Greenspan) Mr. MasMarques, can you explain

25  why two of the e-mail addresses you used to send information

26  to PlainSite are already associated with the ComplaintsBoard

27  accounts, if you only have -- how many e-mail addresses?

28     THE COURT:  Make sure your voice doesn't drop

1    down.

2           MR. GREENSPAN:  I'm sorry.

3      Q    (By Mr. Greenspan) Can you please explain why

4    multiple e-mail addresses you used in the past are already

5    associated with ComplaintsBoard accounts?

6      A    Well, they're not associated with me.

7           THE COURT:  Mr. MasMarques, it might be helpful if

8    you put your papers down.  I want you to focus on the

9    questions that are being posed.  Now, if you need to refer

10   to the papers in order to refresh your memory, let me know.

11   Otherwise, I think it might be helpful to focus on the

12   questions.

13          MR. MASMARQUES:  Sorry.

14     Q    (By Mr. Greenspan) Can you repeat your answer,

15   please?

16     A    Could you repeat the question?

17     Q    Can you explain why multiple e-mail addresses that

18   you used to send PlainSite requests through the Contact Us

19   form, why those e-mail addresses are already associated with

20   ComplaintsBoard accounts?

21     A    They're not associated with me.  Those are not my

22   e-mail accounts.

23     Q    Okay.  You mentioned in your testimony today that

24   I had called you at some point.  Do you have a record of

25   that call?

26     A    Yes.  Well, I didn't say you.  I said we got a lot

27   of hang-up calls.  I never said specifically you called.

28     Q    Do you have any evidence that I called or was

1    associated with those calls in any way?

2        A    No evidence.  If I may, somebody was calling us to

3    pay $4,500 to remove each URL, for a total of $35,000, to

4    remove all the PlainSite.org URLs.

5            THE COURT:  On PlainSite?

6            THE WITNESS:  Yes.  They called us persistently.

7    This happened right before --

8            THE COURT:  You're saying they're trying to get

9    you to pay them to remove this negative information?

10           THE WITNESS:  Yes.  They said they're a reputation

11   management company.  They said they know Greenspan quite

12   well.  They said each URL could be permanently removed for

13   the price of $4,500.

14           THE COURT:  Mr. Greenspan, do you work in

15   cooperation with that type of agency so that they can seek

16   payment for you to remove items from your website?

17           MR. GREENSPAN:  No.

18           THE COURT:  So, you're saying you have no

19   association with any person or entity --

20           MR. GREENSPAN:  I have absolutely no affiliation

21   with it.

22           THE COURT:  -- that seeks monetary payment for you

23   to take down derogatory comments.

24           MR. GREENSPAN:  That is correct.  In fact --

25           THE COURT:  Thank you.  You can go on with your

26   cross-examination.

27           MR. GREENSPAN:  I'd like to provide a document to

28   be marked.

```
 1              THE COURT:  Why don't you finish your
 2   cross-examination, please.
 3              MR. GREENSPAN:  Well --
 4              THE COURT:  He's suggesting, obviously, that you
 5   have an ongoing business association, some type of
 6   association with, I guess, reputation managers.  Once you
 7   post the negative information, they seek a monetary payment
 8   to cause those items to be removed.  So, he's answered your
 9   question, and you can go on to the next one.
10              MR. GREENSPAN:  Okay.
11     Q    (By Mr. Greenspan) Mr. MasMarques, did you file a
12   complaint recently with the Ohio Attorney General?
13     A    Yes, I did.
14              MR. GREENSPAN:  I think I am content to leave
15   things to stand at those questions.
16              THE COURT:  Sorry?
17              MR. GREENSPAN:  I think I'm finished with
18   cross-examination.
19              THE COURT:  Unless there's anything further, we'll
20   hear from Mr. Greenspan now (verbatim.)
21              MR. MASMARQUES:  I have a copy of the Twitter
22   rules and regs.
23              THE COURT:  Do you want to answer his question he
24   asked about how you characterized Twitter, you agreed it was
25   social media.  I know you said he called you a rapist and a
26   murderer, and that was on Twitter, and that was one of your
27   objections for bringing this action.
28              Is there anything else you wanted to say?  We know
```

1  his Twitter account got closed and reopened.  What was it --

2  two times?

3          MR. MASMARQUES:  Three.

4          THE COURT:  Let's go on from there.

5          MR. GREENSPAN:  Your Honor, it's my belief that

6  the case before you today is factually complex, but we

7  believe legally very straightforward.  PlainSite, a website

8  run by my company Think Computer Corporation and my

9  nonprofit Think Computer Foundation --

10          THE COURT:  You need to slow down a tad.

11          MR. GREENSPAN:  Sure.  -- publishes court records

12  on the internet so that the public can have a better

13  understanding how the justice system works and see what it

14  is actually doing.

15          THE COURT:  What about the claims of Mr.

16  MasMarques that you don't really publish the entirety of the

17  court records, but the documents that are accessible to

18  folks visiting your website, they are just sort of negative

19  information, as opposed to other information which might be

20  exonerating, for example?

21          MR. GREENSPAN:  That's false.  There's over

22  4.5 million PDFs on the server, so the notion that I could

23  personally, or my staff could personally, review every

24  single PDF and assess whether it was negative or positive

25  for one party or another is ludicrous.

26          THE COURT:  But you heard his testimony earlier

27  where he presented a document that I think is on the exhibit

28  table that showed demonstrably the fact that there were

1   certain documents that were accessible and others that were

2   not.  Do you want to address that?

3           MR. GREENSPAN:  Sure.  So, if you actually look --

4   I believe this is Exhibit F.  There's a link in the middle

5   of page 1 that shows that there's actually two docket

6   entries for Mr. MasMarques's criminal case in Massachusetts,

7   at least this particular one.  Those are separate because

8   that's the way it's presented on PACER, which is the Federal

9   database.  So, we just copy what we can obtain from PACER.

10  On this particular page that we printed out, it looks like

11  document 17 is available, document 7 is available, and

12  document 1 is available, but there are links to obtain all

13  of the rest, if anybody so desires.

14          On the other docket page, there may in fact be

15  other documents available, depending on what information we

16  obtain from our vendors.

17          THE COURT:  You're categorically denying any

18  selective access to documents?

19          MR. GREENSPAN:  Correct.

20          THE COURT:  So, they're all equally accessible?

21          MR. GREENSPAN:  They're not equally accessible in

22  that some have already been downloaded and others you may

23  need to buy from PACER, but this is why PlainSite exists.

24          THE COURT:  So, there's no rhyme or reason to the

25  fact that some are now accessible and some are not.

26          MR. GREENSPAN:  Not in Mr. MasMarques's case.

27  There may be high profile cases in the news that people are

28  specifically interested in a particular document, because

```
1    it's newsworthy.  In that case, you could argue that there's
2    a selective bias in favor of what is newsworthy.
3                THE COURT:  Got it.
4                MR. GREENSPAN:  Generally speaking, I deny his
5    characterization that this is some vendetta, and that
6    PlainSite is out to get him.
7                THE COURT:  I think you know from last time that
8    my concern was having a cogent explanation as to why you
9    determined that it was Mr. MasMarques who obtained images of
10   your father and you, and put your faces onto pornographic
11   images and published them.  You showed some concern that the
12   Court didn't have a better understanding of that.  Mr.
13   MasMarques has given his explanation as to why your evidence
14   doesn't implicate him.
15               I think that's something you're going to need to
16   revisit, as well as the statements on Twitter that he's a
17   rapist and a murderer.
18               MR. GREENSPAN:  I appreciate that.
19               THE COURT:  We agree he was convicted of something
20   akin to manslaughter and what they call breaking and
21   entering.
22               MR. GREENSPAN:  I have a statement that I
23   prepared, if you want me to read that.  It's about --
24               THE COURT:  Well, you know what the Court is
25   concerned about hearing.  You can address that in the way
26   that you choose.
27               MR. GREENSPAN:  I'm going to continue then.
28               Mr. MasMarques is upset that among millions of
```

1    others, his public court records have been published, not

2    only on PlainSite, but on other sites, including but not

3    limited to Leagle.com, L-E-A-G-L-E.com, and

4    UnitedStatesCourts.org.  This material produced by the

5    United States government is not confidential.  Nonetheless,

6    Mr. MasMarques has embarked on a multi-year campaign of

7    harassment --

8              (The court reporter asked the witness to repeat a

9    phrase.)

10             MR. GREENSPAN:  -- to remove any trace of his

11   disturbing criminal record from the internet, and in the

12   process has turned both myself and numerous others into his

13   latest victims.

14             Mr. MasMarques first contacted PlainSite on

15   January 20th, 2016, by e-mail, using the name Vincent

16   Bellomo, B-E-L-L-O-M-O.

17             MR. MASMARQUES:  I object to that.

18             MR. GREENSPAN:  This name appears to be an amalgam

19   of two Mafia family leaders' names, Vincent Lewis Gigante,

20   G-I-G-A-N-T-E, and Liborio, L-I-B-O-R-I-O --

21             MR. MASMARQUES:  I object to that, your Honor.

22             MR. GREENSPAN:  -- Salvatore Bellomo.

23             THE COURT:  Excuse me.  What is your objection?

24             MR. MASMARQUES:  I don't have anything to do with

25   these names that he's saying.

26             THE COURT:  You're objecting on relevance grounds.

27   I don't know if it's going to be relevant or not, because I

28   don't think that Mr. Greenspan has made the association

 1   between those names and you, but I think he's in the process

 2   of attempting to do so.

 3              MR. GREENSPAN:  Both men were involved in numerous

 4   killings.  Mr. MasMarques chose the name to instill fear

 5   that if I did not remove the cases he requested about

 6   himself, that I might upset the Mafia and suffer the

 7   consequences, such as death.

 8              THE COURT:  How did you figure out that it was him

 9   who chose that name?

10              MR. GREENSPAN:  IP addresses.

11              THE COURT:  You (Simultaneous colloquy.)

12              MR. GREENSPAN:  Mr. MasMarques, to be clear, is

13   not an expert on anything regarding computer technology or

14   the internet.

15              THE COURT:  Well, what he said was fairly basic in

16   nature.  I guess, since you have the burden of proof with

17   respect to your request for a restraining order against him,

18   obviously I need to know how you drew the conclusion that he

19   selected those names and that was his action, as opposed to

20   the action of someone else.

21              MR. GREENSPAN:  Every time you visit a website,

22   your IP address is recorded by the server hosting that

23   website.

24              THE COURT:  And he agrees with that.

25              MR. GREENSPAN:  His IP address, at the time that

26   he sent these messages, was consistent with activity on

27   PlainSite that was interested in Diego MasMarques only.  So,

28   it's strange to think that --

1        THE COURT:  Say that one more time.

2        MR. GREENSPAN:  Because PlainSite hosts many court

3   cases, we can see, if we need to, who has visited a

4   particular court case on a particular date and time.  We can

5   also see who has filled out the form to contact us, based on

6   the IP address.

7        So, when we got an e-mail saying it's from Liborio

8   Bellomo, but that same IP address has been exclusively

9   interested in cases pertaining to Mr. MasMarques, there's a

10  very good chance that it's not actually Liborio Bellomo.

11       THE COURT:  You're saying circumstantially that

12  request is associated with Mr. MasMarques to the exclusion

13  of others?

14       MR. GREENSPAN:  Correct.

15       MR. MASMARQUES:  I object to that.

16       THE COURT:  You're going to have a chance to

17  respond to that, so you might want to make a note of the

18  fact that you want to respond.

19       MR. GREENSPAN:  After that initial request, Mr.

20  MasMarques sent about 60 more messages -- I'm sorry -- 60

21  more requests in 2017 to early 2018, both by e-mail and

22  through the PlainSite Contact Us form.  These requests were

23  made in his name with a variety of strange numeric e-mail

24  addresses and invalid phone numbers, as well as through

25  pseudonyms such as Jack Jones, Liborio Bellomo, AB, Rick,

26  and Ricky, R-I-C-K-Y.  Some I perceived as threatening.

27  Many used profanity liberally.

28       In September of 2017, Mr. MasMarques began posting

1   comments on my personal website, calling me a "sociopath," a

2   "cowardly sneaky snitch," and "a mother fucker."

3              THE COURT:  So, you're saying with certainty that

4   those communications were from Mr. MasMarques?

5              MR. GREENSPAN:  Yes.  If you let me continue, I

6   can get to why.

7              The IP address he used to post these comments was

8   under the pseudonym Joe Lived, traceable to Marlborough,

9   Massachusetts, where he lives, was 76.24.132.152.  The same

10  IP address was used to search PlainSite extensively in 2017

11  for cases pertaining almost exclusively to one person, Diego

12  MasMarques.

13             He also began posting similar commentary on gripe

14  sites, which allow users to post anonymously or under a

15  pseudonym, with complaints about a particular target, in

16  this case me, then my family.  At first, Mr. MasMarques

17  preferred BlackListReport.com where he also posted about his

18  former probation officer --

19             THE COURT REPORTER:  Okay, I'm sorry.  Preferred

20  BlackList?

21             THE COURT:  Mr. Greenspan, you're familiar with

22  these sites.  I think most laypeople are not.  So, when you

23  get to a website, if you would slow down.

24             MR. GREENSPAN:  Sure.  I'm sorry about that.

25  BlackListReport.com, just those three words all run

26  together.

27             THE COURT REPORTER:  All right.

28             MR. GREENSPAN:  -- where he also posted about his

1   former probation officer until I was ultimately successful

2   in getting the site taken offline on account of his roughly

3   1,000 posts.

4           MR. MASMARQUES:  I object to that, your Honor.

5           THE COURT:  You disagree with what he's saying.

6   Unless you have an evidentiary basis for the objection,

7   you'll be able to respond to these things.  But we don't

8   want to run out of time here.

9           MR. GREENSPAN:  He also began using

10  ComplaintsBoard.com.  That's B-O-A-R-D.com, although over

11  time he had used dozens of other sites as well with names

12  such as STDregistry.com and Dating D-A-T-I-N-G Psychos

13  P-S-Y-C-H-O-S.com.

14          THE COURT:  How is it that you are monitoring all

15  this information?  How does that come about?

16          MR. GREENSPAN:  It's pretty simple to do a Google

17  search for my name, especially with my middle name Jacob.

18  And because Mr. MasMarques has this fixation with my middle

19  name, these types of sites are likely to show up in the

20  search results.

21          THE COURT:  What do you mean with this fixation

22  with your middle name?

23          MR. GREENSPAN:  Almost every time he references me

24  in writing, he uses my middle name, which I don't use,

25  typically.

26          I would estimate that Mr. MasMarques has posted

27  between 2- and 3,000 harassing posts concerning myself and

28  my family with a wide range of false allegations.

1          THE COURT:  Let me stop you right there.  You're

2    both complaining about posts.  What is it that makes these

3    2- to 3,000 posts, besides the sheer number of them,

4    harassing?

5          MR. GREENSPAN:  I'm getting to that.

6          Mr. MasMarques called me on December 20, 2017, and

7    I picked up the call at 7:32 p.m., not recognizing his phone

8    number.  I politely informed him I reported him to the

9    police and hung up, as the FBI instructed me to do.

10          THE COURT:  Make a note of what you want to

11   respond to.

12          MR. MASMARQUES:  Fine.

13          MR. GREENSPAN:  Three days later, my brother, who

14   is severely disabled, received two calls on his cell phone

15   from someone claiming to be named Jonathan with no stated

16   last name, upset about PlainSite.

17          Three weeks after that, my father began receiving

18   harassing calls and e-mails at work, and my mother began

19   receiving calls at home.

20          THE COURT:  Now, I am going to stop you there, and

21   I know you probably don't like me interjecting, but one of

22   the things that Mr. MasMarques said last time is there's

23   lots of people who are unhappy with you.  That's what he

24   said.

25          Again, you need to remind me what it is that

26   associates these communications with him, as opposed to

27   somebody else.

28          MR. GREENSPAN:  Sure.  The single most unique

1  circumstance is that Mr. MasMarques, I think, is the first

2  and only person to have alleged that I own this website

3  Leagle L-E-A-G-L-E.com, which I do not own and have never

4  owned and have never had any association with at all.  And

5  all of these callers seem to be under the same impression.

6  Either that means they were calling on his behalf or they

7  had read something he had written, because there's no other

8  source.

9        THE COURT:  So, you can't attribute all of these

10  communications directly to him.  Some of them may be

11  indirect in nature?

12        MR. GREENSPAN:  Correct.  I fully acknowledge that

13  it may not have been Mr. MasMarques picking up the phone and

14  calling on that particular day, although I can't know for

15  sure.  But what I can say is that in terms of why these

16  posts have been harassing, the fact that the posts make

17  these allegations and then provide contact information, and

18  then people follow up thinking that they're true.

19        THE COURT:  What kind of attacking information?

20        MR. GREENSPAN:  I'm sorry.  Contact information.

21        THE COURT:  What is the information in these

22  communications that are harassment, such as your number?

23        MR. GREENSPAN:  So, providing my father's work

24  phone number, providing my parents' home address.

25        THE COURT:  Isn't this the same kind of activity

26  that others complain that you're engaging in?

27        MR. GREENSPAN:  No, your Honor, because what I'm

28  doing is publishing Federal and State court documents --

1          THE COURT:  Right.  But they can contain

2    confidential information.  We have an example right here of

3    something that's going to be redacted, right?

4          MR. GREENSPAN:  They don't encourage people to

5    call.  They don't say, "This person is doing something

6    terrible," which is false, and then tell people to get their

7    revenge.

8          THE COURT:  He's inciting people to make contact

9    with you?

10          MR. GREENSPAN:  Or my family, yes.

11          THE COURT:  Or your family.  I think one of the

12    most significant things here for the Court is whether or not

13    you really can link these images, these offensive images, to

14    some conduct by Mr. MasMarques to the exclusion of others.

15    I imagine you're probably working up to that.

16          MR. GREENSPAN:  Yes.

17          My family and I have also received telephone calls

18    from numerous individuals who have read Mr. MasMarques's

19    harassing writing.  One negative post might be defamatory.

20    Ten such posts widely read might give cause for a libel

21    action apart from these proceedings.  But 2- to 3,000 posts,

22    including contact information, grotesque fabrication,

23    doctored photographs, and incitement to action, are

24    unquestionably harassing.

25          For example, on March 30th, 2018, a

26    ComplaintsBoard user, Jose911, wrote:  "216 844-1000.  Call

27    this number to get Neil N-E-I-L to remove your info."

28          That phone number is the main telephone number of

1  University Hospitals of Cleveland where my father, Neil

2  Greenspan, works as a physician in conjunction with his role

3  at Case Western Reserve University School of Medicine.  His

4  personal desk phone number has also been posted repeatedly.

5  He has nothing to do with PlainSite's operations.  Neither

6  do the hospital employees at the front desk or his

7  colleagues.

8      My father is on the Think Computer Foundation's

9  Board of Directors because I was in high school when it was

10  incorporated, and legally I was a minor.

11      Numerous other posts authored by Mr. MasMarques

12  under different pseudonyms, such as Abraham7 and

13  FightInjustice88, had listed practically every home address

14  I ever had, including my current one, my parents' home and

15  work addresses, my phone number, my parents' home phone

16  number, my brother's cell phone number, my mother's cell

17  phone number, and my cousins' names.  Many of these posts

18  falsely allege that I run an illegitimate nonprofit

19  organization, extort people, cheat in various ways, sexually

20  abuse children, etc.  Obviously, this is all completely

21  false.

22      MR. MASMARQUES:  I have to object.  He's

23  essentially blaming me for everything under the sun that's

24  out on the web on him, when I don't have anything to do with

25  any of these posts.

26      THE COURT:  You'll have an opportunity to

27  cross-examine him and also give a further comment.  So, make

28  a note of the things you want to ask him about, as well as

1   the further statement you want to make.  Go ahead.

2          MR. GREENSPAN:  Some of these posts refer to me as

3   a "hacker."  In court and online, Mr. MasMarques has sought

4   to use my work in computer security from 2004 to 2007 to

5   tarnish my name by falsely alleging that I hacked into his

6   e-mail account, Spanish newspaper sites, etc.  I did no such

7   thing.  Accordingly, there's no legitimate evidence that Mr.

8   MasMarques has produced or can produce.

9          The hacking allegations are of a piece --

10          (The court reporter clarified with the speaker

11   what was being said.)

12          MR. GREENSPAN:  - are of a piece with Mr.

13   MasMarques's conduct.  He fabricates stories out of whole

14   cloth, often with a paranoid tinge.

15          He has also impersonated me.  On at least one

16   occasion, he's sent illegal requests under the Digital

17   Millennium Copyright Act and thus under penalty of perjury,

18   to Google as PlainSite.org to remove search results that

19   linked exclusively to his cases.  I did not submit any such

20   request, nor did anyone on PlainSite's behalf.

21          More recently, as of April 19, 2019, which is a

22   few weeks ago, he has sent his invalid counter-TRO to Google

23   as proof that he has a supposed court order that requires

24   the search results be removed, which is not what the

25   counter-TRO orders.

26          Although it was not certain before these

27   proceedings began, at this point it is clear that Mr.

28   MasMarques suffers from mental illness.  For one thing, the

1  United States Sentencing Commission stipulated that he be

2  subject to the "special mental health aftercare conditions

3  --"

4          MR. MASMARQUES:  This is why he cannot be messing

5  around with legal documents.  He is making all these

6  assumptions, your Honor.

7          THE COURT:  You're going to be able to address

8  them.  Your engaging him like this is not helpful.

9          MR. MASMARQUES:  He's lying, your Honor.

10          THE COURT:  Well, if he thinks you're lying and

11  you think he's lying, the Court has to sort it out.  Now, he

12  gets his time.  And then I hear from you again, and you can

13  rebut these assertions, okay?

14          Let's finish up.

15          MR. GREENSPAN:  "-- which required that Mr.

16  MasMarques participate in an in-patient or out-patient

17  mental health program as directed by this probation."

18          THE COURT:  I'm not going to get into that.  I

19  think it's not appropriate.  It's more -- it's more damaging

20  than it is probative in these proceedings.  And we're not

21  going to go there, because we're going to get into why they

22  made these decisions in the criminal case and whether there

23  was any diagnosis or reason or common conditions or uncommon

24  conditions.  I'm not going to go there.

25          MR. MASMARQUES:  Judge Overton, there was no

26  reason.  It was because I --

27          THE COURT:  If you are acting in this manner in

28  court, it makes me wonder how you're containing yourself

1   outside of court.  The outbursts, no.

2           MR. MASMARQUES:  I just want to clarify.

3           THE COURT:  If you have an evidentiary basis for

4   an objection, I'll hear it.  Otherwise, we are going to

5   finish without interruption.

6           (The court reporter asked for a brief pause in the

7   proceedings.)

8           MR. GREENSPAN:  Jeff Steinport, S-T-E-I-N-P-O-R-T,

9   an attorney who is another victim of Mr. MasMarques and the

10  owner of a site similar to mine, UnitedStatesCourts --

11  that's all one word -- .org, told the Marlborough police in

12  writing that he shut down his site in part because of Mr.

13  MasMarques.  Before doing so, he contacted the police and

14  the FBI.  I am less willing to succumb to Mr. MasMarques's

15  bullying tactics, but I have been just as concerned.

16          Since Mr. MasMarques has started his campaign of

17  harassment, his behavior has forced me to file reports with

18  the FBI and police departments in San Jose; Shaker Heights,

19  Ohio; Medford, Massachusetts; Marlborough, Massachusetts;

20  and San Francisco.  Even though the Middlesex County

21  District Attorney ultimately filed criminal charges against

22  Mr. MasMarques in the Marlborough District Court and those

23  charges are pending, Mr. MasMarques has not ceased his

24  harassment.

25          I have strong evidence he authored new posts

26  concerning me as recently as April 17th on a gripe site

27  called BadBizReport.IS.  Mr. MasMarques's strategy has also

28  included the filing of false official complaints with

1 numerous government agencies, something he has alluded to in

2 his testimony before this Court.

3           In addition to the IRS and FBI, Mr. MasMarques has

4 filed complaints containing demonstrably false information

5 with the Ohio Attorney General and the Marlborough District

6 Court.  Unfortunately, these false reports have caused the

7 Ohio Attorney General to open an investigation into my

8 nonprofit, which is totally unwarranted, and the Marlborough

9 District Court to open a case to evaluate whether criminal

10 charges are warranted against me for supposedly violating

11 the unconstitutional and invalid counter-TRO he convinced

12 this Court to grant on July 3rd, 2018.  That counter-TRO was

13 also based on statements that Mr. MasMarques invented that

14 have no basis whatsoever in fact.

15           Often, Mr. MasMarques has projected what he has

16 done to others onto me.  For example, Mr. MasMarques has

17 been repeatedly arrested for battering women.  In testimony

18 before this Court in February, which is on page 42 of the

19 transcript, he accused me of enabling the battering of

20 women, based on a tale that sprung entirely from his

21 imagination, so far as I can tell.

22           I realize that the testimony thus far has taken

23 twists and turns, so just to recap, despite his confusing

24 denials, Mr. MasMarques has an extensive criminal history,

25 including a history of violent crime.  He broke into the

26 house of and murdered one ex-girlfriend, injured the male

27 passenger of another ex-girlfriend by ramming him with a

28 car, harassed the parents of the woman he killed, and was

1    reportedly arrested numerous times in Massachusetts and

2    Florida for charges including rape and assault.

3          Mr. MasMarques has vociferously denied under oath

4    that he has any criminal history.  This is an outright lie.

5    He has attempted to dance around the issue by speaking of

6    the Massachusetts Criminal Offender Record Information

7    System or CORI, C-O-R-I.  But the crimes at issue here are

8    Federal crimes and not State crimes, so, naturally, they

9    would not be listed in that system.  The NCIC is not open to

10   the public, but records on PACER system are, and they are

11   extremely clear, both in the metadata and in corresponding

12   court opinions --

13          (The court reporter asked that the last sentence

14   be repeated.)

15          MR. GREENSPAN:  Sure.  Mr. MasMarques was found

16   guilty of willful homicide, also referred to in the

17   documents as "murder," which does, indeed, make him a

18   murderer.  Mr. MasMarques is, of course, entitled to

19   disagree with the Court's decision in Spain, the

20   interpretation of that decision by United States

21   authorities, and the publication of the relevant documents

22   therein.  He's also entitled to request that his cases be

23   sealed, but he did that, and his request was twice denied at

24   both the district and the appellate levels.  He's also free

25   to speak in a civil manner about his experience.

26          Instead, Mr. MasMarques's July 3rd, 2018,

27   counter-TRO request was his attempt at an unlawful,

28   unconstitutional, and unsubstantiated end run around the

1   Federal justice system.  Unfortunately, Judge Ryan, who was
2   not familiar with this case, granted his TRO request,
3   seemingly automatically.  That counter-TRO should be
4   immediately vacated for several reasons, because Mr.
5   MasMarques blatantly lied repeatedly in order to obtain it,
6   because he did not pay the filing fee as a result of those
7   lies, and because the hopelessly vague content violates my
8   First Amendment rights.  This is especially important as Mr.
9   MasMarques, not the Marlborough police, is now seeking
10  criminal charges against me for violating this supposed
11  court order.  Journalism is not a crime.
12          I should mention --
13          THE COURT:  Mr. Greenspan, do you know the factual
14  basis for the criminal charges alleging a violation of the
15  restraining order?
16          MR. GREENSPAN:  Yes.  I was able to obtain a copy
17  of his complaints.
18          THE COURT:  What are the allegations -- the
19  factual allegations?
20          MR. GREENSPAN:  The allegations are that I
21  published his court documents.
22          THE COURT:  Okay.  You know, I've been paying
23  attention to everything you've been saying.  I know that you
24  also, I think, are suggesting with respect to your Tweets
25  calling him a murderer, that essentially he is a murderer.
26  That's sort of one of your defenses.
27          I don't know how much more time you have to go,
28  but I just want to let you know, and maybe you're going to,

1   but I want you to focus on the Tweets calling him a rapist

2   and a murderer, as well as any additional information you

3   have to provide about how the Court can conclude by clear

4   and convincing evidence that he's the one who published

5   these pornographic images.

6           MR. GREENSPAN:  I'm going to get to that.

7           THE COURT:  Okay.

8           MR. GREENSPAN:  I should mention that Mr.

9   MasMarques has encouraged and attracted followers of sorts.

10  One of them, Matthew Mahgrefteh, M-A-H-G-R-E-F-T-E-H, is

11  another disaffected and likely ill individual who is upset

12  with his own court cases being online.  Like Mr. MasMarques,

13  he has posted frequently about my family and me, often in

14  reply to Mr. MasMarques's posts.

15          Mr. MasMarques believed that he was speaking with

16  me by e-mail over the summer, which is why he filed his

17  letter and accompanying exhibits in court on December 4th,

18  2018.  In fact, he was speaking with Mr. Mahgrefteh.  This

19  is provable with irrefutable evidence, including IP

20  addresses, call logs, telephone numbers, and e-mail records.

21  Even if Mr. Mahgrefteh created and posted some of the

22  pornographic and Nazi-themed images that have been of

23  concern, some contained themes directly contributed by Mr.

24  MasMarques, such as the unique and wrong allegation that I

25  run a fake nonprofit.  In fact, I believe that after the

26  June 9th (verbatim), 2018, permanent restraining order was

27  issued, Mr. Mahgrefteh began harassing me on Mr.

28  MasMarques's behalf to help him evade the court order, even

1   if Mr. MasMarques did not know his identity.  Most of the

2   pornographic material began to appear within ten days of

3   that day.

4          Since this was an alarming shift in tone, I filed

5   for a DMCA subpoena in the Northern District of Ohio.  The

6   subpoena recipient in that case, the host of

7   BlackListReport.com, flagrantly ignored my valid Federal

8   subpoena.  On that basis, I filed a motion for sanctions,

9   which has yet to be ruled on.  Fortunately, evidence from

10   other sources has made that subpoena's response unnecessary,

11   though it would have still been helpful.

12          First and foremost, Mr. MasMarques implicated

13   himself in his testimony before this Court in February by

14   admitting that his Mac computer had the unusual user name

15   tech, T-E-C-H, which appeared by accident in one of his

16   posts.

17          He has also written harassing posts that include

18   URLs for web pages whose server logs show his specific IP

19   address visiting those specific pages on the same date that

20   the anonymous posts in question were authored.

21          THE COURT:  What was posted that was (inaudible

22   word) toward this name "tech"?

23          MR. GREENSPAN:  There was a post on

24   BlackListReport.com which was kind of the usual diatribe.

25   And instead of an image that was supposed to appear, a path,

26   meaning text, a path to that image appeared in the post

27   instead saying where it was on the hard drive of the

28   computer being used.  And that file path contained the

 1  folder for the desktop of that computer user, and the

 2  desktop folder is always within the user name of the person

 3  using the computer.  So, it would have said something like

 4  /Users/tech/Desktop.  And that is a very specific indicator.

 5          There's plenty of other evidence.  If someone

 6  tries to sign up for a ComplaintsBoard account with two

 7  different e-mail addresses Mr. MasMarques has sent messages

 8  to PlainSite from, it's not possible because those e-mail

 9  addresses are already in use on ComplaintsBoard.  I would

10  estimate Mr. MasMarques has no fewer than thirty

11  ComplaintsBoard accounts, most of which have been used to

12  harass me, but probably closer to fifty.

13          THE COURT:  We have to make some distinction

14  between what you describe as a diatribe and these offensive

15  images.

16          MR. GREENSPAN:  I agree.

17          THE COURT:  And the source of the offensive

18  images.

19          MR. GREENSPAN:  I agree, although I would

20  reiterate that the sheer volume of posts here is itself

21  harassing.  But I agree with you.

22          THE COURT:  Is that something you're going to get

23  to?

24          MR. GREENSPAN:  Oh, I have discussed how there

25  have been between 2- and 3,000 posts.

26          THE COURT:  I'm talking about the pornographic --

27          MR. GREENSPAN:  Yes, absolutely.  I'm aware of the

28  time.

1           As for Mr. MasMarques's case materials, I have a

2    clear First Amendment right to publish them, and I choose to

3    assert that right.  I think it's especially important to

4    prevent future victims from suffering as the twenty or so

5    past and current victims have.

6           So, with those facts and background, the key

7    questions before you are whether Mr. MasMarques has done

8    anything to harass me worthy of a permanent restraining

9    order, and on the flip side, whether I have done anything to

10   harass him worthy --

11          (The speaker was asked to repeat the sentence.)

12          MR. GREENSPAN:  With those facts as background,

13   the key questions before you are whether Mr. MasMarques has

14   done anything to harass me worthy of a permanent restraining

15   order, and, on the flip side, whether I have done anything

16   to harass him worthy of a permanent restraining order.  The

17   answers respectively are yes, he has, and no, I have not.

18   It's true publishing information is involved on both sides,

19   but our actions could not be more different in character.

20          Mr. MasMarques is a career criminal who exacts

21   vengeance against those he disagrees with, often in the name

22   of Mafia dons and often violently.  I have no criminal

23   record and make the legal system more accessible to average

24   people by publishing public record court cases and in-depth

25   research on publicly traded companies.  It's an apples and

26   oranges comparison.  And the precedent weighs not just

27   heavily in my favor, it is completely in my favor.

28          Mr. MasMarques has no privacy rights in regard to

1    his court documents, regardless of whether one of his crimes

2    was committed overseas.  As the First Circuit Court of

3    Appeals just ruled in *United States vs. Morel*, M-O-R-E-L,

4    case No. 17-1696, a case involving "random strangers having

5    access to images on a website," and this is another quote,

6    "Morel did not have a reasonable expectation of privacy in

7    the IP address information."

8            The same applies to public record documents.  Mr.

9    MasMarques has no relevant Fourth Amendment right to privacy

10   as he claims.  I'm not the government, nor am I acting on

11   its behalf.

12           Multiple judges have denied his motions to seal.

13   Ninth Circuit case law strongly favors the publication of

14   case records.  It is ultimately a simple decision to make.

15           As for my extremely limited commentary on Twitter

16   in self-defense, I had every right to refer to Mr.

17   MasMarques as -- and this is the actual quote from October

18   18, 2018 at 12:23 p.m., contrary to what Mr. MasMarques has

19   incorrectly implied on the record -- "Someone who serially

20   harasses, rapes, and murders women."

21           I should note that this remark was not posted

22   without context.  Anyone interested could look at Mr.

23   MasMarques's court records on PlainSite or the relevant

24   newspaper articles on Twitter to see what I was referring

25   to.

26           THE COURT:  What is the rape allegation?  Where

27   does that come in?

28           MR. GREENSPAN:  I'm not sure what you mean by

1   "where does it come in."

2          THE COURT:  Well, I mean, we heard about the

3   conviction for manslaughter.  What about rape?  Why are you

4   referencing him as a rapist?

5          MR. GREENSPAN:  I'm referencing what was written

6   in the Federal Court documents that is in Document 1 of his

7   PACER file.

8          THE COURT:  Elaborate, please.

9          MR. GREENSPAN:  This was filed, I believe, on

10  April 4th in this case as an attachment.  If you read the

11  letter that the probation officer, I believe, wrote

12  regarding his case, they made a specific point of the fact

13  that this crime that was committed in Spain was not an

14  isolated incident, and that in fact Mr. MasMarques had a

15  long history of arrests for violent behavior.  And, you

16  know, that's not my call to make whether that's important.

17  That's something that the probation office decided.

18         THE COURT:  Right.

19         MR. GREENSPAN:  Yes.  It specifically said rape.

20  I did not invent that.  I did not draw that out of thin air.

21  I simply reiterated what I was reading in the court

22  documents.

23         The Spanish newspaper *Ultima Hora*, U-L-T-I-M-A

24  H-O-R-A, published a 12-part series of articles from

25  December 9th, 1999 to July 27th, 2000, describing how

26  incredibly threatening and deranged Mr. MasMarques's conduct

27  was, not just in regard to the murder of Tatiana Vasic,

28  T-A-T-I-A-N-A V-A-S-I-C, but also with regard to several

1    victims of criminal acts aside from her.  It is a fact that

2    Mr. MasMarques was charged with two counts of rape.

3          Looking back, I believe that my description was

4    reasonable, factual, and accurate.  As far as I can tell,

5    Mr. MasMarques fled the United States after those charges

6    were filed, which is why warrants were outstanding for his

7    arrest after he returned.  The notion that I should be

8    subject to a restraining order for properly defending my

9    rights as a journalist in writing against someone so

10   obviously dangerous and confused is frankly absurd.

11         Except to note that he filed a motion to seal,

12   since November 6th, 2018, I have completely refrained from

13   writing anything else about Mr. MasMarques publicly to avoid

14   my words being taken out of context.  But I will gladly

15   clarify in public that even though he was not convicted of

16   rape and only charged with two counts according to Federal

17   Court records -- I'm sorry.

18         But I will gladly clarify in public that even

19   though he was not convicted of rape, he was only charged in

20   two counts, according to Federal Court records.

21         (The court reporter clarified what was said.)

22         MR. GREENSPAN:  And though this should go without

23   saying, I reserve the right to write about this ordeal in

24   the future much more expansively.

25         My immediate priority is stopping the harassment

26   resulting from the existing posts that cannot easily be

27   deleted.  I am, therefore, requesting a court order

28   mandating the removal of the content Mr. MasMarques has

1  posted, based on his IP addresses, especially given that

2  much of it was posted after the TRO against him went into

3  effect, and he clearly knew about its restrictions.

4       Mr. MasMarques has deliberately created a

5  situation where I, my family, and even my co-workers are

6  perpetually at risk of reprisals from angry and confused

7  individuals who find his content on search engines when

8  looking for information on PlainSite or about me.

9  Constantly, they find Mr. MasMarques's posts, read his

10 diatribes, and are soon convinced that I'm an extortionist

11 criminal pedophile hacker out to get them, which is simply

12 not the case.

13      Mr. MasMarques gives these individuals, some of

14 whom are similarly unstable, a roadmap to find my family by

15 phone, at home, and at work.  Either he or his

16 co-conspirator, Mr. Mahgrefteh, has posted the name and

17 phone number of my current landlord, as well as the name of

18 his wife, who has a newborn.  One man has been e-mailing the

19 entire Pathology Department of Case Western Reserve

20 University, because he thinks that will help.

21      Another filed a baseless HIPAA complaint against

22 my father for no reason other than he's a doctor, wrongly

23 described by Mr. MasMarques as having orchestrated random

24 tax evasion conspiracy.

25      THE COURT:  We're getting way, way beyond the pale

26 here.

27      MR. GREENSPAN:  Okay.  Well, I'll conclude this

28 part, and then I'm almost done.

1          THE COURT:  I want to know about these reputation

2     managers and how they manage to get things off your site.

3          MR. GREENSPAN:  Let me address that right now.

4     They don't -- I have extensive e-mails I'm happy to provide

5     to the Court which demonstrate (a) that I completely refuse

6     to work with these entities.  They do exist; Mr. MasMarques

7     is totally right about that.  There is a seedy underbelly of

8     "reputation management," and they work by extorting people.

9     He's correct.  I don't have anything to do with them.  I

10    have put in writing that I won't have anything to do with

11    them.

12         THE COURT:  Do you have anything to do with

13    anybody else who engages in that type of activity?

14         MR. GREENSPAN:  No.  And I frequently --

15         THE COURT:  You're testifying under oath you have

16    never received money either directly or indirectly that is

17    payment for taking things off the site?

18         MR. GREENSPAN:  Yes.  I do say that under oath,

19    and I will also tell you under oath that Mr. MasMarques has

20    offered money repeatedly to have his cases removed, and I

21    refused his money.  And that is the point at which this

22    harassment began because I would not accept his bribes.

23         I told him, "We will not accept your bribes."  And

24    I have the e-mail with me, I believe, if you want to see it.

25         THE COURT:  All right.  You want to wrap up?

26         MR. GREENSPAN:  My personal court records are

27    already on PlainSite, so I've subjected myself to the same

28    treatment Mr. MasMarques complains about so bitterly.  What

1  he has administered is criminal harassment and perjury.

2  Deliberately posting thousands of false, harmful statements

3  on a website managed by an offshore Seychelles-based company

4  run by Latvians and Russians, now hosted out of Latvia, as

5  Mr. MasMarques has done is not the same as posting court

6  records that reflect true events.  Telling at least 28

7  flat-out lies under oath -- and I have a chart with

8  references to the transcript and documents -- is not the

9  same as truthful testimony.

10        The people who run the site Mr. MasMarques has

11  posts on, who truly are extortionists, claim they will honor

12  a court order that tells them to remove the content.  So, I

13  would greatly appreciate anything you can do insofar as

14  providing such an order, because I genuinely believe my

15  safety and my family's safety is at risk.  I should not have

16  to file a separate civil suit if these proceedings already

17  encompass that risk.  Thank you.

18        THE COURT:  Do you have any questions for him?

19        MR. MASMARQUES:  Yes.

20        THE COURT:  We need to give the court reporter a

21  break.

22        THE COURT REPORTER:  Yes.

23        THE COURT:  We're already at the 3:30 point, which

24  is the point where we should be concluding.  But I want to

25  give you an opportunity to cross-examine.  We're going to

26  take our afternoon recess.  We're going to have tight

27  control over the balance of the statements.  We'll set up a

28  briefing schedule for any closing remarks, in addition, and

```
1    then we're going to conclude the matter, okay?
2              MR. GREENSPAN:  Thank you, your Honor.
3              MR. MASMARQUES:  Thank you, your Honor.
4              (Whereupon, a 15-minute recess was taken.)
5              THE COURT:  Cross-examination.
6              MR. GREENSPAN:  Your Honor, before we get that
7    far, can I introduce my exhibit, please?
8              THE COURT:  Let's have it identified, and we'll
9    mark it next in order.
10             MR. GREENSPAN:  This is an e-mail message from Mr.
11   MasMarques and the response saying that I'm denying his
12   bribe request, dated May 3rd, 2017.
13             THE COURT:  You're calling it a bribe request.  I
14   think that's your characterization of it.  Take a look, Mr.
15   MasMarques.
16             The next in order is 20.  Do you have any
17   objection to this being admitted?
18             MR. MASMARQUES:  I don't remember that, your
19   Honor.  But ...
20             THE COURT:  Okay.  If there's no objection, it'll
21   be admitted.
22             (Petitioner's Exhibit 20 was marked for
23   identification.)
24             THE CLERK:  The date on the e-mail was May 7,
25   2017.
26             THE COURT REPORTER:  I'm sorry, Madam Clerk.  Were
27   you saying that to me?
28             THE CLERK:  One e-mail was from May 3rd, and one
```

1  from May 5th, 2017.

2          MR. GREENSPAN:  I believe there were two from May

3  3rd and one from May 5th, 2017.

4          THE CLERK:  I'm looking at the top.

5          MR. GREENSPAN:  That's all, if you want to

6  continue with the cross-examination.

7          THE COURT:  Cross-examination.

8          MR. MASMARQUES:  Can I enter any exhibits at this

9  time?

10          THE COURT:  This is cross-examination.  If, in the

11  course of your cross-examination you need to identify

12  documents, you can.  But this is your opportunity to ask him

13  questions about testimony he's provided that you believe is

14  false, misleading, erroneous, etc.  Let's go ahead and do

15  that, shall we?

16          MR. MASMARQUES:  Yes, your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. MASMARQUES:

19     Q    You say that I am responsible for thousands --

20  first you said thousands, and then you said up to 3,000

21  online complaints or comments, and you're saying that I did

22  all these?

23     A    To the best of my knowledge, yes.

24          MR. MASMARQUES:  Well, that's wrong.

25          THE COURT:  You cannot argue with him.  You can

26  ask him questions.  I'm not going to have engagement between

27  the parties here.  This is a safe zone.  Let's not do that.

28  If you have questions about how he reached the conclusion,

1   you can ask him about that.

2       Q    (By Mr. Masmarques) So, how did you reach these

3   conclusions?

4       A    Several different factors, one being your IP

5   address and the subpoena response from Comcast, the other

6   being the particular wording and way that you capitalize

7   certain letters in certain words.  Like, you write stalker

8   with a capital S.  You use my father's name without a period

9   after his middle initial.  You use the phrase "terrorizing,

10  harassing, and Stalking," so a combination of linguistics

11  and the evidence from servers logs.

12      MR. MASMARQUES:  I'm trying to rebut this, because

13  I didn't do any of these things.

14      THE COURT:  Well, I'm going to hear from you

15  again, but let's complete cross-examination.  If you would

16  rather give a statement rather than ask questions at this

17  time, you can do that.

18      Q    (By Mr. Masmarques) So, you say the first time

19  that you started calling me a rapist and murderer was on the

20  Tweets in October -- October 9th, starting around there?

21      THE COURT:  Wait a second.  The question is

22  whether or not that was the first time, if not the only

23  time, you accused him of being -- what did you say? -- a

24  rapist.  What did you say?

25      MR. MASMARQUES:  A murderer.

26      THE COURT:  A murderer.

27      MR. GREENSPAN:  As I said previously, the actual

28  quote from October 18th, 2018, at 12:23 p.m. was that I used

```
 1  words "someone who serially harasses, rapes, and murders
 2  women."
 3              THE COURT:  Okay, but the question is different.
 4  The question is:  With respect to a murderer, rapist, or
 5  whatever terminology we have in that regard, was that the
 6  first time that you associated such comments with Mr.
 7  MasMarques?
 8              MR. GREENSPAN:  To the best of my knowledge, yes.
 9              THE COURT:  Next question.
10       Q    (By Mr. Masmarques) I have it before that.  You
11  said your father --
12              THE COURT:  If you have it before that, ask him
13  about it.
14              MR. MASMARQUES:  Oh, okay.
15       Q    (By Mr. Masmarques) On March 8, 2018, you called
16  me a --
17              THE COURT:  Don't make a statement.  Turn it into
18  a question.
19       Q    (By Mr. Masmarques) Did you say anything on the
20  ComplaintsBoard on the 8th of March, 2018, regarding me?
21       A    No.  I've never posted on ComplaintsBoard.
22              MR. MASMARQUES:  Can I turn this in as an exhibit?
23              THE COURT:  What is Respondent's next in order?
24              THE CLERK:  L.
25              THE COURT:  Let's have it marked as L.  You can
26  show it to Mr. Greenspan and ask him if he posted that.  We
27  need to get it marked first before you answer the question.
28              (Respondent's Exhibit L was marked for
```

1   identification.)

2          THE COURT:  Hand it to the witness and have him

3   look at it and see if that is something that you posted.

4          THE WITNESS:  Do you want to restate the question?

5   Q    (By Mr. Masmarques) Did you post that?

6   A    No.

7   Q    Is your father Vice President and Treasurer of

8   (inaudible phrase.)

9    (The court reporter asked the speaker to repeat the

10  question.)

11  A    He is, I believe, the Vice President and Treasurer

12  of Think Computer Corporation, if I'm remembering correctly.

13          THE COURT:  But answer the question.

14          MR. GREENSPAN:  But PlainSite.org is not a

15  company, so it doesn't really make sense.

16          THE COURT:  Was the company you identified

17  associated with PlainSite and, if so, in what way?

18          THE WITNESS:  PlainSite is a joint venture of

19  Think Computer Corporation and Think Computer Foundation.

20  Q    (By Mr. Masmarques) Is PlainSite a 501(c)(3)?

21  A    No.  PlainSite.org is a website.  Think Computer

22  Foundation is a 501(c)(3).

23  Q    Do you ask for personal or private monetary

24  donations for the website as a 501(c)(3) for PlainSite.org?

25  A    Can you clarify what you mean by "personal and

26  private monetary donations"?

27  Q    Yes.  Do you make online comments requesting

28  monetary donations for your nonprofit website PlainSite.org?

1      A      Yes, in the past I have solicited contributions

2   for the organization.

3              THE COURT:  Do people get data removed by making

4   donations?

5              THE WITNESS:  No, never.  Not once.  They can

6   contribute to Think Computer Foundation, and that helps us

7   pay for court documents which, as you surely know, often

8   have fees associated with obtaining them.

9              THE COURT:  Next question.

10     Q      (By Mr. Masmarques) Are you saying that you

11  haven't posted any of the comments that have been going out

12  since September 22nd, 2018, on the web?  On the search

13  engines?

14             THE COURT:  Can you be a little less vague?

15             (Simultaneous colloquy.)

16             THE COURT:  -- that document marked L or something

17  else?  Don't make a statement.  Just ask the question.

18     Q      (By Mr. Masmarques) Have you been making all these

19  vile comments about me on these gripe sites, such as

20  ReportCheater?  There's so many of them.  I have an example

21  here.

22     A      No, I have not.

23     Q      You don't know anybody near you that has done

24  that?

25     A      I don't.  And if I knew who it was, I would ask

26  them to stop, because the last thing I want to do is inflame

27  the situation.  I have not posted anything about you except

28  the Twitter posts that you have already referenced in this

 1  case.

 2      Q    You said that my motion to have something sealed

 3  was denied by two different judges.  Can you explain that?

 4      A    Sure.  The first judge to deny your motion was a

 5  District Judge.  I believe his last name was Wolf.  Yeah,

 6  Mark L. Wolf.

 7      The second judge to deny a motion to seal that you

 8  filed I believe was Judge Lynch of the First Circuit Court

 9  of Appeals.  So, those were two motions to seal, and they

10  were denied by two different judges.

11      (Simultaneous colloquy.)

12      Q    The First Circuit said that is not true with

13  Lynch.

14      A    Was that a question?

15      Q    Isn't it true that I was the one who withdrew the

16  appeal to have this sealed?

17      A    I don't know what you mean by that.  I know that

18  you filed a motion to seal, and it was denied.

19          THE COURT:  You can address these issues, but

20  first get finished with your questions.

21      Q    (By Mr. Masmarques) Judge Wolf would not give a

22  legal decision on his own record.  So, you're saying Judge

23  Wolf denied the motion to seal on the appeal?

24      (Simultaneous colloquy.)

25      A    No, that's not what I said.  What I said was that

26  Judge Wolf denied your motion to seal at the District level,

27  and then you filed a separate motion to seal at the

28  Appellate level, and that was also denied by a different

1   judge.  And that is Judge Lynch.

2       Regardless of whether you withdrew your appeal -- and I

3   think there were several appeals you filed -- regardless of

4   whether you withdrew one of those appeals or all of those

5   appeals, before you withdrew that motion --

6       Well, I'm looking at Exhibit F that you provided.

7   There are two appeals listed.  There's Case No. 15-2404 --

8   sorry, 2402 -- and Case 15-2360.  So, there's at least two

9   appeals that you filed, and in one or both of those, your

10  motion to seal was denied.

11      Q    Why do you have this obsession with myself and my

12  case and my documents from Spain?  Why do you have this

13  compulsive obsession with all my personal business when it

14  comes to my legal documents?

15      And you seem to know everything from A to Z.  Why have

16  you made all this your business?

17      A    With all due respect, I categorically deny the

18  assertion that I'm obsessed with anything having to do with

19  you.

20          THE COURT:  Let me ask this.  Obviously, you have

21  a great deal of information at your fingertips.  It seems

22  you don't even have to refer to documents to answer the

23  questions that are posed.  You have a great deal of

24  knowledge about Mr. MasMarques's various dealings, according

25  to your testimony.  I think what he's just trying to find

26  out is why are all those resources or is all that time spent

27  focusing on him to the exclusion, maybe, of other things?

28          THE WITNESS:  For the past two and a half years,

1    I've received e-mails threatening my life, phone calls, etc.

2    My safety has been at risk.  I wanted to know why.  So, the

3    extent that I prepared for this testimony today and to

4    defend myself, I don't think that should be characterized as

5    an obsession.  I think anyone in my situation --

6            THE COURT:  Well, that was argumentative.  But I

7    think it's clear from Mr. MasMarques's testimony, his

8    demeanor, etc., that he's very, sort of, distressed by the

9    information that's out there on your website, and he's

10   distressed with you, rightly or wrongly.  I think, in his

11   mind, he's asking why are so much resources being put into

12   focusing on his affairs?  And I think it's a reasonable

13   question.

14           THE WITNESS:  I can appreciate that he perceives

15   it that way, but, your Honor, there were no resources

16   devoted to Mr. MasMarques before he began sending at least

17   50 to 60 harassing e-mails.  As I said, there are millions

18   of cases out there, and his happens to be one of them.  I

19   can understand completely why he's concerned, but I also

20   have to respect the fact that two Federal judges have

21   disagreed with his opinion that the case should be sealed.

22           THE COURT:  Well, I think that's one of the

23   problems that the Court had focused on last time, is that

24   you have admitted that these documents are not sealed, and

25   so then the Court sort of perceives it as public documents,

26   court documents, the exercise of free speech.  And I know

27   that you've perceived that as harassment.

28           I'm going to have you do written closing briefs,

1   as I indicated, and you're going to have to show me as a
2   matter of law why that constitutes harassment.  It would be
3   different if there were no dispute as to whether or not the
4   information was confidential, but as you conceded yourself,
5   there has not been any court order sealing those documents
6   or indicating that they're confidential in nature.
7           MR. MASMARQUES:  They're already on PACER, your
8   Honor, the Federal database.  Why should one single
9   individual in the United States, one single individual, why
10  should he control over 10 million documents on people?  It
11  doesn't make any sense.
12          THE COURT:  Is that a question for Mr. Greenspan?
13          MR. MASMARQUES:  Yes, that's a question.
14          THE COURT:  If you're going to ask a question, let
15  him answer.
16      Q    (By Mr. Masmarques) So, basically, what I want to
17  say is -- I want to ask you, sorry -- is we have Westlaw, we
18  have LexisNexis, and we have PACER.  These are, like,
19  legitimate, known databases that attorneys and professionals
20  use.  And, then, along came Mr. Greenspan, who decided,
21  well, I can make some money by gathering all these legal
22  dockets on 10 million people --
23          MR. GREENSPAN:  Your Honor, I object.  This is not
24  a question.
25          THE COURT:  You knew -- you knew we do need to
26  distinguish between testimony and a question.  You're not
27  going to lecture.  If you want to be heard, then that's
28  fine, but we're usurping a lot of time and not getting

1   anywhere.  If you have questions for him --

2          You disputed many things that he said.  Ask him

3   about those things.  If you don't want to ask him about

4   those things, I'll hear your further testimony.

5   Q    (By Mr. Masmarques) Well, basically, why do you

6   think -- why are you controlling so many documents?

7   What gives you the special, like, right to have the

8   website and do these things to people like post these things

9   on the search engines?  Because PACER doesn't do it.

10         THE COURT:  You need to pause.  Ask a question.

11  Q    (By Mr. Masmarques) PACER -- I mean, why do you

12  feel you have the privilege to do these things?

13  A    I have the privilege of publishing government

14  documents, because the First Amendment of the United States

15  Constitution gives me that privilege.  As for the underlying

16  rationale why is PlainSite necessary, I think you actually

17  answered it yourself by using PlainSite to be informed about

18  this case and your own cases.  I think you're probably aware

19  that not everyone can always afford a lawyer and that,

20  often, obtaining documents from LexisNexis and Westlaw can

21  be extremely expensive and confusing for people who do not

22  have legal training.  I think you're probably aware that the

23  court system is complex and that existing resources do, I

24  think, a generally poor job of distilling down what is

25  actually happening in the judicial system.

26     So, for all of those reasons, I decided that PlainSite

27  would be beneficial to numerous people, and numerous people

28  have agreed with me.  I should also point out that this is

1  not some unique privilege that I have, but that you have

2  similarly disagreed with other individuals who also have an

3  interest in publishing court documents, such as Jeff

4  Steinport, such as Mike Lissner at the Free Law Project --

5      THE COURT:  You're naming names that have not been

6  identified before.  Make sure to spell them for the court

7  reporter.

8      THE WITNESS:  Sure.  I think Jeff Steinport has

9  been mentioned.  Mike Lissner is Mike, M-I-K-E, Lissner,

10  L-I-S-S-N-E-R.

11      But, generally, you are in a position where you

12  are upset about the way that the Federal judicial system

13  works.  I can appreciate why you have the views that you do,

14  but the law is clear.  The law says that there is a strong

15  presumption in favor of publishing court records in the

16  United States, because that is what allows the judiciary to

17  function.

18      Q    (By Mr. Masmarques) That's not what --

19      A    I'm not done.  If people do not know what is

20  happening in court --

21      THE COURT:  We do not need a narrative response.

22  It's becoming narrative.  So, he's answered the question.

23  Next question.

24      Q    (By Mr. Masmarques) Do you make money from

25  PlainSite?

26      A    Yes.

27      Q    Is that your sole purpose of making money?  Is

28  that your sole income?  PlainSite?

```
 1        A     Can you ask a single question?

 2        Q     Is the website PlainSite.org, is that your sole

 3   means of income?

 4        A     No.

 5        Q     What other means do you have?

 6        A     I have some investments.

 7        Q     Is this the main one, this website?

 8        A     It's my main occupation.

 9        Q     Do you think you became obsessed with me when I

10   perhaps --

11              MR. GREENSPAN:  Objection.

12              THE COURT:  He's disputing that he's obsessed with

13   you.  If you could ask -- it's somewhat argumentative.  See

14   if you can just rephrase the question.

15        Q     (By Mr. Masmarques) The IRS complaints and the

16   other complaints I filed against you, could those have, you

17   know --

18        Could those have made you, like, obsessed with me to

19   the point where you were going to find everything you could

20   on me in my legal documents and come after me by putting

21   things up?

22              THE COURT:  Did you dig deeper into his records as

23   a result of those complaints he filed against you?

24              THE WITNESS:  No, not initially, although the Ohio

25   Attorney General complaint has now turned into a formal

26   investigation, and I've had to spend resources, time and

27   money, to inform the Ohio Attorney General about the

28   background in this case.
```

1    Q    (By Mr. Masmarques) So, basically, what you've

2   done is what I've said all along, is you've informed the

3   Attorney General in Ohio not about your IRS tax issues --

4        MR. GREENSPAN:  Objection.  There's been no

5   evidence of this.

6        THE COURT:  It's cross-examination.  I know what

7   he says is not evidence.  It's not going to be questioned.

8   It's overruled.

9        Just ask a question.

10    Q    (By Mr. Masmarques) So, you've been sending the

11   Attorney General's office my legal documents about Spain and

12   probably my character, and you're probably sending them all

13   these other documents that you have on PlainSite.org to

14   discredit me?

15    A    I'm sending the Ohio Attorney General what they've

16   requested.

17    Q    Okay.  Did you send them any documents on me?  Any

18   legal documents on me?

19    A    I believe I provided them with links to some legal

20   documents so that they would understand the basis of your

21   complaint.

22    Q    I don't feel the question was answered.  Did you

23   send them documents that, oh, this guy is a murderer?  Look

24   at these documents or look at this document.

25    A    Can you clarify your question, please?

26    Q    Did you send the Ohio Attorney General's office

27   any legal documents that you have on me?

28    A    I already answered that question.  Yes.

1     Q    What type of documents?

2     A    Documents that most succinctly summarize why you

3 filed the complaint that you did with the Ohio Attorney

4 General.

5     Q    So, I filed a tax complaint, but you're sending

6 them --

7     Did you send them all of the documents about me from

8 the -- from the -- from the PlainSite.org that you have?

9     A    I believe I sent them a link to the docket.  If

10 they want to view any particular docket, that is their

11 prerogative.

12     Q    Any other type of information?  Did you tell them

13 anything else?

14     A    Yes.  I answered their requests to the best that I

15 could.

16     Q    Did you tell them about my character and about me?

17     A    No.  They're not interested in your character.

18 They're interested in whether Think Computer Foundation

19 complies with the laws of the State of Ohio.

20     Q    That would, of course, help --

21     You would think that it would probably --

22     (The court reporter asked the speaker to speak up.)

23     Q    (By Mr. Masmarques) You probably think that by

24 discrediting me, that could probably help your case.

25     A    Of course, it would, because the complaint you

26 filed is full of false information.

27     THE COURT:  Let's keep it to germane issues here.

28 Listen, the Court knows that you don't get along, which is

1   an understatement.  The Court knows you're at complete odds

2   with one another.  The Court knows the testimony you're

3   giving is vastly different in terms of your accounts of the

4   facts in the case.  But let's get down to the brass tacks of

5   what we're here for.

6           Do you have any other questions for him?

7           MR. MASMARQUES:  I rest, your Honor.

8           THE COURT:  In response to these questions that he

9   asked, do you have anything to add?

10          MR. GREENSPAN:  Yes.  I would like to introduce as

11  an exhibit the complaint he filed with the Ohio Attorney

12  General.

13          THE COURT:  Why?  Is this responsive to his

14  questions on cross-examination?

15          MR. GREENSPAN:  He brought it up.

16          THE COURT:  So, tell me before you give any

17  documents how you want to respond to that.  You said he

18  brought it up, so how do you want to respond to it?

19          MR. GREENSPAN:  I would just like what he actually

20  wrote to be in the record is all, if that would be helpful

21  to the Court.  If not --

22          THE COURT:  What he actually wrote?

23          MR. GREENSPAN:  To the Ohio Attorney General.  He

24  filed a formal complaint with a government agency which has

25  cost Think Computer Foundation --

26          THE COURT:  Do you want to just state it into the

27  record?  If there's no objection and it is something that

28  comes from Mr. MasMarques, why don't you just read the

1  germane sections slowly into the record.

2          MR. GREENSPAN:  Okay.  That's fine.  Mr.

3  MasMarques filed a complaint with the Ohio Attorney General

4  on June 24th, 2018, five days after the permanent

5  restraining order was in effect.

6          (The court reporter clarified what was said.)

7          MR. GREENSPAN:  -- five days after the permanent

8  restraining order against him was in effect.  It begins:

9          "Dr. Neil S. Greenspan and his son, Aaron Jacob

10 Greenspan, have set up a huge tax fraud scam right in the

11 State of Ohio."  And it goes on for several paragraphs,

12 explaining why he believes why it is that I have evaded

13 taxes and that my father is a criminal mastermind.

14         THE COURT:  Anything else?  Let's get the document

15 marked.

16         MR. GREENSPAN:  No.  I think I rest, your Honor.

17         THE COURT:  Petitioner's next in order is 21.

18         (Petitioner's Exhibit 21 was marked for

19 identification.)

20         Do the parties have any specific objections to the

21 Court considering, for whatever weight that may have, the

22 documents that have been identified by the opposing parties?

23 Any objections to the documents?

24         MR. GREENSPAN:  The only document I would object

25 to, I believe, one of the exhibits is a very large

26 compilation of Twitter posts.  Just insofar as it's really

27 difficult to figure out what is being cited exactly, I would

28 object to that document.  But the rest I don't have a

```
 1   problem with.
 2           THE COURT:  Do you have any objection to his
 3   documents?
 4           MR. MASMARQUES:  Well, he's getting sidetracked
 5   here with things that have nothing to do with the case.
 6           THE COURT:  I think the Court can sort of sort out
 7   what's going to be helpful unless you have specific
 8   objections to that.  I'll admit all the documents, knowing
 9   that there are going to be documents that are not really
10   germane to the Court's determination here.
11           (Respondent's Exhibits F through L were admitted
12   into evidence.)
13           (Petitioner's Exhibits 20 and 21 were admitted
14   into evidence.)
15           And I'm going to have to set out a briefing
16   schedule for any legal arguments that you want to make.
17   Maybe I can just sort of prepare that order now so you can
18   walk out with it.  Give me just a few minutes.  It would
19   probably be a more official way of handling that, and I can
20   make that happen.
21           MR. GREENSPAN:  Can I ask one question, your
22   Honor?
23           THE COURT:  Yes.
24           MR. GREENSPAN:  In terms of preparing the brief
25   that you're asking for, the exhibits, as I understand it,
26   have to stay in court.
27           THE COURT:  Yes.  You've retained copies of the
28   exhibits, I would take it.
```

1          MR. GREENSPAN:  Well, I think not all of them is

2     the issue.  Some of them I have; some of them I do not.

3          THE COURT:  Do you have the ability to identify

4     which ones you don't have?  While I'm crafting an order, why

5     don't you take a look at that.

6          MR. MASMARQUES:  But I will have to object, your

7     Honor.  I apologize, but I have to object.  I do not want

8     Mr. Greenspan having any of my court documents.

9               (Simultaneous colloquy.)

10         THE COURT:  Stop and listen.  I'm really sorry,

11    but you need to let me finish.  If you are asking that your

12    documents be admitted, that means he's going to have access

13    to them.  If you don't want him to have access to the

14    documents, then withdraw them from the evidentiary record.

15    If you want the Court to consider your exhibits, the other

16    party has to have access to those exhibits.  Understood?

17         MR. MASMARQUES:  Yes.

18         THE COURT:  Okay. I would have loved it if you

19    could have worked this out through the mediation, but all I

20    can do is encourage the parties to do that.  I can't force

21    the parties to do that.

22         MR. MASMARQUES:  With all due respect, your

23    Honor --

24         THE COURT:  I don't want comments about the

25    mediation.

26         MR. MASMARQUES:  -- Mr. Greenspan didn't want to

27    work it out.

28         THE COURT:  It's an avenue that's available.

1    MR. MASMARQUES:  Will I be able to enter some

2 exhibits, your Honor?  A couple?

3    THE COURT:  Hold onto that thought.  I promise you

4 I'll circle back to you.  Let's see what we can get done

5 here.  Time is really short here.

6    (Pause in the proceedings.)

7    THE COURT:  I don't know if I have the minutes in

8 front of me.  I think we said we were going to have closing

9 briefs that were not to exceed 10 pages.

10    THE CLERK:  On February 28th, that was the order.

11    THE COURT:  Do you think I have minutes from that

12 day up here, or can I glance at yours?  Okay.

13    THE CLERK:  That was a past order.

14    THE COURT:  I think it was contemplated that the

15 hearing would be completed at an earlier date.  So, the

16 parties are going to be submitting written closing briefs

17 not to exceed 10 pages.  And then there would be an

18 opportunity to reply to the other person's brief not to

19 exceed 10 pages.  We do a contemporaneous exchange.  You'll

20 have so many days to respond to that.

21    One of the obviously primary issues here is

22 whether or not the parties are seeking to enjoin activity

23 that is constitutionally protected free speech.  That's

24 going to be one of the centerpieces of what you need to

25 address.

26    Also, insofar as you want to have a brief summary

27 of the reasons why you're asking for a restraining order,

28 enumerate them with any reference to the evidentiary record.

```
 1   You can do that, but you don't have to.  But that's
 2   something that you can do if you so choose to.
 3           The Court is fortunate we have transcripts of
 4   proceedings.  If there's any evidence you want to highlight,
 5   you can do that.
 6           MR. GREENSPAN:  Your Honor, do you automatically
 7   get copies of those transcripts, or should I assume that you
 8   have not seen the transcripts?
 9           THE COURT:  I have been because they're in
10   electronic format.  But I'm not sure I have all of them.  I
11   don't know if all of them have been requested.  I think
12   there have been different court reporters.  I think I got
13   the transcripts from the first court reporter.  Subsequent
14   court reporters, I'm not sure.
15           MR. GREENSPAN:  I have all of them.  If it would
16   help, I can e-mail them.
17           THE COURT:  So, if you want to provide them to the
18   Court and to Mr. MasMarques electronically.  Or are you not
19   allowed to do that?
20           THE COURT REPORTER:  I think they're not allowed
21   to do that.
22           THE COURT:  The Court will order a copy.  The
23   Court will take that initiative.  Thanks to our court
24   reporter for clarifying that.
25           THE COURT REPORTER:  I'm sorry, your Honor.  So,
26   you're ordering one copy?
27           THE COURT:  Well, I'm going to have to get in
28   touch with the various court reporters we have had.  I'm not
```

1    ordering a copy at this time.  I think probably the

2    Petitioner will probably order a copy, and then subsequently

3    I'll sort of do a joint request for all the transcripts.

4            THE COURT REPORTER:  Okay.  So, you're not

5    requesting from me at this time.

6            THE COURT:  Not at this time.

7            MR. GREENSPAN:  Please keep in mind that in order

8    to get the transcript is probably going to take a month and

9    a half.

10           THE COURT:  Does it take that long?

11           MR. GREENSPAN:  As far as actually --

12           If I can just say, I totally appreciate why a

13    briefing makes sense here.

14           THE COURT:  If both of you want to submit it

15    without briefing, that's fine.  If you're okay with that,

16    that's okay with me.

17           MR. GREENSPAN:  At this point, I've responded to

18    Mr. MasMarques's motions to the extent I've been able to see

19    them, because he never serves me with them.  Most of my

20    briefing is already on the record.

21           THE COURT:  If you want to have the matter

22    submitted with no additional briefing, that's fine.  It's

23    true the parties have sort of addressed the issues that the

24    Court has identified previously.

25           MR. MASMARQUES:  I do have copies of the

26    transcripts, your Honor.

27           THE COURT:  Are you okay with my review of the

28    transcripts and documents without any further briefing?  Mr.

1  Greenspan has indicated yes.  And is that suitable to you as
2  well?
3          MR. MASMARQUES:  I don't mean to ask a dumb
4  question, but what does that mean?
5          THE COURT:  It means I've heard everything.  I'm
6  going to be looking over the transcripts.  I'm going to be
7  looking over the documents, and I'm going to be making a
8  ruling.
9          I think what Mr. Greenspan is saying is he wants
10  an opportunity to have the transcripts prepared.
11          Are you going to be requesting a transcript from
12  today?
13          MR. GREENSPAN:  I will. I just want to be really
14  clear.
15          THE COURT:  Then the Court will go ahead and
16  request the transcripts at a later date, because they're
17  going to be useful to me in making a determination on the
18  issues.  I want to be able to go back and look through the
19  transcripts.  That will be at a later date.
20          MR. GREENSPAN:  The Constitutional issue, which is
21  what I think you wanted some briefing on --
22          THE COURT:  You addressed that today in your
23  statements.
24          MR. GREENSPAN:  Well, I addressed it today and
25  some in the opposition to the motions.  So, that's there.
26          My primary concern is my safety and my family's
27  safety.  At the moment, when I go home today, this will be
28  an ongoing issue.

1          THE COURT:  I'm going to reissue the restraining

2     orders.  We're going to maintain the status quo.

3          MR. GREENSPAN:  That's what concerns me, because

4     in a week I have a hearing now, thanks to Mr. MasMarques, in

5     Massachusetts where they're considering criminal charges on

6     the basis of this counter-TRO which you never, I believe,

7     reviewed.  That was reviewed by a different judge.

8          THE COURT:  Well, I'm not going to interfere with

9     the determination that was made by a different judge.  That

10    was their determination at the time.

11         MR. GREENSPAN:  Okay.  But I just want to point

12    out there is a due process issue here, because when you

13    reviewed my initial TRO, you scratched out some text that

14    you said would have a First Amendment issue.  And I don't

15    think that process ever happened with Mr. MasMarques's TRO.

16    Because what he's asking for is both a First Amendment

17    violation and --

18         THE COURT:  Let's take a look at the most recent

19    TRO.

20         MR. GREENSPAN:  Yeah.

21         THE COURT:  Could you print out the most recent?

22    It's so late in the day.  Could you print out the most

23    recent TRO against Mr. Greenspan, and we'll see if the Court

24    had modified that in some fashion.

25         I'm going to indicate the matter is going to be

26    deemed submitted upon the Court's receipt of requested

27    transcripts.  Let me just get a general idea from our court

28    reporter.  What's realistic in terms of if the Court should,

1   or parties should, request a copy of the transcript, in

2   terms of time?

3          THE COURT REPORTER:  Within a month.

4          THE COURT:  Okay.  Can we say the matter can be

5   deemed submitted 30 days from today?  Is that agreeable?

6          MR. GREENSPAN:  That's fine.

7          THE COURT:  Let's identify 30 days from today.

8          MR. GREENSPAN:  That's fine, provided there are no

9   further motions from Mr. MasMarques.

10          THE COURT:  I'm glad you brought up the issue of

11   motions.  The one motion to seal the record is denied in

12   large measure.  I am going to grant that one component where

13   we're going to arrange with the clerk's office to ensure

14   that your California driver's license and social security

15   number and personal residence address are redacted.  We'll

16   need to -- The Court is going to need to prepare an order in

17   that regard.

18          In terms of your request that Mr. Greenspan be

19   determined a vexatious litigant, it's not appropriate for

20   the Court to determine that in the context of this case at

21   this time.  The Court does not find good cause or

22   justification for granting such a motion.  So, that's going

23   to be denied.

24          I have another motion, which I have to refresh my

25   memory as to which one that is.

26          MR. GREENSPAN:  There's a motion which I've never

27   actually seen for an injunction.

28          THE COURT:  To close down your website.  That is

1  outside of the scope of these proceedings.  Mr. Greenspan

2  has not been furnished with a notice that you're going to be

3  making such a request.  It really exceeds the bounds of what

4  the Court should be determining in the context of a civil

5  harassment case.  It sounds more like a general jurisdiction

6  civil request, an injunction request.  It's not appropriate

7  here.  It's outside of the scope of what was initially

8  requested.  It's denied.

9            MR. MASMARQUES:  But it's also for him to stop

10  posting things about me online.

11            THE COURT:  I'm going to deal with the initial

12  requests that were made.  People do have to have due

13  process.  Mr. Greenspan is not going to be adding any

14  requests that were not part of his initial request.  I'm not

15  going to allow you to do that either, because it's unfair.

16            MR. MASMARQUES:  Yes, your Honor.

17            THE COURT:  And it exceeds the scope of the

18  original request.

19            So, on that stated order, I'll get an order out on

20  those motions as well, which I should be able to do within a

21  week's time.

22            I'm going to get another order out saying the

23  matter is going to be deemed submitted 30 days from today's

24  date to enable the Court to review transcripts of the

25  proceedings.

26            THE CLERK:  There was a motion to compel.

27            MR. GREENSPAN:   I'll withdraw that motion.

28            THE COURT:  Okay.  What about the --

1          I think our clerk is printing out the --

2          MR. MASMARQUES:  Your Honor, I don't mean to ask a

3    question --

4          THE COURT:  Hold onto that thought.  Do you want

5    to take a look and see if you feel the Court has addressed

6    that issue?  It's late in the day.

7          THE CLERK:  Is there a restraining order TRO?  I

8    have to get staff up here before we close.

9          THE COURT:  We'll send it out tomorrow.

10         MR. MASMARQUES:  May I ask a question, your Honor?

11         THE COURT:  Why don't you allow Mr. Greenspan to

12   look at documents first.  Hold onto that thought.  I will

13   circle back to you.

14         MR. GREENSPAN:  I think this is the wrong one,

15   because this is restraining Mr. MasMarques.  The issue I

16   have is the one that's restraining me.

17         THE COURT:  I think they're probably the same.

18         MR. GREENSPAN:  They're not.  That's the issue.

19   So, I think this is kind of like a game of telephone in that

20   this order is not the same as the initial TRO.  The initial

21   TRO that Mr. MasMarques had granted on July 3rd contained a

22   text about --

23         THE COURT:  So, this one probably omitted that

24   text.

25         MR. GREENSPAN:  I just want to get that on the

26   record whether that was intentional or unintentional.

27         THE COURT:  Oh, it would have been intentional,

28   because I think you raised this issue before.

```
 1              MR. GREENSPAN:  Okay.  I wasn't aware that had
 2   actually changed.
 3              THE COURT:  Oh, yeah.
 4              MR. GREENSPAN:  In that case, there's an
 5   application for criminal charges pending against me on the
 6   basis --
 7              THE COURT:  Would you like to know when that
 8   changed?
 9              MR. GREENSPAN:  Yeah, I would like to know that.
10              THE COURT:  Yeah, we can tell you that.  We can
11   figure that out.
12              MR. GREENSPAN:  Oh, I'm sorry.  It hasn't changed.
13   It's kind of buried here.  It's in section 6, No. 4.
14              THE COURT:  Okay.  What does it say in No. 4?
15              MR. GREENSPAN:  It says:  "Not to obtain
16   addresses, phone numbers, and any personal data/not to
17   upload on search engines."
18              That is a -- first of all --
19              THE COURT:  Can I take a look at it?
20              MR. GREENSPAN:  Sure.
21              THE COURT:  I don't have it in front of me.  Let
22   me take a look.
23              Folks, I'm going to tell you what's going to
24   happen at 5:00 p.m.  Our deputy is going to clear the
25   courtroom.  Let me take a look at this.  I must have
26   overlooked that, too.
27              Well, it should say not to improperly access
28   confidential information not available to the public.
```

1          MR. GREENSPAN:  That needs to be very clear,

2    because I don't want to go to jail for publishing public

3    records.

4          THE COURT:  Right.  Let me write that in right

5    now.

6          MR. MASMARQUES:  It's not public records.

7          THE CLERK:  That's not the request.  This would be

8    the new cross-request.

9          THE COURT:  That might have been -- I still don't

10   know what the original one said.

11         MR. GREENSPAN:  It was similar language.  It was

12   similar, but the fact is the same, that it is restraining

13   something that's a First Amendment protected activity.

14         MR. MASMARQUES:  I object to that, your Honor.

15   Judge Ryan put it in there for a reason.

16         THE COURT:  I want to have an order that is

17   appropriate and enforceable.  And it's not --

18         If something is public, people can access it.

19   It's that simple.

20         MR. MASMARQUES:  I don't think it's about the

21   public documents.  I think it's about getting access to my

22   personal information.

23         THE COURT:  That's right.  That's what I'm going

24   to address here.

25         MR. MASMARQUES:  He's not to post any of my

26   personal information, address, driver's license, social

27   security.  Nothing online.

28         MR. GREENSPAN:  Just to be clear, the Court cannot

1    order that under the Constitution.

2              MR. MASMARQUES:  Yes, it can, because that's

3    harassment.

4              THE COURT:  Certain information is deemed

5    confidential by law.  One example would be certain juvenile

6    records.  Insofar as there's not -- Mr. Greenspan is not

7    accessing and/or publishing private confidential

8    information --

9              MR. MASMARQUES:  Your Honor, real quick.  I'll do

10   this as quickly as possible.  He's posting my home address

11   on his website.  I have that as Exhibit --

12             MR. GREENSPAN:  Home addresses are listed in the

13   White Pages.

14             MR. MASMARQUES:  My home address is not listed in

15   the White Pages.  And he's been uploading my home address

16   all on the website under (inaudible phrase.)

17             (The court reporter attempted to clarify what was

18   said.)

19             MR. MASMARQUES:  Mr. Greenspan has been uploading

20   my home address.

21             THE COURT:  Are you publishing his home address?

22             MR. GREENSPAN:  No.

23             MR. MASMARQUES:  Yes, he is on third party

24   websites.  It's also on PlainSite.

25             THE COURT:  Refrain from publishing or accessing

26   private confidential information concerning the protected

27   person --

28             MR. MASMARQUES:  He was able to withdraw.  Is

1   there a difference when your motion is denied or withdrawn?

2   THE COURT:  -- and publishing his residential

3   address.  Okay?

4   MR. MASMARQUES:  And social security and driver's

5   license number and date of birth.

6   MR. GREENSPAN:  Date of birth is part of the

7   public records.

8   MR. MASMARQUES:  And any of my immediate family's

9   information as well, ma'am.  I'm sorry, your Honor.  I'm so

10  tired.

11  THE COURT:  Residential address, social security

12  number, and driver's license number.

13  MR. MASMARQUES:  And any of my immediate family's

14  personal information.  I apologize.  I had a long flight

15  last night, your Honor.  I didn't sleep very well.  I flew

16  into San Jose last night.

17  THE COURT:  I'll just say this provision shall

18  also apply to the additional protected persons.

19  You have to understand even if Judge Ryan issued

20  an order, if this Court issues an order that is overly broad

21  in terms of Constitutional protections, it's going to be

22  invalidated.  You could only violate an order that is

23  lawful.  The order has to be lawful in order to be violated.

24  MR. GREENSPAN:  Your Honor, I just want to make it

25  clear on the record some of this information is already

26  public, so I don't want to be accused by Mr. MasMarques of

27  publishing something that's already in the public domain.

28  MR. MASMARQUES:  No, my home address.  My home

1   address is not.

2           THE COURT:  Refrain from accessing and/or

3   publishing confidential personal information.

4           MR. MASMARQUES:  With all due respect, your Honor,

5   can I --

6           THE COURT:  You're interrupting the Court.

7   Personal information concerning the protected person and

8   publishing his residential address, social security number,

9   driver's license number.  This provision should also apply

10  to the additional protected persons who are family members.

11          Mr. MasMarques and Mr. Greenspan, make sure you

12  don't take any marked exhibits out with you today.  We have

13  an obligation to retain those until the Court issues its

14  ruling.

15          MR. GREENSPAN:  Will we get a copy of that ruling

16  by mail?

17          THE COURT:  It's not going to be filed upstairs.

18  I think our clerk is going to file it.  It is only going to

19  be in effect until July 1st.  That gives me 30 days to get

20  transcripts and make a ruling on the matter.  It'll expire

21  sooner if the Court gets its order out sooner.

22          MR. GREENSPAN:  So, just to confirm, the order

23  today, we'll get today.  The ruling you create in about a

24  month, we'll get by mail?

25          THE COURT:  Yes.

26          MR. MASMARQUES:  Your Honor, may I enter two more

27  exhibits for the record?

28          THE COURT:  The evidence is closed.  I'm going to

1  get further orders out tomorrow on the motions and indicate

2  the matter is deemed submitted in 30 days, as of today's

3  date.

4          MR. MASMARQUES:  Can I ask you a question, your

5  Honor?

6          THE COURT:  Yeah, but I think our deputy is

7  getting ready to clear the building.

8          MR. MASMARQUES:  Mr. Greenspan withdrew his

9  motion, and mine were denied.  Is there a difference in the

10  way it's going to show on the docket?

11          THE COURT:  I'll issue a court order.  I just

12  don't have time to do it right now.

13          MR. MASMARQUES:  Oh, because I can withdraw mine

14  as well.

15          THE COURT:  Are you wanting to withdraw your

16  motions?

17          MR. MASMARQUES:  If he withdrew his, I would.

18          THE COURT:  You're not withdrawing your motion to

19  seal, right, because we're going to redact that one item?

20          MR. MASMARQUES:  Yes, your Honor.

21          THE COURT:  Other than that, are your motions

22  withdrawn?

23          MR. MASMARQUES:  Yes, your Honor.

24          THE COURT:  Then I'll have the order blacked out.

25          MR. MASMARQUES:  I would like to --

26          THE COURT:  We don't have time for anything else.

27  If you have a question, you can ask.  Go ahead.

28          MR. MASMARQUES:  I would like to have that police

1    report.  I know you said you redacted the information, but I
2    don't think it belongs in the docket.
3            THE COURT:  One minute before five, the matter has
4    been addressed.  I indicated what the Court is intending to
5    do.  If that's not satisfactory to you, you better tell me
6    in the next 30 seconds.
7            MR. MASMARQUES:  Yes, your Honor.  Can I --
8            THE COURT:  Listen.  Any sealing order that the
9    Court issues has to be narrowly tailored to address just the
10   objectionable information.  I'm indicating I'm redacting the
11   information that you indicated was objectionable.
12           Do you have any problem with that?
13           MR. MASMARQUES:  No, your Honor.
14           THE COURT:  We're going to be in recess.  Thank
15   you.
16           (Whereupon, court proceedings adjourned.)

```
 1   STATE OF CALIFORNIA     )
                             )        SS.
 2   COUNTY OF SANTA CLARA   )

 3

 4

 5           I, AMY L. GOODING, CSR, HEREBY CERTIFY:

 6           That I was the duly appointed, qualified shorthand

 7   reporter of said court in the above action taken on the

 8   above date; that I reported the same in machine shorthand

 9   and thereafter had the same transcribed through

10   computer-aided transcription as herein appears; and that the

11   foregoing pages contain a true and correct transcript of the

12   proceedings had in said matter at said time and place to the

13   best of my ability.

14           I further certify that I have complied with CCP

15   237(a)(2) in that all personal juror identifying information

16   has been redacted, if applicable.

17           DATED:  May 21, 2019

18

19                               / AMY GOODING /

20                             _____

21                             Amy Gooding, CSR
                               CSR Certificate No. 13386

22

23

24   California Government Code section 69954(d) states:

25           "Any court, party, or person who has purchased a
     transcript may, without paying a further fee to the
26   reporter, reproduce a copy or portion thereof as an exhibit
     pursuant to court order or rule, or for internal use, but
27   shall not otherwise provide or sell a copy or copies to any
     other party or person."

28
```

———"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"———

1            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               IN AND FOR THE COUNTY OF SANTA CLARA

3              BEFORE THE HONORABLE CAROL OVERTON, JUDGE

4                            DEPARTMENT 11

5

6    AARON JACOB GREENSPAN,                    )
                                              )
7                           PETITIONER,        )
                                              )
     VS.                                       )  NO. 18CH008067
8                                             )
     DIEGO MAS MARQUES, JR.                     )
9                                             )
                            RESPONDENT.        )
10   _____)

11

12

13

14                REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                   HELD ON:  OCTOBER 30, 2019

17

18

19

20

21   A-P-P-E-A-R-A-N-C-E-S:

22

23    FOR THE PEOPLE:        AARON GREENSPAN, IN PRO PER

24

25    FOR THE DEFENDANT      DIEGO MAS MARQUES, JR. IN PRO PER
                             VIA TELEPHONE

26    COURT REPORTER:        VIRGINIA BARRIOS, C.S.R.
                             CERTIFICATE NUMBER 6771

27

28

———VIRGINIA BARRIOS, CSR 6771———

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

INDEX

HEARING                                    PAGE 3

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

```
 1   SAN JOSE, CALIFORNIA                    OCTOBER 30TH, 2019

 2                        P-R-O-C-E-E-D-I-N-G-S

 3              (WHEREUPON, COURT CONVENED AND THE FOLLOWING

 4   PROCEEDINGS WERE HELD.)

 5              THE COURT:  WE'LL CALL THE MATTER OF AARON

 6   GREENSPAN VERSUS DIEGO MAS MARQUES.  ALSO, DIEGO MAS MARQUES

 7   VERSUS GREENSPAN.  WE HAD INITIALLY A HEARING REQUESTING

 8   RESTRAINING ORDERS.

 9              WE HAVE A MOTION TO RECONSIDER BY MR. MAS MARQUES.

10   A MOTION FOR SANCTIONS, MOTION FOR ATTORNEYS FEES BY MR.

11   GREENSPAN.  LET'S GET APPEARANCES.

12              MR. GREENSPAN:  AARON GREENSPAN.

13              THE CLERK:  ON COURTCALL.

14              MR. MAS MARQUES:  YES.

15              THE COURT:  COULD YOU STATE YOUR NAME, PLEASE.

16              MR. MAS MARQUES:  IT IS DIEGO MAS MARQUES.

17              THE COURT:  NOW, I THINK EVERYBODY HAS BEEN DULY

18   NOTICED OF TODAY'S PROCEEDINGS THAT IS NOT AN ISSUE; IS THAT

19   CORRECT?

20              MR. GREENSPAN:  CORRECT.

21              THE COURT:  MR. MAS MARQUES, DO YOU AGREE, WE'RE

22   HERE PROPERLY BEFORE THE COURT?

23              MR. MAS MARQUES:  YES, YOUR HONOR.

24              THE COURT:  SO WE'RE GOING TO START WITH YOUR

25   REQUEST FOR RECONSIDERATION.  AND I'M JUST GETTING INTO THAT

26   DOCUMENT RIGHT NOW; SO I HAVE IT IN FRONT OF ME.  I THINK I

27   PREVIOUSLY ISSUED AN ORDER FOR SEALING OF DOCUMENTS, OR

28   PROPORTION OF DOCUMENTS, CONFIDENTIAL INFORMATION.  I'M JUST
```

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    TRYING TO DO A LITTLE RECAP HERE.  I THINK THERE WERE SOME

2    PROCEDURAL AFFIRMATIVE LAST TIME RELATIVE TO PROOFS OF

3    SERVICE AND PROPER SERVICE.

4         AND SO WE'RE STARTING WITH MR. MAS MARQUES' MOTION.

5    SO YOU HAD BRIEFED THE MATTER.  I HAVE ACTUALLY THE DOCUMENT

6    IN FRONT OF ME FOR REFERENCE PURPOSES.  THE COMPUTER IS A

7    LITTLE SLOW.  BUT YOU HAD A MOTION, AND ALSO SOME ATTACHMENTS

8    TO THE MOTION; IS THAT CORRECT?

9         MR. MAS MARQUES:  THAT'S CORRECT, YOUR HONOR.

10        THE COURT:  SO I DON'T NEED THE PARTIES TO

11   REITERATE WHAT'S ALREADY IN THE PAPERS, BUT I'LL GIVE SOME

12   LIMITED TIME FOR YOUR ORAL ARGUMENTS.  ARE THERE ANY POINTS

13   THAT YOU WANT TO MAKE BRIEFLY RELATIVE TO YOUR REQUEST FOR

14   RECONSIDERATION?

15        MR. MAS MARQUES:  YES, I DO, YOUR HONOR.

16        THE COURT:  WHENEVER YOU'RE READY.

17        MR. MAS MARQUES:  OKAY.  WELL, THERE IS ABSOLUTELY

18   NO REASON FOR MR. GREENSPAN TO HAVE A RESTRAINING ORDER,

19   BECAUSE I HAVE NOT HARASSED HIM, I HAVE NOT THREATENED HIM IN

20   ANY WAY.  AND THE OPPOSITE IS TRUE, IT IS MR. GREENSPAN WHO

21   HAS BEEN DOING ALL OF THE HARASSMENT, USING SOCIAL MEDIA

22   ACCOUNTS, HIS TWO TWITTER ACCOUNTS, POSTING THINGS ON VARIOUS

23   SITE.  AND SO MR. GREENSPAN SHOULD NOT BE AFFORDED ANY

24   RESTRAINING ORDER.  AND IF HE THINKS THAT I'M POSTING THINGS,

25   WHICH I'M NOT, THEN HE CAN DO A DEFAMATION SUIT.  THIS HAS

26   NOTHING TO DO WITH A RESTRAINING ORDER.  I HAVE NOT HARASSED

27   HIM AND STILL, TO THIS DAY, YOUR HONOR, MR. GREENSPAN

28   HARASSED ME USING HIS TWITTER ACCOUNT.  AND SINCE MY

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    AUGUST 30TH, 2019, T.R.O. LAPSED, MR. GREENSPAN HAS BEEN ON A

2    HARASSMENT CAMPAIGN LIKE YOU WOULDN'T BELIEVE.  I MEAN,

3    CYBER-STALKING, HARASSING ME, CLAIMING I AM THE ONE WHO

4    POSTED THE ITEMS UP, WRITTEN AND POSTED AND I HAVE NOT

5    UPLOADED ANY PICTURES THAT HE BLAMES ME FOR.  HE STATES TO ME

6    FOR ANYTHING UNDER THE SUN AND THAT'S WHAT I WANT THIS COURT

7    TO HEAR.  IT IS NOT ME.  SO IF SOMEBODY IS DOING SOMETHING TO

8    MR. GREENSPAN, HE SHOULD FIND OUT WHO IT IS, BECAUSE IT IS

9    NOT ME.  I SHOULD NOT HAVE A RESTRAINING ORDER OVER MY HEAD

10   BY THIS INDIVIDUAL BECAUSE HE IS VERY ABUSIVE, AND, YOU KNOW,

11   HE HAS BEEN FRAMING ME SAYING I'VE BEEN UPLOADING THIS AND

12   THAT AND PICTURES AND I HAVE NOT.  I'M STATING THIS UNDER

13   OATH.  THIS IS THE GOD-HONEST TRUTH.  I HAVE NOT UPLOADED ANY

14   PICTURES THAT MR. GREENSPAN HAS PRESENTED, AND I HAVE NOT

15   HARASSED HIM AND I HAVE NOT THREATENED HIM; THEREFORE, HE

16   SHOULD NOT HAVE A RESTRAINING ORDER.  I DON'T HAVE A

17   RESTRAINING ORDER.  HE SHOULD NOT HAVE A RESTRAINING ORDER.

18   AND MR. GREENSPAN SHOULD MOVE ON AND JUST TRY TO LEAVE MYSELF

19   AND MY FAMILY ALONE.  THAT'S ALL I HAVE TO SAY ABOUT THIS,

20   YOUR HONOR.

21          THE COURT:  MR. MAS MARQUES, LET ME ASK YOU THIS

22   QUESTION JUST FOR CLARIFICATION OF ONE OF THE THINGS THAT YOU

23   SAID.  YOU SAID THAT MR. GREENSPAN HAS BEEN ON A

24   CYBER-STALKING CAMPAIGN, ARE YOU SAYING THIS HAS BEEN

25   HAPPENING SINCE THIS COURT DENIED THE RESTRAINING ORDER

26   AGAINST HIM IN THIS CASE?

27          MR. MAS MARQUES:  OH, YES, YOUR HONOR.

28          THE COURT:  WAIT, LET ME JUST TELL YOU THIS, MR.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

 1   MAS MARQUES, ON COURTCALL, IT IS REALLY HARD TO INTERJECT,

 2   WHEN I TRY TO DO THAT, FOR SOME REASON, IT IS HARD FOR THE

 3   PERSON ON THE PHONE TO HEAR.  BUT I WANT YOU TO FOCUS ON WHAT

 4   I'M SAYING, OKAY?  LISTEN.  IF THERE HAS BEEN HARASSING

 5   BEHAVIOR PERPETUATED BY MR. GREENSPAN AGAINST YOU SINCE THE

 6   COURT DENIED THE RESTRAINING ORDER -- AND LET ME GET THE DATE

 7   ON THAT BECAUSE I THINK -- LET ME SEE WHAT DATE I MADE THAT

 8   DECISION.  THERE WAS A CIVIL HARASSMENT RESTRAINING ORDER

 9   AFTER HEARING THAT WAS ISSUED AGAINST, LET ME SEE, MR. MAS

10   MARQUES, I BELIEVE, ON AUGUST 30TH AGAINST MR. MAS MARQUES

11   THAT'S VALID THROUGH AUGUST 30TH, 2021.

12         SO THE DENIAL OF THE RESTRAINING ORDER, I BELIEVE,

13   OCCURRED AT OR AT THE SAME TIME AT AROUND THE SAME TIME; SO

14   ARE YOU SAYING SINCE, LET'S SAY, SEPTEMBER OF THIS YEAR YOU

15   HAVE BEEN HARASSED BY MR. GREENSPAN?

16         MR. MAS MARQUES:  YES, YOUR HONOR.  I CAN HONESTLY

17   INFORM YOU THAT I HAVE BEEN; IN A VERY VICIOUS MANNER.  HE

18   HAS STEPPED UP HIS HARASSMENT CAMPAIGN IN A BIG WAY,

19   ESPECIALLY AFTER MY RESTRAINING ORDER AGAINST HIM, MY T.R.O.

20   LAPSED, IT WAS ALLOWED TO LAPSE.  HE HAS GONE OFF THE CLIFF

21   WITH HARASSMENT.  I MEAN, ON TWITTER, ON WEB SITES, YOU KNOW,

22   THESE TWEETS HE HAS BEEN PUTTING OUT FALSE INFORMATION ABOUT

23   ME, THEY ARE FINDING THEIR WAY IN THE SEARCH ENGINES, YOUR

24   HONOR, AND THEY ARE RUINING MY REPUTATION.

25         THE COURT:  MR. MAS MARQUES.

26         MR. MAS MARQUES:  AND MY CAREER.

27         THE COURT:  MR. MAS MARQUES, I THINK WHAT YOU ARE

28   TELLING ME IS THERE HAS BEEN, YOU SAID, A CAMPAIGN OF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    HARASSMENT.  YOU TALKED ABOUT TWITTER, BUT YOU NEED TO TELL

2    ME WHAT ARE YOU SAYING THAT MR. GREENSPAN HAS DONE SINCE THE

3    TEMPORARY RESTRAINING ORDER EXPIRED.  TELL ME SPECIFICALLY SO

4    I CAN UNDERSTAND WHAT HAS HE DONE.

5            MR. MAS MARQUES:  WELL, I'VE BEEN KEEPING RECORDS

6    OF EVERYTHING, YOUR HONOR.  SO HE HAS BEEN GOING ONLINE, HE'S

7    HAS BEEN CALLING ME A MURDERER, YOUR HONOR, HE HAS BEEN

8    CALLING ME THE ALLEGED RAPIST.  HE'S STILL AT IT, YOUR HONOR.

9    HE'S STILL AT IT.  HE HAS BEEN DOING THIS ONE HERE NOT TOO

10   LONG AGO.  AND, YOU KNOW, DIEGO MAS MARQUES IS A MURDERER AND

11   AN ALLEGED RAPIST.  AND I HAVE NOW A PERMANENT RESTRAINING

12   ORDER, HE SAYS.  MR. MAS MARQUES' RESTRAINING ORDER WAS

13   CANCELLED OUT, SOMETHING TO THAT EFFECT, AND JUST RANTING AND

14   RAVING, AND GOING ON, CALLING ME NAMES AND JUST CONTINUOUS

15   HARASSMENT --

16           THE COURT:  WAIT A SECOND.

17           MR. MAS MARQUES:  -- AND WHAT IS GOING ON --

18           THE COURT:  MR. MAS MARQUES, YOU ARE UPSET ABOUT

19   THIS WHOLE SITUATION, I UNDERSTAND THAT, BUT I WANT YOU TO

20   TAKE IT A NOTCH DOWN SO YOU CAN HELP ME UNDERSTAND.  WHEN

21   YOU'RE SAYING HE IS GOING ON A RANT AND CALLING YOU NAMES,

22   ARE YOU SAYING MURDERER AND ALLEGED RAPIST?  ARE THOSE THE

23   NAMES OR ARE THERE OTHER NAMES?

24           MR. MAS MARQUES:  HE HAS SO MANY, IT'S JUST

25   UNBELIEVABLE.

26           THE COURT:  BUT, MR. MAS MARQUES, WE DEAL WITH

27   FACTS IN THE COURTROOM.  WE DEAL WITH FACTS.  SO I WANT YOU

28   TO MAKE A COGENT, CONCISE STATEMENT OF WHAT MR. GREENSPAN HAS

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   DONE SINCE YOUR RESTRAINING ORDER AGAINST HIM EXPIRED.  YOU

2   SAID HE IS GOING ONLINE CALLING YOU A MURDERER, AND AN

3   ALLEGED RAPIST, THOSE THINGS YOU'VE TOLD ME.  BUT ARE THERE

4   OTHER NAMES, ARE THERE OTHER THINGS THAT HE HAS DONE,

5   ACCORDING TO YOUR EXPERIENCE SINCE LET'S SAY THE FIRST OF

6   SEPTEMBER OF THIS YEAR?  IF YOU KEEP SAYING HE HAS DONE

7   HORRIBLE THINGS WITHOUT TELLING ME WHAT THOSE HORRIBLE THINGS

8   ARE, I'M NOT GOING TO HAVE AN UNDERSTANDING.  CAN YOU DO

9   THAT?

10           MR. MAS MARQUES:  HE IS ACCUSING ME -- YES -- HE'S

11  ACCUSING ME OF WRITING COMMENTS ON SITES THAT I HAVE NOT

12  WRITTEN.  HE'S POSTING COMMENTS SAYING THEY CAME FROM ME WHEN

13  THEY DID NOT.

14           THE COURT:  STOP RIGHT THERE.  WHAT COMMENTS IS HE

15  ATTRIBUTING TO YOU THAT YOU DID NOT MAKE?  WHAT COMMENTS WERE

16  THOSE?

17           MR. MAS MARQUES:  I HAVE TO GO TO THE TWEETS.

18  THERE ARE SO MANY OF THEM.

19           THE COURT:  JUST GIVE ME AN EXAMPLE, BECAUSE HE IS

20  ACCUSING YOU OF MAKING COMMENTS THAT YOU HAVE NOT MADE,

21  THAT'S A SERIOUS ALLEGATION.  WHAT COMMENTS IS HE SAYING

22  YOU'VE MADE THAT ARE NOT TRUE?

23           MR. MAS MARQUES:  YOU KNOW, THIS IS AN INJUSTICE

24  THAT'S GOING ON HERE.  THIS IS NOT JUSTICE.  MR. GREENSPAN

25  HAS BEEN HARASSING AND CYBER-STALKING ME --

26           THE COURT:  MR. MAS MARQUES, PLEASE, LISTEN TO THE

27  COURT.  MR. MAS MARQUES, I'M TRYING TO GET THE FACTS HERE.

28  YOU STATED THAT MR. GREENSPAN HAS ACCUSED YOU OF MAKING

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   COMMENTS THAT YOU DID NOT MAKE, AND REPRESENTING ONLINE THAT

2   YOU MADE THESE COMMENTS.  WHAT COMMENTS IS HE ACCUSING YOU OF

3   MAKING?  YOU MAY HAVE SOME LEGITIMATE COMPLAINTS AGAINST HIM,

4   BUT UNLESS YOU TELL ME WHAT THEY ARE, YOU CAN'T HOPE FOR ME

5   TO UNDERSTAND.  SO I'M ASKING YOU, WHAT COMMENTS IS HE SAYING

6   YOU MADE THAT YOU DID NOT MAKE.

7          MR. MAS MARQUES:  I HAVE TO GO INTO THE TWEETS.  SO

8   HE ACCUSED ME OF WRITING 300 COMPLAINTS ON

9   COMPLAINTSBOARD.COM, AND I HAVE NOT DONE THAT AND ALL KINDS

10  OF CLAIMS HE IS TALKING ABOUT.  HE IS WRITING THAT TO OTHER

11  PEOPLE.  ALSO THE TWITTER FOLLOWERS, I DON'T KNOW, ASSOCIATES

12  WHO ARE WRITING MY NAME DOWN ALSO ON TWITTER AND TWEETS AND

13  IT IS COMING UP ON SEARCH ENGINES.

14         THE COURT:  SO YOU'RE SAYING ONE OF THE THINGS HE

15  HAS POSTED IS NOT TRUE IS THAT YOU'VE MADE 300 COMPLAINTS?

16         MR. MAS MARQUES:  YEAH.  THAT I PUT COMPLAINTS, YOU

17  KNOW.  HE HAS IT ALL WRONG, YOUR HONOR.  I REALLY WISH I

18  WOULD HAVE BEEN ABLE TO SIT DOWN AND TALK TO HIM IN A

19  RESPECTFUL MANNER BECAUSE HE DOESN'T UNDERSTAND THAT I AM NOT

20  THE PERSON, YOU KNOW, TRYING TO (UNINTELLIGIBLE) TO HIM.  I

21  HAVE NOT HARASSED OR THREATENED THIS MAN.  ALL I EVER ASKED

22  HIM TO DO IS LEAVE ME ALONE, AND TO DELETE THE DOCUMENTS FROM

23  -- SO I CAN MOVE ON WITH MY LIFE.  I'M GOING THROUGH THE

24  COMPUTER RIGHT NOW.  IT IS IN FRONT OF ME.  IT IS SO MUCH,

25  YOUR HONOR, HOLD ON.  I KNOW YOU WANT DETAILS.

26         THE COURT:  IS THERE ANYTHING ELSE THAT YOU'RE

27  ALLEGING THAT HE HAS DONE SINCE THE TEMPORARY RESTRAINING

28  ORDER EXPIRED?

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1         MR. MAS MARQUES:  ESSENTIALLY, HE'S STILL THROWING

2    MY NAME AROUND, AND IT'S STILL COMING UP ON THE SEARCH

3    ENGINES.  HE'S STILL WRITING ABOUT ME.  HE'S STILL BLAMING ME

4    THAT I HAVE DONE SOMETHING TO HIM, BUT I HAVE NOT DONE, YOUR

5    HONOR.

6         THE COURT:  WAIT, MR. MAS MARQUES, YOU TOLD ME THAT

7    HE'S SAYING YOU PUT THESE COMPLAINTS OUT ONLINE, BUT WHAT

8    ELSE HAS HE ACCUSED YOU OF DOING OR SAYING THAT YOU HAVE NOT

9    DONE OR SAID SO I CAN UNDERSTAND?

10        MR. MAS MARQUES:  OKAY.  I DIDN'T REALIZE YOU WERE

11    GOING TO ASK ME THAT RIGHT THIS MORNING; SO I HAVE IT ALL

12    HERE IN THE ARCHIVES.

13        THE COURT:  LET ME JUMP IN JUST SO I CAN EXPLAIN MY

14    APPROACH TODAY.  I DON'T WANT A SCENARIO WHERE A RESTRAINING

15    ORDER IS DENIED, AND SOMEBODY GOES FORWARD AND THEY ENGAGE IN

16    HARASSING CONDUCT.  THAT'S NOT OKAY.  AND IT WILL BRING

17    EVERYBODY BACK INTO COURT.  BUT MY QUESTION TO YOU, OR THE

18    ANSWERS THAT YOU'VE GIVEN SORT OF UNDERSCORE THE PROBLEM THAT

19    I HAVE WITH YOUR ALLEGATIONS AGAINST MR. GREENSPAN THROUGHOUT

20    THE HEARING.  I KNOW THAT YOU'RE UPSET.  I KNOW THAT YOU'RE

21    AGITATED.  I KNOW THAT YOU'RE SEEKING JUSTICE FOR YOURSELF.

22    BUT YOU HAVE TO UNDERSTAND THAT A JUDGE CAN ONLY MAKE A

23    DECISION BASED ON FACTS.  YOU'RE BOTH NOT REPRESENTED BY

24    COUNSEL, AND MAYBE YOU'RE NOT FAMILIAR WITH COURTROOM PROCESS

25    OR THE BURDENS OF PROOF THAT IS REQUIRED IN A CIVIL ACTION.

26    I'M NOT SAYING THAT THE THINGS THAT YOU HAVE ACCUSED MR.

27    GREENSPAN OF DOING THAT CAUSED YOU TO COME INTO COURT AND ASK

28    FOR THE INITIAL RESTRAINING ORDER AGAINST HIM.  I'M NOT

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    SAYING THAT THOSE THINGS THAT YOU'VE ALLEGED ARE FALSE.  I'M

2    NOT SAYING THAT HE DIDN'T DO THOSE THINGS, HE MAY HAVE.  AND

3    I UNDERSTAND THAT YOU'RE VERY UPSET WITH HIM.  PEOPLE USUALLY

4    DO NOT GET UPSET FOR NO REASON, SOMETIMES THEY DO, BUT I HAVE

5    TO MAKE MY DECISION BASED ON THE EVIDENCE THAT'S PRESENTED.

6    AND I HAVE TO WEIGH THE EVIDENCE AND DETERMINE IF THE

7    EVIDENCE THAT IS PRESENTED IS RELIABLE AND WHETHER IT'S

8    CREDIBLE, AND WHETHER IT'S PERSUASIVE.  SO LET ME JUST TELL

9    YOU A LITTLE ABOUT MY PERSPECTIVE HERE JUST TO GIVE YOU SORT

10   OF A FRAME OF REFERENCE.  ORIGINALLY, AS I RECALL, AND YOU

11   BOTH CAN CORRECT ME IF I'M WRONG BECAUSE WE'VE HAD MULTIPLE

12   SESSIONS IN HERE AND WE MAY RECALL THINGS DIFFERENTLY, BUT

13   YOU CAME IN AND SAID HE WAS IMPERMISSIBLY PUBLISHING

14   INFORMATION ABOUT YOUR CRIMINAL HISTORY, AND THIS IS

15   CONFIDENTIAL.

16           MR. MAS MARQUES:  THAT'S NOT --

17           THE COURT:  NOW, WAIT A SECOND.  THAT WAS A BIG

18   FOCUS OF THIS CASE THIS SORT OF MISCHARACTERIZATION OR

19   IMPROPER DESCRIPTION OF THE CRIMINAL ACTIVITY OR

20   MISREPRESENTING THE PROCEDURES -- DON'T INTERRUPT ME, PLEASE

21   -- BACK IN SPAIN.  AND AT ONE POINT IN THE HEARING I THINK

22   WHEN YOU WERE QUESTIONED, ASKED A DIRECT QUESTION, YOU

23   CONCEDED THE INFORMATION WAS NOT CONFIDENTIAL IN NATURE, BUT

24   YOU WERE GOING TO SEEK A PROTECTIVE ORDER, BUT IT WAS VERY

25   CLEAR ON THE RECORD IN THESE PROCEEDINGS THAT THERE HAD BEEN

26   NO PROTECTIVE ORDER ISSUED.  AND AS I RECALL, MY RECOLLECTION

27   COULD BE FLAWED, I ASKED MR. GREENSPAN, "ARE YOU INTENDING TO

28   CONTINUE TO PUBLISH INFORMATION, IF THERE IS A DETERMINATION

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   MADE THAT THERE IS A SEALING ORDER, A MASKING ORDER,

2   SOMETHING THAT MAKES IT IMPROPER FOR THE INFORMATION TO BE

3   PUBLICALLY COMMUNICATED?"  AND MY RECOLLECTION WAS MR.

4   GREENSPAN SAID NO, HE IS NOT GOING TO DISOBEY A COURT ORDER.

5   AND IT WAS MY UNDERSTANDING THAT YOU WERE GOING TO SEEK THAT

6   FINAL ORDER.

7              AND THEN ALSO THROUGHOUT THE COURSE OF THE HEARING,

8   AS I RECALL, THERE WERE DISPUTES ABOUT WHAT ACTUALLY

9   HAPPENED.  WHAT WERE THE FACTUAL CIRCUMSTANCES THAT RESULTED

10  IN A CONVICTION IN SPAIN.  I UNDERSTAND, MR. MAS MARQUES,

11  THAT YOU SAID AT SOME POINT, THE WAY THEY ARE CHARACTERIZING

12  THE CHARGES IN THE UNITED STATES DO NOT EXACTLY MATCH WHAT

13  THE REAL CHARGES WERE IN SPAIN, AND IT GIVES AN IMPROPER

14  IMPRESSION OF WHAT ACTUALLY HAPPENED AND WHAT THE CONVICTION

15  WAS ACTUALLY FOR.  BUT THROUGHOUT THE COURSE OF THESE

16  PROCEEDINGS, I'VE HEARD VERY LITTLE ABOUT THE ACTUAL FACTS --

17  WAIT, I'M ALMOST DONE -- I'VE HEARD VERY LITTLE ABOUT THE

18  ACTUAL FACTS AND CIRCUMSTANCES THAT GAVE RISE TO THAT

19  CONVICTION.  SO I DON'T KNOW IF MR. GREENSPAN IS PUBLISHING

20  FALSE INFORMATION.  MAYBE HE IS.  MAYBE HE'S NOT.  BUT IF I

21  DON'T HAVE THE EVIDENCE THAT SHOWS THAT, THEN I CANNOT ACT

22  UPON THAT.  IF YOU CAN TELL ME, FOR EXAMPLE, WHAT

23  SPECIFICALLY DID HE PUBLISH ABOUT THE INCIDENT IN SPAIN THAT

24  WAS FALSE.  AND I HAD INFORMATION THAT I COULD RELY UPON TO

25  MAKE THAT DETERMINATION, BECAUSE PUBLISHING PUBLIC DOCUMENTS

26  ABOUT CRIMINAL ACTIVITY IS OKAY, IT IS PROTECTED ACTIVITY,

27  OKAY?  PUBLISHING FALSE INFORMATION IS NOT PROTECTED

28  ACTIVITY.  BUT IT REALLY HASN'T BEEN ESTABLISHED THROUGHOUT

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   THE COURSE OF THESE PROCEEDINGS THAT HE HAS PUBLISHED

2   INFORMATION THAT IS FALSE.  HE HAS GIVEN OPINIONS, AND HE'S

3   LASHED OUT IN WAYS THAT HE SHOULDN'T HAVE ON TWITTER.  BUT

4   I'M TALKING ABOUT THE INFORMATION THAT HE IS PUTTING OUT

5   THERE ABOUT WHAT HAPPENED IN SPAIN RESULTING IN THE

6   CONVICTION.  I DON'T KNOW THOSE CIRCUMSTANCES.  I KNOW WHAT

7   SORT OF WHAT HAS BEEN ALLUDED TO HERE, BUT OTHER THAN THAT I

8   DON'T KNOW ALOT.  I DON'T KNOW ENOUGH, FOR EXAMPLE, BASED ON

9   THE EVIDENTIARY RECORD SAYING MR. GREENSPAN IS PUBLISHING

10  FALSE INFORMATION.  MAYBE YOU CAN CLEAR THAT UP FOR ME NOW.

11      MR. MAS MARQUES:  WELL, YOUR HONOR, THIS IS NOT A

12  SIMPLE MATTER OF ABOUT PUBLISHING INFORMATION; THIS A MATTER

13  OF HARASSMENT.  AND, YOU KNOW, YOU SAY HE'S PROTECTED UNDER

14  THE FIRST AMENDMENT, BUT WHEN HE TAKES LEGAL DOCUMENTS AND HE

15  TAKES THEM AND HE PUTS THEM ON THIRD-PARTY WEB SITES, ON

16  BRIGHTSIDE (PHONETIC), AND THEN HE TWISTS AND TURNS THE FACTS

17  AROUND.  AND THEN HE HAS TAKEN SPANISH CLASSES LEARNING

18  (UNINTELLIGIBLE) AND I INFORMED THE COURT I WAS THERE.  AND

19  HE TRANSLATED IT INTO SPANISH, AND HE TRANSLATES IT INTO

20  ENGLISH AND A LOT OF THIS INFORMATION IS FALSE.  I THINK THE

21  FOCUS SHOULD NOT JUST BE ALL ON HIS -- A PERSON'S RIGHT TO BE

22  PUBLISHING DOCUMENTS, BECAUSE IT'S ABOUT HARASSMENT.  HE IS

23  USING THESE DOCUMENTS TO HARASS ME, YOUR HONOR.  THAT'S THE

24  BOTTOM LINE.

25      THE COURT:  MR. MAS MARQUES, I WANT TO GET YOU BACK

26  TO THE ORIGINAL POINT.  THERE ARE A NUMBER OF ALLEGATIONS

27  THAT YOU'VE MADE AND YOU'RE SAYING THERE IS A COURSE OF

28  HARASSING CONDUCT, AND THAT'S NOT LOST ON ME.  HE'S SORT OF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    FIXATED ON YOU -- AND THAT'S NOT LOST ON ME -- BUT HE IS

2    DOING WHATEVER HE CAN TO BASICALLY HARASS YOU THROUGH ALL OF

3    THESE POSTINGS.  BUT IN YOUR LAST STATEMENT, YOU TALKED ABOUT

4    TWISTING FACTS AND FALSEHOODS.  AND I'M STILL TRYING TO GET

5    YOU TO TELL ME WHAT DID HE PUBLISH THAT WAS TWISTED OR FALSE.

6            MR. MAS MARQUES:  YOUR HONOR, HE IS HARASSING ME

7    ONLINE.

8            THE COURT:  MR. MAS MARQUES, BY AVOIDING MY

9    QUESTION, YOU'RE STILL NOT EDUCATING ME ON WHAT HE'S DONE IN

10   TERMS OF HIS PUBLICATION CONTENT THAT HAS BEEN FALSE OR

11   TWISTED, AND THAT MAY NOT BE THE WHOLE CASE THAT YOU'RE

12   PRESENTING TO THE COURT, BUT IT IS A SIGNIFICANT PART OF THIS

13   CASE.  AND WHEN YOU'RE EITHER AVOIDING MY QUESTIONS OR YOU'RE

14   UNABLE TO ANSWER MY QUESTIONS, THEN YOU'RE NOT GIVING ME A

15   LOT TO WORK WITH ON YOUR BEHALF.

16           MR. MAS MARQUES:  WELL, ONE GOOD EXAMPLE IS, HE'S

17   CALLING ME A MURDERER.  THE PROBLEM IS WE HAVE THE FIRST

18   AMENDMENT IN THE UNITED STATES, YOU CAN'T BE CONVICTED TWICE

19   FOR THE SAME CRIME.  I SAID THIS TO YOU, MR. GREENSPAN IS

20   JUDGING ME OVER AND OVER AGAIN, AND THIS IS INJUSTICE, YOUR

21   HONOR, WHAT HE'S DOING.  IT'S NOT JUST A SIMPLE CASE OF HIM

22   PUBLISHING DOCUMENTS.  HE'S GOING WAY BEYOND AND ABOVE THAT.

23   HE'S GOING ON ABOUT WHAT HAPPENED IN SPAIN.  HE'S EXTRACTING,

24   YOU KNOW, THINGS OUT OF THE CASE, WHATEVER, FROM THE

25   DOCUMENTS THAT HE HAS GOTTEN AHOLD OF, AND THEN HE IS GOING

26   ON TO HIS TWITTER ACCOUNT AND MAKING FALSE STATEMENTS ABOUT

27   ME.  HE DOESN'T KNOW ANYTHING ABOUT WHAT HAPPENED IN SPAIN.

28           THE COURT:  OKAY.  MR. MAS MARQUES, THE PROBLEM IS

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1  I DON'T KNOW WHAT HAPPENED IN SPAIN EITHER.  AND I'M NOT

2  ASKING ANYBODY TO TELL ME.  ALL I'M SAYING IS YOU'RE SAYING,

3  AS PART OF YOUR CASE, THAT MR. GREENSPAN IS PUBLISHING FALSE

4  INFORMATION, EXTRAPOLATING INFORMATION, TO USE YOUR TERMS,

5  AND TWISTING THE FACTS AND BASICALLY SAYING SOMETHING ABOUT

6  THAT CONVICTION, AND THE FACTS AND UNDERPINNING OF THAT

7  CONVICTION ARE NOT TRUE, BUT YOU DON'T SHOW ME THAT HE HAS

8  DONE THAT.

9        THE EVIDENCE YOU HAVE GIVEN IS INSUFFICIENT TO MEET

10  YOUR BURDEN IN THIS CASE.  LET ME REMIND YOU THE BURDEN IS

11  CLEAR AND CONVINCING EVIDENCE, AND EVEN AFTER THIS HEARING,

12  I'M STILL TRYING TO FIND OUT FROM YOU WHAT DID HE SAY ABOUT

13  THAT INCIDENT THAT WAS FALSE.

14        NOW, YOU DON'T HAVE TO ANSWER THAT QUESTION, BUT

15  I'M JUST SAYING IF I DON'T KNOW WHETHER HE'S PUBLISHING

16  FALSEHOODS BECAUSE IT HAS NOT BEEN ESTABLISHED THAT WHAT HE

17  IS PUBLISHING IS FALSE, THEN I CAN'T USE THAT AS A BASIS FOR

18  GRANTING YOUR RESTRAINING ORDER.  IT'S NOT THAT I'M SAYING HE

19  HASN'T DONE IT.  I'M SAYING YOU HAVE NOT PROVEN TO THE LEVEL

20  OF PROOF REQUIRED IN THESE PROCEEDING THAT HE HAS DONE IT.

21  AND IN TERMS OF YOUR REQUEST FOR A RESTRAINING ORDER AGAINST

22  HIM, YOU DO HAVE THE BURDEN OF PROOF.

23        MR. MAS MARQUES:  WHERE IS THE BURDEN OF PROOF OF

24  MR. GREENSPAN?  I HAVEN'T HARASSED HIM.

25        THE COURT:  WAIT A SECOND.  ISN'T THE REASON WE'RE

26  HERE BECAUSE YOU'RE ASKING ME TO RECONSIDER MY -- EXCUSE ME.

27  YOU'RE HERE BECAUSE YOU'RE ASKING ME TO RECONSIDER MY

28  DECISION; RIGHT?

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1        MR. MAS MARQUES:  YES, YOUR HONOR.

2        THE COURT:  AND YOU'RE SAYING THAT HE HARASSED YOU;

3   RIGHT?

4        MR. MAS MARQUES:  THAT'S RIGHT.

5        THE COURT:  IF YOU'RE TRYING TO ESTABLISH HE

6   HARASSED YOU, AND YOU SHOULD HAVE A RESTRAINING ORDER AGAINST

7   HIM, IN THAT CASE, IN THAT ACTION, IN THAT CIRCUMSTANCE YOU

8   HAVE THE BURDEN OF PROOF.  AND IF YOU THINK THE COURT MISSED

9   SOME EVIDENCE OR DID NOT UNDERSTAND THE EVIDENTIARY RECORD,

10  I'M GIVING YOU AN OPPORTUNITY NOW AS PART OF YOUR MOTION, TO

11  TELL ME, WHAT DID HE POST ONLINE THAT WAS TWISTED AND/OR

12  FALSE?  WHAT?

13       MR. MAS MARQUES:  OKAY.  SO HERE IS ONE EXAMPLE.

14  HERE IS A TWEET FROM HIM OCTOBER 28TH.  IT SAYS, DOCUMENT 91,

15  MR. MAS MARQUES' MOST RECENT COURT ORDER, AND THEN HE

16  MENTIONED SOME GUY NAMED OMAR OAZI.  I DON'T KNOW WHO HE IS.

17       THE COURT:  COULD YOU SPELL THE NAME.

18       MR. MAS MARQUES:  HE HAS IT SPELLED, O-M-A-R,

19  Q-A-Z-I.

20       THE COURT:  GO AHEAD.

21       MR. MAS MARQUES:  HE SAYS, HE'S BEEN CONSTANTLY

22  REPEATING MR. MAS MARQUES' LIES, LARGELY FROM

23  COMPLAINTSBOARD, IN PARENTHESIS, FOR MONTHS, PERIOD.

24       THE COURT:  WHAT'S THE PURPOSE OF THAT, MR.

25  GREENSPAN?

26       MR. GREENSPAN:  THERE IS A LONG SAD STORY HERE.  I

27  WOULD ASK FOR YOUR PATIENCE.

28       THE COURT:  YOU'RE GOING TO HAVE TO SPEAK UP.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1      MR. MARQUES, CAN YOU HEAR?

2      MR. MAS MARQUEZ:  YES, I CAN HEAR.

3      THE COURT:  SPEAK UP.  TRY TO MAKE IT --

4      MR. GREENSPAN:  I'LL TRY TO BE CONCISE.

5      THE COURT:  THE MORE CONVOLUTED IT BECOMES, IT'S

6  HARDER FOR THE COURT TO UNDERSTAND.  I HAVE TO LIVE WITH THIS

7  AND TRY TO MAKE IT AS SIMPLE AS POSSIBLE.

8      MR. GREENSPAN:  SURE.  I'VE BEEN REPORTING ON

9  BILLIONAIRES, INCLUDING ELON MUSK WHO RUNS TESLA,

10  INCORPORATED.  MY NONPROFIT INTERVENED IN A COURT CASE

11  INVOLVING TESLA IN DELAWARE, STARTING ON SEPTEMBER 19, 2019.

12      MR. MAS MARQUES:  I CANNOT HEAR HIM.

13      THE COURT:  WILL YOU SPEAK UP.  YOU WILL HAVE TO

14  MAKE THAT EFFORT.

15      MR. GREENSPAN:  AS OF SEPTEMBER 19TH, MY FOUNDATION

16  INTERVENED IN A COURT CASE IN DELAWARE INVOLVING TESLA'S

17  BOARD OF DIRECTORS.  WE FILED A REQUEST TO UNSEAL SEVERAL

18  THOUSAND PAGES OF DOCUMENTS CONCERNING THE COMPANY'S MERGER

19  WITH SOLARCITY.  AND I HAVE VARIOUS REASONS TO BELIEVE THAT

20  THIS MADE THE BOARD OF DIRECTORS VERY UNCOMFORTABLE.

21      AFTER THAT REQUEST WAS FILED, I STARTED BEING

22  HARASSED BY PHONE, FAX, TEXT MESSAGE, EMAIL, AND ON VARIOUS

23  SITES INCLUDING TWITTER BY TESLA'S SHAREHOLDERS WHO WOULD

24  LIKE TO SEE THE PRICE OF THE STOCK GO UP.  AND THE PERSON

25  MOST VITRIOLIC IN HIS HARASSMENT WAS A MAN BY THE NAME OF

26  OMAR QAZI.  MR. QAZI APPARENTLY FOUND A LOT OF THE POSTS THAT

27  HAD BEEN REFERENCED IN THIS CASE ON COMPLAINTSBOARD.COM -- IT

28  IS JUST ONE WORD, COMPLAINTSBOARD -- AND BEGAN REPEATING

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    THOSE ALLEGATIONS AGAINST MYSELF AND MY FAMILY ON TWITTER TO

2    THE POINT WHERE ELON MUSK, TESLA'S CEO, WITH APPROXIMATELY 28

3    MILLION FOLLOWERS ON TWITTER, ALSO BEGAN TO PARROT SOME OF

4    THESE FALSE ALLEGATIONS.

5            I HAVE REPORTED THE HARASSMENT THAT MY FAMILY AND I

6    HAVE EXPERIENCED TO THE SAN FRANCISCO POLICE DEPARTMENT, TO

7    THE F.B.I., AND TO THE S.E.C., BECAUSE I TAKE THIS VERY

8    SERIOUSLY.  AND THAT IS THE REASON WHY AT ONE POINT, WHEN

9    SOMEBODY ASKED ME WHO IS THIS PERSON YOU HAVE A RESTRAINING

10   ORDER AGAINST, I ANSWERED IN THE MOST SUCCINCT AND FACTUAL

11   MANNER POSSIBLE, POINTING THEM TO THE DOCUMENT THAT CONTAINS

12   THE ORDER.

13           I HAVE GONE OUT OF MY WAY TO AVOID INVOKING MR. MAS

14   MARQUES' NAME BECAUSE I KNOW THAT HE IS VERY SENSITIVE TO THE

15   MENTION OF HIS NAME.

16           THE COURT:  WHAT DOES ALL THIS TESLA STUFF HAVE TO

17   DO WITH YOUR TELLING SOMEBODY MR. MAS MARQUES' NAME.  HOW

18   DOES THAT TETHER TOGETHER?

19           MR. GREENSPAN:  IT IS MY BELIEF, BASED ON THE

20   EVIDENCE THAT I HAVE, SOME OF WHICH I HAVE PRESENTED TO THIS

21   COURT, THAT MR. MAS MARQUES, DESPITE HIS DENIALS, HAS BEEN

22   POSTING REPEATEDLY THE SAME TIRED ALLEGATIONS ABOUT ME, ABOUT

23   MY COMPANIES, ABOUT MY FAMILY ON COMPLAINTSBOARD.COM, AMONG

24   OTHER SITES.  AND SO THIS HAS PROVIDED A VEHICLE FOR

25   MISINFORMATION TO SPREAD RAPIDLY AND DANGEROUSLY.

26           THE COURT:  BUT WHAT DOES THAT HAVE TO DO WITH YOUR

27   NAME AND HIS NAME?  IN THE MIDST OF TALKING ABOUT TESLA AND

28   OMAR, AND THEN YOU SAID YOU POINTED TO HIS NAME.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    MR. GREENSPAN:  SOMEBODY ASKED ME -- BECAUSE I SAID

2  THAT THESE ALLEGATIONS AGAINST ME ARE THE SAME ONES THAT HAVE

3  COME UP IN THIS CASE INVOLVING THE RESTRAINING ORDER.  I WAS

4  ASKED WHAT RESTRAINING ORDER.  AND I HAD TO SPECIFY WHAT I

5  WAS TALKING ABOUT.  I DID NOT BRING IT OUT OF NOWHERE.

6    THE COURT:  WELL, WHO WAS ASKING YOU?

7    MR. GREENSPAN:  I DON'T REMEMBER THE EXACT ACCOUNT

8  ON TWITTER, BUT THERE WAS AN ACCOUNT ON TWITTER THAT POSED

9  THOSE QUESTIONS TO ME.

10    THE COURT:  SO NOW YOUR RESPONSE BECOMES PART OF

11  YOUR TWITTER ACCOUNT THAT EVERYONE CAN SEE.

12    MR. GREENSPAN:  BECAUSE, AS I SAID, I HAVE GONE OUT

13  OF MY WAY TO AVOID BRINGING THIS UP.

14    THE COURT:  MR. GREENSPAN, PEOPLE WHO DON'T WANT

15  SOMETHING TO COME UP DON'T POST IT ON THEIR TWITTER ACCOUNT,

16  RIGHT?  I MEAN, I KNOW THIS IS THE WAY OF THE WORLD THESE

17  DAYS, BUT IF WE'RE GOING TO BE DISCRETE, WE KEEP OFF TWITTER,

18  DON'T WE?  I'M ASKING YOU IN EARNEST.

19    MR. GREENSPAN:  IT IS NOT UP TO ME.

20    THE COURT:  IT IS UP TO YOU WHERE YOU POST IT.

21    MR. GREENSPAN:  NO, I THINK YOU'RE MISUNDERSTANDING

22  ME, WITH ALL DUE RESPECT.

23    THE COURT:  YOU BETTER MAKE ME UNDERSTAND.

24    MR. GREENSPAN:  I'M TRYING MY BEST.

25    THE COURT:  I'M REALLY TRYING TO MINIMIZE THIS

26  INFORMATION GETTING OUT, IN SENSITIVITY TO MR. MAS MARQUES,

27  AND THEN THE NEXT SENTENCE YOU SAID YOU POSTED IT ON TWITTER

28  WHERE PEOPLE ARE GOING TO SEE IT.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    MR. GREENSPAN:  SO LET ME BE VERY CLEAR, WHEN YOU

2  SEARCH FOR MY NAME, WHICH PEOPLE DO BECAUSE I AM, FOR

3  EXAMPLE, INTERVENING IN COURT CASES INVOLVING

4  50-BILLION-DOLLAR COMPANIES.

5    THE COURT:  PEOPLE CAN UNDERSTAND GENERALLY WHY

6  THEY MIGHT BE LOOKING FOR YOUR NAME.

7    MR. GREENSPAN:  THEY FIND THESE RESULTS THAT

8  CONTAIN LIBELOUS AND HARASSING STATEMENTS ABOUT ME.

9    THE COURT:  NOW, WAIT.  THAT POINT WAS WELL-TAKEN,

10  BUT YOU STILL NEED TO CIRCLE BACK AROUND AND TELL ME IF

11  YOU'RE TRYING TO BE DISCRETE, AND YOU'RE MAKING THAT

12  REPRESENTATION TO THE COURT, AND YOU'RE ASKING THE COURT TO

13  BELIEVE THAT, I'M NOT UNDERSTANDING.  MY DEFICIT HERE.  I'M

14  NOT UNDERSTANDING WHY YOU WOULD PUT IT OUT ON TWITTER.

15    MR. GREENSPAN:  RIGHT.  IF YOU'D LET ME FINISH.

16    THE COURT:  SURE.

17    MR. GREENSPAN:  AS I SAID, ELON MUSK RAISED THE

18  ISSUE OF MY FOUNDATION'S EXISTENCE TO HIS 28 MILLION

19  FOLLOWERS.  MANY PEOPLE LOOKED ME UP AFTER THAT.  THEY FOUND

20  MISINFORMATION ON COMPLAINTSBOARD, AMONG OTHER SITES,

21  SUGGESTING THAT I AM GUILTY OF ALL KINDS OF CRIMES WHICH I'VE

22  NEVER COMMITTED.  THEY ASKED, "DID YOU SEXUALLY ASSAULT

23  PEOPLE?  DID YOU EXTORT PEOPLE?"  DID YOU DO ANY NUMBER OF

24  THINGS, AND MY ANSWER WAS, NO.

25    THE COURT:  WELL, IF YOU TELL ME, FOR EXAMPLE,

26  "HEY, I PUT IT ON TWITTER TRYING TO DO DAMAGE CONTROL," BUT

27  THAT'S NOT THE CONTEXT YOU PUT IT IN, BECAUSE YOU SAID, "I'M

28  TRYING TO BE DISCRETE," AND SENT IT TO MR. MAS MARQUES, AND

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   THEN THE NEXT SENTENCE YOU'RE SAYING, "I POSTED IT ON

2   TWITTER."  STILL YOU NEED --

3            MR. GREENSPAN:  I'M TRYING TO DO THAT.

4            THE COURT:  YES, PLEASE DO.

5            MR. GREENSPAN:  AT A CERTAIN POINT WHEN PEOPLE ASK

6   WHERE THESE ALLEGATIONS ARE COMING FROM, I'M SAYING THEY ARE

7   THE SAME ALLEGATIONS THAT HAVE BEEN MADE IN A COURT CASE WITH

8   A RESTRAINING ORDER.  I HAVE TO SHOW THAT THERE IS ACTUALLY A

9   RESTRAINING ORDER AND THAT IS WHAT I ATTEMPTED TO DO.  AT

10  SOME POINT YOU CAN NO LONGER HIDE IT, BECAUSE IT IS OUT IN

11  THE OPEN.

12            THE COURT:  SO I THINK WHAT MR. GREENSPAN IS

13  SAYING, I KNOW HE'LL CORRECT ME IF I'M WRONG, HE'S NOT DOING

14  THIS JUST TO GO, "HEY, I GOT A RESTRAINING ORDER, I WANT

15  EVERYBODY TO KNOW," AND NOW I'LL TAKE THE INITIATIVE TO LET

16  EVERYONE KNOW JUST SO I CAN PUNISH MR. MAS MARQUES FURTHER.

17  HE'S SAYING THAT HE DID IT IN A DEFENSIVE POSTURE WHERE

18  PEOPLE ARE ATTACKING HIM, CALLING HIS CREDIBILITY INTO

19  QUESTION.  AND HE'S SAYING, HEY, THERE WAS AN ADJUDICATION OF

20  SOME OF THIS INFORMATION IN COURT AND HERE IT IS.  SO IT PUTS

21  IT SORT OF IN A DIFFERENT CONTEXT THAN THE CONTEXT THAT YOU

22  WERE DESCRIBING EARLIER.  AND IT'S HARD IN THIS CASE, AND IT

23  HAS BEEN HARD TO SORT ALL THIS OUT.  PEOPLE'S MOTIVATION, I

24  THINK THAT A LOT OF PEOPLE NOW A DAYS GO ONLINE A LOT, THEY

25  USE TWITTER, THEY USE INSTAGRAM, THEY USE A LOT OF DIFFERENT

26  TYPES OF ONLINE SITES.  AND IT IS JUST A LOT HARDER TO SORT

27  OF SORT OUT PEOPLE'S MOTIVES.  BUT AGAIN, I HAVE FOR TWO

28  EX-MARINES (PHONETIC) WHOSE VIEWS ARE VERY DIFFERENT.  MR.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    MAS MARQUES, DID YOU WANT TO RESPOND.

2            MR. MAS MARQUES:  YES, YOUR HONOR.  YOU KNOW, MR.

3    GREENSPAN, YOU KNOW, HE'S QUITE SMART.  HE KNOWS HOW TO TALK.

4    HE KNOWS HOW TO SAY THINGS THAT KIND OF MAKE HIM LOOK LIKE A

5    VICTIM, BUT HE IS NOT.  AND THE THING IS WHEN YOU SAID THAT,

6    YOUR HONOR, THAT, LIKE, HE'S NOT GOING AROUND, YOU KNOW,

7    TELLING EVERYBODY, YOU KNOW, ABOUT THE RESTRAINING ORDERS,

8    BUT THAT IS WHAT HE IS EXACTLY DOING, YOUR HONOR.  AND HE HAS

9    BEEN -- I CAN MENTION ANOTHER TWEET TO YOU, ANOTHER EVIDENCE

10   HERE IF YOU WANT.

11           THE COURT:  YES.

12           MR. MAS MARQUES:  IF HE HAS FILED THE FACTS THAT

13   RESTRAINING ORDER AND HE IS WEAPONIZED IT AGAINST ME.  HE'S

14   USING IT AGAINST ME AS A TOOL OF HARASSMENT.

15           IF YOU WOULD LIKE ME TO MENTION ANOTHER?  THIS IS

16   SOMEBODY ELSE, I GUESS HE'S ONE OF HIS FOLLOWERS HERE.  BUT

17   HE HAS PEOPLE NOW ARE HARASSING ME AND POSTING MY NAME WHO

18   ARE COMMUNICATING WITH MR. GREENSPAN.  AND THEY ARE WRITING

19   MY NAME ON THEIR TWEETS.  AND THESE TWEETS, YOUR HONOR, AFTER

20   A FEW DAYS, A WEEK OR SO, THEY FIND THEIR WAY UP ON THE

21   SEARCH ENGINES, AND THEN PEOPLE ASK ME WHAT'S GOING ON OUT

22   THERE, YOU KNOW.  WHAT ABOUT THIS.  MR. GREENSPAN, HE DOES

23   NOT STOP, YOUR HONOR.  AND SINCE AUGUST 30TH, HE'S HAS BEEN

24   DOING THIS, YOU KNOW, ON A CONTINUOUS BASIS.  WOULD YOU LIKE

25   ME TO READ ANOTHER TWEET, ANOTHER SOMETHING ELSE HERE?

26           THE COURT:  WELL, IF YOU'RE TELLING ME HE'S

27   WEAPONIZING THE FACT THAT HE HAS A RESTRAINING ORDER, YES,

28   GIVE ME AN EXAMPLE.

—————"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"—————

1      MR. MAS MARQUES:  FOR EXAMPLE, HERE IS SOMEBODY I

2   DON'T KNOW WHO THE PERSON IS.  THIS PERSON IS FROM THE

3   TWITTER ACCOUNT, C.V.C. RESEARCH.  AND THEY'RE REPLYING TO

4   MR. GREENSPAN ON HIS TWITTER ACCOUNTS AT TWITTER SITES, AND @

5   AARON GREENSPAN.  AND THIS PERSON ON OCTOBER 23RD, SAYS HIS

6   "IRL" NAME, MAS MARQUES, AND HE'S FACING CHARGES

7   (UNINTELLIGIBLE), IS THAT RIGHT?  QUESTION MARK.  SO MR. MAS

8   MARQUES IS FACING CHARGES AND A QUESTION MARK.  IS THAT

9   RIGHT, QUESTION MARK.  MR. GREENSPAN IS OBVIOUSLY EXPANDING

10  ON THAT.  THIS IS CONTINUOUS.  THIS IS NOT AN ISOLATED THING,

11  YOUR HONOR.  HE'S REALLY RAMPED IT UP SINCE AUGUST 30TH,

12  SINCE HE RECEIVED THE PERMANENT RESTRAINING ORDER.

13      THE COURT:  MR. MAS MARQUES, I'M NOT UNDERSTANDING

14  WHAT YOU JUST TOLD ME.  YOU SAID SOMEBODY IS SAYING THAT HE,

15  THAT YOU HAVE SOME CRIMINAL CHARGES.  WHAT'S THAT PERSON

16  SAYING?

17      MR. MAS MARQUES:  IT SAYS HERE, HE WROTE HIS IRL

18  NAME -- I DON'T KNOW WHO THAT IS.  IT SAYS, SO HE RESPONDED

19  TO WHAT MR. GREENSPAN SAYING, HIS IRL NAME IS MAS MARQUES AND

20  HE'S FACING CHARGES, A QUESTION MARK.  THAT'S RIGHT, QUESTION

21  MARK.

22      THE COURT:  HANG ON A SECOND, BEFORE YOU GO ON.

23  MR. MAS MARQUES, BEFORE YOU GO ON, WHAT'S THAT ALL ABOUT?

24      MR. GREENSPAN:  I DON'T KNOW.  I'M NOT LOOKING AT

25  WHAT HE'S LOOKING AT, BUT IRL MEANS, "IN REAL LIFE,"

26  GENERALLY.  AND SOMEONE IS ASKING, "THE PERSON WHO IS FACING

27  CRIMINAL CHARGES IN MASSACHUSETTS IS DIEGO MAS MARQUES," AND

28  THAT IS A FACT.

1    THE COURT:  I WANT TO HEAR -- WAIT, WAIT.  I WANT

2    TO HEAR FROM EVERYBODY, BUT NOT ALL AT THE SAME TIME.

3         MR. MAS MARQUES:  I CAN'T HEAR, YOUR HONOR.

4         THE COURT:  YOU ARE GOING TO HAVE TO SPEAK UP.  SO

5    WHAT MR. GREENSPAN IS GOING TO DO NOW, HE WILL GIVE HIS

6    ACCOUNT OF THAT SITUATION.  AND I'M GOING TO ASK HIM TO SPEAK

7    UP.

8         MR. GREENSPAN:  I CANNOT POLICE EVERY INSTANCE OF

9    EVERY PERSON ON EARTH DISCUSSING MR. MAS MARQUES.

10        THE COURT:  I'M NOT INTERESTED IN EVERY PERSON.

11   I'M INTERESTED IN WHAT YOU DID AND HOW THIS CAME ABOUT.

12        MR. GREENSPAN:  I DIDN'T WRITE THAT.  I DIDN'T DO

13   THAT.  SO I DON'T UNDERSTAND HOW I CAN BE HELD ACCOUNTABLE.

14        THE COURT:  SO YOU'RE SAYING THAT YOU DID NOT

15   RESPOND TO SOMEBODY WHO WAS ASKING A QUESTION POSED TO YOU?

16        MR. GREENSPAN:  I DON'T KNOW.  I CANNOT SEE AT THIS

17   VERY MOMENT.  I DON'T RECALL RESPONDING.

18        THE COURT:  YOU STARTED TO DESCRIBE IT.

19        MR. GREENSPAN:  NO, I DID NOT.  I DID NOT SAY ANY

20   SUCH THING.

21        THE COURT:  SO WHAT DID YOU KNOW ABOUT IT?

22        MR. GREENSPAN:  I KNOW NOTHING ABOUT IT.

23        THE COURT:  WHY DID YOU START TALK ABOUT CHARGES?

24        MR. GREENSPAN:  BECAUSE MR. MAS MARQUES RAISED THE

25   ISSUE, WHAT WAS APPARENTLY RAISED ON THAT POST.

26        THE COURT:  CAN I ASK THE COURT REPORTER TO READ

27   BACK WITNESS MARQUES WHAT MR. GREENSPAN SAID RELATIVE TO THE

28   CHARGES IN RESPONSE TO QUESTIONS?

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1      THE COURT REPORTER:  YOUR HONOR, I WOULD HAVE TO

2  EDIT EVERYTHING, BECAUSE IT'S VERY HARD FOR ME TO HEAR

3  EVERYTHING AND UNDERSTAND EVERYTHING.

4      THE COURT:  SO MAYBE DURING THE RECESS YOU CAN

5  SEARCH FOR THAT?

6      THE COURT REPORTER:  YES.

7      MR. GREENSPAN:  I'M HAPPY TO EXPLAIN.

8      THE COURT:  YOU HAD STARTED TO EXPLAIN.

9      MR. GREENSPAN:  MR. MAS MARQUES JUST ON THE

10 TELEPHONE A FEW SECONDS AGO, SAID THAT A PERSON ON THE

11 INTERNET ASKED A QUESTION OF ME, WHICH I'M NOT SURE THAT I

12 RESPONDED TO, ABOUT WHETHER HE WAS FACING CRIMINAL CHARGES IN

13 MASSACHUSETTS.  THE ANSWER TO THAT QUESTION IS YES, WHICH I'M

14 JUST TELLING YOU HERE TODAY.  HE IS FACING CRIMINAL CHARGES

15 IN MASSACHUSETTS FOR VIOLATING A RESTRAINING ORDER IN THIS

16 CASE AND FOR CRIMINAL HARASSMENT UNDER MASSACHUSETTS GENERAL

17 LAW.

18      SO WHETHER OR NOT SOMEBODY ON THE INTERNET INVOKED

19 HIS NAME WITHOUT MY TELLING THEM TO OR KNOWING THAT THEY WERE

20 GOING TO, DOES NOT CONSTITUTE HARASSMENT ON MY PART.  PEOPLE

21 WILL TALK ABOUT MR. MAS MARQUES NOW AND IN THE FUTURE; THAT

22 IS SOMETHING THAT HE WILL HAVE TO LEARN TO LIVE WITH WHETHER

23 IN THE CONTEXT OF THIS RESTRAINING ORDER OR ANYTHING ELSE.

24 JUST BECAUSE SOMEBODY SAYS HIS NAME DOES NOT MEAN THAT I'M

25 TRYING TO HARM HIM, HARASSING HIM, OR HARASSING HIS FAMILY OR

26 ANY SUCH THING.

27      THE COURT:  LET ME ASK A DIFFERENT QUESTION.  MR.

28 MAS MARQUES, I'LL HEAR FROM YOU, BECAUSE I AM TRYING TO

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   FIGURE OUT WHAT'S GOING ON HERE.  YOU HAD INDICATED A LITTLE

2   BIT EARLIER IN YOUR TESTIMONY, MR. GREENSPAN, THAT YOU

3   UNDERSTAND MR. MAS MARQUES IS VERY SENSITIVE, AND CONTRARY TO

4   WHAT HE IS SAYING ABOUT YOU GLOATING ABOUT THE RESTRAINING

5   ORDER AND TRYING TO MINIMIZE THE EFFECTS OF IT, IN TERMS OF

6   GETTING HIS NAME OUT THERE; IS THAT A FAIR STATEMENT?

7           MR. GREENSPAN:  IT'S A FAIR STATEMENT IN THE

8   CONTEXT THAT THIS HAS ALREADY BECOME AN INTERNATIONAL NEWS

9   STORY.

10          THE COURT:  THAT'S OKAY.  BUT WITH THAT IN MIND,

11  YOUR ATTENTION, WHAT HAVE YOU DONE, IF ANYTHING, TO TRY TO

12  MINIMIZE WHAT HE CHARACTERIZES AS GLOATING FOR PUTTING HIS

13  NAME BACK ON THERE IN A WAY THAT IS GOING TO CONTINUE TO BE

14  AN ANNOYANCE FOR HIM?  WHAT HAVE YOU DONE?  WAIT A MINUTE, I

15  WANT TO ASK YOU A QUESTION -- PLUS THE FACT THAT YOU

16  SUGGESTED YOU WERE REALLY TRYING TO DO THAT.  YOU ARE TRYING

17  TO SHOW RESTRAINT?

18          MR. GREENSPAN:  IT IS A FAIR QUESTION.  THE ANSWER

19  IS, I HAVE NOT DONE A THING.  I HAVE NOT NEEDLESSLY DISCUSSED

20  HIM.  I HAVE NOT WRITTEN ABOUT HIM IN ANY WAY OTHER THAN WHEN

21  I AM DIRECTLY ASKED ABOUT IT, AND I FEEL THAT THERE IS NO

22  OTHER WAY TO ANSWER THE QUESTION HONESTLY EXCEPT TO USE HIS

23  NAME.  BUT EVEN WHEN I USED HIS NAME IN THE FIRST TWEET THAT

24  WE READ, I DID NOT USE HIS FIRST NAME.  SO I DON'T KNOW WHAT

25  ELSE TO DO OTHER THAN TO BE AS RESTRAINED AS POSSIBLE,

26  DESPITE THE FACT, OBVIOUSLY, I DO NOT HAVE A RESTRAINING

27  ORDER AGAINST ME, AND AS A JOURNALIST, I SHOULD NOT BE

28  RESTRAINED.

1    THE COURT:  NOBODY IS DISPUTING THAT.  BUT YOU HAD

2   MADE THE STATEMENT YOU WERE TRYING TO BE DISCRETE.  AND I

3   WANT TO FOLLOW UP IN WHAT WAY ARE YOU TRYING TO BE DISCRETE.

4   SO MUCH OF THIS CASE HAS BEEN ONE PERSON SAYING SOMETHING AND

5   THE OTHER PERSON IS SAYING SOMETHING DIAMETRICALLY OPPOSED.

6    MR. GREENSPAN:  I AGREE.

7    THE COURT:  SO HERE, MR. MAS MARQUES, YOU'RE SAYING

8   IT IS A CAMPAIGN THAT MR. GREENSPAN HAS LAUNCHED SINCE THE

9   TEMPORARY RESTRAINING ORDER EXPIRED.  NOW HE IS SAYING, NO,

10  ON THE CONTRARY, I'VE BEEN GOING OUT OF MY WAY TO BE DISCRETE

11  AND RESTRAINED ABOUT IT.  AND THEN YOU HAVE THE TRIER OF

12  FACT, ANY JUDGE, IT HAPPENS TO BE ME IN THIS SITUATION, AND

13  WE HAVE A BURDEN OF PROOF THAT APPLIES TO CIVIL HARASSMENT

14  HEARINGS, TALKING ABOUT THE HEARING THAT WE HAD, AND YOU SIT

15  THERE AND YOU GO, "HAS THAT BURDEN BEEN MET?"  AND LET ME

16  REITERATE, I'M NOT SAYING THAT MR. GREENSPAN DIDN'T HARASS

17  YOU.  I'M SAYING IN THE CONTEXT OF THE HEARING, THE BURDEN OF

18  PROOF WAS NOT MET WITH THE EVIDENCE THAT I SAW, THAT I HEARD,

19  THAT I REVIEWED.  AND I STILL DON'T KNOW IF HE HAS MADE FALSE

20  STATEMENTS ABOUT THE CRIMINAL ACTIVITY IN SPAIN, BECAUSE NO

21  ONE HAS BEEN REALLY FORTHCOMING ABOUT THAT.

22    NOW, YOU DON'T HAVE TO BE -- IT MAY BE SOMETHING

23  YOU DON'T WANT TO BRING UP, AND YOU MADE A DECISION NOT TO

24  BRING IT UP.  BUT IF I DON'T HEAR ABOUT IT OR KNOW ABOUT IT,

25  THEN I CAN'T CONCLUDE THAT MR. GREENSPAN HAS MADE FALSE

26  STATEMENTS ABOUT IT.

27    MR. MAS MARQUES, IS THERE ANYTHING THAT YOU WANTED

28  TO ADD WITH RESPECT TO ANY OF THE ARGUMENTS YOU ARE MAKING IN

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    SUPPORT OF YOUR MOTION?

2            MR. MAS MARQUES:  YES, THERE IS, YOUR HONOR.  IF I

3    MAY, IF I MAY READ OUT A TWEET FROM AARON GREENSPAN FROM

4    SEPTEMBER 23RD FROM LAST MONTH.

5            THE COURT:  OKAY.

6            MR. MAS MARQUES:  THIS ONE CONTRADICTS WHAT HE JUST

7    STATED TO YOU, YOUR HONOR.  SO MR. GREENSPAN ON HIS PLAINSITE

8    TWITTER ACCOUNT ON SEPTEMBER 23RD HE WROTE THE FOLLOWING: "ON

9    AUGUST 30TH, 2019, JUDGE CAROL OVERTON RULED AGAINST DIEGO

10   MAS MARQUES, JUNIOR, DENYING HIS CROSS REQUEST FOR A

11   RESTRAINING ORDER.  AND POINTING OUT RESPONDENT CONCEDED HIS

12   CRIMINAL RECORD HAD NOT BEEN SEALED.  THUS SUCH INFORMATION

13   WAS A MATTER OF PUBLIC RECORD." (AS READ), THEN HE POSTED,

14   JUDGE OVERTON, HE POSTED THE PAGE AND HE HIGHLIGHTED THAT.

15   THIS IS JUST ONE EXAMPLE, THERE ARE SO MANY MORE.  SO HE SAYS

16   HE'S NOT MENTIONING MY FULL NAME, THAT'S NOT TRUE.  HE IS

17   MENTIONING MY FULL NAME, AND HE'S GLOATING ABOUT THE FACT

18   THAT HE HAS A RESTRAINING ORDER.  AND HE'S BRINGING IT UP

19   LEFT AND RIGHT, AND HE'S NOT BEING SENSITIVE AT ALL.  HE'S

20   NOT -- HE'S DOING THIS INTENTIONALLY, YOUR HONOR.  HE IS

21   DOING THIS INTENTIONAL.  THERE IS NOTHING UNINTENTIONAL THAT

22   MR. GREENSPAN DOES.  BECAUSE HE'S QUITE CALCULATED FROM MY

23   DEALINGS WITH HIM.  AND HE KNOWS EXACTLY WHAT HE'S DOING.

24   HE'S SAYING ONE THING TO YOU, YOUR HONOR, BUT HE'S DOING A

25   WHOLE DIFFERENT THING.

26           THE COURT:  ANYTHING ELSE YOU WANTED TO ADD IN

27   SUPPORT OF YOUR ARGUMENTS TODAY?

28           MR. MAS MARQUES:  THERE ARE JUST SO MANY COMMENTS

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    ON HERE.

2         THE COURT:  WELL, LET ME SAY THIS, MR. MAS MARQUES,

3    IF THERE HAS BEEN A COURSE OF HARASSING CONDUCT SINCE THE

4    EXPIRATION OF THE TEMPORARY RESTRAINING ORDER, IT LOOKS LIKE

5    THIS IS ALL NEW INFORMATION.  THERE IS NOTHING KEEPING YOU

6    FROM ASSERTING THE REMEDY THAT YOU HAVE RELATIVE TO THAT.

7    YOU KNOW, ONE OF THINGS I WANTED TO UNDERSCORE WITH RESPECT

8    TO THIS MOTION WAS THAT I CAN ONLY MAKE DETERMINATIONS BASED

9    ON THE EVIDENCE THAT I'VE HEARD.  I THINK I MAY DETERMINE ON

10   ONE OCCASION THAT, IF IT WAS PROVEN TO THE COURT'S

11   SATISFACTION, BASED ON THE BURDEN OF PROOF, THAT YOU HAD

12   PUBLISHED PORNOGRAPHIC IMAGES WITH MR. GREENSPAN'S FAMILY

13   MEMBERS FACES ATTACHED TO THEM, I CERTAINLY WOULD CONSIDER

14   THAT TO BE HARASSMENT.

15        A LOT OF THINGS THAT ARE POSTED ONLINE ARE

16   DAMAGING.  THEY'RE DAMAGING TO PEOPLE.  THEY'RE HARMFUL TO

17   PEOPLE.  THEY HAVE REAL LIFE CONSEQUENCES.  THIS CASE IS NOT

18   UNIQUE IN THAT.  WE SEE THAT ALL THE TIME.  IF THERE WAS SOME

19   WAY I COULD UNDO IT, I WOULD, BUT THAT'S NOT MY ROLE HERE.

20   BUT THERE ARE SOME THINGS THAT PEOPLE CAN PUBLISH THAT ARE

21   PROTECTED SPEECH AND THEY MAY DO DAMAGE TO OTHERS.  AND ONE

22   WOULD HOPE THAT PEOPLE WOULD EXERCISE SOME RESTRAINT AND

23   UNDERSTAND THE HARM THAT THEY ARE DOING WHEN THEY PUBLISH

24   INFORMATION THAT IS DETRIMENTAL TO OTHER PEOPLE, ESPECIALLY

25   WHEN THOSE PEOPLE ARE TRYING TO MOVE ON WITH THEIR LIVES AND

26   THEY REHABILITATE THEMSELVES AND MOVE FORWARD IN A DIFFERENT

27   WAY FROM THE WAYS THAT THEY ACTED IN THE PAST.  BUT

28   PUBLISHING THOSE THINGS ISN'T HARASSMENT.  IF IT'S A LEGAL

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   ISSUE, THEN I THINK A LEGAL ARGUMENT SHOULD BE MADE.  THERE

2   DEFINITELY IS A CROSS-OVER AND A TENSION BETWEEN HARASSMENT

3   AND FREE SPEECH.  AND IT IS A DIFFICULT AREA TO GRAPPLE WITH,

4   PARTICULARLY WHEN WE'RE TALKING ABOUT THE WORLD WHERE

5   EVERYBODY PUTS EVERYTHING ON THE WEB OR ONLINE SOMEWHERE.

6   BUT I STILL HAVEN'T CONCLUDED, BASED ON THE EVIDENCE THAT HAS

7   BEEN PRESENTED, THAT MR. GREENSPAN PUBLISHED ANYTHING THAT

8   WAS FALSE, SUCH THAT IT WOULDN'T BE NOT PROTECTED SPEECH.

9        IF I COULD ORDER YOU ALL TO TAKE DOWN THESE SITES

10  AND START WITH A CLEAN SLATE, I THINK THAT WOULD COMPLETELY

11  ALLEVIATE THE CONFLICT BETWEEN THE PARTIES, BUT I DON'T HAVE

12  THE AUTHORITY TO DO THAT.

13        SOMEBODY FILES A DEFAMATION LAWSUIT -- WAIT A

14  SECOND, THEY PROVE THAT IT'S INFLAMMATORY, THEN THE JUDGE IN

15  THE DEFAMATION SUIT CAN GIVE INJUNCTIVE RELIEF IF THEY TAKE

16  IT DOWN.  BUT I CAN'T EVEN BEGIN TO DEAL WITH THAT WHEN I

17  KNOW THE INFORMATION IS FALSE TO BEGIN WITH.  YOU HAVEN'T

18  GIVEN ME ENOUGH TO WORK WITH HERE.

19        MR. GREENSPAN:  YOUR HONOR, CAN I ASK A QUESTION?

20        THE COURT:  SURE.

21        MR. GREENSPAN:  I UNDERSTAND THAT YOU DON'T WANT TO

22  BE --

23        MR. MAS MARQUES:  I CANNOT HEAR.

24        MR. GREENSPAN:  I UNDERSTAND THAT YOU DON'T WANT TO

25  BE ADJUDICATING WHETHER ANY GIVEN STATEMENT IN THIS CASE IS

26  TRUE OR FALSE, BUT I DID SEND A PROPOSED ORDER THAT I THINK

27  MIGHT SOLVE CONSIDERABLE PROBLEMS FOR BOTH MR. MAS MARQUES

28  AND MYSELF.

———"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"———

1    THE COURT:  IN THE CONTEXT OF THIS CASE?

2    MR. GREENSPAN:  IN THE CONTEXT OF THIS CASE.

3    THE COURT:  IS IT SOMETHING YOU FILED ALREADY?

4    MR. GREENSPAN:  I FILED IT AND I EMAILED IT TO YOUR

5  DEPARTMENT 11 EMAIL ADDRESS.

6    THE COURT:  WHEN?

7    MR. GREENSPAN:  A FEW WEEKS AGO.

8    THE COURT:  USUALLY, WHEN IT COMES TO THE EMAIL IF

9  IT WAS NOT SOMETHING THAT WAS CC'D TO THE OTHER SIDE, SO I

10  DON'T SEE IT BECAUSE I CAN'T CONSIDER EX PARTE --

11    MR. GREENSPAN:  IT WAS ALSO FILED.

12    THE COURT:  IT WAS FILED WHEN?

13    MR. GREENSPAN:  MAY 20, 2019.

14    THE COURT:  WAS IT COPIED TO MR. MAS MARQUES?

15    MR. GREENSPAN:  I BELIEVE HE WAS SERVED THE SAME

16  WAY HE HAS BEEN SERVED WITH EVERYTHING.

17    THE COURT:  LET'S SEE IF I CAN FIND IT.  DO YOU

18  REMEMBER FINDING SOMETHING LIKE THAT, MR. MAS MARQUES?

19    MR. MAS MARQUES:  I DON'T RECALL AT THIS POINT,

20  YOUR HONOR.

21    THE COURT:  I DON'T EITHER.

22    MR. GREENSPAN:  I CAN GET THE EXACT DATE, IT WAS

23  MAY 13TH.

24    THE COURT:  MR. MAS MARQUES, WHAT I WAS SAYING, IF

25  SOMETHING COMES ON THE COURT'S EMAIL OR PERSONAL EMAIL OR

26  EVEN A LETTER COMING INTO THE DEPARTMENT, AND IT WASN'T

27  COPIED TO THE OTHER SIDE, I DON'T LOOK AT IT.  IT IS

28  CONSIDERED TO BE AN EX PARTE COMMUNICATION, SO I DON'T THINK

———VIRGINIA BARRIOS, CSR 6771———

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    I'VE SEEN IT.  BUT LET ME CHECK IT OUT.

2              MR. GREENSPAN:  IT WAS MAY 3RD.  IT WAS A PROPOSED

3    ORDER OF THE COVER SHEET.

4              THE COURT:  WHAT'S THE TITLE OF THE PROPOSED ORDER?

5              MR. GREENSPAN:  PROPOSED ORDER REQUIRING REMOVAL OF

6    HARASSING CONTENT.

7              THE CLERK:  MAY 13TH.

8              THE COURT:  WAS IT BEFORE OR AFTER THE COURT ISSUED

9    A RULING IN THIS CASE?

10             MR. GREENSPAN:  THIS WAS BEFORE.

11             THE COURT:  WHEN DID THE HEARING IN THIS MATTER

12   CONCLUDE?

13             MR. GREENSPAN:  MAY 2ND, I BELIEVE, WAS THE LAST

14   HEARING.  THIS WAS THE DAY AFTER THAT.

15             THE COURT:  SO IT CAME AFTER.  OKAY, GOT IT.  HERE

16   WE GO.

17             MR. GREENSPAN:  MAY 3RD.

18             MR. MAS MARQUES:  MAY 2ND.

19             MR. GREENSPAN:  MAY 3RD.

20             MR. MAS MARQUES:  OH.

21             THE COURT:  I HAVE SOME ENTRY FROM MAY 2ND, NOT MAY

22   3RD.

23             MR. GREENSPAN:  IT MAY BE THAT THE --

24             THE COURT:  WHAT IS THE TITLE OF THE DOCUMENT?

25             MR. GREENSPAN:  IT WAS ENTERED INTO THE SYSTEM ON

26   MAY 12TH, MAY 13TH.

27             THE COURT:  A PROPOSED ORDER?

28             MR. GREENSPAN:  YES.  IT WAS ENTERED ON MAY 13TH.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    THE COURT:  SO LET'S SEE.  THIS IS CALLED A --

2    MR. GREENSPAN:  PROPOSED ORDER REQUIRING REMOVAL OF

3 HARASSING CONTENT.

4    THE COURT:  GOT IT.  DID YOU SEE THIS, MR. MAS

5 MARQUES?

6    MR. MAS MARQUES:  I DON'T RECALL, YOUR HONOR.  IS

7 IT A MOTION, POSSIBLY?

8    THE COURT:  NO, IT IS A PROPOSED ORDER.

9    MR. GREENSPAN:  THERE WAS ALSO A MOTION FOR THE

10 ORDER.

11    THE COURT:  THERE WAS?

12    MR. GREENSPAN:  YES.

13    THE COURT:  I NEVER HAD A MOTION SET THAT I CAN

14 RECALL.

15    MR. GREENSPAN:  I THINK THE COURT INSTRUCTED ME TO

16 FILE AS A REQUEST.  THERE MAY NOT HAVE BEEN A MOTION.

17    THE CLERK:  MAY 13 THERE IS A REQUEST.

18    THE COURT:  HOW WAS IT SUBMITTED?

19    THE CLERK:  IT WAS ELECTRONICALLY FILED.

20    THE COURT:  IT DIDN'T GENERATE A HEARING DATE.  IT

21 IS INTERESTING, BECAUSE IT LOOKS LIKE I ENCOURAGED THE

22 PARTIES ALL ALONG TO TRY TO REACH AN AGREEMENT, OR AT LEAST A

23 PARTIAL AGREEMENT WITH THE ASSISTANCE OF THE MEDIATORS THAT

24 WE HAVE.  AND I WAS UNAWARE THAT THERE WAS SORT OF AN OFFER

25 FOR THE PARTIES TO AGREE TO REMOVE CERTAIN DATA.  IS THAT HOW

26 IT WAS CRAFTED?

27    MR. GREENSPAN:  NOT EXACTLY.  THE PROBLEM HERE IS

28 THAT I BELIEVE THAT MR. MAS MARQUES HAS BEEN POSTING MANY OF

1   THESE POSTS.  HE DENIES IT.  HE THINKS I HAVE BEEN POSTING

2   THEM.  I HAVE NOT.  I DENY IT.

3           THE COURT:  SO TELL ME IN PLAIN TERMS WHAT YOU ARE

4   PROPOSING.

5           MR. GREENSPAN:  WHAT I'M PROPOSING IS THE ONLY

6   PARTY HERE THAT CAN SOLVE THE PROBLEM IS COMPLAINTSBOARD AND

7   THE VARIOUS GRIPE SITES.  I'VE BEEN WORKING WITH LAW

8   ENFORCEMENT IN OHIO AND THE F.B.I. TO TRY TO FIGURE OUT HOW

9   TO GET THESE GRIPE SITE OWNERS TO ACTUALLY COMPLY, OR

10  HOPEFULLY BE IMPRISONED.  BUT IN THE MEANTIME,

11  COMPLAINTSBOARD WILL HONOR A COURT ORDER INSTRUCTING IT TO

12  REMOVE CONTENT THAT A COURT SAYS IT SHOULD REMOVE.  THE

13  PROBLEM IS THAT THEY ARE IN LATVIA, THEY WILL NOT RESPOND TO

14  U.S. SUBPOENAS.  THEY CLAIM THEY WILL HONOR A U.S. COURT

15  ORDER OR A STATE COURT ORDER.

16          THE COURT REPORTER:  WHERE ARE THEY IN AGAIN?

17          MR. GREENSPAN:  LATVIA, THE FORMER SOVIET REPUBLIC.

18          THE COURT:  WHAT ARE YOU PROPOSING THEY TAKE DOWN?

19          MR. GREENSPAN:  RATHER THAN EVALUATING THE TRUTH OR

20  FALSITY OF ANY GIVEN STATEMENT, YOU TAKE DOWN ANY POST THAT

21  COME FROM A SET OF IP ADDRESSES THAT WE ALREADY KNOW ARE

22  CONNECTED TO MR. MAS MARQUES.  IF THERE ARE NO POSTS FROM MR.

23  MAS MARQUES, NOTHING WILL BE DELETED.  IF THERE ARE POSTS,

24  THEY WILL BE DELETED.

25          THE COURT:  WHAT ABOUT POSTS THAT YOU'VE PUT UP

26  THERE?

27          MR. GREENSPAN:  I HAVEN'T PUT ANY.

28          THE COURT:  BUT IF YOU'RE JUST ASKING TO TAKE DOWN

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

```
 1   HIS POSTS RATHER THAN --
 2            MR. GREENSPAN:  I'M ASKING TO TAKE DOWN ANY POST
 3   MENTIONING MY NAME, HIS NAME, OR MY FAMILY.
 4            THE COURT:  WHAT ARE YOUR THOUGHTS ABOUT THAT?
 5            MR. MAS MARQUES:  I'M HAVING A HARD TIME HEARING,
 6   YOUR HONOR.  CAN YOU RESUME, PLEASE, YOUR HONOR.  I COULD NOT
 7   HEAR HIM WELL.
 8            THE COURT:  REPEAT, MR. GREENSPAN.  CAN YOU PROJECT
 9   A LITTLE BIT MORE.
10            MR. GREENSPAN:  WHAT I'M SUGGESTING, MR. MAS
11   MARQUES, IS THAT COMPLAINTSBOARD REMOVE ANY POSTS WITH MY
12   NAME, YOUR NAME, OR MY FAMILY'S NAME THAT WOULD HAVE COME
13   FROM ANY IP ADDRESS THAT IS ALREADY ASSOCIATED WITH YOU.
14            MR. MAS MARQUES:  I WOULD SUGGEST, IF THAT'S THE
15   CASE, A COURT ORDER THAT WE WOULD BOTH RECEIVE THAT WE WOULD
16   BE ABLE TO USE TO REMOVE ANY POSTS ON ANY SITE THAT HAS OUR
17   NAMES ON IT, NOT JUST LIMITED TO ONE SITE.  BECAUSE WHAT
18   WOULD BE GOOD, IF MR. GREENSPAN WOULD AGREE, IF HE COULD --
19   THE STATEMENTS FROM SPAIN, AND THIS WILL BE EXPUNGED IN A
20   SHORT TIME IN SPAIN AND I'LL BE FILING OVER HERE IN THE
21   UNITED STATES.  IF HE WOULDN'T MIND REMOVING THE INFORMATION
22   ON ME THAT HE HAS UPLOADED ON PLAINSITE, ON HIS WEBSITE, AND
23   A COURT ORDER STATING WHATEVER HE FINDS ON HIMSELF HE CAN
24   HAVE REMOVED, AND WHATEVER IS ON ME ON THE WEBSITE, I CAN
25   HAVE REMOVED.
26            THE COURT:  HERE IS THE THING, MR. MAS MARQUES, I
27   THINK THAT THESE PROPOSALS ARE WORTH EXPLORING.  IT'S NOT
28   GOING TO BE DONE IN THE CONTEXT OF THIS CASE.  IT IS BEYOND
```

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   THE SCOPE OF THE REMEDY THAT THE COURT CAN PROVIDE THE

2   PARTIES IN THIS CASE.  IT LIKELY GOES BEYOND THE SCOPE OF

3   THESE PROCEEDINGS, THE SUBJECT MATTER OF THESE PROCEEDINGS.

4   BUT IF YOU WERE WILLING TO MEDIATE THIS, YOU COULD REACH A

5   PRIVATE AGREEMENT WHICH IS A CONTRACT.  AND MOREOVER, YOU

6   REACH AN AGREEMENT -- WAIT AND LISTEN -- IF YOU REACH AN

7   AGREEMENT YOU PROBABLY DON'T WANT IT TO BE FILED PUBLICLY

8   ANYWAY AND BE SUBJECT TO A COURT ORDER, BECAUSE THEN IT WILL

9   BE OUT THERE AGAIN.  LOTS OF PEOPLE, THEY REACH PRIVATE

10  AGREEMENTS, THEY ARE BINDING LIKE A CONTRACT; IF SOMEBODY

11  VIOLATES THEM, THEY CAN BE TAKEN TO COURT FOR VIOLATING THE

12  ORDER.  I'M NOT GIVING YOU LEGAL ADVICE, I'M JUST SAYING,

13  THERE ARE WAYS OF DOING WHAT YOU ARE BOTH PROPOSING TO DO,

14  BUT IT IS NOT GOING TO GO ANYWHERE UNLESS THERE IS SOME GIVE

15  AND TAKE ON BOTH SIDES.  THERE MAY BE THINGS THAT PEOPLE THAT

16  DON'T WANT TO COME DOWN AND THINGS THAT THEY DO.  BUT WITH

17  RESPECT TO SOME OVERLAP BETWEEN YOUR JOINT INTEREST IN

18  GETTING THINGS COME OFF THE WEB, YOU MIGHT BE ABLE TO AGREE

19  TO SOMETHINGS BEING REMOVED.

20          MR. GREENSPAN:  YOUR HONOR, TO CLARIFY, I'M NOT

21  PROPOSING REMOVING MR. MAS MARQUES' PUBLIC RECORDS.

22          THE COURT:  WELL, I DIDN'T THINK THAT YOU WOULD.  I

23  DIDN'T THINK YOU WERE.

24          MR. GREENSPAN:  THAT'S WHY I'M NARROWLY PROPOSING

25  --

26          THE COURT:  THAT'S WHY I'M SAYING, THERE ARE SOME

27  THINGS THAT YOU ARE NOT GOING TO BE ABLE TO AGREE ON, AND

28  THERE MAY BE OTHER THINGS THAT YOU ARE IN BOTH OF YOUR

1  INTERESTS YOU COULD AGREE ON.  I WOULD ENCOURAGE YOU TO HAVE

2  A DIALOGUE ABOUT THAT WITH THE USE OF A MEDIATOR, BUT WE'RE

3  GETTING A LITTLE OFF TRACK ON WHAT WE HAVE TO DO TODAY.

4         ANY FINAL COMMENTS ON THE SUBJECT FROM EITHER ONE

5  OF YOU?

6         MR. MAS MARQUES:  YES, YOUR HONOR.  CAN I GO AHEAD?

7         THE COURT:  YES, PLEASE DO.

8         MR. MAS MARQUES:  YOUR HONOR, I WANT MR. GREENSPAN

9  TO KNOW, AND I WANT THIS COURT TO KNOW THAT I HAVE NOT

10  UPLOADED ANY OF THE PORNOGRAPHIC IMAGES, AND THOSE VILE

11  IMAGES THAT HE HAS PRESENTED TO THE (UNINTELLIGIBLE) COURT

12  AND TO YOUR COURT, YOUR HONOR.  IT DID NOT COME FROM ME.

13         AND RECENTLY, MR. GREENSPAN HAS BEEN HAVING TROUBLE

14  WITH THIS GENTLEMAN NAMED OMAR, OMAR QAZI.  AND I BELIEVE

15  THAT OMAR -- I BELIEVE THAT MR. GREENSPAN IS ACCUSING HIM OF

16  PORNOGRAPHIC IMAGES AS WELL.

17         MR. GREENSPAN:  THAT'S NOT TRUE.  I'M SORRY, YOUR

18  HONOR.

19         MR. MAS MARQUES:  THAT'S WHAT I READ ONLINE.  MR.

20  OMAR QAZI IS BEING FRAMED.  YOU KNOW, YOUR HONOR, I'M NOT A

21  COMPUTER EXPERT, MR. GREENSPAN IS A COMPUTER EXPERT.  AND

22  RIGHT NOW, MY HOME COMPUTER IS BEING LOOKED AT; IT'S BEING

23  DIAGNOSED BECAUSE I'M GOING TO PROVE, YOUR HONOR, I DID NOT

24  UPLOAD ANY OF THOSE PICTURES.  AND A COMPUTER EXPERT TOLD ME,

25  LITERALLY, WHEN YOU CLICK ON A SITE, WHEN YOU CLICK ON A

26  PICTURE, WHEN YOU CLICK ON A URL, WHEN YOU CLICK ONLINE, YOUR

27  INTERNET PROVIDER AUTOMATICALLY SAVES YOUR IP ADDRESS ON YOUR

28  SYSTEM.  DOES THAT MEAN THAT I UPLOADED THAT PICTURE?  NO, IT

1   DOES NOT, AND I DID NOT, YOUR HONOR.

2          AND THE BASIS FOR MR. GREENSPAN GETTING A

3   RESTRAINING ORDER THIS WEEK, WAS HE PRESENTED A WHOLE STACK

4   OF DOCUMENTS SAYING THEY CAME FROM ME, BUT THEY DID NOT, YOUR

5   HONOR.  I'M INFORMING THIS COURT THAT I DID NOT UPLOAD ANY OF

6   THOSE VILE PICTURES THAT MR. GREENSPAN HAS PRESENTED.  I AM

7   BEING FRANK BECAUSE I DID NOT DO THAT.  MR. GREENSPAN CALLED

8   THE MARLBOROUGH POLICE, AND HE TOLD THEM MY IP ADDRESS.  MR.

9   GREENSPAN ALREADY HAD MY IP ADDRESS.  AND HOW DID HE GET IT?

10  HE CLICKED ON MY SITE, IT'S REGISTERED MY IP ADDRESS.  THIS

11  IS WHAT HAPPENS WHEN YOU CLICK ANYTHING ON ONLINE.  IF YOU

12  ARE AT HOME AND YOU HAVE A BUSINESS PROVIDER AND YOU CLICK ON

13  SOMETHING, THEN YOUR IP ADDRESS -- AND, AND, AND IT GETS

14  DONE.  IT DOES NOT, IT DOES NOT MEAN THAT SOMEBODY UPLOADED

15  THAT, AND I DEFINITELY DID NOT DO THOSE THINGS THAT MR.

16  GREENSPAN IS ACCUSING ME OF.  I WANT HIM TO KNOW THAT.  I

17  THINK HE KNOWS THAT.  BECAUSE I DID NOT UPLOAD ANY OF THOSE

18  PICTURES.  YOUR HONOR, HE'S JUST WRECKING MY LIFE AND

19  WRECKING MY REPUTATION.

20          THE THING IS, YOU KNOW, MR. GREENSPAN, HE HAS A LOT

21  OF COMPUTER SAVVY.  I WISH I HAD THOSE SKILLS.  HE KNOWS,

22  BECAUSE WHEN HE CALLED THE COURTS OVER HERE AND ALSO IN

23  MASSACHUSETTS, AND THE POLICE, ESPECIALLY THE POLICE, FROM

24  WHAT I WAS TOLD, HE TOLD THEM LOOK AT HIS IP ADDRESS.  HE

25  INFORMS PEOPLE OF MY IP ADDRESS.  HE HAS MY IP ADDRESS.  THE

26  COMPUTER EXPERT I'M TALKING TO, HE SAID MY COMPUTER WAS

27  HACKED.  IT'S GOING TO TAKE (UNINTELLIGIBLE).  MR. GREENSPAN

28  HAS MY IP ADDRESS.  OBVIOUSLY, WHEN HE CALLED THE POLICE AND

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   CALLED THE COURTS AND SAID I HAD THOSE CHARGES, HE BASICALLY

2   GAVE A RUNDOWN, A-B-C.  SO I HAVE TO FIGURE OUT, I DIDN'T

3   KNOW ALL THOSE THINGS.  ALSO, MR. GREENSPAN KNEW MY USER NAME

4   ON MY COMPUTER.  I'M LIKE, HOW DO YOU KNOW ALL OF THIS?  SO

5   ONE HAS TO ASK, YOUR HONOR, YOU KNOW, MR. GREENSPAN, LIKE, MY

6   EXHIBITS I WAS TRYING TO SHOW THE COURT THAT HE HAS DONE SOME

7   SERIOUS HACKING.  YOU KNOW -- YOU KNOW, IF HE COULD STILL

8   HAVE IT TO USE IT -- BUT WHEN YOU USE THOSE HACKING SKILLS TO

9   DO BAD THINGS, THAT'S ALSO A CRIME, YOU KNOW.  SO I PUT THE

10  ATTACHMENTS IN THOSE EXHIBITS TO SHOW YOU, YOUR HONOR, THAT

11  HE HACKED INTO, FOR EXAMPLE, THE MASSACHUSETTS BAY TRANSIT

12  AUTHORITY IN 2005, AND HE CHANGED THE PARAMETERS SO THAT IT

13  WOULD BE FREE.  THAT'S STEALING.

14          MR. GREENSPAN:  OBJECTION, YOUR HONOR, IT IS

15  IRRELEVANT, HEARSAY.

16          MR. MAS MARQUES:  MR. GREENSPAN IS VERY SKILLED,

17  YOUR HONOR.  AND THE F.B.I. WENT TO GO TALK TO MR. GREENSPAN.

18  I WILL NEVER KNOW WHY THERE IS NO CRIMINAL CHARGES ON HIM.

19  AND THAT WAS ONLY ONE OF -- THERE WAS ANOTHER HACKING TO A

20  ONLINE COMPANY CALLED PAYMAXX.  AND MR. GREENSPAN SAID, "I'M

21  JUST TRYING TO SHOW EVERYBODY THEIR VULNERABILITY."  AND THE

22  COMPANY SPOKESPERSON SAYS, "WE DON'T AGREE, WE THINK MR.

23  GREENSPAN HACKED US."

24          THE COURT REPORTER:  YOUR HONOR, I NEED A BREAK.

25          THE COURT:  WE'RE GOING TO NEED AN AFTERNOON RECESS

26  RIGHT NOW.  WE'LL BE BACK AT 3:05.  MR. MAS MARQUES, YOU CAN

27  COMPLETE YOUR COMMENTS THEN.

28          (WHEREUPON, A RECESS WAS TAKEN.)

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1          THE COURT:  THE COURT IS BACK IN SESSION AND WE'RE

2    BACK ON THE RECORD IN THE MATTER OF GREENSPAN VERSUS MAS

3    MARQUES AND MAS MARQUES VERSUS GREENSPAN.

4          WITH RESPECT TO THE REQUEST FOR A RESTRAINING ORDER

5    BY MR. MAS MARQUES AGAINST MR. GREENSPAN, WE HAVE A MOTION

6    FOR RECONSIDERATION.  AND, MR. MAS MARQUES, YOU WERE IN THE

7    MIDDLE OF A THOUGHT.  I WANT YOU TO PICK UP WHERE YOU LEFT

8    OFF.  HOWEVER, WE DO HAVE A COURT REPORTER HERE AND I NEED

9    YOU TO SLOW DOWN AND ENUNCIATE SO THAT SHE CAN ACCURATELY

10   TAKE DOWN THE RECORD.  IT'S EASIER, OBVIOUSLY, FOR A COURT

11   REPORTER TO TAKE DOWN INFORMATION WHEN SHE CAN OBSERVE PEOPLE

12   TESTIFYING, BUT SHE CAN'T DO THAT WHEN YOU ARE ON THE PHONE.

13   SO ENUNCIATE CLEARLY AND SLOW DOWN A LITTLE BIT.  COULD YOU

14   DO THAT FOR US, MR. MAS MARQUES?

15         MR. MAS MARQUES:  YES, YOUR HONOR, I APOLOGIZE.

16         THE COURT:  YOU WOULD HAVE NO WAY OF KNOWING THAT

17   BECAUSE YOU'RE NOT HERE.  IF YOU CAN DO THAT, THAT WOULD BE

18   GREAT.

19         MR. MAS MARQUES:  YES.

20         THE COURT:  WHENEVER YOU'RE READY, YOU CAN RESUME.

21         MR. MAS MARQUES:  I'M SORRY.  I'M HAVING A HARD

22   TIME HEARING YOU.

23         THE COURT:  YOU CAN RESUME WHAT YOU WERE SAYING.

24         MR. MAS MARQUES:  SORRY, YOUR HONOR.  SO I ATTACHED

25   TO THIS A HACKING THAT MR. GREENSPAN HAS BEEN DOING.  ONE OF

26   THEM WAS AT THE MASSACHUSETTS BAY TRANSIT AUTHORITY, WHICH

27   IS, LIKE, IT'S LIKE THE TRANSPORTATION AUTHORITY IN SOUTH

28   STATION IN BOSTON, MASSACHUSETTS.  AND MR. GREENSPAN HACKED

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    INTO THE WIFI SYSTEM, AND HE CHANGED THE PARAMETERS OF THE

2    PAYMENT METHOD FROM CREDIT CARD TO FREE.  AND MR. GREENSPAN,

3    HE WAS APPROACHED BY THE F.B.I., AND I DON'T KNOW IF ANY

4    CRIMINAL CHARGES WERE BROUGHT AGAINST HIM.  AT THAT POINT,

5    MR. GREENSPAN, I THINK HE MOVED FROM MASSACHUSETTS, BECAUSE

6    HE SET UP SOME COMPANY IN BOSTON, SOME COMPUTER COMPANY

7    SOMETHING, WHEN HE WAS DOING THAT.

8              MR. GREENSPAN:  OBJECTION, YOUR HONOR, RELEVANCE.

9              MR. MAS MARQUES:  MR. GREENSPAN WAS TRYING TO

10   INFORM THE MBTA, AND THE F.B.I. OF THEIR VULNERABILITIES,

11   THAT WAS HIS EXCUSE FOR HACKING INTO THE MBTA.

12             THE COURT:  WELL, HANG ON A SECOND.  HOW DID YOU

13   FIND THESE THINGS OUT?

14             MR. MAS MARQUES:  THEY CAME UP ON THE INTERNET.

15             THE COURT:  ALL RIGHT.  FINE.  SO WHAT'S YOUR POINT

16   WITH THAT?  WE HAVE A RELEVANCE OBJECTION.  WHAT'S YOUR

17   POINT?  ARE YOU SAYING, FOR EXAMPLE, THAT YOU BELIEVE THAT

18   MR. GREENSPAN WAS THE ONE WHO PUBLISHED THE PORNOGRAPHIC

19   IMAGES OF HIS FAMILY?  YOU THINK THAT HE DID THAT.

20             MR. MAS MARQUES:  WELL, I CAN SAY THAT I DID NOT DO

21   IT.  100 PERCENT, I DID NOT DO THAT, YOUR HONOR.  SO WHETHER

22   MR. GREENSPAN DIRECTLY DID IT OR NOT, I DON'T HAVE PROOF OF

23   THAT, BUT I DO THINK MR. GREENSPAN HAD SOME INVOLVEMENT IN

24   THAT BECAUSE HE CONTACTED THE AUTHORITIES WHERE I LIVE, AND

25   WAS TELLING THEM TO LOOK AT THAT, LOOK AT THIS, LOOK AT MY IP

26   ADDRESS, AND HE GAVE THEM MY IP ADDRESS.  HE HAS MY INTERNET

27   PROTOCOL ADDRESS.  HE HAD A LOT OF INFORMATION ON ME, YOUR

28   HONOR, AND I DON'T KNOW HOW HE IS GETTING ACCESS TO ALL OF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   THIS INFORMATION.  AND SO I CAN'T SAY, YOUR HONOR, I'M NOT A

2   COMPUTER EXPERT.  I'M WORKING ON IT WITH A COMPANY RIGHT NOW.

3   THAT MR. GREENSPAN SOMEHOW ARRANGED, I'M NOT SAYING HE DID IT

4   DIRECTLY.  I DON'T KNOW WHO DID IT.  MAYBE HE HAD SOMEBODY

5   ASSIST HIM.  BUT THESE IMAGES, YOUR HONOR, WERE NOT UPLOADED

6   BY ME.  THAT --

7           THE COURT:  NOW, WAIT A SECOND, MR. MAS MARQUES,

8   YOU'RE DENYING THIS, I UNDERSTAND, BUT WHAT ARE YOU SAYING

9   THAT MR. GREENSPAN DID RELATIVE TO THOSE IMAGES?  ARE YOU

10  SAYING HE WAS THE ONE WHO WAS RESPONSIBLE FOR THEIR

11  PUBLICATION?

12          MR. MAS MARQUES:  I DON'T HAVE PROOF OF THAT, YOUR

13  HONOR; SO I CAN'T SAY -- I DON'T KNOW IF HE WAS DIRECTLY --

14          THE COURT:  LOOK, LET ME, MR. MAS MARQUES, LET ME

15  JUMP IN.  WE HAD ONE SESSION OF THE HEARING WHERE AT THE

16  CONCLUSION, I SAID, I WAS NOT CONVINCED THAT YOU WERE

17  RESPONSIBLE FOR PUBLISHING THOSE IMAGES.  MR. GREENSPAN CAME

18  BACK AFTERWARDS, AND HE GAVE A LITANY OF REASONS,

19  CIRCUMSTANTIAL EVIDENCE, AND AFTER THAT EVIDENCE WAS

20  PRESENTED, I DIDN'T FIND THAT THERE WAS A REAL CONVINCING,

21  PLAUSIBLE DENIAL.  I UNDERSTAND THAT WE'RE DEALING WITH

22  TECHNICAL ISSUES HERE IN TERMS OF TRACING WHO POSTED THIS,

23  BUT AGAIN, ALL I CAN DO IS DRAW MY CONCLUSIONS BASED ON

24  EVIDENCE THAT I'VE HEARD AT THE HEARING.

25          MR. GREENSPAN, I WILL IMPOSE ON YOU, ASK YOU ONE

26  MORE TIME, TO ARTICULATE FOR THE RECORD HOW AND WHY YOU MADE

27  THE DETERMINATION THAT MR. MAS MARQUES WAS RESPONSIBLE FOR

28  PUBLISHING THESE IMAGES?

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1        MR. GREENSPAN:  YOUR HONOR, IF YOU LOOK AT THE

2    DECLARATION THAT I READ INTO THE RECORD, FILED IN MAY, I DO

3    NOT ATTRIBUTE THOSE IMAGES TO MR. MAS MARQUES AT THIS POINT.

4    I SPECIFICALLY SAID THAT I DID NOT BELIEVE THAT HE

5    NECESSARILY POSTED THOSE.  SO I'M NOT SURE WHAT THIS IS

6    ABOUT.  WE'VE ALREADY MOVED PAST THIS.

7        THE COURT:  ALL RIGHT.  SO YOU'RE SAYING THAT YOU

8    DO NOT BELIEVE THAT HE POSTED THOSE IMAGES?

9        MR. GREENSPAN:  THOSE SPECIFIC IMAGES.  I BELIEVE

10   HE DID POST OTHER IMAGES.

11       THE COURT:  AT THE CONCLUSION OF ONE OF THE

12   HEARINGS, YOU SAID THAT IT WAS CONCERNING TO YOU THAT THE

13   COURT WAS NOT FOLLOWING WHAT YOU WERE SAYING RELATIVE TO THE

14   POSTING OF THOSE IMAGES, AND THEN YOU CAME BACK AND YOU GAVE

15   A LITANY OF REASONS OF WHY YOU BELIEVE THAT HE WAS

16   RESPONSIBLE.

17       MR. GREENSPAN:  I'M NOT SURE I WOULD CHARACTERIZE

18   MY VIEWS THAT WAY, BUT I DID GIVE PLENTY OF EVIDENCE --

19       THE COURT:  SO NOW YOU'RE DISAVOWING THEM?

20       MR. GREENSPAN:  I'M NOT DISAVOWING ANYTHING.  I'M

21   SAYING THAT MR. MAS MARQUES POSTED THOUSANDS OF COMPLAINTS ON

22   VARIOUS WEB SITES, AND AT THE SAME TIME, HE WAS COMMUNICATING

23   WITH AN INDIVIDUAL WHO I BELIEVE IS RESPONSIBLE FOR THOSE

24   PORNOGRAPHIC IMAGES.

25       THE COURT:  WHAT IS THE DATE OF YOUR DECLARATION?

26       MR. GREENSPAN:  MAY 3RD.  AGAIN, THEY'VE BEEN

27   POSTED IN THE SYSTEM AFTER MAY 3RD.

28       THE COURT:  HANG ON A SECOND.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    MR. GREENSPAN:  I BELIEVE IT WAS FILED ON MAY 13TH.

2    THE COURT:  GIVE ME A SECOND TO FOLLOW THIS.  I

3    FEEL LIKE WE'RE GETTING SOMEWHERE NOW.  LET ME SEE THE

4    APPLICATION HERE.  GIVE ME THE DATE ONE MORE TIME.

5    MR. GREENSPAN:  IT WAS POSTED IN THE SYSTEM ON MAY

6    13TH.

7    THE COURT:  AND WHEN WAS THE, I MEAN WHEN THE

8    RESTRAINING ORDER WAS ISSUED AGAINST MR. MAS MARQUES?

9    MR. GREENSPAN:  THE INITIAL T.R.O. OR THE PERMANENT

10   ONE?

11   THE COURT:  NO, THE ORDER AFTER HEARING.

12   MR. GREENSPAN:  I BELIEVE THAT WAS AUGUST 30TH OF

13   THIS YEAR.

14   THE COURT:  I RECALL YOU SAYING, AMONG OTHER

15   THINGS, MR. GREENSPAN, THAT THE VERBIAGE THAT WAS USED WAS

16   SOMETHING THAT COULD BE TIED TO THE TYPE OF LANGUAGE THAT WAS

17   EMPLOYED BY MR. MAS MARQUES.  DO YOU REMEMBER THAT?

18   MR. GREENSPAN:  YES.  THERE ARE SEVEN DIFFERENT

19   FACTORS THAT I'M RELYING ON TO ATTRIBUTE AUTHORSHIP OF THESE

20   HARASSING POSTS TO MR. MAS MARQUES.

21   THE COURT:  ARE YOU TALKING ABOUT THE ONES WITH THE

22   IMAGES IN QUESTION?

23   MR. GREENSPAN:  NOT NECESSARILY THE PORNOGRAPHIC

24   IMAGES, BUT OTHER IMAGES WHICH HAD MY FAMILY MEMBERS IN THEM.

25   THE COURT:  WHAT OTHER IMAGES ARE YOU TALKING

26   ABOUT?

27   MR. GREENSPAN:  I BELIEVE THEY'RE IN SOME OF THE

28   TRIAL EXHIBITS THAT GENERALLY IMAGES OF MY MOTHER AND MY

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    FATHER WITH SPEECH BUBBLES COMING OUT OF THEIR MOUTHS.

2           THE COURT:  GOT IT.  LET ME GO AHEAD AND TAKE A

3    LOOK AT THIS.

4           MR. GREENSPAN:  THE PORNOGRAPHIC IMAGES ARE

5    MENTIONED ON PAGE 7.

6           THE COURT:  THANK YOU.  MR. GREENSPAN, DO YOU HAVE

7    ACCESS TO YOUR ORIGINAL REQUEST FOR TEMPORARY RESTRAINING

8    ORDER IN THIS MATTER?

9           MR. GREENSPAN:  I DO.

10          THE COURT:  DO YOU HAVE THAT IN FRONT OF YOU?

11          MR. GREENSPAN:  I CAN PULL IT UP.  YOU'RE TALKING

12   ABOUT APRIL 4TH, 2018; IS THAT CORRECT?

13          THE COURT:  YES.  YOU SAID, AMONG OTHER THINGS, HE

14   HAS SENT HARASSING EMAILS TO YOU.  HE'S AUTHORED FALSE,

15   INFLAMMATORY -- AND HAS SUBMITTED AT OTHER OFFENSIVE WEB

16   SITES SUCH AS BLACKLISTREPORT AND COMPLAINTSBOARD ABOUT YOU

17   AND YOUR FAMILY.  HE'S CALLED YOU DIRECTLY 20 TIMES IN THE

18   NIGHT.  HE CALLED PLAINTIFF'S FAMILY IN OHIO 15 TIMES A

19   NIGHT.  HE HAS CHANGED HIS PHONE NUMBERS REPEATEDLY TO BE

20   ABLE TO CONTINUE CALLING PLAINTIFF AND HIS FAMILY IN ORDER TO

21   AVOID PHONE NUMBER BLOCKAGES, AND YOU SAID IMPERSONATED

22   FAMILY MEMBERS IN AN ATTEMPT TO INDUCE FEAR.

23          MR. GREENSPAN:  MAFIA --

24          THE COURT:  YOU SAID HE -- THEN YOU HAVE A NUMBER

25   OF ATTACHMENTS.  SO I WANT YOU TO STATE SUCCINCTLY, ON THE

26   RECORD, WHAT ARE THE THINGS THAT YOU ASSERT, YOU PROVED AT

27   THE HEARING ON THIS CASE WHICH WOULD WARRANT THE ISSUANCE OF

28   A CIVIL HARASSMENT ORDER?

1    MR. GREENSPAN:  I BELIEVE I DEMONSTRATED THAT MR.

2  MAS MARQUES HAD SENT ME EMAILS, WHICH I PROVIDED TO THE COURT

3  WHICH ARE FULL OF PROFANITY AND GENERALIZED THREATS; THAT HE

4  CALLED ME REPEATEDLY HIMSELF, WHICH WAS ALARMING; THAT HE

5  EITHER INSTRUCTED OR SOMEHOW CONVINCED OTHERS TO CALL ME,

6  MAKING VERY PARTICULAR ASSERTIONS THAT ARE FALSE, SUCH AS THE

7  FACT THAT I OWN LEAGLE.COM, L-E-A-G-L-E.

8    THE COURT:  SO YOU'RE SAYING YOU THINK OTHER PEOPLE

9  WOULD NOT HAVE BEEN DOING, IF IT HADN'T BEEN PUT UP TO IT BY

10  HIM?

11    MR. GREENSPAN:  OR IF THEY HAD NOT READ SOMETHING

12  THAT HE AUTHORED INITIALLY.

13    THE COURT:  HE ASKED HIM TO DO THAT?

14    MR. GREENSPAN:  NOT NECESSARILY, BUT I MEAN IT

15  DEPENDS ON HOW YOU DEFINE ASKING.  IF YOU CONSIDER POSTING MY

16  PHONE NUMBERS, MY PARENTS' PHONE NUMBERS, MY BROTHER'S PHONE

17  NUMBERS, AND OUR HOME ADDRESS IN OHIO, AND SAYING THAT I'VE

18  DONE ALL THESE THINGS AND THAT YOU SHOULD CALL ME AS A

19  REQUEST TO ASK, THEN YES.

20    THE COURT:  OKAY.

21    MR. GREENSPAN:  HE HAS FILED COMPLAINTS WITH I

22  DON'T EVEN KNOW HOW MANY GOVERNMENT AGENCIES AT THIS POINT,

23  FROM THE DELAWARE SECRETARY OF STATE TO THE OHIO ATTORNEY

24  GENERAL.  MOST RECENTLY, AFTER OUR LAST HEARING IN

25  OCTOBER 7TH OR SOMEWHERE AROUND THERE OF THIS MONTH, I WAS

26  UNABLE TO REGISTER MY CAR BECAUSE THE CALIFORNIA DMV -- I DID

27  NOT KNOW THIS FOR A FULL YEAR -- BUT IN OCTOBER OF 2018, THE

28  CALIFORNIA DMV RECEIVED A COMPLAINT ALLEGING THAT I HAD

1  PROVIDED A FRAUDULENT HOME ADDRESS TO THE DMV, WHICH I DID

2  NOT.  ON THAT BASIS, AN INVESTIGATION HAD BEEN OPENED INTO MY

3  CAR.

4         THE COURT:  AND HOW DID YOU KNOW THAT IT WAS MR.

5  MAS MARQUES WHO INITIATED THESE COMPLAINTS?

6         MR. GREENSPAN:  WELL, SOME OF THE COMPLAINTS HAVE

7  HIS NAME ON THEM, INCLUDING THE ONE FROM THE OHIO ATTORNEY

8  GENERAL, THAT I PROVIDED TO THE COURT.

9         THE COURT:  HE GETS TO DO THAT, DOESN'T HE?  HE

10  GETS TO FILE A COMPLAINT, DOESN'T HE?

11         MR. GREENSPAN:  HE DOES, EXCEPT THE COMPLAINTS

12  CONTAIN FALSE INFORMATION.  IN SOME CASES, FILING A FALSE

13  COMPLAINT WITH FALSE INFORMATION IS CRIMINAL, SUCH AS WHEN HE

14  PROVIDED THAT TO THE I.R.S.

15         THE COURT:  BUT THIS IS, AGAIN, ONE OF THOSE

16  CIRCUMSTANCES WHETHER THE COMPLAINTS ARE TRUE OR FALSE IS NOT

17  FULLY ADJUDICATED, AS I RECALL.

18         MR. GREENSPAN:  IT WAS NOT.  NOT IN THIS COURT.

19         THE COURT:  BUT THE MULTIPLE EMAILS TO YOURSELF, TO

20  YOUR FAMILY MEMBERS -- ALSO, YOU HAD TALKED ABOUT, QUOTE,

21  IMPERSONATING MAFIA MEMBERS, I THINK THAT WAS RELATIVE TO HIM

22  ASSUMING THESE NAMES THAT ARE ASSOCIATED WITH MAFIA MEMBERS

23  TO POST INFORMATION?

24         MR. GREENSPAN:  TO TRY AND GET ME TO REMOVE HIS

25  PUBLIC RECORDS.

26         THE COURT:  YOU INDICATED YOU HAD TO CHANGE YOUR

27  PHONE NUMBERS REPEATEDLY.

28         MR. GREENSPAN:  I DID NOT.  I BELIEVE HE USED

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

 1   VARIOUS PHONE NUMBERS, BECAUSE I STOPPED RESPONDING TO HIS

 2   PHONE NUMBER.

 3          THE COURT:  YOU SAID HE CALLED YOU AT LEAST 20

 4   TIMES, AND YOUR FAMILY IN OHIO AT LEAST 15 TIMES.  HE CHANGED

 5   HIS PHONE NUMBERS TO CONTINUE TO CONTACT YOU AND YOUR FAMILY.

 6   HOW DID YOU DETERMINE THAT THE NEW NUMBERS WERE ATTRIBUTED TO

 7   HIM?

 8          MR GREENSPAN:  WELL, I DON'T HAVE CONCLUSIVE PROOF

 9   OF THAT.  I DO KNOW THAT NO ONE ELSE WAS CALLING US WITH THAT

10   FREQUENCY AT THAT EXACT POINT IN TIME.

11          THE COURT:  DID YOU RECOGNIZE HIS VOICE ON THE

12   PHONE?

13          MR. GREENSPAN:  YES.  AT ONE POINT WHEN HE CALLED

14   AND IDENTIFIED HIMSELF AS DIEGO MAS MARQUES, THAT SOUNDED

15   LIKE HE SOUNDS NOW.

16          THE COURT:  WAS THAT ON ONE OF THE OCCASIONS

17   INITIALLY OR AFTER YOU BLOCKED IT?

18          MR. GREENSPAN:  I BELIEVE IT WAS INITIALLY.  I

19   STOPPED RESPONDING TO THAT PHONE NUMBER.

20          THE COURT:  DID YOU HEAR HIS VOICE ON ANY OF THE

21   OTHER CALLS?

22          MR. GREENSPAN:  NOT HIS VOICE.  YOU KNOW, IT'S HARD

23   TO BE 100 PERCENT CERTAIN, BUT I DO RECALL RECEIVING TWO

24   PHONE CALLS THAT I REPORTED TO THE F.B.I. WHERE I WAS ASKED

25   IF I USED A REGISTERED AGENT IN ARKANSAS TO MASK MY OWNERSHIP

26   OF LEAGLE.COM.  AS I'VE SAID IN THIS COURT REPEATEDLY, I

27   DON'T OWN THIS WEBSITE.  I'VE NEVER HAD A REGISTERED AGENT IN

28   ARKANSAS TO MASK ANYTHING.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    THE COURT:  WAS THAT SOMETHING THAT MR. MAS MARQUES

2  HAD MENTIONED TO YOU BEFORE OR NO?

3    MR. GREENSPAN:  THAT WAS ACTUALLY THE FIRST ISSUE

4  HE RAISED IN THIS COURTROOM, IF YOU LOOK AT THE TRANSCRIPT

5  FROM DECEMBER.

6    THE COURT:  AND WHAT WAS THE CONTENT OF THE

7  HARASSING EMAILS?

8    MR. GREENSPAN:  THERE WERE SEVERAL.  ONE OF THEM

9  ASKED ME, YOU KNOW, HE USED PROFANITY CALLING ME SOMETHING,

10  BUT EXCUSE ME, BUT HE CALLED ME A "MOTHERFUCKER," SAYING,

11  "WHERE DO YOU LIVE SO I CAN COME AND GET YOU," THAT KIND OF

12  THING.

13    THE COURT:  AND HOW DO YOU KNOW THOSE EMAILS WERE

14  FROM HIM?

15    MR. GREENSPAN:  BECAUSE IN SOME CASES THEY WERE

16  SENT BY A USER WITH HIS IP ADDRESS.  IN OTHER CASES THEY

17  PROVIDED HIS NAME.  IN OTHER CASES THEY PROVIDED HIS PHONE

18  NUMBER.  ALL OF THEM SEEM TO USE EMAIL ADDRESSES OF THE SAME

19  GENERAL STYLE, WHICH WAS A SERIES OF NUMBERS, FOLLOWED BY A

20  LETTER AT GMAIL.COM.

21    THE COURT:  MR. MAS MARQUES, DO YOU WANT TO RESPOND

22  TO ANY OF THAT?

23    MR. MAS MARQUES:  OKAY, I WILL TRY MY BEST, YOUR

24  HONOR.  I HAD A LITTLE BIT OF A HARD TIME HEARING EVERYTHING

25  FROM MR. GREENSPAN.  I THINK HE SAID THAT I WORKED WITH

26  SOMEBODY ELSE.  IF HE SAID THAT, THAT IS NOT TRUE.  I DON'T

27  WORK, YOU KNOW, NO ONE IS CONSPIRING AGAINST MR. GREENSPAN,

28  AND I'M CERTAINLY NOT.  AND ALSO I WOULD LIKE TO MAKE THIS

```
1    CLEAR TO MR. GREENSPAN AND THE COURT THAT I DID NOT CALL HIS
2    PARENTS.  I DID NOT CALL HIS FATHER.  I DID NOT CALL HIS
3    MOTHER.  I DID NOT CALL 20 TIMES LIKE HE SAID.  THAT DID NOT
4    COME FROM ME.  AND YOU KNOW MR. GREENSPAN IS PUTTING ALL OF
5    THESE THINGS, YOU KNOW, TO STATE THOSE THINGS, YOUR HONOR,
6    WHEN IT HAS NOTHING TO DO WITH ME.  AND IT'S LIKE, YOU KNOW,
7    WHAT CAN I DO, YOUR HONOR?  I DID NOT DO THESE THINGS TO MR.
8    GREENSPAN.  AND, YOU KNOW, HE IS LYING TO THE COURT, BECAUSE
9    I DIDN'T CALL HIM 20 TIMES.  I DIDN'T CALL HIS PARENTS ALL
10   THE TIMES HE SAID THAT I CALLED HIS PARENTS.  I DIDN'T EVEN
11   CALL HIS PARENTS.  I MADE CLEARED TO THE COURT THAT I CALLED
12   MR. GREENSPAN A TOTAL OF TWO TIMES IN WHAT I BELIEVE WAS
13   AUGUST OF 2017, AND IT WAS THE END OF MARCH OF 2018, WHEN I
14   SAID TO MR. GREENSPAN, WHEN HE ANSWERED THE PHONE I SAID, "IF
15   YOU DON'T STOP THIS HARASSMENT, I'M GOING TO TAKE OUT A
16   RESTRAINING ORDER."  AND THAT WAS AROUND THE END OF AUGUST.
17         THEN MR. GREENSPAN WENT TO YOUR COURT, AND HE GOT A
18   RESTRAINING ORDER AGAINST ME ON HARASSMENT BECAUSE I DID NOT
19   HARASS HIM.  ALL OF THESE THINGS THAT HE CLAIMS THAT I DID, I
20   DID NOT DO.
21         MR. GREENSPAN:  YOUR HONOR, CAN I BRIEFLY RESPOND?
22         MR. MAS MARQUES:  OH, AND LASTLY, THIS INDIVIDUAL,
23   OMAR OAZI, IS CLAIMING THAT MR. GREENSPAN AND SOME OF HIS
24   TWITTER FOLLOWERS HAVE PROTESTED TWITTER AND MADE FALSE
25   CLAIMS THAT --
26         MR. GREENSPAN:  OBJECTION, HEARSAY.
27         MR. MAS MARQUES:  -- THAT OMAR QAZI IS SENDING
28   CHILD,  CHILD PORNOGRAPHY TO MR. GREENSPAN OR HIS PARENTS AND
```

1    HARASSING HIS PARENTS.  ESSENTIALLY, IT'S THE SAME TYPE OF

2    THINGS THAT MR. GREENSPAN HAS ACCUSED ME OF, YOUR HONOR, AND

3    NOW HE IS ACCUSING OMAR QAZI OF DOING, AND TWITTER SHUT DOWN

4    HIS ACCOUNT.  AND THIS MAN SAID HE DID THE SAME THING.  I'M

5    AFRAID OF MR. GREENSPAN.  I DON'T WORK WITH ANYBODY.  NOBODY

6    IS OUT CONSPIRING AGAINST MR. GREENSPAN.  AND ONE OF MY

7    EXHIBITS IN THIS MOTION, THE LAST ONE, I BELIEVE IT SHOWS

8    THAT MR. GREENSPAN FILED, IN MARCH OF 2017 -- THIS IS BEFORE

9    I KNEW WHO HE WAS -- HE FILED A DMCA REQUEST, A TAKE DOWN

10   REQUEST FROM SOME WEBSITE CALLED STD CARRIER (PHONETIC) OR

11   SOMETHING OR THE OTHER.  THERE IS ALL OF THESE PICTURES OR

12   COMMENTS BY MR. GREENSPAN.  AND THIS IS BEFORE I EVEN KNEW

13   WHO MR. GREENSPAN WAS.

14           SO WHAT I'M SAYING IS THERE IS A PATTERN HERE, YOUR

15   HONOR.  THERE IS A PATTERN.  MR. GREENSPAN LASHES OUT AT

16   PEOPLE USING HIS, YOU KNOW, COMPUTER SKILLS, WHATEVER HE

17   DOES.  AND WHEN HE WANTS TO TARGET SOMEBODY, HE KNOWS HOW TO

18   DO IT.  HE KNOWS HOW TO FRAME SOMEBODY.  BUT I CERTAINLY

19   DIDN'T UPLOAD ANY OF THE PICTURES THAT HE PRESENTS TO THE

20   COURT, AT ALL.

21           AND, YOU KNOW, IT MAKES ME UPSET, YOUR HONOR.  I AM

22   UPSET BECAUSE I'M BEING ACCUSED OF THAT NONSENSE.  AND I HAVE

23   NEVER DONE ANY OF THAT NONSENSE, AND I HAVE NOT UPLOADED

24   PICTURES.  I HAVE NOT CALLED HIS PARENTS.  I HAVE NOT CALLED

25   HIM 20 TIMES.  HE'S MAKING THAT UP, YOUR HONOR, THAT IS WHAT

26   HE'S DOING.  YOU KNOW, TO BE BLUNT, HE IS LYING TO THE COURT

27   BECAUSE I DID NOT DO THAT.  MR. GREENSPAN KNOWS THAT I CALLED

28   HIM TWICE.  THE LAST CALL TO HIM WAS AT THE END OF MARCH

1   2018.  AND I SAID TO HIM, "IF YOU DON'T STOP THIS HARASSMENT,

2   IM GOING TO FILE A RESTRAINING ORDER AGAINST YOU."  AND THEN

3   HE HANGS UP.  AND THEN DAYS LATER HE GOES TO THE COURT BEFORE

4   YOU, YOUR HONOR, AND HE APPLIES FOR A RESTRAINING ORDER BASED

5   ON FABRICATED EVIDENCE, BASED ON MADE-UP LIES.  I DID NOT

6   HARASS HIM.  THERE IS NO REASON FOR MR. GREENSPAN TO HAVE A

7   RESTRAINING ORDER BECAUSE I DID NOT DO THOSE THINGS TO HIM.

8   AND WHAT IS APPARENT NOW TO ME, IS THAT NOW HE IS HAVING

9   DIFFICULTIES WITH THE OTHER INDIVIDUAL.  AND THAT PERSON IS

10  STATING ONLINE THAT MR. GREENSPAN, ALONG WITH HIS FOLLOWERS

11  ON TWITTER, HE SAID HE WAS UPLOADING PORNOGRAPHY.  I DON'T

12  KNOW THE DETAILS, BUT THEY SAID HIS TWITTER ACCOUNT WAS SHUT

13  DOWN.  AND HIS FATHER WAS SAYING OMAR QAZI -- I DON'T KNOW

14  ALL OF THE DETAILS.  IT IS A VERY SIMILAR PATTERN, YOUR

15  HONOR.

16          THE COURT:  WAIT A SECOND, I THINK WE'RE GETTING

17  FAR AFIELD, AND GETTING INTO AREAS THAT THE COURT CAN'T

18  CONSIDER.  THEY ARE NOT PART OF THE EVIDENCE IN THE CASE.  I

19  WILL LET YOU WRAP IT UP WITH ANY FINAL REMARKS.

20          MR. MAS MARQUES:  CAN I TALK, YOUR HONOR?

21          THE COURT:  FINISH IT.  KEEP IT TO WHAT IS GERMANE

22  HERE.

23          MR. MAS MARQUES:  OKAY.  I'M SORRY.

24          THE COURT:  BUT WE HEARD QUITE A GREAT DEAL FROM

25  YOU, AND I WANT YOU TO WRAP IT UP.

26          MR. MAS MARQUES:  OKAY.  BASICALLY, I WOULD LIKE

27  MR. GREENSPAN TO KNOW, AND MAYBE HE KNOWS, MAYBE HE DOESN'T

28  KNOW, MAYBE HE'S LASHING OUT AT ME BECAUSE HE IS GETTING

1    COMPLAINTS FROM SO MANY PEOPLE AGAINST HIM THAT HE TAKES IT

2    OUT ON ME BECAUSE HE CAN TARGET ME, BECAUSE, YOU KNOW, FOR

3    WHATEVER REASON HE IS UPSET.  HE HAS SOMEONE TO TARGET.  BUT

4    I DID NOT UPLOAD THOSE PICTURES.  I DID NOT CALL HIS PARENTS.

5    I DID NOT CALL HIM 20 TIMES.  NOW, I'M DOING THIS BECAUSE --

6    I ADMIT THAT I DID NOT DO THESE THINGS.  THE COURT NEEDS TO

7    KNOW THIS, BECAUSE MR. GREENSPAN HAS WALKED INTO THIS COURT

8    AND MADE UP ALL OF THESE THINGS, AND THEY ARE NOT FACTUAL.

9    THAT'S HOW YOU GET A RESTRAINING ORDER.

10         YOUR HONOR, I'M PLEADING WITH THE COURT.  WITH ALL

11    DUE RESPECT, YOUR HONOR, I'M ASKING THAT MR. GREENSPAN'S

12    RESTRAINING ORDER BE TERMINATED.  I DO NOT HAVE A RESTRAINING

13    ORDER; MR. GREENSPAN SHOULD NOT HAVE A RESTRAINING ORDER.

14    THERE IS NO REASON FOR MR. GREENSPAN TO HAVE A RESTRAINING

15    ORDER, BECAUSE THESE THINGS HE IS ACCUSING ME OF, I HAVE NOT

16    DONE AND THEY ARE NOT FACTUAL.  HE STATED ALL THESE THINGS,

17    YOU CAN SEE THAT HE IS STATING A LOT IS NOT TRUTHFUL AT ALL.

18    YOU KNOW, IF MR. GREENSPAN HAS SOMEBODY BOTHERING HIM,

19    CALLING HIM, AND HE'S SAYING THAT I'M PROVOKING OTHER PEOPLE,

20    I'M NOT PROVOKING OTHER PEOPLE.  I'M NOT GOING AROUND, YOU

21    KNOW, CONTACTING PEOPLE SAYING DO THIS, NO.  WHAT MR.

22    GREENSPAN HAS TO UNDERSTAND IS VERY SIMPLE, I WANT TO BE LEFT

23    IN PEACE.  I WANT TO BE ABLE TO MOVE ON IN MY LIFE.  BUT WITH

24    MR. GREENSPAN, I CANNOT DO THAT, BECAUSE HE SEEMS TO HAVE

25    THIS OBSESSION WITH ME.  HE'S SAYING I'M DOING THIS AND I'M

26    DOING THAT.  IT IS NOT ME AND HE WON'T STOP.  AND, YOUR

27    HONOR, SINCE THE AUGUST 30TH, YOU KNOW, TERMINATION OF MY

28    T.R.O., THE HARASSMENT STARTED UP AGAIN.  I JUST WANT MR.

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   GREENSPAN TO LEAVE ME ALONE.  THAT'S ALL I WANT.  YOU KNOW,

2   IF HE HAS PEOPLE CALLING HIS PARENTS, HE HAS PEOPLE BOTHERING

3   HIM, HE NEEDS TO GO TO THE F.B.I.  HE NEEDS TO FIND OUT WHO

4   IS DOING THIS.  HE NEEDS TO STOP BLAMING ME FOR EVERYTHING

5   UNDER THE SUN, YOUR HONOR.  I'M NOT THE PERSON DOING THOSE

6   THINGS TO HIM, OKAY?  THOSE PICTURES GOT ME SO UPSET.  YOU

7   KNOW, WHEN I CAME INTO COURT ON SEPTEMBER 12TH, I WAS IN

8   SHOCK.  I COULD NOT BELIEVE THE STACK OF DOCUMENTS, THE

9   PICTURES THAT HE IS SHOWING TO YOU, YOUR HONOR, AND SAYING IT

10  CAME FROM ME.  NONE OF THOSE PICTURES CAME FROM ME, YOUR

11  HONOR.  I DID NOT UPLOAD ANY BIOPICTURES (PHONETIC) ONLINE,

12  OKAY?  I DON'T DO THAT.

13          NOW, MR. GREENSPAN, YOU KNOW, IS UPSET A LITTLE

14  BIT.  MR. GREENSPAN HAS ISSUES NOW WITH ANOTHER PERSON, AND

15  THAT PERSON SAYS HE'S BEING ACCUSED OF UPLOADING PORNOGRAPHY.

16  HE'S GOT A TWITTER ACCOUNT SHUT DOWN.  HE'S ACCUSING HIM OF

17  THE SAME THING THAT MR. GREENSPAN HAS BEEN ACCUSING ME OF.

18  SO IT SEEMS TO ME THAT MR. GREENSPAN HAS HIS SIGHTS ON

19  SOMEBODY, IT APPEARS TO BE HIS MODIS OPERANDI.  I DON'T KNOW

20  HOW HE DOES IT WITH THESE IMAGES, BUT HE IS USING IMAGES, YOU

21  KNOW, BUT I DID NOT DO THAT.  I DIDN'T CALL HIS PARENTS,

22  OKAY?  I'M NOT TRYING TO GET ANYBODY TO BOTHER HIS PARENTS.

23  NOW, I WOULD NOT WANT ANYONE BOTHERING MY PARENTS.  I DON'T

24  BOTHER ANYONE'S PARENTS.

25          MR. GREENSPAN:  YOUR HONOR, OBJECTION.

26          MR. MAS MARQUES:  I WANT HIM TO LEAVE ME IN PEACE.

27  TO LEAVE ME ALONE.

28          THE COURT:  OKAY.  YOU NEED TO REST, MR. MAS

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

 1   MARQUES.  WHAT YOU'RE SAYING IS REPETITIVE.  IS THERE

 2   ANYTHING THAT YOU WANTED TO SAY IN CONCLUSION?  OTHERWISE,

 3   WE'RE GOING TO DRAW THIS TO A CLOSE.

 4         MR. MAS MARQUES:  SURE.  I THINK -- I APOLOGIZE,

 5   YOUR HONOR.  I'M GOING TO TRY TO SUM IT UP HERE.  WHAT

 6   HAPPENED WAS THERE WAS ANOTHER INDIVIDUAL THAT WAS ALSO --

 7         MR. GREENSPAN:  OBJECTION.

 8         MR. MAS MARQUES:  JEFFERY --

 9         THE COURT:  HANG ON.  HANG ON.  I'M GOING TO STOP

10   YOU RIGHT THERE.  WE HAVE AN OBJECTION.  I HAVE ASKED YOU

11   PREVIOUSLY, BOTH OF YOU, WHAT'S BEEN HAPPENING SINCE THE

12   RESTRAINING ORDER EXPIRED.  I'M INTERESTED IN KNOWING WHAT

13   HAS HAPPENED, BECAUSE YOU MADE THE ASSERTION THAT HE'S BEEN

14   BASICALLY ENGAGING IN HARASSING CONDUCT, BUT IF WE'RE TALKING

15   NOW ABOUT EVIDENCE ABOUT OTHER PEOPLE, ABOUT MATTERS THAT ARE

16   OUTSIDE OF THE EVIDENTIARY RECORD, LET'S NOT FORGET, EVIDENCE

17   IS CLOSED IN THIS CASE.  LET'S NOT DO THAT.

18         MR. MAS MARQUES:  YES, YOUR HONOR.

19         THE COURT:  BECAUSE THAT WOULD BE OBJECTIONABLE.

20   YOU SAID YOU WANTED TO WRAP IT UP; SO GO AHEAD.

21         MR. MAS MARQUES:  THE ONLY THING THAT I WAS TRYING

22   TO SHOW THE COURT IS WHAT MR. GREENSPAN'S MOTIVE IS FOR DOING

23   THESE THINGS TO ME.  JUST TO SUM IT UP WITHOUT GOING INTO A

24   LOT OF DETAILS, THE OTHER SITE GOT SHUT DOWN BY LAW

25   ENFORCEMENT BECAUSE HE HAD (UNINTELLIGIBLE).

26         MR. GREENSPAN:  OBJECTION.

27         THE COURT:  YOU'RE OBJECTION IS SUSTAINED.

28         NOW, ONE THING ABOUT THE MOTION TO RECONSIDER IS IF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1   YOU HAVE NEW EVIDENCE, IF YOU HAVE NEW FACTS OR LAW, THAT'S

2   ONE THING, BUT IF YOU'RE TRYING TO SORT OF EXPAND THE SCOPE

3   OF THIS CASE TO ENCOMPASS MATTERS THAT COULD HAVE BEEN RAISED

4   AND WEREN'T RAISED AT THE LAST HEARING OR COMPLETELY OUTSIDE

5   THE SCOPE OF WHAT THE COURT WOULD CONSIDER RELEVANT, I'M NOT

6   GOING TO BE ABLE TO HEAR ABOUT THAT.  BECAUSE ESSENTIALLY

7   WHAT WE'RE DOING IS OPENING THIS CASE UP FOR A BRAND NEW

8   EVIDENTIARY HEARING.  SO IS THERE ANYTHING ELSE THAT YOU

9   WANTED TO SAY JUST IN WRAPPING UP?  YOU SAID YOU HAD

10  SOMETHING YOU WANTED TO SAY TO SUM UP.  AS LONG AS WE STAY ON

11  POINT HERE.

12        MR. MAS MARQUES:  ALL RIGHT.  I DID BRING THAT UP

13  AT THE EVIDENTIARY HEARING, ABOUT THE OTHER INDIVIDUAL.  I

14  JUST WANTED TO SAY THAT'S (UNINTELLIGIBLE) GOING ON THE

15  ATTACK AGAINST ME, FABRICATING ALL OF THIS EVIDENCE, BUT HE

16  IS STILL, HE IS STILL UPLOADING MY NAME.  HE IS STILL

17  COMMENTING ON THE FACTS FROM THE RESTRAINING ORDER.  AND HE

18  IS GOING ALL OVER THE PLACE ONLINE, USING MY NAME, FINDING

19  INDIVIDUALS WHO ARE NOW FINDING MY NAME AND COMMENTING ABOUT

20  ME.  WHAT I WOULD ASK, YOUR HONOR, IS MR. GREENSPAN INNOCENT

21  IN ALL THIS?  IS HE AN INNOCENT BYSTANDER?

22        THE COURT:  OKAY.  MR. MAS MARQUES, NOW I THINK

23  WE'RE GETTING A LITTLE RAMBLING HERE, AND THE SAME VARIATION

24  THAT YOU'VE BEEN ARGUING ABOUT THROUGHOUT.  YOU HEARD ME SAY,

25  I'M NOT SAYING THAT MR. GREENSPAN HAS NOT DONE HARASSING

26  THINGS.  I'M SAYING I MADE A DETERMINATION, BASED ON THE

27  EVIDENCE THAT WAS PRESENTED.  NOW, IF YOU HAD FELT THE NEED

28  TO BRING IN A COMPUTER EXPERT, THAT MIGHT HAVE BEEN HELPFUL

57

1  AT THE HEARING, IT MAY NOT HAVE BEEN, BUT WE'RE NOT TALKING

2  ABOUT RELITIGATING THESE MATTERS.

3          IF THERE WAS INFORMATION THAT COULD HAVE BEEN

4  PROVIDED THAT WASN'T PROVIDED, THEN THE COURT IS NOT GOING TO

5  GRANT YOUR MOTION ON THAT BASIS.

6          I'M NOT SAYING THAT HE'S GONE OUT THERE AND DONE

7  WONDERFUL WORK, THAT HE HASN'T HURT PEOPLE AND HE HASN'T

8  FIXATED ON PEOPLE.  THAT'S OUTSIDE OF MY REALM HERE.  I HAVE

9  TO STICK TO THE FACTS.  I CAN'T MAKE DECISIONS WITHOUT

10 EVIDENTIARY SUPPORT.  IT HAS BEEN A HARD TASK FOR THE COURT

11 IN THIS CASE TO GET THE FACTS, AND TO GET THEM IN A LINEAR

12 AND COGENT MANNER, BUT I'M NOT MAKING ANY STATEMENTS ABOUT

13 WHETHER IF HE HAS DEFAMED YOU.  I'M SAYING IT HAS NOT BEEN

14 PROVEN HERE.  I AM NOT SAYING HE HASN'T HARASSED YOU.  I'M

15 SAYING IT HASN'T BEEN PROVEN BY CLEAR AND CONVINCING EVIDENCE

16 IN THE CONTEXT OF THIS HEARING.  I'M NOT ABSOLVING HIM OF

17 WRONGDOING.  THAT'S NOT MY JOB TO DO.

18         SO TO THE EXTENT THAT YOU'RE MAKING THAT ARGUMENT,

19 YOU NEED TO MAKE IT, TO THE EXTENT YOU WANT TO STICK TO THE

20 EVIDENCE, THAT'S WHAT I'M GOING TO FOCUS ON.

21         NOW, PLEASE, AS YOU INDICATED YOU WANTED TO DO

22 WRAP-UP, I REALLY HATE TO CUT PEOPLE OFF BEFORE THEY'VE

23 FINISHED THEIR THOUGHTS, BUT WE HAVE TO KEEP IT GERMANE TO

24 THE MOTION BEFORE THE COURT.  ANYTHING YOU WANT TO SAY IN

25 CONCLUSION?

26         MR. MAS MARQUES:  MR. GREENSPAN IS THE ONE DOING

27 THE HARASSMENT AND NOT ME.  I'M RESPECTFULLY ASKING THIS

28 COURT TO TERMINATE MR. GREENSPAN'S RESTRAINING ORDER AGAINST

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    ME.  AND MR. GREENSPAN, BASED ON DOING ALL OF THESE THINGS,

2    THEN HE CAN SUE ME FOR DEFAMATION IN CIVIL COURT, BUT FOR HIM

3    TO GET A RESTRAINING ORDER BASED ON NON-FACTUAL THINGS AND

4    THINGS THAT I HAVE NOT DONE, THAT'S NOT FAIR, YOUR HONOR.

5    THAT'S INJUSTICE.

6              THE COURT:  MR. MAS MARQUES, AT A CERTAIN POINT,

7    YOU HAVE TO STOP REPEATING THAT.  AT A CERTAIN POINT YOU HAVE

8    TO TRUST THAT I AM HEARING WHAT YOU'RE SAYING.

9              MR. MAS MARQUES:  OKAY.

10             THE COURT:  OKAY.  IS THERE ANYTHING NEW THAT YOU

11   HAVE NOT MENTIONED?

12             MR. MAS MARQUES:  NO.  I THINK I'VE SAID

13   EVERYTHING, YOUR HONOR.

14             THE COURT:  MR. MAS MARQUES, IF YOU'VE SAID

15   EVERYTHING, THEN PLEASE PAUSE.

16             ANYTHING THAT YOU WANT TO SAY IN CONCLUSION?  AND

17   BASICALLY, THE THING IS THAT YOU'RE ALLEGING, MR. GREENSPAN,

18   HE IS NOT THE HARASSER, THAT YOU'RE THE HARASSER AND YOU HAVE

19   NOT BEEN TRUTHFUL TO THE COURT.

20             MR. GREENSPAN:  I UNDERSTAND WHAT HE IS CLAIMING

21   AND I CATEGORICALLY DENY IT.  I WOULD LIKE TO JUST READ ONE

22   OF THE 58 EMAILS FROM MY INBOX FROM MR. MAS MARQUES AND I'LL

23   READ IT VERBATIM.

24             THE COURT:  IF IT IS IN EVIDENCE YOU CAN DO IT, BUT

25   DO IT IN A LOUD ENOUGH VOICE SO THAT HE CAN HEAR YOU.

26             MR. GREENSPAN:  IT IS ONE OF THE TRIAL EXHIBITS

27   ALREADY.  THIS IS FROM DIEGO MAS MARQUES, ON MARCH 30TH,

28   2019, AT 6:06 P.M.  IT IS SHORT, DON'T WORRY.  PLEASE PROVIDE

1    DETAILS OF YOUR REQUEST, QUOTE, "AARON, YOU DIRTY LOW LIFE,"

2    CAPITAL LETTERS, "MOTHERFUCKER.  YOU NEED TO FUCKING STOP

3    TERRORIZING, HARASSING, STALKING, AND THREATENING MY LIFE AND

4    FAMILY ONLINE.  YOU'RE A FUCKING SCUM, P.O.S. YOU ARE NOT

5    WORTH A FUCKING PENNY.  YOU ARE JUST A PIECE OF TRASH BLOWING

6    IN THE WIND.  STOP THE FUCKING HARASSMENT YOU DIRT BAG, AND

7    GO FUCK YOURSELF.  IP ADDRESS:  24.60.59.25." THIS IS ONE OF

8    ALMOST 60 EMAILS I'VE RECEIVED FROM MR. MAS MARQUES, BEING

9    JUST AS REPETITIVE AS HE HAS BEEN ON THE PHONE TODAY AND AT

10   EVERY PRIOR HEARING.  I'M NOT OBSESSED WITH HIM.  I NEVER

11   HAVE BEEN.  I'VE BEEN TRYING TO DEFEND MYSELF AGAINST

12   SOMEBODY I PERCEIVE, I THINK, RIGHTLY SO TO BE DANGEROUS AND

13   WHO HAS A DOCUMENTED HISTORY OF HARASSMENT.  I HAVE NOT

14   HACKED ANYTHING BELONGING TO HIM EVER.  I WENT TO A PUBLIC

15   NEWSPAPER WEBSITE AND FOUND PUBLIC NEWSPAPER ARTICLES ABOUT

16   HIM, WHICH INDICATE THAT THIS BEHAVIOR IS CONSISTENT WITH THE

17   PATTERN.  I THINK THE REST IS ALREADY IN EVIDENCE.  I THINK

18   HIS MOTION SHOULD BE DENIED.  THAT'S ALL THAT I HAVE TO SAY

19   AT THIS POINT.

20        THE COURT:  YOU'RE THE MOVING PARTY, MR. MAS

21   MARQUES, I'LL GIVE YOU THE LAST WORD HERE TO RESPOND TO THE

22   MOST RECENT COMMENTS BY MR. GREENSPAN.  SO LET'S TAILOR IT TO

23   THAT.

24        MR. MAS MARQUES:  MR. GREENSPAN, HE CONSIDERS

25   HIMSELF A JUDGE ON THE INTERNET.  THOSE ARE THE WORDS THAT HE

26   USED, HE IS JUDGE ON THE INTERNET.  MR. GREENSPAN DOES NOT

27   KNOW ANYTHING ABOUT ME.  HE IS REPEATING ARTICLES THAT HAVE

28   HEARSAY AND RUMORS IN THEM FROM SPAIN.  HE DOES NOT KNOW IF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    THEY'RE FACTUAL.  SO HE'S GATHERING NON-FACTUAL EVIDENCE.

2    SOMEBODY CALLED THE PAPER AND SAID I'M A RELATIVE OF THIS

3    GUY, AND HE DID THIS AND THAT IN MIAMI, AND THAT IS A LIE.

4    MR. GREENSPAN HAS TAKEN THAT TO AN ALL NEW LEVEL, CLAIMING

5    THAT IS FACTUAL, AND MAKING ME LOOK LIKE SOMEBODY WHO

6    HARASSES, AND HAS A HISTORY OF HARASSMENT, AND CALLING ME

7    DANGEROUS.  THAT'S RIGHT HERE WITH HIS OWN WORDS.  THAT IS

8    HARASSMENT.  HE IS HARASSING ME BECAUSE HE DOES NOT KNOW THE

9    FACTS.  HE THINKS HE KNOWS THE FACTS, BUT HE IS GATHERING

10   INFORMATION BASED ON SOME NEWSPAPER ARTICLE, BASED ON AN

11   ANONYMOUS PERSON WHO CALLED A NEWSPAPER MAKING SOME KIND OF

12   STATEMENTS.

13         THE COURT:  MR. MAS MARQUES, I'M MAKING A COUPLE OF

14   COMMENTS, AND I HOPE THAT YOU HEAR ME OUT HERE.  TO THE

15   EXTENT THAT YOU CAN PROVE THAT MR. GREENSPAN HAS PUBLISHED

16   INFLAMMATORY MATERIALS ABOUT YOU, YOU HAVE A REMEDY.  YOU

17   UNDERSTAND THAT, RIGHT?  I WANT TO MAKE SURE THAT YOU

18   UNDERSTAND YOU HAVE A REMEDY IF HE HAS BEEN PUBLISHING

19   INFLAMMATORY STATEMENTS, OKAY?  I WANT TO MAKE SURE THAT YOU

20   UNDERSTAND IT.

21         MR. MAS MARQUES:  I DO.

22         THE COURT:  OKAY.  THAT'S FINE.  NOW, THE OTHER

23   THING WHAT HE BROUGHT UP IN HIS COMMENTS WERE THESE EMAILS.

24   HE READ ONE INTO THE RECORD USING A LOT OF PROFANITY; DO YOU

25   WANT TO RESPOND TO THAT OR NO?

26         MR. MAS MARQUES:  NO, I DON'T.  I HAVE NOT

27   THREATENED MR. GREENSPAN IN ANY WAY.  MR. GREENSPAN HAS

28   ACCESS TO MY IP ADDRESS ALL THE TIME.  YOUR HONOR, I'M

1   WORKING ON THAT WITH A COMPUTER EXPERT BECAUSE I DON'T KNOW

2   HOW MR. GREENSPAN GETS AHOLD OF ALL OF THIS DATA ON ME:  MY

3   IP ADDRESS, AND ALL THE OTHER THINGS, ACCUSING ME OF THINGS.

4          THE COURT:  THAT'S FINE.  MR. MAS MARQUES, I WANT

5   YOU TO UNDERSTAND THAT THE COURT IS LOOKING AT A PRETTY

6   LIMITED REALM HERE IN THE CONTEXT OF THIS CASE.  AND THERE IS

7   NOTHING THAT I'VE DONE THAT WILL FORECLOSE BOTH PARTIES HERE

8   FROM SEEKING OTHER REMEDIES BASED ON OTHER VIOLATIONS OF LAW

9   OR CAUSES OF ACTION YOU MIGHT HAVE AGAINST ONE ANOTHER.  I

10  THINK THERE IS TOO MUCH BEING ATTRIBUTED TO WHAT IS BEING

11  DONE IN A CASE THAT HAS A VERY LIMITED SCOPE, OKAY?

12         SO THAT IS ALL I CAN DO IS TELL YOU I HAVE NOT MADE

13  THE DETERMINATION HERE IN THE CONTEXT OF THE CASE EVERYTHING

14  THAT HAS BEEN STATED ABOUT YOU ONLINE BY MR. GREENSPAN OR

15  OTHERS IS TRUE.  I HAVE NOT REACHED THAT DETERMINATION, I

16  WANT TO MAKE SURE THAT YOU UNDERSTAND THAT.

17         ANYWAY, THANK YOU BOTH, I APPRECIATE THE FACT THAT

18  THIS IS SOMETHING THAT IS VERY IMPORTANT TO BOTH OF YOU, AND

19  I'LL BE ISSUING A RULING ON IT.

20         IN TERMS OF THE LEGAL FEES, IS THERE ANYTHING ELSE

21  BRIEFLY, THAT EITHER PARTY WANTS TO SAY OR CAN WE HAVE THAT

22  SUBMITTED?

23         MR. GREENSPAN:  I THINK SINCE THE MOTION WAS FILED,

24  I HAVE ACCRUED ROUGHLY $100 IN EXPENSES BECAUSE OF THIS CASE;

25  SO I WOULD ASK THAT THE AMOUNT IN THE MOTION --

26         THE COURT:  WELL, IF YOU'RE ASKING FOR ATTORNEY'S

27  FEES, IT WILL JUST BE BASED ON ATTORNEY WORK, ATTORNEYS

28  APPEARING IN COURT FOR YOU.  YOU DON'T HAVE AN ATTORNEY OF

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1    RECORD NOW.

2          MR. GREENSPAN:  CORRECT.  I'M ASKING FOR THE

3    ATTORNEY FEES THAT ARE CONNECTED TO THIS CASE AND THE FALSE

4    COMPLAINTS THAT HAVE EMANATED FROM THIS CASE BY MR. MAS

5    MARQUES WHICH REQUIRED ME HIRING AN ATTORNEY, AND COSTS AND

6    EXPENSES ASSOCIATED WITH THE CASE SUCH AS DRIVING HERE FROM

7    SAN FRANCISCO, TRANSCRIPTS, ET CETERA.

8          THE COURT:  OKAY.  MR. MAS MARQUES, ANY FINAL

9    COMMENTS ON THAT?

10         MR. MAS MARQUES:  YES.  I SPENT A GREAT DEAL OF

11   MONEY, YOUR HONOR, TO DO A PROOF OF SERVICE LIKE I WAS

12   SUPPOSED TO LAWFULLY, AND I HAD HIM SERVED.  MR. GREENSPAN,

13   HE SERVED ME.  I WAS NOT SERVED.  NO ONE CAME TO MY HOME AND

14   GAVE ME PROOF OF SERVICE.  I DON'T KNOW.  NO PROOF OF SERVICE

15   COMPANY PHYSICALLY CAME.  SO I DON'T KNOW WHAT MR. GREENSPAN

16   IS UP TO.  I REALLY DON'T.  I SPENT QUITE A BIT OF MONEY

17   HAVING -- MR. GREENSPAN KEPT AVOIDING SERVICE.  FINALLY, IT

18   WAS THE FIFTH AND THE LAST TIME HE OPENED THE DOOR, AND HE

19   SAID TO THE PERSON THAT HE WAS DOING HIS JOB AND TOOK THE

20   PAPERS.

21         THE COURT:  THANK YOU BOTH.  THE MATTERS ARE DEEMED

22   SUBMITTED.  I WILL GET OUT A WRITTEN RULING FOR YOU.  WE ARE

23   IN RECESS.

24         MR. GREENSPAN:  THANK YOU.

25         (WHEREUPON, THE COURT ADJOURNED.)

26

27

28

"THIS TRANSCRIPT IS COVERED UNDER GOVT. CODE SECTION 69954(D)"

1  STATE OF CALIFORNIA.       )

2                              )SS

3  COUNTY OF SANTA CLARA      )

4          I, VIRGINIA BARRIOS, C.S.R. 6771, IN AND FOR THE

5  STATE OF CALIFORNIA, COUNTY OF SANTA CLARA,  DO HEREBY

6  CERTIFY THAT I WAS APPOINTED BY THE COURT TO ACT AS COURT

7  REPORTER IN THE ABOVE-ENTITLED ACTION; THAT I REPORTED THE

8  SAME INTO TYPEWRITING AS APPEARS BY THE FOREGOING

9  TRANSCRIPTION; THAT SAID TRANSCRIPT IS A FULL, TRUE AND

10  CORRECT STATEMENT OF THE PROCEEDINGS TO THE BEST OF MY

11  ABILITY.

12          I FURTHER CERTIFY THAT I HAVE COMPLIED WITH CCP

13  237(A)(2) IN THAT ALL PERSONAL JUROR IDENTIFYING INFORMATION

14  HAS BEEN REDACTED, IF APPLICABLE.

15          DATED THE 5TH OF FEBURARY, 2020

16          _____

17          VIRGINIA BARRIOS, C.S.R.

18          CERTIFICATE NUMBER 6771

19  GOVERNMENT CODE SECTION 69954(D) STATES:

20          *ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A

21  TRANSCRIPT MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER,

22  REPRODUCE A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO

23  COURT ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT

24  OTHERWISE PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY

25  OR PERSON.*

26

27

28