```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


_____

AARON GREENSPAN,

                    Plaintiff,        Civil Action
                                      No. 23-10134-DJC
V.
                                      October 26, 2023
DIEGO MasMARQUES, et al.,             3:25 p.m.

                    Defendants.
_____
```

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

1     APPEARANCES:

2     FOR THE PLAINTIFF:

3     AARON GREENSPAN
      956 Carolina Street
4     San Francisco, CA 94107-3337
      415-670-9350
5     aaron.greenspan@plainsite.org
      PRO SE
6
      FOR THE DEFENDANTS:
7
      CHRISTOPHER INGLE, ESQ.
8     Gillespie Shields & Taylor
      7319 North 16th Street
9     85020
      Phoenix, AZ 85020
10    602-897-9700
      cingle@gillaw.com
11
      STESHA A. EMMANUEL, ESQ.
12    McCarter & English, LLP
      City Place I
13    185 Asylum Street
      36th Floor
14    Hartford, CT 06103
      860-275-6700
15    semmanuel@mccarter.com

16    DIEGO MasMARQUES
      PO Box 301
17    Marlborough, MA 01752
      508-850-6228
18    dmas5@protonmail.com
      PRO SE
19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1
2              (The following proceedings were held in open
3      court before the Honorable Denise J. Casper, United States
4      District Judge, United States District Court, District of
5      Massachusetts, at the John J. Moakley United States Courthouse,
6      1 Courthouse Way, Boston, Massachusetts, on October 26, 2023.)
7              THE CLERK:  All rise.
8              (The Court entered the courtroom.)
9              THE CLERK:  Court is in session.  Please be seated.
10             Civil action 23-10134, <u>Aaron Greenspan v. Diego</u>
11     <u>MasMarques, et al.</u>
12             And would the plaintiff and then the defendants please
13     state your name for the record.
14             THE COURT:  You should stand, thank you.
15             MR. GREENSPAN:  Sure.
16             Aaron Greenspan, plaintiff.
17             THE COURT:  Sure.  Good afternoon.
18             MR. GREENSPAN:  Good afternoon.
19             MR. INGLE:  Good afternoon, your Honor.  Christopher
20     Ingle for the defendants Sergei Igorevich Kudriavtsev and
21     Astrad.  This is my local counsel, Stesha.
22             MS. EMMANUEL:  Good afternoon, your Honor.  Stesha
23     Emmanuel for the defendants.
24             MR. MasMARQUES:  Diego MasMarques, your Honor,
25     defendant.

| | |
|---|---|
| 1 | THE COURT:  Good afternoon. |
| 2 | Counsel and sirs, I know we're here on the two motions |
| 3 | to dismiss.  And I've read all of the papers on either side, |
| 4 | both the motions and the opposition and to the extent there |
| 5 | were any reply briefs. |
| 6 | I'm prepared to hear argument.  And, counsel, I'll |
| 7 | give sort of equal time to each side.  And if the movants want |
| 8 | to reserve any time for rebuttal, I'll allow you to do that. |
| 9 | Counsel, sir, had you had any discussion on which |
| 03:27 10 | defendant would go first in terms of arguments? |
| 11 | MR. INGLE:  We have not, your Honor. |
| 12 | THE COURT:  Okay. |
| 13 | Sir, why don't -- I think your motion might have been |
| 14 | filed first, so why don't I hear from you.  And just know that |
| 15 | I've reviewed the papers, and my memory was you were moving to |
| 16 | dismiss on 12(b)(6) grounds, that is, failure to state a claim, |
| 17 | but also, 12(b)(1) grounds in regards to subject matter |
| 18 | jurisdiction. |
| 19 | Why don't we start with the subject matter |
| 03:27 20 | jurisdiction here, which was whether or not there was complete |
| 21 | diversity and a sufficient jurisdictional amount, that is, an |
| 22 | amount over $75,000. |
| 23 | MR. MasMARQUES:  Yes, your Honor. |
| 24 | THE COURT:  Is there anything you wanted to add your |
| 25 | papers on that? |

         1              MR. MasMARQUES:  That's pretty much stated in there.

         2              Is it all right to read off of this?

         3              THE COURT:  Well, I guess -- I will say that I've read

         4      the papers.

         5              Let me ask you this:  I mean, obviously I'm aware of

         6      sort of the standard that applies here for the allegations.

         7      What is it you point to to say that the jurisdictional amount

         8      isn't met here, where I believe the plaintiff has alleged

         9      damages in excess of $1 million?

03:28   10              MR. MasMARQUES:  Yes, your Honor.

        11              THE COURT:  Thank you.

        12              (Pause.)

        13              MR. MasMARQUES:  Okay.  Apologize, your Honor.

        14              THE COURT:  No worries.

        15              MR. MasMARQUES:  So plaintiff has offered nothing in

        16      the way of actual evidence other than simply stating generally

        17      that he suffered constant stress and worry to a degree that no

        18      reasonable person could be -- could be expected to endure.

        19      Therefore, plaintiff's claim of intentional infliction of

03:29   20      emotional distress should be denied.

        21              Regarding jurisdiction, plaintiff has not met his

        22      burden to demonstrate that jurisdiction exists in this

        23      honorable court.

        24              Plaintiff asserts damages of $1,625,000, but proffers

        25      little evidence to support his assertion his damages actually

1     exceed the jurisdictional minimum.

2          THE COURT:  Well, I guess here where it's -- we're

3     still at the complaint stage, and I think in response there are

4     allegations not just about the valuation of Mr. Greenspan's

5     company but alleging certain harms, both professionally and

6     personally to him, what do you point to to say that more is

7     required in terms of what he needs to allege at this point?

8          MR. MasMARQUES:  Okay.  A plaintiff has grossly

9     exaggerated, if not totally falsified, the facts in this case.

03:30 10    He's been doing that from the beginning and being very

11    repetitive in his motions in what he's stating.  And in a way,

12    you know, he's -- let me just say he's not -- he's not being

13    honest.  He's not telling the truth to this Court, because if

14    anybody is ruining anybody's reputations and careers, it is the

15    plaintiff, and not myself, the defendant.  And he's been doing

16    this for quite a few years now.

17         THE COURT:  So I guess what I'm trying to get at, sir,

18    is to the extent that you're moving to dismiss his action, I

19    have to focus, for the moment at least, on the legal basis for

03:31 20    dismissing, right?  And so the legal basis for dismissing for

21    subject matter jurisdiction, the standard is not an evidentiary

22    standard for the purposes of the jurisdictional amount or even

23    complete diversity, it's based on what's alleged here.  And

24    I -- so, I guess, is there any particular caselaw that you

25    point me to or do you want me to just consider what you've said

1    in the papers?

2              MR. MasMARQUES:  Yes, I would like to mention some

3    caselaw, if I may.

4              THE COURT:  Sure.

5              (Pause.)

6              MR. MasMARQUES:  So regarding lack of subject matter

7    jurisdiction --

8              THE COURT:  Sure.

9              MR. MasMARQUES:  -- caselaw is <u>Viqueira v. First bank</u>,

03:32 10   that's V-i-q-u-e-i-r-a v. First bank, 145 F.3d 1216 (1st Cir).

11   1998.

12             The second citation is <u>Kokkonen v. Guardian Life Ins.</u>

13   <u>Co. of America</u>, K-o-k-k-o-n-e-n v. Guardian Life Insurance.

14   That's 511 U.S. 177, 1994.

15             And then, last one, <u>Aversa v. The United States</u>,

16   A-v-e-r-s-a v. United States, that's 99 F.3d 1209, 1st Cir.

17   (1996).

18             THE COURT:  Thank you.

19             MR. MasMARQUES:  Those are three legal citations, your

03:33 20   Honor.

21             THE COURT:  Thank you.

22             Sir, I know you are also moving to dismiss under Rule

23   12(b)(6), that the plaintiff hasn't -- his claims don't

24   plausibly state claims.  Do you want to add anything to your

25   papers in regards to that?

```
 1              MR. MASMARQUES:  Yes, your Honor.  Let's see.
 2              I apologize, your Honor.
 3              THE COURT:  No, no.
 4              MR. MasMARQUES:  This is regarding the jurisdiction --
 5              THE COURT:  No, on the 12(b)(6).  Meaning, you moved,
 6    as I understand it, and having read your papers, both on
 7    jurisdiction but then you also moved saying Mr. Greenspan
 8    hasn't plausibly stated the claims against you, which I think
 9    were 1 through 5 and 12 through 14.  And you addressed those
03:34 10   claims, I think all but conspiracy claim, in your memo.  Is
11    there anything else you wanted to say about those arguments?
12              MR. MasMARQUES:  Yes, your Honor.
13              So the failure to state a claim --
14              THE COURT:  Yeah.
15              MR. MasMARQUES:  Okay.  That's 12 -- okay.
16              So basically I have some -- do I mention the legal
17    citations?
18              THE COURT:  Sure, if you'd like to.  If they're not in
19    the papers.  If they're in your papers, I've seen them.
03:35 20              MR. MasMARQUES:  Okay, yes, your Honor.
21              Okay.  So --
22              THE COURT:  Well, would it be more helpful if I asked
23    you more specific questions?
24              MR. MasMARQUES:  Sure, your Honor.
25              THE COURT:  So one thing that Mr. Greenspan brings up
```

1    in his opposition is there didn't seem to be an argument in

2    your papers to dismiss the civil conspiracy count.  Is that a

3    count you were also moving to dismiss?  And if so, what would

4    be the basis?

5            MR. MasMARQUES:  Oh, yes, your Honor.  I am dismissing

6    that.  There's been no communications, there's been no plans,

7    you know, there's been no conspiracy to say -- that's the

8    facts.

9            THE COURT:  At this point I have to take the

03:36 10    allegations in the complaint as alleged as true, and I think it

11    is alleged that there's a conspiracy, which, as a matter of

12    law, doesn't have to be an express or written agreement between

13    you and the co-defendants.  What do you say to those

14    allegations?

15            MR. MasMARQUES:  Yes, your Honor.

16            (Pause.)

17            MR. MasMARQUES:  I can say that I believe -- would

18    you --

19            (Pause.)

03:38 20            MR. MasMARQUES:  Plaintiff failed to sufficiently

21    plead or provide any affidavit outlining the elements of IIED.

22    There has been no conspiracy, just -- I apologize, your Honor,

23    it takes me a little time here.

24            THE COURT:  Sure.

25            Okay.  And as to -- is there anything you wanted to --

1    and you're certainly free to also just rest on your papers,

2    sir, but is there anything else you wanted to add your

3    arguments as to the other claims?

4              MR. MasMARQUES:  Yes.

5              THE COURT:  Okay.

6              MR. MasMARQUES:  Yes, your Honor.

7              (Pause.)

8              MR. MasMARQUES:  Plaintiff's amended complaint fails

9    to make the requisite showing to establish a claim for libel,

03:39 10   except for vague and conclusory references in the plaintiff's

11   amended complaint of statements like "Aaron Greenspan owes his

12   victims millions of dollars."

13             Plaintiff lists examples of statements that do not

14   amount to defamation.

15             Let's see.  Also, the plaintiff has not established

16   that I made any defamatory statements, whether libelous or

17   slanderous, and the plaintiff's libel per se claim must be

18   dismissed pursuant to Rule 12(b)(6) for failure to state a

19   claim upon which relief can be granted.

03:40 20             Let me see.  Can I go through the --

21             THE COURT:  Sure.  But, I guess, sir, I'm happy to

22   hear you, but if you're just going to read from the papers I've

23   already read, then that's not necessary.

24             MR. MasMARQUES:  It's a little different.  I try to

25   sum it up here.

```
 1              THE COURT:  Sure.

 2              MR. MasMARQUES:  So basically Count Two alleges civil

 3       harassment violation of Mass. General Law --

 4              THE COURT:  Yes.

 5              MR. MasMARQUES:  -- 258E.  This does not create a

 6       private right of action to bring a civil claim against an

 7       alleged wrongdoing in this court.  Proceedings under this

 8       chapter shall be filed earlier in a Superior Court to the

 9       department of the respective divisions of the District Court,

03:40 10    department of Boston Municipal Court, department having venue

11       over the plaintiff's residence.  So Count Two must be denied --

12              THE COURT:  Well, counsel, just as a matter of state

13       law claims, if there's diversity, can be brought in federal

14       court.  Is there anything that you cite to -- I mean --

15       meaning, I'm not aware of any caselaw that would bar the claim

16       from being brought here.  Is there anything that you cite to

17       for that proposition?

18              MR. MasMARQUES:  Yes, your Honor.

19              (Pause.)

03:41 20       MR. MasMARQUES:  Case law, your Honor is Foley,

21       F-o-l-e-y, v. Lowell Sun Publisher Company.

22              THE COURT:  Okay.

23              MR. MasMARQUES:  404 Mass. 11, 1989.

24              THE COURT:  Thank you.

25              I think Count Three was the tortious interference.
```

1    Did you want to address that?

2              MR. MasMARQUES:  Yes.  Tortious interference I have --

3    can I give a legal citation?

4              THE COURT:  Say it again?

5              MR. MasMARQUES:  Can I give a legal citation?

6              THE COURT:  If you'd like.

7              MR. MasMARQUES:  That's Singh, S-i-n-g-h, v. Blue

8    Cross/Blue Shield of Massachusetts Incorporated, that's 308

9    F.3d 47, 1st Cir. (2002).

03:42 10         The plaintiff has failed to allege with specificity

11   any business relationship or contemplated contract of economic

12   benefits.

13             Plaintiff also failed to identify any case in which a

14   court applying Massachusetts law has allowed a claim of

15   intentional interference with advantages business relations --

16   with alleged business relationship said to have being

17   interfered with was a rudimentary and tenuous as alleged here.

18   Plaintiff's tortious interference claim should, therefore, be

19   dismissed.

03:43 20         Your Honor, I apologize, we're talking about the

21   Twitter accounts, I believe.

22             THE COURT:  Yes, yes, Count Three.

23             Just so I understand your argument, is your argument

24   that his relationship with Twitter is not a business

25   relationship?

1          MR. MasMARQUES:  It's not a business relationship,

2    your Honor.  It's a social media.  And if I may say

3    something --

4          THE COURT:  Sure.

5          MR. MasMARQUES:  In 2018, plaintiff published my

6    wife's -- my wife works at Mass. General as a Registered Nurse.

7    He published her name, her place of employment, and many other

8    details.  And it took me a while, but I was able to have his

9    account shut down for violating the rules of Twitter.  It

03:43 10    wasn't the first time.  He has been doing this to many people,

11    including Elon Musk and -- it's a long list, your Honor, too

12    many to mention here.

13          THE COURT:  I understand there's sort of a long

14    history on both sides here, but I did want to focus, as you

15    have been, otherwise on your legal arguments as to the claims

16    here.  But I understand the argument as to the relationship

17    with Twitter not being a business relationship or that that's

18    part of your argument.

19          MR. MasMARQUES:  Yes, your Honor.

03:44 20          THE COURT:  Thank you.

21          Did you want to address the abuse of process and

22    malicious prosecution, Counts 4 and 5?

23          MR. MasMARQUES:  Yes, your Honor.  Can I give legal

24    citation?

25          THE COURT:  If you'd like.  I mean, again, if it's in

1       the papers, I've seen them.  If there are other things,

2       otherwise, I'd hear any argument you wanted to add.

3               MR. MasMARQUES:  Yes, your Honor.

4               THE COURT:  Sure.

5               MR. MasMARQUES:  So as far as this argument, this is

6       very, very -- very concerning that something like this was

7       mentioned by plaintiff.  There was absolutely zero abuse of

8       process.  The plaintiff did violate and did do what's called

9       doxxing, d-o-x-x-i-n-g, towards myself beyond belief,

03:45 10    cyberstalking, and the list goes on.  He filed -- if I may

11      mention this, he filed a fabricated -- two fabricated criminal

12      harassment charges against me.  And before the hearing came up

13      in California on the restraining order, I started to notice --

14      on December 12, 2018, I started to notice a lot of things go up

15      online.  I even said to my wife, Do you think he's trying to

16      set me up?  That's exactly what he did, your Honor.  He

17      fabricated evidence against me and had me charged with two

18      criminal harassment charges in Marlboro District Court, which

19      were dismissed.

03:45 20            THE COURT:  I understand, I understand.

21              But here, where Mr. Greenspan is bringing this abuse

22      of process against you, which I think is based on a few things,

23      including your application for criminal charges and what he

24      alleges is sham litigation, what do you say about those claims

25      against you?

```
 1            MR. MasMARQUES:  Yes, your Honor.  What plaintiff is
 2     saying is false.  It was -- I was 100 percent in the right
 3     with -- he was abusing his website towards myself and my
 4     immediate family, and he would not stop.  He just would not
 5     stop.  So I filed harassment charges, I filed the charges
 6     against him.
 7            THE COURT:  And those were in state -- here, right?
 8            MR. MasMARQUES:  Yes, your Honor.
 9            THE COURT:  In Marlboro, is that what --
03:46 10            MR. MasMARQUES:  Yes.
11            THE COURT:  Okay.
12            MR. MasMARQUES:  He was given a court call, he was
13     allowed to call in, but prior to that, I had no notice.  He
14     filed some kind of affidavit, which today he's even posting on
15     his website, with all kinds of lies: defendant has mental
16     illness, defendant is this, and defendant is that.  He lies,
17     your Honor.  I mean, that's the only way I can sum this up with
18     him.
19            To get his way -- he will do anything to get his way.
03:47 20     And so that was -- that -- unfortunately, that was dismissed by
21     the same clerk that allowed him to have two charges against me
22     without even listening to a word I had to say, the clerk just
23     said probable cause, there's probable cause.
24            THE COURT:  Okay.
25            MR. MasMARQUES:  After he --
```

1          THE COURT:  So if I understand your argument, you say

2    that it's not -- the claim is not plausibly alleged because it

3    was for a legitimate purpose.

4          MR. MasMARQUES:  It was, your Honor.

5          THE COURT:  Okay.  I understand the argument.  I

6    understand.

7          And I think -- and I think -- the reason I asked you

8    about them at the same time is I think there's some factual

9    overlap between that claim for abuse of process and the claim

03:48 10    for malicious prosecution, but is it your same argument as to

11    the malicious prosecution?

12          MR. MasMARQUES:  It is, your Honor.

13          THE COURT:  Okay.

14          MR. MasMARQUES:  There was no -- there was no abuse of

15    process and there was no malicious prosecution on my part.  I

16    was -- I went in there fully believing that I was going be

17    getting criminal charges put against plaintiff.  But he -- from

18    what I was told, he was calling the clerk's office five --

19    repeatedly every day, four, five times, sending them all kinds

03:48 20    of documents.  Basically I showed up for the clerk's hearing,

21    they didn't give me an affidavit he had filled out with

22    falsehoods, it was totally fabricated.  He fabricates -- he

23    fabricated evidence, and basically the clerk took it under

24    advisement, as they say, and he said there was no -- the

25    criminal charges against the defendant didn't go through -- but

1   there was no -- I did it with complete, 100 percent confidence

2   that the charges would go through, but somehow I don't -- they

3   didn't go through.

4        It was the same clerk that gave him the two criminal

5   charges against me was the same clerk that -- Darryl Whitney --

6   that denied my criminal charges against him.

7        THE COURT:  Okay.

8        And then I think the -- I've already addressed

9   conspiracy with you, but there is also a charge for false -- I

03:49 10   think it was false light -- hold on.

11        Oh, yes, false light invasion of privacy.  Anything

12   you wanted to add to that?

13        MR. MasMARQUES:  Yes, your Honor.

14        (Pause.)

15        MR. MasMARQUES:  So Count 13 alleges false light

16   invasion of privacy claiming that my alleged defamatory

17   statements subjected plaintiff to unreasonable and highly

18   objectionable publicity.

19        Massachusetts has consistently refused to recognize a

03:50 20   false light invasion of privacy tort, and therefore,

21   plaintiff's allegations of false light does not under current

22   Massachusetts law state a claim.

23        THE COURT:  So I think in the plaintiff's opposition

24   he pointed to a Massachusetts statute that addresses

25   potentially that claim.  Did you have any response to that?

1    MR. MasMARQUES:  Yes, your Honor.

2    THE COURT:  Okay.

3    (Pause.)

4    THE COURT:  That is the Massachusetts Privacy Act.

5    (Pause.)

6    MR. MasMARQUES:  Should I read a citation?

7    THE COURT:  If they're in your papers, I'll have it.

8    MR. MasMARQUES:  Yes, your Honor.

9    Ayash, E-v-a-s-h (sic.) v. Dana-Farber Cancer

03:52 10   Institute, 822 N.E.2d. 681, that's Massachusetts 2005.  And Doe

11   v. Trs. of Boston College, 942 F.3d 535 1st Cir. (2019).

12   THE COURT:  Anything you wanted to add about the

13   intentional infliction claim, which I think is the last?

14   MR. MasMARQUES:  Essentially -- yes, your Honor.  So

15   that's Count 14.

16   THE COURT:  Yes, I believe so.

17   Yes, yes.

18   MR. MasMARQUES:  Should I mentioned the citation?

19   THE COURT:  Again, if they're in your papers, no, but

03:53 20   if they aren't, yeah.

21   MR. MasMARQUES:  That is -- yes, your Honor.  I

22   apologize, your Honor.

23   THE COURT:  Okay.

24   MR. MasMARQUES:  Plaintiff failed to sufficiently

25   plead or provide any affidavit outlining the elements of IIED

1    other than a statement alleging that this defendant made it

2    impossible for plaintiff to travel internationally without

3    pointless interference and delays from federal agents.  There

4    is little else in the record and no evidence at all that

5    defendant's conduct caused plaintiff's distress.  There is not

6    sufficient proof to establish extreme and outrageous misconduct

7    or that plaintiff's distress was severe.  Plaintiff has offered

8    nothing in the way of actual evidence other than simply stating

9    generally that he suffered constant stress and worry to a

03:54 10   degree that no reasonable person could be expected to endure.

11   And, therefore, this defendant's motion to dismiss plaintiff's

12   claim of intentional infliction of emotional distress should be

13   granted, your Honor.

14             THE COURT:  Thank you.

15             Thank you.

16             And you can be seated, thank you.

17             Counsel, why don't I hear from the other defendants,

18   to the extent you want to add any arguments, and then,

19   Mr. Greenspan, I'll let you respond to everything at once.

03:55 20             Counsel.

21             MR. INGLE:  Thank you, your Honor.

22             THE COURT:  And I know that there were some overlap on

23   the 12(b)(6) arguments, but I know the lead argument was in

24   regards to personal jurisdiction as to your clients.

25             MR. INGLE:  Thank you, your Honor.  How much time do

1    we have for argument?

2          THE COURT:  So, counsel, I have the total of -- until

3    a little before 4:30, so, counsel, know that I've read the

4    papers.

5          MR. INGLE:  All right.

6          THE COURT:  Thank you.

7          Are there any issues that the Court would like to hear

8    about specifically?

9          THE COURT:  Counsel, I think I understand the

03:56 10   arguments.  I know in your papers -- obviously the Court needs

11   to consider not just the constitutional arguments but also the

12   long-arm statute arguments, which I think here were ascertained

13   under 3A and 3C, which I don't know were addressed.  And I did

14   get your reply.  I don't know if those were specifically

15   addressed.  I don't know if there's anything you wanted to add

16   on that.

17          I think 3A was as to transacting business in

18   Massachusetts; and 3C I think was about statement made outside

19   of Massachusetts that has an effect in Massachusetts, if I'm

03:56 20   recalling correctly.

21          Mr. Greenspan, was that correct?

22          MR. GREENSPAN:  That sounds right.

23          THE COURT:  Okay.

24          MR. INGLE:  So I assume these are both the state law

25   claims, making statements outside Massachusetts.

1        So my recollection of the caselaw there is that in

2    that case, it does not matter so much where the harm is felt,

3    in fact, the relevant inquiry is where the statement is made.

4    If we're talk talking about --

5        THE COURT:  Counsel, I found the page I was looking

6    for, it's that the -- I think the plaintiff asserts that the

7    transacting any business in the Commonwealth, or, C, causing

8    tortious injury by an act or omission in this Commonwealth.

9        So, meaning, even if the statement was outside of

03:57 10    Massachusetts, that it caused tortious injury in the

11    Commonwealth.  So I just wondered if you had anything to add to

12    address that.

13        MR. INGLE:  Yeah, certainly.  As for transacting

14    business, there is no business that's being transacted.  It's a

15    website, and people can go to the website and they can post

16    comments or they can, you know, like, communicate.  But there's

17    not, like, a paid, you know, like, aspect of this.

18        The way Mediolex makes money is just by advertisements

19    that are displayed on the website.  But having a website that

03:58 20    is available, you know, that can be accessed from

21    Massachusetts, that's not transacting business in

22    Massachusetts.  I believe I cited caselaw on that, including

23    from this court.

24        THE COURT:  But what do you say -- I'm sorry, counsel,

25    because it's on this point.  What do you say to the plaintiff's

1    argument, I think part of his opposition he talks about certain

2    vendors or certain coding businesses that your clients rely on

3    that are in Massachusetts.  What do you say to that?

4          MR. INGLE:  Well, first, it's factually false.  There

5    are no vendors here.  There's not indexing going on of

6    Massachusetts companies, any of that.

7          Secondly, it's not in the first amended complaint.

8    Those allegations aren't anywhere in there, therefore, you

9    know, I couldn't properly address a motion to dismiss as to

03:59 10   those allegations.

11         Even if there were vendors in this state that were

12   transacted with, the cause of action would have to arise out of

13   those contacts for there to be jurisdiction.

14         I believe the one that was mentioned was Cloudflare,

15   and I don't know where Cloudflare is incorporated, I think it

16   would be California.  It's not that Cloudflare is here, it's

17   that they have a data center here.  And, you know, for it to

18   constitute purposeful availment, the Mediolex defendants would

19   have to know about that data center to know that it would be

03:59 20   here and in some manner utilize that center to give rise to the

21   causes of action herein.  But, you know, none of that was

22   alleged, and certainly the Mediolex defendants aren't aware of

23   any contacts that they have with Massachusetts.

24         I would imagine that if you're trying to find a link,

25   you could find electricity that was routed through

1    Massachusetts or internet traffic or a phone call.  None of

2    that has ever held to constitute purposeful availment.

3         And as for statements made outside of Massachusetts

4    that have a tortious effect in Massachusetts, well, there

5    weren't any.  Plaintiff doesn't live in Massachusetts.  He was

6    in California.  He's not alleging that he was in Massachusetts

7    for any of this or felt any harm in Massachusetts.

8         If we look at the defendants, we've got Sergei

9    Kudriavtsev, who lives in Latvia; and we've got Mediolex and

04:00 10   Astrad, who are in the Seychelles.  So anything they did would

11   be in Latvia and the Seychelles.  Plaintiff in California,

12   anything he did or anything he felt would be in California.

13   None of them go through Massachusetts.

14        The sole link that I could find to Massachusetts was

15   just that defendant MasMarquez lives here, and the only way to

16   tie the Mediolex defendants in would be through the conspiracy

17   allegation.

18        But the conspiracy allegation is one -- it is four

19   words, it's in paragraph 188 of the amended complaint, and all

04:01 20   it says is they worked with each other.  It doesn't say they

21   communicated, it doesn't say they came up with a plan, that

22   they knew it was tortious, that they, you know, did this

23   specifically to inflict harms, and each one of them, you know,

24   participated in a substantial step.

25        Reading the remainder of the allegations in that

1   count, which is 189 through 196, it becomes obvious that what

2   he's alleging is just that ComplaintsBoard is a website and

3   defendant MasMarquez used that website to post comments about

4   plaintiff.  And the part in this that the website supposedly is

5   liable for is that they didn't take them down.  Well, that's

6   not a plan, nor is that even action; if anything, it's

7   inaction.

8           But there's no specific acts, there's no allegations

9   as to, you know, why would this -- this would be a conspiracy,

04:02 10   why this isn't just uncoordinated activities.  You have a

11   website that's not taking down stuff that the plaintiff thinks

12   is defamatory, that could happen in just a regular world, it

13   doesn't have to be a conspiracy.

14           Does the Court want to hear anything further on that

15   issue?

16           THE COURT:  No, I appreciate that on conspiracy.

17           Counsel, just on -- give me a moment, on the other

18   claims.

19           So, counsel, I think part of your motion to dismiss

04:03 20   under 12(b)(6) was also in regards to statute of limitations as

21   to some of the state law claims here in terms of the infliction

22   of emotional harm, conspiracy, and I think the privacy claim as

23   well.

24           I think part of Mr. Greenspan's response to that was

25   what I took to be sort of an allegation of continuous, you

1   know -- continuing plans and harm because he references some

2   actions that took place or postings that took place in 2022.

3   Did you have any response to that?

4           MR. INGLE:  Certainly, your Honor.  One, I'm not aware

5   of the website undergoing any update in 2022, and one of the

6   reasons I'm not aware of that is because it's not in the first

7   amended complaint, just as it doesn't appear anywhere in there.

8           What I saw in the first amended complaint was torts

9   beginning, and reading through the state law, you know, causes

04:04 10   of action and -- well, really all of them, I came up with two

11   statute of limitations: three years on personal injury claims

12   and four years on state law claims.  But they essentially come

13   down to the exact same actions because it's all alleging,

14   well --

15           THE COURT:  The four years on the 93A claims, is that

16   what you're referring to?

17           MR. INGLE:  Yes, correct.

18           And as a practical matter, it doesn't really matter,

19   you know, which one we're looking at because if you have, you

04:04 20   know, torts that begin in 2018 and you run your three years,

21   you get to 2021, if you run for four years, you get to 2022.

22   You know, neither one of them gets you to 2023, even if you use

23   the extra 122 days due the corona virus --

24           THE COURT:  You mean the SJC order, okay.

25           MR. INGLE:  Yeah.  So they're going to be barred by

1    the statute of limitations.  There wasn't anything in the

2    complaint about this being an ongoing tort.

3         And moreover, I believe we have the single publication

4    rule, which means that once, you know, a tortious statement is

5    published, that's when the tort occurred.  It doesn't continue

6    to occur every single day that that statement is visible on the

7    internet.

8         THE COURT:  But, arguably, that could apply to the

9    intentional infliction claims, or the infliction claims.

04:05 10     MR. INGLE:  There wasn't anything in the complaint

11   about that.  If that had been alleged, that these were, you

12   know, ongoing things that were happening even today, that would

13   be something that we would take a look at.  But that's not

14   what's in the complaint.  The allegations there were that it

15   started in 2017 and then the very last action I saw listed

16   there was in 2020.  But, you know, this still runs up against

17   the defects in terms of the personal jurisdiction; the failure

18   to state a claim; and then, of course, the Section 230 defense,

19   which if I may.  Section 230 is designed for situations like

04:06 20     this.  As long as my clients are just running the website and

21   other people are posting the content, they're immune from suit.

22   It's not just a defense to liability, it's that they shouldn't

23   even be in here defending the action.  Providing a website is,

24   you know, not actionable in and of itself, and in Jones v.

25   Dirty World, the court listed three reasons for enacting the

1    statute, but one of them was that they don't want website

2    operators to face a death by a thousand cuts, or what he called

3    death by a thousand duck-bites.

4          THE COURT:  Understood.

5          MR. INGLE:  What's that?

6          THE COURT:  Understood.

7          MR. INGLE:  Yeah.  So the idea is that even showing up

8    to defend all these different actions, I mean, it costs

9    thousands and thousands of dollars to fly lawyers out from

04:07 10   Arizona, to have two lawyers here at the hearing.  They

11   shouldn't be forced to defend all this stuff on the theory that

12   they contributed to or encouraged or facilitated this

13   misconduct by having a website and not doing anything to stop

14   it.

15          And that is the exact claim here, is that they have a

16   website and they didn't stop MasMarquez.  But they don't have

17   to.  Section 230 exists for explicitly this purpose.

18          So even if we were looking at, you know, is this

19   continuing harm?  It still wouldn't effect the Mediolex

04:07 20   defendants.

21          It might be a continuing harm as between plaintiff and

22   defendant MasMarquez, but as long as MasMarquez is posting

23   contents on the website, even if it's defamatory, you know, the

24   website isn't liable for that.

25          THE COURT:  I understand.

```
 1              So, counsel, I didn't have any particular other
 2     questions for you.  Anything else you wanted to --
 3              MR. INGLE:  I will reserve my -- what I estimate to be
 4     two-and-a-half minutes.
 5              THE COURT:  Okay, thank you.
 6              Counsel, I'll hear from you.  Obviously you've heard
 7     the arguments on both, so I'll give you time to address them.
 8              MR. GREENSPAN:  Thank you, your Honor.
 9              I think, first, I just have to begin by refuting some
10     of the statements that Mr. MasMarques made.  I'm not going to
11     go into detail that I made in the past --
12              THE COURT:  Yeah, and as I made clear in talking with
13     him, I'm focused on the legal standard.
14              MR. GREENSPAN:  Of course.  I just want to put that on
15     the record.
16              THE COURT:  Understood that the parties dispute the
17     characterization of the facts and the sequence.
18              MR. GREENSPAN:  Correct.
19              On the 12(b)(1) issue, I think it bears noting that
20     for the $75,000 threshold there's an additional way to
21     calculate an amount far exceeding $75,000, which is to look at
22     what I was quoted to get defamatory content removed by a
23     so-called removal service.  This is either just a random person
24     on the other side of the ocean or a company that effectively
25     ferries bribes to these gripe sites, and the quoted rate was
```

1    $700 per URL.  As the first amended complaint states, there

2    have been thousands of these posts that have unique URLs, so

3    already, if we're just talking about a thousand posts, we're

4    talking about $700,000.  So I really don't think that there's

5    any way that there can be a good faith argument that this

6    controversy does not exceed $75,000.

7            THE COURT:  Understood.

8            MR. GREENSPAN:  The next issue that I think requires a

9    response is that Mr. MasMarques is claiming that he didn't have

04:10 10    due process effectively when he was in court.  And I would just

11    point out that there was a hearing in that proceeding --

12            THE COURT:  This is in regards to the abuse of

13    process?

14            MR. GREENSPAN:  Abuse of process, malicious

15    prosecution.  There were hearings in all of those relevant

16    cases, and at each hearing Mr. MasMarques had an opportunity to

17    be heard.  And the proceedings were adjudicated in my favor and

18    not his.  And so I think that's simply just not a correct

19    claim.

04:10 20            Moving on to the ComplaintsBoard defendants.  So it's

21    hard to know where to begin.

22            So counsel just stated that the way Mediolex makes

23    money is just by displaying advertisements on the website, and

24    that is categorically false.  The record already indicates that

25    Mediolex and the other ComplaintsBoard defendants, which I'm

1   arguing are alter egos of each other, and therefore, there's no

2   distinguishing characteristics other than the fact that there's

3   some pieces of paper in Seychelles that say they're separate

4   when, in fact, they're not.

5          It is well established with documentary evidence that

6   this is an extortion ring.  They solicit libel from the far

7   reaches of the globe for their various websites focused on the

8   United States, Latvia, India, Russia.  And it just so happens

9   ComplaintsBoard is the site focused on the United States.  And

04:11 10   when people come saying, This is ruining my life and I'd like

11   to have it removed, please, they say, Well, normally we don't

12   do this for everybody, but for you we'll offer a special paid

13   service and all you have to do is wire $7,000 to our Swiss bank

14   accounts and here's the IBAN.

15          THE COURT:  Counsel, I certainly understand that those

16   are the allegations.

17          I guess in these defendants' motion, what I have to be

18   focused on first is the motion to dismiss for personal

19   jurisdiction, you know, for lack of personal jurisdiction.

04:12 20          MR. GREENSPAN:  To the Massachusetts issues.

21          THE COURT:  Yeah, so if you would turn to that issue,

22   particularly in regards to counsel's argument of lack of --

23   lack of connection, presence, purposeful availment.

24          I'm assuming, counsel, you're -- sir, that you're

25   proceeding just on specific jurisdiction.

1          MR. GREENSPAN:  That's correct.

2          THE COURT:  Versus -- okay.  So just looking at

3     specific jurisdiction, I'll hear you in response to any of the

4     arguments on the other side.

5          MR. GREENSPAN:  Sure.  So my interpretation of the

6     caselaw is that there needs to be purposeful availment, and

7     there are several ways in which Mediolex -- I'm just going to

8     use the term "Mediolex" to refer to all the ComplaintsBoard

9     defendants.

04:13 10          THE COURT:  Okay.

11          MR. GREENSPAN:  Mediolex is purposefully availing

12     itself of -- if you take a step back for a moment, the United

13     States in general.  It's using United States laws to confer

14     upon itself, it claims, immunity.  It's using United States

15     technological infrastructure to ensure that if the site is

16     attacked by people who are upset that it is defrauding them,

17     that the site will stay online, which is not something that it

18     can do itself from Latvia.  It's availing itself of the M.I.T.

19     license from the Massachusetts Institute of Technology which

04:13 20     provides it free of charge with software that is used on every

21     single page of the website that would have to develop on its

22     own if it didn't have the ability to use the M.I.T. license.

23          THE COURT:  Counsel, my understanding -- my

24     understanding is obviously purposeful availment has always been

25     focused on the forum at issue.  So the forum being the District

```
 1   of Massachusetts, and I think there's caselaw that suggests
 2   looking at it nationwide --
 3            MR. GREENSPAN:  Well, let me finish the thought.
 4            THE COURT:  What do you say about the purposeful
 5   availment of this forum, of Massachusetts?
 6            MR. GREENSPAN:  So because it's focused on the United
 7   States but also it's seeking to be a locally driven website, it
 8   has created -- the programmers for Mediolex, for example, have
 9   created a page dedicated to Massachusetts saying here are the
10   top companies that people hate in Massachusetts, here are the
11   rest of the companies we have indexed in Massachusetts; here's
12   the ones in Gloucester; here's the ones in Worcester; here's
13   the ones in Boston.  And that did not happen by accident.  So
14   counsel is trying to paint a picture that this is just like
15   every other 230 case that there's ever been where somebody sets
16   up a website and someone can access it from a particular state
17   and that in and of itself doesn't infer waiver to immunity and
18   it doesn't mean that there's necessarily a specific
19   jurisdiction.  But this is different.  This goes above and
20   beyond that, because they have deliberately written computer
21   code targeted to Massachusetts, so that's a step beyond.
22            Furthermore, because they're using one of these
23   distributed denial of service protection services like
24   Cloudflare, they're not the only one --
25            THE COURT:  What was -- I'm sorry, the Cloudflare?
```

1          MR. GREENSPAN:  Cloudflare is what's called a DDOS

2     protection service.  So the idea is that if your website is

3     attacked, you're going to get a huge rush of traffic, and what

4     Cloudflare does is it distributes that traffic across the world

5     depending upon where the requestor is located.

6          So if I'm looking at ComplaintsBoard from San

7     Francisco, then my request might get routed through San Jose

8     where they have a data center.  And if you're looking at

9     ComplaintsBoard from Boston, then that request might get routed

04:16 10     through Boston, it might get routed through Newark, but it will

11     generally go somewhere on the East Coast of the United States

12     first.

13          That is not typically how websites work.  You know,

14     when the World Wide Web was developed in 1995, you simply had a

15     server and people went to it.  This is a fairly recent

16     technological development, and, you know, sort of the

17     state-of-the-art computer security practices.

18          The point here is that Mediolex has established a

19     contractual relationship with Cloudflare specifically so that

04:16 20     it can have a presence all around the world, including in

21     Boston, should it get attacked.

22          And as far as I can tell, there is nothing in the

23     briefs from Mediolex about this.  They don't deny it.  In fact,

24     they don't deny any of the facts I've alleged in the FAC, and

25     that is why when they used these same arguments in Arizona in

1    2012, they failed because the judge in that case -- this was an

2    Xcentric v. Mediolex case, the judge there said, Well, there's

3    no affidavit, there's no declaration from Mr. Kudriavtsev or

4    his fake alter ego, there's nothing to say this is wrong, and

5    it looks like there is specific jurisdiction in Arizona.

6           I would argue that there's really no difference today

7    in Massachusetts.  This is a company obfuscating its true

8    location, obfuscating its true intent, obfuscating its business

9    model but deliberately trying to do business in the United

04:17 10   States, in every state in the United States, including

11   Massachusetts.  And then, whenever they get caught, which is

12   not often, they say, Oh, well, you know, we're not here so you

13   can't hold us accountable; we are in the Seychelles, we are in

14   Latvia or anywhere but where you are.

15          But that's not how it works.  You can't say we want

16   the advantage of U.S. law but you can't hold us accountable in

17   a U.S. court, especially when this is a company that has hired

18   a Massachusetts lawyer -- not this Massachusetts lawyer sitting

19   before you -- but that Marc Randazza, who I think has been

04:18 20   before you in other cases, went to Gloucester High School to

21   file an *amicus* brief before a United States District Court and

22   they're saying in their briefs here, Oh, well, this is a

23   foreign jurisdiction, how could we possibly be here?

24          THE COURT:  So, I guess, counsel -- and again, if it's

25   in your -- if the cases are cited in your brief, fine, but what

1    is sort of the best case that you cite for this interpretation

2    of purposeful availment, which seems both broader and narrower

3    than what I think the caselaw requires?  So what's -- what do

4    you think your best case is?

5          MR. GREENSPAN:  Can you just help me understand why

6    you think I'm making a broader argument?  Because I don't think

7    I am.

8          THE COURT:  I guess, counsel, there's certainly

9    caselaw in this circuit and others about a website -- you know,

04:19 10   there being a website that exists in Massachusetts not being

11   sufficient for purposeful availment or --

12         MR. GREENSPAN:  You're saying the access issue.

13         THE COURT:  Yes, the sort of --

14         MR. GREENSPAN:  Okay.

15         THE COURT:  The access issue and the sort of focus on

16   the United States seems to me to be more than and less than

17   what purposeful availment requires focusing on the forum.

18         MR. GREENSPAN:  To clarify, I'm not arguing that

19   targeting the United States automatically means you're

04:19 20   targeting a specific district or forum.  I'm arguing that you

21   have to understand how the business model works in order to

22   better understand --

23         THE COURT:  Understood.

24         MR. GREENSPAN:  -- why they're focusing on each state

25   as a particular target market, and Massachusetts is one of

1    those target markets.

2         The answer to your question about what is the

3    strongest case regarding the access to a website argument, I

4    don't think there is case.  I don't think -- I think the

5    Cloudflare issue, the issue of using distributed servers around

6    the world is an issue of first impression, actually.  And

7    that's why I was saying --

8         THE COURT:  Okay, understood.

9         MR. GREENSPAN:  -- this is a fairly recent development

04:20 10   in how websites work.

11         THE COURT:  Okay.

12         And, counsel, were there other things as regards the

13   personal jurisdiction that you wanted to address?

14         MR. GREENSPAN:  Well, let me just make sure I clarify

15   one further thing.  The hosting a website is not something

16   that's typically being referred to when there's been judicial

17   discussions of access to.  So access to a website would mean

18   that there is a user -- a computer user sitting in, let's say,

19   Minnesota and they visit a website that is run by a Delaware

04:21 20   corporation and that Delaware corporation has hired a data

21   center that's in California.  So when they go to the website,

22   the internet traffic goes from Minnesota to California in that

23   hypothetical.

24         So that's what I would think of when I'm talking about

25   access.

1          But when you're talking about the data center itself
2     being in California, it's hard to deny that there is a physical
3     presence for that company.  Even though it may be a Delaware
4     corporation, it's hard to deny that if the website is
5     physically hosted in California, that there's files on a
6     physical hard drive in a physical server in a rack in a data
7     center in California, that they have no presence there.  That's
8     the argument that Mediolex is effectively trying to make, that
9     even though there are copies of files that form the
04:21 10     ComplaintsBoard website in Boston on a physical device, they're
11     saying we have no presence in Boston, in Massachusetts, we
12     don't do business in Massachusetts.  It's just false.

13          As to their argument that, well, we may not know where
14     our data centers are, that's not my problem.  If they signed a
15     contract with a vendor to provide this service and the vendor
16     is providing it such that their website is based in
17     Massachusetts, then that's the fact, that they have a presence
18     in Massachusetts, whether or not they claim to know that.

19          THE COURT:  I'm following the argument.  Thank you.

04:22 20          Counsel -- Mr. Greenspan, anything else you wanted to
21     add?

22          MR. GREENSPAN:  I think so regarding Section 230.

23          THE COURT:  Sure.

24          MR. GREENSPAN:  So there have been a lot of cases
25     about Section 230 where courts taking a fairly broad

1   interpretation have been reluctant to provide immunity to

2   websites that -- you know, again, taking the argument Mediolex

3   is making here, that provide third-party commentary.  And I

4   would argue that for several reasons the ComplaintsBoard

5   website is not the same as many of these other cases that we've

6   seen.

7           So one of the more instructive cases is the

8   Roommates.com case that I think many who have studied 230 are

9   familiar with.  And in that case, the 9th Circuit said that

04:23 10   there were portions of the roommate site that were immune from

11   suit and portions that were not.  And the portions that were

12   not were given that exemption from immunity because the court

13   said that there was a limitation on what users could post and

14   that providing -- in that case by providing preselected sort of

15   question-and-answer fields that may have violated the Fair

16   Housing Act, that that sort of waived immunity.

17           And I think the quote from that case that is most

18   interesting from my vantage point is -- this is at -- this is

19   Roommates.com at 1167, it says, If such screening is prohibited

04:24 20   when practiced in person or by telephone, we can see no reason

21   why Congress would have wanted to make it lawful to profit from

22   if it online.

23           I think that's really helpful way to think about it.

24   Effectively it's saying if you can't do something in real life

25   and it's illegal, you shouldn't be able to do on the internet.

1    The point of Section 230 was not to make brand-new exceptions

2    from other federal laws that Congress had already deemed valid.

3         So what I would argue here is that there is a federal

4    criminal statute that outlaws extortion, and if I go and try to

5    extort anyone in this room, I will probably be arrested and

6    prosecuted for that, as I should be.

7         But what Mediolex is doing is simply that same thing,

8    except in a fairly clever way, I'll admit, online.

9         I don't think it was Congress' intent to carveout a

04:25 10   new exception from the extortion statute by passing Section

11   230.

12        And to be frank, there really are only two companies

13   in the caselaw that have even come close to having this very

14   rare and unusual sort of business model, one of them is a

15   company I know you've seen in this courtroom before, which is

16   Xcentric Ventures doing business as Ripoff Report, and the

17   other is other is Mediolex, which runs ComplaintsBoard.  Those

18   are the two major extortion rings on the internet that claim

19   Section 230 as their saving grace, essentially, because without

04:25 20   it they would not be able to continue existing.

21        Section 230(e)(1) states that there should be no

22   exemption for the purposes of enforcing criminal statutes.  And

23   so that's been interpreted very narrowly to refer to only

24   enforcement, I think, where you have, for example, a criminal

25   prosecution brought by the DOJ and the DOJ is saying, okay,

1    we're going to actually charge you with criminal extortion

2    here, so Section 230 would have no effect on that kind of

3    criminal proceeding.

4         But here's where it gets interesting.  By courts

5    granting civil immunity to companies like Mediolex, companies

6    like Xcentric Ventures, that dissuades federal law enforcement

7    from investigating those companies.

8         THE COURT:  I understand the argument.

9         MR. GREENSPAN:  Okay.

04:26 10         THE COURT:  Just given the time, I'm going to have to

11    have you end there, but I appreciate it, and the clarifications

12    on either side.

13         Counsel, given the time, I'll give you each a minute

14    if you wanted to add anything, if you want to add anything.

15         MR. INGLE:  Thank you, your Honor.  I'm going to go

16    through these in just one minute.

17         With respect to ego, there's no factual allegations to

18    piercing the veil.

19         Even if you pierce the veil as to Mediolex, that

04:27 20    doesn't get you to Astrad.  You don't get to Astrad by going

21    through Mediolex.

22         Soliciting libel is not the same as running a consumer

23    review website.  There's a lot of them: Yelp, Google Reviews,

24    Facebook Reviews, Angie's List --

25         THE COURT:  Understood.

```
 1        MR. INGLE:  Extortion and conspiracy, those would be
 2   fraud-based claims which required heightened pleadings under
 3   Rule 9.
 4        We're not using United States laws to purposefully
 5   avail ourselves of the benefits of doing business in the United
 6   States.  These are a defense to the claims in this case.  The
 7   defense in this case can't be something that gives rise to the
 8   complaint.  We're only doing it because we are moving to
 9   dismiss.
04:28 10        Pages about Massachusetts is not the same as
11   purposeful availment, otherwise every single map maker would be
12   subject to jurisdiction in all 50 states.
13        Cloudflare itself is isn't in Massachusetts, it has
14   multiple locations.  Simply because we're using a service that
15   has one component in Massachusetts doesn't subject us to
16   personal jurisdiction, it's not purposeful availment.  The same
17   as if we had a chip in the computer that was made in
18   Massachusetts.
19        THE COURT:  Understood, counsel.
04:28 20        MR. INGLE:  Let's see.  We are not doing business in
21   all 50 states.  The argument there is if we had a website
22   that's available in all 50 states, then we're doing business
23   there.  But we have this Plixer International case which says a
24   website operator does not purposefully avail itself by doing
25   business in every state where the website is available.
```

1            The same general argument with having a Massachusetts

2     attorney.  We are doing that to defend the case --

3            THE COURT:  Understood.

4            MR. INGLE:  There are multiple places where somebody

5     could sue Mediolex, either Latvia, the Seychelles, or somewhere

6     where they did something and the cause of action arose out of

7     those contacts.

8            THE COURT:  Last ten seconds, counsel.

9            MR. INGLE:  Roommates case, the parts of a website

04:29 10    that are not immune from under Section 230 are the parts that

11    the website operator creates, and in this case --

12           THE COURT:  There's no allegation as to that.

13           MR. INGLE:  You got it.

14           Thank you, your Honor.

15           THE COURT:  Thank you.

16           Sir, anything you want to add?

17           MR. MasMARQUES:  Yes, your Honor.

18           THE COURT:  Very briefly.

19           MR. MasMARQUES:  Yes, your Honor.  First of all, there

04:29 20    was no conspiracy, there was no communications with

21    ComplaintsBoard or any --

22           THE COURT:  Understood.

23           So is there anything you want to add?

24           MR. MasMARQUES:  I do want to add this, your Honor.  I

25    find it -- I don't even know how to say this.  Completely

 1    strange that plaintiff mentions websites that collect money to

 2    take URLs down which are the things they put up.  I have

 3    evidence right here that plaintiff wants $2,500 to remove

 4    each --

 5              THE COURT:  Understood, understood.

 6              So I will focus on the legal arguments.

 7              I appreciate the arguments on all sides.  Thank you.

 8              And I'll take the matter under advisement.

 9              THE CLERK:  All rise.

04:30 10              (Court adjourned at 4:30 p.m.)

11                      - - - - - - - - - - - -

12                         CERTIFICATION

13              I certify that the foregoing is a correct transcript

14    of the record of proceedings in the above-entitled matter to

15    the best of my skill and ability.

16

17

18

19    /s/Debra M. Joyce_____        December 7, 2023_____
      Debra M. Joyce, RMR, CRR, FCRR    Date
20    Official Court Reporter

21

22

23

24

25