UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AARON GREENSPAN,

Plaintiff,

v.

DIEGO MASMARQUES JR., et. al.

Defendants.

Case No.: 1:23-cv-10134-DJC

**DEFENDANT DIEGO MASMARQUES, JR.'S RULE 56.1 STATEMENT
OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Diego MasMarques, Jr. ("Defendant") respectfully submits this Statement of Material Facts, as to which there is no genuine issue to be tried, in support of their accompanying Motion for Summary Judgment .

I. **GENERAL FACTS MATERIAL TO DEFENDANTS' MOTION**

   A. **The Parties**

   1. At all relevant times, Defendant is a private individual residing in the Commonwealth of Massachusetts. MasMarques Decl. ¶ 62.

   2. Plaintiff Aaron Greenspan ("Plaintiff") is a resident of California, except for a brief period from June through September 2018 when he temporarily lived in Ohio. *See* Declaration of Ashley A. Andrade ("Andrade Decl."), Ex. 1 ((Deposition of Aaron Greenspan, Aug. 19, 2025) ("Pl. Dep.") at 131:6–25).

   3. Plaintiff is the founder and sole owner of Think Computer Corporation ("TCC"), which operates plainsite.org ("Plainsite"), and the manager of Turing Feynman, LLC. *See* Andrade Decl., Ex. 1 (Pl. Dep. 9:20–10:5, 11:10–18, 73:16–21); *id*. (Pl. Dep. 209:5–8) (Plaintiff

testified these entities are his sources of income); Doc. No. 54 (First Amended Complaint ("FAC") ¶¶ 1–4).

4. Plaintiff previously owned Think Computer Foundation ("TCF"), a 501(c)(3) nonprofit that was previously in a joint partnership with TCC which ended in 2021–the year TCF dissolved after an investigation by the Ohio AG that Plaintiff blamed on Defendant's "false complaint." *See* Andrade Decl., Ex. 1 (Pl. Dep. 74:2–9, 75:1–25).

5. Defendant communicated with Plaintiff only through Plaintiff's business email or phone and has no personal ties to him, his family, friends, or colleagues. *See* MasMarques Decl. ¶ 71; Andrade Decl., Ex. 1 (Pl. Dep. 130:3–10) (Plaintiff admitted that Defendant would have had no reason to contact him if not for Plainsite). *See* FAC, at 48 (FAC lists Plaintiff's contact email as a plainsite.org address).

### B. Plaintiff's Public Activities

6. Plaintiff describes himself as an advocate of legal transparency and "data journalist," reporting on government policy, corporate wrongdoing, macroeconomics, and the justice system, publishing extensive investigative reports, and publicly criticizing government officials based on his findings. *See* Andrade Decl., Ex. 1 (Pl. Dep. 20:13–15, 27:24–28:12, 55:22–57:8); Doc. No. 226, Ex. C, at 9 (Pl. Rule 26(a)(1)(A)(iii) Computation of Damages ("Pl. Rule 26 Damages")) (marked as Pl. Dep. Ex. 11, at 9) (Plaintiff states that his data journalism "work has affected many hundreds of millions of people").

7. Plaintiff is a published author, hosts a podcast, and maintains an active social media and personal website. Andrade Decl., Ex. 1 (Pl. Dep. 28:17–29:2, 54:15–55:21).

1

8. Plaintiff has been asked to speak on panels and has been interviewed 50 to 100 times, including by major media outlets, such as *The New York Times*, *Wall Street Journal*, *CNBC, and Reuters*—with a *New York Times* piece about Plaintiff as recently as October 31, 2025. *See id.* (Pl. Dep. 24:2–8; 25:1–23); *see id*. Ex. 21 (*What If You Spent Every Waking Moment Taking on Elon Musk?*, N.Y. Times, Oct. 31, 2025); FAC ¶ 4.

9. Plaintiff provided written testimony to the U.S. Senate Homeland Security Committee and testified before the British Parliament's Subcommittee on Department for Digital, Culture, Media and Sport. *See id.* (Pl. Dep. 26:4–16, 26:23–27:9).

10. Plaintiff has engaged in public disputes and litigation with high–profile figures including Mark Zuckerberg and Elon Musk, and has been a party to at least 40 personal legal actions—including against the SEC, DOJ, FBI, CIA, DEA, and the Federal Reserve—as well as roughly 40 additional legal actions through his wholly-owned company, TCC. *Id.* (Pl. Dep. 18:20–19:9, 20:23–21:20, 29:24–30:16, 31:15–20); *id* (Pl. Dep. 60:23–61:8) (Plaintiff has filed about 100 FOIA Requests); *id.* (Pl. Dep. 225:1–3) (Plaintiff admitted his work has earned him "more than [his] fair share of enemies").

    C. **Plainsite**

11. Plainsite indexes and makes available approximately 17-18 million case dockets to thousands of daily users. FAC ¶ 2; Andrade Decl., Ex. 1 (Pl. Dep. 72:18–73:15) (Plaintiff testified Plainsite's purpose is to "make the legal system more open and accessible to the public").

12. Plainsite publishes public court records which include criminal proceedings, bankruptcy filings, and other potentially sensitive topics. *See id.* (Pl. Dep. 87:19–88:3).

13. Plaintiff exclusively controls Plainsite's content—including what is posted or removed and any updates to the privacy policy governing that process—and testified that he does

not believe he has ever acted outside that policy. *See id.* (Pl. Dep. 86:14–87:8, 88:3–90:6); Doc. No. 54 (FAC ¶¶ 2, 9).

14. Plaintiff anticipated some level of criticism for creating Plainsite. Andrade Decl., Ex. 1 (Pl. Dep. 111:22–112:6); *id.* (Pl. Dep., 112:16:113:6) (Plaintiff understands "to an extent" why some people would be angry at having their court records publicly accessible).

15. Plainsite has received approximately 25,000 takedown requests and estimates that 50–75% were denied. *See id.* (Pl. Dep. 103:21–24, 105:18–107:3). He conceded that people get upset and even admits that a "very small number of people…are more persistent and worrisome" and have responded to the denial with threats "to sue or physically" harm him, with some even filing lawsuits against Plaintiff personally or TCC. *See id.* (Pl. Dep. 107:4–109:12).

16. Plaintiff is aware of at least 20 consumer complaints to government entities arising from denials of takedown requests and testified that "about half" of those complaints "echo whatever is written on Complaints Board." *See id*, (Pl. Dep. 106:11–107:11).

17. Plainsite allows paid users to "tag" docket pages with labels intended to "accurately reflect the opinion" of the user, and Plaintiff admitted that he personally added tags such as "Failed Lawsuits Against Plainsite" and "First Amendment" to three legal actions involving both himself and Defendant. *Id.* (Pl. Dep. 118:1–119:4, 121:16–122:14, 123:4–124:24); *id.* Exs. 2–4 (Pl. Dep. Exs. 2–4).

   D. **Defendant's Spanish Conviction & Treaty Transfer**

18. Spain reintroduced jury trials in 1995. *See* MasMarques Decl. ¶ 3.

19. In 2000, Defendant was convicted in Spain ███████████████████████
███████████████████████████████████████████████████████████
███████ Defendant has always maintained his innocence. *Id.* ¶ 2.

3

20. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████ *Id*. ¶ 4-5.

21. ████████████████████████████ Defendant agreed to complete the remainder of his sentence in the United States under a foreign-prisoner treaty transfer. *Id*. ¶¶ 6-7.

22. At the time of his transfer in 2006, the initial treaty transfer paperwork prepared by the Department of Justice inaccurately described the foreign conviction as ████████ Defendant raised concerns as he was not convicted of ██████ under Spanish law and was informed that it is standard practice to list the highest comparable U.S. offense in treaty transfer paperwork and then the USPC will be responsible for reviewing and reclassifying under federal sentencing guidelines. *Id*. ¶ 8.

23. In 2008, the USPC reclassified the conviction as ████████████████ under U.S. law, essentially cutting Defendant's sentence in half, though Defendant disputed parts of USPC's determination and its description of the Spanish conviction as ████████████". *Id*. ¶ 9.

24. After his 2008 release Defendant married his longtime partner and focused on family. *Id*. ¶ 10.

25. In January 2013, Defendant moved to seal or expunge the court dockets relating to his foreign prisoner treaty transfer, concerned they could be misunderstood or used to harm him; the motion was denied in September 2015. *Id*. ¶ 11.

26. Shortly thereafter he discovered that records of his treaty transfer and Spanish conviction were posted on websites including leagle.com and later plainsite.org, while he was preparing to seek expungement in Spain, for which he became eligible in 2016; Spain formally expunged the conviction in December 2020. *See* MasMarques Decl. *Id*. ¶¶ 12, 14, 56.

### E. Defendant's Complaints To Government Agencies

27. Defendant made multiple written complaints to state and/or federal agencies regarding the publication of his court records—including his treaty transfer records which misrepresented his foreign conviction—and personal information online, including, *inter alia,* concerns that Plaintiff and his business entities—TCC and TCF—were monetizing and misusing the 501(c)(3) nonprofit designation, including, but not limited to:

  a. the Arkansas Attorney General's Office in February 2017 (MasMarques Decl. ¶ 13 (Defendant contends the complaint primarily concerned leagle.com); Doc. No. 54-5, at 2);

  b. the Internal Revenue Service ("IRS") on August 29, 2017 (MasMarques Decl. ¶ 18; Doc. No. 54-5, at 3);

  c. the FBI in July 2017 (MasMarques Decl. ¶ 19);

  d. the IRS on December 14, 2017 (MasMarques Decl. ¶ 21; Doc. No. 54-5, at 7–8);

  e. the IRS on April 2, 2018 (MasMarques Decl. ¶ 24; Doc. No. 54-5, at 9);

  f. the Delaware Attorney General on April 3, 2018 (MasMarques Decl. ¶ 25; Doc. No. 54-5, at 10).

28. Plaintiff first learned about Defendant's complaints "probably in 2017" after being contacted by the Arkansas Attorney General. Andrade Decl., Ex. 1 (Pl. Dep. 80:3–81:4).

### F. TRO Filings

29. On April 4, 2018, Plaintiff sought a temporary restraining order ("TRO") against Defendant in Santa Clara County Superior Court ("Santa Clara Court") in San Jose, California, alleging harassment, which the Court granted. *See* FAC ¶ 62; MasMarques Decl. ¶ 27.

30. From April to December 2018, Defendant made additional complaints to government agencies concerning Plaintiff and his businesses, including the U.S. Attorney General in May 2018 and the Ohio Attorney General on June 24, 2018. *See, e.g.,* FAC ¶ 73; Doc. No. 54-5, at 13–15; MasMarques Decl. ¶¶ 29, 30.

31. On July 3, 2018, Defendant obtained a cross-TRO against Plaintiff in Santa Clara Court, prohibiting Plaintiff from posting or accessing Defendant's personal information online. *See* MasMarques Decl. ¶¶ 31-32.

32. Despite this, on July 20, 2018, Plaintiff posted on his and Plainsite's Twitter accounts–@plainsite and @aarongreenspan– what he framed as a "NOTICE" naming Defendant directly and threatening to seek sanctions unless Defendant withdrew his TRO. MasMarques Decl. ¶ 33; Andrade Decl., Ex. 1 (Pl. Dep. 69:4–9, 70:2–6).

33. On or about October 4, 2018, Defendant filed a complaint with the California Department of Motor Vehicles after multiple attempts to serve his TRO on Plaintiff. MasMarques Decl. ¶¶ 34–36; Doc. No. 54-5, at 16 (affidavit of process server describing multiple service attempts and learning from the tenant at the residence address that Plaintiff had moved).

34. On October 9, 2018, the day Plaintiff was served with Defendant's cross–TRO, Plaintiff posted on his personal and Plainsite's Twitter accounts, sharing a link to the TRO on Plainsite—disclosing Defendant's name, home address, and his wife's workplace—and also posted Defendant's photographs and translated Spanish media articles about Defendant's now-

6

expunged 2000 conviction; Twitter later suspended both accounts. MasMarques Decl. ¶¶ 37–38, 40; Andrade Decl., Ex. 1 (Pl. Dep. 214:15–215:6) (Plaintiff admitted publishing these posts); *id.* Ex. 5 (Pl. Dep. Ex. 20).

35. On or about October 10, 2018, Defendant filed a report with the Marlborough Police Department regarding Plaintiff's posts. MasMarques Decl. ¶ 39.

36. On or about October 18, 2018, Plaintiff posted on both Twitter accounts referring to Defendant by name and stating that he "serially harasses, rapes, and murders women"; Twitter suspended both accounts shortly thereafter. MasMarques Decl. ¶ 41; Andrade Decl., Ex. 5; *id.* Ex. 1 (Pl. Dep. 218:12–219:23) (Plaintiff admitted to publishing these posts).

37. Defendant has never been convicted of murder, attempted murder, rape, stalking, or attempted vehicular homicide, and has no documented history of mental illness. MasMarques Decl. ¶ 65. Andrade Decl., Ex. 1 (Pl. Dep. 216:2–217:20) (Plaintiff admitted he has not seen official records of Defendant's Spanish conviction, was informed of its expungement, and does not know whether Defendant was convicted of rape).

### G. The Criminal Complaint Against Defendant And TRO Proceedings

38. On November 15, 2018, the Marlborough Police Department filed a criminal complaint against Defendant based on Plaintiff's allegations that Defendant published pornographic and anti–Semitic posts about Plaintiff and published other posts suggesting the author "intends to or wishes to harm the individual." MasMarques Decl. ¶ 43. Andrade Decl., Ex. 6 (Pl. Decl. [attaching Criminal Complaint] (Pl. Dep. Ex. 4).

39. On or about November 28, 2018, Plaintiff received a faxed copy of this complaint and filed unredacted documents in Santa Clara Court that same day—which was docketed on December 6, 2018—disclosing Defendant's home address, Social Security number, and driver's

license number; Defendant then filed an incident report with the San Francisco Police Department. *Id.*; MasMarques Decl. ¶ 46; Andrade Decl., Ex. 1 (Pl. Dep. 173:23–174:7) (Plaintiff admitted he did not redact the document before filing and acknowledged it may have been publicly filed with that information unredacted); Doc. No. 54-5, at 19-21 (S.F. police incident report dated December 7, 2018).

40. On December 12, 2018, the Santa Clara Court temporarily vacated Plaintiff's TRO for improper service after a hearing Defendant attended in person with private security retained to accompany him to all in-person hearings in this matter. MasMarques Decl. ¶¶ 47–48.

41. On April 8, 2019, Defendant filed an application for criminal charges against Plaintiff in Marlborough District Court seeking relief under M.G.L. c. 209A, and the matter was dismissed without prejudice; on July 29, 2019, Defendant sought relief in Middlesex Superior Court under M.G.L. c. 258E; that action was likewise dismissed without prejudice. *See* MasMarques Decl. ¶ 51 (Defendant attests that the initial filing under 209A was inadvertent); Doc. No. 54-5, at 27–34 (court dismissal notices); Doc. No. 68-1, at 84–95 (Defendant's complaint for protection under 258E showing order in place until Aug. 27. 2019).

42. By May 17, 2019, Plaintiff knew that multiple posts he supplied to the Marlborough Police—which were part of the criminal complaint initiated against Defendant months earlier—were authored by someone else. Andrade Decl., Ex. 7 (Pl.'s Decl., May 13, 2019, Santa Clara Sup. Ct.) (Pl. Dep. Ex. 6); *id.* Ex. 1 (Pl. Dep. 154:7–155:25, 158:23–159:25, 163:13–25, 165:3-25) (Plaintiff admitted he did not believe Defendant published the specific posts referenced in the Nov. 15, 2018 complaint and claimed he emailed his liaison about this).

43. On August 30, 2019, the Santa Clara Court terminated Defendant's TRO and reduced Plaintiff's 5-year TRO to 2 years, expiring on August 30, 2021, while also denying

Plaintiff's motion for attorneys' fees and sanctions. MasMarques Decl. ¶ 51. In September 2019, both parties moved for reconsideration of these decisions. *See* Andrade Decl., Ex. 8 (Pl.'s Mot. for Attorneys' Fees) (Pl. Dep. Ex. 19); MasMarques Decl. ¶ 53.

44. In January 2020, Santa Clara Court denied both motions. *See* Andrade Decl., Ex. 9 (Jan. 28, 2020 Santa Clara Court Order) (Pl. Dep. Ex. 18) ("cannot reasonably conclude that [Defendant's case] was frivolous or baseless," and "not devoid of factual basis/evidentiary support"); *id*. Ex. 1 (Pl. Dep. 210:2–211:9) (Plaintiff calls this Order "the sloppiest court order [he has] ever seen"); MasMarques Decl. ¶ 54.

45. On or about November 24, 2020, the Marlborough District Court dismissed all charges against Defendant arising from the November 15, 2018 criminal complaint and later expunged the case. *See* Andrade Decl., Exs. 10 (Pl. Dep. Ex. 7 [Marlborough Dist. Ct. Dismissal Notice]) & 11 (Pl. Dep. Ex. 8 [Expungement Order]) (finding no "good faith basis" for the charges and could not be "prove[n] the D[efendant] was behind the posts [at] issue" and "false identification" of Defendant); MasMarques Decl. ¶ 55.

46. On Oct. 1, 2021, Defendant emailed Plaintiff seeking to resolve matters and asked if he would remove Defendant's legal information from Plainsite; Plaintiff replied that Defendant must first satisfy twelve conditions, including, *inter alia,* admitting to making "false reports" about Plaintiff, his family members, TCC, and TCF to various federal and state government agencies, and admitting to "commit[ing] perjury" to the Santa Clara Court—allegations that are both false. Andrade Decl. Ex. 12 (Pl. Dep. Ex. 24); MasMarques Decl. ¶ 59.

47. In December 2022–one month before Plaintiff filed this action– Defendant filed a complaint with the U.S. Cybersecurity and Infrastructure Security Agency ("CISA") regarding Plaintiff and Plainsite. MasMarques Decl. ¶¶ 60-61; *id.* Ex. A (CISA Complaint).

48. Plaintiff was never arrested, charged, or prosecuted as a result of Defendant's cross–TRO or TRO applications. MasMarques Decl., ¶ 52.

49. Defendant maintains that all complaints to governmental agencies or courts were made in good faith, and not for any improper purpose. MasMarques Decl., ¶ 70. Andrade Decl., Ex. 1 (Pl. Dep. 139:9–20) (Plaintiff testified only that he believed Defendant was "a sick person" and that the complaints were not "rational" when asked about motive); Doc. No. 237–9, at 5–13 (Plaintiff's filing of Defendant's alleged takedown requests show no extortion).

### H. Think Computer Foundation Was Investigated And Ultimately Dissolved.

50. Allegations of tax fraud involving Plaintiff and TCF were circulating publicly as early as 2015–before Plaintiff had any knowledge of Defendant. Andrade Decl., Ex. 1 (Pl. Dep. 235:10–20); *id.* Ex. 13 (Ripoff Report post) (Pl. Dep. Ex. 23); MasMarques Decl., ¶ 17.

51. In 2019, the Ohio Attorney General began investigating TCF, and the IRS also audited the nonprofit. Doc. No. 226, Ex. C, at 6–7.

52. In 2021, the Ohio AG concluded its investigation into the relationship between TCC and TCF, finding issues with TCF's balance sheet and, according to Plaintiff, the Ohio AG then requested that Plaintiff dissolve TCF entirely and/or reincorporate in another state. Andrade Decl., Ex. 1 (Pl. Dep. 77:11–79:9) (Plaintiff conceded that had he not dissolved TCF, the Ohio AG "probably would have filed some sort of civil enforcement action.").

53. The IRS website confirms the revocation of TCF's 501(c)(3) status. Andrade Decl., Ex. 14 (screenshot of IRS website showing revocation status).

## II. ADDITIONAL FACTS MATERIAL TO DEFENDANT'S MOTION RELATED TO PLAINTIFF'S DEFAMATION CLAIM

54. Plaintiff identifies four categories of allegedly defamatory statements: (1) complaints to government agencies, (2) statements made in judicial proceedings, (3) posts on

Twitter (now X), and (4) posts on other websites, including Blacklist Report and Complaints Board. *See* FAC ¶¶ 70, 99 (excerpts of alleged defamatory statements from 2018–2022); Andrade Decl., Ex. 1 (Pl. Dep. 226:10–12).

55. Defendant has used a VPN since at least 2019. MasMarques Decl. ¶ 20; Andrade Decl., Ex. 1 (Pl. Dep. 224:2–10) (Plaintiff testified that "even if [he] did have an IP address, [Defendant] has been using VPNs for years… [unlikely] the IP address would reveal too much after about 2019…").

56. Defendant maintains that he does not have or use a Twitter/X account or any social media account. MasMarques Decl. ¶ 72; Doc. No. 237-2 (Def. Ans. Interrog. No. 6).

57. Plaintiff has no direct evidence linking Defendant to any online posts at issue. Andrade Decl., Ex. 1 (Pl. Dep. 150:3–20) (Plaintiff admitted that "information that would be conclusive evidence is in the control of some other third party").

58. Plaintiff identified "indicators" he claimed linked Defendant to the challenged posts but admitted they are "not conclusive." *Id.* (Pl. Dep. 151:9–152:2). These included: (i) the use of white-out and color inkjet printing (*id*. at 84:1–85:23); (ii) use of Plaintiff's full name, which Plaintiff himself has used in PACER filings (*id*. at 82:10–83:9); (iii) usernames with "numbers followed by one letter" (*id*. at 221:1–8); (iv) a similar character count and two identical numbers between Defendant's email and a partially hidden Twitter/X email (*id*. at 221:20–222:3); and (v) capitalized nouns common in German, noting Defendant's purported dual German–American citizenship (*id.* at 222:8–13).

59. Plaintiff asserts that two online posts–both dated in 2018–constitute what he calls "conclusive evidence" linking Defendant: (i) a Mac OS file path with a "tech" username that Plaintiff concedes does not establish publication, and (ii) a server log showing IP access to a

11

URL under Plaintiff's control, which that day appeared in an online post. *Id.* (Pl. Dep., 144:19–146:9, 150:6–151:23); FAC ¶¶ 74–75).

60. No post on ComplaintsBoard.com or the "Blacklist Report" website identifies Defendant as the author. *See* Andrade Decl., Ex. 1 (Pl. Dep. 83:22–84:4, 142:12–16).

61. Defendant published only one Complaints Board post—dated April 3, 2018–sharing public Ohio business records for TCF. MasMarques Decl. ¶ 26; Doc. No. 237-3 (Def.'s Am. Ans. Interrog. No. 5); Doc. 54-5, at 14.

62. The Blacklist Report website was taken offline in late 2018. Andrade Decl., Ex. 1 (Pl. Dep. 146:10–146:14); FAC ¶ 50.

63. Plaintiff attributes most of his alleged damages stem from the publication of allegedly defamatory content by Omar Qazi ("Qazi"), a Twitter/X user and Elon Musk ("Musk") "follower." Andrade Decl., Ex. 1 (Pl. Dep. 66:11–67:1) (testifying that in 2019 Qazi reposted and "amplified" modified court filings from the Santa Clara Court TRO action to his "hundreds of thousands of followers"); *id.* (Pl. Dep. 227:6–8) (stating the conflict with Qazi "started to get heated" around December 2018); *id.* (Pl. Dep. 69:17–20) (identifying Qazi's wide "reposting" of "gripe site hyperlinks" allegedly "written or inspired" by Defendant as the "real problem"); MasMarques Decl. ¶ 64; *id.* Ex. 17, 17 (Compl., *Greenspan v. Musk*, No. CGC-24-615352 (Cal. Super. Ct. San Francisco Cnty. 2024)) (claiming certain defendants in that action "echoed Mr. MasMarques's allegations: that Plaintiff's non-profit origination was a 'fraudulent charity' and that Plaintiff…'harassed, intimidated, or targeted for extortion' individuals").

64. Plaintiff admits he lacks knowledge of any agreement between Defendant and others to post defamatory or pornographic material, testifying only that he "believe[s]" Defendant and certain individuals agreed that he "needed to be…held to account" and

referencing a post about a Proton Mail address allegedly used to coordinate "retaliatory action" toward him. Andrade Decl., Ex. 1 (Pl. Dep. 158:1–11); MasMarques Decl. ¶ 71 (Defendant denies having direct contact with Qazi, Musk, or Mahgrefteh, or encouraging anyone to publish defamatory statements).

### A. Plaintiff's Publicity of Disputes with Defendant

65. Before his permanent suspension from X (formerly Twitter), Plaintiff operated the accounts @aarongreenspan and @plainsite, each with thousands of followers. *See* Andrade Decl., Ex. 1 (Pl. Dep. 28:21–29:20, 86:17–87:2, 214:15–215:6).

66. Plaintiff repeatedly publicized his disputes with Defendant on his and Plainsite's social media. MasMarques Decl. ¶¶ 33, 38, 41; Andrade Decl., Ex. 1 (Pl. Dep. 69:4–9, 70:2–22 214:15–215:6, 218:12–219:23, 222:14–223:9, 226:5–227:23); *see id.* (Pl. Dep. 71:1–20) (Plaintiff admitted his Twitter posts could have gotten the attention of Qazi); *id.* (Pl. Dep., 229:24–230:22) (Plaintiff testified that he invokes Defendant's name in Twitter disputes to "defend" himself against an "army" of "pseudonymous posters"); *id.* (Pl. Dep. 234:16–235:3) (Plaintiff admitted he made the docket for the Santa Clara Court TRO case publicly accessible "whether through Twitter or through Plainsite" "as a method of self-defense" so "people [could] access the truth."); *id*. Exs. 5, 15–16 (Pl. Dep. Exs. 20–22) (Plaintiff's Twitter posts calling Defendant, *inter alia*, a "murderer," "rapist," and "stalker," and sharing links to legal actions involving the parties); *id.* Ex. 21 (Oct. 31, 2025 *New York Times* piece on Plaintiff refers to a "Massachusetts man convicted of a violent crime in Spain...").

67. Plaintiff also invoked Defendant's name in unrelated litigation involving high-profile parties, in which Defendant is not a party. MasMarques Decl. ¶ 64; Andrade Decl., Ex. 17 (Compl., *Greenspan v. Musk*, No. CGC-24-615352 (Cal. Super. Ct. San Francisco Cnty.

2024)) (describing Defendant as "convicted of murder and attempted murder in Spain," "made death threats," and "posted thousands of libelous fabrications" about Plaintiff and his family).

68. Plaintiff has himself engaged in online debate with critics. Andrade Decl., Ex. 1 (Pl. Dep. 234:1–235:9); *id.* Ex. 13 (Plaintiff's rebuttal to Ripoff Report post).

**B. Plaintiff's Purported Damages**

    **a. Rule 26 Initial Disclosures**

69. On April 18, 2025, Plaintiff served Rule 26 disclosures claiming "direct security realized losses" of at least $812,500 in compensatory damages and $11,000 in costs. Doc. No. 226, Ex. A (marked as Pl. Dep. Ex. 9).

70. On July 23, 2025–after the Scheduling Order deadline–Plaintiff amended his Rule 26 disclosures to claim at least $1,000,000 in compensatory damages and $11,500 in costs, replacing the original categories with "Loss of Time," "Loss of Asset Value," "Loss of Reputation," "Loss of Good Standing with State and Federal Government Agencies," and "Emotional Distress and Suffering." Doc. No. 226, Ex. B, at 1 (marked as Pl. Dep. Ex. 10), *cf. Id.*, Ex. C, at 11 (estimating compensatory damages at $6,782,250.00 on Aug. 3, 2025).

71. Plaintiff offers no expert testimony or tax or wage documents to support his claimed damages, asserting "no functional relationship…between Plaintiff's tax information and economic damages." Andrade Decl., Ex. 18 (Pl. Resp. to Notice of Dep., Req. for Docs. No. 3).

72. Plaintiff admits his claimed "costs" include costs and fees that the Santa Clara Court rejected twice. *Id.* Ex. 1 (Pl. Dep. 210:11–211:9, 212:7–213:6); Doc. No. 68-1, at 66–80 (incorporating Plaintiff's Santa Clara Court motion for attorney's fees and costs on Oct. 7, 2019); Andrade Decl., Ex. 8, at 12–13 (Plaintiff's request of court costs and fees in Santa Clara Court on Oct. 7, 2019), *cf.* Doc. No. 226, Ex. C, at 11–13 (court costs and fees as of Aug. 3, 2025).

73. Plaintiff's claimed "costs" include expenses incurred and/or paid by TCC or TCF. Doc. No. 68-1, at 101, 113, 116, 127–129, 130–134 (invoices directed to TCC or TCF); Doc. No. 226, Ex. C, at 11–13 (asserting TCF paid invoice).

### b. "Loss of Reputation"

74. Plaintiff identified no lost contract, investor, or client and admitted venture-capital interest was minimal even before 2018 due to his public rift with Mark Zuckerberg. Doc. No. 226, Ex. C, at 9 (citing Crunchbase article and stating that "to the extent" the posts prevented Plaintiff from securing funding, "the damage to Plaintiff on reputational grounds could easily have exceeded $5,000,000"); Doc. No. 68-1, at 54 (Crunchbase report showing average Series A funding of $18.7 million in Q1 2023); Andrade Decl., Ex. 1 (Pl. Dep. 41:14–21, 190:8–18) (admitted no venture capital firm said posts deterred investment and Musk never showed interest); *id.* (Pl. Dep. 35:11–14, 36:7–37:1) (Plaintiff published Musk's Aug. 8, 2019 email stating "your true colors" containing image of a Complaints Board post Plaintiff attributes to Defendant); Doc. No. 68-1, at 26 (Aug. 8, 2019 e-mail from Musk to Plaintiff).

### c. "Loss of Assets"

75. Plaintiff's claimed damages for "loss of assets" rely on TCC's 2012 common-equity valuation of about $509,400. Doc. No. 226, Ex. C, at 8; Andrade Decl., Ex. 1 (Pl. Dep. 198:4–11); *id.* Ex. 19 (Pl. Dep., Ex. 16) (2012 TCC common equity valuation).

### d. "Loss of good standing with state and federal government agencies"

76. Plaintiff claimed damages for "loss of good standing with state and federal government agencies," are currently unknown. Doc. No. 226, at 9–10 (Plaintiff asserts "unknown adverse financial impact" such as possible "future audits" and "additional interest or fees" for credit-score changes that "could be based on government data").

15

e. **"Loss of Time"**

77.  Plaintiff seeks reimbursement for "time…wasted dealing with [Defendant]" at an hourly rate of $750, though he admits he neither bills hourly nor charges that rate, basing the figure on a *New York Times* article about high AI salaries and by comparing his *pro se* work to top law-firm billing rates, and proposes an alternative "reasonable" rate of $450. Doc. No. 226, Ex. C, at 2–3; Andrade Decl., Ex. 1 (Pl. Dep. 204:1–19, 205:2–8, 205:22–206:11, 207:13–19); *id*. Ex. 20 (Pl. Dep. Ex. 15) (*New York Times* article on high AI salaries); Doc. No. 68-1, at 64 (TCC invoice showing consulting invoice hourly rate of $300 on Dec. 11, 2009 ).

78.  Plaintiff claims he "wasted" 1,375 hours due to Defendant's alleged actions, including responding to takedown requests to Plainsite and to inquiries from the Ohio Attorney General and the IRS about TCF, diverting time from "programming (adding features to Plainsite or Think's other products), fundraising, and networking." *See* Doc. No. 226, Ex. C, at 4, 6–8, 7 (Aug. 3, 2025 computation of 50, 175, 250, 150, 125, 125, 250, 100, and 150 hours for 2017–2025), *cf.* Doc. No. 68-1, at 5 (Aug. 29, 2023 estimates of 33.75, 175, 175, 150, 125, 125, and 50 hours for 2017–2023).

79.  Plaintiff made nearly $1 million in 2018 through his businesses; he voluntarily reduced his salary after 2018 for tax purposes. Andrade Decl., Ex. 1 (Pl. Dep. 207:2–207:12).

f. **"Emotional Distress and Suffering"**

80.  Plaintiff claims, "stress of worrying about Defendant," stating he "sacrifice[d] sleep to research thousands of gripe site posts," endured "uncomfortable and stressful conversations with family members," and believes his ▮▮▮▮▮▮▮▮▮▮ was "potentially worsened," but admits he "handles stress fairly well" and has not sought therapy and does not provide any medical expenses. Doc. No. 226, Ex. C, at 10; Andrade Decl., Ex. 1 (Pl. Dep.

133:1–134:20; 134:23-135:6; 137:7-19) (Plaintiff testified that he felt "anxious" and "deeply concerned," with a racing heart and elevated blood pressure, and feared Defendant was telling the FBI lies and that agents might arrive "with guns drawn and kill [him]").

                                      DEFENDANT, DIEGO MASMARQUES, JR.,

                                      By his Attorney,

                                      */s/ Ashley A. Andrade*
                                      Ashley A. Andrade, Esq.
                                      ANDRADE LEGAL, LLC
                                      867 Boylston Street, 5th Floor #1119
                                      Boston, MA 02116
                                      BBO# 697189
                                      Phone: 617.206.1822
                                      Email: ashley@andrade–legal.com

Dated: November 6, 2025

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of this document was filed electronically on November 6, 2025, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

                                      */s/ Ashley A. Andrade*
                                      Ashley A. Andrade
                                      BBO # 697189