UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


AARON GREENSPAN,

        Plaintiff,

vs.             Civil Action No.  1:23-cv-10134-DJC

DIEGO MASMARQUES, JR., et al.,

        Defendants.

_____


DEPOSITION OF

AARON J.  GREENSPAN

TAKEN ON

TUESDAY, AUGUST 19, 2025

10:05 A.M.


18 TREMONT

18 TREMONT STREET

BOSTON, MASSACHUSETTS 02108

1                          EXHIBIT INDEX

2    EXHIBITS                                          PAGE

3

4    1    AMENDED NOD                                  117

5    2    STATE CIVIL LAWSUIT WEBPAGE                  120

6    3    STATE CIVIL LAWSUIT WEBPAGE                  120

7    4    STATE CIVIL LAWSUIT WEBPAGE                  120

8    5    DECLARATION                                  152

9    6    DECLARATION                                  162

10    7    CRIMINAL DOCKET – OFFENSES                  176

11    8    FINDINGS AND ORDER ON PETITION              176

12    9    DISCLOSURES                                  192

13    10    AMENDED DISCLOSURES                        192

14    11    COMPUTION OF DAMAGES                       193

15    12    EMAIL DATED 02.27.2023                     193

16    14    EMAIL DATED 03.01.2024                     193

17    15    ARTICLE                                    193

18    16    COMMON EQUITY VALUATION AS OF              194

19          12.31.2011

20    17    TIMELINE OF EVENTS                         194

21    18    MOTION TO RECONSIDER                       209

22    19    MEMORANDUM IN SUPPORT OF MOTION            209

23    20    DOCUMENTS POSTED IN PLAINSITE ON           213

24          TWITTER

25    21    POSTS ON TWITTER

AARON GREENSPAN                August 19, 2025                          5
88254

```
                    220
 1                   EXHIBIT INDEX CONTINUED

 2    EXHIBITS                                    PAGE

 3

 4    22    POSTS ON TWITTER                      228

 5    23    ARTICLE ON RIPOFFREPORT.COM           233

 6    24    EMAIL DATED 10.01.2021                233

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    California.  And I also don't know that ZIP code,

2    because this has all been a very quick succession of

3    moves in the past couple of months.

4        Q.    Okay.  Before this -- this last address,

5    where?

6        A.    Before that?

7        Q.    Yeah.

8        A.    You mean ██████████ ?

9        Q.    Before ██████████.

10       A.    For a few months I was not in the United

11   States, and prior to that I was at 956 Carolina

12   Street.

13       Q.    How long were you at 956?

14       A.    About six years, I want to say.  You know,

15   between -- I think between six and seven years.

16       Q.    Okay.  What is your date of birth?

17       A.    ██████████ 1983.

18       Q.    What is your current occupation?

19       A.    I'm a software developer.

20       Q.    What is your primary source of income?

21       A.    I would say it's the business that I run

22   from my software development efforts.

23       Q.    And what business is that?

24       A.    Think Computer Corporation.

25       Q.    And you -- and do you own Think Computer

1  Corporation?

2      A.    To the best of my knowledge, yes.

3      Q.    Okay.   Do you have any other partners?

4      A.    No.   I have in the past, but at the moment

5  I am the 100 percent owner of the corporation.

6      Q.    And what is the current address of Think

7  Computer Corporation?

8          MR. GREENSPAN: Before we get too far down

9  this road, I just want to object on the grounds that

10  Think is not a party to this case.   And, you know, I

11  realize that there is some overlap, but I'm not

12  going to entertain questions that are a fishing

13  expedition about Think.

14          So if you could repeat your question, I'll

15  answer that question, I believe.   But I just want

16  you to be aware that I am the plaintiff.   Think is

17  not the plaintiff.   The court has rejected your

18  tactic to join Think as a party, and this is not a

19  deposition about Think.

20          MS. ANDRADE: So for me to clarify, you

21  refuse to answer questions about Think Computer

22  Corporation.

23          MR. GREENSPAN: That's not what I said.

24          MS. ANDRADE: What exactly are you saying?

25          MR. GREENSPAN: I'm saying that if you're

1  going to use this deposition as a way to obtain

2  information about Think, that is irrelevant to this

3  action.  I will not answer irrelevant questions

4  solely because they are about Think Computer

5  Corporation.

6  BY MS. ANDRADE:

7       **Q.   Where is your current business address?**

8       A.   Current business address is 956 Carolina

9  Street.

10       **Q.   Do you -- do you own any other businesses?**

11       A.   Yes.

12       **Q.   Can you provide -- can you identify each**

13  **one, your role.**

14       A.   Sure.

15            The only other business that I own is

16  Turing -- it's T-u-r-i-n-g -- Feynman -- F-e-y-n-m-

17  a-n -- LLC, and it has the same business address.

18            And I am the manager of the LLC.

19       **Q.   Have you taken any medication, alcohol or**

20  **drugs in the last 24 hours that could affect your**

21  **memory or ability to answer questions truthfully?**

22       A.   No.  Although I am very tired, and I do

23  have a condition that actually makes me fatigued.

24  So I expect that if this does run all day, I will

25  probably run into that at some point.

1  2009.  It's a confidential settlement.

2            After that was complete, there were

3  essentially three areas I wanted to work on

4  potentially: One was medicine -- sort of

5  anecdotally, my father's a doctor -- one was law,

6  and one was payments.

7            And I decided to basically start with

8  payments because the regulatory landscape is maybe a

9  little bit easier than medicine, and I didn't really

10  know much about law at the time.

11            And so I built a payment system that

12  allowed you to use your phone to pay for goods and

13  services, mostly at the point of sale, at least to

14  start.  And the idea was that when you went to the

15  cash register, an image of your face would show up

16  not on your phone but actually on the register, and

17  that way you could facilitate a secure payment that

18  didn't just depend on the signature on the back of

19  your card.

20            And that was actually fairly successful as

21  we were trying to get it up and running, but then

22  financial lobbyists managed to change the law

23  spontaneously in California.  They introduced a law

24  called the Money Transmission Act of 2010, and

25  because, for the first time, California began

 1  regulating domestic money transmission, that made

 2  all of the work I had done and my team had done

 3  spontaneously illegal overnight, which I was not

 4  happy about.

 5            And so I decided to sue the State of

 6  California over the constitutionality of that law.

 7  When I say "I decided," I mean, I was the CEO of

 8  Think.  Think filed the lawsuit.  Think was

 9  represented by counsel.

10            And that lawsuit took roughly five years

11  to resolve because the federal magistrate judge, who

12  I think is now deceased, who was overseeing that

13  case I think didn't know what to do with it.  The

14  legislature amended the law twice.  I was lobbying

15  in Sacramento for that to happen.  The legislature

16  was concerned about the lawsuit.  Everything was

17  kind of a mess.

18            And so while I was waiting for the

19  payments case to resolve, I wanted to know what was

20  going on with this, you know, four-and-a-half year

21  delay on a motion to dismiss, and so I started

22  building, with the help of some friends at first, a

23  site that let you get a better understanding of the

24  legal system and increased legal transparency.  And

25  eventually I brought in court cases from this

1  document dump that Aaron Swartz -- S-w-a-r-z (sic) -
2  - I'm sorry; I think it's S-w-a-r-z -- had compiled,
3  and that is what PlainSite is.  That's a good part
4  of the reason why it got started.
5          The other part being that my friends and I
6  were concerned after the financial crisis, that
7  Occupy Wall Street had not really achieved its goal
8  of facilitating reform in the financial sector, and
9  we thought maybe there would be some good that could
10 come from more legal transparency.
11         So to answer your question about my career
12 trajectory, I think that's a fair summary.
13     Q.   **Would you call yourself an advocate of**
14 **legal transparency?**
15     A.   I would now, yeah.
16     Q.   **Did any of these cases bring you media**
17 **exposure?**
18     A.   Define what you mean by "cases."
19          Certainly Facebook has had media exposure.
20     Q.   **Right.**
21     A.   But I don't know whether my case
22 necessarily had much.
23     Q.   **Was there a litigation involved in the**
24 **Facebook before the Facebook settlement?**
25     A.   Again, it's complicated.

AARON GREENSPAN                    August 19, 2025                         21
88254

1              There was no lawsuit, per se.  There was

2   first one, and then I believe two, proceedings

3   before the United States Patent and Trademark

4   Office, Trademark Trial and Appeal Board, concerning

5   the Facebook trademark.  The general issue was that

6   I had used the term "facebook" before Mark, and Mark

7   had, of course, used it after both I had used it and

8   Harvard and many, many other schools had used it.

9              And so he was going to the USPTO claiming

10  that it was this unique term that he had come up

11  with, and of course that wasn't true.

12             So there was a dispute about that.  It

13  wasn't a lawsuit exactly, but it was a form of

14  litigation, I guess, you could say.

15             There was not a lot of media coverage

16  around it.  There might have been one or two, like,

17  blog posts, but I specifically remember talking to a

18  reporter at the "New York Times" when the settlement

19  was reached, and he declined to even write a story

20  about it.

21             So...

22        Q.   Did the reporter reach out to you? Or you

23  reached out to the reporter?

24        A.   I don't remember which happened first.

25             He had asked me for contact information

AARON GREENSPAN                    August 19, 2025                    24
88254

```
 1        A.   But they trimmed it.
 2        Q.   Have you ever been interviewed by
 3   journalists or quoted in publications?
 4        A.   Yes.
 5        Q.   Which ones?
 6        A.   Several.  The "New York Times," "Wall
 7   Street Journal," CNBC, Reuters.  It's a long list.
 8             I have talked to media.
 9        Q.   If you were to put a number on that list,
10   approximately how many times have you been
11   interviewed by journalists?
12             MR. GREENSPAN: I'm just going to object.
13   What's the relevance of this?
14             MS. ANDRADE: Aaron, it is -- it is
15   relevant.  It goes to whether or not you -- you are
16   a public figure, whether you have communications
17   with, you know, journalists, whether you are a part
18   of -- you know, insert yourself in the public
19   domain.
20             So yes, it is relevant.
21             MR. GREENSPAN: I would argue that that is
22   highly context dependent, but okay.
23             The -- I'm sorry.  Can you repeat your
24   question?
25   BY MS. ANDRADE:
```

AARON GREENSPAN                    August 19, 2025                          25
88254

1       Q.   If you were to put a number on how many

2  times you've been interviewed by a journalist, what

3  would that number be?

4       A.   Between 50 and 100 times, something like

5  that.  I'm not exactly sure, of course.

6       Q.   Have you ever been invited to speak on

7  panels, conferences or public forum?

8       A.   Not often.  I think it's been several

9  years since I've been asked to speak on a panel, but

10  it's happened every now and then.  I think I led a

11  panel at a CodeX conference one year, but it's not

12  as though I'm constantly in demand for speaking

13  engagements.

14       Q.   Well, how many speaking engagements have

15  you been a part of?

16       A.   Are you including, like, panels in that?

17       Q.   Yes.  Yeah.  Let's --

18       A.   I think less than five.  It's not a large

19  number.

20       Q.   Were you asked to speak specifically? Or

21  did you volunteer?

22       A.   I think -- I don't think I've ever

23  volunteered for a speaking engagement; and I think I

24  was asked to speak specifically maybe once at a,

25  like, young entrepreneurship thing when I was in

AARON GREENSPAN                    August 19, 2025                    26
88254

1    college and I was speaking to high school students.

2           I mean, as I said, I'm not someone that's

3    frequently sought out as a speaker.

4           **Q.   Have you testified -- have you testified**

5    **before a public committee or at a public hearing?**

6           A.   I have.

7           **Q.   Which ones?**

8           A.   I provided written testimony to the Senate

9    Homeland Security Committee, if I'm remembering

10   correctly.  And I testified before the British

11   Parliament DCMS subcommittee.  And I think DCMS

12   stands for digital cultural media and sports, or

13   sport.  Something like that, I don't know.  That was

14   in 2019, regarding Facebook.

15          **Q.   Regarding Facebook?**

16          A.   Yeah.

17          I mean, to the extent that I have had

18   media exposure, I think it's fair to say is that

19   most of that has concerned Facebook.  There have

20   been other aspects to my career, but, you know, that

21   is by far, I think, the most frequent topic of media

22   attention.

23          **Q.   What is frequently asked at these panels**

24   **or before the hearing in terms of Facebook?**

25          A.   Are you referring to the British

1   Parliament or --

2        Q.   Yes.  Let's stick with the British

3   Parliament?

4        A.   Because the other one was written, so

5   there was no panel.

6        Q.   Okay.

7        A.   The British Parliament was interested in,

8   I guess, my observations and a report I wrote about

9   fake accounts on Facebook.

10            I have maintained for a long time that

11   essentially Mark is committing securities fraud by

12   not disclosing to investors the fact that most of

13   Facebook's accounts are fake, and that most of the

14   traffic to the site is not genuine and is not

15   accurately reflected in their financial disclosures

16   and their investor disclosures.

17            So that was, I think, the main topic that

18   they were interested in.

19        Q.   And you mentioned reports that you've

20   written about fake accounts.

21            What type of reports?

22        A.   I guess can you clarify? I guess I'm not

23   sure what you mean by "type."

24        Q.   Would -- I guess what do you mean by

25   "reports"?

```
 1        A.    A compilation of insights about a

 2   particular topic.

 3             I mean, it's a pretty vague question.

 4        Q.    Was it an article? Was it published?

 5        A.    It was published.  It's something like --

 6   I don't know how many pages it is.  It's probably, I

 7   don't know, 80 to 100 pages, something like that,

 8   with footnotes.  It's a lengthy document explaining

 9   why a particular viewpoint has factual merit.

10        Q.    What is the name of the report?

11        A.    I think it's just "A Reality Check Report

12   about Facebook, Incorporated."

13             This was before the Meta name change,

14   so...

15        Q.    And where is it published?

16        A.    On PlainSite.

17        Q.    Do you maintain a social media presence

18   related to your work?

19        A.    I suppose I do.  It has sort of changed

20   over time, but I do.

21        Q.    What kind of following do you have?

22        A.    I would say pretty minimal.  On Twitter,

23   before my accounts were suspended, I had

24   approximately 2,000 personal followers, Twitter

25   followers.  And I think on Bluesky, I have roughly
```

AARON GREENSPAN                    August 19, 2025                    29
88254

1  the same number, 2,000 or so followers.

2              Which is not, you know, that many for -- a

3  public figure, I would expect, would have hundreds

4  of thousands of followers, so I don't know, if

5  you're using that particular metric, if I would

6  qualify as a public figure.  But obviously there's

7  some debate about how to measure that kind of thing.

8      Q.    You mentioned Twitter.

9              What do you mean by your account being

10 suspended?

11     A.    In, I think it was June of 2023, both my

12 personal account and the account for PlainSite --

13             And, by the way, PlainSite is probably

14 going to be said several times throughout this, and

15 it's P-l-a-i-n-capital-S-i-t-e.

16             The PlainSite account and my personal

17 account were suspended at the exact same time

18 shortly after a lawsuit filed by Elon Musk against

19 me was voluntarily withdrawn in the Superior Court

20 of California for Alameda County.  And I was told

21 that somehow both of my accounts had violated the X

22 rules at the same time, which does not seem quite

23 believable, but that is what happened.

24     Q.    Why did Elon Musk sue you?

25     A.    Well, there's the stated reason in the

1  complaint, and there's the real reason.

2          I don't know that I am aware of the real

3  reason exactly.  You would have to ask Elon Musk.

4          The stated reason in the complaint was

5  that I suppose he believed that I had masterminded

6  some sort of litigation against him in which he was

7  accused of libel because he had written back to me

8  in an on-the-record conversation.  And so when I

9  published that conversation on PlainSite, he said

10 essentially that I was to blame for him being sued

11 by a third party for libel, and so he was suing for

12 contribution, and I can't remember the second claim.

13 It was something like -- it wasn't indemnification,

14 but it was -- it was some sort of like, "You

15 published this, and therefore you must be partially

16 liable for this libel suit."

17         There were no other claims.  He was not

18 alleging that I had libeled him.  He was just sort

19 of roping me into this other case.

20         And the pretenses that he was using for

21 that were 100 percent false.  I had not actually

22 masterminded the litigation against him.  I did not

23 think that was a particularly good idea.  I didn't

24 know that it would be filed.  Once I heard that it

25 was filed, I thought that the lawyer they had chosen

 1  was probably not the best choice.

 2          So sort of every allegation he made was

 3  just completely fabricated, and I served a motion

 4  for sanctions under California Code of Civil

 5  Procedure Section 128.5, I think, on his attorneys,

 6  and within days the suit was withdrawn.

 7      Q.   What year did he file suit?

 8      A.   At first he tried to file in 2022, and a

 9  judge told him he couldn't.  And then -- and that

10  was I guess a cross-claim under California law.

11          And so rather than file a cross-claim, he

12  decided to sort of go behind the judge's back and

13  file a separate case, and that way she couldn't

14  prevent him from doing it.

15      Q.   Was there ongoing litigation between you

16  two?

17      A.   There was.  There was also a case I filed

18  against him from prior to that.

19      Q.   And what was the outcome of that case?

20      A.   It's still pending.

21      Q.   What do you mean "it's still pending"?

22      A.   Well, it was filed in 2020 in federal

23  court in the Northern District of California, and

24  then there were several amended complaints.  And

25  then, after the fourth amended complaint was filed,

1   by my client?

2        A.    Well, he seemed to share one with me.  I

3   don't know if he shared it with other people.  But,

4   as far as I can tell, the e-mail thread that

5   resulted in him being sued for libel -- and I don't

6   know if it was 2019 or 2020 -- but the ███████████

7   -- ██████████  and  █████  is █████████ -- case.

8   The -- the case that            filed against

9   Elon Musk came out of this e-mail thread that was

10  effectively an interview that we had had on the

11  record.  And the final e-mail in that thread

12  involved Elon Musk replying to me with a grainy

13  screenshot of a ComplaintsBoard post which I believe

14  was written by your client.

15          So yes, I mean, what I just said was not

16  that particular allegation that you summarized.  But

17  I think, as you are aware, the fact that someone as

18  prominent as Elon Musk could find one of these posts

19  and then use it as ammunition against me, regardless

20  of its veracity, is concerning to me.

21       Q.    Who else were parties -- who else was on

22  the e-mail exchange between you and Elon Musk?

23       A.    I think the -- the exchange began with my

24  e-mailing Elon and the Tesla board, and then the

25  board kind of dropped off the thread and it was just

1  Elon and me after that.  I don't remember exactly

2  how many threads in it was before that change

3  happened, but, you know, these are public documents

4  that you can go and look if you'd like.

5      Q.    Who -- was that e-mail between you and

6  Elon Musk ever made public?

7      A.    Well, you mean the one with the

8  ComplaintsBoard post? Is that what you're asking?

9      Q.    Yes.

10     A.    It's now part of the record in this

11  action, so yes.

12     Q.    Who made it public?

13     A.    I believe I did.

14     Q.    Was it made public before that?

15     A.    Before that, I thought it was probably

16  best not to make it public.  Because I have had a

17  recurring concern about many of these posts sort of

18  resurfacing.  It's been extremely difficult to get

19  them taken down.  Some of them I still can't get

20  taken down.

21            And you know, there's always a cost-

22  benefit.  In the case with the message from Elon,

23  the only words that Elon himself wrote in that

24  message I think were "your true colors," and the

25  ComplaintsBoard post itself is actually borderline

 1  illegible.  But because I've been forced to pay

 2  attention to this sort of bizarre situation now for

 3  many, many years, it's not hard for me to recognize

 4  the ComplaintsBoard user interface when I see it.

 5          So I don't think most people would

 6  actually know what to make of that.  They would

 7  probably just assume it's a grainy screenshot and

 8  not think much of it.  But I know exactly what it

 9  is.  And I don't know exactly the technical reason

10  why he sent the low-resolution version of that

11  screenshot, but that's what I got in my e-mail,

12  so...

13     Q.   So what are -- so are you saying that most

14  people, if they read that post, or that message,

15  they wouldn't understand where it came from?

16     A.   Well, I don't know what most people would

17  understand.

18          I know that if you're asking why I chose

19  to share it as opposed to other things that I've

20  said that I prefer confidential, part of the

21  equation is that I think it's just hard to read.

22  Whereas, you know, native PDF of some of these posts

23  containing whatever -- my landlord's name or my

24  parents' address or -- you know, that's a much

25  different situation when you can clearly identify

1  but we can look at that later on.

2       A.    I can just remind you that you had me fly

3  here.  So I was hoping, if you have questions,

4  they're not questions about what I've already

5  provided you in the documents.

6       Q.    I'm just trying to understand your loss of

7  reputation.

8       A.    Well, I mean, it's up to you to ask the

9  questions to better understand it.

10           I mean, I can try to explain it if you'd

11  like to just ask me an open-ended question about

12  that.  But, I mean, the questions you're asking I

13  don't think are going to get you what you want.

14       Q.    Did you lose a contract with any clients,

15  for instance, as a result of these posts?

16       A.    It's hard for me to know.

17           You know, I don't have a contract I'm

18  pointing to, but as is often the case in the

19  business world, people make decisions for all kinds

20  of reasons, and they don't always share them with

21  you.  So you can sometimes think you've had a very

22  productive meeting with somebody and then never hear

23  from them again.

24           And, you know, there could be many reasons

25  for that.  But it is a reasonable assumption that

1        A.    Some of them did, yeah.

2        **Q.    For the most part, were these posts**

3   **related to your business -- more about your**

4   **businesses than you personally?**

5        A.    I really -- you know, I would have to do

6   some sort of, you know, statistical analysis, which

7   I haven't done.

8             But there are pictures of my partner on

9   there.  I fail to see how that could be connected to

10  my business.  Just it seems like -- you know, my

11  maternal aunt, ███████████████████████████

12  ███  she is mentioned.  She's a Realtor in Chicago,

13  has nothing to do with this.  Don't know why she's

14  on there except to harm me.

15       **Q.    Okay.  Let's jump back a little bit.**

16             **Do you publish articles -- do you publish**

17  **blog posts?**

18       A.    I have a part of my personal website that

19  has some essays on it.  I don't know if you would

20  call those "blog posts" or not, but sure.

21       Q.    What about articles?

22       A.    I'm not sure what you mean.  Like is there

23  a difference in how you're referring to one or the

24  other? Or...

25       **Q.    I guess a blog I would look at as more**

1    personal.  Articles discuss, you know, areas of

2    controversy.  I mean, you know --

3          A.   I'm not sure how to answer your question.

4               There is an area of my website that I have

5    devoted to, you know, generally under 10,000-word

6    essays that I have written.  Whatever you want to

7    characterize those as is, you know, up to you.

8          Q.   And what -- what do you -- what are the

9    topics of these articles?

10         A.   Some are about technology.  Some are about

11   economics.  Some are about medicine, I guess.  I

12   mean, kind of whatever I feel like writing about.

13              I don't -- I don't post things daily,

14   probably not even weekly or monthly at this point.

15   But every now and then I'll find a specific area

16   that I don't think is particularly well explored,

17   and I'll decide to write something about it.

18         Q.   Have you ever published a book?

19         A.   Yes.

20         Q.   Do you have a podcast?

21         A.   I do.

22         Q.   Do you a consider yourself a journalist?

23         A.   Not in the traditional sense.

24         Q.   What does that mean?

25         A.   You know, I -- I don't work for a

1  newspaper.  I don't work for a TV station.  I don't

2  pledge to avoid financial overlap with the subject

3  that I'm covering.  So I think, in that sense, I am

4  not a traditional journalist.

5          I do pretty in-depth research that some

6  journalists are probably not capable of because it

7  requires a lot of technical skill, and so I have

8  used the phrase "data journalist" to try to

9  distinguish the kind of work I'm doing from

10 traditional journalism.

11         But, you know, I don't want to claim that

12 I am like a typical journalist that does not have

13 conflicts with their subject and that just gets a

14 paycheck from a publisher or something like that.

15     **Q.    Okay.  Well, in your own words, what's a**

16 **"data journalist"?**

17     A.    Someone who relies on large amounts of

18 data in order to reveal interesting or unusual facts

19 about a subject.

20         And in my personal situation, I am using

21 mostly legal data, but, you know, there's other

22 kinds of data I rely on as well.

23     **Q.    And what type of subjects?**

24     A.    Are you asking about me? Or about data

25 journalism in general?

1    Q.   Your -- you mentioned getting -- that you

2    write about various subjects, and you focus in on

3    those subjects.

4         So what are -- what do you mean -- what

5    are they?

6    A.   I am interested in corporate wrongdoing.

7    I'm interested in macroeconomics and government

8    policy.  I'm interested in the justice system.

9         As I mentioned, you know, I was a CodeX

10   fellow.  I audited that course at Harvard Law

11   School.  I've had a longstanding interest in how the

12   law works.  I mean, I'm interested in medicine.  I'm

13   certainly not a doctor or anything, but, like, I --

14   I have enough experience firsthand with the medical

15   system that I -- I think -- I would probably say

16   this somewhere on my website, that I'm drawn to

17   complex topics.  I like looking into complex systems

18   and see how they work and how they don't.

19   Q.   Have you ever published criticisms of

20   government officials based on your findings?

21   A.   Yeah.

22   Q.   Do you consider your role to be that of a

23   public watchdog in a way?

24   A.   I guess I don't think of myself using

25   those exact terms, but I could understand why

**NAEGELI** (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

1 don't know if you are referring to that kind of

2 situation or as a party.

3     **Q.   No.  As a party in litigation.  My**

4 **apologies.**

5     A.   So as a party -- this information is also

6 easy to find on PlainSite -- but I think I've

7 probably been involved in 20-something different

8 dockets in my personal capacity.

9         But it's also important to realize that

10 many of those dockets revolve around the same

11 dispute.  So, for example, with your client, there's

12 something like eight dockets now, but they're all

13 the same core dispute.  The -- the Facebook issue

14 has had its share of docket numbers, but those are

15 all the same dispute.

16         So like it looks like a kind of large

17 number at first glance, but many of these are

18 appeals or, you know, as I was explaining with the

19 Elon Musk situation, that case has gone from court

20 to court and bounced around.  So it has several

21 different docket numbers, but it's all really the

22 same thing.

23     **Q.   Have you initiated FOIA requests?**

24     A.   Yes.

25     **Q.   How many?**

1        A.    On the order of 100.

2        **Q.    Do any of them result in litigation?**

3        A.    Some of them have.

4        **Q.    How many?**

5        A.    How many FOIA requests or how many cases?

6        **Q.    How many FOIA requests.**

7        A.    I think I've probably sued over -- between

8   and 40 of them, something like that.  Again, many of

9   these requests are about overlapping subject matter.

10           So there's a -- a FOIA case about the

11   president of Nigeria that came up because he was one

12   of the most searched for -- not individuals.  His

13   case was one of the most searched-for cases on

14   PlainSite.  And I think that covers 12 FOIA

15   requests.  But all 12 requests are really in some

16   way about him.  So it sounds like a lot, but it's

17   the same thing.

18        **Q.    Just for clarity, when you mentioned**

19   **earlier about being a party, whether directly or**

20   **indirectly through your wholly owned entities, when**

21   **you mentioned being in 20 or so --**

22        A.    Yeah.  I think I said in my personal

23   capacity.

24        **Q.    Oh.**

25        A.    So for Think Computer Corporation, there

1    publish defamatory --

2         A.    Yes.

3         Q.    -- posts about you?

4         A.    They have directly as a consequence of

5    your client's posts.

6         Q.    What do you mean -- what are these posts?

7    What do they say?

8         A.    Well, in one case there's a particular

9    follower who is a defendant in the Musk litigation

10   -- his name is Omar -- O-m-a-r -- Qazi -- Q-a-z-i.

11             And Mr. Qazi in 2019 sort of began this

12   secondary campaign of harassment by looking into the

13   restraining order I secured against your client, and

14   he took the documents from the restraining order

15   case and modified them and posted the modified

16   versions online, basically to harass me.  And, in

17   addition to that, began posting links on Twitter to

18   some of these gripe site posts, and these links were

19   viewed by, minimum, tens of thousands of his

20   followers.  And at this point, this same person, Mr.

21   Qazi, has hundreds of thousands of followers.

22             It really started to sprawl in 2019 with

23   his involvement.  He took the sort of core false

24   allegations made by your client, and he amplified

25   them literally a thousand fold, many thousand fold

1  potentially.  And it, at that point, becomes a

2  little difficult to track because, you know, there

3  were some core allegations that your client was

4  making -- all of them false; or at least the ones

5  I'm thinking of were false -- and, you know, once

6  other people sort of got on that bandwagon, it got

7  quite intense.

8          So that's what I'm referring to.

9      Q.    Okay.  Just my understanding, Omar Qazi,

10  you allege that Omar Qazi pulled filings from a

11  harassment order --

12     A.    I don't know if --

13     Q.    -- civil action?

14     A.    Yes.

15     Q.    Okay.

16     A.    It was the civil action.  I don't know if

17  it was the order, per se, or which order.  There

18  were several.

19     Q.    Okay.

20     A.    But yes, it was the civil action.

21     Q.    And at which court?

22     A.    The restraining order against your client

23  was issued by the Superior Court of California for

24  Santa Clara County.

25     Q.    Got it.

1       A.   Well, I definitely don't have my history

2  in front of me, so it's hard to say if it was at the

3  time.

4           I had posted a few things about your

5  client, but I can't remember if that was in 2018 or

6  if it was after this all began with Omar.  So I

7  couldn't say off the top of my head, but I think,

8  you know, the timeline is available, either in this

9  case's history or the other Elon Musk case.

10      Q.   When was my client's counterclaim,

11 counterclaim harassment order, when did that come to

12 your knowledge? When did you first become aware of

13 that?

14      A.   I want to clarify there was no order in

15 the end because he lost that attempt to file a

16 counter TRO.

17      Q.   Okay.

18      A.   But he, I believe, first requested a

19 counter TRO in July 2018, and I believe I first

20 filed for a TRO in April of 2018.

21      Q.   Would you say that is when you first got

22 notice of his counter TRO, in July 2018?

23      A.   You mean his counter-request?

24      Q.   Yes.

25      A.   I think so.  I don't know how I would have

 1  been aware of it before he filed it.

 2      Q.    Do you remember posting about it in July

 3  of in a post on Twitter stating that my client has a

 4  number of days to remove or retract it?

 5      A.    At some point I did file a public notice,

 6  because there is the issue of how to serve him.  It

 7  wasn't clear exactly where he was at the time that

 8  -- I think I had asked the -- was it the Middlesex

 9  County sheriff's office to serve him.  And they

10  mistakenly -- essentially they mistakenly identified

11  his father as him.  I had provided them with what

12  ended up being the correct address, and they said,

13  "Well, we did another search, and we found a

14  different address.  So we're going to serve him

15  there."

16           And that turned out to be his father who

17  has the same name that he does.

18           So in -- in order to avoid any confusion

19  about where he was physically, I think I just posted

20  something on Twitter as a public notice saying, you

21  know, "please stop" or something to that effect,

22  and, you know, "withdraw your counter-request."

23           I don't remember the exact date this all

24  happened.  You know, it's been a multi-year ordeal.

25  It all kind of blends together after a while.

1        Q.    Okay.   Do you think these Twitter posts

2    could have gotten the attention of Omar Qazi?

3        A.    Pretty unlikely.

4             You know, Twitter is a pretty fast-paced

5    -- or at least was, you know, back when I used it.

6    It was fairly fast-paced and people didn't tend to

7    scroll back months and months and months to see what

8    had been posted.  Partly because there's just such a

9    fire hose of information on social media, but also

10   because the user interface made that very difficult

11   to do.  You would have to sort of scroll back in

12   maybe batches of 20 posts at a time.  And so if you

13   were trying to find something that happened 5,000

14   posts ago, you would be doing that for a long while.

15            You know, it's possible that Omar did a

16   search for my name, sifted through thousands of

17   posts and that came up, but I don't -- I don't know

18   exactly how he came across the restraining orders

19   proceedings.  But my guess would be that he just

20   found them on PlainSite.

21       Q.    And they are publicly available on

22   PlainSite?

23       A.    They are.

24       Q.    How are they publicly available on

25   PlainSite?

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

1          A.    They're public records.

2          Q.    Did you -- but did you connect to that

3    state court -- strike that.

4                Initially, with -- was PlainSite initially

5    part of just solely providing PACER court records

6    for the most part?

7          A.    Initially, yes.

8                As I mentioned, it -- it began providing

9    court information with Aaron Swartz's document dump

10   from 2012, 2013, whatever year it was that that

11   happened.  And those were just PACER records.

12               And over time, I realized that it would be

13   quite useful to also have state court records

14   available, where that was possible.  And of course

15   the, you know, state court systems are complicated

16   patchworks.  But so now PlainSite does have several

17   million dockets from various state courts.

18         Q.    In total, how many dockets are on

19   PlainSite?

20         A.    Between right now 17 and 18 million.

21         Q.    Did we ever discuss what exactly PlainSite

22   is?

23               What is PlainSite?

24         A.    I don't know.  Yeah, I don't know if you

25   asked that specific question.

NAEGELI  (800) 528-3335
DEPOSITION & TRIAL  NAEGELIUSA.COM

 1              I -- I would describe it as a legal and
 2    financial information service.
 3         Q.    Does it have a mission?
 4         A.    I guess it doesn't have an explicitly
 5    stated mission, no.
 6         Q.    But if you can give a mission right now,
 7    in general, what would you --
 8         A.    Well, I don't think that's the purpose of
 9    this deposition.  But, I mean, as I've described, I
10    generally subscribe to the belief that legal
11    transparency is important.
12         Q.    And this includes making lawsuits and
13    information about litigation available to the
14    public?
15         A.    Yes.
16         Q.    Who or what entity currently owns and
17    incorporates PlainSite?
18         A.    Think Computer Corporation.
19         Q.    And Think Computer Corporation is your
20    wholly owned entity?
21         A.    Yes.
22         Q.    Has any other entity or individual owned
23    or operated PlainSite?
24         A.    No.  I don't think it would be fair to
25    characterize any other entity as having owned or

1  operated it.

2      **Q.   What about Think Computer Foundation?**

3      A.   So for a time Think Computer Foundation

4  contributed records to PlainSite.  And some of those

5  records involved the payment of fees to courts in

6  order to obtain them.  So the foundation paid those

7  fees and then put them on PlainSite to make them

8  public.  I don't think that that counts as ownership

9  or operation.

10         I guess there may have been a period at

11  the very beginning in like 2011 where my friends and

12  I who were thinking about this were trying to figure

13  out how to make it all work.  And so, you know, it's

14  possible some of the extremely early pages stated

15  the foundation was running the site before court

16  records were even involved and this was just, like,

17  in the very early idea stage.

18         But I think really ever since the site

19  began charging subscription fees in 2012, it's been

20  owned by the corporation.

21         So, you know, at the point where there was

22  actually any real intellectual property to own, it's

23  been owned by the corporation.

24      **Q.   That was since 2012?**

25      A.   Yeah.

AARON GREENSPAN                    August 19, 2025                    75
88254

1       Q.    Was there a joint venture agreement

2   between --

3       A.    There was.

4       Q.    And when did that expire?

5       A.    I think 2021.

6       Q.    Is Think Computer Corporation still in

7   existence? Think Computer Foundation.  I'm sorry.

8       A.    No.

9       Q.    No?

10             When did -- when did that end?

11      A.    2021.

12      Q.    Why was it dissolved?

13      A.    It was dissolved because there was an

14  investigation, I believe, as the result of your

15  client's false complaints, by the Ohio Attorney

16  General's office.  And they asked me to shut it

17  down, but gave me the option of reincorporating it

18  in a different state.

19             And then I decided, rather than shut it

20  down and reincorporate, I would just shut it down

21  because people like your client had made the process

22  of doing basic work so difficult and onerous that it

23  just was not worth the added bureaucratic hurdles to

24  do that work.  So I figured I can just do the same

25  kind of work through a for-profit.

 1              MR. GREENSPAN: Again, going back to my

 2     prior objection, this is not a lawsuit about Think

 3     Computer Foundation.  It's not a lawsuit about Think

 4     Computer Corporation.

 5              MS. ANDRADE: You mentioned the Ohio

 6     Attorney General in numerous sections of your

 7     complaint.

 8              MR. GREENSPAN: I appreciate that.  I'm

 9     answering your questions, but just to remind you.

10     BY MS. ANDRADE:

11        Q.   Okay.  So the Ohio Attorney General was

12     looking into Think Computer Corporation, and Think

13     Computer Foundation.

14              Was that the extent of the investigation?

15        A.   Well, I think it depends how you

16     characterize it.

17              The investigation only named Think

18     Computer Foundation as a subject.  There was only a

19     complaint, I think, or a series of complaints filed

20     about Think Computer Foundation that they were

21     acting on.  They were interested in the relationship

22     between the foundation and Think Computer

23     Corporation.

24              But they were not formally investigating

25     Think Computer Corporation.  Which, by that point,

1  was not an Ohio entity.  So they would have had no

2  jurisdiction to investigate it anyhow.

3       **Q.   What state was it incorporated in?**

4       A.   It was initially incorporated -- excuse me

5  -- in Ohio, but it was then later reincorporated in

6  Delaware.

7       **Q.   When was it later incorporated in**

8  **Delaware? What year?**

9       A.   I think 2010.

10      **Q.   2010.**

11           **Did the Ohio AG, attorney general, ever --**

12  **ever release a finding or tell you what their**

13  **conclusion was?**

14      A.   They sent a letter making some allegations

15  that, as best as I can understand, were based on a

16  misinterpretation of the foundation's balance sheet,

17  and also some conclusions that just seemed to be

18  made up out of thin air.  Which, I guess, is why

19  they wanted it shut down.

20           But in terms of release of findings, they

21  didn't make a public release.  It was all part of

22  the investigation, so...

23      **Q.   And -- and at that point, they asked for**

24  **you to shut it down?**

25      A.   Yes.

1        Q.    And if you had said no?

2        A.    If I had said no, I think they probably

3   would have filed some sort of civil enforcement

4   action.  And I was reasonably confident that this --

5   that would have resulted in them losing, because

6   their findings were so completely off base, but I

7   didn't really feel like fighting that battle in

8   order to fight more battles for no reason.  It

9   didn't really make any sense.

10        So I figured, you know, given that my

11  views on sort of the role nonprofits play in society

12  had also shifted considerably since high school, I

13  thought it just did not make sense to continue

14  running that as a separate entity, especially with

15  your client filing multiple baseless complaints.  It

16  just seemed like that would never stop.

17        Q.    So talking about those complaints, when

18  were you first made aware? What year were you first

19  made aware of one of those complaints? Year and

20  month.

21        A.    When you say "one of these complaints,"

22  you mean a complaint filed by your client

23  specifically?

24        Q.    Complaint filed by my client to a

25  government entity --

 1        A.    Oh.

 2        **Q.    -- or agency.**

 3        A.    That I think was probably in 2017, because

 4    that's when I heard from the Arkansas Attorney

 5    General asking who is this guy, essentially.

 6        **Q.    Do you remember the month?**

 7        A.    No, I don't.

 8        **Q.    Were any other complaints filed that year?**

 9        A.    Well, I now know that they were, but I

10    don't think I knew necessarily at the time.

11             I think the Arkansas Attorney General's e-

12    mail to me -- or maybe there was a phone call.  I

13    can't remember.  But my recollection is that the

14    first -- the first time I thought, "Oh, Diego

15    MasMarques is filing false complaints against me and

16    my companies," that thought occurred to me because

17    of the Arkansas Attorney General.

18        **Q.    Do you remember what complaint or agency**

19    **you heard from next?**

20        A.    I don't.

21             But I -- I think the next one I became

22    aware of was probably his complaints to the IRS,

23    because I think somehow either those were being

24    posted by him on ComplaintsBoard, or they were

25    showing up in the restraining order proceedings in

1  California, or both.

2          And I think -- so it would have been

3  Arkansas Attorney General, IRS, Ohio Attorney

4  General that I was generally aware of.

5          And then somewhere in the middle there, he

6  was writing to Delaware.  And, I mean, it gets

7  really -- I have all the documents that you have

8  provided, and I've got some of my own.  But, you

9  know, there's so many of them that it's hard to sort

10 of keep track of off the top of my head.

11     Q.   On ComplaintsBoard were there posts during

12 this time alluding to there being complaints --

13     A.   They weren't --

14     Q.   -- being made?

15     A.   -- just allusions.  The actual paper that

16 he had filed had been scanned in, I believe, by him,

17 and posted.  So he was -- he was filing these

18 complaints and then signing up on ComplaintsBoard

19 using different accounts and then attaching images

20 of the complaints he had filed to his posts under

21 various pseudonyms to tell the world that, "Aaron

22 Greenspan is doing horrible, fraudulent things, and

23 he's a criminal.  And here's the proof.  I've filed

24 this complaint against him," whoever I am.

25     Q.   Were those complaints specific personally

1  about you? Or did they mention your business?

2       A.   I don't have them in front of me, but some

3  of them mentioned Think Computer Foundation.  Some

4  of them mentioned Think Computer Corporation.  Some

5  of them mentioned PlainSite.  Some of them mentioned

6  none of those things.  And I think almost all of

7  them used my name, Aaron Greenspan, or -- I mean

8  specifically Aaron Jacob Greenspan.  Because even

9  though I almost never use my middle name, your

10  client almost always does, so...

11       Q.   But Jacob is your middle name?

12       A.   Jacob is my middle name.

13       Q.   Does anyone -- do you know anyone that

14  might use your middle name --

15       A.   No.

16       Q.   -- to refer to you?

17       A.   Not even my mother.

18            I can't recall the last time I heard my

19  middle name from anyone except Diego MasMarques.

20       Q.   Have you used it in any of your filings as

21  the plaintiff?

22       A.   So I have not done that deliberately ever.

23            What has ended up happening is that

24  because of the way PACER works in different

25  jurisdictions, you have a user account that they --

1  you know, it's a government agency.  They ask you

2  for your full legal name.

3              And so I think at one point on some

4  district court PACER installation, I typed in my

5  full legal name, and then that became associated

6  with my user name.  And so I don't know if it's

7  Massachusetts or California or wherever it is, but

8  somewhere whenever I file something, it says, "Oh,

9  Aaron Jacob Greenspan filed this."

10             But that's not actually anything I

11  intended to do.

12        Q.   Okay.

13        A.   So...

14        Q.   Do you remember when you started -- when

15  you first used your full name, Aaron Jacob

16  Greenspan?

17        A.   I don't remember, no.

18        Q.   Okay.

19        A.   But again, it's something that I have --

20  except when dealing with the IRS or some formal

21  government process, I do not use my middle name.

22        Q.   Okay.  So about the ComplaintsBoard posts

23  that you allege my client posted, did it -- did

24  these various scanned IRS complaints, did it include

25  my client's name or any --

1    A.   No.  Your client has a habit, as I have

2    learned, often when he would post information, there

3    would be redactions that would potentially lead back

4    to his identity.  And oftentimes, when people redact

5    things, they use a black rectangle.

6              But most of these redactions, if not all

7    of them, did not use a black rectangle.  They used

8    whiteout.  And so in some of these posts, you could

9    see the physical, like, white paint on the page that

10   had covered up something that might be identifying.

11             And there was a day in court, in Santa

12   Clara County -- and this is reflected in the

13   transcript -- where Judge Overton asked your client

14   to provide her and me with an exhibit that he was

15   referring to.  And he took out two copies of the

16   exhibit -- I can't remember exactly what it was; it

17   was some article, somewhere -- and one of the copies

18   was unredacted, and one of the copies was redacted.

19   He gave the judge the unredacted copy, and he gave

20   me the copy with whiteout on it.

21             And I pointed out to the judge that these

22   were not the same exhibit, and that one of them had

23   whiteout.  And that was also consistent with the

24   scanned images on ComplaintsBoard.

25             So to answer your question, no --

1        Q.    Okay.

2        A.    -- the images did not always have his

3   name, but there were some telltale signs.

4        **Q.    So you assume it was him because whiteout**

5   **was used?**

6        A.    No.  I assume it was him because whiteout

7   was used, and he has a particular kind of printer --

8   which I believe is a color inkjet printer, which

9   also didn't have the best cartridges in the world

10  installed.  And because the exhibits he would

11  present in court would match the print quality of

12  the images posted online, because sometimes these

13  images were printed or scanned at an angle, there

14  were basically a number of indicia that matched what

15  was posted online with what I was seeing in court.

16              And, you know, a lot of people buy

17  whiteout.  There's a lot of office supply stores out

18  there.  Some people read articles about South

19  Station in Boston.  Some people have inkjet

20  printers.  But when you put all of these things

21  together, it starts narrowing down a bit.

22       **Q.    Are you an expert on printers?**

23       A.    Well, I don't know.  You know, I don't

24  work for HP or a printer company.  But I can

25  identify many fonts on sight.  When I was a kid, I

1  used to be able to tell people what printer they had

2  based on their printout.  I've repaired problems

3  with printer drivers for 30 years.  And so, I mean,

4  I don't know what qualifies one to be an expert on

5  printers, but I know quite a bit about PostScript

6  versus PCL, so I know something.

7        **Q.    Okay.**

8        A.    Are we expecting someone?

9              MS. ANDRADE: Just can we go off the

10  record.

11              THE REPORTER: Off the record.

12              (Discussion off the record)

13  BY MS. ANDRADE:

14        **Q.    Do you personally control the operations**

15  **of PlainSite?**

16        A.    Yes.

17        **Q.    Okay.  Do you control PlainSite's website**

18  **Twitter account or related social media?**

19        A.    The Twitter account is no longer under my

20  control.

21        **Q.    Oh.  Okay.**

22        A.    The Bluesky account, I would say has

23  pretty limited activity, but I do control that

24  account.

25        **Q.    Okay.  And did you control Twitter, the**

AARON GREENSPAN                    August 19, 2025                            87
88254

 1  **Twitter account when it was active?**

 2       A.    When it was active, I did control that.

 3       **Q.    Does anyone else have administrative**

 4  **access to PlainSite's website, social media**

 5  **accounts?**

 6       A.    There is one other individual who has

 7  administrative access in the event that something

 8  were to happen to me.

 9       Q.    And who is that?

10       A.    His name is Ying -- Y-i-n-g -- Lei -- L-e-

11  i.

12       Q.    Is he an officer at Think Computer --

13       A.    No.

14       Q.    -- Corporation?

15            So in general, could sensitive court

16  filings like criminal records, criminal charges or

17  bankruptcy records be available on PlainSite?

18       A.    Did you say in general?

19       **Q.    Does PlainSite have sensitive court**

20  **filings such as, you know, criminal records and**

21  **bankruptcy records?**

22       A.    Some criminal records and some bankruptcy

23  records are available on PlainSite, as they are

24  public records.

25       **Q.    Do you admit that these are sensitive**

1  **areas, sensitive filings for people?**

2         A.    I think it's context dependent.

3              My -- my view is that the intent of

4  bankruptcy law is to give people a second chance,

5  and so I try to be pretty liberal in granting

6  requests for suppression of bankruptcy cases.  The

7  situations where I think that being liberal is maybe

8  not the best idea is where you have contested

9  bankruptcies where there's some acrimonious

10 situation.  But if there's no contest, then

11 generally these requests are granted.

12             Criminal records are a lot more

13 complicated, I think.  There are misdemeanor crimes

14 that probably don't matter all that much in the long

15 run to anybody, but then there's also felonies that

16 really do matter.  And so depending on the kind of

17 scale of the crime or the type, you know, in some

18 cases -- you know, personally I am very anti-drug,

19 but I realize that maybe people don't view the use

20 of marijuana as a very big deal, and depending on

21 what timeframe you're looking in what jurisdiction,

22 marijuana might have been criminalized or not -- so,

23 you know, point being there's a lot of factors to

24 take into account.

25             When you get to crimes like murder, I

1  think it's a lot less complicated.  I think that

2  violent felonies generally, especially on the

3  federal level, should be public record, because

4  there are some types of crimes that present sort of

5  an indication of a public safety risk.  And even

6  though that can make me a target, as we now know, in

7  some cases I think that those documents generally

8  belong in the public domain.  And especially if

9  there is an order from a judge already on the record

10 about whether or not a given criminal record should

11 be sealed, that's always a good indication of, you

12 know, some reasoning behind that decision.

13          So it's a complicated set of factors.

14     **Q.   Do you go outside these factors when**

15 **considering whether or not certain court filings**

16 **should be available on PlainSite?**

17     A.   Well, I'm not sure what you mean about

18 "these factors," because I just gave you some

19 examples; but I'm not suggesting that that's a

20 comprehensive list.

21          There is a privacy policy on PlainSite

22 that is more comprehensive.

23     **Q.   Okay.**

24     A.   And that policy has been arrived at over a

25 period of years by trying to take into account sort

1   of the universe of relevant factors.  So I don't

2   really think I go far outside of that policy really

3   ever.  Or if somehow there's a really special case

4   that comes up, then the policy gets amended to take

5   into account the fact there is something new that

6   hasn't been contemplated before.

7            I think the policy does say the date it

8   was last amended on the bottom.  And it's also not -

9   - historically it has not only been me making these

10  decisions.  At various points I've hired contractors

11  to help with handling privacy requests.

12       Q.   Okay.

13       A.   But those contractors would have also been

14  following that policy.

15       Q.   Were those contractors involved when they

16  received -- when you received a request from my

17  client, were those contractors also involved?

18       A.   I don't think so.  I think they would have

19  been before 2017.

20       Q.   The contractors were before 2017?

21       A.   Correct.

22            I think their involvement was mostly

23  before .  And if there was any overlap in the

24  timeframe, they still didn't handle those particular

25  requests from your client.  Those I handled.

1  these situations where they're trying to seal

2  something that's already out there, you know, the

3  options are to comply or to challenge it.  So far I

4  don't think I've challenged anything like that, but

5  that option is always on the table.

6           You know, I don't think there's been any

7  record of PlainSite, you know, failing to comply

8  with court orders.  I don't think that's been a

9  thing.

10      **Q.    Okay.**

11      A.    Not an issue.

12      **Q.    Does that mean, though, that you've always**

13  **complied with an order that you believe is invalid?**

14      A.    Sorry.  Can you just restate the question?

15      **Q.    Are you saying that you always comply with**

16  **an order regardless if you feel that it's invalid?**

17      A.    My recollection is that, to date, there's

18  never been a situation where it has been necessary

19  to challenge an order, and I believe that PlainSite

20  has always complied with court orders.

21      **Q.    Approximately how many take-down requests**

22  **have you received in total?**

23      A.    I think it's somewhere on the order of

24  25,000.

25           You know, some of these got categorized as

1  determine if the CCPA doesn't comply?

2       A.   You mean apply?

3       Q.   Yeah.  Sorry.

4            If it applies, the CCPA.

5            Does it apply?

6       A.   If you're asking if I've, you know, hired

7  a private attorney to consult or provide a legal

8  opinion to Think Computer Corporation on that issue?

9  No.  I don't think that's necessary.

10            I think it's evident from the statute and

11  from the guidance provided by the California

12  Attorney General that it does not apply.  And the

13  California Attorney General at this point has had

14  several opportunities to correct that viewpoint, and

15  it has never taken the view that it applies.

16       Q.   What do you mean by that, several

17  opportunities?

18       A.   There are -- there are some people who

19  have filed complaints with the California Attorney

20  General saying that, you know, they asked for their

21  case to be taken down, and the CCPA means that it

22  should be.  And each time I would respond to that

23  and point out that the CCPA does not apply to Think

24  or to any business like it.

25            So it's kind of a moot point.

 1       Q.    Approximately how many people have made
 2   complaints to the California Attorney General about
 3   this?
 4       A.    The ones I've been notified of, probably
 5   like three.  Not a large number.
 6       Q.    Okay.  What about complaints to government
 7   agencies, state or federal?
 8       A.    I honestly don't know.  I mean, I'm not
 9   sure I get notified each time.
10             With the California Attorney General, they
11   do send some sort of, like, form notification, so
12   you can respond to the complaint.  But I don't know
13   nationwide.
14       Q.    Okay.  So based off of -- based on your
15   knowledge, what -- how many complaints do you know
16   of that have been made to federal or state
17   government entities?
18       A.    It's probably something like 20.
19       Q.    20?
20       A.    Yeah.  Around there.
21             I don't -- and this is over a period of
22   more than a decade, right? So it's not a large
23   number.
24       Q.    Is it 20 complaints or 20 individuals?
25       A.    I don't know.  Some of these people use

1  pseudonyms.  It could be one person writing ten

2  complaints.  It could be ten people writing ten

3  complaints.  I don't know.

4      Q.    And what's the basis of these complaints?

5  What are they generally saying?

6      A.    About half of them echo whatever is

7  written on ComplaintsBoard.  And the other half are

8  just people who think that their court documents

9  should not be in the public domain.  And, you know,

10  they're entitled to that view, of course, but that's

11  not really how our system works.

12      Q.    Do you know how many times you've denied

13  take-down requests?

14      A.    Not off the top of my head.

15      Q.    If you were to put a percentage of the

16  amount of -- of the 25,000, approximately how many

17  have you denied?

18      A.    I really don't want to speculate, but...

19      Q.    Is it more often than not? Is it more than

20  percent that gets denied?

21      A.    I think that's probably a safe assumption,

22  yeah.

23      Q.    Is it closer to 75 percent?

24      A.    It's probably between 50 and 75 percent,

25  but I honestly don't know the exact percentage.

AARON GREENSPAN                    August 19, 2025                    108
88254

1  It's not actually something I've checked on lately.

2  So it's not, like -- I just haven't run the numbers

3  on that.

4      **Q.    How do these people normally react when**

5  **their request has been denied?**

6      A.    I would say most people I never hear any

7  reaction from.  Some people are upset.  Some people

8  ask for reconsideration essentially, but politely,

9  you know.  They try to point out some other fact or

10 highlight why they think it's wrong.  And sometimes

11 I do reconsider based on what people send.

12          I would emphasize that the vast majority

13 of people are either polite in their communications

14 or, even if they're upset -- and you can tell

15 they're upset -- they're not openly hostile or

16 anything.  They're just, you know, justifiably upset

17 this is the way the system works, and unfortunately

18 it's not in their favor.  And that's -- that's fine.

19          There have been a very small number of

20 people who are more persistent and more worrisome,

21 frankly.  I'm talking single-digit numbers of people

22 here, like maybe, like, five who have made some kind

23 of threat either, you know, to sue or physically,

24 kind of like your client.  But most of those have

25 ended up people who filed lawsuits and then lost,

```
 1   not people who took the route that your client did.
 2             So there have been some lawsuits against
 3   me and against PlainSite -- whether, you know,
 4   through Think Computer Corporation, I guess, or
 5   suing the DBA -- which it's not even a DBA -- but
 6   that's how it got styled in the caption.
 7             And I, or whatever entity they've sued,
 8   has won every single one of those cases.  But, you
 9   know, they happen here and there.
10        Q.   So these lawsuits are not against you
11   personally?
12        A.   Some of them are.
13             There was an individual who attempted to
14   get a restraining order against me personally in ,
15   and that -- that individual lost because his
16   petition for the restraining order was struck under
17   the California anti-SLAPP statute.
18        Q.   And you were the one that filed the
19   special motion to dismiss under --
20        A.   Yes.
21        Q.   -- the anti-SLAPP statute?
22             Okay.  Who is -- and I'm assuming this is
23   ██████████████ --
24        A.   Yes.
25        Q.   -- Jr.?
```

1   to search under family law even though it has
2   nothing to do with family law.  That was not my
3   doing.
4       **Q.   So you have -- you've been sued based off**
5   **of the content on PlainSite, correct?**
6       A.   I have.  Yes.
7            There was that case.  There was also a --
8   a filing in the Central District of California in
9   federal court by somebody who also wanted their case
10  taken down.  And in that particular lawsuit, I was
11  never served, and the judge dismissed it, I believe
12  within 24 hours, because it did not meet any of the
13  criteria for federal diversity jurisdiction.
14           So it just never went anywhere.
15      **Q.   And in that lawsuit, were you sued**
16  **personally?**
17      A.   Yes.
18      **Q.   Okay.  And that was based off of the fact**
19  **that their information, whatever court filing, was**
20  **on PlainSite?**
21      A.   Correct.
22      **Q.   Okay.  Did you anticipate before you**
23  **started PlainSite that making litigation materials**
24  **public and available could lead to criticism and**
25  **pushback?**

AARON GREENSPAN                    August 19, 2025                    112
88254

```
 1        A.    I think I anticipated some degree of
 2   criticism, just because no matter what field you're
 3   in there's always going to be somebody who disagrees
 4   with any kind of point of view.  There's lot of
 5   competing interests in the world.  So that -- that's
 6   something I expected.
 7             You know, I think there's a difference
 8   between commonplace criticism and sustained and
 9   intense internet harassment.  And, you know, I don't
10   file lawsuits against people for criticism.
11   Criticism is a necessary part of life.  But I also
12   can't -- can't operate in an environment where my
13   safety is being threatened every day.  That's much
14   different.
15        Q.    Understood.
16             Can you understand why some people would
17   be angry at having their -- their criminal history,
18   you know, their court actions, bankruptcy, so
19   readily available?
20        A.    I think, to an extent, I do understand.
21   But there's all kinds of nuance, because, as I think
22   we've already covered, not every type of crime is
23   the same.  Not every criminal statute is the same.
24   Not every case history is the same.
25             Sometimes judges will agree with a
```

**NAEGELI** (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

AARON GREENSPAN                    August 19, 2025                    113
88254

1   defendant that materials should be sealed.  It

2   happens all the time.

3          But do I understand the, like, sort of

4   basic human need for privacy, yeah.  Of course I

5   understand that.  I just don't think it applies in

6   this case at all.

7          So that's why we're here.

8      Q.    Is there a difference between having

9   materials on PlainSite and having them on federal or

10  state court dockets?

11     A.    Yes.

12     Q.    And what's the difference?

13     A.    There are several differences.

14          One is that search engines do not index, I

15  would say, most court databases automatically.  That

16  is why companies like WestLaw and Lexis exist in the

17  modern era.  I mean back before electronic records,

18  things were different and so that affected their

19  business model.  Or I guess I should say their

20  business model evolved out of that historical

21  reality.

22          But there's a difference in terms of how

23  the internet functions.  There's a difference in

24  terms of payment required to access information.

25  And there's a difference in terms of, I would say,

AARON GREENSPAN                August 19, 2025                          118
88254

1          Each docket page includes tags.

2          What are tags?

3     A.   Tags are shorthand indicators for

4  different categories.  It can be defined by users.

5  Any user on PlainSite can create or apply tags as

6  they see fit.

7     Q.   Any user? Or paid users?

8     A.   Paid users.

9     Q.   Okay.

10     A.   Any -- any user who has a user account.

11  So at this point that means paid users.

12     Q.   Okay.  Understood.

13          Do you have final say on the tags?

14     A.   As the site administrator, I suppose that

15  I can override or delete tags that seem like they're

16  not appropriate or, you know, designed to harass

17  someone or something like that.  But, you know, the

18  goal is to have them accurately reflect the opinion

19  of whichever user is applying them.

20          And tags are a topic I have a particular

21  interest in.  I have a US patent that I share with

22  some coauthors on tagging that is more or less a

23  framework for the kinds of features that are on

24  PlainSite.

25     Q.   You mentioned that these tags accurately

1  reflect the user's opinion.

2           Should it also accurately reflect the

3  docket page, the case information?

4       A.   Ideally.

5       Q.   If it does not represent the case

6  information on the docket page, do you override that

7  tag?

8       A.   I haven't ever had to do that.

9            They're not really that frequently used

10  right now.  I use them because I think tagging is

11  interesting.  There may be a few other users who use

12  them, but it's not a very widespread phenomenon, I

13  guess, as a feature.  It is, I think, very helpful,

14  but kind of hasn't caught on, I would say, with the

15  mainstream.

16            Let me clarify.

17            Tagging has caught on for a variety of

18  uses, especially on social media.  But usually it's

19  for a different kind of purpose, like humor a lot of

20  the time.  Hashtags are a subset of tags.

21            This is not intended to be about humor.

22  It's intended to be about information access and

23  sort of enhanced search capability.

24            So, you know, tagging has all kinds of

25  disparate uses, and this is just one aspect.

1  BY MS. ANDRADE:

2        Q.   **Do you recognize these documents?**

3        A.   They appear to be printouts of different

4  docket pages on PlainSite regarding your client.

5        Q.   **Do they accurately reflect what is**

6  **currently on the PlainSite docket page?**

7        A.   Well, let's see.

8             So as far as I can tell, these were all

9  printed on July 18th.  And assuming there have been

10  no updates to the pages since July 18th, then the

11  answer would be yes.

12             I don't have any reason to think there

13  have been any updates, but just to be clear about

14  the answer to your question, they look like they're

15  current as of July 18th.

16        Q.   **Okay.  And who are the parties in each of**

17  **these litigations?**

18             **We can begin with the Superior Court of**

19  **California, County of Santa Clara, Case Number**

20  **CH008067.**

21        A.   So that's Exhibit 4.

22             That particular docket involves myself as

23  plaintiff, or I guess petitioner, depending on how

24  you interpret the best way to describe parties in a

25  civil harassment case, and your client, Diego

AARON GREENSPAN                    August 19, 2025                              122
88254

1    MasMarques, as the defendant, or respondent.

2           And then the other two cases, Mr.

3    MasMarques is the petitioner in the Marlborough

4    District Court, which is Exhibit 2, and I am the

5    respondent.

6           And then in Exhibit 3, in the Middlesex

7    County Superior Court, your client, Mr. MasMarques,

8    is the plaintiff, and I am the defendant.

9       Q.   Thank you.

10          And when you referred to yourself as

11   either the plaintiff or the respondent, you mean in

12   your personal capacity, correct?

13      A.   Correct.  In these particular dockets,

14   yes.

15      Q.   Now, for the tags on each docket page,

16   were these tags done by you?

17      A.   So I don't -- I might be missing

18   something, but I don't see any tags on your

19   printout.

20          Are you looking at something in

21   particular?

22          Oh, I see there's --

23      Q.   They're very faint.

24      A.   They're very faint.

25          Okay.  So yeah, I see I think, where they

AARON GREENSPAN                    August 19, 2025                                123
88254

```
 1  show up usually in a gray box on the screen, but
 2  here there's no -- there's no box.
 3          So can you repeat your question? Sorry.
 4     Q.   Were you the one who created the tags?
 5     A.   Yes.
 6     Q.   One of the tags is "failed lawsuits
 7  against PlainSite"; is that correct?
 8     A.   Yes.
 9     Q.   Why would you add that if these actions
10  involve you in your personal capacity?
11     A.   Well, because they involve me in my
12  personal capacity at the same time that they involve
13  my role regarding PlainSite.  It seems like the
14  substance of each case is an attempt to -- I'm not
15  sure what the best word is, I don't know if it's
16  extort or affect my decision-making in order to
17  achieve an outcome that is related to PlainSite.
18     Q.   So you would admit that PlainSite is an
19  indirect party?
20     A.   Well, PlainSite is not a legal entity.
21          I would admit that PlainSite is the
22  subject largely of each of these dockets, and that
23  despite PlainSite being a registered trademark of a
24  corporation, I am still individually the party in
25  each docket.
```

1        Q.    Okay.

2        A.    Both things can be true.

3        Q.    What entity owns -- what entity or

4   individual owns PlainSite or operates PlainSite?

5        A.    Well, we've covered this, I think.

6              But Think Computer Corporation owns the

7   intellectual property that comprises PlainSite, and

8   I am the individual person who runs the site.

9              So...

10       Q.    By claiming these lawsuits relate to

11   failed lawsuits against PlainSite, are you, in fact,

12   stating that it's -- relates to failed lawsuits

13   against Think Computer Corporation?

14       A.    I suppose you can characterize it that way

15   if you'd like, but that's not really what I'm trying

16   to convey.   I don't think it has quite the same

17   meaning.

18              The meaning I'm trying to convey through

19   this tag is that these are lawsuits that

20   specifically involve attempts to remove records from

21   the public domain that have been published on this

22   website, which is a little bit different than failed

23   lawsuits against Think Computer Corporation as a

24   subject.

25              You know, Think Computer Corporation has

 1          So, again, the corporate involvement sort

 2   of takes a back seat in those kinds of situations.

 3       Q.    But for your involvement with PlainSite,

 4   would the defendant be contacting you?

 5       A.    Probably not.

 6             But, you know, if I had -- if I had

 7   decided in 2011 to do essentially what Aaron Swartz

 8   did and post court documents in my personal capacity

 9   with all the exact same features, then, you know,

10   maybe.  I don't know.

11             MR. GREENSPAN: Like it -- it seems like

12   sort of an irrelevant question.  I feel like the

13   court has already ruled that Think should be joined

14   to this case.

15             MS. ANDRADE: The court has not ruled that

16   --

17             MR. GREENSPAN: Well --

18             MS. ANDRADE: -- and we reserve all rights

19   to raise it.

20             MR. GREENSPAN: -- it denied your motion

21   for leave to --

22             MS. ANDRADE: It denied it because it was

23   not the right time.

24             Let's go off the record.

25             THE REPORTER: Off the record?

```
 1              Are you okay going off the record?
 2              MR. GREENSPAN: I don't really see a need
 3    to go off the record, but we can.
 4              (Recess taken)
 5    BY MS. ANDRADE:
 6         Q.   Okay.  During from 2017 to 2023, what
 7    state were you living in?
 8         A.   For most of that period, except for a few
 9    months, I was in California.
10         Q.   And except for the few months, where were
11    you located?
12         A.   Ohio.
13         Q.   Around what timeframe?
14         A.   It would have been June 2018 until
15    September 2018, the beginning of September.
16         Q.   Did your address change during that time
17    to Ohio?
18         A.   Yes.
19         Q.   And it's fair to say that you were no
20    longer living in California during June --
21         A.   Correct.
22         Q.   -- to September?
23         A.   My lease in California ended in June.  I
24    stayed with my parents for a few months, and then I
25    moved back to California at a new address.
```

 1   that each time he posted something about my being

 2   supposedly mentally ill or having committed fraud or

 3   being a criminal, or each time that he communicated

 4   on Twitter with Omar Qazi, or each time he contacted

 5   my partner's employer to try to get him fired, or

 6   each time he contacted the FBI, or specifically now

 7   Kash Patel, or any number of government officials

 8   encouraging them to take some sort of action against

 9   me.  And now that I have had the opportunity to

10   review some of the discovery documents that I

11   requested from you, I now know that he also was

12   contacting his probation officer about getting some

13   sort of special treatment from the FBI.

14           There were numerous, numerous situations

15   in which I felt threatened or anxious or deeply

16   concerned.  I had conversations with my partner

17   about what we would do if someone showed up at the

18   door with a gun, either your client himself or

19   someone who believed what he had written online.  We

20   plotted potential escape routes from our home just

21   in case that happened.

22           There was an episode where someone threw a

23   pair of what looked like children's shoes up on the

24   power line outside of our house, which is something

25   I wouldn't typically pay much attention to.  But

AARON GREENSPAN                    August 19, 2025                    134
88254

```
 1  somehow it came to my attention that that had

 2  happened, and it was just these shoes just hanging

 3  outside our front door.  And I looked up what that

 4  indicated, or, you know, why that happened.  Like

 5  how do shoes get on a power line like that?

 6              And it turns out that in some

 7  neighborhoods, that's a signal for a gang to like

 8  shoot up a house.  I had to tape together two brooms

 9  to get them down off the power line.

10              And yeah.  There were -- there was this --

11  the example where the name of my parents' former

12  synagogue where I got bar mitzvahed was posted on

13  Blacklist Report.  And although, you know, I was

14  successful in getting the Blacklist Report site

15  taken down in its entirety, I was able to save the

16  screenshot of that result on Google.  And, you know,

17  the timeframe during which I think that showed up,

18  and also the name of the synagogue that my parents

19  joined -- joined subsequent to that, that later

20  showed up, I think, separately on ComplaintsBoard.

21  And this was around the time that there was a

22  shooting at a synagogue in Philadelphia, I think.

23              So, you know, I think it's fair to say

24  that there were dozens, if not hundreds, of

25  instances where, you know, I could feel my heart
```

1   beating faster and my blood pressure going up

2   because this was legitimately scary stuff.  To say

3   nothing of the eventual explosion in hatred that

4   resulted when the Tesla cult caught on to these

5   things that had been posted in 2017, 2018, and 2019,

6   and 2020.

7       Q.   Why would you be in fear for your safety

8   if the FBI and IRS were contacted? Or any other, you

9   know, government entity.

10      A.   So several reasons:

11           First of all, during the Santa Clara

12  County proceedings, I became aware that your client

13  had hired a private investigator named John X.  Haro

14  -- H-a-r-o.  And, I mean, I'm sure private

15  investigators have a lot of different ways to look

16  into people, and some of those are legal and some of

17  those are not.  But in this particular instance, it

18  doesn't even really matter, because it was just so

19  obvious that this particular person was willing to

20  lie under oath.

21           And there was an incident where we had

22  been in court in Santa Clara County, and it was one

23  of the many hearings that took place.  I can't

24  remember exactly which one.  There were, like, at

25  least four of them.

1   restaurant, which was the other way.

2              And, you know, this all, like, "Who cares

3   where I was, right?" But the fact that he was just

4   making things up and filing them in court to try to

5   -- I'm not exactly sure what the goal was --

6   sanction me or convince the judge that I was

7   dangerous or whatever, the point is your client is a

8   fabulist, and he hires people who lie under oath.

9              And that combination, in conjunction with

10  federal law enforcement, scares the hell out of me,

11  because I don't know what he told the FBI.  I know

12  he talked to the FBI repeatedly, and I have a

13  reasonable basis to believe that he lied to them

14  repeatedly.  And if he told them that I was

15  dangerous, just as he told the Superior Court of

16  Santa Clara County that I owned a weapon -- which I

17  do not -- then they could show up at my house with

18  guns drawn and kill me.

19              That's why I'm afraid.

20       Q.   Did -- take it a step back.

21              Regarding the statement that my client had

22  stated in state documents that you had a weapon, is

23  that really by -- is that really what he stated in

24  that document?

25       A.   That is what the court interpreted it, and

AARON GREENSPAN                    August 19, 2025                    139
88254

```
 1            It was a waste of everyone's time, and
 2    everyone's money, and here we are today.
 3        Q.    How many complaints has my client filed
 4    against you?
 5        A.    You tell me.  I asked you for documents.
 6    You only gave me some of them.
 7        Q.    We complied with your request.
 8        A.    I disagree.
 9        Q.    Okay.  In general, if someone -- why do
10    you believe he was filing these complaints with
11    state agencies and/or federal agencies?
12        A.    Because he's a sick person.
13        Q.    Do you think -- is it logical to assume
14    that someone who goes out of their way to file these
15    complaints, and not only that seek relief in these
16    complaints, that they are in fear of the other
17    person?
18        A.    Well, if he's a paranoid schizophrenic, he
19    may very well be in fear, but that doesn't make his
20    complaints rational.
21        Q.    Does he -- could you reasonably see why
22    someone may believe that your -- your weapon is your
23    computer?
24        A.    No.  That is not a reasonable belief.
25        Q.    No?
```

1      A.   Yes:  "Aaron Jacob Greenspan is a lowlife

2 parasite."

3           Correct.  That's what's written.

4      **Q.   Okay.  When were you first informed of it?**

5      A.   I don't know.

6           I mean the date of the post is December

7 7th, 2017.  I don't think I saw it the same day it

8 was posted.  But probably within one to four weeks

9 after that, I would guess.

10          Excuse me.  Around -- around that

11 timeframe.

12     **Q.   What was the name of the user name that**

13 **posted that statement?**

14     **A.   Well, I wouldn't know because Blacklist**

15 **Report did not post user names adjacent to the**

16 **posts.  At least not based on my recollection.**

17          Some of these gripe sites are based on

18 WordPress templates, and, I mean, I -- I don't use

19 WordPress on a regular basis, but my general

20 impression is that you can configure it in different

21 ways.  And so some of them may have posted user

22 names.  But I think, by and large, that most of the

23 WordPress-based ones didn't.

24          ComplaintsBoard definitely posted user

25 names adjacent to the posts, and I believe

1  there were tags on Blacklist Report.

2          And so as I'm thinking about different

3  pages I saw in that site, I believe my name was

4  tagged.  My brother's name was tagged.  My parents,

5  PlainSite.

6          So I think maybe the synagogue name I was

7  talking about.

8          So I think it's reasonable to assume that

9  there were third parties who viewed those posts.  I

10 can't give you an exact number, but the posts were

11 intended to be seen, and I certainly found them

12 using search engines, not -- not knowing a priori

13 that they were out there.  So...

14     Q.   Okay.  Let me ask you another question.

15          Did the name Diego MasMarques appear on

16 any of these posts?

17     A.   If you're referring specifically to

18 Blacklist Report, I don't think so.

19          But as has been discussed in the

20 litigation, there was a specific post where Mr.

21 MasMarques' user name, as part of a Mac OS file

22 system path for an image, appeared directly in the

23 post, which suggested to me that somebody had

24 attempted to drag and drop an image into the post

25 but somehow -- whether they, like, clicked wrong or

AARON GREENSPAN                     August 19, 2025                     145
88254

1   the Java script for the site didn't work that time

2   for some reason -- instead of the image appearing

3   itself it was just a path to the image.

4              It's also possible that that's just not

5   how you're supposed to upload images.  Because I

6   never posted on the site, so I don't know what the

7   posting interface looked like, but, you know, it's

8   conceivable that there was a dedicated user

9   interface control to upload images.  And if you

10  tried to drag and drop, you would just end up

11  putting the image path in the text box, but as a

12  string of text, not the image.

13             Anyway, that string of text appeared, and

14  as Mr. MasMarques confirmed in court in Santa Clara

15  County, that matched his home laptop user name.

16       Q.   **What was the user name?**

17       A.   The word tech, t-e-c-h, all lower case.

18       Q.   **Just "tech"?**

19       A.   Just "tech."

20             Which is unusual for a user name because

21  most people would have, you know, their first name

22  or full name or some initial somewhere.  Most people

23  don't use a random word for their user name.

24       Q.   **What if they bought a refurbished Mac**

25  **computer? Is that conceivable?**

 1      A.   Is that the question?

 2           I mean, yeah, it's conceivable.  And

 3  apparently that is the explanation that your client

 4  gave to the court in California.  I'm not saying it

 5  can never happen.  I'm just saying that it's

 6  unusual.

 7      Q.   And when was that post?

 8      A.   I think it was late 27 -- sorry, late 2017

 9  or early 2018.

10      Q.   You mentioned Blacklist Report being taken

11  down.

12           What year was it taken down?

13      A.   I would have to look at my e-mail to be

14  sure, but I -- I think it was in late 2018.

15      Q.   In the post -- it's not even a post.

16           It was a statement to the Ohio Attorney

17  General, Complaint Number 1409784.  The quote reads:

18  "On April 4, 2018, Aaron Jacob Greenspan went to the

19  Santa Clara Superior Court in California and has

20  lied under oath.  He committed perjury in order to

21  obtain temporary restraining order against me and to

22  further harass, stalk, shame, defame and bully me

23  online."

24      A.   Is that a question?

25      Q.   Do you recognize that statement?

```
 1    there are a lot of points that you allege came from

 2    my client.

 3            But what posts do you specifically, like

 4    directly attribute to my client, and have proof of

 5    that?

 6        A.   Well, I think there is a portion of the

 7    first amended complaint that goes into some of that

 8    evidence, such as the server logs that were cross-

 9    referenced with one of the ComplaintsBoard posts.

10    Obviously, I would be in a better position to answer

11    your question if you had fully complied with my

12    discovery requests.  But since you didn't, I don't

13    have all the documents that I would need to obtain

14    that evidence.

15            And since your client has falsely stated

16    that he doesn't use social media, that also makes it

17    more difficult for me to properly attribute many of

18    the posts where I have a very strong belief, but the

19    information that would be conclusive evidence is in

20    the control of some other third party.

21            So we're still hashing that out, as you

22    know.

23        Q.   So if I'm understanding you correctly,

24    most of these posts you can't directly attribute to

25    my client?
```

AARON GREENSPAN                    August 19, 2025                          151
88254

```
 1        A.   Well, I mean, I don't know if "most" is
 2   accurate.
 3             Like the Ohio Attorney General complaint
 4   that you just read from, that I think has your
 5   client's name directly on it.
 6        Q.   Outside of the government entities and
 7   agency complaints.
 8        A.   Right.
 9             So then some of these from Reddit, from
10   ComplaintsBoard, many of them have some sort of
11   indication that they were posted by your client,
12   even if it's not conclusive.
13             But there are some other posts where it is
14   conclusive.  I mean, I regard the embedding of
15   someone's user name in a post when it's an unusual
16   user name and it's consistent for other reasons, I
17   regard that has conclusive.
18             I regard it as conclusive when there's a
19   server log that shows that the very first person who
20   accessed a URL on a certain day then used the same
21   URL in a post from that day.  And that IP address
22   matches the results from a subpoena or -- was that a
23   subpoena?
24             Yeah.  It was a subpoena to Comcast.
25             So there are -- there are conclusive
```

1  indicators for some of these, not all of them.  And

2  I know that is why we have discovery.

3          And I don't want to misattribute anything,

4  you know.  I don't want to pin something on your

5  client that he didn't do.  That's not my goal.  My

6  goal is to accurately reflect what he did do.  And

7  the challenge there is that he deliberately has made

8  it as difficult as possible to achieve that goal.

9          Because even a fraction of what I've

10 accused him of in a properly functioning society

11 would send him to jail for years.  But, you know, I

12 think he very much wants to avoid that outcome.

13          MS. ANDRADE: I would like -- I would like

14 to mark as Exhibit 5 -- this is the declaration

15 filed with the Santa Clara Superior Court.  It also

16 includes a police report that was filed in

17 Marlborough to the Marlborough Police Station.

18          (Document marked as Greenspan Exhibit 5

19 for identification)

20          THE WITNESS: Thank you.

21          Are we now done with Exhibits 2, 3 and 4?

22          MS. ANDRADE: Yes.  Sorry.

23          THE WITNESS: Okay.

24 BY MS. ANDRADE:

25      Q.  Do you recognize that document?

1  establishing civil issues involving libel and abuse

2  of process, but, you know...

3           MS. ANDRADE: I respectfully reject the

4  assertion.

5           MR. GREENSPAN: Okay.  Well, I'm just

6  noting the objection for the record.

7  BY MS. ANDRADE:

8       Q.   Okay.

9       A.   So the Marlborough Police, I was told,

10  worked with the district attorney's office in, I

11  think, Middlesex County, Massachusetts, to file a

12  criminal complaint against your client, alleging

13  that he had violated the restraining order against

14  him, and that he was in violation of Chapter 258e,

15  Section 9 of the Massachusetts General Laws.

16           You know, I did not draft their complaint.

17  I don't think I was even privy to a number of the

18  proceedings because of the unusual way that

19  Massachusetts criminal law works.  Much of the

20  proceedings are behind closed doors, basically.

21           My understanding of what happened later is

22  that the DA's office basically didn't have the

23  technical expertise to handle the task of

24  attributing posts to different authors, and they

25  didn't really know what to do with the case, and it

1   passed from assistant district attorney to assistant

2   district attorney, I think five or six times.

3              This was not what I was hoping for.  I did

4   not want more bureaucracy and confusion to make this

5   situation even more complex.  But that is apparently

6   what happened.

7              And at some point they realized that they

8   had ignored an e-mail I sent them in which I told

9   them that I did not think that your client had

10  actually posted a specific post where his name had

11  been used.  I think it had to do with "Dora the

12  Explorer" or something, where someone said something

13  like "Diego's going to shank Aaron," something to

14  that effect.

15             It was a clear reference to stabbing and

16  violence basically.  And that is, I guess -- I mean

17  I didn't fully understand this at the time, but I

18  guess that is the only reason why the police decided

19  to do something was because they could find one

20  reference to violence.

21             And so when they doubled back and looked

22  at that e-mail where I had told them I'm not sure

23  that is actually Diego's post, they unilaterally

24  decided to dismiss the case.  They did not ask for

25  my testimony.  They did not ask for my feedback.

 1       Q.    And regarding the conspiracy claim, is it
 2    your understanding that they agreed that they would
 3    post defamatory or pornographic materials about you?
 4       A.    I don't know.
 5       Q.    What do you believe that they agreed upon?
 6       A.    I believe they agreed that I was someone
 7    who needed to be, in their view, held to account.
 8    There was, for a while, a recurring kind of post
 9    that said that there was a -- a Proton Mail e-mail
10    address that had been set up to coordinate
11    effectively retaliatory action toward me.  I believe
12    it was something like
13    classactionlawsuit@protonmail.com.
14           And whether they were purely interested in
15    filing litigation or also thought that posts on
16    gripe sites were fair game, some of which clearly
17    were pretty extreme.  I'm trying to be diplomatic.
18           I don't know, but these posts did get
19    made, and that is one of the many reasons I decided
20    to contact the police, because I thought that this
21    was so extreme that it certainly did not seem like
22    it could be legal.
23       Q.    So you do agree that my client did not
24    post any pictures of you associated with pictures of
25    penises and swastika symbols drawn or placed on your

1  **face with comments that would lead someone to**

2  **believe that this author intends to or wishes to**

3  **harm you.**

4        A.   Well, I don't know, but I don't think that

5  the specific posts being referenced by Zachary

6  Attaway here were posted by him.

7             I do know that he posted images.  I don't

8  think that's even controversial at this point

9  because, as I said, his user name appeared on

10  Blacklist Report in place of an image that was

11  intended to be uploaded.  And while the images on

12  Blacklist Report were disturbing and libelous and

13  inappropriate, they weren't pornographic, and they

14  weren't antisemitic in the way that the images being

15  referenced here were.

16             So, you know, how far did your client go

17  with image editing? That's a question that I would

18  like an answer to, but I haven't gotten it yet.

19        **Q.   When did you become aware that these posts**

20  **were not attributed to my client?**

21        A.   I would have to look at my e-mail for the

22  exact date.  I think that, you know, whenever the

23  case was dismissed, it was -- well, actually,

24  because I e-mailed them and, as I said, they

25  basically disregarded my e-mail for months.  And so

1   this document.

2       A.    Yes.

3       Q.    Can you read that to yourself.

4       A.    Okay.

5       Q.    When you allege that someone else had

6   posted those image -- those pornographic images and

7   swastika symbols, do you mean it was -- who do you

8   mean it was?

9       A.    As best as I have been able to discern, it

10  was most likely ███████████████, which is spelled

11  Matthew, the normal spelling, ███████, ███████████

12  ████████.

13      Q.    Based off of the date, on May 13, 2019, it

14  appears that you knew that Mr. ███████ created

15  and posted some of the pornographic and Nazi-themed

16  images.

17            Is that correct?

18      A.    I think I did some analysis of one of the

19  images based on the fonts that were used, and the

20  conclusion that I reached was that the image had to

21  have been created on a Windows-based computer, if

22  I'm remembering correctly.

23            That was one of a few factors that led me

24  to conclude that it was actually not your client in

25  that specific instance, and that it was Mr.

1        Q.    No.  This relates -- this relates to the

2    criminal action, docket number --

3        A.    So as I said, I contacted whatever liaison

4    I was supposed to interact with on behalf of the

5    district attorney's office.  Because, you know, at

6    some point this gets handed up from the police to

7    the DA.

8        Q.    Correct.

9        A.    And I contacted the DA.

10       Q.    Did the DA contact you back?

11       A.    As I said, the first time I informed them

12   of what I had found, based on -- I was basically

13   doing their job for them.  I was doing technical

14   analysis of posts and images that they seemed to be

15   incapable of doing themselves.

16            And so when I informed them of what I had

17   found, they ignored me.  And then I reminded them

18   sometime later after I think there was another staff

19   changeover, and then they said, "Oh, we should have

20   paid attention to that before."

21            So whether it was submitted in the form of

22   a declaration in one court, which they could have

23   found themselves if they were paying attention, or

24   it was submitted directly to them by e-mail -- which

25   I also did -- I did what I could do.  I mean, I'm

1  County at the clerk's window.  You can see from the

2  filing stamp.  It was filed on December 6th, in

3  person.

4      **Q.   Okay.**

5      A.   And given the way that the court operates

6  in California, that would have become part of the

7  record.

8          I think it was a necessary action on my

9  behalf because there was some dispute in court

10  hearings about what was actually happening, and I

11  was trying to explain to the court that there

12  actually had been a criminal complaint issued, and I

13  believe Mr. MasMarques was denying that it was

14  issued or said it had been dismissed or something to

15  that effect.

16          And so in order to clarify for Judge

17  Overton what was going on in Massachusetts, a

18  jurisdiction where she had no authority or insight,

19  it -- it seemed completely rational and reasonable

20  to file copies of the documents from Massachusetts

21  in California where the restraining order had

22  actually issued.

23      **Q.   Was this declaration and the police report**

24  **and information relating to my client, including**

25  **driver's license and Social Security number, for any**

 1    **-- was any personally -- personal information**

 2    **regarding my client uploaded onto the Santa Clara**

 3    **court docket?**

 4         A.   It's possible.

 5         **Q.   Do you remember redacting the information**

 6    **before providing it to the clerk --**

 7         A.   No.

 8         **Q.   -- filing?**

 9         A.   Because that wouldn't be standard practice

10    in Santa Clara County.

11              The -- the judge would need to be able to

12    see personally identifying information about a

13    defendant or a party to a case, and it would be up

14    to the court to decide whether that needed to be

15    redacted.

16              And, in fact, when your client protested

17    that information was available on the court's

18    docket, I think the court addressed that.  And, to

19    the extent it was available on PlainSite, I

20    addressed that, and it was kind of a nonissue.

21              So, you know, things get redacted every

22    day in court.  This was one of those times when

23    things got redacted.

24              And you can see in the copy you just

25    provided me, his home address is redacted.  His

AARON GREENSPAN                    August 19, 2025                    190
88254

1  confounding factor, but I don't think that's

2  absolving your client of liability.  That is my

3  position.

4       Q.   Just for clarity, venture capitalists'

5  firms were not interested in investing in you up

6  until 2018 because of Mark Zuckerberg?

7       A.   Well, again, I'm not privy to every VC

8  firm's internal dialogue, right? But I know that

9  that was an issue for many VCs.  I know that, you

10  know, having any kind of dispute with one of the

11  entrepreneurs regarded as, whatever phrase you want

12  to use, the next Bill Gates, you know, someone who

13  had been very successful, that was not a good -- it

14  was not a good characteristic, or it was not a good

15  line to have on your resum., so to speak, you know.

16  I think it had been an issue.

17            I think after Cambridge Analytica, that

18  changed drastically.  I think investors began to

19  question whether he was flawless, and I just think

20  it became less of an issue if someone disagreed with

21  him, because people were disagreeing with him on

22  front-page headlines, like, all the time around

23  then.

24            And that was also around when he was

25  hauled before Congress.  Like there was -- like,

AARON GREENSPAN                    August 19, 2025                    198
88254

```
 1            And my argument is that today the company
 2  is worth much less, and this document is at least
 3  some sort of reference point for corporate value.
 4       Q.   Okay.  Are there any other valuations
 5  since the 2011?
 6       A.   There are no independent third-party
 7  valuations, the way that this was an independent
 8  third party.  Because, you know, these are
 9  expensive.  These are not something that you get for
10  free.  You have to pay a significant fees, and then
11  they'll perform the valuation.
12            But, you know, it doesn't even make sense
13  given how low the assets of the company are now to
14  perform a valuation because it just makes no
15  economic sense.
16       Q.   So who has performed any evaluation or
17  valuation for your company?
18       A.   I'm telling you this is the only one.
19       Q.   This is the only one?
20       A.   Yeah.  I mean, you can -- you can use
21  other methods to value companies, but this is the
22  only formal valuation that's been done.
23       Q.   And how are you valuing your company less
24  than the valuation in 2011?
25       A.   Based primarily on its balance sheet.
```

1      Q.    How does it relate to your damages?

2      A.    I think this article is illustrative of

3  the fact that software skills are highly valued;

4  and, in fact -- and I should say highly valued at

5  this particular moment in time.  I don't think that

6  this is going to last necessarily.

7            But, I mean, we are in the present, and so

8  when I'm saying that I think my time is worth $750

9  an hour, that pales in comparison with the kind of

10  hourly rates that we're seeing discussed openly in

11  the software industry right now.

12            So I think this sort of emphasizes how

13  conservative my estimates are.  I am not saying that

14  I think I'm going to make a $250 million paycheck.

15  Even though I went to school with Mark Zuckerberg

16  and reached a settlement with him and can be

17  properly credited with creating the initial version

18  of Facebook, I'm still not even saying that I belong

19  in this article.

20            So I think it just emphasizes that what I

21  am asking here is not unreasonable.  It is based on

22  math that is far easier to comprehend than the math

23  in this article.  Or at least the math implicit in

24  this article.

25            Yet this is a reflection of reality right

 1  now, so...
 2       Q.   So is it fair to say that you're using the
 3  math in this article to support the claim -- your
 4  damage -- your hourly rate as part of your damages
 5  at $750 an hour?
 6       A.   I'm saying I could double that rate and
 7  still not be as crazy as what people are paying for
 8  experienced software developers right now.
 9       Q.   Okay.
10       A.   And, like, again, I have this unusual
11  credential, if you to call it that, you know.  In
12  that Facebook timeline I believe you have Mark
13  Zuckerberg referring to me as one of the six
14  smartest people in the world at some point.  Which
15  is probably not true, and I don't know why he said
16  that, if he was just being an idiot as a college
17  student or if he really genuinely thought that or
18  what.  But, you know, Mark Zuckerberg is the same
19  guy paying 250 million salaries to people right now.
20  So if he thinks I am supposedly that smart, $750 an
21  hour is probably not completely crazy.
22       Q.   What is your current hourly rate?
23       A.   Well, I don't charge by the hour right
24  now, as I've I think explained in my document here
25  as Exhibit 11.  I mean, I -- I don't -- I don't do

1  work that is billed on an hourly basis.  So if I

2  were to do work on an hourly basis, I would start at

3  $750 an hour.

4          And, you know, the kind of work that I'm

5  doing defending myself against your client's

6  harassment campaign in courts in Massachusetts, in

7  California, legal work, as you know, is billed

8  hourly.  So that's a lot of time I've invested in

9  protecting myself.  And were I to be compensated for

10 the kind of work I've been doing at a reasonable

11 rate, I think 750 would be quite reasonable.

12         Q.   What is your annual gross income?

13         MR. GREENSPAN: I'm going to object on

14 relevance grounds because I don't think that my

15 damages are correlated with my income necessarily.

16 I mean they could be, but they could also --

17         MS. ANDRADE: You claim loss of time.

18         MR. GREENSPAN: Right.

19         But just because my time is valuable

20 doesn't mean that I get paid for every hour of the

21 year, especially because I'm not an attorney.

22         If I were an attorney, the law, I guess,

23 is quite different about how valuable people's time

24 is, even if it's the exact same work product.  But

25 -- and I obviously disagree with that case law, but

AARON GREENSPAN                    August 19, 2025                         207
88254

1   I don't think I can change it overnight.

2          THE WITNESS: So, you know, just noting

3   that objection, my income has fluctuated over the

4   years.

5          In 2018 it was close to a million dollars.

6   In subsequent years I decided to pay myself

7   considerably less because there are tax consequences

8   to paying yourself a large salary that initially I

9   didn't fully appreciate.

10          So in later years, I paid myself basically

11  just enough as I needed to pay my bills and my rent,

12  and it was sort of like more of a token salary.

13  But, you know, if you divide -- if you do assume

14  that I was paid every working hour of the year in ,

15  I think that hourly rate is around $450 an hour.

16  And so even if you disagree with my estimate of

17  being -- doing $750 an hour type work, and you want

18  to be conservative at 450, I think the damages are

19  still significant.

20  BY MS. ANDRADE:

21      Q.   Does the 1 million consist of just your W-

22  2 or does it include your salary, your -- in your

23  personal capacity? Or does it also include any

24  dividends by virtue of your position at Think

25  Computer Corporation?

1           So, again, this is why I lodged an

2    objection, because I don't think just looking at the

3    W-2 gets you very far in terms of understanding the

4    kind of damages here.

5           Q.    You mentioned two sources of income.

6                 What are the two sources of income?

7           A.    Think Computer Corporation, and Turing

8    Feynman, LLC.

9           Q.    Okay.  And at both companies do you just

10   receive a W-2?

11          A.    It's -- it's changed from year to year.

12                So there have been some years where I

13   think I got a W-2 from one, and some years where I

14   got a W-2 from the other.

15                MS. ANDRADE: Okay.  Okay.  I would like to

16   mark as Exhibit 18.

17                (Document marked as Greenspan Exhibit 18

18   for identification)

19                MS. ANDRADE: And Exhibit 19.

20                (Document marked as Greenspan Exhibit 19

21   for identification)

22   BY MS. ANDRADE:

23          Q.    Do you recognize those documents?

24          A.    I recognize certainly Exhibit 18.

25                Exhibit 19, yes.

 1              I recognize both documents.

 2        Q.    Can you describe what Exhibit 18 is?

 3        A.    Exhibit 18 is one of the sloppiest court

 4   orders I've ever seen.  It was written by Judge

 5   Carol Overton, signed on January 28th, 2020, denying

 6   my request for attorneys' fees and sanctions without

 7   a single citation to precedent, without any

 8   substantive analysis, and with, as I recall, a

 9   number of typos in the order, which is basically

10   three paragraphs long.

11        Q.    Can you read the paragraph beginning under

12   the title "Petitioner Aaron Greenspan's Motion for

13   Attorneys' Fees/Sanctions."

14        A.    Sure.

15              "As a preliminary matter with regard to

16   petitioner's request for attorneys' fees, petitioner

17   was not represented by counsel for the majority" --

18   excuse me -- "of the proceedings herein.  Petitioner

19   seeks attorneys' fees based on his counsel's limited

20   scope of representation."

21        Q.    Can you continue reading?

22        A.    Sure.

23              I would just note that that is a false

24   statement that is included in this court order.  If

25   you actually do the math, the judge is wrong.

1          "As to the merits of petitioner's motion

2    for attorneys' fees/sanctions, while respondent's

3    evidence and support of his cross-request suffered

4    from lack of cogency in its presentation, the Court

5    cannot reasonably conclude that it was frivolous

6    or baseless as petitioner contends.  Although in the

7    Court's judgment, respondent's evidence did not meet

8    the required burden of proof, it was not devoid of

9    factual basis/evidentiary support."

10          Q.    You can stop there.

11          And how did the court rule on your motion

12   for attorneys' fees and sanctions?

13          A.    Again, it ruled that the motion was

14   denied, but in violation of basic principles of due

15   process, and I don't think it's actually a valid

16   order as a result.

17          Q.    Okay.  And did you file a motion for

18   reconsideration?

19          A.    Yes, I did, I think, file one before the

20   same judge.

21          Q.    Okay.  And how was -- how did the court

22   rule on that motion?

23          A.    I believe it was denied, although I don't

24   have it in front of me, so I can't remember exactly

25   what that order said.

1      Q.   Actually, wait.  This is the motion for

2  reconsideration, so this was the final?

3      A.   Oh, is that -- yeah.  You're right.  It

4  says "respondent's motion to reconsider."

5           So it's three paragraphs for two motions

6  then, still no precedent.

7      Q.   Can you describe your memorandum in

8  support of motion for sanctions and reasonable

9  expenses including attorneys' fees?

10     A.   I guess how would you like me to describe

11 it? Like number of pages or...

12     Q.   The costs that you sought to be

13 reimbursed.

14     A.   So I outlined in detail with receipts

15 approximately $9,300 worth of costs, $7,700 in

16 attorneys' fees, $1,153.10 in transcript fees, plus

17 additional service of process fees, filing fees,

18 transportation, parking and office supplies and

19 postage.  All of which were fees that I actually did

20 incur or that, in one case, I think Think Computer

21 Foundation incurred.

22     Q.   Do you agree that you're also seeking

23 these same costs in this litigation?

24     A.   I do.

25           And it's completely reasonable because in

1  this litigation, Judge Casper ruled that there was a

2  plausible claim for abuse of process and for

3  malicious prosecution, which would suggest that it's

4  at least possible that Judge Overton -- who, again,

5  did not analyze the motion in any detail whatsoever

6  -- made an error.

7          And so, yeah, I think I'm entitled to be

8  compensated for the costs that I expended defending

9  myself against a completely frivolous counter-

10  request for restraining order, which your client

11  lost.

12      Q.   Which was a civil action, wasn't it?

13      A.   Yeah.  It was a civil harassment action.

14      Q.   And where did the malicious prosecution

15  come in?

16      A.   Malicious prosecution can refer to civil

17  proceedings, as far as I know.

18      Q.   I have a couple of more exhibits.  I know

19  we're running out of time.

20      A.   Again, I mean, the judge evaluated that

21  claim.  I think, if she believed there was no

22  substance, it would have been dismissed.

23          MS. ANDRADE: Can we mark -- actually can

24  we mark this as Exhibit 20.

25          (Document marked as Greenspan Exhibit 20

```
 1  for identification)

 2          MR. GREENSPAN: I hope you're not going to

 3  ask me to read that print.

 4          MS. ANDRADE: No.

 5          MR. GREENSPAN: That might be a bit small

 6  for me.

 7          Thank you.

 8  BY MS. ANDRADE:

 9      Q.    Attached as Exhibit 19 --

10          THE REPORTER: 20.

11  BY MS. ANDRADE:

12      Q.    -- 20 -- why do I keep doing that -- 20

13  are text messages -- text messages? Are Twitter

14  posts that took place in October 2018.

15          Do you recognize these posts?

16      A.    I do.

17      Q.    What are these posts of?

18      A.    These are posts from the former PlainSite

19  Twitter account that describe what was happening in

20  court in Santa Clara County at the time.  And they

21  reference newspaper articles that were translated

22  into English by Google Translate from Spanish about

23  your client.

24      Q.    Are there posts from your Twitter account

25  also included in that document?
```

1    A.    In this exhibit? Or in this first page you

2  mean?

3    Q.    In this exhibit.

4    A.    Yes.

5           Later in the exhibit there are some posts

6  from my personal account, former personal account.

7    Q.    And this was after you received a

8  harassment order against the defendant; is that

9  correct?

10    A.    I don't think so.  I think this was during

11  the period when we were still having hearings in

12  court about whether my request would be granted, or

13  his cross-request would be granted, or they would

14  both be granted.  So the final restraining order had

15  not issued yet, because that didn't happen until .

16    Q.    Had you served the defendant at that point

17  with --

18    A.    Yeah.  Well, I mean this was after he

19  filed his cross-request, or counter-request.

20           So he was definitely served, and he was

21  participating in the litigation at that point, so...

22    Q.    Do you -- do you refer to the defendant as

23  a "murderer" or a "rapist" in any of those posts?

24    A.    Well, I asked if you were going to require

25  me to read this, you know, one-point type.  I can't

1  really read the first page.

2          I do recall generally that I have referred

3  to Mr. MasMarques as a convicted murderer, because I

4  believe that he is a convicted murderer.  And I have

5  alluded to the -- the United States Department of

6  Justice documents that point out that he was accused

7  of rape.  I don't know that he was convicted for

8  rape, but there is documented evidence of that

9  accusation.

10      Q.   **Have you seen an official court record**

11  **convicting --**

12      A.   That's why I would use the word "alleged,"

13  but --

14      Q.   **Was he ever --**

15      A.   -- are you asking -- sorry.

16          Are you asking about the murder charge or

17  the rape accusation here?

18      Q.   **I'm asking about both.**

19      A.   So the conviction -- I think, as you know,

20  was transferred from Spain to the United States, and

21  I have examined multiple times the United States

22  criminal records that explicitly reference 18 USC ,

23  which is entitled "murder." And that word appears in

24  his court records.

25          And I have not seen the Spanish conviction

AARON GREENSPAN                August 19, 2025                        217
88254

1  documents, because I don't know if those are

2  publicly available or if they are expunged, as Mr.

3  MasMarques has claimed at various points.  Although,

4  you know, it's a little confusing because while we

5  were in court in California, I think he was also

6  saying at some point that it was not expunged, but

7  that he was working on it.  So I don't fully

8  understand the timeline of events there, and I have

9  not seen documents that would indicate whether he's

10 telling the truth or not.

11         But it doesn't really matter because so

12 long as his criminal record in the United States is

13 public, and as clear as it is, I think that is

14 plenty to go on for the statements that I've made.

15 **Q.   Have you been informed that his conviction**

16 **in Spain has been expunged?**

17      A.   I've been informed of a lot of things by

18 your client, and I would say that 99 percent of them

19 turn out not to be true.  So I can't trust what he

20 says.  That's just a fundamental issue.

21         If you'd like to provide the documents

22 from Spain that show an expungement, I'll happily

23 take a look.  I don't know that it's going to change

24 my mind about the fact that his United States

25 records are clearly public and available on PACER.

1  But in the interest of trying to resolve some part

2  of this dispute, I'm happy to examine documents if

3  you provide them.  You just haven't provided them.

4      **Q.   Do you think it is reasonable, after**

5  **getting a harassment order against another**

6  **individual, to then post repeatedly about this**

7  **individual referring to this individual as someone**

8  **who serially harasses and murders women?**

9      A.   Well, it's true.  It seems reasonable.  If

10  it's not true, then no, it wouldn't be reasonable.

11          Which page is this on?

12      **Q.   It would be on Page 3.**

13      **A.   Right.**

14          **So this was not out of the blue.  I**

15  **believe this thread was in response to your client**

16  **trying to get me booted off of Twitter.**

17          **And so, you know, just for context, this**

18  **was not just my posting information about your**

19  **client -- which, as far as I know, is true**

20  **information -- because I was trying to take some**

21  **sort of victory lap.  This was my, again, defending**

22  **myself against his attacks against my ability to**

23  **speak, which I really didn't appreciate.**

24      **Q.   Are those statements:  "...  serially**

25  **harasses, rapes and murders women," is that**

AARON GREENSPAN                    August 19, 2025                              219
88254

 1   **factually accurate?**

 2        A.   I believe it is.  "Serial" means in

 3   sequence, correct?  And harassing, raping and

 4   murdering is something that he's been either accused

 5   or convicted or reported to have done by multiple

 6   women.

 7        **Q.   Has he been convicted of murder, "yes" or**

 8   **"no"?**

 9        A.   Yes.

10        **Q.   Have you read the Spanish official court**

11   **records, "yes" or "no"?**

12        A.   I don't need to read a Spanish record to

13   read the record that is binding in this country.

14        **Q.   Has he been convicted of rape, "yes" or**

15   **"no"?**

16        A.   He was accused of rape, and that appears

17   in his criminal record, and I am entitled under the

18   First Amendment to refer to that record.

19        **Q.   You're entitled to call someone a rapist**

20   **when they haven't been convicted of a rape?**

21        A.   Well, if you'd like to take a legal action

22   against me in 2025 for this statement from 2018,

23   feel free, but I don't think you can anymore.

24             And this issue has already been litigated,

25   so I don't know why you're wasting the last few

1      A.   As with many of these attribution

2  challenges, this one I base on multiple factors.

3          So the first one is that anyone who has

4  spent any time analyzing your client's history will

5  be familiar with his preference for using lot of

6  numbers followed by one letter in his user names.

7  This is something he's done since 2017.  That's one

8  factor.

9          A second factor is the fact that in at

10 least one document that I believe I've provided to

11 you at this point he simply admits that it's him.

12 He just says that he was the one with the

13 restraining order in California involving -- and so

14 I'm paraphrasing, but one of these Tweets is just

15 like a flat-out admission.

16          So there's that.

17          There's the fact that this particular user

18 name, the Giza user name, is tied -- or at least at

19 the time that I checked -- was tied to a

20 protonmail.com account which I believe you have

21 admitted, or your client has admitted, through your

22 discovery responses is -- is a -- a match for all of

23 the available characters that you can see.  It's

24 either -- I think it's ▮▮▮▮▮▮▮ and

25 Twitter reveals the eight and the seven and the

1  number of characters, and the characters for the

2  domain name seem to match Proton Mail, and the

3  characters for the user name seem to match the ███.

4          So if you have someone admitting that it's

5  them, and the e-mail address matches, and they have

6  a similar user name style, and all the things they

7  talk about on Twitter seem to match the obsessions

8  that have been expressed in court, and they have the

9  same kind of pattern of capitalization nouns that's

10  common in German when your client is a dual German-

11  American citizen and grew up in part in Germany,

12  these things all tend to suggest that it's your

13  client.

14      Q.   Do you admit during this period you have

15  made several posts about my client?

16      A.   I'm sorry.  What is "this period"?

17      Q.   I guess 20 -- 20 -- 2018 through 2021.

18          You had made several posts about my

19  client?

20      A.   I mean, there were probably three or four

21  threads about him, I would guess.  But I don't think

22  that it was, like, a daily occurrence that I was

23  writing about your client.

24          My goal was to absolutely minimize the

25  amount of attention that I gave him publicly,

1  because I wanted nothing to do with him.  I didn't

2  want any retaliatory actions.  I didn't want to

3  think about him.

4         But that, you know, at the same time, when

5  he would do things like try to get me banned from

6  services or prevent me from driving legally or

7  report me for the, you know, who-knows-how-many-th

8  time to the IRS, like at some point you can't just

9  completely ignore what's going on.

10         But how is this exhibit -- I think we got

11  sidetracked with the user name.

12         How is this relevant?

13  **Q.   How wouldn't -- how wouldn't it be**

14  **relevant? You've claimed that --**

15     A.   Well, I don't know.  I mean, I haven't

16  actually -- this post by Omar is about some girl who

17  claims she blocked me.  As far as I know, this is a

18  total fabrication.

19         But I just -- I don't know what this

20  directly has to do with the case other than proving

21  that your client has communicated on social media

22  with Omar Qazi, which are two things that you have

23  denied, so...

24  **Q.   You can't attribute this user name to my**

25  **client; is that correct?**

 1      A.   I just did.

 2      **Q.   No.   You did in -- is there an IP? Do you**

 3  **have actual proof?**

 4      A.   I don't need an IP address.   I have an

 5  admission.

 6           And even if I did have an IP address, your

 7  client has been using VPNs for years.   And so, I

 8  mean, I don't know that the IP address would reveal

 9  too much after about 2019, except that it might be

10  the same VPN service your client has used, so...

11      **Q.   During this period, you and Omar Qazi are**

12  **-- are at odds; is that correct?**

13      A.   We still are, yes.

14      **Q.   And Omar Qazi has a decent following; is**

15  **that correct?**

16      A.   Yes.   He has hundreds of thousands of

17  followers on Twitter.   And even if I would estimate

18  that half of them are real, it's still hundreds of

19  thousands of followers.

20      **Q.   And given that you have made several posts**

21  **about my client alluding to the harassment order in**

22  **California, is it conceivable that Omar Qazi and his**

23  **followers had taken an interest in that conflict and**

24  **may have made posts, may have, I don't know,**

25  **attacked you with it more or less on social media?**

AARON GREENSPAN                    August 19, 2025                    225
88254

1        A.    Well, to be clear, my work unfortunately

2   has earned me more than my fair share of enemies.    I

3   know that.

4            The question isn't do a lot of people

5   dislike the work that I've done exposing companies

6   like Facebook and like Tesla.    That's not what this

7   case is about.    The case is about did your client

8   post this stuff?

9            And the answer is yes, he did.    He posted

10  not everything about me, and not those specific

11  pornographic issues, pornographic posts we were

12  discussing previously.    But he still, when you

13  remove those from the equation, he has still posted

14  thousands of libelous, inflammatory, bigoted, awful

15  things about me, my family, my relatives.    And he

16  has not just done that on social media and not just

17  done that on gripe sites, but has also, as you have

18  alluded to, sent those same conspiratorial,

19  fabricated, frankly insane rants to numerous

20  government agencies with real effects for me.

21            So I -- I don't think there's even any

22  controversy about whether your client is responsible

23  for some of these posts.    I mean, you haven't used

24  any of the documents I've provided you in this

25  deposition, but if you were to examine them, you

AARON GREENSPAN                    August 19, 2025                        226
88254

```
 1  would find that your client has kind of boxed
 2  himself in because he's just sort of admitted to
 3  some of this stuff.
 4              So...
 5      Q.    You admit that California -- the
 6  California harassment order was publicly available?
 7      A.    Correct.
 8      Q.    And you admit that you were repeatedly
 9  sharing links to that action?
10      A.    I'm not sure what you're referring to
11  there.
12      Q.    Well, in that Tweet, it does show links
13  through PlainSite, the previous one?
14      A.    Here (indicating)?
15      Q.    Yes.
16      A.    This is Exhibit --
17      Q.    Are there things --
18      A.    -- Exhibit 20 is what we're looking at.
19      Q.    Does it contain material attributed to the
20  California harassment order action?
21      A.    Yeah.
22              So this -- this says:  "We have posted
23  additional documents in Greenspan vs.  MasMarques."
24              And it links to the docket for that
25  California restraining order action.
```

AARON GREENSPAN                    August 19, 2025                    227
88254

```
 1            This is, again -- we covered this before
 2   -- this is --
 3       Q.   I understand that.
 4       A.   -- October 9th, I think, 2018, if I'm
 5   reading the tiny, tiny print correctly.
 6            This is, like -- it's at least two months
 7   before things with Omar really started to get
 8   heated, and probably three months.
 9            So, again, I don't think that he scrolled
10   back three months through Twitter.  That seems very
11   unlikely to me.  I do think that he Googled my name
12   and found the docket on PlainSite anyway.  So
13   whether it was through Twitter or whether it was --
14   I mean, this is sort of a moot point, right?
15       Q.   Would you admit that whether it be through
16   Twitter or through PlainSite, it's you who have --
17   who has made that California action readily
18   accessible for anyone to click on it and review?
19       A.   Yeah.  I admit that I posted the docket in
20   that case as a method of self-defense, because I
21   thought it was more important to have people be able
22   to access the truth than to keep it all concealed
23   and hope that I didn't get killed.
24            But the unfortunate reality is that people
25   like Omar Qazi exist.  And even when you put the
```

1    Q.   Can you -- can you read this -- on the

2    second page, can you read the first two posts?

3    A.   The second page?

4    Q.   Uh-huh.

5    A.   "Emboldened by Elon Musk Omar Qazi and

6    Melayna" -- M-e-l-a-y-n-a -- "Lokosky" -- L-o-k-o-s-

7    k-y -- "with whom he regularly interacts, Diego

8    MasMarques, Jr., is now inserting himself in

9    conversations on social media and writing fabricated

10   essays about how am I supposedly a child molester."

11   Q.   Can you read the next bubble underneath

12   it?

13   A.   The sub-tweet there?

14   Q.   Yeah.

15   A.   So this is my account, @AaronGreenspan,

16   replying to two accounts.  The first is @YatinKheti,

17   and the second is @Witches -- W-i-t-c-h-e-s -- today

18   -- t-o-d-a-y.  And it says:  "The account you are

19   interacting with belongs to Diego MasMarques, Jr.

20   He is a convicted murderer, and he has issued death

21   threats against me, aside from digging up documents

22   about my deceased relatives.  I highly suggest you

23   find something better to do with your time."

24   Q.   Who was inserting my client in these

25   conversations here?

1          MR. GREENSPAN: Objection, relevance.

2    BY MS. ANDRADE:

3        Q.   **Are you raising my client in your Twitter**

4    **post, "yes" or "no"?**

5        A.   There's some missing context here.

6             I have invoked the name of your client to

7    defend myself against sort of an army of pseudon --

8    sorry -- pseudonymous posters on Twitter who are

9    treating posts from your client as factual.

10            And again this is sort of a cherry-picked

11   series of posts that does not take into account this

12   full conversation with YatinKheti.  So if you were

13   to view the full conversation, I think you would see

14   that, as is usually the case when I feel the need to

15   bring up your client's name, I'm being attacked.

16   And your client has a habit of finding everyone who

17   has ever had anything bad to say about me and

18   communicating with them to egg them on and encourage

19   them to be even more aggressive.

20            So did I invoke your client's name here, I

21   absolutely did, because what other way do I have to

22   defend myself?

23       Q.   **Did you invoke his name unprovoked?**

24       A.   No.

25       Q.   **Was he a party --**

1    A.   The title is "Complaint Review:  Aaron

2  Greenspan, Plain Site" -- written as two separate

3  words -- "Think Computer Foundation" with all of

4  those separated by commas.

5    Q.   And further down in large font, can you

6  read the paragraph above "rebuttal," beginning with

7  "Aaron Greenspan"?

8    A.   "Aaron Greenspan, Plain Site" -- two words

9  -- "Think Computer Foundation" -- and this is kind

10  of a run-on sentence, so it doesn't really make

11  sense verbally, but -- "Aaron Greenspan, Plain

12  Site," again, "Think Computer Foundation," again

13  "tax fraud, fraudulent 501(c)(3)" -- "c" and "3"

14  in parentheses, "con artist, duped investors Shaker

15  Heights Ohio."

16    Q.   Underneath that, it states:  "Rebuttal

17  Individual responds:  Reply from Aaron Greenspan."

18    A.   Are you talking about the same page or the

19  next page?

20    Q.   The same page, just underneath that.

21         Is that correct?

22    A.   Oh, yeah.  It says:  "*Rebuttal Individual

23  responds: Reply from Aaron Greenspan," yes.

24    Q.   Looking at the rebuttal, which begins on

25  Page 4 --

AARON GREENSPAN                    August 19, 2025                    235
88254

1        A.    Yeah.

2        Q.    -- does that look familiar?

3        A.    Yes.

4        Q.    You wrote this rebuttal?

5        A.    Yeah.  I think so.

6              It's a little bit hard to read because

7   there's some overlapping text from the formatting of

8   the printout; but I think, nonetheless, this looks

9   like something that I posted in response.

10       Q.    Going back to the posting, do you agree

11  that, based off of the date being December 17th, ,

12  that allegations of tax fraud go back before you

13  even learned of my client?

14       A.    Yeah.  I think that's a fair statement.

15       Q.    Okay.  Do you agree that my client was not

16  the first to raise allegations of tax fraud, either

17  pertaining to you or PlainSite of Think Computer

18  Foundation?

19       A.    I don't know.  I'm not sure who wrote

20  this, so...

21       Q.    Okay.

22       A.    I don't know.

23       Q.    And then moving on to Exhibit 24, this is

24  --

25       A.    Sorry.  Is this all one exhibit?

CERTIFICATE

I, Alexander K. Loos, do hereby certify that I
reported all proceedings adduced in the foregoing
matter and that the foregoing transcript pages
constitutes a full, true and accurate record of said
proceedings to the best of my ability.

I further certify that I am neither related to
counsel or any party to the proceedings nor have any
interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand
this 3rd day of September, 2025.



Alexander K. Loos,

RDR, Notary Public

My Commission Expires: 05/05/28

```
 1              CORRECTION SHEET

 2   Deposition of: Aaron Greenspan    Date: 08/19/25

 3   Regarding: Greenspan vs. Masmarques, Jr.

 4   Reporter: Loos

 5   _____

 6   Please make all corrections, changes or

 7   clarifications to your testimony on this sheet,

 8   showing page and line number.  If there are no

 9   changes, write "none" across the page.  Sign this

10   sheet and the line provided.

11   Page  Line  Reason for Change

12    6     2    extra space after J. (AARON J. GREENSPAN)

13    6     7    extra space after J. (AARON J. GREENSPAN)

14   12     8    "that would take a long time *as* there's"

15   12    12    "do *that* off the"

16   16     1    "be concerned *if it* no longer *functioned*

17              because of something"

18   16    25    houseSYSTEM

19   17     1    houseSYSTEM

20   17    11    "And *I* met"

21   17    13    houseSYSTEM

22   17    15    "*he* registered the domain name"

23   17    19    "*1 and* 1/2 to I think $2 trillion"

24           Signature:  Aaron Greenspan

25                       Aaron Greenspan
     1 of 6
```

```
 1                      CORRECTION SHEET

 2   Deposition of: Aaron Greenspan     Date: 08/19/25

 3   Regarding: Greenspan vs. Masmarques, Jr.

 4   Reporter: Loos

 5   _____

 6   Please make all corrections, changes or

 7   clarifications to your testimony on this sheet,

 8   showing page and line number.  If there are no

 9   changes, write "none" across the page.  Sign this

10   sheet and the line provided.

11   Page   Line   Reason for Change

12    17     24    "I reached a settlement" (no "have")

13    20     24    "Facebook *case*" (???)

14    22      1    Winklevoss

15    33     19    "came my way"

16    42      8    "if people *were* always"

17    47      3    no comma

18    48      8    "*tiny* sliver"

19    57     15    "I probably say" (no "would")

20    57     18    "and *seeing* how"

21    58      8    "*Brandeis saying* that"

22    59     15    "lawsuit where I was *deposed*"

23    73     17    "*operates* PlainSite" (not "incorporates")

24                 Signature:

25                            Aaron Greenspan
     2 of 6
```

```
 1              CORRECTION SHEET

 2  Deposition of: Aaron Greenspan    Date: 08/19/25

 3  Regarding: Greenspan vs. Masmarques, Jr.

 4  Reporter: Loos

 5  _____

 6  Please make all corrections, changes or

 7  clarifications to your testimony on this sheet,

 8  showing page and line number.  If there are no

 9  changes, write "none" across the page.  Sign this

10  sheet and the line provided.

11  Page  Line   Reason for Change

12   90    23     extra space before period

13   97    3      "e-mail *me* personally"

14  109    23     DonRay

15  113    16     Westlaw

16  116    4      Lexis

17  116    5      Westlaw

18  116    8      Westlaw

19  121    20     18CH008067

20  128    3      aaron.greenspan@plainsite.org

21  130    13     "should *not* be joined"

22  135    13     extra space after X. (X. Haro)

23  137    2      "this *is* all"

24          Signature:  [signature: Aaron Greenspan]

25                      Aaron Greenspan

    3 of 6
```

```
 1                    CORRECTION SHEET
 2   Deposition of: Aaron Greenspan    Date: 08/19/25
 3   Regarding: Greenspan vs. Masmarques, Jr.
 4   Reporter: Loos
 5   _____
 6   Please make all corrections, changes or
 7   clarifications to your testimony on this sheet,
 8   showing page and line number.  If there are no
 9   changes, write "none" across the page.  Sign this
10   sheet and the line provided.
11   Page  Line   Reason for Change
12   137   25    "interpreted it *as*, and"
13   138   7     "gun" (should be in quotes)
14   143   1     "*does not use* WordPress"
15   144   6     "*Also* I think maybe the"
16   145   1     "the *JavaScript* for the site"
17   169   1     "*conduct*.  Whether it was the exact criminal *conduct*"
18   175   2     "*The* Social"
19   176   16    "Yeah, I don't know"
20   183   17    "versus" (lowercase)
21   186   5     extra space after F. (John F. Kennedy)
22   187   5     was running *my*
23   188   20    "in *2018*, just as this was all playing out"
24          Signature:  Aaron Greenspan
25                       Aaron Greenspan
     4 of 6
```

AARON GREENSPAN                    August 19, 2025                              247
88254

```
 1                      CORRECTION SHEET
 2   Deposition of: Aaron Greenspan    Date: 08/19/25
 3   Regarding: Greenspan vs. Masmarques, Jr.
 4   Reporter: Loos
 5   _____
 6   Please make all corrections, changes or
 7   clarifications to your testimony on this sheet,
 8   showing page and line number.  If there are no
 9   changes, write "none" across the page.  Sign this
10   sheet and the line provided.
11   Page   Line   Reason for Change
12   190    15     "resume"
13   195    20     "I'm also *including* Mark"
14   195    22     "May 22, *2009*"
15   196    5      "by *2018*"
16   205    19     "250 million *dollar* salaries"
17   207    14     "in *2018*"
18   215    15     "until *2019*"
19   216    22     "18 USC *1111*"
20   222    9      "capitalization *of* nouns"
21   232    15     "2022, *2023*, I think"
22   235    11     "December 17th, *2015*"
23   237    6-11   extra quotes
24             Signature:  Aaron Greenspan
25                         Aaron Greenspan
     5 of 6
```

```
 1                    CORRECTION SHEET
 2   Deposition of: Aaron Greenspan    Date: 08/19/25
 3   Regarding: Greenspan vs. Masmarques, Jr.
 4   Reporter: Loos
 5   _____
 6   Please make all corrections, changes or
 7   clarifications to your testimony on this sheet,
 8   showing page and line number.  If there are no
 9   changes, write "none" across the page.  Sign this
10   sheet and the line provided.
11   Page  Line   Reason for Change
12    238   12    remove extra "had he" at end of line
13    241   11    "possible that *he* had then filed"
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24             Signature: _____
25                        Aaron Greenspan
     6 of 6
```

1                            DECLARATION

2    Deposition of: Aaron Greenspan    Date: 08/19/2025

3    Regarding: AARON GREENSPAN vs DIEGO MASMARQUES

4    Reporter:  Alexander Loos

5    _____

6

7    I declare under penalty of perjury the following to be

8    true:

9

10   I have read my deposition and the same is true and

11   accurate save and except for any corrections as made

12   by me on the Correction Sheet herein.

13

14   Signed at _____ San Francisco , California _____

15   on the ____12th____ day of _____ September , 20_25_ .

16

17

18

19

20

21

22

23

24            Signature: _Aaron Greenspan_____

25                       Aaron Greenspan