**EXHIBIT L**
Relevant Excerpts from August 19, 2025 Deposition of Aaron Greenspan

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


AARON GREENSPAN,

          Plaintiff,

vs.           Civil Action No. 1:23-cv-10134-DJC

DIEGO MASMARQUES, JR., et al.,

          Defendants.

_____


DEPOSITION OF

AARON J. GREENSPAN

TAKEN ON

TUESDAY, AUGUST 19, 2025

10:05 A.M.

18 TREMONT

18 TREMONT STREET

BOSTON, MASSACHUSETTS 02108

1                           APPEARANCES

2

3  Pro Se Plaintiff:

4  Aaron Greenspan, Pro Se

5  956 Carolina Street

6  San Francisco, CA 94107

7  (913) 428-9873

8  Aaron.greenspan@plainsite.org

9

10  for Defendant Diego MasMarques, Jr.:

11  Ashley A.  Andrade, Esquire

12  Andrade Legal, LLC

13  867 Boylston Street, Fifth Floor, #1119

14  Boston, MA 02116

15  (617) 206-1822

16  Ashley@andrade-legal.com

17

18  ALSO PRESENT:

19  Tyler Cordeiro

20  Diego MasMarques, Jr.  (via videoconference)

21  Mark Nilson, Virtual Concierge (via videoconference)

22

23

24

25

1                        EXAMINATION INDEX

2                                                        PAGE

3

4    EXAMINATION BY MS. ANDRADE                          6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

EXHIBITS                                              PAGE

| 1  | AMENDED NOD | 117 |
| 2  | STATE CIVIL LAWSUIT WEBPAGE | 120 |
| 3  | STATE CIVIL LAWSUIT WEBPAGE | 120 |
| 4  | STATE CIVIL LAWSUIT WEBPAGE | 120 |
| 5  | DECLARATION | 152 |
| 6  | DECLARATION | 162 |
| 7  | CRIMINAL DOCKET – OFFENSES | 176 |
| 8  | FINDINGS AND ORDER ON PETITION | 176 |
| 9  | DISCLOSURES | 192 |
| 10 | AMENDED DISCLOSURES | 192 |
| 11 | COMPUTION OF DAMAGES | 193 |
| 12 | EMAIL DATED 02.27.2023 | 193 |
| 14 | EMAIL DATED 03.01.2024 | 193 |
| 15 | ARTICLE | 193 |
| 16 | COMMON EQUITY VALUATION AS OF 12.31.2011 | 194 |
| 17 | TIMELINE OF EVENTS | 194 |
| 18 | MOTION TO RECONSIDER | 209 |
| 19 | MEMORANDUM IN SUPPORT OF MOTION | 209 |
| 20 | DOCUMENTS POSTED IN PLAINSITE ON TWITTER | 213 |
| 21 | POSTS ON TWITTER | |

220

EXHIBIT INDEX CONTINUED

EXHIBITS                                           PAGE

22    POSTS ON TWITTER                             228

23    ARTICLE ON RIPOFFREPORT.COM                  233

24    EMAIL DATED 10.01.2021                       233

1                        DEPOSITION OF

2                     AARON J.  GREENSPAN

3                         TAKEN ON

4                 TUESDAY, AUGUST 19, 2025

5                       10:05 A.M.

6

7    AARON J.  GREENSPAN, a witness called for

8    examination by the Defendants, having been

9    satisfactorily identified by the production of his

10   driver's license and being first duly sworn by the

11   Notary Public, was examined and testified as

12   follows:

13            MS. ANDRADE: We are on the record for the

14   deposition of Aaron Greenspan.

15   DIRECT EXAMINATION

16   BY MS. ANDRADE:

17       Q.   Good morning, Mr. Greenspan.

18       I'm Ashley Andrade, counsel for defendant Diego

19   MasMarques.  You have been sworn in, and you are

20   under oath, which means you must answer questions

21   truthfully as you -- as if you were testifying in

22   court.

23            A few ground rules before we begin:

24            Please answer each question verbally so

25   the court reporter can record your testimony

1  California.  And I also don't know that ZIP code,

2  because this has all been a very quick succession of

3  moves in the past couple of months.

4       **Q.   Okay.  Before this -- this last address,**

5  **where?**

6       A.   Before that?

7       **Q.   Yeah.**

8       A.   You mean Roosevelt Way?

9       **Q.   Before Roosevelt Way.**

10      A.   For a few months I was not in the United

11  States, and prior to that I was at 956 Carolina

12  Street.

13      **Q.   How long were you at 956?**

14      A.   About six years, I want to say.  You know,

15  between -- I think between six and seven years.

16      **Q.   Okay.  What is your date of birth?**

17      A.   March 31st, 1983.

18      **Q.   What is your current occupation?**

19      A.   I'm a software developer.

20      **Q.   What is your primary source of income?**

21      A.   I would say it's the business that I run

22  from my software development efforts.

23      **Q.   And what business is that?**

24      A.   Think Computer Corporation.

25      **Q.   And you -- and do you own Think Computer**

1          Q.    Where did you grow up?

2                This is just some background.

3          A.    Right.

4                Most of my childhood was spent in the

5    Cleveland area, in Ohio.

6          Q.    Can you describe your educational

7    background, starting with the highest level of

8    education completed?

9          A.    So that gets into a question of how you

10   think about education, I suppose.

11               But although I don't have a graduate

12   degree, I was a CodeX fellow -- C-o-d-e-capital-X --

13   at Stanford Law School between 2012 and 2013.  It

14   was an unpaid fellowship.

15               I quit that fellowship before -- I'm not

16   sure if it ever really ends.  There are people who

17   are still CodeX fellows many years later.  But I

18   decided that the program was not particularly

19   supportive of legal transparency, so I left that.

20   But I still, you know, was a fellow for a time.

21               Prior to that, I attended college at

22   Harvard from September 2001 to June 2004.  I

23   graduated cum laude with advanced standing in three

24   years.  I have a degree in economics, I believe it's

25   an AB.

1      Prior to college, I went to Shaker Heights

2   High School in Shaker Heights, Ohio.

3      I'm not sure if you want anything more

4   than that, but...

5      Q.   No.   That's fine.

6      **Did you graduate Harvard?**

7      **A.   Yes.**

8      **Q.   And what year was that?**

9      **A.   Well, I was initially class of 2005, but I**

10   **graduated in 2004.**

11      Q.   Okay.   Have you received any specialized

12   training, licenses or certifications?

13      A.   I suppose I have not.

14      Q.   Did you receive anything from the

15   fellowship?

16      A.   I would -- no, it's not -- it's not a JD

17   program, so it's --

18      Q.   Oh.

19      A.   -- it's not something I would say a

20   license -- I mean, I spent time at the law school.

21   I also -- I guess I can mention I cross-registered

22   at the Massachusetts Institute of Technology when I

23   was at Harvard for a course on designing and leading

24   the entrepreneurial organization I believe it was

25   called.   I also audited a course at Harvard Law

1   college and I was speaking to high school students.

2          I mean, as I said, I'm not someone that's

3   frequently sought out as a speaker.

4          Q.    Have you testified -- have you testified

5   before a public committee or at a public hearing?

6          A.    I have.

7          Q.    Which ones?

8          A.    I provided written testimony to the Senate

9   Homeland Security Committee, if I'm remembering

10  correctly.  And I testified before the British

11  Parliament DCMS subcommittee.  And I think DCMS

12  stands for digital cultural media and sports, or

13  sport.  Something like that, I don't know.  That was

14  in 2019, regarding Facebook.

15         Q.    Regarding Facebook?

16         A.    Yeah.

17               I mean, to the extent that I have had

18  media exposure, I think it's fair to say is that

19  most of that has concerned Facebook.  There have

20  been other aspects to my career, but, you know, that

21  is by far, I think, the most frequent topic of media

22  attention.

23         Q.    What is frequently asked at these panels

24  or before the hearing in terms of Facebook?

25         A.    Are you referring to the British

1  operated it.

2       Q.   What about Think Computer Foundation?

3       A.   So for a time Think Computer Foundation

4  contributed records to PlainSite.  And some of those

5  records involved the payment of fees to courts in

6  order to obtain them.  So the foundation paid those

7  fees and then put them on PlainSite to make them

8  public.  I don't think that that counts as ownership

9  or operation.

10           I guess there may have been a period at

11  the very beginning in like 2011 where my friends and

12  I who were thinking about this were trying to figure

13  out how to make it all work.  And so, you know, it's

14  possible some of the extremely early pages stated

15  the foundation was running the site before court

16  records were even involved and this was just, like,

17  in the very early idea stage.

18           But I think really ever since the site

19  began charging subscription fees in 2012, it's been

20  owned by the corporation.

21           So, you know, at the point where there was

22  actually any real intellectual property to own, it's

23  been owned by the corporation.

24       Q.   That was since 2012?

25       A.   Yeah.

1      Q.   Was there a joint venture agreement

2   between --

3      A.   There was.

4      Q.   And when did that expire?

5      A.   I think 2021.

6      Q.   Is Think Computer Corporation still in

7   existence? Think Computer Foundation.   I'm sorry.

8      A.   No.

9      Q.   No?

10           When did -- when did that end?

11      A.   2021.

12      Q.   Why was it dissolved?

13      A.    It was dissolved because there was an

14   investigation, I believe, as the result of your

15   client's false complaints, by the Ohio Attorney

16   General's office.   And they asked me to shut it

17   down, but gave me the option of reincorporating it

18   in a different state.

19           And then I decided, rather than shut it

20   down and reincorporate, I would just shut it down

21   because people like your client had made the process

22   of doing basic work so difficult and onerous that it

23   just was not worth the added bureaucratic hurdles to

24   do that work.   So I figured I can just do the same

25   kind of work through a for-profit.

1  somehow it came to my attention that that had

2  happened, and it was just these shoes just hanging

3  outside our front door.  And I looked up what that

4  indicated, or, you know, why that happened.  Like

5  how do shoes get on a power line like that?

6          And it turns out that in some

7  neighborhoods, that's a signal for a gang to like

8  shoot up a house.  I had to tape together two brooms

9  to get them down off the power line.

10          And yeah.  There were -- there was this --

11  the example where the name of my parents' former

12  synagogue where I got bar mitzvahed was posted on

13  Blacklist Report.  And although, you know, I was

14  successful in getting the Blacklist Report site

15  taken down in its entirety, I was able to save the

16  screenshot of that result on Google.  And, you know,

17  the timeframe during which I think that showed up,

18  and also the name of the synagogue that my parents

19  joined -- joined subsequent to that, that later

20  showed up, I think, separately on ComplaintsBoard.

21  And this was around the time that there was a

22  shooting at a synagogue in Philadelphia, I think.

23          So, you know, I think it's fair to say

24  that there were dozens, if not hundreds, of

25  instances where, you know, I could feel my heart

1  beating faster and my blood pressure going up

2  because this was legitimately scary stuff.  To say

3  nothing of the eventual explosion in hatred that

4  resulted when the Tesla cult caught on to these

5  things that had been posted in 2017, 2018, and 2019,

6  and 2020.

7       **Q.   Why would you be in fear for your safety**

8  **if the FBI and IRS were contacted? Or any other, you**

9  **know, government entity.**

10      A.   So several reasons:

11           First of all, during the Santa Clara

12  County proceedings, I became aware that your client

13  had hired a private investigator named John X.  Haro

14  -- H-a-r-o.  And, I mean, I'm sure private

15  investigators have a lot of different ways to look

16  into people, and some of those are legal and some of

17  those are not.  But in this particular instance, it

18  doesn't even really matter, because it was just so

19  obvious that this particular person was willing to

20  lie under oath.

21           And there was an incident where we had

22  been in court in Santa Clara County, and it was one

23  of the many hearings that took place.  I can't

24  remember exactly which one.  There were, like, at

25  least four of them.

1              The hearing went on for multiple hours.

2    After the hearing was over, the practice was for a

3    bailiff to escort one party out of the courtroom and

4    outdoors, and then let the other party separately

5    follow outside.

6              And, you know, I didn't think anything of

7    this.  I was just planning to go home.  And I think

8    I was hungry, so I wanted to get something to eat on

9    the way home.

10             And there was a Jamaican restaurant not

11   far from the courthouse.  I don't remember if it was

12   on First Street or exactly what street it was on,

13   but the courthouse has an address on North First

14   Street.  And so I went from the courthouse door,

15   through the parking lot to this restaurant and

16   purchased my food and thought everything was fine.

17             And then I learned, not soon after, that

18   this guy had completely made up a story about how I

19   was not just running through the streets of San

20   Jose, but running in the opposite direction that I

21   had actually gone.  And that I had, like, delivered

22   your client some mean look that put him in fear.

23   Some utter nonsense.

24             And I have my receipt which I filed later

25   with the court to prove that I was at the

1  restaurant, which was the other way.

2         And, you know, this all, like, "Who cares

3  where I was, right?" But the fact that he was just

4  making things up and filing them in court to try to

5  -- I'm not exactly sure what the goal was --

6  sanction me or convince the judge that I was

7  dangerous or whatever, the point is your client is a

8  fabulist, and he hires people who lie under oath.

9         And that combination, in conjunction with

10 federal law enforcement, scares the hell out of me,

11 because I don't know what he told the FBI.  I know

12 he talked to the FBI repeatedly, and I have a

13 reasonable basis to believe that he lied to them

14 repeatedly.  And if he told them that I was

15 dangerous, just as he told the Superior Court of

16 Santa Clara County that I owned a weapon -- which I

17 do not -- then they could show up at my house with

18 guns drawn and kill me.

19         That's why I'm afraid.

20    Q.    Did -- take it a step back.

21         Regarding the statement that my client had

22 stated in state documents that you had a weapon, is

23 that really by -- is that really what he stated in

24 that document?

25    A.    That is what the court interpreted it, and

1  **there are a lot of points that you allege came from**

2  **my client.**

3           **But what posts do you specifically, like**

4  **directly attribute to my client, and have proof of**

5  **that?**

6       A.   Well, I think there is a portion of the

7  first amended complaint that goes into some of that

8  evidence, such as the server logs that were cross-

9  referenced with one of the ComplaintsBoard posts.

10  Obviously, I would be in a better position to answer

11  your question if you had fully complied with my

12  discovery requests.  But since you didn't, I don't

13  have all the documents that I would need to obtain

14  that evidence.

15           ==And since your client has falsely stated==

16  ==that he doesn't use social media, that also makes it==

17  ==more difficult for me to properly attribute many of==

18  ==the posts where I have a very strong belief, but the==

19  ==information that would be conclusive evidence is in==

20  ==the control of some other third party.==

21           So we're still hashing that out, as you

22  know.

23       **Q.   So if I'm understanding you correctly,**

24  **most of these posts you can't directly attribute to**

25  **my client?**

1  passed from assistant district attorney to assistant

2  district attorney, I think five or six times.

3          This was not what I was hoping for.  I did

4  not want more bureaucracy and confusion to make this

5  situation even more complex.  But that is apparently

6  what happened.

7          And at some point they realized that they

8  had ignored an e-mail I sent them in which I told

9  them that I did not think that your client had

10  actually posted a specific post where his name had

11  been used.  I think it had to do with "Dora the

12  Explorer" or something, where someone said something

13  like "Diego's going to shank Aaron," something to

14  that effect.

15          It was a clear reference to stabbing and

16  violence basically.  And that is, I guess -- I mean

17  I didn't fully understand this at the time, but I

18  guess that is the only reason why the police decided

19  to do something was because they could find one

20  reference to violence.

21          And so when they doubled back and looked

22  at that e-mail where I had told them I'm not sure

23  that is actually Diego's post, they unilaterally

24  decided to dismiss the case.  They did not ask for

25  my testimony.  They did not ask for my feedback.

1  Greenspan with pictures of penises and swastika

2  symbols drawn or placed upon to his face, with

3  comments that would lead someone to believe that

4  this author (Diego) intends to or wishes to harm the

5  individual."

6           Do you still believe my client wrote --

7  posted that material?

8       A.   Well, no.  A couple of things.

9           First this was written by, I guess,

10  Zachary Attaway, not by me.

11           Second, it says, "These posts." I don't

12  know exactly which posts he's referring to.

13           I mean the posts that specifically had

14  graphic pornography and swastikas, I don't think

15  that your client posted himself.  But I do think

16  that the person who posted them is someone your

17  client communicated with repeatedly, and that your

18  client was encouraging other people at the time this

19  was happening to attack me online.

20           So whether or not he posted them himself

21  for the purposes of this action is not dispositive

22  because there is a conspiracy claim that is active.

23  And I -- I don't know exactly who posted them, but I

24  have a good hunch that it was a specific individual

25  he was speaking with.

1      Q.    Let's go to damages.

2            You've said these statements have hurt

3      your reputation.

4            Could you give me an example of a specific

5      situation where that happened?

6      A.    Well, again, I think we covered a bit of

7      this phenomenon earlier.

8            People don't always tell you exactly why

9      they're reacting a certain way, but there have been

10     e-mails, as I've said, that I've received that cite

11     ComplaintsBoard posts that I believe originated with

12     your client.  There was the Elon Musk situation

13     where he sent a screenshot of one of these posts as

14     part of an e-mail exchange.

15           I have made efforts to raise venture

16     capital.  No one is guaranteed venture capital, of

17     course, but I have some connections to particularly

18     prominent venture capitalists who, based on the way

19     that we met, you would expect would have been

20     willing to follow up, even in a perfunctory way.

21           For example, in December of 2018, one of

22     my friends invited me onto the private boat of John

23     Doerr, D-o-e-r-r.  He's probably one of the two most

24     prominent venture capitalists in history.  He

25     invested in Google, among other companies.

1          And, you know, this was not just a typical

2    five-, ten-minute VC meeting where they ask, "How

3    can I help," and then you pitch your company, and

4    then you leave.  This was an entire afternoon spent

5    on the former yacht of John F.  Kennedy with one of

6    the most powerful people in Silicon Valley.

7          And, you know, I thought that we had a

8    pleasant afternoon, played a board game.  I think I

9    beat him in that board game astonishingly.  You

10   know, had the opportunity to actually have some

11   substantive conversations, not just, you know,

12   typical VC chitchat, and followed up by thanking him

13   for the opportunity, you know, to spend that time in

14   what was, you know, a really special place.  Like I

15   never expected to be invited onto a yacht, let

16   alone, you know, a boat with that historical

17   significance.  And sent him some pictures.  We had

18   talked about exchanging pictures.

19          Never heard a thing.  Not a word.

20          And this was in December 2018, when both

21   this sort of outing took place, and when I first

22   followed up, which was kind of around the peak of

23   all this really awful sort of reputation-destroying

24   activity.

25          And, you know, John Doerr is a very busy



1    guy.  I have no illusions that he was just waiting

2    for my e-mail.  That's not what I am arguing.

3              What I am arguing is that if he had any

4    inclination about discussing technology or

5    investment or the fact that I was running the

6    company and that he had already invested in my

7    friend's company, and that there were certain

8    commonalities between my friend and I, which is why

9    I got invited in the first place, that never

10   happened because the first thing that he would have

11   asked someone to do was find out more about this

12   guy.  And as soon as you do that, you run into the

13   world of Diego MasMarques.

14             So, you know, can I say for certain that

15   is what happened? No, I am not privy to John Doerr's

16   decision-making.  But, again, this was not a typical

17   meeting.  This was the kind of opportunity that very

18   few people get, and even with the rare ability to

19   converse with and enjoy an afternoon with someone of

20   that stature, it was not productive.  And I -- I

21   suspect that these posts are a large reason why.

22             Again, never heard a word back.  Just I

23   can't remember every word of that afternoon and

24   every conversation, but, like, this was one of these

25   things were I thought I was on good terms with



1  someone; we had a good rapport, and then just radio

2  silence.

3          Similar phenomenon with probably the other

4  best-known venture capitalist in Silicon Valley,

5  Michael Moritz.

6          With Mr. Moritz, you know, I could get him

7  to respond to e-mails about anything but investment,

8  essentially.  And this is also unusual.

9          I mean, if I were in your shoes, I would

10  say, "Well, Aaron, you've got a complicated history.

11  You have all this background with Facebook," as

12  we've discussed.  "How do you know that these

13  powerful individuals just don't want to have

14  anything to do with you because of Facebook? Maybe

15  that's it.  Maybe it's not Diego MasMarques.  Maybe

16  it's not the thousands of posts slandering you and

17  libeling you.  Maybe it's just you've got that

18  background," right?

19          The thing is, there was a paradigm shift

20  in , just as this was all playing out.  In 2018,

21  Cambridge Analytica happened, and because of the

22  disclosures of this whistleblower -- I think

23  Christopher Wylie was his name, W-y-l-i-e -- double-

24  check that, though -- the media narrative around

25  Facebook and Mark Zuckerberg went from sort of



1   unadulterated praise -- is that the right word -- to

2   really pretty intense criticism overnight.

3            People who had long been fans of Mark

4   Zuckerberg suddenly realized, "Oh, maybe this guy

5   isn't quite perfect.  Maybe he's actually

6   responsible for some shady stuff." And many people

7   who knew sort of the saga that I've been through

8   came to me saying, "Wow." You know, "You've really

9   been validated here." Like, "You have been calling

10  this forever, and now finally people are starting to

11  pay attention."

12           And that was kind of the sense that I got,

13  that people who were previously on team Facebook

14  were now thinking twice.

15           So finally I had this opportunity.  I

16  mean, I wasn't directly clearing my name.  Some

17  exogenous event happened that finally made it

18  possible for me to go to VCs and be, like, "Yeah,

19  this whole thing happened.  That was a long time

20  ago.  And, look.  I've been proven correct.  We can

21  now put that behind us and move forward."

22           But at the same time that was happening, I

23  had your client posting all over the internet saying

24  I was psychotic, which really didn't help.

25           So just to be clear, I'm aware of this

1 confounding factor, but I don't think that's

2 absolving your client of liability.  That is my

3 position.

4      Q.  Just for clarity, venture capitalists'

5 firms were not interested in investing in you up

6 until 2018 because of Mark Zuckerberg?

7      A.  Well, again, I'm not privy to every VC

8 firm's internal dialogue, right? But I know that

9 that was an issue for many VCs.  I know that, you

10 know, having any kind of dispute with one of the

11 entrepreneurs regarded as, whatever phrase you want

12 to use, the next Bill Gates, you know, someone who

13 had been very successful, that was not a good -- it

14 was not a good characteristic, or it was not a good

15 line to have on your resum., so to speak, you know.

16 I think it had been an issue.

17          I think after Cambridge Analytica, that

18 changed drastically.  I think investors began to

19 question whether he was flawless, and I just think

20 it became less of an issue if someone disagreed with

21 him, because people were disagreeing with him on

22 front-page headlines, like, all the time around

23 then.

24          And that was also around when he was

25 hauled before Congress.  Like there was -- like,

1  work that is billed on an hourly basis.  So if I

2  were to do work on an hourly basis, I would start at

3  $750 an hour.

4          And, you know, the kind of work that I'm

5  doing defending myself against your client's

6  harassment campaign in courts in Massachusetts, in

7  California, legal work, as you know, is billed

8  hourly.  So that's a lot of time I've invested in

9  protecting myself.  ==And were I to be compensated for==

10 ==the kind of work I've been doing at a reasonable==

11 ==rate, I think 750 would be quite reasonable.==

12         Q.   **What is your annual gross income?**

13         MR. GREENSPAN: I'm going to object on

14 relevance grounds because I don't think that my

15 damages are correlated with my income necessarily.

16 I mean they could be, but they could also --

17         MS. ANDRADE: You claim loss of time.

18         MR. GREENSPAN: Right.

19         But just because my time is valuable

20 doesn't mean that I get paid for every hour of the

21 year, especially because I'm not an attorney.

22         If I were an attorney, the law, I guess,

23 is quite different about how valuable people's time

24 is, even if it's the exact same work product.  But

25 -- and I obviously disagree with that case law, but

1  I don't think I can change it overnight.

2          THE WITNESS: So, you know, just noting

3  that objection, my income has fluctuated over the

4  years.

5          In 2018 it was close to a million dollars.

6  In subsequent years I decided to pay myself

7  considerably less because there are tax consequences

8  to paying yourself a large salary that initially I

9  didn't fully appreciate.

10          So in later years, I paid myself basically

11  just enough as I needed to pay my bills and my rent,

12  and it was sort of like more of a token salary.

13  But, you know, if you divide -- if you do assume

14  that I was paid every working hour of the year in ,

15  I think that hourly rate is around $450 an hour.

16  And so even if you disagree with my estimate of

17  being -- doing $750 an hour type work, and you want

18  to be conservative at 450, I think the damages are

19  still significant.

20  BY MS. ANDRADE:

21      Q.   Does the 1 million consist of just your W-

22  2 or does it include your salary, your -- in your

23  personal capacity? Or does it also include any

24  dividends by virtue of your position at Think

25  Computer Corporation?

1  number of characters, and the characters for the

2  domain name seem to match Proton Mail, and the

3  characters for the user name seem to match the 8587.

4        So if you have someone admitting that it's

5  them, and the e-mail address matches, and they have

6  a similar user name style, and all the things they

7  talk about on Twitter seem to match the obsessions

8  that have been expressed in court, and they have the

9  same kind of pattern of capitalization nouns that's

10 common in German when your client is a dual German-

11 American citizen and grew up in part in Germany,

12 these things all tend to suggest that it's your

13 client.

14     **Q.   Do you admit during this period you have**

15 **made several posts about my client?**

16     A.   I'm sorry.  What is "this period"?

17     **Q.   I guess 20 -- 20 -- 2018 through 2021.**

18       **You had made several posts about my**

19 **client?**

20     A.   I mean, there were probably three or four

21 threads about him, I would guess.  But I don't think

22 that it was, like, a daily occurrence that I was

23 writing about your client.

24       My goal was to absolutely minimize the

25 amount of attention that I gave him publicly,

1                        CERTIFICATE

2

3        I, Alexander K. Loos, do hereby certify that I

4    reported all proceedings adduced in the foregoing

5    matter and that the foregoing transcript pages

6    constitutes a full, true and accurate record of said

7    proceedings to the best of my ability.

8

9        I further certify that I am neither related to

10   counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13       IN WITNESS HEREOF, I have hereunto set my hand

14   this 3rd day of September, 2025.

15

16                    

17

18

19               Alexander K. Loos,

20               RDR, Notary Public

21               My Commission Expires: 05/05/28

22

23

24

25

1            CORRECTION SHEET

2   Deposition of: Aaron Greenspan      Date: 08/19/25

3   Regarding: Greenspan vs. Masmarques, Jr.

4   Reporter: Loos

5   _____

6   Please make all corrections, changes or

7   clarifications to your testimony on this sheet,

8   showing page and line number.  If there are no

9   changes, write "none" across the page.  Sign this

10  sheet and the line provided.

11  Page  Line   Reason for Change

12   6     2      extra space after J. (AARON J. GREENSPAN)

13   6     7      extra space after J. (AARON J. GREENSPAN)

14   12    8      "that would take a long time *as* there's"

15   12    12     "do *that* off the"

16   16    1      "be concerned *if it* no longer *functioned*

17                because of something"

18   16    25     houseSYSTEM

19   17    1      houseSYSTEM

20   17    11     "And *I* met"

21   17    13     houseSYSTEM

22   17    15     "*he* registered the domain name"

23   17    19     "*1 and* 1/2 to I think $2 trillion"

24          Signature:  _Aaron Greenspan_

25                  Aaron Greenspan

1 of 6

```
 1                     CORRECTION SHEET
 2    Deposition of: Aaron Greenspan    Date: 08/19/25
 3    Regarding: Greenspan vs. Masmarques, Jr.
 4    Reporter: Loos
 5    _____
 6    Please make all corrections, changes or
 7    clarifications to your testimony on this sheet,
 8    showing page and line number.  If there are no
 9    changes, write "none" across the page.  Sign this
10    sheet and the line provided.
11    Page  Line  Reason for Change
12    17    24    "I reached a settlement" (no "have")
13    20    24    "Facebook *case*" (???)
14    22    1     Winklevoss
15    33    19    "came my way"
16    42    8     "if people *were* always"
17    47    3     no comma
18    48    8     "*tiny* sliver"
19    57    15    "I probably say" (no "would")
20    57    18    "and *seeing* how"
21    58    8     "*Brandeis saying* that"
22    59    15    "lawsuit where I was *deposed*"
23    73    17    "*operates* PlainSite" (not "incorporates")
24          Signature:  [signature]
25                     Aaron Greenspan
      2 of 6
```

```
 1                    CORRECTION SHEET

 2  Deposition of: Aaron Greenspan     Date: 08/19/25

 3  Regarding: Greenspan vs. Masmarques, Jr.

 4  Reporter: Loos

 5  _____

 6  Please make all corrections, changes or

 7  clarifications to your testimony on this sheet,

 8  showing page and line number.  If there are no

 9  changes, write "none" across the page.  Sign this

10  sheet and the line provided.

11  Page  Line   Reason for Change

12  90    23     extra space before period

13  97    3      "e-mail *me* personally"

14  109   23     DonRay

15  113   16     Westlaw

16  116   4      Lexis

17  116   5      Westlaw

18  116   8      Westlaw

19  121   20     18CH008067

20  128   3      aaron.greenspan@plainsite.org

21  130   13     "should *not* be joined"

22  135   13     extra space after X. (X. Haro)

23  137   2      "this *is* all"

24          Signature: Aaron Greenspan

25                 Aaron Greenspan
```

3 of 6

1          CORRECTION SHEET

2     Deposition of: Aaron Greenspan     Date: 08/19/25

3     Regarding: Greenspan vs. Masmarques, Jr.

4     Reporter: Loos

5     _____

6     Please make all corrections, changes or

7     clarifications to your testimony on this sheet,

8     showing page and line number.  If there are no

9     changes, write "none" across the page.  Sign this

10    sheet and the line provided.

11    Page  Line   Reason for Change

12    137   25     "interpreted it *as*, and"

13    138   7      "gun" (should be in quotes)

14    143   1      "*does not use* WordPress"

15    144   6      "*Also* I think maybe the"

16    145   1      "the *JavaScript* for the site"

17    169   1      "*conduct*.  Whether it was the exact criminal *conduct*"

18    175   2      "*The* Social"

19    176   16     "Yeah, I don't know"

20    183   17     "versus" (lowercase)

21    186   5      extra space after F. (John F. Kennedy)

22    187   5      was running *my*

23    188   20     "in *2018*, just as this was all playing out"

24           Signature: _Aaron Greenspan_____

25                       Aaron Greenspan

4 of 6

1        CORRECTION SHEET

2   Deposition of: Aaron Greenspan      Date: 08/19/25

3   Regarding: Greenspan vs. Masmarques, Jr.

4   Reporter: Loos

5   _____

6   Please make all corrections, changes or

7   clarifications to your testimony on this sheet,

8   showing page and line number.  If there are no

9   changes, write "none" across the page.  Sign this

10  sheet and the line provided.

11  Page   Line   Reason for Change

12   190    15     "resume"

13   195    20     "I'm also *including* Mark"

14   195    22     "May 22, *2009*"

15   196    5      "by *2018*"

16   205    19     "250 million *dollar* salaries"

17   207    14     "in *2018*"

18   215    15     "until *2019*"

19   216    22     "18 USC *1111*"

20   222    9      "capitalization *of* nouns"

21   232    15     "2022, *2023*, I think"

22   235    11     "December 17th, *2015*"

23   237    6-11   extra quotes

24        Signature: *Aaron Greenspan*

25              Aaron Greenspan

5 of 6

1                  CORRECTION SHEET

2  Deposition of: Aaron Greenspan    Date: 08/19/25

3  Regarding: Greenspan vs. Masmarques, Jr.

4  Reporter: Loos

5  _____

6  Please make all corrections, changes or

7  clarifications to your testimony on this sheet,

8  showing page and line number.  If there are no

9  changes, write "none" across the page.  Sign this

10  sheet and the line provided.

11  Page  Line  Reason for Change

12   238   12    remove extra "had he" at end of line

13   241   11    "possible that *he* had then filed"

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24        Signature: Aaron Greenspan

25             Aaron Greenspan

6 of 6

1            DECLARATION

2    Deposition of: Aaron Greenspan    Date: 08/19/2025

3    Regarding: AARON GREENSPAN vs DIEGO MASMARQUES

4    Reporter:  Alexander Loos

5    _____

6

7    I declare under penalty of perjury the following to be

8    true:

9

10   I have read my deposition and the same is true and

11   accurate save and except for any corrections as made

12   by me on the Correction Sheet herein.

13

14   Signed at _____ San Francisco , California _____

15   on the ___12th___ day of _____ September , 20_25_ .

16

17

18

19

20

21

22

23

24            Signature: _Aaron Greenspan_____

25                       Aaron Greenspan