AARON GREENSPAN,

     Plaintiff,

v.

DIEGO MASMARQUES, JR. a/k/a DIEGO
MAS HOWARD a/k/a RICKY MAS MARQUES
a/k/a JACK JONES, SERGEI IGOREVICH
KUDRIAVTSEV, MEDIOLEX, LTD., and
ASTRAD, LTD.,

     Defendants.

Case No.: 1:23-cv-10134-DJC

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT DIEGO MASMARQUES, JR.'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Civil Local Rule 56.1, Plaintiff Aaron Greenspan submits this Amended Response to Defendant Diego MasMarques, Jr.'s Statement of Uncontested Material Facts In Support Of Motion For Summary Judgment as to which Defendant MasMarques claims there is no genuine issue to be tried. This amended version corrects typographical errors, features additional citations to the record relative to the previous version and is supported by a supplemental declaration of Aaron Greenspan. There are no substantive changes.

## I.  GENERAL FACTS

### A.  The Parties

1.  At all relevant times, Defendant is a private individual residing in the Commonwealth of Massachusetts. MasMarques Decl. ¶ 62.

**Response**:  Undisputed.

1

2.     Plaintiff Aaron Greenspan ("Plaintiff") is a resident of California, except for a brief period from June through September 2018 when he temporarily lived in Ohio.  *See* Declaration of Ashley A. Andrade ("<u>Andrade Decl.</u>"), Ex. 1 ((Deposition of Aaron Greenspan, Aug. 19, 2025) ("<u>Pl. Dep.</u>") at 131:6–25).

**<u>Response</u>**:     Undisputed.

3.     Plaintiff is the founder and sole owner of Think Computer Corporation ("<u>TCC</u>"), which operates plainsite.org ("<u>Plainsite</u>"), and the manager of Turing Feynman, LLC.  *See* Andrade Decl., Ex. 1 (Pl. Dep. 9:20–10:5, 11:10–18, 73:16–21); *id*. (Pl. Dep. 209:5–8) (Plaintiff testified these entities are his sources of income); Doc. No. 54 (First Amended Complaint ("<u>FAC</u>") ¶¶ 1–4).

**<u>Response</u>**:     Undisputed.

4.     Plaintiff previously owned Think Computer Foundation ("<u>TCF</u>"), a 501(c)(3) nonprofit that was previously in a joint partnership with TCC which ended in 2021–the year TCF dissolved after an investigation by the Ohio AG that Plaintiff blamed on Defendant's "false complaint."  *See* Andrade Decl., Ex. 1 (Pl. Dep. 74:2–9, 75:1–25).

**<u>Response</u>**:     Plaintiff disputes this "fact" insofar as individuals do not own non-profit organizations in the same way that they do for-profit corporations.  Ohio Revised Code § 1702.01(C).  Plaintiff previously founded Think Computer Foundation.  ECF No. 270 ¶ 2.

5.     Defendant communicated with Plaintiff only through Plaintiff's business email or phone and has no personal ties to him, his family, friends, or colleagues.  *See* MasMarques Decl. ¶ 71; Andrade Decl., Ex. 1 (Pl. Dep. 130:3–10) (Plaintiff admitted that Defendant would have had no reason to contact him if not for Plainsite).  *See* FAC, at 48 (FAC lists Plaintiff's contact email as a plainsite.org address).

**Response**:    Plaintiff disputes this "fact" insofar as he did not have separate personal and business telephone numbers at all relevant times.  Plaintiff did not own a cell phone at all relevant times and used an iPod Touch with Skype through a single telephone number as his personal and business phone.  Once Skype was discontinued by Microsoft, Plaintiff separated his personal and business telephone numbers.  ECF No. 274-1 ¶ 2.

### B.    Plaintiff's Public Activities

6.    Plaintiff describes himself as an advocate of legal transparency and "data journalist," reporting on government policy, corporate wrongdoing, macroeconomics, and the justice system, publishing extensive investigative reports, and publicly criticizing government officials based on his findings.  *See* Andrade Decl., Ex. 1 (Pl. Dep. 20:13–15, 27:24–28:12, 55:22–57:8); Doc. No. 226, Ex. C, at 9 (Pl. Rule 26(a)(1)(A)(iii) Computation of Damages ("Pl. Rule 26 Damages")) (marked as Pl. Dep. Ex. 11, at 9) (Plaintiff states that his data journalism "work has affected many hundreds of millions of people").

**Response**:    Undisputed.

7.    Plaintiff is a published author, hosts a podcast, and maintains an active social media and personal website.  Andrade Decl., Ex. 1 (Pl. Dep. 28:17–29:2, 54:15–55:21).

**Response**:    Undisputed.

8.    Plaintiff has been asked to speak on panels and has been interviewed 50 to 100 times, including by major media outlets, such as *The New York Times*, *Wall Street Journal*, *CNBC, and Reuters*—with a *New York Times* piece about Plaintiff as recently as October 31, 2025.  *See id*. (Pl. Dep. 24:2–8; 25:1–23); *see id*. Ex. 21 (*What If You Spent Every Waking Moment Taking on Elon Musk?*, N.Y. Times, Oct. 31, 2025); FAC ¶ 4.

**Response**:     Plaintiff disputes this "fact" insofar as his work involves communicating with journalists about a wide variety of topics, often behind the scenes and off the record concerning subjects completely unrelated to Plaintiff but with which Plaintiff could assist due to his ability to query records on PlainSite about a variety of subjects.  Not every one of the "50 to 100 times" described was on-the-record or a formal interview, and not every one of those times was for an interview about Plaintiff.  ECF No. 274-1 ¶ 3.

9.     Plaintiff provided written testimony to the U.S. Senate Homeland Security Committee and testified before the British Parliament's Subcommittee on Department for Digital, Culture, Media and Sport.  *See id*. (Pl. Dep. 26:4–16, 26:23–27:9).

**Response**:     Undisputed.

10.     Plaintiff has engaged in public disputes and litigation with high–profile figures including Mark Zuckerberg and Elon Musk, and has been a party to at least 40 personal legal actions—including against the SEC, DOJ, FBI, CIA, DEA, and the Federal Reserve—as well as roughly 40 additional legal actions through his wholly-owned company, TCC.  *Id*.  (Pl. Dep. 18:20–19:9, 20:23–21:20, 29:24–30:16, 31:15–20); *id* (Pl. Dep. 60:23–61:8) (Plaintiff has filed about 100 FOIA Requests); *id*. (Pl. Dep. 225:1–3) (Plaintiff admitted his work has earned him "more than [his] fair share of enemies").

**Response**:     Plaintiff disputes this "fact" insofar as it misstates Plaintiff's August 19, 2025 deposition testimony, deliberately or otherwise.  In fact, Plaintiff stated,

> "I think I've probably been involved in 20-something different dockets in my personal capacity.  But it's also important to realize that many of those dockets revolve around the same dispute.  So, for example, with your client, there's something like eight dockets now, but they're all the same core dispute.  The -- the Facebook issue has had its share of docket numbers, but those are all the same dispute."

Plaintiff's Deposition Transcript at 60:6-15.  An analysis of Plaintiff's litigation history, involving cases that name Aaron [Jacob] Greenspan as a party, reveals five (5) core legal disputes each covering multiple dockets:

1. an inaccurate book and subsequent movie about Facebook's origins (4 dockets);

2. harassment and libel by Diego MasMarques, Jr. (6 dockets excluding 1 expunged criminal docket with which Plaintiff was involved but was not a named party);

3. harassment and libel at the behest of Elon Musk and Tesla, Inc. based in part upon harassment and libel by Diego MasMarques, Jr. (5 dockets);

4. various public-interest lawsuits involving Freedom of Information Act and/or public records law or rule violations (8 dockets);

5. defense against various individuals upset with their records being published on PlainSite (4 dockets).

Beyond those five core legal disputes, Plaintiff has been personally involved in three (3) small claims actions about unrelated topics over a period of eighteen years.  ECF No. 274-1 ¶ 4.

An analysis of Think Computer Corporation's litigation history, involving cases that do not also name Plaintiff personally as a party and excluding United States Patent and Trademark Office Trademark Trial and Appeal Board procedural requests for extensions of time (which are assigned unique case numbers), reveals six (6) core legal disputes, each covering multiple dockets:

1. a trademark dispute with a company in Irvine, CA that began calling itself "Think Computer Products" shortly after Plaintiff's company was incorporated (3 dockets);

2. a dispute with Mark Zuckerberg and Facebook, Inc. over Facebook's origins and intellectual property (3 dockets);

3. a trademark dispute with United Business Media, LLC, which began using the name "Think Services" without permission (4 dockets);

4. a dispute with the formerly-named California Department of Financial Institutions over the constitutionality of the California Money Transmission Act of 2010, which was subsequently amended twice due in part to the litigation and Plaintiff's lobbying (3 dockets);

5. a patent dispute with Square, Inc. over Think's patented mobile payment technology, which it copied without permission (3 dockets);

6. defense against various individuals upset with their records being published on PlainSite (11 dockets);

Beyond those seven core legal disputes, Think Computer Corporation has been involved in three (3) small claims actions about unrelated topics and one (1) trademark opposition proceeding over a period of eighteen years. ECF No. 274-1 ¶ 5.

Thus, the sum total of the number of unique core legal issues connected to Plaintiff personally and Think Computer Corporation is ten (10), while the total number of involved uniquely numbered dockets across both legal entities, which is misleading, is fifty-seven (57). ECF No. 274-1 ¶ 4-5.

### C.   PlainSite

11.   Plainsite indexes and makes available approximately 17-18 million case dockets to thousands of daily users. FAC ¶ 2; Andrade Decl., Ex. 1 (Pl. Dep. 72:18–73:15) (Plaintiff testified Plainsite's purpose is to "make the legal system more open and accessible to the public").

**Response**:      Undisputed.

12.   Plainsite publishes public court records which include criminal proceedings, bankruptcy filings, and other potentially sensitive topics. *See id.* (Pl. Dep. 87:19–88:3).

**Response**:      Undisputed.

13.   Plaintiff exclusively controls Plainsite's content—including what is posted or removed and any updates to the privacy policy governing that process—and testified that he does

not believe he has ever acted outside that policy. *See id*. (Pl. Dep. 86:14–87:8, 88:3–90:6); Doc. No. 54 (FAC ¶¶ 2, 9).

**Response**:     Undisputed.

14.     Plaintiff anticipated some level of criticism for creating Plainsite. Andrade Decl., Ex. 1 (Pl. Dep. 111:22–112:6); *id*. (Pl. Dep., 112:16:113:6) (Plaintiff understands "to an extent" why some people would be angry at having their court records publicly accessible).

**Response**:     Undisputed.

15.     Plainsite has received approximately 25,000 takedown requests and estimates that 50–75% were denied. See id. (Pl. Dep. 103:21–24, 105:18–107:3). He conceded that people get upset and even admits that a "very small number of people...are more persistent and worrisome" and have responded to the denial with threats "to sue or physically" harm him, with some even filing lawsuits against Plaintiff personally or TCC. *See id*. (Pl. Dep. 107:4–109:12).

**Response**:     Undisputed.

16.     Plaintiff is aware of at least 20 consumer complaints to government entities arising from denials of takedown requests and testified that "about half" of those complaints "echo whatever is written on Complaints Board." *See id*, (Pl. Dep. 106:11–107:11).

**Response**:     Undisputed.

17.     Plainsite allows paid users to "tag" docket pages with labels intended to "accurately reflect the opinion" of the user, and Plaintiff admitted that he personally added tags such as "Failed Lawsuits Against Plainsite" and "First Amendment" to three legal actions involving both himself and Defendant. *Id*. (Pl. Dep. 118:1–119:4, 121:16–122:14, 123:4–124:24); id. Exs. 2–4 (Pl. Dep. Exs. 2–4).

**Response**:     Undisputed.

**D.     Defendant's Spanish Conviction & Treaty Transfer**

18.     Spain reintroduced jury trials in 1995.  *See* MasMarques Decl. ¶ 3.

**Response**:     Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding the Spanish legal system and Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion.  ECF No. 274-1 ¶ 6.  Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

19.     In 2000, Defendant was convicted in Spain [redacted] Defendant has always maintained his innocence.  *Id*. ¶ 2.

**Response**:     Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding the details of Defendant MasMarques's Spanish conviction or his continuous conduct thereafter and Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion.  ECF No. 274-1 ¶ 6.  Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters.  ECF No. 274-1 ¶ 7.  Plaintiff further disputes this "fact" because public records indicate that Defendant MasMarques's crime in Spain was equated to "Murder" in the United States pursuant to 18 U.S.C. § 1111.  *USA v. MasMarques*, Case No. 1:09-cr-10304-MLW, ECF No. 1-3 at 4-6 (D. Mass filed October 15, 2009).

20.     [Redacted]  *Id*. ¶ 4-5.

**Response**:     Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding the Spanish legal system and regarding the details of Defendant MasMarques's Spanish

conviction or his continuous conduct thereafter and Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion. ECF No. 274-1 ¶ 6. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

21.    [Redacted] Defendant agreed to complete the remainder of his sentence in the United States under a foreign-prisoner treaty transfer. *Id*. ¶¶ 6-7.

**Response**:    Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding the Spanish legal system and regarding the details of Defendant MasMarques's Spanish conviction or his continuous conduct thereafter and Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion. ECF No. 274-1 ¶ 6. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

22.    At the time of his transfer in 2006, the initial treaty transfer paperwork prepared by the Department of Justice inaccurately described the foreign conviction as [redacted]. Defendant raised concerns as he was not convicted of [redacted] under Spanish law and was informed that it is standard practice to list the highest comparable U.S. offense in treaty transfer paperwork and then the USPC will be responsible for reviewing and reclassifying under federal sentencing guidelines. *Id*. ¶ 8.

**Response**:    Plaintiff disputes this "fact" insofar as the public record contradicts these assertions. *USA v. MasMarques*, Case No. 1:09-cr-10304-MLW, ECF No. 1-3 at 4-6 (D. Mass filed October 15, 2009). Plaintiff disputes this "fact" insofar as Defendant MasMarques has

never attempted to raise such concerns on the record.  ECF No. 1-6; Case No. 1:23-cv-10134-DJC Case Docket.

23.     In 2008, the USPC reclassified the conviction as [redacted] under U.S. law, essentially cutting Defendant's sentence in half, though Defendant disputed parts of USPC's determination and its description of the Spanish conviction as [reacted]".  *Id*. ¶ 9.

**Response**:     Plaintiff disputes this "fact" insofar as the public record contradicts these assertions.  *USA v. MasMarques*, Case No. 1:09-cr-10304-MLW, ECF Nos. 1-2, 1-3 (D. Mass filed October 15, 2009).  Plaintiff disputes this "fact" insofar as Defendant MasMarques has never filed evidence of any such "reclassifi[cation]" on the record.  Case No. 1:23-cv-10134-DJC Case Docket.

24.     After his 2008 release Defendant married his longtime partner and focused on family. Id. ¶ 10.

**Response**:     Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding Defendant MasMarques's personal and/or family life and Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion.  ECF No. 274-1 ¶ 8.

25.     In January 2013, Defendant moved to seal or expunge the court dockets relating to his foreign prisoner treaty transfer, concerned they could be misunderstood or used to harm him; the motion was denied in September 2015.  *Id*. ¶ 11.

**Response**:     Undisputed.

26.     Shortly thereafter he discovered that records of his treaty transfer and Spanish conviction were posted on websites including leagle.com and later plainsite.org, while he was preparing to seek expungement in Spain, for which he became eligible in 2016; Spain formally expunged the conviction in December 2020. See MasMarques Decl. Id. ¶¶ 12, 14, 56.

**Response**: Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding Defendant MasMarques's discovery of the fact that public records are public and also lacks knowledge of any expungement of any conviction(s) in Spain, as Defendant MasMarques has provided no documents in the discovery phase of this action to support this assertion. ECF No. 274-1 ¶¶ 6, 9.

E.     **Defendant's Complaints To Government Agencies**

27.     Defendant made multiple written complaints to state and/or federal agencies regarding the publication of his court records—including his treaty transfer records which misrepresented his foreign conviction—and personal information online, including, inter alia, concerns that Plaintiff and his business entities—TCC and TCF—were monetizing and misusing the 501(c)(3) nonprofit designation, including, but not limited to:

   a.   the Arkansas Attorney General's Office in February 2017 (MasMarques Decl. ¶ 13 (Defendant contends the complaint primarily concerned leagle.com); Doc. No. 54-5, at 2);

   b.   the Internal Revenue Service ("IRS") on August 29, 2017 (MasMarques Decl. ¶ 18; Doc. No. 54-5, at 3);

   c.   the FBI in July 2017 (MasMarques Decl. ¶ 19);

   d.   the IRS on December 14, 2017 (MasMarques Decl. ¶ 21; Doc. No. 54-5, at 7–8);

   e.   the IRS on April 2, 2018 (MasMarques Decl. ¶ 24; Doc. No. 54-5, at 9);

   f.   the Delaware Attorney General on April 3, 2018 (MasMarques Decl. ¶ 25; Doc. No. 54-5, at 10).

**Response**: Plaintiff disputes this "fact" insofar as Plaintiff lacks knowledge regarding Defendant MasMarques's purported complaints for which he has refused to turn over documents in the discovery phase of this action. ECF No. 274-1 ¶ 10. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under

oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7. For example, ECF No. 54-5 at 2 contains a letter signed by "Liz Garcia," an "Investigator" at the Consumer Protection Division within the Office of the Attorney General for the State of Arkansas, but it is not clear if Liz Garcia is the same person as the purported "Investigator Elizabeth Lopez" referred to in ¶ 13 of the Declaration of Defendant MasMarques. ECF No. 54-5 at 2.

28.     Plaintiff first learned about Defendant's complaints "probably in 2017" after being contacted by the Arkansas Attorney General. Andrade Decl., Ex. 1 (Pl. Dep. 80:3–81:4).

**Response**:     Undisputed.

### F.     TRO Filings

29.     On April 4, 2018, Plaintiff sought a temporary restraining order ("<u>TRO</u>") against Defendant in Santa Clara County Superior Court ("<u>Santa Clara Court</u>") in San Jose, California, alleging harassment, which the Court granted. *See* FAC ¶ 62; MasMarques Decl. ¶ 27.

**Response**:     Undisputed.

30.     From April to December 2018, Defendant made additional complaints to government agencies concerning Plaintiff and his businesses, including the U.S. Attorney General in May 2018 and the Ohio Attorney General on June 24, 2018. *See, e.g.*, FAC ¶ 73; Doc. No. 54-5, at 13–15; MasMarques Decl. ¶¶ 29, 30.

**Response**:     Undisputed.

31.     On July 3, 2018, Defendant obtained a cross-TRO against Plaintiff in Santa Clara Court, prohibiting Plaintiff from posting or accessing Defendant's personal information online. *See* MasMarques Decl. ¶¶ 31-32.

**Response**:     Plaintiff disputes this "fact" insofar as the word "obtained" might suggest that Defendant MasMarques's request for a Cross-Temporary Restraining Order automatically granted under California law based on his false assertion(s) about Plaintiff possessing a "weapon" and having made threats of violence, was evaluated and granted due to any kind of substantive merit.  ECF No. 274-1 ¶ 11.  Plaintiff further disputes this "fact" in that the Cross-Temporary Restraining Order granted and its progeny did not prohibit Plaintiff "from posting or accessing Defendant's personal information online," as doing so would have been unconstitutional, as Superior Court Judge Carol Overton later acknowledged and told Defendant MasMarques on the record.  ECF No. 1-6 at 397:19-23.

32.     Despite this, on July 20, 2018, Plaintiff posted on his and Plainsite's Twitter accounts–@plainsite and @aarongreenspan– what he framed as a "NOTICE" naming Defendant directly and threatening to seek sanctions unless Defendant withdrew his TRO.  MasMarques Decl. ¶ 33; Andrade Decl., Ex. 1 (Pl. Dep. 69:4–9, 70:2–6).

**Response**:     Plaintiff disputes this "fact" insofar it omits that California Code of Civil Procedure § 128.5(f)(1) requires "notice and a reasonable opportunity to respond" and that Plaintiff was complying with California law by providing Defendant MasMarques with both. California Code of Civil Procedure § 128.5(f)(1).

33.     On or about October 4, 2018, Defendant filed a complaint with the California Department of Motor Vehicles after multiple attempts to serve his TRO on Plaintiff. MasMarques Decl. ¶¶ 34–36; Doc. No. 54-5, at 16 (affidavit of process server describing multiple service attempts and learning from the tenant at the residence address that Plaintiff had moved).

**Response**:      Plaintiff disputes this "fact" insofar as Defendant MasMarques has refused to turn over documents in the discovery phase of this action and thus Plaintiff has no knowledge of the precise date of the complaint filed with the California Department of Motor Vehicles. ECF No. 274-1 ¶ 10.  Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters.  ECF No. 274-1 ¶ 7.

34.      On October 9, 2018, the day Plaintiff was served with Defendant's cross–TRO, Plaintiff posted on his personal and Plainsite's Twitter accounts, sharing a link to the TRO on Plainsite—disclosing Defendant's name, home address, and his wife's workplace—and also posted Defendant's photographs and translated Spanish media articles about Defendant's now-expunged 2000 conviction; Twitter later suspended both accounts.  MasMarques Decl. ¶¶ 37–38, 40; Andrade Decl., Ex. 1 (Pl. Dep. 214:15–215:6) (Plaintiff admitted publishing these posts); *id*. Ex. 5 (Pl. Dep. Ex. 20).

**Response**:      Plaintiff disputes this "fact" insofar as Plaintiff was never served with the specific Cross-Temporary Restraining Order in question and thus waived service at a hearing in Santa Clara County on October 9, 2018.  ECF No. 1-6 at 21:11-13, 139:1.  Plaintiff further disputes this "fact" insofar as Defendant MasMarques is the party who initially "disclosed" his own name, home address and wife's workplace by writing them down on a public record he then filed in a court of law.  Case No. 18CH008067 Form CH-100 Dated July 3, 2018.  Plaintiff further disputes this "fact" insofar as Twitter, Inc. subsequently restored Plaintiff's Twitter accounts and admitted in writing that any suspension involving speech about Defendant MasMarques had been made in error.  ECF No. 237-9 at 17.  Plaintiff further disputes this "fact"

because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

35. On or about October 10, 2018, Defendant filed a report with the Marlborough Police Department regarding Plaintiff's posts. MasMarques Decl. ¶ 39.

**Response**: Undisputed.

36. On or about October 18, 2018, Plaintiff posted on both Twitter accounts referring to Defendant by name and stating that he "serially harasses, rapes, and murders women"; Twitter suspended both accounts shortly thereafter. MasMarques Decl. ¶ 41; Andrade Decl., Ex. 5; *id*. Ex. 1 (Pl. Dep. 218:12–219:23) (Plaintiff admitted to publishing these posts).

**Response**: Plaintiff disputes this "fact" insofar as Twitter, Inc. subsequently restored Plaintiff's Twitter accounts and admitted in writing that any suspension involving speech about Defendant MasMarques had been made in error. ECF No. 237-9 at 17. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

37. Defendant has never been convicted of murder, attempted murder, rape, stalking, or attempted vehicular homicide, and has no documented history of mental illness. MasMarques Decl. ¶ 65. Andrade Decl., Ex. 1 (Pl. Dep. 216:2–217:20) (Plaintiff admitted he has not seen official records of Defendant's Spanish conviction, was informed of its expungement, and does not know whether Defendant was convicted of rape).

**Response**: Plaintiff disputes this "fact" insofar as Defendant MasMarques hinges his denial(s) upon immaterial semantic differences inherent in Spanish-to-English translations. ECF No. 1-6 at 59:7-21. Plaintiff further disputes this "fact" insofar as it is contradicted by public

records, including but not limited to statements in the public record of *USA v. MasMarques*, Case No. 1:09-cr-10304-MLW (noting at ECF No. 1-2 at 5, "you shall be subject to the Special Mental Health Aftercare Condition that requires you to participate in an in-patient or an out-patient mental health program as directed by your U.S. Probation Officer" and further noting that Defendant MasMarques had been charged with "rape").  Plaintiff further disputes this "fact" insofar as it has been reported in the news media that Defendant MasMarques was convicted of a crime similar to attempted vehicular homicide in Spain (see *Periódico de Ibiza y Formentera*, "El acusado de matar a Tatiana fue detenido otras dos veces por golpear a mujeres: El sospechoso del último crimen por malos tratos ocurrido en Balears posee una condena de un juzgado" ["The accused of killing Tatiana was arrested another two times for hitting women: The suspect in the latest domestic abuse crime in the Balearic Islands has a prior conviction from a court"] dated December 20, 1999, stating in Spanish as translated to English, "Since moving to Mallorca, Diego Mas has been convicted once for chasing another ex-girlfriend and ramming her with his car.  The sentence, dated November 30th of last year, was handed down by Judge Antoni Rotger of the Palma Criminal Court No. 1.  The judge found him guilty of a minor offense of causing injury.  The events occurred on October 16, 1997.  The court ruling states that Diego Mas was driving his car when he noticed his ex-partner.  The woman was in a car driven by another man.  Diego Mas initiated a chase.  Mas rammed the man with his car, causing abrasions and bruises to his right hand and left thigh.  The victim in this case asserted that Mas had subjected him to a distressing situation after their breakup.").  ECF No. 269-2 at 19-20. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters.  ECF No. 274-1 ¶ 7.

### G. The Criminal Complaint Against Defendant And TRO Proceedings

38.     On November 15, 2018, the Marlborough Police Department filed a criminal complaint against Defendant based on Plaintiff's allegations that Defendant published pornographic and anti–Semitic posts about Plaintiff and published other posts suggesting the author "intends to or wishes to harm the individual."  MasMarques Decl. ¶ 43.  Andrade Decl., Ex. 6 (Pl. Decl. [attaching Criminal Complaint] (Pl. Dep. Ex. 4).

**Response**:     Plaintiff disputes this "fact" insofar as it conflates independent conclusions drawn by law enforcement officers of the Marlborough Police Department with Plaintiff's careful and specific allegations, which are directly referenced in neither the Declaration of Defendant MasMarques nor in the Criminal Complaint labeled as Exhibit 6 to the Declaration of Ashley Andrade.  Plaintiff's Deposition Transcript at 157:9-10 ("First this was written by, I guess, Zachary Attaway, not by me.").  The Criminal Complaint labeled as Exhibit 6 to the Declaration of Ashley Andrade, authored by Marlborough Police Department Sergeant Zachary Attaway, specifically notes that Plaintiff provided the Marlborough Police Department with digital copies of "posts believed to be associated with Diego," which is not the same as an allegation above that "Defendant published pornographic and anti-Semitic posts."  ECF No. 258-6.  In fact, Plaintiff believes that Defendant MasMarques was communicating with Matthew Mahgrefteh, a third party who made the pornographic and anti-Semitic posts after viewing other libelous and harassing posts on ComplaintsBoard made by Defendant MasMarques.  Plaintiff's Deposition Transcript at 163:9-164:2.  Plaintiff informed the Marlborough Police Department of this belief promptly and of other relevant facts as Plaintiff learned them.  ECF No. 274-3.

39.     On or about November 28, 2018, Plaintiff received a faxed copy of this complaint and filed unredacted documents in Santa Clara Court that same day—which was docketed on

December 6, 2018—disclosing Defendant's home address, Social Security number, and driver's license number; Defendant then filed an incident report with the San Francisco Police Department. *Id.*; MasMarques Decl. ¶ 46; Andrade Decl., Ex. 1 (Pl. Dep. 173:23–174:7) (Plaintiff admitted he did not redact the document before filing and acknowledged it may have been publicly filed with that information unredacted); Doc. No. 54-5, at 19-21 (S.F. police incident report dated December 7, 2018).

    **Response**:      Plaintiff disputes this "fact" insofar as it falsely suggests that Plaintiff intentionally went about "disclosing" Defendant MasMarques's personal information. In fact, at the time, Plaintiff had no intent of disclosing Defendant MasMarques's personal information, the Superior Court of California for the County of Santa Clara did not yet allow electronic access to court documents over the internet, and Plaintiff intended only for Judge Carol Overton to be aware of the exact contents of documents that had been filed in another court in a different state, which required them to be unredacted. ECF No. 274-1 ¶ 13. Plaintiff disputes this "fact" insofar as it omits that the relevant portions of these documents were redacted as appropriate once the issue was brought to Plaintiff's attention and the attention of the court in Santa Clara County. Case No. 18CH008067 Docket.

    40.      On December 12, 2018, the Santa Clara Court temporarily vacated Plaintiff's TRO for improper service after a hearing Defendant attended in person with private security retained to accompany him to all in-person hearings in this matter. MasMarques Decl. ¶¶ 47–48.

    **Response**:      Plaintiff disputes this "fact" insofar as it refers to Private Investigator John X. Haro, who was retained to research Plaintiff and fabricate false statements about him that could later be filed in court under oath, as "private security."

41.     On April 8, 2019, Defendant filed an application for criminal charges against Plaintiff in Marlborough District Court seeking relief under M.G.L. c. 209A, and the matter was dismissed without prejudice; on July 29, 2019, Defendant sought relief in Middlesex Superior Court under M.G.L. c. 258E; that action was likewise dismissed without prejudice.  *See* MasMarques Decl. ¶ 51 (Defendant attests that the initial filing under 209A was inadvertent); Doc. No. 54-5, at 27–34 (court dismissal notices); Doc. No. 68-1, at 84–95 (Defendant's complaint for protection under 258E showing order in place until Aug. 27. 2019).

**Response**:     Plaintiff disputes this "fact" insofar as it is unclear that either matter was dismissed without prejudice.  ECF No. 54-5 at 26, 32-34.

42.     By May 17, 2019, Plaintiff knew that multiple posts he supplied to the Marlborough Police—which were part of the criminal complaint initiated against Defendant months earlier—were authored by someone else.  Andrade Decl., Ex. 7 (Pl.'s Decl., May 13, 2019, Santa Clara Sup. Ct.) (Pl. Dep. Ex. 6); id. Ex. 1 (Pl. Dep. 154:7–155:25, 158:23–159:25, 163:13–25, 165:3-25) (Plaintiff admitted he did not believe Defendant published the specific posts referenced in the Nov. 15, 2018 complaint and claimed he emailed his liaison about this).

**Response**:     Plaintiff disputes this "fact" insofar as it is only true that Plaintiff admitted that he did not believe that Defendant MasMarques published *one* of "the specific posts referenced in the Nov. 15, 2018 complaint."  What Plaintiff actually stated in the August 19, 2025 deposition was, "[A]t some point [the Middlesex County District Attorney's Office] realized that they had ignored an e-mail I sent them in which I told them that I did not think that your client had actually posted ***a specific post*** where his name had been used.  I think it had to do with 'Dora the Explorer' or something, where someone said something like 'Diego's going to

shank Aaron,' something to that effect" (emphasis added). Plaintiff's Deposition Transcript at 155:7-14.

43. On August 30, 2019, the Santa Clara Court terminated Defendant's TRO and reduced Plaintiff's 5-year TRO to 2 years, expiring on August 30, 2021, while also denying Plaintiff's motion for attorneys' fees and sanctions. MasMarques Decl. ¶ 51. In September 2019, both parties moved for reconsideration of these decisions. See Andrade Decl., Ex. 8 (Pl.'s Mot. for Attorneys' Fees) (Pl. Dep. Ex. 19); MasMarques Decl. ¶ 53.

**Response**:    Plaintiff disputes this "fact" insofar as it is untrue that Judge Carol Overton of the Superior Court of California for the County of Santa Clara "reduced Plaintiff's 5-year TRO to 2 years" or denied "Plaintiff's motion for attorneys' *[sic]* fees and sanctions" on "August 30, 2019" simultaneous with the issuance of Plaintiff's 2-year "permanent" restraining order against Defendant MasMarques. Judge Overton first vacated the initial 5-year "permanent" restraining order against Defendant MasMarques upon learning about initial confusion over the authorship of specific pornographic posts (*see* ECF No. 1-6 at 68:24-25; Case No. 18CH008067 Order Dated December 12, 2018), then conducted several more hearings over a period of approximately a year, and then granted Plaintiff a 2-year "permanent" restraining order on August 30, 2019. Case No. 18CH008067 Docket. On January 28, 2020, Judge Overton denied Plaintiff's separate motion for attorney's fees as sanctions under California law on the incorrect basis that Plaintiff was purportedly not represented by counsel for the majority of the proceedings, which is mathematically false, and also irrelevant under the law. *Id*.; ECF No. 274-1 ¶ 14.

44. In January 2020, Santa Clara Court denied both motions. *See* Andrade Decl., Ex. 9 (Jan. 28, 2020 Santa Clara Court Order) (Pl. Dep. Ex. 18) ("cannot reasonably conclude that

[Defendant's case] was frivolous or baseless," and "not devoid of factual basis/evidentiary support"); *id*. Ex. 1 (Pl. Dep. 210:2–211:9) (Plaintiff calls this Order "the sloppiest court order [he has] ever seen"); MasMarques Decl. ¶ 54.

**Response**: Plaintiff disputes this "fact" insofar as it suggests that the California court's decision was correct. Defendant MasMarques's cross-request for a restraining order against Plaintiff was, in fact, entirely frivolous, completely baseless, and utterly devoid of any factual basis or evidentiary support for the notion that Plaintiff had ever "inflicted or threatened violence" against anyone, or placed Defendant MasMarques "in reasonable fear of violence" pursuant to California Code of Civil Procedure § 527.6(y). ECF No. 274-1 ¶ 15. Plaintiff further disputes this "fact" insofar as it suggests that this Court is bound by the California court's erroneous decision.

45. On or about November 24, 2020, the Marlborough District Court dismissed all charges against Defendant arising from the November 15, 2018 criminal complaint and later expunged the case. *See* Andrade Decl., Exs. 10 (Pl. Dep. Ex. 7 [Marlborough Dist. Ct. Dismissal Notice]) & 11 (Pl. Dep. Ex. 8 [Expungement Order]) (finding no "good faith basis" for the charges and could not be "prove[n] the D[efendant] was behind the posts [at] issue" and "false identification" of Defendant); MasMarques Decl. ¶ 55.

**Response**: Undisputed.

46. On Oct. 1, 2021, Defendant emailed Plaintiff seeking to resolve matters and asked if he would remove Defendant's legal information from Plainsite; Plaintiff replied that Defendant must first satisfy twelve conditions, including, *inter alia*, admitting to making "false reports" about Plaintiff, his family members, TCC, and TCF to various federal and state government

agencies, and admitting to "commit[ing] perjury" to the Santa Clara Court—allegations that are both false. Andrade Decl. Ex. 12 (Pl. Dep. Ex. 24); MasMarques Decl. ¶ 59.

**Response**:   Plaintiff disputes this "fact" insofar as it is untrue that Plaintiff's allegations about Defendant MasMarques "making 'false reports'" and Defendant MasMarques "'committ[ing] perjury'" are "both false."  In fact, both of those allegations made by Plaintiff are true, as Defendant MasMarques did make false reports and did commit perjury.  ECF No. 274-1 ¶ 7.

47.   In December 2022–one month before Plaintiff filed this action– Defendant filed a complaint with the U.S. Cybersecurity and Infrastructure Security Agency ("CISA") regarding Plaintiff and Plainsite. MasMarques Decl. ¶¶ 60-61; id. Ex. A (CISA Complaint).

**Response**:   Undisputed.

48.   Plaintiff was never arrested, charged, or prosecuted as a result of Defendant's cross–TRO or TRO applications. MasMarques Decl., ¶ 52.

**Response**:   Plaintiff disputes this "fact" insofar as Plaintiff's involuntary detention by United States Customs and Border Patrol and/or affiliated law enforcement personnel upon arriving back in the United States of America from an international flight, on the basis of the existence of Defendant MasMarques's fraudulent Cross-Temporary Restraining Order, could be properly construed as an "arrest."  The first Oxford Languages definition of the word "arrest" is to "seize (someone) by legal authority and take into custody."  ECF No. 274-5 at 2.

49.   Defendant maintains that all complaints to governmental agencies or courts were made in good faith, and not for any improper purpose.  MasMarques Decl., ¶ 70. Andrade Decl., Ex. 1 (Pl. Dep. 139:9–20) (Plaintiff testified only that he believed Defendant was "a sick person"

and that the complaints were not "rational" when asked about motive); Doc. No. 237–9, at 5–13 (Plaintiff's filing of Defendant's alleged takedown requests show no extortion).

**Response**: Plaintiff disputes this "fact" insofar as Defendant MasMarques's March 19, 2018 PlainSite "Contact Us" form submission in the name of "Liborio Bellomo," a notorious Genovese crime boss and murderer, requesting "Suppression" of a lawsuit on PlainSite, and further requesting that Plaintiff "Shut this site down!", while simultaneously demanding, "You dirty Mother Fucker! Where are you in the Bat Area. You Asshole! You cock sucker!", does not "show" "extortion." ECF No. 237-9 at 13. "Extortion" is defined by Oxford Languages as "the practice of obtaining something, especially money, through force or threats." ECF No. 274-5 at 3. Here, Defendant MasMarques, himself a convicted murderer, made a credible death threat from his mobile device using the IP address 107.77.223.149 (mobile-107-77-223-149.mobile.att.net) conditioned on PlainSite shutting down PlainSite. *Id.* Plaintiff further disputes this "fact" insofar as "Defendant maintains" means that Defendant MasMarques has been instructed by counsel to "maintain" beliefs that are clearly contradicted by evidence, and that if his maintenance of such beliefs are so informed, counsel should be disbarred.

### H. Think Computer Foundation Was Investigated And Ultimately Dissolved.

50. Allegations of tax fraud involving Plaintiff and TCF were circulating publicly as early as 2015–before Plaintiff had any knowledge of Defendant. Andrade Decl., Ex. 1 (Pl. Dep. 235:10–20); *id.* Ex. 13 (Ripoff Report post) (Pl. Dep. Ex. 23); MasMarques Decl., ¶ 17.

**Response**: Plaintiff disputes this "fact" insofar as omits the possibility that the only example provided, Exhibit 13 to the Declaration of Ashley Andrade, was possibly generated by Defendant MasMarques himself, even if Plaintiff did not yet have knowledge of him. ECF No. 274-1 ¶ 16.

51.    In 2019, the Ohio Attorney General began investigating TCF, and the IRS also audited the nonprofit.  Doc. No. 226, Ex. C, at 6–7.

**Response**:    Plaintiff disputes this "fact" insofar as omits the material, related fact that Defendant MasMarques filed separate, repeated complaints with both the Ohio Attorney General and the Internal Revenue Service immediately preceding the respective investigation of and audit of Think Computer Foundation.  ECF No. 54-5.

52.    In 2021, the Ohio AG concluded its investigation into the relationship between TCC and TCF, finding issues with TCF's balance sheet and, according to Plaintiff, the Ohio AG then requested that Plaintiff dissolve TCF entirely and/or reincorporate in another state. Andrade Decl., Ex. 1 (Pl. Dep. 77:11–79:9) (Plaintiff conceded that had he not dissolved TCF, the Ohio AG "probably would have filed some sort of civil enforcement action.").

**Response**:    Plaintiff disputes this "fact" insofar as it suggests that there were any actual problems with Think Computer Foundation's balance sheet.  In fact, the staff assigned to the investigation by the Office of the Ohio Attorney General who still remained on the investigation—as one investigator asked to be re-assigned to a different unit in the middle, possibly because she found the investigation to be illegitimate and politically motivated given Think Computer Foundation's support for transparency around the affairs of Donald Trump— were incompetent and did not know how to distinguish negative from positive numbers, leading them to the false conclusion that Plaintiff may have borrowed a large sum of money from Think Computer Foundation that, in fact, he never did.  Unable to prove that such non-existent borrowing took place, and without any related violation of law to charge, it is true that the remaining staff offered Plaintiff the option to dissolve the non-profit in Ohio but re-incorporate elsewhere, further suggesting a political motivation behind the investigation, while having used

complaints such as Defendant MasMarques's as a pretext to open it in the first place.  Plaintiff

disputes this "fact" insofar as it ignores the Internal Revenue Service's roughly simultaneous far

more objective, careful, and detailed audit of Think Computer Foundation's finances, which

revealed no issues at all.  ECF No. 274-1 ¶ 17; ECF No. 274-4.

53. The IRS website confirms the revocation of TCF's 501(c)(3) status.  Andrade

Decl., Ex. 14 (screenshot of IRS website showing revocation status).

**Response**: Plaintiff disputes this "fact" insofar as this may no longer be true given

that the Internal Revenue Service erroneously ignored several years worth of faxed

correspondence in reply to serial CP259A notices entitled, "You didn't file a required annual tax

return."  Each time Plaintiff received such an erroneous notice on behalf of Think Computer

Foundation, he responded immediately by completing and signing the section on page 4 of the

notice that stated "My organization ceased operations," and faxed it back to the Internal Revenue

Service at the fax number provided.  As of August 26, 2025, the Internal Revenue Service

confirmed that it had ignored these submissions in error, by which point Think Computer

Foundation had already been erroneously added to the Exempt Organization Auto-Revocation

List.  Plaintiff has since followed up with the Internal Revenue Service and has been informed

that Think Computer Foundation should be removed from the Exempt Organization Auto-

Revocation List since it was only placed there due to the agency's serial errors.  ECF No. 274-1 ¶

18; ECF No. 274-4 at 10-11.

## II. ADDITIONAL FACTS MATERIAL TO DEFENDANT'S MOTION RELATED TO PLAINTIFF'S DEFAMATION CLAIM

54. Plaintiff identifies four categories of allegedly defamatory statements: (1)

complaints to government agencies, (2) statements made in judicial proceedings, (3) posts on

Twitter (now X), and (4) posts on other websites, including Blacklist Report and Complaints

Board. See FAC ¶¶ 70, 99 (excerpts of alleged defamatory statements from 2018–2022);

Andrade Decl., Ex. 1 (Pl. Dep. 226:10–12).

**Response**:        Undisputed.

55.        Defendant has used a VPN since at least 2019.  MasMarques Decl. ¶ 20; Andrade

Decl., Ex. 1 (Pl. Dep. 224:2–10) (Plaintiff testified that "even if [he] did have an IP address,

[Defendant] has been using VPNs for years... [unlikely] the IP address would reveal too much

after about 2019...").

**Response**:        Plaintiff disputes this "fact" insofar as ¶ 20 of the Declaration of

Defendant MasMarques makes no such assertion.  In fact, ¶ 20 states, "In fall of 2017, my MSN

email was hacked twice, after which I switched to ProtonMail. Given the timing of my

complaints and Plaintiff's technical expertise, and the fact media outlets have described him as a

'hacker', I believe he was responsible for these breaches."

56.        Defendant maintains that he does not have or use a Twitter/X account or any

social media account.  MasMarques Decl. ¶ 72; Doc. No. 237-2 (Def. Ans. Interrog. No. 6).

**Response**:        Plaintiff disputes this "fact" insofar as "Defendant maintains" means that

Defendant MasMarques has been instructed by counsel to "maintain" beliefs that are clearly

contradicted by evidence, and that if his maintenance of such beliefs are so informed, counsel

should be disbarred.  Massachusetts Rule of Professional Conduct 3.3.  Plaintiff disputes this

"fact" insofar as "Defendant maintains" is based on ¶ 72 of the Declaration of Defendant

MasMarques, which refers only to the present tense at this minute, but not the past: "I do not

have or use any social media accounts."  *See also* ECF No. 1-6 at 335:13-15.

57.     Plaintiff has no direct evidence linking Defendant to any online posts at issue. Andrade Decl., Ex. 1 (Pl. Dep. 150:3–20) (Plaintiff admitted that "information that would be conclusive evidence is in the control of some other third party").

**Response**:     Plaintiff disputes this "fact" insofar as the first sentence is simply false. There exists an abundance of "direct evidence linking Defendant to any online posts at issue." ECF No. 54-3; ECF No. 266 Exhibits F, G, H, I.  Plaintiff further disputes this "fact" insofar as opposing counsel has taken a quotation from Plaintiff's August 19, 2025 deposition out of context, which does not actually refer to "any online posts," but only select "social media" posts lacking direct evidence but for which Plaintiff has "a very strong belief."  As the full quotation states, "And since your client has falsely stated that he doesn't use social media, that also makes it more difficult for me to properly attribute many of the posts where I have a very strong belief, but the information that would be conclusive evidence is in the control of some other third party."  Plaintiff's Deposition Transcript at 150:15-20.  *See also* Plaintiff's Response to ¶ 58.

58.     Plaintiff identified "indicators" he claimed linked Defendant to the challenged posts but admitted they are "not conclusive." Id. (Pl. Dep. 151:9–152:2). These included: (i) the use of white-out and color ink-jet printing (id. at 84:1–85:23); (ii) use of Plaintiff's full name, which Plaintiff himself has used in PACER filings (id. at 82:10–83:9); (iii) usernames with "numbers followed by one letter" (id. at 221:1–8); (iv) a similar character count and two identical numbers between Defendant's email and a partially hidden Twitter/X email (id. at 221:20–222:3); and (v) capitalized nouns common in German, noting Defendant's purported dual German–American citizenship (id. at 222:8–13).

**Response**:        Plaintiff disputes this "fact" insofar as it contains an incomplete, cherry-picked list of the weakest indicia proving and/or suggesting Defendant MasMarques's authorship of the posts at issue.  A more complete list is as follows:

a) **Matching IP Address:** As described in the First Amended Complaint ¶ 74-75, Defendant MasMarques's home IP address 24.60.59.25, confirmed by a subpoena response from his internet service provider, Comcast, was the first non-machine IP address to access certain URLs embedded in a ComplaintsBoard post by user "Expose 501(c)(3) Fraud" on the same day when that post appeared, June 5, 2018.

b) **Open Admission 1:** Defendant MasMarques has admitted to his identity repeatedly on social media.  Twitter account @R62607249 stated, "Apparently Aaron Greenspan has sued your company, as he is a Vexatious Litigant.  We have a RO against this individual…"  ECF No. 266-8 at 15.  Twitter account @Giza299792458N wrote on or around May 11, 2021, "I too am a victim for many years of Aaron Greenspan." The next day, the same account posted scanned images of Massachusetts criminal case documents from Case No. 1821CR000187 against Defendant MasMarques that were not publicly available pursuant to Massachusetts law.  Plaintiff's Document GREENSPAN00341; repeat similar post visible at ECF No. 237-9 at 21.

c) **Open Admission 2:** Defendant MasMarques further admitted to filing FOIA requests about Plaintiff (*see* ECF No. 242 at 2, n. 2), as did the owner of the @WitchesToday Twitter account on July 6, 2022, just 17 days (within the statutory 20-business day window pursuant to 5 U.S.C. § 552(a)(6)) after Defendant MasMarques submitted a FOIA request to the United States Securities and Exchange Commission about Plaintiff on June 19, 2022.  *See* Plaintiff's Document GREENSPAN00752, ECF No. 237-9 at 27.  *See also* ECF No. 54-5 at 35-36.  To the best of Plaintiff's knowledge, no other individual in the world made any other FOIA requests about Plaintiff during this time period.

d) **<u>Private Admission</u>:** In Defendant's Document Def-P2_000241, Defendant MasMarques admits, "I filed a complaint with Twitter" regarding specific posts made by Plaintiff. ECF No. 237-10 at 19. At the time (and still), Twitter's post reporting functionality was only available to other Twitter users with registered accounts. Therefore, Defendant MasMarques had a Twitter account.

e) **<u>Existing ComplaintsBoard Account 1</u>:** The gripe site ComplaintsBoard would not permit a new user to register using the e-mail address 8587@protonmail.com as of April 27, 2019 because "Email already exists. Please change email," indicating the presence of an account in its user database already registered to that e-mail address, which Defendant MasMarques disclosed as his own. *See* Plaintiff's Document GREENSPAN00002, ECF No. 237-9 at 2.

f) **<u>Existing ComplaintsBoard Account 2</u>:** Defendant MasMarques used the e-mail address 958957z@gmail.com to file PlainSite Request 4V9C9RJ on June 17, 2017 and PlainSite Request 4W2ZE7U on June 25, 2017. *See* Plaintiff's Document GREENSPAN00080. The gripe site ComplaintsBoard would not permit a new user to register using the e-mail address 958957z@gmail.com as of April 27, 2019 because "Email already exists. Please change email," indicating the presence of an account in its user database already registered to that e-mail address, which Defendant MasMarques disclosed as his own. *See* Plaintiff's Document GREENSPAN00004, ECF No. 237-9 at 3.

g) **<u>Existing Scribd Account</u>:** Defendant MasMarques disclosed 56546@protonmail.com as one of his many e-mail addresses in his "Supplemental Answer" to Interrogatory No. 10 on July 25, 2025. The social media website Scribd would not permit a new user to register using the e-mail address 56546@protonmail.com as of August 13, 2025 because "An account with this email already exists." *See* Plaintiff's Document GREENSPAN00006, ECF No. 237-9 at 4.

h) **Existing Twitter Account:** At least as early as August 12, 2025, Twitter did not allow a user to request a link to reset an account password unless the provided account e-mail address was already in its database. When provided with the e-mail address 56546@protonmail.com, Twitter did not provide the error message "Sorry, we could not find your account," but instead proceeded to a screen asking the user to "Confirm your username," thus indicating that Defendant MasMarques's e-mail address 56546@protonmail.com is linked to an active Twitter account. *See* ECF No. 237-1 at 1-4.

i) **Twitter E-Mail Match:** Defendant MasMarques disclosed 8586@protonmail.com and 8587@protonmail.com as two of his many e-mail addresses in response to Interrogatory No. 10 on May 23, 2025. As shown in ECF No. 182-4, these e-mail addresses perfectly match the unredacted portion of the redacted e-mail address registered to Twitter/X ("Twitter") account @Giza299792458N ("85\*\*@p\*\*\*\*\*\*\*\*.\*\*\*") as of May 11, 2021.[1] Which of the two he actually used is irrelevant for the purposes of identification. *See* Plaintiff's Document GREENSPAN00339, ECF No. 237-9 at 20.

j) **Prior Testimony:** In court in the Superior Court of California for Santa Clara County under penalty of perjury, Defendant MasMarques responded to the question "Do you control or have you ever controlled the Twitter account @R62607249?" by stating, "I don't recall. I don't remember." ECF No. 1-6 at 335:15. This is an unusual response if Defendant MasMarques had never used social media as he now "maintains," as his memory of which accounts might or might not be his should not have factored into his evaluation at all.

k) **Unique Conspiracy Theories:** In court in the Superior Court of California for Santa Clara County, Defendant MasMarques has espoused a number of unique and false conspiracy theories, primarily:

---

[1] Each asterisk disclosed by Twitter corresponds to one character in the e-mail address.

1) that Plaintiff purportedly is a "malicious hacker";

2) that Plaintiff purportedly owns the court website leagle.com;

3) that Plaintiff purportedly admitted to extorting individuals via a specific post on Twitter that was actually just referring to the threshold number of "$2,500" in the PlainSite Privacy Policy;

4) that Plaintiff purportedly engaged in "out of control shouting" in the courtroom in Santa Clara County; and

5) that Plaintiff is purportedly a vexatious litigant.

Twitter accounts @R62607249, @badbadwebsites, @Giza299792458N, @WitchesToday, @x13757, Reddit accounts 198412345, ManufacturerFast7523, AdPlenty5728 and Ok-Exercise-3238, among others on various sites, each posted one or more variations on these same conspiracy theories, believed by no other person. ECF No. 266 Exhibits G, H, I.

l) **Unique Wording 1:** The phrase "cyberstalking, doxxing and harassing monetized website plainsite.org" appears verbatim in Defendant MasMarques's Document Def-P2_000162—a private e-mail—and on the About page of the now-banned public Google Group "Expose abusive data mining websites" started by "lola crum" in or around 2022. Before the content was removed due to the ban, the same account falsely accused Plaintiff by name of being "married" to "another deranged homosexual" and obsessed over PlainSite and leagle.com. *See* Plaintiff's Document GREENSPAN05600, ECF No. 237-9 at 33. "lola crum" also posted about Plaintiff on the obsolete Spanish-language USENET group es.rec.aviation. Defendant MasMarques admits that he speaks Spanish (*see* Defendant's Document Def-P2_000358, ECF No. 237-10 at 28) and privately referenced both Google Groups and USENET in his Document Def-P2_000163, ECF No. 237-10 at 14.

m) **Unique Wording 2:** Defendant MasMarques used the unusual phrasing "Decency Act 230" to refer to 47 U.S.C. § 230, Section 230 of the Communications Act of 1934

enacted as part of the Communications Decency Act of 1996 (which most people refer to as the "Communications Decency Act," "CDA 230," or "Section 230"). This exact phrase appeared in a private January 3, 2022 e-mail Defendant MasMarques sent to his former probation officer produced as Document Def-P2_000350, and a false December 10, 2022 private e-mail report Defendant MasMarques made to the United States Cybersecurity & Infrastructure Security Agency (CISA) produced as Document Def-P2_000255. ECF No. 237-10 at 27, 22. It also appears in ECF Nos. 28, 34, 140 and 143, which Defendant MasMarques filed *pro se*, posts from the @Giza299792458N Twitter account, as well as numerous posts on ComplaintsBoard under the usernames "Online cyber stalkers working together" from a post dated February 20, 2021 and "[Redacted] Cyber Stalker" from a post dated March 12, 2022.

n) **Unique Account Notation:** In court in the Superior Court of California for Santa Clara County, when filing documents *pro se*, Defendant MasMarques used unique and improper notation to refer to Twitter accounts, such that he put the same username both before and after the "@" symbol. For example, on December 4, 2018, Defendant MasMarques filed a letter with that court in which he accused Plaintiff of having "uploaded my home address on one of his Twitter accounts 'plainsite@plainiste' *[sic]* and also uploaded my personal information on another one of his Twitter accounts 'aarongreenspan@aarongreenspan'". ECF No. 274-2 at 3. On April 13, 2022, Defendant MasMarques registered the Twitter account @Diegomasmarque5 and gave it the name "Diegomasmarques@diegomasmarques". *See* Plaintiff's Document GREENSPAN00702, ECF No. 266-8 at 60. On April 25, 2022, he used this account to tell Tesla fans that Plaintiff "has lots of fake Twitter accounts as well". *Id*.

o) **Numeric Obsession:** Defendant MasMarques has a notable preference for usernames that contain at least four numbers, often with one letter at the beginning or the end (@R62607249, @Giza299792458N, @x13757, 8586, 8587, 56544, 56546, 85086,

87754a, 87764a, 986842a, etc.).  This pattern is useful for someone whose goal is to quickly create as many usernames as possible.  ECF Nos. 266-8; 237 at 17; 237-2 at 9.

p) **Middle Name Obsession:** In court in the Superior Court of California for Santa Clara County, in private e-mails, and in false government complaints, Defendant MasMarques constantly invoked Plaintiff's middle name, Jacob, which Plaintiff rarely uses except for completing government forms.  *See*, *e.g.*, Defendant's Documents Def-P2_000255, Def-P2_000314.  ECF No. 237-10 at 22-23.  The Twitter accounts @badbadwebsites, @Giza299792458N, @WitchesToday and @x13757 all posted constantly about "Aaron Jacob Greenspan".  *See*, *e.g.*, Plaintiff's Document GREENSPAN01029, ECF No. 237-9 at 31.

q) **Color Ink-Jet Printer:** In court in the Superior Court of California for Santa Clara County, Defendant MasMarques presented numerous exhibits printed on a color ink-jet printer with faded ink.  Twitter accounts @LiarsStalkers, @Giza299792458N and @x13757, among many others on various sites, posted scanned images of some of these same exhibits that were printed on a color ink-jet printer with faded ink.  *See*, *e.g.*, Plaintiff's Documents GREENSPAN00209, GREENSPAN01096.  ECF No. 237-9 at 15, 32.  *See also* ECF No. 274-2 at 35-36.

r) **White-Out Usage:** In court in the Superior Court of California for Santa Clara County, on May 2, 2019, Defendant MasMarques presented Plaintiff with a physical copy of a Massachusetts court document that differed from the version he had presented to that court because it contained White-Out (the office supply that resembles white paint) applied to the page to cover up information he was concerned might identify him.  ECF No. 1-6 at 314.  Prior to that hearing, Plaintiff had noticed scanned images on gripe sites of articles about his security work printed on a color ink-jet printer that also appeared to have White-Out applied to them.  ECF No. 274-2 at 33-36.

s) **Matching Timeline:** On October 17, 2020, Twitter account @badbadwebsites posted "Perhaps people need to get together & make an appointment w the FBI so they take action once and for all against all these abuses." *See* Plaintiff's Document GREENSPAN00280, ECF No. 237-9 at 18. According to Defendant MasMarques's Document Def-P2_000214, this would be days after he went "to the FBI in Chelsea, MA and the Secret Service at the Tip O'Neill building around September of 2020. I went there in person and both agencies listened…" ECF No. 237-10 at 16. On May 17, 2021, Twitter account @Giza299792458N followed up with a post to @FBI and @SecretService asking those agencies to "please look further in to what Aaron Greenspan is doing online and using plainsite.org @plainsite @aarongreenspan & his other legal document data mining and gripe sites to cyber stalk, harass, lots of doxing, hacking & harvesting IP addresses." *See* Plaintiff's Document GREENSPAN00350, ECF No. 237-9 at 21.

t) **Improper Capitalization:** Defendant MasMarques is a dual German-American citizen who knows German. In the German language, nouns are capitalized. Improper capital letters frequently appear in the text for words in Defendant MasMarques's *pro se* court documents, as well as in the social media posts that Plaintiff has identified as likely having been written by him. *See*, *e.g.*, ECF No. 58 at 1 (improperly capitalizing "Cease & Desist"). *See also* Plaintiff's Documents GREENSPAN00416, ECF No. 237-9 at 22 (improperly capitalizing "Tesla Stock"), GREENSPAN00941, ECF No. 237-9 at 29 (improperly capitalizing "Borders" and "Illegal Immigrants").

Plaintiff further disputes this "fact" insofar as it uses the word "similar" to mean "exact" in connection with the character count in the string of characters representing two of Defendant MasMarques's e-mail addresses and the redacted version of that string provided by Twitter.

59. Plaintiff asserts that two online posts–both dated in 2018–constitute what he calls "conclusive evidence" linking Defendant: (i) a Mac OS file path with a "tech" username that

Plaintiff concedes does not establish publication, and (ii) a server log showing IP access to a URL under Plaintiff's control, which that day appeared in an online post. *Id.* (Pl. Dep., 144:19–146:9, 150:6–151:23); FAC ¶¶ 74–75).

**Response**: Plaintiff disputes this "fact" insofar as it omits the fact that "IP access to a URL under Plaintiff's control" was also the *first* "IP access" that day, indicating that it could not have resulted from some a view of the post containing the URL in question that day.

60. No post on ComplaintsBoard.com or the "Blacklist Report" website identifies Defendant as the author. *See* Andrade Decl., Ex. 1 (Pl. Dep. 83:22–84:4, 142:12–16).

**Response**: Plaintiff disputes this "fact" insofar as it depends on the exact meaning of the word "identifies." Plaintiff disputes the definition used here by Defendant MasMarques. Oxford Languages defines "identify" as "establish or indicate who or what (someone or something) is." ECF No. 274-5 at 4.

61. Defendant published only one Complaints Board post—dated April 3, 2018—sharing public Ohio business records for TCF. MasMarques Decl. ¶ 26; Doc. No. 237-3 (Def.'s Am. Ans. Interrog. No. 5); Doc. 54-5, at 14.

**Response**: Plaintiff disputes this "fact" insofar as it is obviously false. ECF No. 237-9 at 2-3. Plaintiff further disputes this "fact" because Plaintiff has personally witnessed Defendant MasMarques make false statements under oath about a variety of topics, including but not limited to legal matters. ECF No. 274-1 ¶ 7.

62. The Blacklist Report website was taken offline in late 2018. Andrade Decl., Ex. 1 (Pl. Dep. 146:10–146:14); FAC ¶ 50.

**Response**: Undisputed.

63. Plaintiff attributes most of his alleged damages stem from the publication of allegedly defamatory content by Omar Qazi ("Qazi"), a Twitter/X user and Elon Musk ("Musk") "follower." Andrade Decl., Ex. 1 (Pl. Dep. 66:11–67:1) (testifying that in 2019 Qazi reposted and "amplified" modified court filings from the Santa Clara Court TRO action to his "hundreds of thousands of followers"); *id*. (Pl. Dep. 227:6–8) (stating the conflict with Qazi "started to get heated" around December 2018); *id*. (Pl. Dep. 69:17–20) (identifying Qazi's wide "reposting" of "gripe site hyperlinks" allegedly "written or inspired" by Defendant as the "real problem"); MasMarques Decl. ¶ 64; *id*. Ex. 17, 17 (Compl., *Greenspan v. Musk*, No. CGC-24-615352 (Cal. Super. Ct. San Francisco Cnty. 2024)) (claiming certain defendants in that action "echoed Mr. MasMarques's allegations: that Plaintiff's non-profit origination was a 'fraudulent charity' and that Plaintiff...'harassed, intimidated, or targeted for extortion' individuals").

**<u>Response</u>**: Plaintiff disputes this "fact" insofar as it mischaracterizes Plaintiff's statements, and in particular fabricates the notion that Plaintiff has said that "most of his alleged damages stem from" anything at all. Plaintiff's Deposition Transcript (phrase not found). Plaintiff further disputes this "fact" insofar as it misstates the timeline of events and misstates Plaintiff's remarks about that timeline. *Id*. Plaintiff further disputes this "fact" insofar as it uses words out of context to conjure up a falsehood.

64. Plaintiff admits he lacks knowledge of any agreement between Defendant and others to post defamatory or pornographic material, testifying only that he "believe[s]" Defendant and certain individuals agreed that he "needed to be...held to account" and referencing a post about a Proton Mail address allegedly used to coordinate "retaliatory action" toward him. Andrade Decl., Ex. 1 (Pl. Dep. 158:1–11); MasMarques Decl. ¶ 71 (Defendant denies having

direct contact with Qazi, Musk, or Mahgrefteh, or encouraging anyone to publish defamatory statements).

**Response**: Plaintiff disputes this "fact" insofar as it groups disparate sets of third parties together as "others," and Plaintiff's admission at the August 19, 2025 deposition only regarded his lack of knowledge about the existence of any agreement between Defendant MasMarques and one person, Matthew Mahgrefteh, the "specific individual" Plaintiff referenced at page 157, line 24 of the transcript. Plaintiff's Deposition Transcript 157:24. The First Amended Complaint alleges a civil conspiracy between Defendant MasMarques and several named defendants that collectively run ComplaintsBoard (Mediolex, Ltd., Astrad, Ltd. and Sergei Igorevich Kudriavtsev). ECF No. 54 at 41-43. Here, Defendant MasMarques cites Plaintiff's discussion about a ComplaintsBoard *user*, Matthew Mahgrefteh, who is a non-party to this lawsuit, and Defendant MasMarques's non-denial, regarding his purported lack of having direct contact with individuals *who are not ComplaintsBoard representatives or employees*.

### A.    Plaintiff's Publicity of Disputes with Defendant

65.    Before his permanent suspension from X (formerly Twitter), Plaintiff operated the accounts @aarongreenspan and @plainsite, each with thousands of followers. See Andrade Decl., Ex. 1 (Pl. Dep. 28:21–29:20, 86:17–87:2, 214:15–215:6).

**Response**: Plaintiff disputes this "fact" insofar as it suggests that the @AaronGreenspan and @PlainSite Twitter accounts had roughly the same number of followers, when in fact there was a difference of an order of magnitude. The @AaronGreenspan Twitter account had approximately 2,000 followers, whereas the @PlainSite Twitter account had approximately 25,000 followers. ECF No. 274-1 ¶ 19.

66.     Plaintiff repeatedly publicized his disputes with Defendant on his and Plainsite's social media.  MasMarques Decl. ¶¶ 33, 38, 41; Andrade Decl., Ex. 1 (Pl. Dep. 69:4–9, 70:2–22 214:15–215:6, 218:12–219:23, 222:14–223:9, 226:5–227:23); see id. (Pl. Dep. 71:1–20) (Plaintiff admitted his Twitter posts could have gotten the attention of Qazi); *id*. (Pl. Dep., 229:24–230:22) (Plaintiff testified that he invokes Defendant's name in Twitter disputes to "defend" himself against an "army" of "pseudonymous posters"); *id*. (Pl. Dep. 234:16–235:3) (Plaintiff admitted he made the docket for the Santa Clara Court TRO case publicly accessible "whether through Twitter or through Plainsite" "as a method of self-defense" so "people [could] access the truth."); *id*. Exs. 5, 15–16 (Pl. Dep. Exs. 20–22) (Plaintiff's Twitter posts calling Defendant, inter alia, a "murderer," "rapist," and "stalker," and sharing links to legal actions involving the parties); *id*. Ex. 21 (Oct. 31, 2025 *New York Times* piece on Plaintiff refers to a "Massachusetts man convicted of a violent crime in Spain...").

**Response**:      Plaintiff disputes this "fact" insofar as it falsely suggests that Plaintiff admitted that any of Plaintiff's Twitter posts prior to mid-January 2019 "could have gotten the attention of Qazi" at the time they were posted because Omar Qazi was unaware of Plaintiff before mid-January 2019.  ECF No. 274-1 ¶ 20.  Plaintiff disputes this "fact" insofar as it deliberately misstates Plaintiff's words in the August 19, 2025 deposition, in which Plaintiff's rejected opposing counsel's hypothesis as "Pretty unlikely."  Plaintiff's Deposition Transcript 71:3.  Plaintiff disputes this "fact" insofar as it falsely suggests that Plaintiff has any control over what a newspaper published based upon public records, or that a newspaper referring to Defendant MasMarques without even using his name is equivalent to "Plaintiff repeatedly publiciz[ing] his disputes with Defendant on his and Plainsite's social media."  ECF No. 274-1 ¶ 21.

67.     Plaintiff also invoked Defendant's name in unrelated litigation involving high-profile parties, in which Defendant is not a party.  MasMarques Decl. ¶ 64; Andrade Decl., Ex. 17 (Compl., Greenspan v. Musk, No. CGC-24-615352 (Cal. Super. Ct. San Francisco Cnty. 2024)) (describing Defendant as "convicted of murder and attempted murder in Spain," "made death threats," and "posted thousands of libelous fabrications" about Plaintiff and his family).

**Response**:     Plaintiff disputes this "fact" insofar as it falsely suggests that the litigation cited is "unrelated."

68.     Plaintiff has himself engaged in online debate with critics.  Andrade Decl., Ex. 1 (Pl. Dep. 234:1–235:9); *id*. Ex. 13 (Plaintiff's rebuttal to Ripoff Report post).

**Response**:     Plaintiff disputes this "fact" insofar as it seems to be entirely based on a Ripoff Report post that, *supra* at ¶ 50, was used to argue that Plaintiff did not yet know who Defendant MasMarques was, so it cannot be both that Plaintiff did not yet know who he was at the time, but also that Plaintiff used the same post to publicize any dispute with him.

### B.     Plaintiff's Purported Damages

#### 1.     Rule 26 Initial Disclosures

69.     On April 18, 2025, Plaintiff served Rule 26 disclosures claiming "direct security realized losses" of at least $812,500 in compensatory damages and $11,000 in costs.  Doc. No. 226, Ex. A (marked as Pl. Dep. Ex. 9).

**Response**:     Plaintiff disputes this "fact" insofar as it was already explained to the Court and to opposing counsel that this statement was made in error and corrected via amendment as soon as the error was discovered.

70.     On July 23, 2025–after the Scheduling Order deadline–Plaintiff amended his Rule 26 disclosures to claim at least $1,000,000 in compensatory damages and $11,500 in costs,

replacing the original categories with "Loss of Time," "Loss of Asset Value," "Loss of Reputation," "Loss of Good Standing with State and Federal Government Agencies," and "Emotional Distress and Suffering." Doc. No. 226, Ex. B, at 1 (marked as Pl. Dep. Ex. 10), cf. Id., Ex. C, at 11 (estimating compensatory damages at $6,782,250.00 on Aug. 3, 2025).

**Response**: Plaintiff disputes this "fact" insofar as there was never any "Scheduling Order deadline" regarding the amendment of initial disclosures, nor did the Court ever express any concern about Plaintiff's amendment of his initial disclosures despite opposing counsel raising the issue previously. ECF No. 170. *See also* August 6, 2025 Status Conference Recording starting at 8:08.

71. Plaintiff offers no expert testimony or tax or wage documents to support his claimed damages, asserting "no functional relationship...between Plaintiff's tax information and economic damages." Andrade Decl., Ex. 18 (Pl. Resp. to Notice of Dep., Req. for Docs. No. 3).

**Response**: Plaintiff disputes this "fact" insofar as he has provided Defendant MasMarques with a tax document indicating that he earned nearly $1 million in salary in 2018. Plaintiff's Documents GREENSPAN06065-06070 (2018 Internal Revenue Service Form W-2, not filed on the public docket).

72. Plaintiff admits his claimed "costs" include costs and fees that the Santa Clara Court rejected twice. *Id*. Ex. 1 (Pl. Dep. 210:11–211:9, 212:7–213:6); Doc. No. 68-1, at 66–80 (incorporating Plaintiff's Santa Clara Court motion for attorney's fees and costs on Oct. 7, 2019); Andrade Decl., Ex. 8, at 12–13 (Plaintiff's request of court costs and fees in Santa Clara Court on Oct. 7, 2019), *cf*. Doc. No. 226, Ex. C, at 11–13 (court costs and fees as of Aug. 3, 2025).

**Response**: Undisputed.

73.    Plaintiff's claimed "costs" include expenses incurred and/or paid by TCC or TCF. Doc. No. 68-1, at 101, 113, 116, 127–129, 130–134 (invoices directed to TCC or TCF); Doc. No. 226, Ex. C, at 11–13 (asserting TCF paid invoice).

**Response**:    Plaintiff disputes this "fact" insofar as the Court and opposing counsel are already aware that Plaintiff personally paid the "invoices directed to T[hink ]C[omputer ]C[orporation]" in question, as per ECF No. 196 at 2, and that those invoices were so directed due to poor recordkeeping on the part of Plaintiff's attorney, who at various times represented both Plaintiff and Think Computer Corporation in separate matters.  ECF No. 196.

### 2.    "Loss of Reputation"

74.    Plaintiff identified no lost contract, investor, or client admitted venture-capital interest was minimal even before 2018 due to his public rift with Mark Zuckerberg. Doc. No. 226, Ex. C, at 9 (citing Crunchbase article and stating that "to the extent" the posts prevented Plaintiff from securing funding, "the damage to Plaintiff on reputational grounds could easily have exceeded $5,000,000"); Doc. No. 68-1, at 54 (Crunchbase report showing average Series A funding of $18.7 million in Q1 2023); Andrade Decl., Ex. 1 (Pl. Dep. 41:14–21, 190:8–18) (admitted no venture capital firm said posts deterred investment and Musk never showed interest); id. (Pl. Dep. 35:11–14, 36:7–37:1) (Plaintiff published Musk's Aug. 8, 2019 email stating "your true colors" containing image of a Complaints Board post Plaintiff attributes to Defendant); Doc. No. 68-1, at 26 (Aug. 8, 2019 e-mail from Musk to Plaintiff).

**Response**:    Plaintiff disputes this "fact" insofar as Plaintiff identified at his August 19, 2025 deposition two prominent investors he had met in person and had generally positive

interactions with, yet who refused to follow up for unexplained reasons: Michael Moritz and John Doerr. Plaintiff's Deposition Transcript at 185:21-192:10.

### 3. "Loss of Assets"

75. Plaintiff's claimed damages for "loss of assets" rely on TCC's 2012 common-equity valuation of about $509,400. Doc. No. 226, Ex. C, at 8; Andrade Decl., Ex. 1 (Pl. Dep. 198:4–11); *id*. Ex. 19 (Pl. Dep., Ex. 16) (2012 TCC common equity valuation).

**Response**: Undisputed.

### 4. "Loss of good standing with state and federal government agencies"

76. Plaintiff claimed damages for "loss of good standing with state and federal government agencies," are currently unknown. Doc. No. 226, at 9–10 (Plaintiff asserts "unknown adverse financial impact" such as possible "future audits" and "additional interest or fees" for credit-score changes that "could be based on government data").

**Response**: Undisputed.

### 5. "Loss of Time"

77. Plaintiff seeks reimbursement for "time…wasted dealing with [Defendant]" at an hourly rate of $750, though he admits he neither bills hourly nor charges that rate, basing the figure on a New York Times article about high AI salaries and by comparing his *pro se* work to top law-firm billing rates, and proposes an alternative "reasonable" rate of $450. Doc. No. 226, Ex. C, at 2–3; Andrade Decl., Ex. 1 (Pl. Dep. 204:1–19, 205:2–8, 205:22–206:11, 207:13–19); id. Ex. 20 (Pl. Dep. Ex. 15) (New York Times article on high AI salaries); Doc. No. 68-1, at 64 (TCC invoice showing consulting invoice hourly rate of $300 on Dec. 11, 2009 ).

**Response**: Plaintiff disputes this "fact" insofar as Plaintiff stated that a "reasonable" hourly rate would be $750/hour, whereas $450/hour would be an absolute floor based on actual

compensation data.  In Plaintiff's words from the August 19, 2025 deposition, "And were I to be compensated for the kind of work I've been doing at a reasonable rate, I think 750 would be quite reasonable."  Plaintiff's Deposition Transcript at 206:9-11.

78.    Plaintiff claims he "wasted" 1,375 hours due to Defendant's alleged actions, including responding to takedown requests to Plainsite and to inquiries from the Ohio Attorney General and the IRS about TCF, diverting time from "programming (adding features to Plainsite or Think's other products), fundraising, and networking." See Doc. No. 226, Ex. C, at 4, 6–8, 7 (Aug. 3, 2025 computation of 50, 175, 250, 150, 125, 125, 250, 100, and 150 hours for 2017–2025), cf. Doc. No. 68-1, at 5 (Aug. 29, 2023 estimates of 33.75, 175, 175, 150, 125, 125, and 50 hours for 2017–2023).

**Response**:    Undisputed.

79.    Plaintiff made nearly $1 million in 2018 through his businesses; he voluntarily reduced his salary after 2018 for tax purposes. Andrade Decl., Ex. 1 (Pl. Dep. 207:2–207:12).

**Response**:    Plaintiff disputes this "fact" insofar as it conflates aggregate corporate earnings with salary paid.  Plaintiff was paid a salary of nearly $1 million in 2018.  Plaintiff's Documents GREENSPAN06065-06070 (2018 Internal Revenue Service Form W-2, not filed on the public docket).

### 6.    "Emotional Distress and Suffering"

80.    Plaintiff claims, "stress of worrying about Defendant," stating he "sacrifie[d] sleep to research thousands of gripe site posts," endured "uncomfortable and stressful conversations with family members," and believes his [redacted] was "potentially worsened," but admits he "handles stress fairly well" and has not sought therapy and does not provide any medical expenses.  Doc. No. 226, Ex. C, at 10; Andrade Decl., Ex. 1 (Pl. Dep. 133:1–134:20;

134:23-135:6; 137:7-19) (Plaintiff testified that he felt "anxious" and "deeply concerned," with a racing heart and elevated blood pressure, and feared Defendant was telling the FBI lies and that agents might arrive "with guns drawn and kill [him]").

       **Response**:    Undisputed.


Dated: December 16, 2025      Respectfully submitted,


Aaron Greenspan, *pro se*
440 N. Barranca Avenue #6720
Covina, CA 91723
Phone: +1 415 670 9350 x101
E-Mail: aaron.greenspan@plainsite.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2025 I filed the foregoing with the Clerk of Court

using the CM/ECF system to the following defendants and non-parties in this action:

Diego MasMarques, Jr.
Mediolex, Ltd.
Astrad, Ltd.
Sergei Igorevich Kudriavtsev
X Corp.

Aaron Greenspan