UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AARON GREENSPAN,

Plaintiff,

v.

DIEGO MASMARQUES JR., et. al.

Defendants.

Case No.: 1:23-cv-10134-DJC

### DECLARATION OF DIEGO MASMARQUES, JR.

I, Diego MasMarques, Jr., hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a resident of the Commonwealth of Massachusetts and am competent to testify. I make this declaration based on my personal knowledge, and if called as a witness, I could and would testify competently to the facts stated herein.

**I. Spanish Conviction & Foreign Prisoner Treaty Transfer (1999-2008)**

2. In 2000, I was convicted in Spain of an offense that the U.S. Parole Commission later determined to be the equivalent of voluntary manslaughter under U.S. law. I have always maintained that I am innocent and was wrongfully convicted.

3. In 1995, Spain had only recently reintroduced jury trials and lacked many of the procedural safeguards that would have protected me in a U.S. court. I also believe that being seen as an "outsider" put me at a significant disadvantage from the outset. Following my arrest, false and damaging stories about me were being shared with the press, which I was told came from the prosecutor's office.

1

4.    Although I was offered a 5-year plea deal with a promise of early release, I refused to take it because I am innocent.

5.    During my trial, the jury initially reached a unanimous verdict (9-0) on a lesser charge equivalent to involuntary manslaughter in the United States (which carries 1-4 years in Spain).  Instead of accepting that verdict, the judge altered the verdict form, removing the lesser charge and adding aggravating circumstances, and sent the 9 jurors back to deliberate again, this time with the 2 alternate jurors included.  When they returned, the result was 8-1 (although the verdict sheet was never corrected to show this).  Despite the jury's initial unanimous verdict, I was ultimately convicted of a more serious offense that carried a longer sentence—"homicidio ejecutado por dolo eventual".  This offense is not expressly defined in the Spanish Penal Code and created later confusion when my case was processed under the foreign prisoner treaty transfer.

6.    I pursued every appeal I could in Spain, but none were successful.

7.    In order to return home, I agreed to a foreign prisoner treaty transfer to complete the remainder of my sentence in the U.S.

8.    At the time of my transfer in 2006, the initial treaty transfer paperwork prepared by the Department of Justice inaccurately described the foreign conviction as "murder."  I raised concerns as I was not convicted of murder under Spanish law; I was told not to worry and that it is standard practice to list the highest comparable U.S. offense in treaty transfer paperwork and then the U.S. Parole Commission will be responsible for reviewing and reclassifying under federal sentencing guidelines.

9.    In 2008, the U.S. Parole Commission reviewed my Spanish conviction and reclassified it as voluntary manslaughter, essentially cutting my sentence by half.  I disagreed,

however, with certain reports the Commission relied on in its determination and with its description of the foreign conviction as "Willful Homicide" which was still inaccurate.

10.     After my release from custody in 2008, I focused on rebuilding my life, eventually marrying the woman who had long supported me, with whom I already had a son, and dedicating myself to being the best husband and father I can be for my family.

## II.  Beginning of Harassment (2015–2017)

11.     In January 2013, I moved to seal or expunge the court dockets relating to my foreign prisoner treaty transfer, concerned they could be misunderstood or used to harm me. Although I understood I would receive notice before any action, in September 2015, or thereabouts,  this Court denied my *ex parte* motion in a 7-page decision without prior notice. Plaintiff Aaron Greenspan ("Plaintiff") has since used this decision and my transfer records to repeatedly and relentlessly refer to me as a "murderer" (when I'm not).

12.     By October 2015, I discovered that my treaty transfer records and information relating to my Spanish conviction were being published online by the website Leagle (*leagle.com*).  At that time, I was preparing the paperwork to seek expungement of my criminal records in Spain, for which I became eligible under Spanish law in 2016.

13.     In February 2017, I filed a complaint about *leagle.com* with the Arkansas Attorney General.  Investigator Elizabeth Lopez told me the AG's Office had received many similar complaints but only had an email on file for the site's operators.  At this point, I got worried and wanted to withdraw my complaint; she informed me it had already been transmitted.

## III.  Escalation of Harassment (2018-present)

14.     Within weeks of my complaint to the Arkansas AG, my court records—particularly those concerning the treaty transfer and the Spanish conviction—were  appearing

not believe he has ever acted outside that policy. *See id.* (Pl. Dep. 86:14–87:8, 88:3–90:6); Doc. No. 54 (FAC ¶¶ 2, 9).

14.    Plaintiff anticipated some level of criticism for creating Plainsite. Andrade Decl., Ex. 1 (Pl. Dep. 111:22–112:6); *id.* (Pl. Dep., 112:16:113:6) (Plaintiff understands "to an extent" why some people would be angry at having their court records publicly accessible).

15.    Plainsite has received approximately 25,000 takedown requests and estimates that 50–75% were denied. *See id.* (Pl. Dep. 103:21–24, 105:18–107:3). He conceded that people get upset and even admits that a "very small number of people…are more persistent and worrisome" and have responded to the denial with threats "to sue or physically" harm him, with some even filing lawsuits against Plaintiff personally or TCC. *See id.* (Pl. Dep. 107:4–109:12).

16.    Plaintiff is aware of at least 20 consumer complaints to government entities arising from denials of takedown requests and testified that "about half" of those complaints "echo whatever is written on Complaints Board." *See id*, (Pl. Dep. 106:11–107:11).

17.    Plainsite allows paid users to "tag" docket pages with labels intended to "accurately reflect the opinion" of the user, and Plaintiff admitted that he personally added tags such as "Failed Lawsuits Against Plainsite" and "First Amendment" to three legal actions involving both himself and Defendant. *Id.* (Pl. Dep. 118:1–119:4, 121:16–122:14, 123:4–124:24); *id.* Exs. 2–4 (Pl. Dep. Exs. 2–4).

### D. Defendant's Spanish Conviction & Treaty Transfer

18.    Spain reintroduced jury trials in 1995. *See* MasMarques Decl. ¶ 3.

19.    In 2000, Defendant was convicted in Spain of an offense that the U.S. Parole Commission ("USPC") later determined to be the equivalent of voluntary manslaughter under U.S. law; Defendant has always maintained his innocence. *Id.* ¶ 2.

3

20.    Defendant rejected a five-year plea offer; at trial, the jury initially returned a 9–0 verdict on a lesser offense comparable to involuntary manslaughter under U.S. law, which the judge rejected, after which the jury delivered a second, non-unanimous verdict of "*homicidio ejecutado por dolo eventual*" —a greater offense carrying a longer sentence and not defined in the Spanish Penal Code. *Id.* ¶ 4-5.

21.    After multiple unsuccessful appeal attempts, Defendant agreed to complete the remainder of his sentence in the United States under a foreign-prisoner treaty transfer. *Id.* ¶¶ 6-7.

22.    At the time of his transfer in 2006, the initial treaty transfer paperwork prepared by the Department of Justice inaccurately described the foreign conviction as "murder"; Defendant raised concerns as he was not convicted of murder under Spanish law and was informed that it is standard practice to list the highest comparable U.S. offense in treaty transfer paperwork and then the USPC will be responsible for reviewing and reclassifying under federal sentencing guidelines. *Id.* ¶ 8.

23.    In 2008, the USPC reclassified the conviction as voluntary manslaughter under U.S. law, essentially cutting Defendant's sentence in half, though Defendant disputed parts of USPC's determination and its description of the Spanish conviction as "Willful Homicide". *Id.* ¶ 9.

24.    After his 2008 release Defendant married his longtime partner and focused on family. *Id.* ¶ 10.

25.    In January 2013, Defendant moved to seal or expunge the court dockets relating to his foreign prisoner treaty transfer, concerned they could be misunderstood or used to harm him; the motion was denied in September 2015. *Id.* ¶ 11.

4

by my client?

A.    Well, he seemed to share one with me.  I don't know if he shared it with other people.  But, as far as I can tell, the e-mail thread that resulted in him being sued for libel -- and I don't know if it was 2019 or 2020 -- but the ████████████ -- ████████████ and ████ is ████████ -- case. The -- the case that ████████ filed against Elon Musk came out of this e-mail thread that was effectively an interview that we had had on the record.  And the final e-mail in that thread involved Elon Musk replying to me with a grainy screenshot of a ComplaintsBoard post which I believe was written by your client.

So yes, I mean, what I just said was not that particular allegation that you summarized.  But I think, as you are aware, the fact that someone as prominent as Elon Musk could find one of these posts and then use it as ammunition against me, regardless of its veracity, is concerning to me.

Q.    Who else were parties -- who else was on the e-mail exchange between you and Elon Musk?

A.    I think the -- the exchange began with my e-mailing Elon and the Tesla board, and then the board kind of dropped off the thread and it was just

by my client?

A.    Well, he seemed to share one with me.  I don't know if he shared it with other people.  But, as far as I can tell, the e-mail thread that resulted in him being sued for libel -- and I don't know if it was 2019 or 2020 -- but the Randeep Hothi -- R-a-n-d-e-e-p and Hothi is H-o-t-h-i -- case. The -- the case that Randeep Hothi filed against Elon Musk came out of this e-mail thread that was effectively an interview that we had had on the record.  And the final e-mail in that thread involved Elon Musk replying to me with a grainy screenshot of a ComplaintsBoard post which I believe was written by your client.

So yes, I mean, what I just said was not that particular allegation that you summarized.  But I think, as you are aware, the fact that someone as prominent as Elon Musk could find one of these posts and then use it as ammunition against me, regardless of its veracity, is concerning to me.

Q.    Who else were parties -- who else was on the e-mail exchange between you and Elon Musk?

A.    I think the -- the exchange began with my e-mailing Elon and the Tesla board, and then the board kind of dropped off the thread and it was just